IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA**,

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP
Perrin Rynders (P38221)
Mark E. Hills (P47524)
Attorneys for Plaintiff
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
(616) 336-7000 – Facsimile

Claudia Burke
Commercial Litigation Branch
Civil Division
United States Department of Justice
Washington DC 20530
Attn: Classification Unit
1100 L Street NW, 8th Floor
(202) 307-0277
(202) 514-8624 – Facsimile

# PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

## TABLE OF CONTENTS

**Page**

**TABLE OF CONTENTS** ........................................................................................... ii

**TABLE OF AUTHORITIES** ....................................................................................... iii

**I. INTRODUCTION**.........................................................................................................1

**II. STATEMENT OF QUESTIONS PRESENTED** .........................................................2

**III. STATEMENT OF THE CASE**......................................................................................2

**IV. ARGUMENT**................................................................................................................11

**A. Standard of Review**..........................................................................................11

**B. Plaintiff Is An Intended Third-Party Beneficiary Of The DSCC' Contracts With Capital City.** ..................................................................12

**1. *D&H Distributing Co. v. United States*, 102 F.3d 542 (Fed. Cir. 1997)** ...........................................................................................14

**2. *Norwest Bank Arizona v. United States*, 37 Fed. Cl. 605 (1997).** ...........15

**C. Defendant Breached its Implied in Fact Contract By its Failure to Remit Payment Directly To Flexfab.**..................................................18

**V. CONCLUSION** ...........................................................................................................21

# TABLE OF AUTHORITIES

Page

**Cases**

Airport Industrial Park, Inc. v. United States
2004 WL 86186 (Fed. Cl. 2004) ........ 11

Coast Fed. Bank, FSB v. United States
323 F3d 1035, 1037 (Fed. Cir. 2003) ........ 11

Cristos v. United States
48 Fed. Cl. 469, 476 (2000) ........ 12

D&H Distributing Co. v. United States
102 F.3d 542 (Fed. Cir. 1997) ........ 13, 14, 15, 16

Folden v. United States
56 Fed. Cl. 43, 52 (2003) ........ 18

Johnson Controls World Serv., Inc. v. United States
44 Fed Cl. 334, 347 (1999)(citing Pacific Maritime Assn'n v. United States, 123 Fed. Cl. 667, 675-77 (1952) ........ 18

Maniere v. United States
31 Fed.Cl 410, 417 (1994). ........ 12

National Surety Corp. v. United States
31 Fed. Cl. 565 (1994) ........ 12

Norwest Bank Arizona v. United States
37 Fed. Cl. 605 (1997) ........ 13, 15, 16

Schuerman v. United States
30 Fed. Cl. 420, 426 (1994) ........ 18

Schuerman v. United States
30 Fed. Cl. 420, 433 (1994) ........ 12

Sullivan v. United States
54 Fed. Cl. 214, 216 (2002) ........ 12

**Rules**

Rules of the United States Court of Federal Claims 56(c) ........ 11

# I. INTRODUCTION

The Defendant in this case is the United States of America. This case arises out of the Defendant's failure to pay Plaintiff Flexfab, Inc. ("Flexfab") for goods that it supplied. The Defense Construction Supply Center ("DSCC") and the Defense Finance and Accounting Service ("DFAS") acted on the behalf of the Defendant United States in this case. The DSCC was the entity responsible for issues arising from the procurement of the contract while the DFAS was the entity responsible for payment issues connected with the contract.

This case began when the DSCC awarded an 8(A) contract for air ducting hose to 8(A) supplier Capital City Pipes ("Capital City"). Capital City could not manufacture the air ducting hose required by the contract and contacted Plaintiff Flexfab, to manufacture the product required by the DSCC. Flexfab stated that it would <u>only</u> manufacture the air ducting hose if it received payment for the hose directly from the DSCC. The DSCC and Capital City agreed to Flexfab's conditions and constructed the prime contract to remit payment directly to Flexfab's controlled escrow account in Michigan. In response to a concern that the original contract was unclear, the DSCC and Capital City executed a modification clarifying the original contract and again reinforcing the obligation of the DSCC to remit payment directly to Flexfab.

Although the original contract and the subsequent modification both clearly required the DFAS to remit payment for the air ducting hose directly to Flexfab's escrow account, the DFAS failed to do so. Instead, the DFAS remitted all payments, collectively totaling $452,031.60, directly to Capital City. The DSCC, subsequent to the DFAS' remitting each payment to Capital City, repeatedly admitted that such payment was improper and reportedly took numerous steps to correct the error. Although the DSCC admits that all parties intended the DFAS's payment to go directly to Flexfab and although the DSCC admits that it incorrectly remitted payment to Capital

City, the DFAS has nonetheless failed to remit any payment to Flexfab. Capital City, subsequent to the receipt of the DFAS's erroneous payments, filed for bankruptcy. Pursuant to RCFC 56, Summary Judgment in favor of Flexfab is warranted as there are no genuine issues of material fact and Flexfab is entitled to judgment as a matter of law.

## II. STATEMENT OF QUESTIONS PRESENTED

Whether Defendant is liable to Flexfab for its failure, in breach of written contract modifications, to remit payment directly to Flexfab for goods provided to Defendant by Flexfab.

Whether Defendant is liable to Flexfab for violation of Flexfab's rights as a third-party beneficiary to Defendant's contract with Capital City.

## III. STATEMENT OF THE CASE

Flexfab is an elastomeric engineering company that specializes in the design and production of hose, ducts, flexible connectors, boots, bellows, and special shapes made from a wide range of materials for severe applications in the automotive, heavy duty truck, aerospace, government, and broad industrial sectors.[1] *See* DeCamp Affidavit ¶ 4, Exh. A, (APP-4). Flexfab has supplied its specialized products to the United States military for many years. *See* DeCamp Affidavit, Exh. A, ¶ 7, (APP-4); Cook Affidavit, Exh. B, ¶ 6, (APP-21); LaJoye Affidavit, Exh. C, ¶ 6, (APP-29). Unfortunately, this is the second time that Flexfab has been forced to sue the Government in the Court of Claims. *See* DeCamp Affidavit, Exh. A, ¶ 13, (APP-5).

The prior dispute is relevant as it sets the context and backdrop of the negotiations of the current dispute. In 1994, Flexfab filed an action against the Government, Case No. 94-974C, based on the Government's failure to remit payment directly to Flexfab's address as required by a modified contract. *See id.* Unlike the case at bar, the modified contract did not require the

[1] Flexfab's principal place of business is located in the City of Hastings, State of Michigan. *See* DaCamp Affidavit, Exh. A, ¶ 5, (APP-4).

Government to remit payment to a Flexfab controlled escrow account and instead merely required the Government to remit payment to Flexfab's business address. *See id.* Contrary to the language of that modified contract, the Government erroneously remitted payment directly to its prime contractor and not to Flexfab. *See id.* On February 8, 1996, the United States Court of Federal Claims denied the Government's summary judgment motion and granted Flexfab's summary judgment motion on liability. *See id.* The Court ordered recovery under a third-party beneficiary theory and based its decision on evidence that "clearly demonstrat[ed] that the contract modifications were intended to benefit plaintiff [Flexfab]." *See id.* (identifying the Court of Claims' Opinion attached at Tab 1 of DeCamp Affidavit, Exh. A, APP-11).

Due to Flexfab's previous problems in receiving payment directly from the Government, Flexfab will now only supply goods to the 8(A) Program if an escrow account is established for its benefit to ensure proper payment. *See* DeCamp Affidavit, Exh. A, ¶ 11, 12, (APP-5); Cook Affidavit, Exh. B, ¶ 18, (APP-23); LaJoye Affidavit, Exh. C, ¶ 18, (APP-31). Although this Court previously stated that a contract directing the Government to remit payment to Flexfab's address is sufficient to grant Flexfab the status of a third-party beneficiary, Flexfab nonetheless will now only supply goods to the DSCC through its 8(A) program upon receipt of confirmation that the DFAS will remit all payments directly to Flexfab through its escrow account located in Grand Rapids, Michigan. *See* DeCamp Affidavit, Exh. A, ¶¶ 10, 11, 12, (APP-5); LaJoye Affidavit, Exh. C, ¶¶ 7, 8, 18, (APP-30-31).

Flexfab has supplied its specialized products to the United States military on many occasions through C&S Industrial Supply ("C&S"). *See id*. C&S is an industrial supply company founded by Henry Cook sixteen years ago. *See* Cook Affidavit, Exh. B, ¶ 2, (APP-20). Until approximately August 1998, C&S was designated as a Small Disadvantaged Business by the

DSCC, and was a participant in the DSCC's 8(A) Program for minority owned suppliers. *See* Cook Affidavit, Exh. B, ¶¶ 2-4, (APP-20-21). Over the past ten years, C&S has been awarded many industrial supply contracts by the DSCC and has repeatedly worked with Flexfab as one of its subcontractors. *See* Cook Affidavit, Exh. B, ¶ 6, (APP-21); LaJoye Affidavit, Exh. C, ¶ 6, (APP-29); DeCamp Affidavit, Exh. A, ¶ 7, (APP-4). As a consequence, C&S has entered into numerous subcontracts with Flexfab whereby Flexfab, as a subcontractor, has supplied goods to the DSCC pursuant to prime contracts between C&S and the DSCC. *See id.*

In 1998, Mike Taylor, the Small Business Specialist at the Small Business Office in Columbus, Ohio contacted Mr. Cook for purposes of locating an 8(A) contractor. *See* Cook Affidavit, Exh. B, ¶ 12, (APP-22). Since C&S had "graduated" from the 8(A) program and was ineligible for the contract, Mr. Cook gave Mr. Taylor the name of Capital City and several other 8(A) contractors as possible prime contractors. *See* Cook Affidavit, Exh. B, ¶ 12, (APP-22). Capital City subsequently approached Flexfab to manufacture the product that Capital City was to provide to the DSCC. *See* DeCamp, Affidavit, Exh. A, ¶ 14, (APP-6), LaJoye Affidavit, Exh. C, ¶ 10, (APP-30). Since Flexfab had never worked with Capital City and had previously decided to not take on any new 8(A) customers, Flexfab refused to enter into a direct contract with Capital City. *See* Cook Affidavit, Exh. B, ¶¶ 13, 15, 16, (APP-22). Flexfab told Capital City that C&S was its minority supplier, and that if Capital City wanted to deal with Flexfab it would have to order goods from Flexfab through C&S. *See id.*

After Flexfab refused to enter into a direct contract with Capital City, Mr. Taylor again contacted Mr. Cook of C&S to determine whether C&S would be willing to work with both Flexfab and Capital City to facilitate the acquisition and shipment of the goods from Flexfab to the United States. *See* Cook Affidavit, Exh. B, ¶¶ 16, 17, (APP-23). Upon information and

belief, Mr. Taylor contacted Capital City and informed Capital City that, in order to receive goods from Flexfab, it must order through C&S. *See* Cook Affidavit, Exh. B, ¶ 17, (APP-23). Mr. Cook told Mr. Taylor that C&S could facilitate the sale, but he knew from his many past dealings and experience with Flexfab that Flexfab would only agree to supply the air ducting hose if an escrow account was established for its benefit to ensure proper payment. *See* Cook Affidavit, Exh. B, ¶ 18, (APP-23); LaJoye Affidavit, Exh. C, ¶ 18, (APP-31).

Mr. Cook had multiple conversations with Mr. Taylor, an agent of the Defendant. *See* Cook Affidavit, Exh. B, ¶ 20, (APP-23). Mr. Cook, as a result of his conversations with Mr. Taylor, contacted Flexfab in Michigan to subcontract with Flexfab to produce the air ducting hose required by the prime contract between Capital City and the DSCC. *See* Cook Affidavit, Exh. B, ¶ 19, (APP-23). As a result of the parties' agreement and in accordance with Flexfab's past practices, an escrow account specifically benefiting Flexfab was established. *See* LaJoye Affidavit, Exh. C, ¶¶ 11-15, (APP-30). The escrow account was set up to ensure that Flexfab would receive proper payment, and subsequently that the DSCC would receive the goods that it desired from Flexfab. *See* LaJoye Affidavit, Exh C, ¶¶ 11-15, (APP-30-31); Cook Affidavit, Exh. B, ¶ 8, (APP-21).

On June 29, 1999, Ms. Anita Luich, the Pre-award Contract Specialist for the Defendant, awarded contract SP0740-99-C-1004 to Capital City. *See* Luich Dep., p. 9, lns 17-22, Exh. D, (APP-41) (referencing deposition Exhibit 3, attached as Exhibit E , (APP-47) to this brief, as the applicable contract). It is clear that at the time the DSCC entered into the June 29, 1999, Contract with Capital City that it knew that Flexfab was the manufacturer of the air ducting hose to be distributed by Capital City. *See* Luich Dep., p. 13, lns 19-25; p. 14 lns 1-6; p. 15, lns 21-25; p. 28, lns 5-10; p. 43 lns 1-13; p. 50, lns 3-6, Exh. D, (APP-40) (stating that the DSCC knew

that Flexfab was the manufacturer for Capital City by the time that Capital City submitted their proposal or quote to the DSCC, a date prior to the June 1999 Contract). In accordance with the parties' agreement, the original June 29, 1999, Contract both identified Flexfab as the manufacturer of the air ducting hose required pursuant to DSCC's prime contract with Capital City and also specifically directed the DFAS's payment to the escrow account controlled by Flexfab. *See* Luich Dep., p. 17, lns 14-25 – p. 19 lns 1-3; p. 24, lns 11-13, p. 28, lns 5-10, Exh. D, (APP-41) (identifying page twelve of the June 29, 1999, Contract, deposition exhibit 3, as properly referencing Flexfab as the manufacturer of the air ducting hose and directing the DFAS's payment to the escrow account located in Grand Rapids, Michigan). Consequently, pursuant to the June 29, 1999, Contract as written and executed by the DSCC, the DFAS was not supposed to make any payments directly to Capital City, its 8(A) supplier. *See id. See also* LaJoye affidavit, Exh. C, ¶ 14, (APP-31). Rather, the DFAS was required to make its payments directly to the escrow account controlled by Flexfab. *See id.* Flexfab, upon payment by the DFAS, was to then authorize payment from its escrow to Capital City. *See* LaJoye Affidavit, Exh. C, ¶ 14, (APP-31).

While the specific language of the June 29, 1999, Contract correctly identifies Flexfab as the manufacturer of the air ducting hose and identifies the remittance address as the escrow account located in Grand Rapids, Michigan, the contract also generally references the address of Capital City Pipes. *See* Spratt Deposition, pp. 78-80, Exh. I, (APP-113). While agents for the Defendant have testified that the remittance address directing payment to the escrow account

located in Grand Rapids,[2] the ambiguity caused Flexfab to insist that a modification to the June 29, 1999, Contract be executed to clarify the DFAS's duty to remit payment to the escrow account located in Grand Rapids, Michigan. *See* Spratt Deposition, pp. 78-80, Exh. I, (APP-113); *See* LaJoye Affidavit, Exh. C, ¶ 16, (APP-31); DeCamp Affidavit, Exh. A ¶ 23, (APP-7); Cook Affidavit, Exh. B, ¶¶ 22, 23, (APP-24) (stating that subsequent to the execution of the June 29, 1999, Contract, Mr. Cook contacted Mr. Taylor and stated that Flexfab would not provide any air ducting hose until the contract was modified to reflect that payments would have to be made by the DFAS to the Flexfab controlled escrow account and that Mr. Taylor reaffirmed the DFAS's intent to pay Flexfab directly and stated that he would inform Capital City that Flexfab was a necessary party to the DSCC's prime Contract with Capital City and the contract would not proceed unless a modification of the original June 29, 1999, Contract was executed to direct payments to the Flexfab controlled escrow account).

On September 27, 1999, a contracting officer for the DSCC executed Modification P00001. *See* Deposition of Melinda Jeffries ("Jeffries Dep."), p. 20, lns 20-25; p. 21, Exh. F, (APP-88) (referencing deposition exhibit 4, attached to this brief as Exhibit G, (APP-93), as the September 27, 1999, modification which directed the DFAS to remit payment to Old Kent Bank Corp. Trust in Grand Rapids, Michigan). The September 27, 1999, modification is further evidence of the DSCC's continuing intent to direct its payments for the prime contract with Capital City to the escrow account located in Grand Rapids, Michigan. *See id.* The September 27, 1999, Modification, like the parties' original June 29, 1999, Contract occurred prior to

[2] The deposition testimony of Ms. Luich, the Pre-award Contract Specialist, clarifies that the September 1999 modification was actually unnecessary in light of the June 29, 1999, Contract which did in fact identify Flexfab as the manufacturer of the air ducting hose and also correctly required and directed the DFAS to remit payment to the Flexfab controlled escrow account. *See* Luich Dep., p. 17, lns 14-25 – p. 19 lns 1-3; p. 24, lns 11-13, p. 28, lns 5-10; p. 43 lns 1-13, Exh. D (APP-41) (stating that page twelve of the June 29, 1999, Contract provides that Flexfab is the manufacturer of the product and that payment is to be made into an escrow account located in Grand Rapids, Michigan.)

Flexfab's manufacture or shipment of any air ducting hose to the DSCC. *See* Cook Affidavit, Exh. B, ¶25, (APP-24); LaJoye Affidavit, Exh. C, ¶ 19, (APP-32).

Without assurance that the payment from the DSCC was to be remitted directly to Flexfab, Flexfab would not have agreed to manufacture the air ducting hose required by both Capital City and Flexfab. *See* LaJoye Affidavit, Exh. C, ¶ 18, (APP-31); DeCamp Affidavit, Exh. A, ¶25, (APP-7). After receiving assurance that DFAS was to remit payment directly to Flexfab's escrow account located in Grand Rapids, Michigan, Flexfab manufactured the air ducting hose and shipped it directly to DSCC. *See* DeCamp Affidavit, ¶ 26, Exh. A; LaJoye Affidavit, Exh. C, ¶ 19, (APP-32). However, contrary to the parties' intent and the plain language of both the June 29, 1999, Contract and the September 27, 1999, modification, the DFAS did not direct any payments into the Flexfab controlled escrow account. *See* Taylor Dep., p 58 lns 22-24; p. 59 lns 1-3, Exh. H, (APP-106); LaJoye Affidavit, Exh. C,¶ 27, (APP-33). Instead, the DFAS, contrary to the parties' agreement and the modified contract, erroneously and incorrectly directed payment for air ducting hose to Capital City, in the amount of $452,031.60. *See id*; *see also* Spratt Dep., p. 59, lns 22-24- p. 60, lns 1-12, Exh. I, (APP-112) (identifying deposition exhibit 5 attached to this brief as Exhibit J, (APP-118), as the October 2, 2000, letter that she, while in her capacity as an agent for the Defendant, sent to Mr. Mark Hills, attorney for Flexfab, to explain that the DFAS had failed to input the proper remittance address into its computer and incorrectly remitted payment to Capital City).

Mr. Cook, upon the DFAS's improper payment to Capital City, contacted the billing office of the DSCC. *See* Cook Affidavit, Exh. B, ¶ 27, (APP-25). Mr. Cook spoke with a

representative of Defendant, identified as Phil Kover,[3] and reminded him of the modification. *See id.* Mr. Cook informed Mr. Kover that the DFAS was incorrectly remitting payments directly to Capital City. *See id*. Mr. Kover informed Mr. Cook that he was aware that the DFAS had incorrectly remitted payment to Capital City and stated that the DSCC would correct the error and properly remit payment to the Flexfab controlled escrow account. *See* Cook Affidavit, Exh. B, ¶ 28, (APP-25). Despite all of this, the DSCC failed to correct the error and continued to remit payments for the air ducting hose directly to Capital City. *See* Cook Affidavit, Exh. B, ¶ 29, (APP-25). Mr. Cook contacted Mr. Kover on several subsequent occasions to inform him that payments were still not being made to the Flexfab controlled escrow account. *See* Cook Affidavit, Exh. B, ¶ 30, (APP-25). Mr. Cook even faxed information to Mr. Kover demonstrating that the DFAS was incorrectly remitting payment in violation of the June 29, 1999, contract and the September 27, 1999, Modification. *See* Cook Affidavit, Exh. B, ¶ 31, (APP-25). The DSCC, in the face of its intent to remit payment directly to Flexfab and its continued representations that it would correct the error, continued to incorrectly remit payment to Capital City.

In fact, after the final payment was incorrectly made directly to Capital City, Mr. Cook traveled to Columbus, Ohio, and met with Mr. Taylor and Mr. Kover to discuss the DFAS's failure to properly remit payment to the Flexfab controlled escrow account. *See* Cook Affidavit, Exh. B, ¶ 32, (APP-25); *see also* Taylor Dep., p. 57 -63 lns 1-12, Exh. H, (APP-106). Again, Mr. Cook was assured by the DSCC that it would remedy the error, and that payments would be properly made to the Flexfab controlled escrow account. *See* Cook Affidavit, Exh. B, ¶ 33, (APP-25); *see also* Taylor Dep., p. 57 -63 lns 1-12, Exh. H, (APP-106) (explaining that

---

[3] While Mr. Cook was unable to remember the name of Mr. Kover, the testimony of Defendant's agents, Mr. Griffin and Mr. Taylor, identify Mr. Kover in attendance in meetings with Mr. Cook, Mr. Taylor and Mr. Griffin convened for the purpose of correcting the DFAS's incorrect payments to Capital City. *See* Taylor Dep., pp. 57 – 60, Exh. H, (APP-106); Griffin Dep., pp. 27-31, Exh. K, (APP-122).

payments were incorrectly made directly to Capital City and that the DSCC would take actions to direct payments made by the DFAS into the Flexfab controlled escrow account).

In all of Mr. Cook's conversations and meetings with representatives of the Defendant, neither Mr. Taylor nor any other Defendant representative ever disputed the DSCC's obligation to remit payment for the air ducting hose to the Flexfab controlled escrow account. *See* Cook Affidavit, Exh. B, ¶ 34, (APP-25). In fact, Mr. Cook was assured that the DFAS's payment error would be corrected. *See* Cook Affidavit, Exh. B, ¶ 34, (APP-25). *See also* LaJoye Affidavit, Exh. C, ¶ 30, (APP-33). Nonetheless, in the face of all its assurances, the DSCC never corrected its error and never remitted any payment to the escrow account controlled by Flexfab. *See* Spratt Dep., p. 59, lns 22-24- p. 60, lns 1-12, Exh. I, (APP-112) (identifying deposition exhibit 5 attached to this brief as Exhibit J, (APP-118), as the October 2, 2000, letter that she, while in her capacity as an agent for the Defendant, sent to Mr. Mark Hills, attorney for Flexfab, to explain that the DSCC had failed to input the proper remittance address into its computer and incorrectly remitted payment to Capital City).

Even today, four years after the DSCC breached its contract by failing to direct payment to the escrow account identified on the original June 29, 1999, Contract, and the September 27, 1999, Modification, the DSCC still admits that it was supposed to direct its payment directly to the escrow account controlled by Flexfab. Similarly, the DSCC also admits that after its improper payment to Capital City, it intended to correct the error. *See* Taylor dep., p. 57 -63 lns 1-12, Exh. H, (APP-106) (explaining that payments were incorrectly made directly to Capital City and that the DSCC would take actions to direct payments made by the DFAS into the Flexfab controlled escrow account). Similarly, agents of the Defendant also remember attending the meeting with Mr. Cook and have testified that, after the meeting, they believed the error had

been remedied and that DFAS was going to remit payment to Flexfab. *See* Taylor Dep., p. 57 -63 lns 1-12, Exh. H, (APP-106); Spratt Dep., p. 84 lns 8-24; p. 85 lns 1-3, Exh. I, (APP-114) (stating that the intent of the modification was to direct payment into the escrow account.) Not even the DSCC disputes that it and Flexfab intended DFAS' payment to be remitted directly to the escrow account located in Grand Rapids, Michigan). *See* Taylor Dep., p. 62 lns 16-24; p. 63 lns 1-12, Exh. H, (APP-107). Nonetheless, and in the face of the DSCC's continued representations and acknowledgment of its duty to pay Flexfab directly, Flexfab has not received any payment for the air ducting hose that it provided to the DSCC and the amount of $452,031.60 remains unpaid. *See* DeCamp Affidavit, Exh. A ¶ 31, (APP-9). This was the very result that Flexfab had sought to avoid. *See id.*

## IV. ARGUMENT

### A. Standard of Review

Summary judgment is proper and the moving party is entitled to a judgment as a matter of law "when there is no genuine issue as to any material fact." *See Coast Fed. Bank, FSB v. United States*, 323 F3d 1035, 1037 (Fed. Cir. 2003).; *see also* Rules of the United States Court of Federal Claims 56(c) (setting out the standard for summary judgment). Material facts are those "that might affect the outcome of the suit under the governing law." *See Airport Industrial Park, Inc. v. United States*, 2004 WL 86186 (Fed. Cl. 2004) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986). A dispute over a material fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *See id.* "Where a movant has supported its motion with affidavits or other evidence which, unopposed, would establish its right to judgment, the non-movant may not rest upon general denials in its pleadings or otherwise, but must proffer countering evidence sufficient to create a genuine factual dispute." *Id.* (citing *Sweats Fashions,*

*Inc. v. Pannill Knitting Co.,* 833 F2d 1560, 1562 (Fed. Cir. 1987). "A nonmoving party's failure of proof concerning the existence of an element essential to its case on which the nonmoving party will bear the burden of proof at trial necessarily renders all other facts immaterial and entitles the moving party to summary judgment as a matter of law." *Id.* (citing *Dairyland Power Coop. v. United States,* 16 F.3d 1197, 1202 (Fed. Cir. 1994).

### B. Plaintiff Is An Intended Third-Party Beneficiary Of The DSCC' Contracts With Capital City.

Flexfab is a third-party beneficiary of the DSCC's direct contract with Capital City and entitled to recover. One's status as a third-party beneficiary relieves the obligation to prove privity of contract:

> To avoid the privity requirement and demonstrate jurisdiction in this Court, a claimant may assert the status of a third-party beneficiary.

*Maniere v. United States*, 31 Fed.Cl 410, 417 (1994). The appropriate standard for determining whether a party qualifies as a third-party beneficiary is "whether the contract reflects the express or implied intention of the parties to benefit the third party." *See Schuerman v. United States*, 30 Fed. Cl. 420, 433 (1994); *see also*, *National Surety Corp. v. United States*, 31 Fed. Cl. 565 (1994). This is referred to as the "intention-to-benefit test." *See id*. Intent to benefit is found through an examination of the parties' entire contractual relationship. *See Cristos v. United States*, 48 Fed. Cl. 469, 476 (2000). The intent of the parties may be determined by the formation, execution, and language of the contract, as well as subsequent actions taken by the parties to implement the terms. *See id*. Although the third party need not be specifically or individually identified in the contract, it must fall within a class clearly intended to be benefited. *See Sullivan v. United States*, 54 Fed. Cl. 214, 216 (2002). Determining whether the third party was an intended beneficiary requires the court to ask if the beneficiary was reasonable in

believing that the promise was intended to confer a right on it. *See id*. Courts, in determining the parties' intent, look to the express language of the parties' agreement or, if the terms of or existence of an agreement is ambiguous, to the circumstances surrounding the agreement. *See National Surety Corp. v. United States*, 31 Fed.Cl 565 (1994).

The June 29, 1999, Contract and the September 27, 1999, Modification specifically identify Flexfab as the party to receive direct payment for the prime contract between the DSCC and Capital City. It is clear from the contract documents, including both the original June 29, 1999, Contract and the September 27, 1999, Modification, and the admissions of Defendant's own agents, that Flexfab is the intended third-party beneficiary of the prime contract between the DSCC and Capital City. The evidence demonstrates that the DSCC established the escrow account for the specific purpose of convincing Flexfab to perform and consequently ensure that the DSCC would receive the air ducting hose that it required. Without the DSCC's promise to remit payment directly to Flexfab at the escrow account located in Grand Rapids, Michigan, Flexfab would not have manufactured the air ducting hose required by the Government. Similarly, without the DSCC's repeated promise to direct payment to the escrow account, Flexfab would not have agreed to expedite the shipment of the air ducting hose to the DSCC. The actions taken by the Defendant's agents to correct the DFAS' erroneous payment to Capital City also demonstrate that Flexfab was an intended third-party beneficiary of the DSCC's prime contract with Capital City. As a third-party beneficiary of the contract between Capital City and the DSCC, Flexfab is entitled to enforce its beneficiary right of payment directly against the DSCC.

The case at bar is remarkably similar to the facts of both *D&H Distributing Co. v. United States*, 102 F.3d 542 (Fed. Cir. 1997) and *Norwest Bank Arizona v. United States*, 37 Fed. Cl.

605 (1997), two cases in which the Courts found that the subcontractor, in a position similar to Flexfab, was an intended third-party beneficiary of the contract between the Government and its contractor.

**1. *D&H Distributing Co. v. United States*, 102 F.3d 542 (Fed. Cir. 1997)**

The Government in this case entered into a contract with Computer Integrated Management Corporation ("CIM") for the delivery of computer hard disks. *See id*. at 544. CIM attempted to contract with D&H to supply the hard disks, but D&H was reluctant to extend a line of credit to CIM. *See id*. In an effort to facilitate D&H's involvement, CIM requested that the government modify their contract to allow CIM and D&H to be joint payees on all payments made under the contract. *See id*. The Government issued the modification and made CIM and D&H joint payees under the contract. *See id*. As a result, D&H supplied the hard disks to the Government and billed CIM for the disks. *See id*. The Government, upon receipt of the disks, erroneously remitted payment to CIM only. *See id.* CIM remitted partial payment to D&H. See *id*. at 544-45. CIM subsequently ceased operation and was unable to satisfy the remainder of its debt owed to D&H. *See id*. at 545.

D&H sued the Government and sought recovery of the unpaid amount of its invoice to contractor CIM. *See id*. In support of its claim, D&H argued that it was a third-party beneficiary as a result of the contractual modification that named it as a joint payee with CIM. *See id.* As a result, D&H asserted that it was entitled to enforce the modified contract against the Government. *See id.* The Court of Federal Claims granted summary judgment in favor of the Government. *See id.* D&H appealed. *See id.* The Court of Appeals reversed the Court of Federal Claims, and held that D&H did qualify as a third-party beneficiary and could recover the amounts due from the Government. *See id*. at 548.

In determining whether D&H was a third-party beneficiary, the Court of Appeals analyzed whether the modified contract, in which D&H was not a party, gave D&H an enforceable right against the Government. *See id*. at 546. The Court of Appeals determined that D&H was a third-party beneficiary of the contract and was therefore entitled to enforce the payment clause of the modified contract against the Government. *See id.* The Court of Appeals, in reaching its determination emphasized that the entire purpose of the modification in this case was to ensure that D&H received payment for the goods provided. *See id.* at 547. The Court consequently stated that the failure to allow D&H to enforce its rights against the Government would render the payment provision of the modified contract a nullity. *See id.* D&H's status as a third-party beneficiary permitted it to enforce the payment provision against the Government as a result of its breach. *See id.*

**2. *Norwest Bank Arizona v. United States,* 37 Fed. Cl. 605 (1997).**

Following *D&H*, the Court of Federal Claims in *Norwest Bank* held that a prime contractor's assignment of payment to a subcontractor's bank, under a contract with the Government, rendered the subcontractor a third-party beneficiary and hence enabled the subcontractor to bring suit against the Government for its failure to remit payment directly to the subcontractor's bank. *See Norwest Bank Arizona*, 37 Fed. Cl. at 606.

Plaintiff Arizona was a subcontractor on a Government project to provide modular buildings to the prime contractor. *See id.* Soon after Arizona began performing under the contract it ceased delivery due to a concern that its contractor was unable to make payments. *See id.* at 606. Arizona subsequently refused to perform until its prime contractor agreed to assign its payments on its direct contract with the Government to Arizona's bank. *See id.* The contractor agreed and notified the Government. *See id.* In response, the Government executed a

modification naming the subcontractor Arizona's bank as the payee under the contract. *See id.* at 607. Contrary to the modified contract, the Government, upon receipt of the modular buildings from subcontractor Arizona, remitted payment to the contractor instead of to subcontractor Arizona's bank. *See id.* The contractor who received the Government's erroneous payment filed for Bankruptcy. *See id.*

Arizona sued the Government to recover the amount erroneously paid to the contractor in contravention of the prior modification identifying Arizona's bank as the payee. *See id.* The Court entered judgment in favor of Arizona subcontractor and its bank on the basis of its status as a third-party beneficiary. The court, in determining that Arizona and its bank both achieved that status of a third party beneficiary, emphasized that the modification of the contract naming Arizona's bank as the payee pursuant to the contract between the Government and the contractor, occurred for the express purpose of Arizona's demand for guaranteed payment. *See id.* The court analogized the situation to the facts of *D&H Distributing Co.*, 102 F.3d 542, in that the subcontractors in both cases were dealing with prime contractors who were financially unstable. *See id.* at 609. As a result, the subcontractors in both *D&H Distributing* and *Norwest Bank Arizona*, each asked their contractors to arrange for "more secure forms of payment" backed by contractual modifications. *See id.*

Like the Court in *D&H Distributing Co.*, the Court in *Norwest Bank Arizona*, in determining that the subcontractor was a third-party beneficiary, indicated that both the prime contractor and the Government possessed an interest in obtaining the materials supplied by the subcontractor. Similarly, the "prime contract could not be accomplished" until the contract was modified in favor of the subcontractor Arizona. *See id.* The Court held that the subcontractor was in fact a third-party beneficiary of the Government's prime contract with the prime contractor

and could consequently enforce the contract against the Government. *See id.* The Court neatly summarized its reasoning and stated: "the [Government] issued a modification designating Arizona's banks as payee under the contract….The Government was obligated to pay the [subcontractor's] Bank under the contract and it did not do so. The contract required the Government to pay one entity and it paid another. The clerk will enter judgment for plaintiffs."

Here, as in the case of both *D&H Distributing Co*., and *Norwest Bank of Arizona*, Flexfab was also apprehensive of working directly with Capital City and as a result, and as a condition of its involvement, insisted that it receive payment directly from the DSCC, and not from Capital City. Similarly, and like the modifications that occurred in both *D&H Distributing Co*., and *Norwest Bank of Arizona*, the September 27, 1999, Modification occurred for the express purpose of clarifying and guaranteeing the DSCC's obligation to remit payment to Old Kent Bank Corp. Trust in Grand Rapids, Michigan. Unlike the facts of both *D&H Distributing Co*., and *Norwest Bank of Arizona*, the original June 29, 1999, Contract also identified Flexfab as the manufacturer of the air ducting hose and directed the DSCC to remit payment to Old Kent Bank Corp. Trust in Grand Rapids, Michigan. There is no doubt from the contractual language that DSCC was required to remit payment to the escrow account located in Grand Rapids, Michigan. Similarly, and like the facts of both *D&H Distributing Co*., and *Norwest Bank of Arizona,* it is clear that Flexfab would not have manufactured the air ducting hose required by the Government if it hadn't received assurances, in the form of the June 29, 1999, Contract and the September 27, 1999, Modification, that it would receive its payment directly from the DSCC. The DSCC was obligated to remit payment directly to Flexfab and it did not do so. Judgment in favor of Plaintiff Flexfab in the amount of $452,031.60 is warranted.

**C. <u>The DSCC Breached its Implied in Fact Contract By its Failure to Remit Payment Directly To Flexfab.</u>**

As Flexfab's argument in the preceding section indicates, Flexfab is entitled to recover based upon its status as a third-party beneficiary. Even if this were not the case, Flexfab would be entitled to recover based upon the implied contract reached with the DSCC. An implied in fact contract occurs when, although there is no express offer and acceptance through the parties' conduct mutual assent to enter into an agreement is shown. *See Folden v. United States,* 56 Fed. Cl. 43, 52 (2003). In order to establish the existence of an implied contract, Flexfab must prove mutuality of intent, lack of ambiguity, an offer and acceptance, and consideration. *See Schuerman v. United States*, 30 Fed. Cl. 420, 426 (1994). In addition, "the facts and circumstances must demonstrate that the parties to the contract have taken it upon themselves corresponding obligations and liabilities and have come to a meeting of the minds." *See id*. (Internal quotations and citations omitted). While the mere fact that a defendant receives a benefit from the plaintiff is insufficient to create a contract, the continual acceptance of a benefit by a party who knows that the party providing benefits expects to get paid, amounts to an implied in fact contract with the party. *See Johnson Controls World Serv., Inc. v. United States*, 44 Fed Cl. 334, 347 (1999)(citing *Pacific Maritime Assn'n v. United States*, 123 Fed. Cl. 667, 675-77 (1952)(finding an implied in fact contract "because the Government continued to request and receive the plaintiff's services."). Each of these elements exists between Flexfab and the DSCC.

Prior to even awarding Capital City with the 8(A) contract to supply air ducting hose, the DSCC knew that Flexfab played a crucial and fundamental role in the DSCC's contract with Capital City. For example, the DSCC, prior to even entering into a contract with Capital City, admits that it knew that Flexfab was the manufacturer of the air ducting hose to be supplied by

Capital City. *See* Luich Dep., p. 13, lns 19-25; p. 14 lns 1-6; p. 15, lns 21-25; p. 28, lns 5-10; p. 43 lns 1-13, Exh. D, (APP-40) (stating that the DSCC knew that Flexfab was the manufacturer for Capital City by the time that Capital City submitted their proposal or quote to the DSCC, a date prior to the June 1999, Contract). In fact, the DSCC's knowledge of Flexfab's involvement in the potential contract predated the execution of the contract by at least three months. *See* Luich Dep., p. 43 lns 1-13; p. 50, lns 3-6, Exh. D, (APP-44) (stating that by at least March 26, 1999, the DSCC knew that Flexfab would be the manufacturer of the air ducting hose distributed by Capital City). The DSCC, after learning that Flexfab would only manufacture the air ducting hose needed by the DSCC if it received payment from the DSCC directly, identified the remittance address as Old Kent Bank Corp. Trust in Grand Rapids, Michigan. *See* Luich Dep., p. 17, lns 14-25 – p. 19 lns 1-3; p. 24, lns 11-13, p. 28, lns 5-10 Exh. D, (APP-41) (identifying page twelve of the June 29, 1999, Contract, deposition exhibit 3, as properly referencing Flexfab as the manufacturer of the air ducting hose and directing the DSCC's payment to the escrow account located in Grand Rapids, Michigan).

Moreover, after a discussion with Mr. Cook regarding whether the June 29, 1999, Contract did in fact clearly identify Flexfab's escrow account in Grand Rapids, Michigan as the remittance address, a discussion that occurred prior to Flexfab's shipment of any air ducting hose, the DSCC executed a "Modification" which again identified Flexfab's escrow account located at Old Kent Bank, Corp. Trust in Grand Rapids, Michigan, as the remittance address. *See* Jeffries Dep., p. 20 lns 20-25; p. 21, Exh. F, (APP-88) (referencing deposition exhibit 4, attached to this brief as Exhibit G, (APP-93), as the September 27, 1999, modification which directed the DSCC to remit payment to Old Kent Bank Corp. Trust in Grand Rapids, Michigan). The contract language alone demonstrates the DSCC was not a passive third party in discussions

involving Flexfab and Capital City. Rather, the DSCC actively sought to obtain Flexfab's involvement as the manufacturer of the air ducting hose that it required. The DSCC's active involvement is evidenced by the plain language of both the June 29, 1999, original Contract and the September 27, 1999, Modification, which both identify Flexfab's escrow account located in Grand Rapids, Michigan, as the remittance address.

Moreover, the DSCC's need for the air ducting hose provided by Flexfab is undisputed. Pursuant to the parties' contract, Flexfab was to ship the parts directly to the government on March 21, 2000. *See* LaJoye Affidavit Exh. C, ¶ 21, (APP-32). However, in approximately January of 2000, Howard Crockett, in his capacity as an agent for the defendant, employed at the time as an inventory manager supporting supplies to the military services, contacted Flexfab directly[4] to request that Flexfab expedite the delivery of the air ducting hose to the DSCC. *See* Crockett Dep, p. 8, lns 5-8, pp. 9-10; p. 13, lns 7-18, p. 15, lns 15-20, Exh. L, (APP-127); *see also* LaJoye Affidavit, ¶ 22, Exh. C, (APP-32). According to Mr. Crockett, the DSCC urgently needed the air ducting hose to supply it to the Tinder Air Force Base in Omaha City. *See* Crokett Dep, p. 9, lns 16-25, p. 10, lns 1-4; p. 17, lns 4-7, Exh. L, (APP-128). Mr. Crockett testified that the air ducting hose provided coolant to the aircraft and that without it the Tinder Air Force Base would have been unable to perform any work on its aircrafts. *See id.* In response to the DSCC's request for expedited delivery, on February 22, 2000, Flexfab began directing shipments of the air ducting hose directly to the DSCC. *See* LaJoye Affidavit, Exh. C ¶ 23, (APP-32).

The above facts and circumstances indicate that Flexfab and the DSCC did in fact reach a "meeting of the minds," acceptable to both parties. The parties' agreement required Flexfab to

[4] Mr. Crockett made the request for expedited delivery by contacting Flexfab directly and also by relaying the communication through Thelma Williams of Capital City. See Crockett Dep, pp. 9-10; p. 13, lns 7-18, Exh. L, (APP-128) (stating that he "did call Flexfab in order to see if they could expedite on getting parts to Capital City"); LaJoye Affidavit, Exh. C,¶ 22, (APP-32).

manufacture the air ducting hose upon the DSCC's agreement to remit payment for the air ducting hose directly to its escrow account located in Grand Rapids, Michigan. As a result of the DSCC's agreement to remit payment directly to Flexfab, Flexfab did manufacture and ship the air ducting hose directly to the DSCC. *See* LaJoye Affidavit, Exh. C ¶¶ 23, 26, (APP-32). Flexfab's shipment and manufacture of the air ducting hose served as consideration for the DSCC's promise to send payment directly to Flexfab. Absent the DSCC's agreement to remit payment directly to the Flexfab controlled escrow account, Flexfab would not have manufactured and shipped the parts required by DSCC to the DSCC.

The Defendant's admissions, the June 29, 1999, Contract, and the September 27, 1999, Modification each evidence the DSCC's assent to Flexfab's requirement of direct payment. The DSCC's implicit or explicit assent to remit payment directly to Flexfab establishes privity of contract between the DSCC and Flexfab and gives rise to an implied contract. The DSCC's failure to remit payment to the Flexfab controlled escrow account and its admitted erroneous payment to Capital City constituted a breach of its agreement with Flexfab, for which it is liable.

## V. CONCLUSION

At its essence, this is a simple case. Flexfab agreed to provide the parts required pursuant to the DSCC's prime contract with Capital City. Flexfab's agreement was contingent on the Defendant's agreement to direct payment directly to Flexfab. DSCC agreed to direct payment directly to Flexfab. As a result of the DSCC's promise, Flexfab shipped parts directly to the DSCC. The DSCC admits that it erroneously remitted payment to Capital City. The DSCC admits that, after erroneously remitting payment to Capital City, it intended to and thought it had corrected its error. As a result of the DSCC's error, Flexfab has lost $452,031.60. Either the DSCC breached its contract with Flexfab, or it breached Flexfab's rights as an intended third

party beneficiary of DSCC's contract with Capital City. For these reasons, Flexfab respectfully requests that the Court grant its Motion for Summary Judgment pursuant to RCFC 56 in that there are no genuine issues of material fact and find Flexfab is entitled to judgment as a matter of law.

At the telephonic scheduling conference held on February 12, 2004, counsel for Plaintiff indicated that he didn't believe that oral argument was necessary. Plaintiff will participate in oral argument to the extent such argument will benefit the Court.

VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP

Date: March __22____, 2004

By: ______/s/ Perrin Rynders____________________
Perrin Rynders (P38221)
Mark E. Hills (P47524)
Business Address & Telephone:
Bridgewater Place/P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

# APPENDIX


| | | |
|---|---|---|
| Exhibit A | Matt DeCamp Affidavit | APP-3 |
| Tab 1 | 1996 Opinion and Order | APP-11 |
| Tab 2 | FlexFab April 11, 2000 Statement of Account | APP-18 |
| Exhibit B | Henry Cook Affidavit | APP-20 |
| Exhibit C | Sue LaJoye Affidavit | APP-28 |
| Tab 1 | Flexfab April 11, 2000 Statement of Account | APP-35 |
| Exhibit D | Anita Luich Deposition (pp 3-6, 9, 13-15, 17-19, 24, 28, 43, 50) | APP-37 |
| Exhibit E | Anita Luich Deposition, Exhibit 3 (June 29, 1999 Contract) | APP-47 |
| Exhibit F | Malinda Jeffries Deposition (pp 13, 20-22, 28, 70) | APP-86 |
| Exhibit G | Malinda Jeffries Deposition, Exhibit 4 (Sept. 27, 1999 Modification) | APP-93 |
| Exhibit H | Michael Taylor Deposition (pp 5-24, 27, 38, 41-42, 45-48, 50-51, 57-63, 82) | APP-95 |
| Exhibit I | Shirley Spratt Deposition (pp 33, 57, 59, 60, 78-81, 84, 85, 96) | APP-110 |
| Exhibit J | Shirley Spratt Deposition, Exhibit 5 (Oct 2, 2002 letter to M. Hills) | APP 118 |
| Exhibit K | Howard Griffin Deposition (pp 15, 26-31, 33) | APP-120 |
| Exhibit L | Howard Crockett Deposition (pp 8-10, 13, 15, 17) | APP-126 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.**, a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA**,

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP
Perrin Rynders (P38221)
Mark E. Hills (P47524)
Attorneys for Plaintiff
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336 6000
(616) 336-7000 – Facsimile

Claudia Burke
Commercial Litigation Branch
Civil Division
United States Department of Justice
Washington DC 20530
Attn: Classification Unit
1100 L Street NW, 8th Floor
(202) 307-0277
(202) 514-8624 – Facsimile

## AFFIDAVIT OF MATT DECAMP

STATE OF MICHIGAN )
)ss.
COUNTY OF BARRY )

I, Matt DeCamp, being first duly sworn, depose and say as follows:

1. The statements made in this Affidavit are based on my personal knowledge and to the best of my knowledge are true. If called upon as a witness, I can testify competently as to the truth of the statements made in this Affidavit.

2. I am the president of the Flexfab, LLC., North America ("Flexfab") in Hastings, Michigan. I have been in this position since approximately 2002. I have been employed by Flexfab since 1993.

3. In my position as president, I have personal knowledge of Flexfab's contracts with the Government and Capital City.

4. Flexfab is an elastomeric engineering company that specializes in the design and production of hose, ducts, flexible connectors, boots, bellows, and special shapes made from a wide range of materials for severe applications in the automotive, heavy duty truck, aerospace, government, and broad industrial sectors.

5. Flexfab's principal place of business is located in the City of Hastings, State of Michigan.

6. Flexfab has developed a working history and business relationship with C&S Industrial Supply ("C&S"), a company owned by Mr. Henry Cook.

7. C&S and Flexfab have a long-standing relationship of dealing with each other on contracts through the 8A Program based upon C&S' status as a Small Disadvantaged Business.

8. Flexfab, over the years has frequently served as one of the contractors to C&S and would frequently manufacture products required by a contract between C&S and the Government.

9. As a result, C&S, in connection with the receipt of an award from the Government, would contract Flexfab to serve as the manufacturer of products required by a contract between C&S and the Government.

10. In each of these contracts with C&S, Flexfab agreed to supply parts to the United States only if payment for its goods were made through a Flexfab controlled escrow account, thereby insuring that there would be no significant delay in Flexfab's receipt of payment for its goods. The particular escrow account used by Flexfab and C&S is located at Old Kent Bank in Grand Rapids, Michigan.

11. Flexfab conducts all of its business with 8(A) Program and Small Disadvantaged Business contracts through this escrow account.

12. Flexfab insists on the use of the escrow account system of payment as a result of past contracts where such a payment plan was not in place and Flexfab experienced extensive delays in receiving payments directly from the contractors.

13. Flexfab was previously successful in a lawsuit against the Government in the Court of Claims on a third party beneficiary theory. In 1994, Flexfab filed an action against the Government, Case No. 94-974C, based on the Government's failure to remit payment directly to Flexfab's address as required by a modified contract. Contrary to the language of the modified contract, the Government erroneously remitted payment directly to its prime contractor and not to Flexfab. On February 8, 1996, the United States Court of Federal Claims denied the Government's summary judgment motion and

granted Flexfab's summary judgment motion on liability. The Court permitted recovery under a third-party beneficiary theory and based its decision on evidence that "clearly demonstrat[ed] that the contract modifications were intended to benefit plaintiff [Flexfab]." The Court of Claims' Opinion is attached hereto at Tab 1.

14. Upon information and belief, in 1998, Flexfab was contracted by an 8A contractor, Capital City Pipes ("Capital City"). Capital City approached Flexfab to manufacturer the product that Capital City was to provide to the Government.

15. Since Flexfab had never worked with Capital City and had previously decided to not take on any new 8A customers, Flexfab refused to enter into a direct contract with Capital City.

16. Flexfab told Capital City that C&S was its minority supplier, that it was not taking on any new 8A customers and that if Capital City wanted to deal with Flexfab it would have to order goods from Flexfab through C&S.

17. Flexfab also told Capital City that it would only agree to manufacture the air ducting hose needed by Capital City and the Government if an escrow account was established for its benefit.

18. Mr. Cook of C&S subsequently contacted Flexfab to serve as the subcontractor to Capital City and produce the air ducting hose required by the prime contract between Capital City and the United States.

19. As a condition to Flexfab's agreement to manufacturer the air ducting hose, Flexfab insisted that it receive payment directly from the Government and not from Capital City.

20. As a result of the parties' agreement, an escrow account specifically benefiting Flexfab was established. The escrow account was set up to ensure that Flexfab would receive proper payment, and subsequently that the Government would receive the goods that it desired from Flexfab.

21. Pursuant to the escrow agreement, the Government was not supposed to make payments directly to Capital City, its 8A supplier. Rather, the Government was required to make its payments directly to the escrow account controlled by Flexfab. Flexfab, upon payment by the Government, was to then authorize payment from the escrow to Capital City.

22. In accordance with Flexfab's conditions, the contract between Capital City and the Government identified the remittance address for payment by the Government to be directed to C/o ABA#C0720052, Old Kent Bank, Corp. Trust, P.O. Box 144, Grand Rapids, MI 49501-0144.

23. Moreover, Capital City and the Government entered into a modification a few months after the contract again clarifying that the remittance address was the escrow account located at Old Kent Bank in Grand Rapids, Michigan.

24. Flexfab, after receiving multiple assurances that the Defendant was required to direct payment to the Flexfab controlled escrow account in Grand Rapids, Michigan, agreed to manufacture the air ducting hose and ship it directly to the Government.

25. Flexfab would not have supplied the air ducting hose required by Capital City and the Government if the parties had not agreed to direct the Defendant's payment directly to the Flexfab controlled escrow account.

26. The document identified as Statement of Account dated March 11, 2000, attached hereto at Tab 2, identifies the invoice number, invoice date and invoice amount for the shipments made by Flexfab to the Government. Pursuant to the parties' contract, Flexfab shipped air ducting hose directly to the Government on approximately February 22, 2000, February 29, 2000, March 7, 2000 and March 14, 2000. Flexfab shipped goods in the amount of $452,031.60 to the Government.

27. Contrary to agreement, the Government did not direct any payments into the Flexfab controlled escrow account.

28. Instead, the Government erroneously and incorrectly directed payment for air ducting hose to Capital City in the amount of $452,031.60.

29. Flexfab, in an attempt to collect the amount due, contacted Capital City but to date has been unsuccessful in recovering the amount due.

30. Upon information and belief, Capital City is currently seeking protection from its creditors through bankruptcy.

31. Flexfab has not received any of the amounts due to it. This was the very result that Flexfab had sought to avoid when it required the Government to agree to make payment directly to the Flexfab controlled escrow account. The amount of $452,031.60 remains unpaid on the invoices the Government agreed but failed to pay directly to the Flexfab controlled escrow.

FURTHER AFFIANT SAYETH NOT.

Dated: 3-19-04

Matthew DeCamp
Matthew DeCamp

Sworn and subscribed to before me, a Notary Public, this 19 day of March 2004

, Notary Public
Barry County, Michigan
My Commission Expires: 10-27-2004

962967

MICHIGAN
EXPIRES 10-27-2004

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT A-1

# United States Court of Federal Claims

February 8, 1996

94-974 C

FLEXFAB, INC.,

Plaintiff,

versus

UNITED STATES OF AMERICA,

Defendant.

---

Perrin Rynders, Grand Rapids, MI, for plaintiff.

Armando O. Bonilla, with whom were Assistant Attorney General Frank W. Hunger, David M. Cohen and Kirk T. Manhardt, Washington, DC, for defendant. Susan McKee and Carol N. Matheke, Defense Logistics Agency, Columbus, OH, of counsel.

## OPINION AND ORDER

TURNER, Judge.

This government contract case stands on cross-motions for summary judgment. For reasons stated below, we conclude that the government's motion for summary judgment filed July 7, 1995 must be denied and that plaintiff's motion for summary judgment on liability issues filed August 22, 1995 should be granted.

I

The following facts, derived from plaintiff's complaint and both plaintiff's and defendant's dispositive motions, are undisputed.

Plaintiff is a manufacturing firm specializing in parts for military vehicles. During the Gulf War, plaintiff was a subcontractor to Gladen Industries Inc. During the period at issue in this case, Gladen had three contracts to supply aircraft and submarine parts to the Defense Construction Supply Center (DCSC) (an agency within the Department of Defense). Plaintiff, in turn, supplied the vehicle parts to Gladen under its subcontract. This suit arises out of business interactions among plaintiff, Gladen and DCSC.

Exhibit 7

letter asking the government to change both 'the payee and remittance address' on ... Gladen's contracts with the Government to indicate that only the remittance address was to be changed."); Weiden Aff. ¶ 8 ("Mrs. Turner confirmed that my suggestion was acceptable to the Government and that this solution would take care of my concerns about payment on these contracts.").

The second step in the process of informally turning Gladen's contract rights over to Flexfab entailed Gladen granting Flexfab authority to endorse the checks it received from DCSC. Flexfab agreed to renew deliveries as soon as it had the authority to cash checks made out to Gladen and disbursed under the contracts with DCSC. According to Tebo:

> Upon receiving the endorsement stamp, I informed Mrs. Turner at the DCSC via facsimile on December 5, 1991, that Flexfab had received the endorsement stamp and was ready to proceed on the contracts as soon as the contract modifications were enacted.

Tebo Aff. ¶ 12. A copy of the facsimile is Pl.'s Mot. Summ. J., Ex. 4 and Def.'s Mot. Summ. J., Ex. 8; A copy of the endorsement letter is Def.'s Mot. Summ. J., Ex. 9.

The final step in the arrangement was for Flexfab to make shipments directly to DCSC. Gladen agreed to this arrangement. *See* Letter from Green of 12/20/91, Pl.'s Mot. Summ. J., Ex. 6 (authorizing Flexfab to ship orders directly to the government). Flexfab proceeded according to the new arrangement. *See* Tebo Aff. ¶ 14 ("Flexfab shipped these orders in December 1991 and January 1992.").

According to plaintiff, the modifications designating Flexfab as "mailee" were simply one step in an arrangement among it, Gladen, and the government -- an arrangement that was negotiated both by and for the benefit of all three parties. Plaintiff specifically alleges that the government was an active participant in the negotiations that led up to the modifications and clearly intended the modifications to directly benefit Flexfab.

Plaintiff argues that it is entitled to judgment as a matter of law on its cross-motion for summary judgment against defendant.

2. **Defendant's Position**

The following facts are taken from the answer, from defendant's motion for summary judgment, from defendant's proposed findings of uncontroverted fact and from defendant's response to plaintiff's cross-motion for summary judgment.

The government claims that it did not intend to benefit plaintiff when it modified its contract with Gladen and further denies any participation in negotiations with Gladen and plaintiff. According to defendant:

> Had the Government intended to make Flexfab a direct beneficiary under the purchase orders in issue, such intent would have been evidenced by a novation agreement and subsequent modifications to the contract making Flexfab the prime contractor.

Def.'s Mot. Summ. J. at 9. The Contract Specialist who performed contract administration for the modifications at issue, Turner, stated in her affidavit:

> My normal practice, if a contractor requests a change of payee and/or remittance address, is to inform the contractor that they must make the request in writing. It would not be my normal practice to tell a contractor who wanted to change a payee that it could not be done because the Government would have to rebid the contract.

Turner Aff. ¶ 2 (6/15/95).

Defendant does not specifically respond to plaintiff's contention that, in this case, the government refused to follow the normal procedure of getting a novation and assignment because it would require rebidding the contract and result in delay which was unacceptable under the circumstances (the Gulf War). Thus, the testimony of defendant's affiant is not directly responsive to plaintiff's evidence. The government does not contradict the statements of fact alleged by plaintiff's affiants Tebo and Weiden explaining that under wartime conditions, the government did not follow "normal procedures."

The government does specifically deny participating in the negotiations that led to the modifications:

> [T]he modifications in issue ... were executed at the request of Gladen to implement a financial arrangement between a general contractor (Gladen) and its

> subcontractor (Flexfab); the government was not a party to the agreement, nor did the government participate in the negotiations between Gladen and Flexfab.

Def.'s Mot. Summ. J. at 9. The government's affiant, Turner, stated that she did "not recall having any discussions with Flexfab about paying Flexfab directly" (Turner Aff. ¶ 3 (6/15/95)), and denies negotiating an agreement with plaintiff:

> As a Contract Specialist, I do not negotiate agreements with subcontractors. I have discussion or negotiations with the prime contractor, which is the party with whom the government has the contract or purchase order. I did not negotiate any agreement with Flexfab in this case.

Turner Aff. ¶ 3 (9/20/95).

However, under plaintiff's third-party beneficiary theory, evidence of an agreement between the government and plaintiff is not necessary. All that plaintiff must show is that the parties to the prime contract intended to benefit plaintiff directly. This status may be established by implication. *Schuerman*, 30 Fed.Cl. at 433.

The government does not deny that it was aware of the arrangement between Gladen and Flexfab. In fact, defendant's own submissions provide conclusive proof that the government was fully informed regarding the arrangement. Included in defendant's proposed findings of uncontroverted fact is a finding that on December 5, 1991 plaintiff informed the government that Gladen had agreed to "permit [plaintiff] to endorse any checks the Government issued to Gladen relating to the purchase orders in issue [and] ... that work under the purchase orders would begin 'as soon as [Flexfab] received the mods changing the remittance address'." Def.'s Proposed Findings Uncontroverted Fact ¶ 8. Further, exhibit 8 to defendant's motion for summary judgment, a facsimile from plaintiff to Contract Specialist Turner together with an accompanying copy of the letter of agreement between Flexfab and Gladen, demonstrates beyond peradventure that DCSC contract officials were aware of the payment arrangement between plaintiff and Gladen and that plaintiff would ship parts when the contracts had been modified to designate plaintiff as the "mailee" for

payment.

Also submitted by defendant as uncontroverted fact is a finding that on December 9, 1991 DCSC issued unilateral contract modifications for each of the three purchase orders in issue changing the remittance address. Def.'s Proposed Findings Uncontroverted Fact ¶ 9. Defendant does not dispute that upon receipt of the modifications, plaintiff promptly made shipments pursuant to the purchase orders or that the shipments were sent directly from plaintiff to DCSC.

In short, defendant admits that it was informed that Gladen agreed to permit plaintiff to endorse checks representing payment by the government and that plaintiff agreed to make shipments to the government only if defendant modified the contracts, designating plaintiff as "mailee" for payment. Defendant further admits that it made the requested modification and subsequently received the shipments.

Under the circumstances outlined above, we conclude that the evidence clearly demonstrates that the contract modifications were intended to benefit plaintiff.

V

The evidence supporting plaintiff's claim consists of the allegations made in its brief, extensive supporting documents in the form of letters, facsimiles and invoices, and detailed affidavit testimony included as an appendix to the brief. We find this evidence convincing for several reasons. The affidavits are detailed in describing the government's active involvement in negotiations with plaintiff and Gladen. The documents cited by plaintiff are consistent with plaintiff's version of the facts and support the statements of plaintiff's affiants. Finally, nowhere does the government specifically contest the details of plaintiff's statements of fact.

In response to plaintiff's claims and the evidence plaintiff has provided, defendant merely reiterates the fact that plaintiff was never made "payee" under the contract, repeats its assertion that mere designation of Flexfab as "mailee" is not sufficient to show intent to benefit, and denies negotiating an agreement with

plaintiff. Because the government does not contradict the factual details of plaintiff's affidavits, we conclude that no genuine issues of material fact remain in this case.

VI

Based on the forgoing, plaintiff's cross-motion for summary judgment on liability issues filed August 22, 1995 is GRANTED and defendant's motion for summary judgment filed July 7, 1995 is DENIED. Judgment for plaintiff shall be withheld pending resolution of damages issues.[2]

The parties are requested to agree upon the precise amount of damages to which plaintiff is entitled and upon the correct date for accrual of interest pursuant to 41 U.S.C. § 611. The parties shall file a joint status report by Monday, March 11, 1996 covering these subjects.

James T. Turner
Judge

[2] Upon entry of judgment, plaintiff shall be awarded costs pursuant to RCFC 54(d) ("costs shall be allowed as a matter of course to the prevailing party").

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

# EXHIBIT A-2

FROM : PHONE NO. : 9127326587 May. 12 2000 12:50PM P4

FLEXFAB® DIVISION

COMMITTED TO EXCELLENCE IN ENGINEERED ELASTOMERIC PRODUCTS SINCE 1961

FHI — FLEXFAB HORIZONS INTERNATIONAL INC.

ISO 9001 & QS 9000 REGISTERED CERT. #95-031

1699 West M-43 Highway • Hastings, Michigan U.S.A. 49058 • TEL: (616) 945-2433 • FAX: (616) 945-4149

Parent Customer:
Customer: C & S INDUSTRIAL SUPPLY

STATEMENT OF ACCOUNT
04/11/00

C & S INDUSTRIAL SUPPLY
PO BOX 5
CUTHBERT GA 31740

CUSTOMER NUMBER
10418

| INVOICE NO. | INV. DATE | PO NUMBER | INVOICE AMOUNT | AMOUNT OPEN |
|---|---|---|---|---|
| 105 218222 | 02/22/00 | 503305 | 55,464.00 | 55,464.00 |
| 105 218901 | 02/29/00 | 503305 | 157,379.10 | 157,379.10 |
| 105 219740 | 03/07/00 | 503305 | 155,992.50 | 155,992.50 |
| 105 220563 | 03/14/00 | 503305 | 83,196.00 | 83,196.00 |
| Totals in USD 452,031.60 nE | | | | 452,031.60 |

Grand Totals in USD
TOTAL BALANCE 452,031.60

AGING ANALYSIS IN DAYS USD
Aging On Document date

| 0 - 30 Days | 31 - 60 Days | 61 - 90 Days | 91 - 120 Days | > 120 Days |
|---|---|---|---|---|
| 83,196.00 | 368,835.60 | 0.00 | 0.00 | 0.00 |

Please remember your credit terms are Net 30 Days
We would appreciate payment on any past due amounts immediately! If you need more information please call Suzy Schmader at 616-945-3533 ext. 223.

F000058

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.**, a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA**,

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FLEXFAB, INC.,
a Michigan corporation,

Plaintiff,

Case No. _______________

v.

HON. _________________

UNITED STATES OF AMERICA,

Defendant.

VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP
Perrin Rynders (P38221)
Attorneys for Plaintiff
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000

**AFFIDAVIT OF HENRY COOK**

STATE OF GEORGIA )
)ss.
COUNTY OF RANDOLPH )

I, Henry Cook, being first duly sworn, depose and say as follows:

1. The statements made in this Affidavit are based on my personal knowledge and to the best of my knowledge are true. If called upon as a witness, I can testify competently as to the truth of the statements made in this Affidavit.

2. I am the owner and president of C&S Industrial Supply ("C&S"), an industrial supply company that I founded fifteen years ago.

3. C&S is designated as a Small Disadvantaged Business by the United States Government.

Exhibit 1

4. Until approximately August 1998, C&S was also a participant in the United States' 8A Program for minority owned suppliers.

5. As both an 8A Program participant and a Small Disadvantaged Business, C&S has been awarded many industrial supply contract by the United States.

6. Over the past ten years, C&S has developed a history of working with Flexfab, Inc. ("Flexfab"), a manufacturing firm, as one of its subcontractors. C&S, subsequent to the award of contracts from the United States (Department of Defense, Defense Logistics Agency, Defense Supply Centers) has contacted and relied upon Flexfab, as a subcontractor, to supply the required goods. As a consequence, C&S has entered into numerous subcontracts with Flexfab whereby Flexfab, as a subcontractor, would supply goods to the United States pursuant to prime contracts between C&S and the United States.

7. C&S and Flexfab have a long-standing relationship of dealing with each other on contracts through the 8A Program and C&S' status as a Small Disadvantaged Business.

8. In each of these contracts, Flexfab agreed to supply parts to the United States only if payment for its goods were made through a Flexfab-controlled escrow account, thereby insuring that there would be no significant delay in Flexfab's receipt of payment for its goods. The particular escrow account used by Flexfab and C&S is located at Old Kent Bank in Grand Rapids, Michigan. To my knowledge Flexfab conducts all of its business with 8(A) Program and Small Disadvantaged Business contracts through this escrow account.

9. It is my understanding that Flexfab insists on the use of the escrow account system of payment as a result of past contracts where such a payment plan was not in place and Flexfab experienced extensive delays in receiving payments directly from the contractors.

10. Numerous other manufacturers with whom C&S works on 8A Program and Small Disadvantaged Business contracts insist on similar escrow account payment plans to insure that they do not encounter delays in receiving payment for the goods they provide.

11. The contract at issue was specifically designated as an 8A contract and required to be awarded to an 8A contractor.

12. In 1998, I was contacted by Mike Taylor, a small business specialist at the Small Business Office of the Defense Logistics Agency, Defense Supply Construction Center, ("DSCC") in Columbus, Ohio. Mr. Taylor indicated that he was looking for the name of an 8A Program contractor to work with the Government on the prime contract at issue in this matter. I gave him the name of Capital City Pipes ("Capital City") and several other 8A contractors as possible prime contractors.

13. In 1999, Mr. Taylor, contacted me and told me that the DSCC, through its 8A Program, had awarded Capital City contract SPO704-99-C-1004. Mr. Taylor told me that Capital City had approached Flexfab directly to manufacture air ducting hose that Capital City was to provide to the DSCC.

14. From my conversation with Mr. Taylor in 1999, I understood that Flexfab was the sole source and manufacturer of the air ducting hose that Capital City had agreed to provide to the DSCC.

15. Mr. Taylor informed me that Flexfab had told Capital City that it had a long-standing relationship with C&S and that C&S was its minority supplier. Mr. Taylor told me that Flexfab informed Capital City that it was not taking any new 8A customers and if it wanted Flexfab to supply goods, it would have to work through C&S.

16. In response, Mr. Taylor contacted me to determine whether C&S would be willing to work with both Flexfab and Capital City to facilitate acquisition and shipment of the goods from Flexfab to the United States.

17. I told Mr. Taylor if Capital City wanted Flexfab to provide the goods pursuant to its primary contract with the DSCC, that C&S would have to be involved in the deal and that Capital City would have to deal with Flexfab through C&S. It is my understanding that Mr. Taylor provided this information to Capital City.

18. I also told Mr. Taylor that I could facilitate the sale, but due to my past experience and dealings with Flexfab I knew that Flexfab would agree to supply the air ducting hose only if an escrow account was established for its benefit as described in paragraph 8 above.

19. I then contacted Flexfab in Michigan to subcontract with Flexfab to produce the air ducting hose required by the prime contract between Capital City and the United States.

20. I had multiple conversations with Mr. Taylor, who told me that Flexfab was the only source for the goods that the United States required pursuant to its contract with Capital City, and that Mr. Taylor was going to contact Capital City to ensure that the contract was properly executed to remit payment to a Flexfab controlled escrow account.

21. On June 29, 1999, the United States, through the DSCC, and Capital City executed a contract which, contrary to my conversations with Mr. Taylor, did not direct the United States' payments into the Flexfab controlled escrow account.

22. Thereafter, I contacted Mr. Taylor and indicated to him that the June 29, 1999, original contract did not direct payment to the Flexfab controlled escrow account and that Flexfab would not provide any air ducting hose until the contract was modified to reflect that payments would be made by the United States to the Flexfab controlled escrow account.

23. Mr. Taylor told me that he would inform Capital City that Flexfab was a necessary party and that Capital City's contract with the DSCC would not proceed unless a modification of the original June 29, 1999, contract was executed to direct payments to the Flexfab controlled escrow account.

24. On September 27, 1999, the original contract between the DSCC and Capital City was modified to direct payment to the Flexfab controlled escrow account. Capital City faxed me a copy of the contract Modification to demonstrate that the remittance address was changed and that payments were to be directed to the Flexfab controlled escrow account.

25. The September 27, 1999, Modification occurred prior to Flexfab's manufacture or shipment of any air ducting hose to the DSCC.

26. The United States failed to remit payment to the escrow account and incorrectly directed payment for air ducting hose to Capital City, which I understand is now in bankruptcy.

27. Subsequent to the first misrouted payment, I contacted the DSCC's billing office and spoke with a representative named Phil. I informed him that the DSCC had failed to properly remit payment to the Flexfab controlled escrow account.

28. When I reminded Phil of the September 27, 1999, Modification, he informed me that the DSCC had incorrectly remitted payment directly to Capital City and that he would correct the error and properly remit payment to the Flexfab controlled escrow account.

29. Despite this conversation, the DSCC failed to correct the error and continued to remit payments for the air ducting hose directly to Capital City.

30. I contacted Phil at the DSCC on several subsequent occasions to inform him that payments were still not being made to the Flexfab controlled escrow account as required by the September 27, 1999, Modification.

31. I even faxed information to Phil demonstrating that the DSCC was incorrectly remitting payment in violation of the September 27, 1999, Modification.

32. After the final payment was incorrectly made directly to Capital City, I traveled to Columbus, Ohio, and met with Mr. Taylor and Phil to discuss the DSCC's failure to properly remit payment to the Flexfab controlled escrow account.

33. Phil assured me that the DSCC would remedy the error and that payment would be properly made to the Flexfab controlled escrow account.

34. In all of my conversations and meetings, neither Mr. Taylor nor Phil ever disputed the DSCC's obligation to remit payment for the air ducting hose to the Flexfab controlled escrow account, and Phil assured me that the payment error would be corrected.

35. Upon information and belief, the DSCC has failed to remedy its error and has not yet directed payment into the Flexfab controlled escrow account.

FURTHER AFFIANT SAITH NOT.

Dated: 3/14/01

Henry Cook

Sworn and subscribed to before me, a Notary Public, this 14th day of March, 2001.

Wesley L Thornton, Notary Public
Randolph County, Georgia
My Commission Expires: 3/15/04

#537891

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP
Perrin Rynders (P38221)
Mark E. Hills (P47524)
Attorneys for Plaintiff
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
(616) 336-7000 – Facsimile

Claudia Burke
Commercial Litigation Branch
Civil Division
United States Department of Justice
Washington DC 20530
Attn: Classification Unit
1100 L Street NW, 8th Floor
(202) 307-0277
(202) 514-8624 – Facsimile

**AFFIDAVIT OF SUSAN K. LAJOYE**

STATE OF MICHIGAN )
)ss.
COUNTY OF KENT )

I, Susan K. LaJoye, being first duly sworn, depose and say as follows:

1. The statements made in this Affidavit are based on my personal knowledge and to the best of my knowledge are true. If called upon as a witness, I can testify competently as to the truth of the statements made in this Affidavit.

2. I was previously employed as the Government Contract Administrator of the Flexfab, LLC., North America ("Flexfab") in Hastings, Michigan. Although I was employed at Flexfab for approximately eleven years, I held that position for approximately two years. I am currently employed at Foremost Insurance in Grand Rapids, Michigan.

3. In my position as Government Contract Administrator at Flexfab, I have personal knowledge of Flexfab's contracts with the DSCC and Capital City.

4. Flexfab is an elastomeric engineering company that specializes in the design and production of hose, ducts, flexible connectors, boots, bellows, and special shapes made from a wide range of materials for severe applications in the automotive, heavy duty truck, aerospace, government, and broad industrial sectors.

5. Flexfab's principal place of business is located in the City of Hastings, State of Michigan.

6. Flexfab has developed a working history and business relationship with C&S Industrial Supply ("C&S"), a company owned by Mr. Henry Cook. During the time that I was employed at Flexfab, Flexfab would frequently work with C&S and Mr. Cook. As a result, C&S, in connection with the receipt of an award from the Government, would contract Flexfab to serve as the manufacturer of products required by a contract between C&S and the Government.

7. In each of these contracts with C&S, Flexfab agreed to supply parts to the United States only if payment for its goods were made through a Flexfab-controlled escrow account, thereby insuring that there would be no significant delay in Flexfab's receipt of payment for its goods. The particular escrow account used by Flexfab and C&S is located at Old Kent Bank in Grand Rapids, Michigan.

8. Flexfab conducted all of its business with C&S through this escrow account.

9. Flexfab insisted on the use of the escrow account system of payment as a result of past contracts where such a payment plan was not in place and Flexfab experienced extensive delays in receiving payments directly from the contractors.

10. Upon information and belief, in 1998, Flexfab was contracted by an 8A contractor, Capital City Pipes ("Capital City"). Capital City approached Flexfab to manufacturer air ducting hose that Capital City was to provide to the Government.

11. Flexfab agreed to manufacturer the product required by Capital City's contract with the Government. Due to Flexfab's prior and long standing relationship with C&S, C&S facilitated the relationship between Flexfab, Capital City and the Government.

12. As a condition to Flexfab's agreement to manufacturer the air ducting hose, Flexfab insisted that it receive payment directly from the Government and not from Capital City.

13. As a result of the parties' agreement, an escrow account specifically benefiting Flexfab was established. The escrow account was set up to ensure that Flexfab

would receive proper payment, and subsequently that the DSCC would receive the goods that it desired from Flexfab.

14. Pursuant to the escrow agreement, the DSCC was not supposed to make payments directly to Capital City, its 8A supplier. Rather, the DSCC was required to make its payments directly to the escrow account controlled by Flexfab. Flexfab, upon payment by the DSCC, was to then authorize payment from the escrow to Capital City.

15. Pursuant to the parties' agreement and in accordance with Flexfab's conditions, the contract between Capital City and the Government was to identify the remittance address for payment by the Government to a Flexfab controlled escrow account located in Grand Rapids, Michigan.

16. Subsequent to the execution of the original contract, Flexfab requested that a modification be issued clarifying that the remittance address was the escrow account identified at C/o ABA#C0720052, Old Kent Bank, Corp. Trust, P.O. Box 144, Grand Rapids, MI 49501-0144.

17. Prior to the Government's contract with Capital City requiring it to direct payment to the Flexfab controlled escrow account, the Government had, on numerous occasions throughout my employment at Flexfab, issued payment to Flexfab's controlled escrow account located in Grand Rapids, Michigan.

18. Flexfab would not have supplied the air ducting hose required by Capital City and the Government if the parties had not agreed to direct the Defendant's payment directly to the Flexfab controlled escrow account.

19. The September 27, 1999, Modification, like the parties' original June 29, 1999, contract occurred prior to Flexfab's manufacture or shipment of any air ducting hose to the Defendant.

20. Pursuant to the parties' contract, Flexfab was to ship the parts required by the Government through its contract with Capital City, directly to the Government.

21. Pursuant to the parties' contract, the contract was scheduled for a March 21, 2000, ship date.

22. In approximately January of 2000, Howard Crockett, in his capacity as an agent for the defendant, employed at the time as an inventory manager supporting supplies to the military services, contacted me directly to request that Flexfab expedite the delivery of the air ducting hose to the Defendant.

23. In response to the Defendant's request for expedited delivery, in approximately February of 2000, Flexfab began directing shipments of the air ducting hose directly to the Defendant.

24. Prior to shipment, an agent for the government inspected the air ducting hose manufactured by Flexfab. The inspection by the Government occurred at Flexfab.

25. As of approximately January of 2000 through the end of the contract, I dealt directly with the Government regarding the contract on issues such as shipment and deliver. Prior to this time, the Government would deal with Flexfab through C&S.

26. The document identified as Statement of Account dated March 11, 2000, attached hereto at Tab 1, identifies the invoice number, invoice date and invoice amount for the shipments made by Flexfab to the Government. Pursuant to the parties' contract, Flexfab shipped air ducting hose directly to the Government on approximately, February

22, 2000, February 29, 2000, March 7, 2000 and March 14, 2000. *See* 4/11/00, Statement of Account, Tab 1. The invoice date evidences the date that Flexfab shipped air ducting hose to the Government. Flexfab, shipped goods in the amount of $452,031.60, to the Government.

27. Contrary to agreement, the DSCC did not direct any payments into the Flexfab controlled escrow account.

28. Instead, the Government erroneously and incorrectly directed payment for air ducting hose to Capital City.

29. In an attempt to collect the amount due, I contacted Thelma Williams at Capital City. I asked Ms. Williams if it had incorrectly received payment from the Government. Ms. Williams would not provide me with an answer or a response.

30. An agent for the Government admitted that they incorrectly remitted payment to Capital City and not to Flexfab. The agent for the Government indicated that the government would correct the error.

31. I later learned that the Government had never corrected its error and had not, as promised, properly remitted payment to Flexfab.

FURTHER AFFIANT SAYETH NOT.

Dated: 3/22/04

Susan K. LaJoye [signature]
Susan K. LaJoye

Sworn and subscribed to before me, a Notary Public, this 22 day of 04, 2004.

Laurentiu Matei [signature]
, Notary Public
Kent County, Michigan
My Commission Expires: Nov 25 2007

LAURENTIU MATEI
Notary Public, Kent County, Michigan
My Commission Expires November 25, 2007

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

**FLEXFAB, L.L.C.**, a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA**,

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

---

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT C-1

FLEXFAB® DIVISION

A MEMBER OF THE FHI FLEXFAB HORIZONS INTERNATIONAL INC.

COMMITTED TO EXCELLENCE IN ENGINEERED ELASTOMERIC PRODUCTS SINCE 1961

ISO 9001 & QS 9000 REGISTERED CERT. #95-031

1699 West M-43 Highway • Hastings, Michigan U.S.A. 49058 • TEL: (616) 945-2433 • FAX: (616) 945-4149

Parent Customer:
Customer: C & S INDUSTRIAL SUPPLY

STATEMENT OF ACCOUNT
04/11/00

C & S INDUSTRIAL SUPPLY

PO BOX 5

CUTHBERT GA 31740

CUSTOMER NUMBER 10418

| INVOICE NO. | INV. DATE | PO NUMBER | INVOICE AMOUNT | AMOUNT OPEN |
|---|---|---|---|---|
| 105 218222 | 02/22/00 | 503305 | 55,464.00 | 55,464.00 |
| 105 218901 | 02/29/00 | 503305 | 157,379.10 | 157,379.10 |
| 105 219740 | 03/07/00 | 503305 | 155,992.50 | 155,992.50 |
| 105 220563 | 03/14/00 | 503305 | 83,196.00 | 83,196.00 |
| Totals in USD | | | | |
| 452,031.60 nE | | | | 452,031.60 |

Grand Totals in USD
TOTAL BALANCE 452,031.60

AGING ANALYSIS IN DAYS USD
Aging On Document date

| 0 - 30 Days | 31 - 60 Days | 61 - 90 Days | 91 - 120 Days | > 120 Days |
|---|---|---|---|---|
| 83,196.00 | 368,835.60 | 0.00 | 0.00 | 0.00 |

Please remember your credit terms are Net 30 Days
We would appreciate payment on any past due amounts immediately! If you need more information please call Suzy Schmader at 616-945-3533 ext. 223.

F000058

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

---

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT D

IN THE UNITED STATES COURT OF
FEDERAL CLAIMS

- - -

Flexfab, LLC, a Michigan :
Limited Liability Company, :
Successor to Flexible :
Horizons International, :
Inc., d/b/a Flexfab, :

Plaintiff, :

vs. : Case No. 02-1096 C
: Judge Lawrence J. Block
United States of America, :

Defendant. :

- - - - -

DEPOSITION OF ANITA LUICH

- - -

Taken at Defense Supply Center
3990 East Broad Street
Columbus, Ohio 43213
December 10, 2003, 10:45 a.m.

- - -

Spectrum Reporting LLC
333 East Stewart Avenue
Columbus, Ohio 43206
614-444-1000

- - - -

Spectrum Reporting, LLC
Specializing in Full-Time Reporting



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

Perrin Rynders, Esq.
Varnum, Riddering, Schmidt, Howlett
Bridgewater Place, Post Office Box 352
Grand Rapids, Michigan 49501

ON BEHALF OF DEFENDANT:

Claudia Burke, Esq.
U. S. Department of Justice
1100 L Street, NW
Washington, DC 20530

ALSO PRESENT:

Vasso Monta



Wednesday Morning Session
December 10, 2003, 10:45 a.m.

- - - - -

S T I P U L A T I O N S

- - - - -

It is stipulated by and between counsel for the respective parties that the deposition of ANITA LUICH, a witness herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice and by agreement of counsel; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -



ANITA LUICH

being first duly sworn, as hereinafter certified, testifies and says as follows:

CROSS-EXAMINATION

- - - - -

MR. RYNDERS: The record should reflect that this is the deposition of Anita Luich, taken pursuant to notice. Any objections?

MS. BURKE: No.

BY MR. RYNDERS:

Q. Would you please state your full name for the record?

A. Anita Lynne Luich.

Q. Is it L-Y-N-N?

A. E.

Q. Oh, L-Y-N-N-E. Okay. Ms. Luich, my name is Perrin Rynders. I represent a company by the name of Flexfab, at least that's what pretty much everybody knows it by. Have you given a deposition before?

A. No.

Q. A couple ground rules. I will do the asking. You'll do the answering. If there's something about my question that's not clear to

you or if I include something in my question that you don't agree with, just tell me that I'm -- either I'm not clear or I'm asking a loaded question or whatever. You can't do your job until I've done my job at least well enough for you to understand. Okay?
A. Okay.
Q. If you answer the question, then I can only conclude that you understood the question. Fair enough?
A. Yes.
Q. We need to talk one at a time. That's as hard for me as it is for you, and I'll try to respect that. You can remind me if I've interrupted you and -- it's not a big deal, but that's really so our court reporter can make sure she gets everything down. You're aware that what I say and what you say and what anybody else says in here is being typed?
A. Yes.
Q. Okay. So when you answer a question, it might be a long sentence or a paragraph, but if it's a yes or no, it needs to be a yes or no, not uh-huh and not a nod. Okay?



A. Okay.
Q. We're going to go through a series of questions on a variety of topics that are pretty related to each other. We're not going to go all over everywhere, but there's a possibility that you will try to answer my questions to the best of your ability, and then later on because the conversation has evolved, you might think of something new that was responsive to what I was talking about before or that we were talking about before.
If that happens, would you just interrupt me right then and there and let me know what you've just remembered?
A. Yes.
Q. Our court reporter types it all down. It's a lot easier for her to tell us where we were when we were just interrupted by your flashback than for you to somehow try to remember something until the end of the deposition and then do it. So please don't hesitate to interrupt me.
A. Okay.
Q. You recognize you're under oath?
A. Yes.



Q. I want you to treat what we're doing here this morning and maybe after lunch -- we'll see how long this lasts -- as if you were in court. It's just as important as if you were in court. Okay?
A. Okay.
Q. On the other hand, we're not in court, and it's a lot easier to take a break, or if we get to the noon hour, to take lunch. That's not a problem. You can just let me know if you need to take a break for any reason.
A. Okay.
Q. You're employed by the DSCC; is that right?
A. Yes.
Q. And currently in what position?
A. I'm a supplier operations supervisor.
Q. Okay. I've heard about contract specialists, pre-award and post-award, and I've heard about contract administrators. Is what you just said something different than that?
A. No, it's not. We are focused on the pre-award side of the contracting.
Q. Okay. But it's sounding to me that



you're in more of a supervisory or administrative --
A. Currently, I am a supervisor, yes.
Q. Okay. Now, you're aware that this deposition is in connection with litigation brought by Flexfab, and that relates to a contract from the 1999 time frame?
A. Yes.
Q. Okay. At that time frame, my understanding is you were a pre-award contract specialist?
A. Yes.
Q. Okay. And since then, you've been promoted to the supervisory position?
A. Yes.
Q. Okay. How long have you worked for DSCC?
A. 20 years.
Q. Okay. And can you run me real briefly through the progression of positions?
A. Yeah. Initially, I started as a procurement clerk in the procurement field. And then I progressed up into the procurement intern program.

Q. Okay.
A. And then following, as a GS11, a contract specialist. And currently, as a supervisor.
Q. Okay. Have you been a contract specialist both pre- and post-award?
A. No.
Q. Just pre-award?
A. Yes.
Q. Have you had any post-award roles during your time at DSCC?
A. Very minimal.
Q. Okay. So, basically, you're a pre-award person, and now you're in a supervisory status?
A. Yes.
Q. Okay. Now, to get us started here, I'm going to show you what was previously marked as Exhibit 3. Do you recognize this to be the contract pertaining to parts that were supplied by Flexfab through Capital City Pipe?
A. Yes.
Q. And down at the bottom, is that your signature?



A. Yes.
Q. My understanding is that this Exhibit 3 starts out as a form on the computer, and you would fill in blanks?
A. Yes.
Q. So where there are spaces to have information added, you're the person who keystroked that into the computer?
A. Yes.
Q. Okay. And just to clarify -- I've learned a lot of things about this case -- Exhibit 3 is, I think, 24 pages long, and it would include solicitation materials that are added to it once the contract's awarded?
A. Yes.
Q. Okay. Now, it starts out -- on this first page of Exhibit 3, you'll see where it says 1 of 11, and then the 11 is crossed out?
A. Yes.
Q. And so when you first prepared this, it hadn't been approved or awarded yet; is that correct?
A. No.
Q. I can imagine that your job would, in



part, include preparing documents like this to be in the anticipation of the award being given?
A. Yes.
Q. So at the time that you filled it out and in the anticipation of the award being given, it was 11 pages long?
A. Yes.
Q. And then once the award is given, the solicitation materials get added to it, and now, all of sudden, it's up to 24?
A. That is part of the process, yes.
Q. Okay. Now, you had direct contact with Capital City Pipes during this time period?
A. Yes.
Q. Okay. And were you the person with the primary responsibility for having contact with Capital City Pipes?
A. Yes.
Q. How did you come to know about Capital City Pipes?
A. They are an 8(a) set-aside contractor, so I was designated to solicit them through the small business office.
Q. Okay. To try to cut to the chase and



-- because we'd both like to get out of here on time. It's not just because I'm a nice guy, although I try to be -- let me see if I can summarize it, and you tell me if I've gotten off track. I can imagine that in your job, somehow it's brought to your attention that the United States Government, the Department of Defense, in particular, needs to procure certain parts, certain products; is that fair?
A. Yes.
Q. Okay. And when you're informed of that, then part of your job is to find the source for those products?
A. Yes.
Q. And in this particular case, it was certain hose products. And when you did your investigation, you found out that those particular hoses were part of an 8(a) set-aside?
A. Yes.
Q. And am I correct in understanding that, in fact, you learned that the supplier to be used was Capital City Pipe?
A. Yes.
Q. Okay. So it's not just that we have --

I have to find an 8(a) supplier for these products; I actually have to go to Capital City Pipe, barring them tripling the price on us, which might open up some other issues, but in the ordinary course, you would just go directly to them and only to them?
A. Yes.
Q. Okay. And that's how it worked in this case?
A. Yes.
Q. Now, were you aware from the beginning that Capital City Pipe would be functioning as a distributor and not the actual manufacturer of these products?
A. Initially at what point?
Q. At the point in time when you are informed that the government needs to buy them?
A. No.
Q. Okay. At what point in time -- well, did you ever come to learn that Capital City Pipe, in connection with the contract marked as Exhibit 3, was functioning as a distributor, not the actual manufacturer?
A. Yes.



Q. Where did you learn that -- or at what point in time did you learn that?
A. When they submitted their proposal.
Q. Okay. And so their proposal indicates that the source is Flexfab?
A. Yes.
Q. Okay. Now, I know at some point in time we've got some contract modifications. You're not involved in that?
A. No.
Q. Now, at the bottom of Exhibit 1 -- I'm sorry. Excuse me. At the bottom of Exhibit 3, the bottom right, it has the date June 29, 1999; is that right?
A. Yes.
Q. Is that the date that the award was actually given to Capital City?
A. Yes.
Q. Okay. You would have started preparing Exhibit 3 before June 29?
A. Yes.
Q. And they would have submitted their quote or their proposal well before June 29?
A. Yes.



Q. In fact, if I'm understanding things correctly, you had been working on this particular procurement maybe even back into late 1998? Do you remember that?
A. Possibly.
Q. Okay. If I indicated to you that it's my impression that there were a series of extensions during the solicitation process, does that trigger memory?
A. Yes.
Q. Okay. Is that unusual, or is that routine?
A. Very routine.
Q. Okay. But anyway, it would have been a number of months prior to June 29 that you would have been working on this?
A. Yes.
Q. And I'm guessing that you're working on a lot of other projects like this?
A. Yes.
Q. Okay. And at the point in time when Capital City provided a quote or a proposal, that's when you learned about Flexfab's role?
A. Yes.



Q. Now, I'll show you -- I don't know if you're aware of this, but Exhibit 4 is a contract modification. Have you seen that before?
A. Yes.
Q. Did you see it in connection with your role as being a contract specialist or in connection with preparing for a deposition?
A. Actually, I may retract my statement. I was thinking this was one of the amendments I did. This is not -- I'm not the author of this, so no, I would not have seen this.
Q. Okay. I have seen other documents that are before the award, and that's what you were thinking of?
A. Right, yes.
Q. Now, this same form is used whether you are amending the solicitation or modifying the contract?
A. Yes.
Q. And so either you're amending the offer, or you are amending the agreement that's struck at eventually?
A. Yes.
Q. Okay. And that confused me too at one

point in time before I really figured all of that out. Okay. Anyway, if you look at Exhibit 4, you will see that the remittance address has changed. Do you see that?
A. Yes.
Q. Now, was there ever a point in time when anybody brought to your attention that the remittance address that was contained in what started out as your proposed contract, the original 11 pages, or in the final award -- did anybody bring it your attention that the remittance address was not what the parties had wanted to have?
A. There is an attachment to this contract with the correct remittance address.
Q. Okay. You know what, instead of me flipping through there, I'm sure you'll be faster.
A. Right there. I'm sorry.
Q. And this is in Exhibit 3, what's been marked up at the top as page 12 of 24?
A. Yes.
Q. So that tells me it's part of the solicitation materials that were added to what you originally created once the contract was awarded?



A. Yes.
Q. Okay.
A. And it's part of the contract.
Q. Okay. And this is a June 23 letter that pre-dates the June 29 document that you typed up?
A. Yes.
Q. Okay. Now, is this -- in terms of the original award, does this June 23, 1999 letter addressed to you from Thelma Williams, page 12 of 24 -- is that what the contract is, in terms of the remittance address?
A. This is the remittance address in the contract.
Q. Okay. Now, I'm going to quickly turn over -- kind of keep this handy, but also turn over to Exhibit 4. And I'm looking at it upside down, and it's kind of small, so maybe you can do this: Is the modification calling for an -- actually in a different account?
A. No. No.
Q. Now, I know that you've only very little worked on the post-award side, but do you have an understanding of why there would be a need



for the modification marked as Exhibit 4, given the fact that this June 23 letter was part of the original contract?
A. No.
Q. Okay. Now, let's forget about Exhibit 4. Let's just think about Exhibit 3, your contract that you put together. What happens to the contract to make sure that payment is handled the way it's supposed to be handled?
A. A copy goes over to DFAS.
Q. Okay. Now, is that an electronic transmission, or was it a hard copy transmission or both and -- back at that point in time?
A. I'm unsure.
Q. Okay. My guess is that today, it's electronic?
A. Yes.
Q. Is it today both electronic and hard copy?
A. I'm unsure.
Q. Clearly, 20 years ago, it was just hard copy?
A. Yes.
Q. Today it might be both, but it's for



sure electronic?
A. Yes.
Q. And you're not sure where the transition was?
A. That's not my role.
Q. Okay. Maybe this is silly, but bear with me. I know that you're the person who types the information into the form that is at least the first 11 pages of the contract?
A. Uh-huh.
Q. What happens then? Do you hit print and it comes out the printer, or does somebody else deal with that?
A. You're correct. You hit print, and it comes out on a local printer with the first 11 pages. After that, you start to add your attachments and solicitations and renumber it with the final contract.
Q. Okay. And then do you create a file that has just those 24 pages in it?
A. Not just those 24 pages. The entire contract file encompasses all documentation from the beginning of the initiation of the solicitation to the very end.

Q. So correspondence, e-mails, faxes --
A. Yes.
Q. -- if they were printed off, would go into the file?
A. Yes.
Q. Now, physically, what happens to the file? It stays here at DSCC?
A. There is a holding file here, yes.
Q. Now, what actually gets physically sent to DFAS?
A. The contract.
Q. Okay. The 24 pages?
A. Yes.
Q. Okay. And are you the person who actually does that, or does a clerical person make a copy of that and deliver that?
A. A clerical.
Q. Okay. Is there some way that you confirmed that, in fact, it was transmitted over to DFAS?
A. No.
Q. Has it ever happened that you've discovered that somehow the contract didn't get delivered? You know, a clerical person says, oh,



gosh, I forgot. I didn't make it over there yesterday or -- have you ever encountered that kind of scenario?
A. No.
Q What would happen -- would something bog down if DFAS didn't get the contract?
A. I can't speak for DFAS. I don't know what their procedures are.
Q. Okay. Let me get at it this way: Obviously, you've got a contract, and that's all nice, but it's just paper. And so what you really want to end up with is somebody who actually makes something and gets it to the Department of Defense so that those people can use it obviously.
What I'm wondering is, is there something in the way that your whole system works so that unless that contract gets over to DFAS, the actual process of getting parts made and delivered isn't going to happen? I mean, is there like a check and balance?
A. There is a system process, yes. And if the contract has not been delivered at a certain point, it becomes delinquent, and there is action taken on that. They follow it through on



delivery.
Q. And when you talk about "they," you're talking about DFAS, or are you talking about --
A. DSCC follows through delivery. DFAS handles the payment issues.
Q. Okay. So the fact that -- well, let me -- do you know whether or not DFAS ever paid any money with respect to this contract?
A. No.
Q. My understanding is that DFAS did pay money, but paid it directly to Capital City, not to the bank account at Old Kent Bank. Do you know if that's true or not?
A. No.
Q. Okay. Just assume that that's true for right now. Does that indicate to you that, obviously, these 12 pages -- I'm sorry, these 24 pages of the contract were, in fact, physically delivered to DFAS?
A. Yes.
Q. Okay. Now, is there anything in the first 11 pages that would indicate, but for page 12, where payment is to be made?
A. There is a location on page 8 that



offers a remittance payment, an address.
Q. Okay. So if they only looked through page 8, they would see, okay, I'm supposed to remit payment to Capital City Pipes, Inc, right?
A. Yes.
Q. What they're supposed to do, though, at the very least is continue reading all 24 pages to make sure there isn't something else that supersedes that?
A. Yes.
Q. Now, is page 12 intended to supersede page 8 in terms of the remittance address?
A. Yes.
Q. Is there some protocol or procedure that you're aware of that DFAS is supposed to follow to know whether to look at page 8 for a remittance address or page 12 for the remittance address?
A. No. I have no idea.
Q. Okay. Is there anything that you know to do or can do to check to see what DFAS does in terms of remittance address or any other issue --
A. No.
Q. -- in terms of handling payment?

A. No.
Q. Can you get in through your computer here at DSCC and look to see where DFAS is sending money?
A. Yes. And I'm not a hundred percent sure of that, but I'm pretty sure in our SAMMS system it displays the remittance address.
Q. Okay. Now, on the SAMMS system -- S-A-M-M-S?
A. Yes.
Q. Is that something that was around back in 1999?
A. Yes.
Q. Do pre-award contract specialists have different access under the SAMMS system than post-award contract specialists?
A. Sometimes.
Q. Okay. Do you have any reason to believe that Malinda Jeffries back in 1999 would have had different access than you in terms of knowing where the payments were being sent?
A. She would have more knowledge of where to find that information than I would.
Q. Okay. And that's because she's



post-award and you're pre-award?
A. Yes.
Q. Now, when you finished these 24 pages, and you've put them together and renumbered them and had a clerk send a copy over to DFAS, are you done?
A. Yes.
Q. Is there anything after that that you did with respect to this particular contract?
A. Aside from faxing out the contract to Capital City Pipes.
Q. Okay. Now, if there is a complaint down the road that -- and somebody says, well, I was dealing with Anita Luich, I'm going to give her a call, what do you do?
A. I refer them to post-award.
Q. Okay. And that was Melinda Jeffries?
A. Yes.
Q. Did you ever get anything like that? Did you hear about things that you then referred to Ms. Jeffries?
A. I can't recall.
Q. Okay. But, certainly, your procedure would have been to do that?



A. Yes.
Q. Okay. Since we've got the binder open with the exhibits, let me show you what's been marked as Exhibit 5. This is a letter to one of my colleagues from Shirley Spratt. Did you have any input into the preparation of this letter?
A. No.
Q. Have you ever seen this letter before?
A. No.
Q. Did you ever have a meeting with Shirley Spratt to deal with any problems that had arisen over this contract?
A. No.
Q. Other than finding out that you were being asked to give a deposition and meeting with counsel to prepare for that, have you had any role at all with Flexfab in that particular contract since the day you faxed a copy off to Capital City Pipes?
A. No.
Q. I'm going to guess from that, then, on Exhibit 6, another letter -- this one's three pages long, also from Ms. Spratt to my colleague Mark Hills -- that you didn't have any role in



this?
A. No.
Q. And you've never seen this before?
A. No.
Q. The fact that we have in Exhibit 3, page 12 of 24, this letter dated June 23, 1999, addressed to you from Thelma Williams, establishes absolutely conclusively in your mind that you, in fact, had this letter at the time of the contract being awarded?
A. Yes.
Q. Were you involved in a procurement effort where Capital City Pipes was the primary contractor and JGB Enterprises was the manufacturer? Do you remember anything about that?
A. No.
Q. Okay. Do you know -- we've marked as Exhibit 3 materials that have been faxed, at least twice, I can tell from the headers at the top, so it's really hard to read. And so that's not your fault certainly, but there's some reference here to JGB Enterprises. And I'm wondering if you can explain why that's part of the solicitation

Q. In fact, do you even pay attention to whether the remittance address is the same as the prime contractor?
A. I do make note of that because that does need to be addressed in the formal contract.
Q. Okay. But here, the remittance address was not Tallahassee, Florida. You were aware of that?
A. Yes.
Q. Did that raise any flags with you, or did that require you to do anything? Or if that's what you're told, that's fine with you?
A. That's not uncommon, so it's fine.
Q. Okay. I'm going to show you what's been marked as Exhibit 18. And I will alert you to the fact that this is a prior procurement effort. This is different. I don't want there to be any misunderstanding about that, but do you ever in your status as a pre-award contract specialist encounter quotes like Exhibit 18 that come from subcontractors?
A. No.
Q. Now, you were aware -- and maybe I've asked you this -- but you were aware at the time



that Capital City was not the point of origin for this hose, correct?
A. At the time of their submitted proposal.
Q. Right. That's right. That's what you said. I'm sorry. And you became aware of that how? Somebody told you that, or somebody sent you something?
A. They would identify that, Capital City.
Q. Okay. And how would they identify that?
A. I'm not sure where -- if I can --
Q. Yeah. You can look at anything in the binder. They're all marked exhibits.
A. Specifically, I'm looking for a fax from Capital City identifying Flexfab as their manufacturer.
Q. It would have been before June 29, correct?
A. Yes.
Q. This is something that you remember looking at recently?
A. Yes.
Q. Well, look at page 12 of 24 in Exhibit



3. Do you see where it says that -- in the second line of the text -- that Flexfab is the manufacturer?
A. That was their final confirmation that Flexfab is the contractor -- I mean, is the manufacturer.
Q. Okay. But most likely, you were aware of that possibility before June 23 of 1999?
A. Yes.
Q. And that might have come through verbal communications, or would it have come through written communications?
A. Written.
Q. Let me show you something which we will have marked as Exhibit 20.

\- - - - -

Thereupon, Exhibit 20 is marked for purposes of identification.

\- - - - -

Q. And my first question for you is whether you've seen Exhibit 20 before today?
A. Yes.
Q. And is it something that you would have



seen at the time of the solicitation process?
A. No.
Q. Did you see it only in connection with preparing for your deposition?
A. No.
Q. When did you first see it, to the best of your recollection?
A. This is, I'm assuming, a part of the pre-award survey.
Q. Okay. I was going to ask you that too. It's not necessarily a stand-alone document?
A. No.
Q. It's part of something bigger. And, unfortunately, at least the way I have it is -- yeah. I may have pulled it out of something, so I apologize, or it may have been given to me this way. I don't know one way or the other.
Do you see in the beginning of the narrative where it talks about a pre-award quality survey was performed on June 15, 1999?
A. Yes.
Q. Obviously, this document was created on or after June 15, right?
A. Yes.

remember seeing this document?
A. Yes.
Q. It's got your name on the bottom of it, right?
A. Yes.
Q. And I'm understanding this to say that you've done your check and determined that the Flexfab price, or maybe the Flexfab plus Capital City mark-up price, was competitive?
A. Determining that the Capital City Pipes is competitive.
Q. Okay. And you weren't sure what percentage of that Flexfab got and what percentage of it Capital City got?
A. No.
Q. And it didn't matter?
A. No.

- - - - -

Thereupon, Exhibits 21 and 22 are marked for purposes of identification.

- - - - -

Q. Let me show you what we've marked as Exhibit 21. And do you remember getting that



letter?
A. Yes.
Q. And this would indicate that at least by March 26 of 1999, you were aware that Flexfab was the source for the product?
A. Yes.
Q. Let me turn your attention to Exhibit 17. Is that your handwriting on there by any chance?
A. No.
Q. Okay. Let me show you what has been marked as Exhibit 22. Can you explain what that document is?
A. This is the submission of a Flexfab quote.
Q. Okay. And so this date of January 19, 1999, is that corresponding with when the quote is sent in?
A. No. That is when the solicitation closes, the date and time.
Q. I see. Okay. So, presumably, this is something that you would have received on or before that date?
A. I would not have received. Our bid



room would have received this.
Q. Okay. And when you say "our bid room," meaning somebody here at the DSCC?
A. Yes.
Q. Now, what is the purpose for Flexfab submitting that quote to your bid room?
A. They're submitting their quote in anticipation of receiving an award.
Q. Okay. Now, is this in connection -- can you tell, is this in connection with the contract that's at issue in this case?
A. This is in connection with the initial solicitation that was issued.
Q. Do you know whether this is Flexfab saying, hey, we'd like to be the prime contractor for this solicitation, or is this in connection with Flexfab as the subcontractor for Capital City Pipes?
A. This, based on this document, is just a copy of the Fed Ex envelope that they sent to the bid room. Now, what's involved in that, I'm unsure.
Q. Okay. My understanding is that this particular product was part of an 8(a) set-aside,



and nobody other than an 8(a) supplier would have been permitted to actually bid on it?
A. There was no minimum established to the initial solicitation modifying them -- the solicitation to an 8(a) set-aside.
Q. I see. So perhaps at this point in time, it was prior to that?
A. Yes.
Q. But you don't know if that's the case or not?
A. I'm assuming, yes.
Q. Okay. That would make the most sense to you?
A. Yes.
Q. Okay. I'm curious: How does a place like Flexfab or any other place, Capital City Pipes for that matter, know that the federal government wants to purchase a particular piece of equipment or a particular product?
A. We have publications that come out to identify solicitations, NSNs, and items.
Q. Okay.
A. And they have their own networking capabilities as well.

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **FLEXFAB, L.L.C.**, a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab<br><br>Plaintiff,<br>v.<br><br>**UNITED STATES OF AMERICA**,<br><br>Defendant. | Case No. 02-1096 C<br><br>Hon. Lawrence J. Block |

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT E

**SECTION A**

| | | | |
|---|---|---|---|
| [X] J AWARD/CONTRACT [ ] K | 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) > | RATING DOA1 | PAGE 01 OF PAGES 24 |
| 2. CONTRACT (Proc. Inst. Ident.) NO. SP0740-99-C-1004 | 3. EFFECTIVE DATE 99 JUN 29 | 4. REQUISITION/PURCHASE REQUEST/PROJECT NO. SEE ATTACHED | |
| 5. ISSUED BY CODE SC0700 | 6. ADMINISTERED BY CODE S1109A | | |

**5. Issued by:**
DEFENSE SUPPLY CENTER COLUMBUS
ATTN: DSCC-
3990 E. BROAD STREET, P.O. BOX 16704
COLUMBUS, OHIO 43216-5010

For Post Award Inquiries - See G01

**6. Administered by:**
DCMC CLEARWATER
GADSEN BLDG SUITE 200
9549 KROGER BLVD
ST PETERSBURG FL 33702-2455

CD: PAS: YES

**7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, state and ZIP code)**

CAPITAL CITY PIPES INC
1872 MILLS ST SUITE F
TALLAHASSEE FL 32310-0205

CAGE CODE 0NSZ5 FACILITY CODE SEE SCHEDULE

**8. DELIVERY**
[X] FOB DESTINATION *See Section F
[ ] FOB ORIGIN [ ] OTHER (See below)

**9. DISCOUNT FOR PROMPT PAYMENT**
NET 30

**10. SUBMIT INVOICES** (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN > Item BLOCK 12

**11. SHIP TO/MARK FOR** CODE

SEE SECTION B

**12. PAYMENT WILL BE MADE BY:** EFT: T CODE S33181

DFAS COLUMBUS CENTER
ATTN: DFAS-CO-LSCAA
P O BOX 182317
COLUMBUS OH 43218-2317

**13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:**

[X] 10 U.S.C. 2304 (c) ( 1 )

[ ] 41 U.S.C. 253 (c) ( )

**14. ACCOUNTING AND APPROPRIATION DATA:**

[ ] OTHER - See Sec G, Clause G03

[ ] CG: 97 x 4930.5CC0 000-26.0 S33-150

[ ] 97 x 4930.5CC0 000-22.1 S33-150 (Trans)

[ ] FMS 9711 x 8242 L009 4D 8401 GBL S380000 (Trans)

[ ] Award issued pursuant to the Small Business Competitiveness Demonstration Program.

CAUTION: Whenever only a portion of a Clause is set forth herein, or identified only by number and title, such portion shall not be construed as varying the meaning or intent of the entire Clause as it appears or is referred to in the Federal Acquisition Regulation (FAR) or DoD FAR Supplement.
Federal Acquisition Regulation (FAR) Clauses cited throughout this Contract by Clause Title, Number, and Date are incorporated herein by reference with the same force and effect as if set forth in full text.

[ ] SPECIAL REVIEW [ ] FMS REQUIREMENT

15G. TOTAL AMOUNT OF CONTRACT > $ 497241.28

**16. TABLE OF CONTENTS**


| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 9 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH | |
| | C | DESCRIPTION/SPECS/WORK STATEMENT | | X | J | LIST OF ATTACHMENTS | 10 |
| | D | PACKAGING AND MARKING | | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 9 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 9 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 9 | | L | INSTRS, CONDS, AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |


**CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE**

17. [ ] CONTRACTORS NEGOTIATED AGREEMENT (Contractor is required to sign this document and return _______ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. [X] AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number SP0740-99-R-3025 including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

19A. NAME AND TITLE OF SIGNER (Type or print)

20A. NAME OF CONTRACTING OFFICER
ANITA L. LUICH

19B. NAME OF CONTRACTOR
BY _______________
(Signature of person authorized to sign)

EXHIBIT

19C. DATE SIGNED

20B. UNITED STATES OF AMERICA
BY Anita L. Luich
(Signature of Contracting Officer)

20C. DATE SIGNED
99 JUN 29

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-C-1004 | PAGE OF 02 | 1124 PAGES |
|---|---|---|---|

OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|

PR YPC98169000611
NSN 4720-01-066-6447

ITEM DESCRIPTION:

HOSE ASSY, AIR DUCT. 8" SIZE, 15 FT LENGTH, YELLOW COLOR WITH STOWAGE DEVICE, 4 LOCKS. PER MILITARY SPECIFICATION TITLED "DUCT ASSEMBLIES, GROUND, CONDITIONED AIR, INSULATED, FLEXIBLE."
THE FOLLOWING EXCEPTIONS TO THE CITED DRAWINGS APPLY: ON DRAWING 64C1004, PART NUMBER 64C1004, ASTM-A-569HR P AND O CQ .156 OR .180 THICK WILL BE USED AND ALLOWING ZINC PLATING PER ASTM-B-633 SC3 TYPE II AS AN OPTION TO THE CADMIUM PLATING AND; ON DWG 64C1005, PART NUMBER 64C1005, ASTM-A-569HR P AND O CQ .125 THICK WILL BE USED AND ALLOWING ZINC PLATING PER ASTM-B-633 AC3 TYPE II AS AN OPTION TO THE CADMIUM PLATING.

"CONTRACTOR/MANUFACTURER IS REQUIRED TO ESTABLISH AND MAINTAIN A CALIBRATION SYSTEM THAT MEETS THE REQUIREMENTS OF ANSI/NCSL Z540-1-1994, AMERICAN NATIONAL STANDARD FOR CALIBRATION - CALIBRATION LABORATORIES AND MEASURING AND TEST EQUIPMENT-GENERAL REQUIREMENTS, OR ISO 10012-1, QUALITY ASSURANCE REQUIREMENTS FOR MEASURING EQUIPMENT- PART 1, METROLOGICAL CONFIRMATION SYSTEM FOR MEASURING EQUIPMENT."

IF AQLS ARE LISTED IN THE SPECIFICATION(S) OR DRAWING(S) THEY MAY BE USED TO ESTABLISH THE AUTHORIZED SAMPLE SIZE, HOWEVER, THE ACCEPTANCE NUMBER FOR THIS CONTRACT IS ZERO; I.E., THIS CONTRACT REQUIRES A SAMPLING PLAN THAT ACCEPTS ON ZERO DEFECTS AND REJECTS ON ONE OR MORE DEFECT(S).

"CLASS I OZONE DEPLETING CHEMICALS ARE NOT TO BE USED NOR INCORPORATED IN ANY ITEMS TO BE DELIVERED UNDER THIS CONTRACT. THIS PROHIBITION SUPERSEDES ALL SPECIFICATION REQUIREMENTS BUT DOES NOT ALLEVIATE ANY PRODUCT REQUIREMENTS. SUBSTITUTE CHEMICALS MUST BE SUBMITTED FOR APPROVAL UNLESS THEY ARE AUTHORIZED BY THE

CONTINUED ON NEXT PAGE

CONTINUATION SHEET

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-C-1004

PAGE 03 OF 24 PAGES

OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | SPECIFICATION REQUIREMENTS." | | | | |
| | I/A/W DRAWING NR 98750 62A1008<br>REFNO DTD 64 MAR 12<br>AMEND NR B DTD 70 JUN 05<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1004<br>REFNO DTD 64 MAR 11<br>AMEND NR C DTD 72 OCT 04<br>TYPE NUMBER: 62B1004<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1005<br>REFNO DTD 64 MAR 10<br>AMEND NR F DTD 86 APR 10<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1006<br>REFNO DTD 64 MAR 11<br>AMEND NR B DTD 70 JUN 05<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1007<br>REFNO DTD 64 MAR 11<br>AMEND NR C DTD 86 APR 10<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 64C1004<br>REFNO DTD 64 MAR 12<br>AMEND NR M DTD 83 JUN 20<br>TYPE NUMBER: 64C1004<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 64C1005<br>REFNO DTD 64 MAR 11<br>AMEND NR L DTD 83 JUN 20<br>TYPE NUMBER: 64C1005<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | CONTINUED ON NEXT PAGE | | | | |

APP-49

CONTINUATION SHEET

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-C-1004

PAGE 04 OF 24 PAGES

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | I/A/W DRAWING NR 98750 64C1006<br>REFNO DTD 64 MAR 11<br>AMEND NR F DTD 83 JUN 20<br>TYPE NUMBER: 64C1006<br>"DETAILED DRAWING (ONE ITEM)"<br><br>I/A/W SPEC NR MIL-D-38386D<br>BASIC DTD 89 AUG 28<br>AMEND NR DTD<br>TYPE NUMBER: M38386-C-015 | | | | |
| 0001 | PR YPC98169000611 PRLI 0001 | 416 | EA | $ 381.32 | $ 158629.12 |

PREP FOR DELIVERY

PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991
QUP = 001: PRES MTHD = 10: CLNG/DRY = 1: PRESV MAT = 00:
WRAP MAT = 00: CUSH/DUNN MAT = 00: CUSH/DUNN THKNESS = 0:
UNIT CONT = E1: LEVEL PRESV = A: OPI = O:
PACK CODE = U: PACKING LEVEL = C:
MARKING SHALL BE IN ACCORDANCE WITH MIL-STD-129M SPECIAL
MARKING CODE: 99 - NO CODES IN THIS TABLE ONLY MIL-STD-129.
PALLETIZATION SHALL BE IN ACCORDANCE WITH DC1636P001 REV A
DATED 96150

DOD LOGMARS BAR CODE MARKING REQUIRED IAW MIL-STD-129M,
DATED 15 JUN 93 AND MIL-STD-1189B, DATED 10 AUG 89.

PARCEL POST ADDRESS:

SW3100
MECHANICSBURG FACILITY
DEF DIST DEPOT SUSQUEHANNA PA
GENERAL SUPPLIES
MECHANICSBURG PA 17055-0789

FREIGHT SHIPPING ADDRESS:

CONTINUED ON NEXT PAGE

**CONTINUATION SHEET**

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-C-1004

PAGE 05 OF 124 PAGES

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | PR YPC98169000611 PRLI 0001 | | CONT'D | | |
| | SW3100<br>MECHANICSBURG FACILITY TRNS OFFICER<br>DEF DIST DEPOT SUSQUEHANNA PA<br>5450 CARLISLE PIKE<br>MECHANICSBURG PA 17055-0789 | | | | |
| | NON-MILSTRIP RDD 01/28/99 PROJ | | | | |
| | * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |
| 0002 | PR YPC98169000611 PRLI 0002 | 198 | EA | $ 381.32 | $ 75501.36 |
| | PREP FOR DELIVERY | | | | |
| | PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991<br>MIL-STD-2073 PACKAGING DATA SAME AS PRIOR LINE | | | | |
| | PARCEL POST/FREIGHT ADDRESS: | | | | |
| | SW3200<br>DEF DIST DEPOT SAN JOAQUIN<br>TRACY CA 95376-5000 | | | | |
| | NON-MILSTRIP RDD 12/17/98 PROJ | | | | |
| | * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |
| | CONTINUED ON NEXT PAGE | | | | |

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-C-1004 | 06 | 124 PAGES |

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0003 | PR YPC98201001312 PRLI 0001 | 178 | EA | $ 381.32 | $ 67874.96 |

PREP FOR DELIVERY

PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991
QUP = 001: PRES MTHD = 10: CLNG/DRY = 1: PRESV MAT = 00:
WRAP MAT = 00: CUSH/DUNN MAT = 00: CUSH/DUNN THKNESS = 0:
UNIT CONT = E1: LEVEL PRESV = A: OPI = O:
PACK CODE = U: PACKING LEVEL = C:
MARKING SHALL BE IN ACCORDANCE WITH MIL-STD-129M SPECIAL
MARKING CODE: 99 - NO CODES IN THIS TABLE ONLY MIL-STD-129.
PALLETIZATION SHALL BE IN ACCORDANCE WITH DC1636P001 REV A
DATED 96150

DOD LOGMARS BAR CODE MARKING REQUIRED IAW MIL-STD-129M,
DATED 15 JUN 93 AND MIL-STD-1189B, DATED 10 AUG 89.

PARCEL POST ADDRESS:

SW3100
MECHANICSBURG FACILITY
DEF DIST DEPOT SUSQUEHANNA PA
GENERAL SUPPLIES
MECHANICSBURG PA 17055-0789

FREIGHT SHIPPING ADDRESS:

SW3100
MECHANICSBURG FACILITY TRNS OFFICER
DEF DIST DEPOT SUSQUEHANNA PA
5450 CARLISLE PIKE
MECHANICSBURG PA 17055-0789

NON-MILSTRIP RDD 05/15/99 PROJ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CONTINUED ON NEXT PAGE

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>SP0740-99-C-1004 | PAGE OF<br>07 | ~~11~~ 24<br>PAGES |
|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0004 | PR YPC98201001312 PRLI 0002 | 343 | EA | $ 381.32 | $ 130792.76 |

PREP FOR DELIVERY

PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991
MIL-STD-2073 PACKAGING DATA SAME AS PRIOR LINE

PARCEL POST/FREIGHT ADDRESS:

SW3200
DEF DIST DEPOT SAN JOAQUIN
TRACY CA 95376-5000

NON-MILSTRIP RDD 05/15/99 PROJ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 5 | PR YPC98323000624 PRLI 0001 | 169 | EA | $ 381.32 | $ 64443.08 |

PREP FOR DELIVERY

PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991
QUP = 001: PRES MTHD = 10: CLNG/DRY = 1: PRESV MAT = 00:
WRAP MAT = 00: CUSH/DUNN MAT = 00: CUSH/DUNN THKNESS = 0:
UNIT CONT = E1: LEVEL PRESV = A: OPI = O:
PACK CODE = U: PACKING LEVEL = C:
MARKING SHALL BE IN ACCORDANCE WITH MIL-STD-129M SPECIAL
MARKING CODE: 99 - NO CODES IN THIS TABLE ONLY MIL-STD-129.
PALLETIZATION SHALL BE IN ACCORDANCE WITH DC1636P001 REV A
DATED 96150

DOD LOGMARS BAR CODE MARKING REQUIRED IAW MIL-STD-129M,
DATED 15 JUN 93 AND MIL-STD-1189B, DATED 10 AUG 89.

PARCEL POST ADDRESS:

CONTINUED ON NEXT PAGE

APP-53

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-C-1004 | 08 | 11 PAGES |

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | PR YPC98323000624 PRLI 0001 CONT'D | | | | |

SW3100
MECHANICSBURG FACILITY
DEF DIST DEPOT SUSQUEHANNA PA
GENERAL SUPPLIES
MECHANICSBURG PA 17055-0789

FREIGHT SHIPPING ADDRESS:

SW3100
MECHANICSBURG FACILITY TRNS OFFICER
DEF DIST DEPOT SUSQUEHANNA PA
5450 CARLISLE PIKE
MECHANICSBURG PA 17055-0789

NON-MILSTRIP RDD 08/25/99 PROJ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

The following stamp applies to all lines

USE REVISION D OF MIL-37386 UNTIL REVISION E IS AMENDED.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

REMIT PAYMENT TO:
CAPITAL CITY PIPES, INC.
PO BOX 12368
TALLAHASSEE FL 32317

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>SP0740-99-C-1004 | PAGE OF<br>09 | 1124<br>PAGES |
|---|---|---|---|

SECTION B
B02 - CONFIRMING NOTICE OF AWARD:

( ) Ltr (X) Facsimile Dated 06/28/99 .

SECTION E
E01 - INSPECTION AT ORIGIN:

SUPPLIES:
CLIN(s)

ALL (X) Same as Block 7 on Standard Form 26
( ) Other (Cage Code, Name, Street Address, City, State & Zip Code)

Cage Code:

Cage Code:

PACKAGING
CLIN(s)

ALL (X) Same as Block 7 on Standard Form 26
( ) Same as for Supplies
( ) Other (Cage Code, Name, Street Address, City, State & Zip Code)

Cage Code:

Cage Code:

TREATING FACILITY, if applicable (Name, Street, City, State & Zip Code)

( ) See

E01/E02 - INSPECTION/ACCEPTANCE AT ORIGIN WILL BE PERFORMED BY:

CLIN(s) Supplies:

ALL (X) Office Administering Contract (See SF 26, Block 6)
( ) Other

Packaging:
(X) Office Administering Contract (See SF 26, Block 6)
( ) Same as for Supplies
( ) Other

E02 - ACCEPTANCE AT ORIGIN.

E05 - CERTIFICATE OF CONFORMANCE (CoC) (APR 1984) FAR 52.246-15.
a. (X) Not Authorized.
b. ( ) Shipment based on CoC shall not be made unless authorized by CAO.

SECTION F
F03 - F.O.B. DESTINATION.
EXPORT SHIPMENTS - PORT

Delivery Point (Wood Products):

( ) FAS Vessel ( ) FOB Dock ( ) FOB Port

(see clause F70 and F71)

F62 - TIME OF DELIVERY:

See Clause F62 of the basic solicitation.

SECTION G
G01 - CONTRACTING OFFICE REPRESENTATIVE:

-- FOR POST AWARD INFORMATION CONTACT --

DSCC-AEAA Telephone: A/C 614-692-2961

G02 - NOTES TO CONTRACT ADMINISTRATION OFFICE:

a. Delinquency Reports - In accordance with FAR 42.1106(c), the Contract Administration Office may at any time initiate a report to advise the Administrative Contracting Officer and Inventory Control Manager (ICM) of any potential or actual delay in performance.

Address for ICM is as follows:
(X) DLA, Defense Supply Center Columbus
P.O. Box 16704
ATTN: DSCC ADAA
Columbus, Ohio 43216-5000

( ) See Clause H01, Table 2 of this contract.

g. Part IV of the solicitation has been retained in the contract file in accordance with FAR 14.201-1(c) and FAR 15.406-1(b).

SECTION I
I20 - RATED ORDERS:

(X ) DO A1 ( ) DO B1

( ) DX

Extend the Defense Rating to your Supplier(s)

I82 - TRANSPORTATION OF SUPPLIES BY SEA

I87 - PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY

I99 - DRUG FREE WORKPLACE

I212 - SECTION 8(a) AWARD (DEC 1996) - FAR 52.219-17

(a) By execution of a contract, the Small Business Administration (SBA) agrees to the following:
(1) To furnish the supplies or services set forth in the contract according to the specifications and the terms and conditions by subcontracting with the Offeror who has been determined an eligible concern pursuant to the provisions of section 8(a) of the Small Business Act, as amended (15 U.S.C. 637(a)).
(2) Except for novation agreements and advance payments, delegates to the Defense Supply Center Columbus the responsibility for administering the contract with

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>SP0740-99-C-1004 | PAGE 10 | OF 124 PAGES |
|---|---|---|---|

complete authority to take any action on behalf of the Government under the terms and conditions of the contract; provided, however that the contracting agency shall give advance notice to the SBA before it issues a final notice terminating the right of the subcontractor to proceed with further performance, either in whole or in part, under the contract.

(3) That payments to be made under the contract will be made directly to the subcontractor by the contracting activity.

(4) To notify the Defense Supply Center Columbus Contracting Officer immediately upon notification by the subcontractor that the owner or owners upon whom 8(a) eligibility was based plan to relinquish ownership or control of the concern.

(5) That the subcontractor awarded a subcontract hereunder shall have the right of appeal from decisions of the cognizant Contracting Officer under the "Disputes" clause of the subcontract.

(b) The offeror/subcontractor agreees and acknowledges that it will, for and on behalf of the SBA, fulfill and perform all of the requirements of the contract.

(c) The offeror/subcontractor agrees that it will not subcontract the performance of any of the requirements of this subcontract to any lower tier subcontractor without the prior written approval of the SBA and the cognizant Contracting Officer of the Defense Supply Center, Columbus.

**I213 - NOTIFICATION OF COMPETITION LIMITED TO ELIGIBLE 8(a) CONCERNS (FAR 52.219-18) (JAN 1997)**

(a) Offers are solicited only from small business concerns expressly certified by the Small Business Administration (SBA) for participation in the SBA's 8(a) Program and which meet the following criteria at the time of sub[illegible]sion of offer --

(1) SIC code 3494 is specifically included in the [illegible]r's approved business plan;

(2) The Offeror is in conformance with the 8(a) s[illegible]port limitation set forth in its approved business plan; and

(3) The Offeror is in conformance with the Business Activity Targets set forth in its approved business plan or any remedial action directed by the SBA.

(b) By submission of its offer, the Offeror represents that it meets all of the criteria set forth in paragraph (a) of this clause.

(c) Any award resulting from this solicitation will be made to the Small Business Administration, which will subcontract performance to the successful 8(a) offeror selected through the evaluation criteria set forth in this solicitation.

(d)(1) Agreement. A manufacturer or regular dealer submitting an offer in its own name agrees to furnish, in performing the contract, only end items manufactured or produced by small business concerns inside the United States, its territories or possessions, the Commonwealth of Puerto Rico, or the Trust Territory of the Pacific Islands. However, this requirement does not apply in connection with construction or service contracts.

(2) The will notify the Defense Supply Center Columbus Contracting Officer in writing immediately upon entering an agreement (either oral or written) to transfer all or part of its stock or other ownership interest to any other party.

## SECTION J

J02 - LIST OF ENCLOSURES MADE A PART OF THIS CONTRACT:

| | | | |
|---|---|---|---|
| AMENDED QUOTE | dtd | 03/04/99 | Encl #1 |
| AMENDED QUOTE | dtd | 06/28/99 | Encl #2 |
| | dtd | | Encl # |
| | dtd | | Encl # |
| | dtd | | Encl # |
| | dtd | | Encl # |
| | dtd | | Encl # |

N04 - Solicitation Amendment Number (s) 0001, 0002, 0003

**ATTACHMENT**
**PALLETIZATION NO. DC1636P001 - 96150**

1. **SCOPE.** This sheet covers the requirements for palletization of DSCC items or supply for handling, shipment, and storage.

2. **REFERENCED DOCUMENTS.** The following documents, of the issue in effect on the date of solicitation, form a part of this palletization sheet to the extent specified herein:

Specifications

FEDERAL

NN-P-71 Pallets, Material Handling, Wood Stringer Construction, 2-way and 4-way (Partial)

Standards

MILITARY

MIL-STD-147 Palletized Unit Load

(Copies of listed federal and military specifications, standards, and associated documents listed in the Department of Defense Index of Specifications and Standards (DODISS), should be obtained from the DOD Single Stock Point, Commanding Officer, Naval Publications and Forms (Center, 5801 Tabor Ave., Philadelphia, PA 19120-5099).

3. **REQUIREMENTS.**

Shipments of indentical items packed in four or more shipping containers exceeding a total of 48 cubic feet per destination shall be palletized except when the shipping containers are required to be skidded (see 3c), or a quantity of four shipping containers pallet exceeds the size of weight limitations for palletized loads (see 3a and 3b, as applicable). Shipments packed Level C shall be palletized in accordance with 3a or 3b. Shipments packed Level A or Level B shall be palletized in accordance with 3b.

a. Material may be palletized on commercial pallets provided the load meets the following requirements:

(1) The load does not exceed 52 inches in length or width, 54 inches in height, and [illegible],000 pounds.

(2) The load is prepared and secured in a manner that will ensure carrier acceptance and permit safe rehandling at destination.

b. Palletization shall comply with MIL-STD-147 and appendices there to modified as follows:

(1) Loads shall be stable and shall not exceed the size and overseas limitations of MIL-STD-147.

(2) Glued loads shall not be used.

(3) For Level A packing, pallets shall comply with NN-P-71, Type V, class 1, size 2, except softwood may be used and the size may be reduced to a minimum of 36 inches in length and 44 inches in width to properly fit the load.

(4) For Level B packing, pallets shall conform to NN-P-71, Type II, size 2; Type IV; or Type V, class I, size 2. Wood used to construct pallets shall be group II, III, or IV, grade A, as specified in NN-P-71.

(5) Residual quantities of less than the quantity required for one course of the load need not be palletized.

c. Palletization is not required for shipping containers that are constructed with skids. Shipping containers, except drums, exceeding 70 pounds gross weight or 40 inches in length, shall be constructed with skids, skids, shall be a minimum of 3x4 inch (nominal) lumber and shall be securely attached to permit multiple re-handling at destination. Drums shall be palletized.

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-C-1004 | 11 | ~~11~~ 24 PAGES |

Prepared by: DSCC
Columbus, OH 43216-5000
December 13, 1996

SP0740-99-C-1004 12 of 24

# Capital City Pipes, Inc.

Office 850/574-3717 Fax 850/574-0384

June 23, 1999

Anita L. Luich
DSCC/ADAA
Defense Supply Center/Columbus
P.O. Box 16704
Columbus, Ohio

Ref: SP074099R3025
4720-01-066-6447
QTY (1304)

Dear Madam:

Capital City Pipes, Inc is submitting a proposal to you on the above reference. Capital City Pipe, Inc is quoting FLEXFAB as the manufacturer.
**Quoting a price of $381.32 each.**

Capital City Pipes, Inc request the remittance address to be:
**Capital City Pipes, Inc**
**C/o ABA#07200052**
**Old Kent Bank, Corp Trust**
**P.O. Box 144**
**Grand Rapids, MI 49501-0144**

If there are any questions, you may contact me by phone, 850/574-3717; fax, 850/574-0384; or e-mail, capicity@aol.com

Thank you,

Thelma S. Williams
Director of Government Sales

SP0740-99-C-1004

13 of 24

# Capital City Pipes, Inc.

Office 850/574-3717

Fax 850/576-2956

March 4, 1999

To: Anita L. Luich
DSCC, PAADAA1
Columbus, Ohio
614 692 6271-fax

Re: SP074099R3025
4720-01-066-6447

Ms. Luich:

I am resubmitting an offer of $311.50 as my best and final offer pertaining to the above Solicitation # SP074099R3025.

I will call you on tomorrow morning to verify that you have received this fax.

If you have any questions, please call me at 850-574-3717 or e-mail Capicity@aol.com

Thank you again,

Thelma S. Williams
Director of Government Sales

02/25/1999 16:51 850-57( )56 CAPITAL CITY PI PAGE 05
FILE No. 100 01/14 '00 11:16 DCOC AEROSPACE COLS,OH 1 614 69_ _71 PAGE 4

SP0740-99-C-1004 17 of 24

## SOLICITATION AND OFFER

[X] J [ ] K

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) > RATING: See L11 or L20 | PAGE OF PAGES: 01 23

2. CONTRACT NO | 3. SOLICITATION NO. SP0740-99-R-3025 | 4. TYPE OF SOLICITATION [ ] SEALED BID (IFB) [X] NEGOTIATED (RFP) | 5. DATE ISSUED 22-DEC-98 | 6. REQUISITION/PURCHASE NO. SEE ATTACHED

7. ISSUED BY CODE SC0700
DEFENSE SUPPLY CENTER COLUMBUS
ATTN: DSCC- ABAA1
P.O. BOX 16704
COLUMBUS, OHIO 43216-5010
For Post Award Inquiries - See G01

8. ADDRESS OFFER TO
DEFENSE SUPPLY CENTER COLUMBUS
ATTN: DSCC-PBAA (Bid Opening Room D130, Bldg 20)
P.O. BOX 16653
COLUMBUS, OHIO 43216-5009

FOR COURIER SERVICE AND FACSIMILE NUMBERS - SEE BLOCK 9

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder"

[ ] SPECIAL REVIEW [ ] FMS REQUIREMENT SOLICITATION

9. Sealed offers in original and NO copies for furnishing the supplies or services in the Schedule will be received at the place specified in Item 8, or if handcarried, in the depository located in Bid Opening Room, Bldg 20, Room D130, 3990 East Broad Street, Columbus, OH 43213 until 1:00pm (Hour) local time 19-JAN-99 (Date)

Facsimile Numbers: A/C 614-692-4235, A/C 614-692-3279, or A/C 614-692-5701.
CAUTION - LATE Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-10. All offers are subject to all terms and conditions contained in this solicitation.

10. FOR INFORMATION CALL: > A. NAME: Arida Lulch DSCC-PAADAA1 | B. TELEPHONE NO (Include area code) (NO COLLECT CALLS) A/C (614) 692-3277

### 11. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 10 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS/WORK STATEMENT | 7 | X | J | LIST OF ATTACHMENTS | 16 |
| X | D | PACKAGING AND MARKING | 7 | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 8 | X | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | 17 |
| X | F | DELIVERIES OR PERFORMANCE | 9 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 9 | X | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | 21 |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 9 | X | M | EVALUATION FACTORS FOR AWARD | 22 |

### OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period. See Provision K 14

12. In compliance with the above, the undersigned agrees, if this offer is accepted within (See Note Above) calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 13. DISCOUNT FOR PROMPT PAYMENT (See Section I, Clause No. 52.232-8) | 10 CALENDAR DAYS % | 20 CALENDAR DAYS % | 30 CALENDAR DAYS % | CALENDAR DAYS % |
|---|---|---|---|---|

| 14. ACKNOWLEDGEMENT OF AMENDMENTS (The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated) | AMENDMENT NO | DATE | AMENDMENT NO | DATE |
|---|---|---|---|---|

15A. NAME AND ADDRESS OF OFFEROR — CAGE CODE 0NSZ5 FACILITY
Capital City Paper Inc
1872 Mills St Bldg F
Tallahassee FL 32310
FACSIMILE NUMBER: 850 574 0384

16. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER (Type or print)
THELMA S. WILLIAMS
Director of Government Sales

15B. TELEPHONE NO. (Include area code) 850 574 3717

15C. CHECK IF REMITTANCE ADDRESS IS DIFFERENT FROM ABOVE. ENTER SUCH ADDRESS IN SCHEDULE [ ]

17. SIGNATURE: Thelma S Williams | 18. OFFER DATE 2/25/99

IMPORTANT - Award will be made on Standard Form 26, or by other authorized official written notice. SECTION A

NSN 7540-01-152-8064 33-132 DPACS SF33M (REV. 4-85)
PREVIOUS EDITION UNUSABLE Prescribed by GSA
OP 301-33.0-2 (R7) (FAR) (FEB 87) FAR (48 CFR) 53.214c

02/25/1999 16:51 850-57( J56 CAPITAL CITY P[illegible] 1 614 [illegible] - 6271 PAGE 06

PAGE 5

SP0740-99-C-1004

15 of 24

**CONTINUATION SHEET**

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025

PAGE 02 OF 24 PAGES

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | PR YPC983230006[illegible]<br>NSN 4720-01-06[illegible]-6447<br>ITEM DESCRIPTION:<br><br>HOSE ASSY, AIR DUCT. 8" SIZE, 15 FT LENGTH, YELLOW COLOR WITH STOWAGE DEVICE, 4 LOCKS. PER MILITARY SPECIFICATION TITLED "DUCT ASSEMBLIES, GROUND, CONDITIONED AIR, INSULATED, FLEXIBLE."<br>THE FOLLOWING EXCEPTIONS TO THE CITED DRAWINGS APPLY: ON DRAWING 64C1004, PART NUMBER 64C1004, ASTM-A-569HR P AND O CQ .156 OR .180 THICK WILL BE USED AND ALLOWING ZINC PLATING PER ASTM-B-633 SC3 TYPE II AS AN OPTION TO THE CADMIUM PLATING AND; ON DWG 64C1005, PART NUMBER 64C1005, ASTM-A-569HR P AND O CQ .125 THICK WILL BE USED AND ALLOWING ZINC PLATING PER ASTM-B-633 AC3 TYPE II AS AN OPTION TO THE CADMIUM PLATING.<br><br>"CONTRACTOR/MANUFACTURER IS REQUIRED TO ESTABLISH AND MAINTAIN A CALIBRATION SYSTEM THAT MEETS THE REQUIREMENTS OF ANSI/NCSL Z540-1-1994, AMERICAN NATIONAL STANDARD FOR CALIBRATION - CALIBRATION LABORATORIES AND MEASURING AND TEST EQUIPMENT-GENERAL REQUIREMENTS, OR ISO 10012-1, QUALITY ASSURANCE REQUIREMENTS FOR MEASURING EQUIPMENT- PART 1, METROLOGICAL CONFIRMATION SYSTEM FOR MEASURING EQUIPMENT."<br><br>IF AQLS ARE LISTED IN THE SPECIFICATION(S) OR DRAWING(S) THEY MAY BE USED TO ESTABLISH THE AUTHORIZED SAMPLE SIZE, HOWEVER, THE ACCEPTANCE NUMBER FOR THIS CONTRACT IS ZERO; I.E., THIS CONTRACT REQUIRES A SAMPLING PLAN THAT ACCEPTS ON ZERO DEFECTS AND REJECTS ON ONE OR MORE DEFECT(S).<br><br>"CLASS I OZONE DEPLETING CHEMICALS ARE NOT TO BE USED NOR INCORPORATED IN ANY ITEMS TO BE DELIVERED UNDER THIS CONTRACT. THIS PROHIBITION SUPERSEDES ALL SPECIFICATION REQUIREMENTS BUT DOES NOT ALLEVIATE ANY PRODUCT REQUIREMENTS. SUBSTITUTE CHEMICALS MUST BE SUBMITTED FOR APPROVAL UNLESS THEY ARE AUTHORIZED BY THE SPECIFICATION REQUIREMENTS."<br><br>CONTINUED ON NEXT PAGE | | | | |

NSN 7540-01-152-8067 PREVIOUS EDITION UNUSABLE 36-109 STANDARD FORM 36 (REV. 10-83) PRESCRIBED BY GSA

SP0740-99-C-1004 16 of 24

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-R-3025 | PAGE OF 03 | 24 PAGES |
|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | DLAD 52.246-9004, PRODUCT VERIFICATION TESTING, APPLIES. THIS CLAUSE IS A GOVERNMENT OPTION THAT CAN ONLY BE INVOKED UPON THE COGNIZANT CONTRACT ADMINISTRATION OFFICE NOTIFYING THE CONTRACTOR THAT PVT SAMPLES ARE TO BE SELECTED. | | | | |
| | I/A/W DRAWING NR 98750 62A1008<br>REFNO DTD 64 MAR 12<br>AMEND NR B DTD 70 JUN 05<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1004<br>REFNO DTD 64 MAR 11<br>AMEND NR C DTD 72 OCT 04<br>TYPE NUMBER: 62B1004<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1005<br>REFNO DTD 64 MAR 11<br>AMEND NR B DTD 70 JUN 05<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1007<br>REFNO DTD 64 MAR 11<br>AMEND NR C DTD 86 APR 10<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 64C1004<br>REFNO DTD 64 MAR 12<br>AMEND NR M DTD 83 JUN 20<br>TYPE NUMBER: 64C1004<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 64C1005<br>REFNO DTD 64 MAR 11<br>AMEND NR L DTD 83 JUN 20<br>TYPE NUMBER: 64C1005<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 64C1006<br>REFNO DTD 64 MAR 11<br>AMEND NR F DTD 83 JUN 20 | | | | |

CONTINUED ON NEXT PAGE

SP0740-99-C-1004 17 of 24

CONTINUATION SHEET

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025

PAGE 04 OF 23 PAGES

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | TYPE NUMBER: 64C1006<br>"DETAILED DRAWING (ONE ITEM)"<br><br>I/A/W SPEC NR MIL-D-28386E<br>BASIC DTD 89 AUG 28<br>AMEND NR DTD<br>TYPE NUMBER: M10586-C-015 | | | | |
| 0001 | PR YPC98201001312 PRLI 0001 | 178 | EA | 381.32 | 67874.96 |

PREP FOR DELIVERY:

PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991
QUP = 001: PRES MTHD = 10: CLNG/DRY = 1: PRESV MAT = 00:
WRAP MAT = 00: CUSH/DUNN MAT = 00: CUSH/DUNN THKNESS = 0:
UNIT CONT = 01: LEVEL PRESV = A: OPI = O:
PACK CODE = U: PACKING LEVEL = C:
MARKING SHALL BE IN ACCORDANCE WITH MIL-STD-129M SPECIAL
MARKING CODE: 99 - NO CODES IN THIS TABLE ONLY MIL-STD-129.
PALLETIZATION SHALL BE IN ACCORDANCE WITH DC1536P001 REV A
DATED 96150

DOD LOGMARS BAR CODE MARKING REQUIRED IAW MIL-STD-129M,
DATED 15 JUN 93 AND MIL-STD-1189B, DATED 10 AUG 89.

PARCEL POST ADDRESS:

SW3100
MECHANICSBURG FACILITY
DEF DIST DEPOT SUSQUEHANNA PA
GENERAL SUPPLIES
MECHANICSBURG PA 17055-0789

FREIGHT SHIPPING ADDRESS

SW3100
MECHANICSBURG FACILITY TRNS OFFICER
DEF DIST DEPOT SUSQUEHANNA PA
5450 CARLISLE PIKE
MECHANICSBURG PA 17055-0789

NON-MILSTRIP RDD 05/15/99 PROJ

* * * * * * * * * * * * * * * * * * * * * * * * * * * *

CONTINUED ON NEXT PAGE

02/25/1999 16:51 850-57( 56 CAPITAL CITY PF PAGE 09

PAGE 8

SP0740-99-C-1004

18 of 24

**CONTINUATION SHEET**

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025 PAGE 05 OF 24 PAGES

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0002 | PR YPC98323000624 PRLI 0002 | 100 | EA | 381.32 | 38132.00 |

PREP FOR DELIVERY:

PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991
MIL-STD-2073 PACKAGING DATA SAME AS PRIOR LINE

PARCEL POST/FREIGHT ADDRESS:

SW3200
DEF DIST DEPOT SAN JOAQUIN
TRACY CA 95376-5000

NON-MILSTRIP RDD 08/25/99 PROJ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0003 | PR YPC98201001312 PRLI 0001 | 178 | EA | 381.32 | 67874.96 |

PREP FOR DELIVERY:

PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991
QUP = 001: PRES MTHD = 10: CLNG/DRY = 1: PRESV MAT = 00:
WRAP MAT = 00: CUSH/DUNN MAT = 00: CUSH/DUNN THKNESS = 0:
UNIT CONT = B1: LEVEL PRESV = A: OPI = O:
PACK CODE = U: PACKING LEVEL = C:
MARKING SHALL BE IN ACCORDANCE WITH MIL-STD-129M SPECIAL
MARKING CODE: 99 - NO CODES IN THIS TABLE ONLY MIL-STD-129.
PALLETIZATION SHALL BE IN ACCORDANCE WITH DC1636P001 REV A
DATED 96150

DOD LOGMARS BAR CODE MARKING REQUIRED IAW MIL-STD-129M,
DATED 15 JUN 93 AND MIL-STD-1189B, DATED 10 AUG 89.

PARCEL POST ADDRESS:

SW3100
MECHANICSBURG FACILITY
DEF DIST DEPOT SUSQUEHANNA PA
GENERAL SUPPLIES
MECHANICSBURG PA 17055-0789

CONTINUED ON NEXT PAGE

SP0740-99-C-1004 19 of 24

**CONTINUATION SHEET**

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025 | PAGE 06 OF 24 PAGES

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | FREIGHT SHIPPING ADDRESS<br><br>SW3100<br>MECHANICSBURG FACILITY TRNS OFFICER<br>DEF DIST DEPOT SUSQUEHANNA PA<br>5450 CARLISLE PIKE<br>MECHANICSBURG PA 17055-0789<br><br>NON-MILSTRIP RDD 05/15/99 PROJ<br>* * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |
| 0004 | PR YPC98201001312 PRLI 0002 | 343 | EA | 381.32 | 130792.76 |
| | PREP FOR DELIVERY:<br><br>PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991<br>MIL-STD-2073 PACKAGING DATA SAME AS PRIOR LINE<br><br>PARCEL POST/FREIGHT ADDRESS:<br><br>SW3200<br>DEF DIST DEPOT SAN JOAQUIN<br>TRACY CA 95376-5000<br><br>NON-MILSTRIP RDD 05/15/99 PROJ<br>* * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |
| 0005 | PR YPC98169000611 PRLI 0001 | 218 | EA | 381.32 | 83127.76 |
| | PREP FOR DELIVERY:<br><br>PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991<br>QUP = 001: PRES MTHD = 10: CLNG/DRY = 1: PRESV MAT = 00:<br>WRAP MAT = 00: CUSH/DUNN MAT = 00: CUSH/DUNN THKNESS = 0:<br>UNIT CONT = E1: LEVEL PRESV = A: OPI = O:<br>PACK CODE = U: PACKING LEVEL = C:<br>MARKING SHALL BE IN ACCORDANCE WITH MIL-STD-129M SPECIAL<br>MARKING CODE: 99 - NO CODES IN THIS TABLE ONLY MIL-STD-129.<br>PALLETIZATION SHALL BE IN ACCORDANCE WITH DC1636PC01 REV A<br>DATED 96150<br><br>DOD LOGMARS BAR CODE MARKING REQUIRED IAW MIL-STD-129M,<br>DATED 15 JUN 93 AND MIL-STD-1189B, DATED 10 AUG 89.<br><br>CONTINUED ON NEXT PAGE | | | | |

02/25/1999 16:51 850-5( 56 CAPITAL CITY R 1 614 0271 PAGE 11

PAGE 10

SP0740-99-C-1004

20 of 24

**CONTINUATION SHEET**

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025

PAGE 07 OF 24 PAGES

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | PARCEL POST ADDRESS: | | | | |
| | SW3100<br>MECHANICSBURG FACILITY<br>DEF DIST DEPOT SUSQUEHANNA PA<br>GENERAL SUPPLIES<br>MECHANICSBURG PA 17055-0789 | | | | |
| | FREIGHT SHIPPING ADDRESS | | | | |
| | SW3100<br>MECHANICSBURG FACILITY TRNS OFFICER<br>DEF DIST DEPOT SUSQUEHANNA PA<br>5450 CARLISLE PIKE<br>MECHANICSBURG PA 17055-0789 | | | | |
| | NON-MILSTRIP RDD 12/17/98 PROJ<br>* * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |
| 0006 | PR YPC98169000611 PRLI 0002 | 198 | EA | 381.32 | 75,501.36 |
| | PREP FOR DELIVERY: | | | | |
| | PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991<br>MIL-STD-2073 PACKAGING DATA SAME AS PRIOR LINE | | | | |
| | PARCEL POST/FREIGHT ADDRESS: | | | | |
| | SW3200<br>DEF DIST DEPOT SAN JOAQUIN<br>TRACY CA 95376-5000 | | | | |
| | NON-MILSTRIP RDD 12/17/98 PROJ<br>* * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |

NSN 7540-01-152-8-67
Previous edition unusable

36-103
* GPO : 1983 O - 381-526 (8056)

STANDARD FORM 36 (REV. 10-83)
Prescribed by GSA

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.**, a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA**,

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT E
# (Continued)

SP0740-99-C-1004 21 of 24

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 08 | 24 PAGES |

ATTENTION CONTRACTORS!!

ALL CONTRACTORS ARE REQUIRED TO REGISTER IN THE CENTRAL CONTRACTOR REGISTRATION (CCR) SYSTEM BY MAY 31, 1998 (DEFENSE FEDERAL ACQUISITION REGULATION SUPPLEMENT (DFARS) 204.7302). UNREGISTERED CONTRACTORS WILL NOT BE ELIGIBLE FOR AWARDS SOLICITED AFTER THAT DATE. YOU MAY REGISTER OR CHECK YOUR CCR REGISTRATION STATUS AT THE CENTRAL CONTRACTOR REGISTRATION SITE - (HTTP://CCR.EDI.DISA.MIL/)

HELP WITH CCR REGISTRATION IS AVAILABLE AT YOUR REGIONAL ELECTRONIC COMMERCE RESOURCE CENTER (ECRC) (HTTP://WWW.ECRC.[illegible]/REGIONAL.HTML)

VENDORS WILL NEED TO SUPPLY A DUNS NUMBER WITH ALL QUOTATIONS REGARDLESS OF DOLLAR VALUE IN THE NEAR FUTURE. A DUNS NUMBER IS ALSO A REQUIREMENT FOR CCR REGISTRATION. YOU MAY REQUEST A DUNS NUMBER AT THE D-U-N-S NUMBER REQUEST FROM SITE, HTTP://WWW.DNB.COM/[illegible].HTM

***ALTERNATE DISPUTE RESOLUTION (ADR) POLICY***

It is the goal of this Center for all parties to be satisfied at contract completion. Consequently, this Center is encouraging the use of all forms of ADR to resolve differences of view that may occur under the contract, whether the differences involve disputes of contract terms, issues of administration, or merely points of inquiry. The use of any form of ADR is voluntary for all parties. Any costs associated with the use of ADR will be agreed to by both parties and with no increase in contract price, unless agreed to otherwise.

FOR COURIER SERVICE AND/OR CONTRACTOR HANDCARRIED OFFERS

RFPs and IFBs (generally Large Purchase Offers, $100,000 and over) when being hand carried (Courier service or other means) shall be placed in the White Bid Box, located at DSCC in the Lobby of Building 20, 3990 E. Broad St., Columbus, OH 43216-5000.

SECTION B

NOTICE

Any contract awarded to a contractor who, at the time of award was suspended, debarred, ineligible for receipt of contracts with Government agencies or in receipt of a notice of proposed debarment from any Government agency, is voidable at the option of the Government.

AVAILABILITY OF AWARD INFORMATION

Large Purchases - $100,000 and over (IFB/RFP) - Written notification is automatically mailed to all unsuccessful offerors at time of award. This notice provides the number of firms solicited, the number of offers received, the name of successful offeror and contract unit price and quantity awarded. In addition, unsuccessful offerors are also informed why their offer was not accepted.

NOTE: Firms not responding to an IFB/RFP, may request award information under the Freedom of Information Act (FOIA) by written request to this Center, ATTN: DSCC-VEIF. Include specific identification data and statement that you are willing to pay necessary fees for research and/or reproduction costs.

PROCUREMENT HISTORY

Procurement history is not supplied with the solicitation, and will not be furnished based on telephone calls. Procurement history is now available on microfiche as follows:

- NSN History published quarterly;
- Non-NSN History published semi-annually; and
- Prior Month Award History published monthly.

Each updated microfiche set will be available in the Bid Opening Room at DCSC for public viewing. This information can be purchased by submitting a written request for history desired to: Defense Supply Center Columbus, ATTN: DSCC-VEIF, P.O. Box 3990, Columbus, Ohio 43216-5010. Requester will be advised of cost of history by return mail.

AVAILABILITY OF DRAWING

This requirement is in accordance with drawings listed in Section B - Item Description. See Provision [illegible] for instructions for obtaining aperture cards of these drawings.

NOTE: The drawings cannot be furnished by the buyer/contracting officer

AVAILABILITY OF SPECIFICATIONS

This requirement is in accordance with specifications, standards and descriptions. Do not try to order from this Center. For order instructions see Provision L12 in the IFB/RFP. See item description for address to order standards.

SECTION C

Year 2000 (Y2K) Compliant Notice:

All deliverables under this contract containing embedded microcircuit chips with a clock mechanism, timing device, or control device required to perform date\time processing involving dates subsequent to December 31, 1999, shall be year 2000 (Y2K) compliant at the time of delivery.

"Y2K compliant" means that it accurately process date\time data (including, but not limited to, calculating, comparing, and sequencing) from, into, and between the twentieth and twenty-first century, and the years 1999 and 2000 and leap year calculations, to the extent that other (information technology) IT / non-IT items being acquired properly exchange date/time data with it.

SECTION D

D01 - PACKING AND MARKING (AUG 1991) DCSC 52.219-9C01

( ) Packaging will be in accordance with the Contractor's commerical practice, which will ensure acceptance by the carrier.

Marking will be in accordance with MIL-STD-129.

CLIN(s)

( ) Packaging and Marking shall be in accordance with the following DCSC Pkg sheet:

| CLIN(s) | ATTACHED PKG SHT NO. | QUP | PRES/PKG LEVEL | PACKING LEVEL | METHOD |
|---|---|---|---|---|---|

(X) Packaging Data MIL-STD-2073-1B and MIL-STD-2073-2C, 21 JUN 93. Marking will be in accordance with MIL-STD-129.

( ) OTHER:

CLIN(s)

D08 - USE OF OAK-CHESTNUT WOOD FOR PACKING SUPPLIES (JUN 1986) - DCSC 52.210-9C05

(a) In order to prevent the spread of oak wilt disease, oak or chestnut wood shall not be used for packaging and packing of supplies to be delivered under this contract, unless the wood either is bark free and square-edged so that none of the natural rounded surface tissues remain or is bark free and has a moisture content not exceeding twenty (20) percent.

(b) The contractor must comply with and perform inspection to insure compliance with the above restrictions on use of oak or chestnut wood. If a shipment is frustrated for noncompliance, the contractor will be responsible for the cost incurred to repack the supplies; and this right of the Government shall not be affected by other provisions concerning the conclusiveness of inspection and acceptance and is in addition to and does not limit any rights of the government under other provision of the contract.

SP0740-99-C-1004 22 of 24

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 09 | 24 PAGINA |

SECTION E

E01 - INSPECTION AT ORIGIN (FEB 1991) - DCSC 52.246-9C01

(a) Inspection for compliance with contract requirements will be performed at origin by an authorized Government Inspector.

(b) Inspection prior to shipment will be based on the following:

(1) For CLIN(s) described by a Military or Federal specification or purchase description contractor must present evidence showing compliance with all contract and specification requirements including preparation for delivery.

(2) For CLIN(s) described by manufacturer's name/code and part number:

(i) Contractor must present evidence of performance of all quality assurance requirements specified in the contract and assure that item will serve its intended purpose by performing examinations and tests to determine (A) completeness of item, (B) absence of rust, contamination, or deterioration, (C) correct identification, (D) absence of any damage, and (E) compliance with preparation for delivery. If the contractor is not the manufacturer of the supplies, evidence must be furnished to establish that the supplies were produced by the manufacturer.

(ii) The word "manufacturer" means the actual manufacturer of each CLIN. The QAR may require that evidence be furnished establishing the name and address of the plant that manufactures each CLIN to assure that a domestic product is being supplied.

(iii) In lieu of the requirement specified above, the contractor may be required by the inspecting activity to furnish a Certificate of Conformance.

E02 - ACCEPTANCE AT ORIGIN (NOV 1995) - DCSC 52.246-9C02

Acceptance will be performed by an authorized Government Representative at origin. The point of acceptance will be the point of last inspection before shipment unless otherwise indicated by the offeror.

NOTE: For contracts awarded on f.o.b. destination basis, contractor must comply with Clause F03 - F.O.B. Destination, in order that payment may be made prior to receipt of the supplies at destination.

E05 - CERTIFICATE OF CONFORMANCE (CoC) (APR 1984) - FAR 52.246-15
(Applicable as specified in the Award/Contract)

E07 - INSPECTION OF SUPPLIES--FIXED PRICE (AUG 1996) - FAR 52.246-2

E08 - RESPONSIBILITY FOR SUPPLIES (APR 1984) - FAR 52.246-16

E09 - RECORDS RETENTION REQUIREMENTS (JUN 1985) - DCSC 52.204-9C01

The Contractor shall retain receiving and inspection report records, consisting of reports reflecting receipt and inspection of supplies, equipment and materia , for four (4) years from the date of final payment under this contract and shall make them available upon request, to the Comptroller General of the United States, the Contracting Officer, or their authorized representatives.

E10 - CHANGE OF INSPECTION/ACCEPTANCE POINT (AUG 1986) DCSC 52.246-9C06

If this solicitation provides for inspection and acceptance at destination, the Government may exercise the right reserved under FAR 52.246-2 Inspection of Supplies Fixed Price and make awards requiring inspection and acceptance at origin and Clauses E01 and E02 will be applicable. Bidders must complete Provision [illegible], Place of Performance of the solicitation.

E17 - PRODUCT VERIFICATION TESTING (AUG 1997) - DLAD 52.246-9004

(a) References: The applicable documents are the issues of Federal Acquisition Regulation (FAR) Clause 52.246-2, "Inspection of Supplies-Fixed Price," and ANSI/ASQC Z1.4-1993, Sampling Plan and Tables for Inspection by Attributes, which are in effect on date of solicitation for awards resulting from invitation for bids and date of award for all other contractual actions. These documents form the basis for the Government's right to perform product verification testing (PVT) of this product. FAR 52.246-2 is hereby incorporated by reference into the contract if not otherwise called out in the purchase document.

(b) The contractor is responsible for insuring that supplies are manufactured, produced, and subjected to all tests required by applicable material specifications/drawings specified in the purchase description of the contract. Notwithstanding any other clause to the contrary, and/or in addition thereto, the Government reserves the right to conduct PVT to ascertain if any or all requirements of the purchase identification description contained elsewhere herein are met prior to final acceptance.

(c) On any given contract, the Government may require PVT through a Government-designated testing laboratory on the contract or production lot at Government expense. Testing will consist of chemical and/or mechanical/dimensional conformance tests as the Government deems necessary. When material under the contract is designated by the contracting officer/ administrative contracting officer for such test, the Government inspector will select a sample size in accordance with MIL-STD-105, Inspection Level S-2, randomly from the contract or production lot, and send the samples to a designated laboratory for testing. Where origin inspection is specified, the contractor agrees to make available, at the Government's request, at the manufacturing facility, subcontracting facility, and/or final point of inspection, the quantity selected by the DCAS QAR to verify that the entire lot tendered meets the requirements of the Contract. The Government shall be permitted to select such samples at random from the production lot tendered for acceptance.

(d) [This subparagraph pertains only to contracts and bilateral purchase orders.]

(1) The PVT samples will be sent, by the Government and at Government expense, to a Government-designated testing laboratory for product verification. The Government will notify the contractor of the results of the testing within 16 working days of receipt of the samples by the Government. If the Government fails to act within the period set forth herein for notification, the contracting officer shall, upon timely written request, equitably adjust, under the Changes Clause of this contract, the delivery or performance dates and/or the contract price and any other contractual term affected by the delay. The Government is not required to accept/reject the supplies tendered until after receipt of the PVT test results.

(2) The Government shall have the option to require the contractor to screen the entire lot tendered for any defects noted by the PVT testing. Any defects so found shall be corrected before retendering the lot for acceptance by the Government. Further, the Government may subject this lot to additional PVT testing. If the Government disapproves the lot tendered for acceptance because of a failure to pass the PVT, the contractor shall be deemed to have failed to make delivery within the meaning of the Default Clause of this contract. In such case, the Government reserves all rights and remedies to which it is otherwise entitled by law, regulation, or this contract.

(e) [This subparagraph pertains only to unilateral purchase orders.]

(1) The PVT samples will be sent by the Government and at Government expense, to a Government-designated testing laboratory for for product verification. The Government will notify the contractor of the results of the testing within 15 days after receipt of the samples by the Government. If the Government fails to act within the specified time period set forth herein for notification, the contracting officer shall, upon timely written request from the contractor, incorporate FAR Clause 52.243-1, "Changes-Fixed Price," into the purchase order, and equitably

SP0740-99-C-1004 23 of 24

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 10 | 24 PAGES |

adjust the delivery or performance date and/or the price and any other terms affected by the delay. The Government is not required to accept/reject the supplies tendered until after receipt of the FVT test results.

(2) The Government shall have the option to require the contractor to screen the entire lot tendered for any defects noted by the FVT. Any defects so found shall be corrected before retendering the lot for acceptance by the Government. Further, the Government may subject this lot to additional FVT. If the Government disapproves the lot tendered for acceptance because of a failure to pass the FVT, the Government has the right to reject the entire offer, thereby releasing the parties from further obligations under the purchase order.

**SECTION F**

**F04a - ADVANCE NOTICE OF DELIVERY TO CONSIGNEES (OTHER THAN AIR OR WATER TERMINALS (AUG 1985) - DCSC INFORMATION TO VENDORS**

The contractor is responsible for requiring carriers to give telephone notice of delivery to the consignee Transportation Officer (Transport Control/Preload Desk), at least 24 hours prior to delivery of freight shipments (other than small parcels). All bills of lading must be annotated to reflect this requirement.

**F05 - LOADING, BLOCKING AND BRACING OF FREIGHT CAR SHIPMENTS (APR 1984) - FAR 52.247-58**

**F07 - FIRST ARTICLE DELIVERY (OCT 1974) - DCSC 52.109-9C01**

CLIN(S) 0001

When First Article Approval (Clause I43 or I44) is required, the applicable "Time of Delivery" clause includes the number of days specified for submission and approval of First Article. If First Article Approval is waived in the award, the number of days required for such testing and approval will be subtracted from the delivery time as provided by the First Article Approval clause unless offeror specifies a different period of reduction in Clause I43a or I44a.

**F11 - DELIVERY OF EXCESS QUANTITIES (SEP 1989) FAR 52.211-17**

**F12 - GOVERNMENT DELAY OF WORK (APR 1984) - FAR 52.242-17**

**F22 - REQUIRED DELIVERY WITH DELIVERY EVALUATION FACTOR (DEC 1995) DCSC 52.211-9C07**

(a) This clause applies to CLINS ALL

The intent of this clause is to obtain the shortest delivery at the best possible price. Offers for other than the required delivery will be considered and evaluated in accordance with Provision M22.

The Government requires delivery to be made according to the following schedule:

**REQUIRED DELIVERY SCHEDULE**
(Contracting Officer insert specific details.)

| ITEM NO. | QUANTITY | WITHIN DAYS AFTER DATE OF CONTRACT |
|---|---|---|
| ALL | 427 | 150 |

It is intended to award without discussions regarding delivery; therefore it is in the offeror's best interest to provide the best delivery. If the offeror proposes no other delivery schedule, the required delivery schedule will apply.

**OFFEROR'S PROPOSED DELIVERY SCHEDULE**

| ITEM NO. | QUANTITY | WITHIN DAYS AFTER DATE OF CONTRACT |
|---|---|---|
| 0001 thru 0005 | 1682 | 150 days |
| | | |
| | | |

(b) Application of the delivery evaluation factor set forth in Provision M22 may result in award to other than the lowest priced acceptable offeror. In such circumstances, if delivery is made after the contract due date, the award price will be reduced using the following formula

Unit Price x Evaluation Factor x Delinquent Quantity x # of Days Delinquent

This reduction may be applied even if the awardee offered the required delivery schedule and the lowest offered price was for delivery longer than the required delivery

This reduction may be up to, but not exceeding 15% of the total award price or 150% of the price differential, whichever is greater, plus the administrative cost of modifying the award to provide for a revised delivery schedule

(c) This clause does not affect or limit the Government's right under the Default Clause of this contract

(d) Attention is directed to the Contract Award provision of the solicitation that provides that a written award or acceptance of offer mailed or otherwise furnished to the successful offeror results in a binding contract. The Government will mail or otherwise furnish to the offeror an award or notice of award not later than the day the award is dated. Therefore, the offeror shall compute the time available for performance beginning with the actual date of award, rather than the date the written notice of award is received from the Contracting Officer through the ordinary mails.

NOTE. Unless otherwise specified in the individual solicitation/contract ACCELERATED DELIVERY IS ACCEPTABLE AND DESIRED AT NO ADDITIONAL COST TO THE GOVERNMENT; however, for contracts awarded on an F.O.B. origin delivery basis, the requirements of FAR 52.247-59, F.O.B. Origin-Carload and Truckload Shipments, must be complied with.

**F23 - STOP-WORK ORDER (AUG 1989) - FAR 52.242-15**

**SECTION G**

**G - CONTRACT ADMINISTRATION DATA** to be included in Section G of the contract.

**SECTION H**

**H01 - MATERIAL INSPECTION AND RECEIVING REPORT (DEC 1991) DFARS 252.246-7000**

At the time of each delivery of supplies or services under this contract, the Contractor shall prepare and furnish to the government a material inspection and receiving report in the manner and to the extent required by Appendix F Material Inspection and Receiving Report, of the Defense FAR Supplement.

NOTE 1: DD Forms 250 may be obtained upon request and at no cost, from the Contract Administration Office.

NOTE 2: Insure that all DD Forms 250 covering MIPR shipments indicate the MIPR Number.

NOTE 3: Wood Products shipments require supplemental data per Clause H01a.

NOTE 4: The following addresses are provided to supplement the distribution prescribed in DoD FAR SUP Appendix F, Tables 1 and 2:

Table 1 - Consignee mailing address:

(C) - See Ship-to Address in Section F

( ) - *APO/FPO Address in Section G

( ) - *APO/FPO Address:

24 of —

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 11 | 24 PAGES |

*NOTE: Copies must be forwarded by airmail.

Table 2 - Inventory Control Manager (ICM) copy:

( ) - Navy Status Control Activity, Army, or Air Force. (ICM)

And the MIPR processing purchase office, if applicable:

( ) - Marine Corps - Addresses as cited in Table 2.

( ) - FMS - Address will be obtained from activity administering contract.

( ) -

917 - SUBSTITUTIONS FOR MILITARY OR FEDERAL SPECIFICATIONS AND STANDARDS (AUG 1997) DFARS 252.211-7005

(a) Definition. "SPI process," as used in this clause, means a management or manufacturing process that has been accepted previously by the Department of Defense under the Single Process Initiative (SPI) for use in lieu of a specific military or Federal specification or standard. Under SPI, these processes are reviewed and accepted by a Management Council, which includes representatives from the Defense Contract Management Command, the Defense Contract Audit Agency, and the military departments.

(b) Offerors are encouraged to propose SPI processes in lieu of military or Federal specifications and standards cited in the solicitation.

(c) An offeror proposing to use an SPI process shall -

(1) Identify the specific military or Federal specification or standard for which the SPI process has been accepted, and the specific paragraph or other location in the solicitation where the military or Federal specification or standard is required;

(2) Provide a copy of the Department of Defense acceptance of the SPI process;

(3) Identify each facility at which the offeror proposes to use the specific SPI process; and

(4) Unless provided in response to paragraph (c)(2) of this clause, provide the name and telephone number of the cognizant Administrative Contracting Officer for each facility where the SPI process is proposed for use.

(d) Absent a determination at the head of the contracting activity or program executive officer level that an SPI process is not acceptable for this procurement, the contractor shall use the following SPI processes in lieu of military or Federal specifications and standards:

(Offeror insert information for each SPI process)

SPI Process:

Facility:
Military or Federal

Specification or Standard:
Affected Contract Line Item and Subline Item Number and Requirement Citation:

Cognizant Administrative Contracting Officer:

**SECTION I**

**702 - AUTHORIZED DEVIATIONS IN CLAUSES (APR 1984) - FAR 52.252-6**

(a) The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

(b) The use in this solicitation or contract of any DoD FAR Supplement (48 CFR Chapter 2) or Defense Logistics Acquisition Regulation Clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the name of the regulation.

**703 - WARRANTY - ACCEPTANCE OF SUPPLIES (JUN 1988) DCRC 52.246-9C16**

This clause is applicable when surplus materials are accepted (See Clause 726), when a Certificate of Conformance (see Provision M05) supports or forms the basis for acceptance of supplies at origin by the Government, or when acceptance is performed by the Government at destination.

(a) The contractor warrants for a period of one year that the supplies at time of delivery conform to all contract requirements. If this warranty is breached, the Government at its option may (1) reject the supplies and require refund of contract price, or (2) require contractor at its expense to repair or replace the supplies; or (3) repair or correct the supplies and charge the contractor for the costs incurred, or (4) retain the supplies and require an equitable adjustment in the contract price. The Government shall mail or otherwise furnish notice to the contractor of the breach of this warranty within one year after date of delivery, inform the contractor of the option exercised, and require the contractor to take action accordingly. For Wood Products, notice of breach of warranty for other than packing deficiencies must be furnished by the Government within the time limits specified in the applicable industry grading rules or standards after receipt of the supplies. Any disputes as to the breach of this warranty shall be resolved under the Disputes clause of the contract.

(b) The contractor shall mark warranty items as required by paragraph 5.2.8, MIL-STD-129(N), "Marking For Shipments And Storage."

(c) The rights hereby provided the Government shall not be affected by other clauses concerning the conclusiveness of inspection and acceptance and are in addition to and do not limit any rights of the Government under other clauses of this contract.

**706 - PREFERENCE FOR CERTAIN DOMESTIC COMMODITIES (FEB 1997) - DFARS 252.225-7012**

(a) The Contractor agrees to deliver under this contract only such of the following articles that have been grown, reprocessed, reused, or produced in the United States, its possessions, or Puerto Rico:

(1) Food;
(2) Clothing;
(3) Tents, tarpaulins, covers;
(4) Cotton and other natural fiber products;
(5) Woven silk or woven silk blends;
(6) Spun silk yarn for cartridge cloth;
(7) Synthetic fabric, and coated synthetic fabric, including all textile fibers and yarns that are for use in such fabrics;
(8) Canvas products;
(9) Wool (whether in the form of fiber or yarn or contained in fabrics, materials, or manufactured articles); or
(10) Any item of individual equipment (Federal Supply Classification 8465) manufactured from or containing such fibers, yarns, fabrics or materials.

(b) This clause does not apply--

(1) To supplies listed in FAR 25.108(d)(1), or other supplies for which the Government has determined that a satisfactory quality and sufficient quantity cannot be acquired as and when needed at U.S. market prices;



24 of —

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-R-3025 | PAGE 12 | OF 24 PAGES |
|---|---|---|---|

(2) To foods which have been manufactured or processed in the United States, its possessions, or Puerto Rico; and

(3) To chemical warfare protective clothing produced in countries listed in subsection 225.872-1 of the Defense FAR Supplement; or

(4) To purchases of fibers and yarns that are for use in synthetic fabric or coated synthetic fabric, if such fabric is to be used as a component of an end item not classified in Federal Supply Group 83, Textile/leather/furs/findings/tents/flags, or Federal Supply Group 84, Clothing, Individual Equipment and Insignia

I12 - REMITTANCE ADDRESS (COMPLETE IF DIFFERENT FROM BLOCK 15A, SF33): (APR 1984) - DCSC INFORMATION TO VENDORS

Capital City Pipes Inc
PO Box 12368
Tallahassee Fl 32317

I13 - DEFAULT - ADMINISTRATIVE COST OF REPROCUREMENT AFTER DEFAULT (MAY 1986) - DLAD 52.249-9000

If this contract is terminated in whole or in part for default pursuant to the clause included herein entitled 'Default,' and the supplies or services covered by the contract so terminated are repurchased by the Government, the Government will incur administrative costs in such repurchases. The contractor and the Government expressly agree that, in addition to any excess costs of repurchase, as provided in paragraph (b) of the 'Default' clause of the contract, or any other damages resulting from such default, the contractor shall pay, and the Government shall accept, the sum of $519.00 as payment in full for the administrative costs of such repurchase. This assessment of damages for administrative costs shall apply for any termination for default following which the Government repurchases the terminated supplies or services, regardless of whether any other damages are incurred and/or assessed.

I14 - BANKRUPTCY (JUL 1995) - FAR 52.242-13

In the event the Contractor enters into proceedings relating to bankruptcy, whether voluntary or involuntary, the Contractor agrees to furnish, by certified mail, written notification of the bankruptcy to the Contracting Officer responsible for administering the contract. This notification shall be furnished within five days of the initiation of the proceedings relating to bankruptcy filing. This notification shall include the date on which the bankruptcy petition was filed, the identity of the court in which the bankruptcy petition was filed, and a listing of Government contract numbers and contracting offices for all Government contracts against which final payment has not been made. This obligation remains in effect until final payment under this contract.

I16 - CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) - FAR 52.203-8

(a) If the Government receives information that a contractor or a person has engaged in conduct constituting a violation of subsection (a), (b), or (c) of Section 27 of the Office of Federal Procurement Policy Act (41 U.S.C. 423) (the Act), (as amended by section 4304 of the National Defense Authorization Act for) Fiscal Year 1996 (Pub. L. 104-106), the Government may-

(1) Cancel the solicitation, if the contract has not yet been awarded or issued; or

(2) Rescind the contract with respect to which-

(i) The Contractor or someone acting for the Contractor has been convicted for an offense where the conduct constitutes a violation of subsection 27 (a) or (b) of the Act for the purpose of either-

(A) Exchanging the information covered by such subsections for anything of value; or

(B) Obtaining or giving anyone a competitive advantage in the award of a Federal agency procurement contract; or

(ii) The head of the contracting activity has determined, based upon a preponderance of the evidence, that the Contractor or someone acting for the Contractor has engaged in conduct constituting an offense punishable under subsections 27(e)(1) of the Act.

(b) If the Government rescinds the contract under paragraph (a) of this clause, the Government is entitled to recover, in addition to any penalty prescribed by law, the amount expended under the contract.

(c) The rights and remedies of the Government specified herein are not exclusive, and are in addition to any other rights and remedies provided by law, regulation, or under this contract.

I20 - PRIORITY RATING (FEB 1996) - DLAD 52.211-9002

This contract is assigned a priority rating under the Defense Priorities and Allocations System (DPAS) regulations (15 CFR 700) which requires contractors to utilize said rating in obtaining the products, materials and supplies needed to fill their contracts. In the event the contractor is unable to obtain the necessary products, materials and supplies to complete the contract, the contractor shall immediately advise the DCMC or the appropriate DPAS priorities and allocations (P&A) officer through the cognizant ACO or contracting officer. The P&A officer or the DCMC industrial specialist will provide necessary assistance or will provide the necessary instructions to complete DOC ITA Form 999, Request for Special Priorities Assistance. This form will be processed through appropriate channels to the Department of Commerce which, upon receipt, will take action to make the needed supplies available to the applicant.

I21 - HAZARDOUS MATERIAL IDENTIFICATION AND MATERIAL SAFETY DATA (JAN 1997) - FAR 52.223-3

(a) "Hazardous material", as used in this clause, includes any material defined as hazardous under the latest version of Federal Standard No. 313 (including revisions adopted during the term of the contract).

(b) The offeror must list any hazardous material, as defined in paragraph (a) of this clause, to be delivered under this contract. The hazardous material shall be properly identified and include any applicable identification number, such as National Stock Number or Special Item Number. This information shall also be included on the Material Safety Data Sheet submitted under this contract.

| MATERIAL (If none, insert "NONE") | IDENTIFICATION NO. |
|---|---|
| - NONE - | |
| | |
| | |

(c) This list must be updated during performance of the contract whenever the Contractor determines that any other material to be delivered under this contract is hazardous.

(d) The apparently successful offeror agrees to submit, for each item as required prior to award, a Material Safety Data Sheet, meeting the requirements of 29 CFR 1910.1200(g) and the latest version of Federal Standard No. 313, for all hazardous material identified in paragraph (b) of this clause. Data shall be submitted in accordance with Federal Standard No. 313, whether or not the apparently successful offeror is the actual manufacturer of these items. Failure to submit the Material Safety Data Sheet prior to award may result in the apparently successful offeror being considered nonresponsible and ineligible for award.

(e) If, after award, there is a change in the composition of the item(s) or a revision to Federal Standard No. 313, which renders incomplete or inaccurate the data submitted under paragraph (d) of this clause, the Contractor shall promptly notify the Contracting Officer and resubmit the data.

(f) Neither the requirements of this clause nor any act or failure to act by the Government shall relieve the Contractor of any responsibility or liability for the safety of Government, Contractor, or subcontractor personnel or property.

(g) Nothing contained in this clause shall relieve the Contractor from complying with applicable Federal, State, and local laws, codes, ordinances, and regulations (including the obtaining of licenses and permits) in connection with hazardous material.

(h) The Government's rights in data furnished under this contract with respect to hazardous material are as follows:

(1) To use, duplicate and disclose any data to



25

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-R-3025 | PAGE 13 | OF 24 PAGES |
|---|---|---|---|

which this clause is applicable. The purposes of this right are to--

(i) Apprise personnel of the hazards to which they may be exposed in using, handling, packaging, transporting, or disposing of hazardous materials;

(ii) Obtain medical treatment for those affected by the material; and

(iii) Have others use, duplicate, and disclose the data for the Government for these purposes.

(2) To use, duplicate, and disclose data furnished under this clause, in accordance with subparagraph (h)(1) of this clause, in precedence over any other clause of this clause, in precedence over any other clause of this contract providing for rights in data.

(3) The Government is not precluded from using similar or identical data acquired from other sources.

**I21a - MATERIAL SAFETY DATA SHEET (MSDS) AND HAZARD WARNING LABELS (MAR 1992) - DLAD 52.223-9038**

(a)(1) This clause is to be used in conjunction with FAR clause 52.223-3, "Hazardous Material Identification and Material Safety Data", and DFARS clause 252.223-7001, "Hazard Warning Labels." Material Safety Data Sheets (MSDSs) and Hazard Warning Labels shall be required to be submitted by the apparently successful offeror prior to contract award. Notwithstanding paragraph a. of Federal Standard (FED-STD) 313c (1 March 1988), the contractor shall submit MSDSs and accompanying HWLs to the contracting officer, rather than directly to the Defense General Supply Center (DGSC). This will satisfy the FED-STD requirement on the part of the contractor.

(2) The MSDS must cite the solicitation number and the applicable CAGE code of the manufacturer, the part number, and where so identified, the National Stock Number (NSN).

**I21b - HAZARD WARNING LABELS (DEC 1991) (FARS 252.223-7001**

(a) "Hazardous material" as used in this clause, is defined in the Hazardous Material Identificatio and Material Safety Data clause of this contract.

(b) The Contractor shall label the item package (unit container) of any hazardous material to be delivered under this contract in accordance with the Hazard Communication Standard (29 CFR 1910.1200 et seq). The Standard requires that the hazard warning label conform to the requirements of the standard unless the material is otherwise subject to the labeling requirements of one of the following statutes:

(1) Federal Insecticide, Fungicide and Rodenticide Act;
(2) Federal Food, Drug and Cosmetic Act;
(3) Consumer Product Safety Act;
(4) Federal Hazardous Substances Act; or
(5) Federal Alcohol Administration Act.

(c) The Offeror shall list which hazardous material listed in the Hazardous Material Identification and Material Safety Data clause of this contract will be labeled in accordance with one of the Acts in paragraphs (b)(1) through (5) of this clause instead of the Hazard Communication Standard. Any hazardous material not listed will be interpreted to mean that a label is required in accordance with the Hazard Communication Standard.

| MATERIAL (If None, Insert "None.") | ACT |
|---|---|
| - NONE - | |
| | |

(d) The apparently successful Offeror agrees to submit, before award, a copy of the hazard warning label for all hazardous materials not listed in paragraph (c) of this clause. The Offeror shall submit the label with the Material Safety Data Sheet being furnished under the Hazardous Material Identification and Material Safety Data clause of this contract.

(e) The Contractor shall also comply with MIL-STD-129, Marking for Shipment and Storage (including revisions adopted during the term of this contract).

**I23 - OZONE-DEPLETING SUBSTANCES (JUN 1996) - FAR 52.223-11**

(a) Definitions. "Ozone-depleting substance", as used in this clause, means any substance designated as Class I by the Environmental Protection Agency (EPA) (40 CFR Part 82), including but not limited to chlorofluorocarbons, halons, carbon tetrachloride, and methyl chloroform; or any substance designated as Class II by EPA (40 CFR Part 82), including but not limited to hydrochlorofluorocarbons.

(b) The Contractor shall label products which contain or are manufactured with ozone-depleting substances in the manner and to the extent required by 42 U.S.C. 7671j(b), (c), and (d) and 40 CFR Part 82, Subpart E, as follows:

"WARNING: Contains (or manufactured with, if applicable ________*, a substance(s) which harm(s) public health and environment by destroying ozone in the upper atmosphere."

*The Contractor shall insert the name of the substance(s).

**I26 - CERTIFICATION OF REQUESTS FOR EQUITABLE ADJUSTMENT (MAR 1998) - DFARS 252.243-7002**

(a) The amount of any request for equitable adjustment to contract terms shall accurately reflect the contract adjustment for which the Contractor believes the Government is liable. The request shall include only costs for performing the change, and shall not include any costs that already have been reimbursed or that have been separately claimed. All indirect costs included in the request shall be properly allocable to the change in accordance with applicable acquisition regulations.

(b) In accordance with 10 U.S.C. 2410(a), any request for equitable adjustment to contract terms that exceeds the simplified acquisition threshold shall bear, at the time of submission, the following certificate executed by an individual authorized to certify the request on behalf of the Contractor:

I certify that the request is made in good faith, and that the supporting data are accurate and complete the best of my knowledge and belief.

Thelma B. Williams
(Official's Name)

Director of Government Sales
(Title)

(c) The certification in paragraph (b) of this clause requires full disclosure of all relevant facts, including-

(1) Cost or pricing data if required in accordance with FAR 15.403-4 of the Federal Acquisition Regulation (FAR); and

(2) Information other than cost or pricing data, in accordance with subsection 15.403-3 of the FAR, including actual cost data and data to support any estimated costs, even if cost or pricing data are not required.

(d) The certification requirement in paragraph (b) of this clause does not apply to-

(1) Requests for routine contract payments, for example, requests for payment for accepted supplies and services, routine vouchers under a cost-reimbursement type contract, or progress payment invoices; or

(2) Final adjustments under an incentive provision of the contract.

**I33 - Required Central Contractor Registration (Mar 1998) DFARS 252.204-7004**

(a) Definitions. As used in this clause--

(1) Central Contractor Registration (CCR) database means the primary DoD repository for contractor information required for the conduct of business with DoD.

(2) Data Universal Numbering System (DUNS) number means the 9-digit number assigned by Dun and Bradstreet Information Services to identify unique business entities.

(3) Data Universal Numbering System +4 (DUNS+4) number means the DUNS number assigned by Dun and Bradstreet plus a 4-digit suffix that may be assigned by a parent (controlling) business concern. This 4-digit suffix may be assigned at the discretion of the parent business concern for

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 14 | 24 PAGES |

such purposes as identifying subunits or affiliates of the parent business concern.

(4) Registered in the CCR database means that all mandatory information, including the DUNS number or the DUNS+4 number, if applicable, and the corresponding Commercial and Government Entity (CAGE) code, is in the CCR database; the DUNS number and the CAGE code have been validated, and all edits have been successfully completed.

(b)(1) By submission of an offer, the offeror acknowledges the requirement that a prospective awardee must be registered in the CCR database prior to award, during performance, and through final payment of any contract resulting from this solicitation, except for awards to foreign vendors for work to be performed outside the United States.

(2) The offeror shall provide its DUNS or, if applicable, its DUNS+4 number with its offer, which will be used by the Contracting Officer to verify that the offeror is registered in the CCR database.

(3) Lack of registration in the CCR database will make an offeror ineligible for award.

(4) DoD has established a goal of registering an applicant in the CCR database within 48 hours after receipt of a complete and accurate application via the Internet. However, registration of an applicant submitting an application through a method other than the Internet may take up to 30 days. Therefore, offerors that are not registered should consider applying for registration immediately upon receipt of this solicitation.

(c) The Contractor is responsible for the accuracy and completeness of the data within the CCR, and for any liability resulting from the Government's reliance on inaccurate or incomplete data. To remain registered in the CCR database after the initial registration, the Contractor is required to confirm on an annual basis that its information in the CCR database is accurate and complete.

(d) Offerors and contractors may obtain information on registration and annual confirmation requirements by calling 1-888-227-2423, or via the Internet at http://ccr.edi.disa.mil.

I16 - PRODUCTION FACILITY CHANGES (APR 1996) - DCSC 52.216-9C04

The performance of any of the work contracted for in any place other than that named in the contract is prohibited unless specifically approved by the DSCC Contracting Officer. Written requests for a change in production facilities must be submitted to the DSCC Contracting Officer. Changes in production facilities may be approved, provided (1) performance by small business or in labor surplus areas as required by the contract will not be changed; (2) the change will not cause a delay in delivery or necessitate a change in the purchase description; (3) the F.O.B. point is not changed; and (4) each request is supported by a price reduction of $250.00 to cover the government's administrative costs to process the change.

I51 - SPECIAL PROHIBITION ON EMPLOYMENT (JUN 1997) DFARS 252.203-7001

(a) Definitions. As used in this clause--

(1) "Arising out of a contract with the DoD" means any act in connection with--(i) Attempting to obtain, (ii) Obtaining, or (iii) Performing a contract or first-tier subcontract of any agency, department, or component of the Department of Defense (DoD).

(2) "Conviction of fraud or any other felony" means any conviction for fraud or a felony in violation of state or Federal criminal statutes, whether entered on a verdict or plea, including a plea of nolo contendere, for which sentence has been imposed.

(3) "Date of conviction" means the date judgment was entered against the individual.

(b) 10 U.S.C. 2408 provides that any individual who is convicted after September 29, 1988, of fraud or any other felony arising out of a contract with the DoD is prohibited from:

(1) Working in a management or supervisory capacity on any DoD contract or first-tier subcontract;

(2) Serving on the board of directors of any DoD contractor or first-tier subcontractor; or

(3) Serving as a consultant to any DoD contractor or first-tier subcontractor.

(c) Unless waived, the prohibition in paragraph (b) applies for five years from the date of conviction.

(d) 10 U.S.C. 2408 further provides that a defense contractor or first-tier subcontractor shall be subject to a criminal penalty of not more than $500,000 if convicted of knowingly--

(1) Employing a person under a prohibition specified in paragraph (b) of this clause; or

(2) Allowing such a person to serve on the board of directors of the contractor or first-tier subcontractor.

(e) In addition to the criminal penalties contained in 10 U.S.C. 2408, the Government may consider other available remedies, such as--

(1) Suspension or debarment;

(2) Cancellation of the contract at no cost to the Government; or

(3) Termination of the contract for default.

(f) The Contractor may submit written requests for waiver of the prohibitions in paragraph (b) of this clause to the Contracting Officer. Requests shall clearly identify--

(1) The person involved;

(2) The nature of the conviction and resultant sentence or punishment imposed;

(3) The reasons for the requested waiver; and,

(4) An explanation of why a waiver is in the interest of national security.

(g) The Contractor agrees to include the substance of this clause, appropriately modified to reflect the identity and relationship of the parties, in all first-tier subcontracts exceeding the simplified acquisition threshold in Part 2 of the Federal Acquisition Regulation, except those for commercial items or components.

(h) Pursuant to 10 U.S.C. 2408(c), defense contractors and subcontractors may obtain information as to whether a particular person has been convicted of fraud or any other felony arising out of a contract with the DoD by contacting The Office of Justice Programs, The Denial of Benefits Office, U.S. Department of Justice, telephone (202) 616-3507.

I82 - TRANSPORTATION OF SUPPLIES BY SEA (NOV 1995) - DFARS 252.247-7023

(a) Definitions. As used in this clause:

(1) "Components" means articles, materials, and supplies incorporated directly into end products at any level of manufacture, fabrication or assembly by the Contractor or any subcontractor.

(2) "Department of Defense" (DoD) means the Army, Navy, Air Force, Marine Corps, and defense agencies.

(3) "Foreign flag vessel" means any vessel that is not a U.S.-flag vessel.

(4) "Ocean transportation" means any transportation aboard a ship, vessel, boat, barge, or ferry through international waters.

(5) "Subcontractor" means a supplier, materialman, distributor or vendor at any level below the prime contractor whose contractual obligation to perform results from, or is conditioned upon, award of the prime contract and who is performing any part of the work or other requirement of the prime contract.

(6) "Supplies" means all property except land and interests in land that is clearly identifiable for eventual use by the armed services, or owned by the armed services, at the time of transportation by sea. (i) An item is clearly identifiable for eventual use by DoD if, for example, the contract documentation contains a reference to a DoD contract number or a military destination. (ii) "Supplies" includes (but is not limited to) public works, buildings and facilities, ships, floating equipment and vessels of every character, type, and description, together with parts, subassemblies, accessories, and equipment; machine tools, material, equipment, and stores of all kinds; end items, construction materials and the components of the foregoing.

(7) "U.S.-flag vessel" means a vessel of the United States or belonging to the United States, including any vessel registered or having national status under the laws of the United States.

(b) The Contractor shall employ United States-flag vessels in the transportation by sea of any supplies to be furnished in the performance of this contract. The Contractor and its subcontractors may request that the Contracting Officer authorize shipment in foreign flag vessels, or designate available U.S.-flag vessels, if the Contractor or a subcontractor believes that, (1) U.S.-flag vessels are not available for timely shipment, (2) the freight charges are excessive or unreasonable; or (3) freight charges are higher than charges to private persons for the transportation of like goods.

(c) The Contractor must submit any request for use of



27

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>SP0740-99-R-3025 | PAGE OF<br>15 | 24<br>PAGES |
|---|---|---|---|

other than U.S.-flag vessels in writing to the Contracting Officer at least forty-five (45) days prior to the sailing date for the shipper to meet its delivery schedules. The Contracting Officer will process requests submitted after such date(s) as expeditiously as possible but the Contracting Officer's failure to grant approvals to meet the shipper's sailing date will not of itself constitute a compensable delay under this or any other clause of this contract.

The request shall contain at a minimum:

(1) Type, weight, and cube of cargo.
(2) Required shipping date.
(3) Special handling and discharge requirements.
(4) Loading and discharge points.
(5) Name of shipper and consignee.
(6) Prime contract number.
(7) A documented description of efforts made to secure U.S.-flag vessels, including points of contact with at least two (2) U.S.-flag carriers contacted by name and telephone number. Copies of telephone notes, telegraphic and facsimile messages or letters will be sufficient for this purpose.

(d) The Contractor shall, within thirty (30) days after each shipment covered by this clause' provide the Contracting Officer and the Division of National Cargo, Office of Market Development, Maritime Administration, U.S. Department of Transportation, Washington, DC 20590, one copy of the rated on board vessel operating carrier's ocean-bill-of-lading, which shall contain the following information:

(1) Applicable Government prime contract number;
(2) Name of vessel;
(3) Vessel flag of registry.
(4) Date of loading;
(5) Port of loading;
(6) Port of final discharge;
(7) Description of commodity;
(8) Gross weight in pounds and cubic feet if applicable;
(9) Total ocean freight in U.S. dollars.
(10) Name of steamship company.

(e) The Contractor agrees to provide with its final invoice under this contract a representation that to the best of its knowledge and belief:

(1) No ocean transportation was used in the performance of this contract,
(2) Ocean transportation was used and only United States-flag vessels were used for all ocean shipments under the contract.
(3) Ocean transportation was used, and to the extent any non-U.S.-flag vessels were used, the Contractor had the written consent of the Contracting Officer for all non-U.S.-flag ocean transportation; or
(4) Ocean transportation was used and some or all of the shipments were made on non-U.S.-flag vessels without the written consent of the Contracting Officer. These shipments were as follows:

| ITEM DESCRIPTION | CONTRACT LINE ITEM | QUANTITY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| TOTAL | | 1486 |

(f) If the invoice does not include the required representation, the Government will be reject and return it to the Contractor as an improper invoice for the purposes of the clause of the contract entitled "Prompt Payment". In the event there has been unauthorized use of non-U.S.-flag vessels in the performance of this contract, the Contracting Officer is entitled to equitably adjust the contract, based on the unauthorized use.

(g) The contractor shall include this clause, including this paragraph (g) in all subcontracts under this contract, which exceed the simplified acquisition threshold in Part 13 of the Federal Acquisition Regulation.

**I07 - PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) - FAR 52.203-10**

(a) The Government, at its election, may reduce the price of a fixed-price type contract or contract modification and the total cost and fee under a cost-type contract or contract modification by the amount of profit or fee determined as set forth in paragraph (b) of this clause if the head of the contracting activity or his or her designee determines that there was a violation of subsection 27(a) of the Office of Federal Procurement Policy Act, as amended (41 U.S.C. 423), as implemented in the FAR. In the case of a contract modification, the fee subject to reduction is the fee specified in the particular contract modification at the time of execution, except as provided in subparagraph (b)(6) of this clause.

(b) The price or fee reduction referred to in paragraph (a) of this clause shall be--

(1) For cost-plus-fixed-fee contracts, the amount of the fee specified in the contract at the time of award;

(2) For cost-plus-incentive-fee contracts, the target fee specified in the contract at the time of award notwithstanding any minimum fee or "fee floor" specified in the contract.

(3) For cost-plus-award-fee contracts--

(i) The base fee established in the contract at the time of contract award;

(ii) If no base fee is specified in the contract, 30 percent of the amount of each award fee otherwise payable to the Contractor for each award fee evaluation period or at each award fee determination point.

(4) For fixed-price-incentive contracts, the Government may--

(i) Reduce the contract target price and contract target profit both by an amount equal to the initial target profit specified in the contract at the time of contract award; or

(ii) If an immediate adjustment to the contract target price and contract target profit would have a significant adverse impact on the incentive price revision relationship under the contract, or adversely affect the contract financing provisions, the Contracting Officer may defer such adjustment until establishment of the total final price established in accordance with the incentive price revision provisions of the contract shall be reduced by an amount equal to the initial target profit specified in the contract at the time of contract award and such reduced price shall be the total final contract price.

(5) For firm-fixed price contracts, by 10 percent of the initial contract price or a profit amount determined by the Contracting Officer from records or documents in existence prior to the date of the contract award.

(c) The Government may, at its election, reduce a prime contractor's price or fee in accordance with the procedures of paragraph (b) of this clause for violations of the Act by its subcontractors by an amount not to exceed the amount of profit or fee reflected in the subcontract at the time the subcontract was first definitively priced.

(d) In addition to the remedies in paragraphs (a) and (c) of this clause, the Government may terminate this contract for default. The rights and remedies of the Government specified herein are not exclusive, and are in addition to any other rights and remedies provided by law or under this contract.

**I34 - SECONDARY ARAB BOYCOTT OF ISRAEL (JUN 1992) DFARS 252.225-7031**

(a) Definitions.
As used in this clause--

"Foreign person" means any person other than a United States person as defined in Section 16(2) of the Export Administration Act of 1979 (50 U.S.C. App. Sec 2415).

"United States person" is defined in Section 16(2) of the Export Administration Act of 1979 and means any United States resident or national (other than an individual resident outside the United States and employed by other than a United States person), any domestic concern (including any permanent domestic establishment of any foreign concern), and any foreign subsidiary or affiliate (including any permanent foreign establishment) of any domestic concern which is controlled in fact by such domestic concern, as determined under regulations of the President.

(b) Certification.

By submitting this offer, the offeror, if a foreign person, company or entity, certifies that it--

(1) Does not comply with the secondary Arab boycott of



28

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.**, a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT E

# (Continued)

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 16 | 24 PAGES |

Israel; and

(2) Is not taking or knowingly agreeing to take any action, with respect to the secondary boycott of Israel by Arab countries, which 50 U.S.C. App. Sec 2407(a) prohibits a United States person from taking.

I36 - COMPUTER GENERATED FORMS (JAN 1991) FAR 52.253-1

(a) Any data required to be submitted on a Standard or Optional Form prescribed by the Federal Acquisition Regulation (FAR) may be submitted on a computer generated version of the form, provided there is no change to the name, content, or sequence of the data elements on the form, and provided the form carries the Standard or Optional Form number and edition date.

(b) Unless prohibited by agency regulations, any data required to be submitted on an agency unique form prescribed by an agency supplement to the FAR may be submitted on a computer generated version of the form provided there is no change to the name, content, or sequence of the data elements on the form and provided the form carries the agency form number and edition date.

(c) If the Contractor submits a computer generated version of a form that is different than the required form, then the rights and obligations of the parties will be determined based on the content of the required form.

I99 - DRUG-FREE WORKPLACE (JAN 1997) - FAR 52.223-6

I100 - CLAUSES INCORPORATED BY REFERENCE (JUN 1988) FAR 52.252-2

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

NOTE: The text of any referenced FAR or DFARS clause may be obtained by request to Defense Supply Center Columbus, Logistics Management Group, P.O. Box 16704, ATTN: DSCC-GPP, Columbus, Ohio 43216-5000. However, the complete edition of Federal Acquisition Regulation (FAR) or DoD FAR SUPPLEMENT (DFARS) may be obtained by purchase from the Superintendent of Documents, Government Printing Office, Washington, D.C. 20402.

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

(a) The following clauses are applicable to sealed bid/negotiated solicitations/contracts:

| CLAUSE TITLE | DATE | FAR REFERENCE |
|---|---|---|
| Affirmative Action for Disabled Veterans and of the Vietnam Era | (APR 1998) | 52.222-35 |
| Affirmative Action for Workers with Disabilities | (JUN 1998) | 52.222-36 |
| Anti-Kickback Procedures | (JUL 1995) | 52.203-7 |
| Assignment of Claims and Alternate I | (JAN 1986) (APR 1984) | 52.232-23 52.232-23 |
| Authorization and Consent | (JUL 1995) | 52.227-1 |
| Audit and Records - Negotiation | (AUG 1996) | 52.215-2 |
| Changes - Fixed Price | (AUG 1987) | 52.243-1 |
| Clean Air and Water | (APR 1984) | 52.223-2 |
| Contract Work Hours and Safety Standards Act - Overtime Compensation | (JUL 1995) | 52.222-4 |
| Covenant Against Contingent Fees | (APR 1984) | 52.203-5 |
| Contractor Use of Mandatory Sources of Supply | (MAR 1996) | 52.208-9 |
| Convict Labor | (AUG 1996) | 52.222-3 |
| Default (Fixed Price Supply and Service) | (APR 1984) | 52.249-8 |
| Defense Priority and Allocation Requirements | (SEP 1990) | 52.211-15 |
| Definitions | (OCT 1995) | 52.202-1 |
| Discounts for Prompt Payments | (MAY 1997) | 52.232-8 |
| Disputes | (DEC 1998) | 52.233-1 |
| Duty-Free Entry | (APR 1984) | 52.225-10 |
| Employment Reports on Disabled Veterans and Veterans of the Vietnam Era | (APR 1998) | 52.222-37 |
| Equal Opportunity (DEVIATION) | (APR 1984) | 52.222-26 |
| Extras | (APR 1984) | 52.232-11 |
| Federal, State, and Local Taxes (Applicable UNLESS clause at FAR 52.229-6. Taxes-Foreign Fixed-Price Contracts (JAN 1991) applies to contracts to be performed outside the U.S.) | (JAN 1991) | 52.229-3 |
| Gratuities | (APR 1984) | 52.203-3 |
| Integrity of Unit Prices and Alternate I | (OCT 1997) (OCT 1997) | 52.215-14 |
| Interest | (JUN 1996) | 52.232-17 |
| Limitation of Liability | (FEB 1997) | 52.246-23 |
| Mandatory Information for Electronic Funds Transfer Payment | (AUG 1996) | 52.232-33 |
| Material Requirements | (OCT 1997) | 52.211-5 |
| Notice & Assistance Regarding Patent and Copyright Infringement | (AUG 1996) | 52.227-2 |
| Notice to the Government of Labor Disputes | (FEB 1997) | 52.222-1 |
| Patent Indemnity | (APR 1984) | 52.227-3 |
| Payments | (APR 1984) | 52.232-1 |
| Pollution Prevention and Right-to-Know Information | MAR 1997 | 52.223-5 |
| Preference for Privately Owned U.S. - Flag Commercial Vessels | (AUG 1996) | 52.247-64 |
| Preference for U.S. - Flag Air Carriers | (JAN 1997) | 52.247-63 |
| Printing/Copying Double-Sided on Recycled Paper | (JUN 1996) | 52.204-4 |
| Prompt Payment | (JUN 1997) | 52.232-25 |
| Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment | (AUG 1995) | 52.209-6 |
| Protest After Award | (AUG 1996) | 52.233-3 |

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 17 | 24 PAGES |

| | | |
|---|---|---|
| Restrictions of Subcontractor Sales to the Government | (JUL 1995) | 52.203-6 |
| Subcontracts | (AUG 1996) | 52.244-2 |
| Taxes - Contracts Performed in U.S. Possessions or Puerto Rico | (APR 1984) | 52.229-6 |
| Termination for Convenience of the Government (Fixed-Price) (Short Form) (Applicable to contracts of $100,000 or less) | (AUG 1996) | 52.249-1 |
| Termination for Convenience of the Government (Fixed-Price) | (SEP 1996) | 52.249-2 |
| Toxic Chemical Release Reporting | (OCT 1996) | 52.223-14 |
| Utilization of Small, Small Disadvantaged and Women-Owned Small Business Concerns | (JAN 1999) | 52.219-8 |
| Walsh-Healey Public Contracts Act | (DEC 1996) | 52.222-20 |
| Order of Precedence - Uniform Contract Format | (OCT 1997) | 52.215-8 |
| Restrictions on Certain Foreign Purchases | (OCT 1996) | 52.225-11 |

II. DoD FAR SUPPLEMENT (48 CFR Chapter 2) Clauses

| | | |
|---|---|---|
| Assignment of Claims (Overseas) | (JUN 1997) | 252.225-7008 |
| Authorization to Perform | (JUN 1997) | 252.225-7042 |
| Buy American Act and Balance of Payments Program | (MAR 1998) | 252.225-7001 |
| Choice of Law (Overseas) | (JUN 1997) | 252.233-7001 |
| Control of Government Personnel Work Product | (APR 1992) | 252.204-7003 |
| Correspondence in English | (JUN 1997) | 252.225-7041 |
| Duty Free Entry - Qualifying Country Supplies (End Products and Components) | (MAR 1998) | 252.225-7009 |
| Duty-Free Entry - Eligible End Products | (MAR 1998) | 252.225-7037 |
| Duty-Free Entry-Additional Provisions | (MAR 1998) | 252.225-7010 |
| Military Recruiting On Campus | (FEB 1996) | 252.209-7005 |
| Payment For Subline Items Not Separately Priced | (DEC 1991) | 252.204-7002 |
| Pricing Adjustments | (DEC 1991) | 252.215-7000 |
| Pricing of Contract Modifications | (DEC 1991) | 252.243-7001 |
| Qualifying Country Sources as Subcontractors | (DEC 1991) | 252.225-7002 |
| Postaward Conference | (DEC 1991) | 252.242-7000 |
| Subcontracting with Firms That are Owned or Controlled by the Government of a Terrorist Country | (MAR 1998) | 252.209-7004 |
| Supplies to be Accorded Duty-Free Entry | (MAR 1998) | 252.225-7008 |

I208 - DRUG-FREE WORK FORCE (SEP 1988) - DFARS 252.223-7004

I207 - INCONSISTENCY BETWEEN ENGLISH VERSION AND TRANSLATION OF CONTRACT (AUG 1989) - FAR 52.215-16

In the event of inconsistency between any terms of this contract and any translation thereof into another language, the English language meaning shall control.

I208 - LIMITATIONS ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (JUN 1997) - FAR 52.203-12

I216 - SUBCONTRACTS FOR COMMERCIAL ITEMS AND COMMERCIAL COMPONENTS (OCT 1998) - FAR 52.244-6

(a) Definition.
"Commercial item", as used in this clause, has the meaning contained in the clause at 52.202-1, Definitions.
"Subcontract", as used in this clause, includes a transfer of commercial items between divisions, subsidiaries, or affiliates of the Contractor or subcontractor at any tier.
(b) To the maximum extent practicable, the Contractor shall incorporate, and require its subcontractors at all tiers to incorporate, commercial items or nondevelopmental items as components of items to be supplied under this contract.
(c) Notwithstanding any other clause of this contract, the Contractor is not required to include any FAR provision or clause, other than those listed below to the extent they are applicable and as may be required to establish the reasonableness of prices under Part 15, in a subcontract at any tier for commercial items or commercial components:
(1) 52.222-26, Equal Opportunity (E.O. 11246);
(2) 52.222-35, Affirmative Action for Disabled Veterans and of the Vietnam Era (38 U.S.C. 4212(a));
(3) 52.222-36, Affirmative Action for Workers with Disabilities 29 U.S.C. 793); and
(4) 52.247-64, Preference for Privately-Owned U.S.-Flagged Commercial Vessels (46 U.S.C. 1241) (flow down not required for subcontracts awarded beginning May 1, 1996).
(d) The Contractor shall include the terms of this clause, including this paragraph (d), in subcontracts awarded under this contract.

SECTION J
J01 - LIST OF DOCUMENTS, EXHIBITS, AND OTHER ATTACHMENTS

This solicitation consists of documents and attachments identified by an "X" in the space provided and made a part hereof.

| ATCH/FM NO. | NAME | DATE |
|---|---|---|
| (X) DD FM 1707 (Cover Sheet) | Information to Offerors or Quoters | MAR 90 |
| (X) SF 33 | Solicitation, Offer and Award | Rev 4-85 |
| (X) --- | Section B | --- |
| (X) --- | Sections C thru M | --- |
| ( ) --- | Pkg Spc(s) as Cited in Sec D | --- |
| ( ) --- | Interim Amend. No. | |
| ( ) --- | Quality Assurance Provision (QAP) No. | |
| ( ) --- | Supplemental Alternate Offer Guidelines for AMC/NAVSEA/AVSCOM Critical Items | --- |
| ( ) SF 1411 | *Contract Pricing Proposal Cover Sheet | Rev 10-95 |
| ( ) SF 1448 | Proposal Cover Sheet (Cost or Pricing Data Not Required) | 10-95 |



30

**CONTINUATION SHEET**

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025

PAGE 18 OF 24 PAGES

| | | | |
|---|---|---|---|
| ( ) DCSC FM 1650 | Freight Shipping Information - Mode of Shipment | | AUG 73 |
| ( ) Form CASB-CMF | Facilities Capital Cost of Money Factors Computation | | --- |
| ( ) DD Form 1861 | Contract Facilities Capital Cost of Money | | APR 96 |
| (X) DC1636P001 | Palletization | | Rev 9615 |
| ( ) | | | |
| ( ) | | | |
| ( ) | | | |
| ( ) DD FM 1423 | Contract Data Rqmt List | | JUN 90 |
| | EXHIBIT No. | | --- |
| | w/ATCH No. | | --- |
| | EXHIBIT No. | | --- |
| | w/ATCH No. | | --- |
| | EXHIBIT No. | | --- |
| | w/ATCH No. | | --- |
| | EXHIBIT No. | | --- |
| | w/ATCH No. | | --- |

*Instructions included in FAR 15.404-6(b) must be followed carefully.

## SECTION K

K01 - CERTIFICATE OF INDEPENDENT PRICE DETERMINATION (APR 1985) - FAR 52.203-2

(a) The offeror certifies that -

(1) The prices in this offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to (i) those prices, (ii) the intention to submit an offer, or (iii) the methods or factors used to calculate the prices offered;

(2) The prices in this offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a formally advertised solicitation) or contract award (in the case of a negotiated solicitation) unless otherwise required by law; and

(3) No attempt has been made or will be made by the offeror to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

(b) Each signature on the offer is considered to be a certification by the signatory that the signatory--

(1) Is the person in the offeror's organization responsible for determining the prices being offered in this bid or proposal, and that the signatory has not participated and will not participate in any action contrary to subparagraphs (a)(1) through (a)(3) above; or

(2)(i) Has been authorized, in writing, to act as agent for the following principals in certifying that those principals have not participated, and will not participate in any action contrary to subparagraphs (a)(1) through (a)(3) above

Capital City Pipe Inc.
PO Box 12348
Tallahassee FL 32317

(insert full name of person(s) in the offeror's organization responsible for determining the prices offered in this bid or proposal, and the title of his or her position in the offeror's organization);

(ii) As an authorized agent, does certify that the principals named in subdivision (b)(2)(i) above have not participated, and will not participate, in any action contrary to subparagraphs (a)(1) through (a)(3) above; and

(iii) As an agent, has not personally participated, and will not participate, in any action contrary to subparagraphs (a)(1) through (a)(3) above.

(c) If the offeror deletes or modifies subparagraph (a)(2) above, the offeror must furnish with its offer a signed statement setting forth in detail the circumstances of the disclosure.

K02 - PREVIOUS CONTRACTS AND COMPLIANCE REPORTS (APR 1984) (DEVIATION) FAR 52.222-22

The offeror represents that--

(a) It ( ) has, (✓) has not participated in a previous contract or subcontract subject to the Equal Opportunity clause of this solicitation;

(b) It (✓) has, ( ) has not, filed all required compliance reports; and

(c) Representations indicating submission of required compliance reports, signed by proposed subcontractors, will be obtained before subcontract awards.

K03 SMALL BUSINESS PROGRAM REPRESENTATIONS (OCT 1998) FAR 52.219-1

(a)(1) The standard industrial classification (SIC) code for this acquisition is

(2) The small business size standard is (insert size standard).

(3) The small business size standard for a concern which submits an offer in its own name, other than on a construction or service contract, but which proposes to furnish a product which it did not itself manufacture, is 500 employees.

(b) Representations. (1) The offeror represents and certifies as part of its offer that it (✓) is, ( ) is not a small business concern.

(2) (Complete only if offeror represented itself as a small business concern in paragraph (b)(1) of this provision.) The offeror represents, for general statistical purposes, that it (✓) is, ( ) is not, a small disadvantaged business concern as defined in 13 CFR 124.1002.

(3) (Complete only if offeror represented itself as a small business concern in block (b)(1) of this section.) The offeror represents as part of its offer that it ( ) is (✓) is not a women-owned small business concern.

(c) Definitions.

"Small business concern," as used in this provision, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the criteria in 13 CFR Part 121 and the size standard in paragraph (a) of this provision.

"Woman-owned small business concern," as used in this provision, means a small business concern--

(1) Which is at least 51 percent owned by one or more women or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and

(2) Whose management and daily business operations are controlled by one or more women.

(d) Notice. (1) If this solicitation is for supplies and has been set aside, in whole or in part, for small business concerns, then the clause in this solicitation providing notice of the set-aside contains restrictions on the source of the end items to be furnished.

(2) Under 15 U.S.C. 645(d), any person who misrepresents a firm's status as a small or small disadvantaged business concern in order to obtain a contract to be awarded under the preference programs established pursuant to sections 8(a), 8(d), 9, or 15 of the Small Business Act or any other provision of Federal law that specifically references section 8(d) for a definition of program eligibility, shall -

(i) Be punished by imposition of fine, imprisonment, or both;

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 19 | 24 PAGES |

(ii) Be subject to administrative remedies, including suspension and debarment; and
(iii) Be ineligible for participation in programs conducted under the authority of the Act.

(x) ALTERNATE I (OCT 1998)
(4) [Complete if the offeror has represented itself as disadvantaged in paragraph (b)(2) of this provision.] [The offeror shall check the category in which its ownership falls]:

[✓] Black American.
[ ] Hispanic American.
[ ] Native American (American Indians, Eskimos, Aleuts, or Native Hawaiians).
[ ] Asian-Pacific American (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China, Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, The Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Hong Kong, Fiji, Tonga, Kiribati, Tuvalu, or Nauru).
[ ] Subcontinent Asian (Asian-Indian) American (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands, or Nepal).
[ ] Individual/concern, other than one of the preceding.

K05 - PROHIBITION OF SEGREGATED FACILITIES (APR 1984) (DEVIATION)

(a) "Segregated facilities," as used in this clause, means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees, that are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, sex or national origin because of written or oral policies or employee custom. The term does not include separate or single-user rest rooms and necessary dressing or sleeping areas, which shall be provided to assure privacy between the sexes.

(b) The Contractor agrees that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. The Contractor agrees that a breach of this clause is a violation of the Equal Opportunity clause in this contract.

(c) The Contractor shall include this clause in every subcontract that contains the clause of this contract entitled "Equal Opportunity."

K06 - RECOVERED MATERIAL CERTIFICATION (OCT 1997) - FAR 52.223-4

K07b - TYPE OF BUSINESS ORGANIZATION (OCT 1997) - FAR 52.215-6 (RFP's only)

The offeror or respondent, by checking the applicable box, represents that-
(a) It operates as [ ] an individual, [ ] a partnership, [ ] a nonprofit organization, [ ] a joint venture, or a corporation under the laws of the State of FLORIDA
(b) If the offeror or respondent is a foreign entity, it operates as [ ] an individual, [ ] a partnership, [ ] a nonprofit organization, [ ] a joint venture, or [ ] a corporation, registered for business in ______________. (Country)

K08 - CLEAN AIR AND WATER CERTIFICATION (APR 1984) - FAR 52.223-1

The Offeror certifies that.
(a) Any facility to be used in the performance of this proposed contract is [✓], is not [ ] listed on the Environmental Protection Agency List of Violating Facilities;
(b) The offeror will immediately notify the Contracting Officer, before award, of the receipt of any communication from the Administrator, or a designee, of the Environmental Protection Agency, indicating that any facility that the offeror proposes to use for the performance of the contract is under consideration to be listed on the EPA List of Violating Facilities; and
(c) The offeror will include a certification substantially the same as this certification, including this paragraph (c), in every nonexempt subcontract.

K12 - AFFIRMATIVE ACTION COMPLIANCE (APR 1984) FAR 52.222-25

The offeror represents that (a) it [✓] has developed and has on file, [ ] has not developed and does not have on file, at each establishment, affirmative action programs required by the rules and regulations of the Secretary of Labor (41 CFR 60-1 and 60-2), or (b) it [ ] has not previously had contracts subject to the written affirmative action programs requirement of the rules and regulations of the Secretary of Labor.

NOTE: Offeror represents that he [ ] has, [✓] has not, 50 or more employees.

K14 - DATA UNIVERSAL NUMBERING SYSTEM (DUNS) NUMBER (APR 1996) - FAR 52.204-6

(a) The offeror shall enter, in the block with its name and address on the cover page of its offer, the annotation "DUNS" followed by the DUNS number that identifies the offeror's name and address exactly as stated in the offer. The DUNS number is a nine-digit number assigned by Dun and Bradstreet Information Services.

(b) If the offeror does not have a DUNS number, it should contact Dun and Bradstreet directly to obtain one. A DUNS number will be provided immediately by telephone at no charge to the offeror. For information on obtaining a DUNS number, the offeror, if located within the United States, should call Dun and Bradstreet at 1-800-333-0505. The offeror should be prepared to provide the following information:
(1) Company name.
(2) Company address.
(3) Company telephone number.
(4) Line of business.
(5) Chief executive officer/key manager.
(6) Date the company was started.
(7) Number of people employed by the company.
(8) Company affiliation.

(c) Offerors located outside the United States may obtain the location and phone number of the local Dun and Bradstreet Information Services office from the Internet Home Page at http://www.dnb.com/. If an offeror is unable to locate a local service center, it may send an e-mail to Dun and Bradstreet at globalinfo

K17 - WHEN OFFEROR DESIRES ADMINISTRATIVE MATTERS TO BE PERFORMED AT OTHER THAN ADDRESS IN BLOCK 15A, SF 33, INDICATE BELOW. (APR 1984) - DCSC INFORMATION TO VENDOR

______________________________

______________________________

______________________________

______________________________

K18 - MINIMUM ACCEPTANCE PERIODS (APR 1984) - DSCC 52.214-9C01

MINIMUM BID ACCEPTANCE PERIOD (APR 1984) - FAR 52.214-16 (IFBs only)

(a) "Acceptance period," as used in this provision, means the number of calendar days available to the Government for awarding a contract from the date specified in this solicitation for receipt of bids.

(b) This provision supersedes any language pertaining to the acceptance period that may appear elsewhere in this solicitation.

(c) The Government requires a minimum acceptance period of (See Notes 1 & 2) calendar days.

(d) In the space provided immediately below, bidders may specify a longer acceptance period than the Government's minimum requirement. The bidder allows the following



32

02/25/1999 16:51 850- ( '956 CAPITAL CITY PES PAGE 24
FILE No. 328 01/19 '99 14:36 ID:DCSC AEROSPACE COLS.OH 1 614 271 PAGE 2

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 20 | 24 PAGES |

acceptance period: calendar days.

(e) A bid allowing less than the Government's minimum acceptance period will be rejected.

(f) The bidder agrees to execute all that it has undertaken to do, in compliance with its bid, if that bid is accepted in writing within (1) the acceptance period stated in paragraph (c) above or (2) any longer acceptance period stated in paragraph (d) above.

NOTES:
(1) All Items (except Wood Products):
(i) 60 calendar days.
(ii) If a period is not stated by offeror, offer may be accepted within 60 calendar days after date of bid opening.

(2) Wood Products' Items:
(i) 10 calendar days for shipments to Ports of Loading.
(ii) ? calendar days for all other shipments.
(iii) If a period is not stated by offeror, offer may be accepted within 30 calendar days after date of bid opening.

PERIOD FOR ACCEPTANCE OF OFFER (APR 1984) - FAR 52.215-19 (RFPs only)

In compliance with the solicitation, the offeror agrees, if this offer is accepted within : calendar days (60 calendar days unless a different period is inserted by the offeror) from the date specified in the solicitation for receipt of offers, to furnish any or all items on which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the Schedule.

NOTE:
(3) Negotiated RFP: The minimum acceptance periods stated in notes (1) and (2) above are desired. If a different period is not stated, 60 calendar days applies except for wood products which is 30 calendar days.

K30 - ROYALTY INFORMATION (APR 1984) - FAR 52.227-6 (RFPs only)

K35 - REPRESENTATION OF EXTENT OF TRANSPORTATION BY SEA (AUG 1992) - DFARS 252.247-7022

(a) The Offeror shall indicate by checking the appropriate blank in paragraph (b) of this clause whether transportation of supplies by sea is anticipated under the resulting contract. The term "supplies" is defined in the Transportation of Supplies by Sea clause of this solicitation.

(b) REPRESENTATION.
The Offeror represents that it—

( ) Does anticipate that supplies will be transported by sea in the performance of any contract or subcontract resulting from this solicitation.

(✓) Does not anticipate that supplies will be transported by sea in the performance of any contract or subcontract resulting from this solicitation.

(c) Any contract resulting from this solicitation will include the Transportation of Supplies by Sea clause. If the Offeror represents that it will not use ocean transportation, the resulting contract will also include the Defense FAR Supplement clause at 252.247-7024, Notification of Transportation of Supplies by Sea.

K39 - Place of Performance (FAR 52.215-6) (OCT 1997)

(a) The offeror or respondent, in the performance of any contract resulting from this solicitation, ( ) intends, (✓) does not intend (check applicable block) to use one or more plants or facilities located at a different address from the address of the offeror or respondent as indicated in this proposal or response to request for information.
(b) If the offeror or respondent checks "intends" in paragraph (a) of this provision, it shall insert in the following spaces the required information:

Place of Performance (Street, Address, City, County, State, Zip Code:
JGB Enterprises
115 Metropolitan Dr / Liverpool NY

Name and Address of Owner and Operator of the Plant or Facility if other Than Offeror or Respondent
JGB Enterprises
115 Metropolitan Dr / Liverpool NY

K32 - INSPECTION AND SHIPPING POINTS (APR 1984) - DCSC 52.246-9C02

Paragraphs a, b and c below must be completed ONLY if the place of inspection of supplies, packaging/packing point or shipping point are DIFFERENT than the place of manufacture/treating facility listed in Provision K39.
(a) PLACE OF INSPECTION (Supplies): Indicate below where Contractor inspection will be performed and where facilities and assistance for Government verification inspection will be furnished as required by FAR 52.246-2(b) and (d) Inspection.

| CLIN(S) | PLANT NAME | ADDRESS |
|---|---|---|
| | | |
| | | |
| | | |

(b) PLACE OF INSPECTION (Packaging and Packing Point): Indicate location at which packaging/packing will be performed if other than place of inspection for supplies.

| CLIN(S) | PLANT NAME | ADDRESS |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

(c) SHIPPING POINT: Indicate below the shipping point if DIFFERENT from (a) or (b) above (See Provision K10:

| CLIN(S) | PLANT NAME | ADDRESS |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

K34 - ECONOMIC PURCHASE QUANTITY-SUPPLIES (AUG 1987) FAR 52.207-4

(a) Offerors are invited to state an opinion on whether the quantity(ies) of supplies on which bids, proposals or quotes are requested in this solicitation is (are) economically advantageous to the Government.

__________

__________

__________

__________

(b) Each offeror who believes that acquisitions in different quantities would be more advantageous is invited to recommend an economic purchase quantity. If different quantities are recommended, a total and a unit price must be quoted for applicable items. An economic purchase quantity is that quantity at which a significant price break occurs. If there are significant price breaks at different quantity points, this information is desired as well

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>SP0740-99-R-3025 | PAGE OF<br>21 | 24<br>PAGES |
|---|---|---|---|

OFFEROR RECOMMENDATIONS

| CLIN(s) | QUANTITY | PRICE QUOTATION | TOTAL |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

(c) The information requested in this provision is being solicited to avoid acquisitions in disadvantageous quantities and to assist the Government in developing a data base for future acquisitions of these items. However, the Government reserves the right to amend or cancel the solicitation and resolicit with respect to any individual item in the event quotations received and the Government's requirements indicate that different quantities should be acquired.

K44 - DISCLOSURE OF OWNERSHIP OR CONTROL BY THE GOVERNMENT OF A TERRORIST COUNTRY (MAR 1998) DFARS 252.209-7001

(a) Definitions

As used in this provision--

(1) "Government of a terrorist country" includes the state and the government of a terrorist country, as well as any political subdivision, agency, or instrumentality thereof.

(2) "Terrorist country" means a country determined by the Secretary of State, under section 6(j)(1)(A) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)(i)(A)), to be a country the government of which has repeatedly provided support for acts of international terrorism. As of the date of this provision, terrorist countries include: Cuba, Iran, Iraq, Libya, North Korea, Sudan, and Syria.

(3) "Significant interest" means--

(i) Ownership of or beneficial interest in five percent (5%) or more of the firm's or subsidiary's securities. Beneficial interest includes holding five percent (5%) or more of any class of the firm's securities in "nominee shares", "street names", or some other method of holding securities that does not disclose the beneficial owner;

(ii) Holding a management position in the firm such as director or officer;

(iii) Ability to control or influence the election, appointment, or tenure of directors or officers of the firm;

(iv) Ownership of ten percent (10%) or more of [illegible] of a firm such as equipment, buildings, real estate, or other tangible assets of the firm; or

(v) Holding fifty percent (50%) or more of the indebtedness of a firm.

(b) Prohibition on award.
In accordance with 10 U.S.C. 2327, no contract may be awarded to a firm or a subsidiary of a firm if the government of a terrorist country has a significant interest in the firm or subsidiary or, in the case of a subsidiary, the firm that owns the subsidiary, unless a waiver is granted by the Secretary of Defense.

(c) Disclosure.
If the government of a terrorist country has a significant interest in the Offeror or a subsidiary of the Offeror, the Offeror shall disclose such interest in an attachment to its offer. If the Offeror is a subsidiary, it shall also disclose any significant interest the government of a terrorist country has in any firm that owns or controls the subsidiary. The disclosure shall include--

(1) Identification of each government holding a significant interest; and

(2) A description of the significant interest held by each government.

K41 - DISCLOSURE OF OWNERSHIP OR CONTROL BY A FOREIGN GOVERNMENT (SEP 1994) - DFARS 252.209-7002

K42 - TAXPAYER IDENTIFICATION (OCT 1998) - FAR 52.204-3

(a) Definitions.

"Common parent," as used in this provision, means that corporate entity that owns or controls an affiliated group of corporations that files its Federal income tax returns on a consolidated basis, and of which the offeror is a member.

"Taxpayer Identification Number (TIN)," as used in this provision, means the number required by the Internal Revenue Service (IRS) to be used by the offeror in reporting income tax and other returns. The TIN may be either a Social Security Number or an Employer Identification Number.

(b) All offerors must submit the information required in paragraphs (d) through (f) of this provision to comply with debt collection requirements of 31 U.S.C. 7701(c) and 3325(d), reporting requirements of 26 U.S.C. 6041, 6041A, and 6050M and implementing regulations issued by the IRS. If the resulting contract is subject to the reporting requirements described in Federal Acquisition Regulation (FAR) 4.904, the failure or refusal by the offeror to furnish the information may result in a 31 percent reduction of payments otherwise due under the contract.

(c) The TIN may be used by the Government to collect and report on any delinquent amounts arising out of the offeror's relationship with the Government (31 U.S.C. 7701(c)(3)). If the resulting contract is subject to the payment reporting requirements described in FAR 4.904, the TIN provided hereunder may be matched with IRS records to verify the accuracy of the offeror's TIN.

(✓) TIN: 59-2991957
( ) TIN has been applied for.
( ) TIN is not required because:
( ) Offeror is a nonresident alien, foreign corporation, or foreign partnership that does not have income effectively connected with the conduct of a trade or business in the United States and does not have an office or place of business or a fiscal paying agent in the United States;
( ) Offeror is an agency or instrumentality of a foreign government;
( ) Offeror is an agency or instrumentality of the Federal Government.

(e) Type of organization.

( ) Sole proprietorship;
( ) Partnership;
(✓) Corporate entity (not tax-exempt);
✓ Corporate entity (tax-exempt);
( ) Government entity (Federal, State, or local);
( ) Foreign government;
( ) International organization per 26 CFR 1.6049-4
( ) Other ______

(f) Common parent.

✓ Offeror is not owned or controlled by a common parent as defined in paragraph (a) of this provision.
( ) Name and TIN of common parent:

Name ______

TIN ______

K45 - CERTIFICATION REGARDING DEBARMENT, SUSPENSION, PROPOSED PROPOSED DEBARMENT, AND OTHER RESPONSIBILITY MATTERS (MAR 1996) - FAR 52.209-5

(a)(1) The Offeror certifies, to the best of its knowledge and belief, that--

(i) The Offeror and/or any of its Principals--

(A) Are ( ) are not (✓) presently debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal agency.

(B) Have ( ) have not (✓), within a three-year period preceding this offer, been convicted of or had a civil judgement rendered against them for: commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, state, or local) contract or subcontract; violation of Federal or state antitrust statutes relating to the submission of offers; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen



34

02/25/1999 16:51 850 1-2956 CAPITAL CITY FLS PAGE 4
FILE No. 328 01/19 '99 14:37 ID:DCSC AEROSPACE COLS,OH 1 614 69 271

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 22 | 24 PAGES |

property; and

(C) Are [ ] are not [ ] presently indicted for, or otherwise criminally or civilly charged by a governmental entity with, commission of any of the offenses enumerated in subdivision (a)(1)(i)(B) of this provision.

(ii) The Offeror has [ ] has not [ ], within a three-year period preceding this offer, had one or more contracts terminated for default by any Federal agency.

(2) "Principals," for the purposes of this certification, means officers; directors; owners; partners; and, persons having primary management or supervisory responsibilities within a business entity (e.g., general manager; plant manager; head of a subsidiary, division or business segment, and similar positions).

THIS CERTIFICATION CONCERNS A MATTER WITHIN THE JURISDICTION OF AN AGENCY OF THE UNITED STATES AND THE MAKING OF A FALSE, FICTITIOUS, OR FRAUDULENT CERTIFICATION MAY RENDER THE MAKER SUBJECT TO PROSECUTION UNDER SECTION 1001, TITLE 18, UNITED STATES CODE.

(b) The Offeror shall provide immediate written notice to the Contracting Officer if, at any time prior to contract award, the Offeror learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

(c) A certification that any of the items in paragraph (a) of this provision exists will not necessarily result in withholding of an award under this solicitation. However, the certification will be considered in connection with a determination of the Offeror's responsibility. Failure of the Offeror to furnish a certification or provide such additional information as requested by the Contracting Officer may render the Offeror nonresponsible.

(d) Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render, in good faith, the certification required by paragraph (a) of this provision. The knowledge and information of an Offeror is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

(e) The certification in paragraph (a) of this provision is a material representation of fact upon which reliance was placed when making award. If it is later determined that the Offeror knowingly rendered an erroneous certification, in addition to other remedies available to the Government, the Contracting Officer may terminate the contract resulting from this solicitation for default.

K46 - CERTIFICATION AND DISCLOSURE REGARDING PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (APR 1991) - FAR 52.203-11

K47 - INFORMATION FOR DUTY-FREE ENTRY EVALUATION (MAR 1998) DFARS 252.225-7003

(a) Does the offeror propose to furnish
(1) A domestic end product with nonqualifying country components for which the offeror requests duty-free entry; or
(2) A foreign end product consisting of end items, components, or material of foreign origin other than those for which duty-free entry is to be accorded pursuant to the Duty - Free Entry-Qualifying Country Supplies (End Products and Components) clause or, if applicable, the Duty - Free Entry-Eligible End Products clause of this solicitation?
( ) Yes ( ) No

(b) If the answer in paragraph (a) is yes, answer the following questions:
(1) Are such foreign supplies now in the United States? ( ) Yes ( ) No
(2) Has the duty on such foreign supplies been paid? ( ) Yes ( ) No
(3) If the answer to paragraph (b)(2) is no, what amount is included in the offer to cover such duty?
$

K50 - CERTIFICATION OF TOXIC CHEMICAL RELEASE REPORTING (OCT 1996) - FAR 52.223-13

(a) Submission of this certification is a prerequisite for making or entering into this contract imposed by executive order 12969, August 8, 1995.

(b) By signing this offer, the offeror certifies that--

(1) As the owner or operator of facilities that will be used in the performance of this contract that are subject to the filing and reporting requirements described in section 313 of the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA) (42 U.S.C. 11023) and section 6607 of the Pollution Prevention Act of 1990 (PPA) (42 U.S.C. 13106), the offeror will file and continue to file for such facilities for the life of the contract the Toxic Chemical Release Inventory Form (Form R) as described in sections 313(a) and (g) of EPCRA and section 6607 of PPA; or

(2) None of its owned or operated facilities to be used in the performance of this contract is subject to the Form R filing and reporting requirements because each such facility is exempt for at least one of the following reasons: (Check each block that is applicable).

[ ] (i) The facility does not manufacture, process, or otherwise use any toxic chemicals listed under section 313(c) of EPCRA, 42 U.S.C. 11023(c);

[ ] (ii) The facility does not have 10 or more full-time employees as specified in section 313(b)(1)(A) of EPCRA, 42 U.S.C. 11023(b)(1)(A);

[ ] (iii) The facility does not meet the reporting thresholds of toxic chemicals established under section 313(f) of EPCRA, 42 U.S.C. 11023(f) (including the alternate thresholds at 40 CFR 372.27, provided an appropriate certification form has been filed with EPA);

[ ] (iv) The facility does not fall within Standard Industrial Classification Code (SIC) designations 20 through 39 as set forth in section 19.102 of the Federal Acquisition Regulation; or

[ ] (v) The facility is not located within any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Northern Mariana Islands, or any other territory or possession over which the United States has jurisdiction.

SECTION L

L01 - AUTHORIZED DEVIATIONS IN PROVISIONS (APR 1984) - FAR 52.252-5

(a) The use in this solicitation of any Federal Acquisition Regulation (48 CFR Chapter 1) provision with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the provision.

(b) The use in this solicitation of any DoD FAR Supplement (48 CFR Chapter 2) or Defense Logistics Acquisition Regulation provision with an authorized deviation is indicated by the addition of "(DEVIATION)" after the name of the regulation.

L06 - POSTPONEMENT OF OPENING OF OFFERS (OCT 1992) - DLAD 52.214-9000

If the opening of offers is postponed because emergency or unanticipated events (such as, but not limited to, flood, fire, accident, weather condition or strikes) result in closing the designated site for opening offers, so that the conduct of openings as scheduled is impracticable, offers or modifications or withdrawal of offers received prior to the time of actual opening will be considered as timely. Offers or modifications or withdrawal of offers received after the time of actual opening of offers, when opening of offers was postponed as provided above, will not be considered except as provided in FAR 52.214-7 or FAR 52.215-10 as applicable.

L11 - NOTICE OF PRIORITY RATING FOR NATIONAL DEFENSE USE (SEP 1990) - FAR 52.211-14

Any contract awarded as a result of this solicitation will be ( ) DX Rated order; (X) DO Rated order certified for national defense use under the Defense Priorities and Allocations System (DPAS) (15 CFR 700), and the Contractor will be required to follow all the requirements of this regulation.

( ) DX-Rating; (X) DO-Rating

NOTE: (INFORMATION FOR OFFEROR-

(X) DO A1 ( ) DO A1 rating

( ) DX



35

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 23 | 24 PAGES |

L15 - SUBMISSION OF OFFERS IN THE ENGLISH LANGUAGE (APR 1991) - FAR 52.214-34

Offers submitted in response to this solicitation shall be in the English language. Offers received in other than English shall be rejected

L16 - SUBMISSION OF OFFERS IN U.S. CURRENCY (APR 1991) - FAR 52.214-35

Offers submitted in response to this solicitation shall be in terms of U.S. dollars. Offers received in other than U.S. dollars shall be rejected.

L16 - GOVERNMENT PRODUCTION AND RESEARCH PROPERTY (APR 1998) - DCSC 52.245-9C02

This solicitation does not authorize the use of any Government production or research property, except as may be specified in the solicitation. If an offeror requires the use, in performing any resulting, contract, of any items of Government property in the offeror's or its subcontractor's possession under a facilities contract or agreement independent of this solicitation, such offers, to be responsive, must identify the contract under which the property is held and list the property to be used showing acquisition cost and date of acquisition, and include written permission of the Contracting Officer having cognizance of the property to use property for the period required under the solicitation, and indicate the rent to be paid for the use, or if use is rent free, the evaluation factor to be applied computed under the facilities contract. Offers in response to sealed bid solicitations contingent on the use of Government property not provided for in the schedule thereof that do not comply with the foregoing will be nonresponsive and not considered for award.

L18 - TYPE OF CONTRACT (APR 1984) - FAR 52.216-1 (RFPs only)

The Government contemplates award of:
(X) FIRM FIXED PRICE
( ) FIXED PRICE WITH ECONOMIC PRICE ADJUSTMENT
( )
contract resulting from this solicitation.

L27 - SERVICE OF PROTEST (AUG 1996) - FAR 52.233-2

(a) Protests, as defined in Section 33.101 of the Federal Acquisition Regulation, that are filed directly with an agency, and copies of any protests that are filed with the General Accounting Office (GAO), shall be served on the contracting officer (addressed as follows) by obtaining written and dated acknowledgment of receipt from:

Office of Counsel (DCCC)
Defense Supply Center Columbus
P.O. Box 16704
Columbus, OH 43216-5010

(b) The copy of any protest shall be received in the office designated above within one day of filing a protest with the GAO.

L28 - MANUFACTURING OR PRODUCTION INFORMATION (FEB 1996) - DLAD 52.217-9002 (RFPs only)

If offers are submitted which fail to provide the actual manufacturing/production source(s) for the item(s) offered, or such, if such information is provided but restricted from disclosure (by the inclusion of the FAR 52.215-12 legend or any other proprietary or confidentiality restriction) such offers may be rejected as technically unacceptable. This provision does not apply to commercial items.

L37 - AGENCY PROTESTS (SEP 1996) - DLAD 52.233-9000

Companies protesting this procurement may file a protest
1. with the contracting officer, or
2. with the General Accounting Office, or
3. pursuant to Executive Order 12979, with the activity for a decision at a level above the contracting officer.

Protests filed with the activity should be addressed to the contracting officer, but should clearly state that they are an "Agency Level Protest under Executive Order 12979." The contracting officer will forward the protest to the appropriate official for decision. (This process allows for a higher level decision on the initial protest; it is not a review of a contracting officer's decision on a protest filed with the contracting officer.) Absent a clear indication of the intent to file an agency level protest, protests will be presumed to be protests to the contracting officer.

L5108 - SOLICITATION PROVISIONS INCORPORATED BY REFERENCE (FEB 1998) - FAR 52.252-1

This solicitation incorporates one or more solicitation provisions by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. The offeror is cautioned that the listed provisions may include blocks that must be completed by the offeror and submitted with its quotation or offer. In lieu of submitting the full text of those provisions, the offeror may identify the provision by paragraph identifier and provide the appropriate information with its quotation or offer. Also, the full text of a solicitation provision may be accessed electronically at this/these address(es):

NOTE: The text of any referenced FAR provisions may be obtained by request to Defense Construction Supply Center, ATTN: DCSC-BOA, P.O. Box 16704, Columbus, Ohio 43216-5350. However, the complete edition of Federal Acquisition Regulation (FAR) may be obtained by purchase from the Superintendent of Documents, Government Printing Office, Washington, D. C. 20402.

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) SOLICITATION PROVISIONS

| PROVISION TITLE | DATE | FAR REFERENCE |
|---|---|---|
| COMPLIANCE WITH VETERANS' EMPLOYMENT REPORTING REQUIREMENTS | (MAR 1994) | 252.209-7023 |

SECTION M

M06 - F.O.B. TERMS (MAR 1973) - DCSC 52.247-9C08

Bids/offers submitted on a basis other than the F.O.B. terms specified in Section F will render an offeror's bid (IFB) nonresponsive and may preclude consideration of an offeror's proposal (RFP).

ATTACHMENT
PALLETIZATION NO. DC16316001 - 96150

1. SCOPE. This sheet covers the requirements for palletization of DCSC items of supply the handling, shipment, and storage.

2. REFERENCED DOCUMENTS. The following documents, of the issue in effect on the date of solicitation, form a part of this palletization sheet to the extent specified herein.

Specifications

FEDERAL

NN-P-71 Pallets, Material Handling, Wood Stringer Construction, 2-way and 4-way (Partial

Standards

MILITARY

MIL-STD-147 Palletized Unit Load

(Copies of listed federal and military specifications, standards, and associated documents listed in the Department of Defense Index of Specifications and Standards (DODISS) should be obtained from the DOD Single Stock Point, Commanding Officer, Naval Publications and Forms Center, 5801 Tabor Ave., Philadelphia, PA 19120-5099).

3. REQUIREMENTS.

Shipments of indentical items packed in four or more shipping

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 24 | 24 PAGES |

containers exceeding a total of 48 cubic feet per destination shall be palletized except when the shipping containers are required to be skidded (see 4c), or a quantity of four shipping containers pallet exceeds the size of weight limitations for palletized loads (see 3a and 3b, as applicable). Shipments packed Level C shall be palletized in accordance with 3a or 3b. Shipments packed Level A or Level B shall be palletized in accordance with 3b.

a. Material may be palletized on commercial pallets provided the load meets the following requirements:

(1) The load does not exceed 52 inches in length or width, 54 inches in height, and 3,000 pounds.

(2) The load is prepared and secured in a manner that will ensure carrier acceptance and permit safe rehandling at destination.

b. Palletization shall comply with MIL-STD-147 and appendices there to modified as follows.

(1) Loads shall be stable and shall not exceed the size and overseas limitations of MIL-STD-147.

(2) Glued loads shall not be used.

(3) For Level A packing, pallets shall comply with MM-P-71, Type V, class 1, size 2, except softwood may be used and the size may be reduced to a minimum of 36 inches in length and 44 inches in width to properly fit the load.

(4) For Level B packing, pallets shall conform to MM-P-71, Type II, size 2; Type IV; or Type V, class I, size 1. Wood used to construct pallets shall be group II, III, or IV, grade A, as specified in MM-P-71.

(5) Residual quantities of less than the quantity required for one course of the load need not be palletized.

c. Palletization is not required for shipping containers that are constructed with skids. Shipping containers, except drums, exceeding 70 pounds gross weight or 60 inches in length, shall be constructed with skids. Skids, shall be a minimum of 3x4 inch (nominal) lumber and shall be securely attached to permit multiple re-handling at destination. Drums shall be palletized.

Prepared by: DSCC
Columbus, OH 43216-5000
December 13, 1996



37

SECTION A

[X] J AWARD/CONTRACT [ ] K

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) > RATING DOA1 PAGE 01 OF PAGES 24

2. CONTRACT (Proc. Inst. Ident.) NO. SP0740-99-C-1004

3. EFFECTIVE DATE 99 JUN 29

4. REQUISITION/PURCHASE REQUEST/PROJECT NO. SEE ATTACHED

5. ISSUED BY CODE SC0700

DEFENSE SUPPLY CENTER COLUMBUS
ATTN: DSCC-
3990 E. BROAD STREET, P.O. BOX 16704
COLUMBUS, OHIO 43216-5010

For Post Award Inquiries - See G01

6. ADMINISTERED BY CODE S1109A

DCMC CLEARWATER
GADSEN BLDG SUITE 200
9549 KROGER BLVD
ST PETERSBURG FL 33702-2455

CD: PAS: YES

7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, state and ZIP code)

CAPITAL CITY PIPES INC
1872 MILLS ST SUITE F
TALLAHASSEE FL 32310-0205

CAGE CODE 0NSZ5 FACILITY CODE SEE SCHEDULE

8. DELIVERY
[X] FOB DESTINATION *See Section F
[ ] FOB ORIGIN [ ] OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT
NET 30

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN > Item BLOCK 12

11. SHIP TO/MARK FOR CODE

SEE SECTION B

12. PAYMENT WILL BE MADE BY: EFT: T CODE S33181

DFAS COLUMBUS CENTER
ATTN: DFAS-CO-LSCAA
P O BOX 182317
COLUMBUS OH 43218-2317

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:

[X] 10 U.S.C. 2304 (c) ( )

[ ] 41 U.S.C. 253 (c) ( )

14. ACCOUNTING AND APPROPRIATION DATA:

[ ] OTHER - See Sec G, Clause G03

[ ] CG: 97 x 4930.5CC0 000-26.0 S33-150

[ ] 97 x 4930.5CC0 000-22.1 S33-150 (Trans)

[ ] FMS 9711 x 8242 L009 4D 8401 GBL S380000 (Trans)

[ ] Award issued pursuant to the Small Business Competitiveness Demonstration Program.

CAUTION: Whenever only a portion of a Clause is set forth herein, or identified only by number and title, such portion shall not be construed as varying the meaning or intent of the entire Clause as it appears or is referred to in the Federal Acquisition Regulation (FAR) or DoD FAR Supplement.
Federal Acquisition Regulation (FAR) Clauses cited throughout this Contract by Clause Title, Number, and Date are incorporated herein by reference with the same force and effect as if set forth in full text.

[ ] SPECIAL REVIEW [ ] FMS REQUIREMENT

15G. TOTAL AMOUNT OF CONTRACT > $ 497241.28

16. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 9 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH | |
| | C | DESCRIPTION/SPECS/WORK STATEMENT | | X | J | LIST OF ATTACHMENTS | 10 |
| | D | PACKAGING AND MARKING | | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 9 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 9 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 9 | | L | INSTRS, CONDS. AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |

CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE

17. [ ] CONTRACTORS NEGOTIATED AGREEMENT (Contractor is required to sign this document and return ______ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. [X] AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number SP0740-99-R-3025, including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

19A. NAME AND TITLE OF SIGNER (Type or print)

20A. NAME OF CONTRACTING OFFICER
ANITA L. LUICH

19B. NAME OF CONTRACTOR
BY ______ (Signature of person authorized of sign)

19C. DATE SIGNED

20B. UNITED STATES OF AMERICA
BY Anita L. Luich (Signature of Contracting Officer)

20C. DATE SIGNED 99 JUN 29

NSN 7540-01-152-8069
PREVIOUS EDITION UNUSABLE
OP 301-26 9-3 (R4) (FAR) (OCT 87)



DPACS SF26M (REV 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab<br><br>Plaintiff,<br>v.<br><br>**UNITED STATES OF AMERICA,**<br><br>Defendant. | Case No. 02-1096 C<br><br>Hon. Lawrence J. Block |

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT F

1

IN THE UNITED STATES COURT OF
FEDERAL CLAIMS

- - -

Flexfab, LLC, a Michigan Limited Liability Company, Successor to Flexible Horizons International, Inc., d/b/a Flexfab,
Plaintiff,
vs. : Case No. 02-1096 C
: Judge Lawrence J. Block
United States of America,
Defendant.

- - - - -

DEPOSITION OF MALINDA JEFFRIES

- - - - -

Taken at Defense Supply Center
3990 East Broad Street
Columbus, Ohio 43213
December 9, 2003, 2:23 p.m.

- - - - -

Spectrum Reporting LLC
333 East Stewart Avenue
Columbus, Ohio 43206
614-444-1000

- - - - -

Spectrum Reporting, LLC
Specializing in Real-Time Reporting

2

A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

Perrin Rynders, Esq.
Varnum, Riddering, Schmidt, Howlett
Bridgewater Place, Post Office Box 352
Grand Rapids, MI 49501

ON BEHALF OF DEFENDANT:

Claudia Burke, Esq.
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20530

ALSO PRESENT:

Vasso Monta

3

Tuesday Afternoon Session
December 9, 2003, 2:23 p.m.

- - - - -

S T I P U L A T I O N S

- - - - -

It is stipulated by and between counsel for the respective parties that the deposition of MALINDA JEFFRIES, a witness herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice and by agreement of counsel; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -

4

MALINDA JEFFRIES

being first duly sworn, as hereinafter certified, testifies and says as follows:

CROSS-EXAMINATION

- - - - -

MR. RYNDERS: The record should reflect that this is the time and place for the taking of the deposition of Malinda Jeffries. Any objections to notice?

MS. BURKE: No.

BY MR. RYNDERS:

Q. Ms. Jeffries, my name is Perrin Rynders. I represent a company by the name of Flexfab, at least the short term -- the shortened word that we'll use.

A. Okay.

Q. Have you given a deposition before?

A. No, I have not

Q. Let me give you a few ground rules that I'd like all of us to follow.

A. Okay.

Q. First of all, my job is to ask questions. Your job is to answer them to the best of your ability.

in determining whether or not the contract modification should take place?
A. Yes.
Q. And what was your role in that regard?
A. I would -- in my determining whether or not a modification should take place on a contract, I would receive some type of correspondence from the contractor, and my determination would be made after receiving that correspondence.
Q. Okay. Do you remember receiving correspondence from Capital City Pipes?
A. No, I do not.
Q. Regarding any modifications?
A. No, I do not.
Q. Do you remember getting any correspondence regarding modifications as to the delivery dates or the timing of delivery of products?
A. No, I do not.
Q. And I take it you don't remember anything about a modification to change the payee address?
A. No, I do not.



Q. Let's -- but your standard procedure would have been that something would have come to you?
A. Exactly.
Q. And then you would have processed it?
A. Exactly.
Q. Now, if the contractor says, please change the contract so that the payee address is a new address instead of the original address, do you automatically do that?
A. If it is the prime contractor whom which we have the contract with, yes, I would.
Q. Okay. Can you imagine any scenario under which you would say, we don't want to do that or we don't understand the purpose of that, so we're going to decline your request for modification?
A. No.
Q. Okay. What are the factors that you follow -- or that you use, rather, in evaluating a request to modify a contract?
A. It greatly depends on what the request is.
Q. Okay. What about the request to change



the payee address?
A. The factors that I would use to change a contractor's payee's address, that I received a piece of letterhead from the contractor whom we have the contract with, that the contract is still open, it has not been paid yet. And that's all I can think of at this time.
Q. Okay. Is there anybody other than you who would have any input into whether or not to grant the request for modification? Anybody other than you from the DSCC side?
A. There is no one that I would have went to to request any additional information from, no.
Q. Okay. Is it your understanding, sitting here today, that, in fact, the modification was made to change the payee address?
A. Your question is, do I understand that a modification was issued to change that contractor's payee address on that contract? Yes.
Q. Okay. And your testimony, if I understand it, is that was your decision and your decision alone whether to grant that modification?
A. From what I recall, yes.
Q. Okay. Do you know why the contractor



made that request?
A. No, I do not.
Q. What is the process that is followed to implement that request? And here's what I'm wondering: Something comes in the mail or is faxed or is somehow received by the DSCC where a contractor seeks to modify an original contract to change where the money gets sent. Okay?
A. Okay.
Q. Our scenario. And somehow, I guess you're identified as the post-award contract specialist?
A. Right.
Q. Okay. So wherever that fax machine is or the mail comes in, somebody can figure out that I need to get this piece of paper to Ms. Jeffries?
A. Yes.
Q. Okay. So now you've received that piece of paper, and you determine that the contract is still open and that the request has come from the prime contractor. And at that point in time, you decide to go forward with the modification; is that correct?

A. In that scenario, I would possibly, yes.
Q. Okay. Now, what -- physically, what do you do? What steps do you go through at that point?
A. I would go into our -- at that point, in 1999, I do believe that we had a system which is now -- it's called DPACS. I would have went into the system and processed the modification and distributed it to the parties who would need a copy.
Now, the system would automatically tell me which party needs a copy. But other than the system actually doing the distribution, I would have sent everyone a copy of the mod up-front.
Q. Okay. Now, that document, we'll probably look at it in a moment. I believe it was given the document number P1. Do you remember that?
A. I don't recall. I don't recall.
Q. That's fine. The best you can do is what you recall today. Is whatever that document's called or whatever number its given,



are you the one who types it up?
A. Yes
Q. And you do that in the computer?
A. Yes.
Q. There is probably some kind of form that you fill in the blanks, and then you can print that completed form? Is that how it works?
A. Sort of, yes.
Q. Okay. I mean, if we see something that's been printed out, are you the one who prints it for the first time?
A. Yes.
Q. Okay. And the information in there that's not part of the blank form but that's filled in, you would have typed that information into the computer?
A. That's correct.
Q. Okay. Now, when the change has to do with where the money gets sent, is there anything else that needs to be done to make sure that the modification is, in fact, followed?
A. As far as I know, any additional function that I would have to make, I do not believe so.



Q. Okay. Now, are you the person that handles the payments?
A. No, I am not.
Q. Who handles the payments?
A. DFAS.
Q. And -- D-F-A-S?
A. Yes.
Q. And what does that stand for?
A. Defense Finance and Accounting Service.
Q. Okay. Are they located here in Columbus?
A. Yes, they are.
Q. And how does DFAS know, if you know, that a modification has been made to the contract regarding the payment process?
A. A copy is forwarded to them.
Q. Okay. Now, is that copy forwarded to them -- is a physical copy forwarded to them, or do they receive an electronic notice of that change?
A. A physical copy is forwarded to them, and I do believe that DPACS -- somehow they have the distribution at the bottom of the mod -- sends it off electronically also.



Q. Okay. And DPACS is the computer program?
A. Right.
Q. Okay. Do you know, from your own knowledge, whether or not DFAS has to key in any additional information into its system to accomplish the modification that you've entered into?
A. I have no idea.
MR. RYNDERS: Okay. Just for the record -- and we'll work through this, but this is really for counsel to confirm. My understanding is that this witness has been produced to respond to the Rule 30(b)(6) deposition notice, items 3, 4, 5, 7, 10, and 13, is that correct?
MS. BURKE: That's correct.
MR. RYNDERS: Okay. Let's go off the record a minute.
(A discussion is held off the record.)
Q. Ms. Jeffries, let me show you what was marked previously during an earlier deposition as Exhibit 4. And I'll hand that to you, and I might have to look at it with you a little bit upside down. But is this the modification?

A. This would be the modification -- or yes, this is the modification.
Q. Okay. As I understand, and as far as you know, am I correct that the original contract remains in place, but it's changed to whatever extent this modification says it's changed?
A. Exactly.
Q. Okay. And can you tell me what it was that this particular modification changed about the original contract?
A. The remittance address.
Q. And what was the new remittance address?
A. According to this modification, it's Old Kent Bank Corp. Trust, C/O No., ABA No. 07200052, Post Office Box 144, Grand Rapids, Michigan 49501-0144.
Q. Do you know why the remittance address is being changed from the original address to this address?
A. No, I do not.
Q. Okay. Did it matter to you at the time when you executed the contract modification why it was being changed?



A. No, it does not.
Q. Would you have done something different depending on what the reasoning was?
A. No.
Q. Okay. All that mattered to you was that the prime contractor requested it, and, therefore, you did it?
A. That's correct.
Q. And what was the date of this modification?
A. September 27, 1999 is the date signed.
Q. Okay. And that's your signature --
A. Yes, it is.
Q. -- down at the bottom right?
A. Yes, it is.
Q. Okay. To whom was this modification distributed?
A. The distribution at the bottom tells me it was distributed to DCMC. That's Defense Contract Management Command in Clearwater and DFAS, Columbus Center. Defense Finance and Accounting Center.
Q. Okay. And whether it did or not, at least this modification should have been provided



to DFAS?
A. According to this, it should have been.
Q. Okay. Now, are you the one who generated the distribution list at the very bottom of this exhibit?
A. The system does that automatically.
Q. Okay. Can you override that?
A. No, but I can add to it.
Q. Okay. So do you remember if you needed to add DFAS, or was DFAS an automatic recipient?
A. This was automatic.
Q. And was DFAS an automatic recipient simply because it was a contract modification or because the modification involved the remittance address?
A. DFAS is a recipient simply because it's a contract modification.
Q. Okay. So even a non-monetary or non-economic change still goes to DFAS?
A. It should.
Q. Okay. Fair enough. It would automatically be on the distribution list?
A. It would automatically be on the distribution list through the DPACS system.



Q. Okay. Let me take that back from you a moment. Thank you. If at any time you want to see this again, just let me know. I'll pull it out.
A. Okay.
Q. It's Exhibit 4. Instead of taking it out of my book, I'm going to give you my whole book.
A. Okay.
Q. Let me show you what's been marked as Deposition Exhibit 3. That's from an earlier deposition as well. Do you recognize that to be the original contract?
A. I recognize this to be a copy of the contract, yes.
Q. Okay. Fair enough. It's definitely a photocopy.
A. Okay.
Q. Sorry. Everything in there is a photocopy.
A. Okay.
Q. So can you tell me the date of that original contract?
A. The date on this contract says June

29th, 1999.
Q. And my understanding is that this is a document that would have been prepared by the pre-award contract specialists?
A. Yes.
Q. And at that time that was Anita Luich?
A. Yes.
Q. Did you know Anita Luich back in 1999?
A. I believe so.
Q. Okay. And you definitely know her today?
A. I know who she is, yes.
Q. Okay. What was the original remittance address as of June 29, 1999?
A. They're written differently now, so I would have to search through this to find this information.
Q. That's okay.
A. Okay. Capital City Pipes, Inc., P.O. Box 12368, Tallahassee, Florida. I believe that's 32317.
Q. Now, was there anything according to this original contract that would indicate the original -- I'm sorry -- that indicate that



payment was to be made to a bank of Capital City Pipes? Or does it appear to you that the payment was to be sent directly to Capital City Pipes itself?
A. It appears to me that the payment was to be sent directly to this post-office box at Capital City Pipes in Tallahassee, Florida.
Q. Okay.
MR. RYNDERS: Let's go off for just a moment.
(A short recess is taken.)
Q. We're back on the record.
MS. BURKE: I think Ms. Jeffries actually has a clarification to make.
Q. Okay. You spoke to counsel during our break, I take it?
A. Yes.
Q. So you want to fix something? That's fine. Go ahead.
A. I just wanted to -- I guess I want you to repeat your question regarding the remittance address.
Q. Well, let me -- you're looking at something. Can I see what it is that you're



looking at it?
A. Okay.
Q. And for the record, it appears that you're looking at a June 23, 1999 letter from Capital City Pipes. And at the top right-hand corner, it says 12 of 24. Do you see that?
A. Uh-huh.
Q. I would understand that -- 12 of 24 to mean that it is part of what is now the original contract?
A. That is correct.
Q. But it appears to have been dated a few days after the -- I'm trying to remember. What's the original date of the contract?
A. This is June 29th.
Q. Oh, 29. Okay.
A. Yes.
Q. So this letter dated June 23 would have been in existence, then, at the time of the contract, correct?
A. I assume so, yes.
Q. Okay. So you wanted to clarify something as to this letter which -- in the contract that's been marked page 12 of 24?



A. I wanted to clarify your question regarding what the remittance address -- what the contract showed as the remittance address in this letter being a part of the contract shows that the remittance address was, in fact, Capital City Pipes, Inc., C/O, ABA No. 07200052, Old Kent Bank Corp. Trust, P.O. Box 144, Grand Rapids, Michigan 49501-0144.
Q. Now, is there anywhere in the contract form -- and now I'm talking about something that would have been on your computer system -- that is other than that letter? Do you know?
A. I don't understand your question.
Q. Okay. We've got a 24-page contract.
A. Okay.
Q. Okay. The first page -- just turn back to the first page with me. You would see that that is a DSCC or, at least, a governmental form, correct?
A. Correct.
Q. Okay. Now, is there some reference on that first page that tells us where in the contract we're going to find the remittance address?

Q. Okay. Would it be fair to say that at least by the time of mod P2 that you were aware that Flexfab was the origin of the product?
A. No, I cannot say that because I do not recall.
Q. Okay. Certainly, P2 makes that clear? You would agree?
A. Makes what clear?
Q. That the origin of the product is Flexfab.
A. P2 does state that the place of inspection would be at Flexfab.
Q. Okay. And by definition, that means that Flexfab is the manufacturer of the product?
A. No.
Q. How could it be an inspection at the point of origin if Flexfab isn't the manufacturer? How would that work?
A. There's instances where the contractors will have the supplies at their plant or what have you and have the inspection done there.
Q. So you're familiar with scenarios where -- the analogy would be Flexfab would deliver its product to Capital City Pipes?



A. Right.
Q. That would be counted as the point of origin?
A. Right.
Q. But given the fact that this particular contract, the prime contractor is Capital City Pipes and the inspection is happening at Flexfab, that would pretty clearly tell you that Flexfab is manufacturing this particular product, wouldn't it?
A. I suppose you could come to that conclusion.
Q. Another area that you've been produced as being the person best able to testify has to do with communications between the United States and Capital City Pipes regarding the modification. I think we've gone through this too many times, but are you aware of anything that we have not marked as an exhibit that would be a communication between the United States and Capital City Pipes as to that particular modification?
A. No, I'm not aware of anything.
Q. Now, would you agree with you being the person identified as best able to testify about



payments from the United States to escrow accounts --
A. Would I agree that --
Q. -- escrow accounts controlled by subcontractors?
A. Would I agree that I would be the best person to talk to -- I'm sorry -- to testify --
Q. Yeah.
A. -- about payments to escrow accounts -- I'm sorry. What was the last part?
Q. Okay. Let me back up.
A. Okay.
Q. You're aware that in this particular case, the first contract modification had to do with changing the remittance address to a particular bank account?
A. I'm aware of that.
Q. At Old Kent Bank in Grand Rapids, Michigan?
A. Yes.
Q. Okay. Now, had you prior to that time -- I believe it was September of 1999 -- been involved either as a pre-award or post-award contract specialist regarding a contract that



required payment to an escrow account?
A. Any contract?
Q. Just anywhere along the line in your 13 years or whatever.
A. I don't recall. I do not recall.
Q. Okay. Do you recall at any point during your career here, either as a post or a pre-award contract specialist, the idea of payment being made to a subcontractor instead of to the prime contractor?
A. There are situations where contracts and payments and everything that the contractor may have opened is assigned to a different contractor, and those are what we call novation agreements.
Q. Okay.
A. Which are done between the contractor and the DCMC office.
Q. And remind me, what is DCMC?
A. Defense Contract Management Command.
Q. Okay.
A. And they are the administration office that would be better located to oversee contractor's actions or --

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT G

# AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT

1. CONTRACT ID CODE: [X] J [ ] K

PAGE OF PAGES: 01 | 01

2. AMENDMENT/MODIFICATION NO.: P00001

3. EFFECTIVE DATE: SEP 27 1999

4. REQUISITION/PURCHASE REQ. NO.: YPC98169000611 +

5. PROJECT NO. (if applicable)

6. ISSUED BY — CODE: SC0700

DEFENSE SUPPLY CENTER, COLUMBUS
Post Office Box 16704
Columbus, Ohio 43216-5010

INITIATOR: M.A. Jeffries
DSCC-PAAEAAL (614) 692-2961, fax (614) 692-1238

7. ADMINISTERED BY (If other than Item 6) — CODE: S1109A

DCMC CLEARWATER
GADSEN BLDG SUITE 200
9549 KROGER BLVD
ST PETERSBURG FL 33702-2455

8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and Zip Code)

CAPITAL CITY PIPES INC
1872 MILLS ST SUITE F
TALLAHASSEE FL 32310-0205

CODE 0NSZ5 — FACILITY CODE

X 9A. AMENDMENT OF SOLICITATION NO.

9B. DATED (SEE ITEM 11)

X 10A. MODIFICATION OF CONTRACT/ORDER NO.: SP0740-99-C-1004

10B. DATED (SEE ITEM 13): 1999 JUN 29

## 11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS

[ ] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [ ] is extended, [ ] is not extended. Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (if required)

SAME AS BASIC

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14

| | |
|---|---|
| X | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN CONTRACT ORDER NO. IN ITEM 10A. |
| X | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation data, etc.) SET FORTH IN ITEM 14. PURSUANT TOTHE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER (Specify type of modification and authority) |

E. IMPORTANT: Contractor [X] is not, [ ] is required to sign this document and return _____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION
(Organized by section headings, including solicitation/contract subject matter where feasible.)

NSN: 4720-01-066-6447

The remittance address where cited throughout the contract is hereby corrected to read as follows:

Old Kent Bank, Corp Trust
CO# ABA# 07200052
P.O. Box 144
Grand Rapids, MI 49501-0144

Distribution: S1109A DCMC CLEARWATER, S33181 DFAS COLUMBUS CENTER

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, ins unchanged and in full force and effect.

15A. NAME AND TITLE OF SIGNER (Type or print)

16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)
MALINDA A. JEFFRIES
Contracting Officer

15B. CONTRACTOR/OFFEROR
(Signature of person authorized to sign)

15C. DATE SIGNED

16B. UNITED STATES OF AMERICA
BY [signature]
(Signature of Contracting Officer)

16C. DATE SIGNED: SEP 27 1999

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

EXHIBIT

Deposition 4

DPACS SF30
Prescribed by GSA
FAR (48 CFR) 53.243

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT H

IN THE UNITED STATES COURT OF
FEDERAL CLAIMS

Flexfab, LLC, a Michigan :
Limited Liability Company :
Successor to Flexible :
Horizons International :
Inc., d/b/a Flexfab, :

Plaintiff, :

vs. : Case No. 02-1096 C
: Judge Lawrence J. Block

United States of America, :

Defendant. :

\- - - - -

DEPOSITION OF MICHAEL TAYLOR

\- - - - -

Taken at Defense Supply Center
3990 East Broad Street
Columbus, Ohio [illegible]
December 10, 2003, 8:21 a.m.

\- - - -

Spectrum Reporting LLC
333 East Stewart Avenue
Columbus, [illegible]
[illegible]

\- - -



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

Perrin Rynders, Esq.
Varnum, Riddering, Schmidt, Howlett
Bridgewater Place, Post Office Box 352
Grand Rapids, Michigan 49501

ON BEHALF OF DEFENDANT:

Claudia Burke, Esq.
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20530

ALSO PRESENT:

Vasso Monte



Wednesday Morning Session
December 10, 2003, 8:21 a.m.

\- - - - -

S T I P U L A T I O N S

\- - - - -

It is stipulated by and between counsel for the respective parties that the deposition of MICHAEL TAYLOR, a witness herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice and by agreement of counsel; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

\- - - - -



MICHAEL TAYLOR
being first duly sworn, as hereinafter certified, testifies and says as follows:
CROSS-EXAMINATION

\- - - - -

BY MR. RYNDERS:

Q. Good morning, Mr. Taylor.
A. Morning.
MR. RYNDERS: The record should reflect that this is the deposition of Mr. Taylor taken pursuant to notice. Any objections?
MS. BURKE: No.
MR. RYNDERS: Thank you.
Q. Can you state your full name for the record?
A. Michael Anthony Taylor.
Q. Mr. Taylor, my name is Perrin Rynders. I represent a company we all know as Flexfab, and I've got some questions for you today. Have you given a deposition before?
A. Yes.
Q. Okay. Just to refresh you, then, if there's anything about the questions that I ask that is unclear, that you don't understand, or if

the question suggests something that you don't agree with, just let me know, and I'll try to rephrase the question. Okay?

A. Yes.

Q. My job is to ask questions. Your job is to answer them. Unless I do my job well enough for you to understand, then you can't do yours, so you just let me know that.

A. All right.

Q. You're doing a wonderful job. We need to talk one at a time for the benefit of our court reporter. And when the answer is yes or no, say yes or no instead of nodding your head or uh-huh or huh-uh because sometimes that gets unclear.

A. Right.

Q. We're going to talk about a number of topics today, and my understanding is you don't work for the DSS anymore; is that correct?

A. That's correct.

Q. Okay. And how long has it been?

A. I believe it's been close to three years.

Q. Okay. So some of these issues may not be fresh in your mind. It's possible that as we



go through the conversation, more and more memory will come back to you. And so if you think about something or you remember something that I've been asking about earlier, I just want you to tell me at that point in time. Okay?

A. Okay.

Q. In other words, if I ask you some questions and you tell me everything that you can remember and then we continue with the conversation and then more memory comes back, just let me know then what pops into your head regardless of what we are talking about at that point in time.

A. All right.

Q. You recognize that you're under oath?

A. Yes.

Q. You know that in some ways this is like being in court. I mean, your testimony might be used in court or for the purposes of legal proceedings.

A. Right.

Q. On the other hand, we're in a conference room. If you need a break, feel free to let me know, and we'll accommodate you as much



as we can.

A. All right.

Q. It's about 8:22, by the clock here in the room. I'll try not to keep you too long this morning. We have a few things to get through. Why don't we start with your educational background. Can you tell me if you went to college, and, if so, how far you got through and what kind of degrees you might have?

A. Okay. I do have a bachelor's degree in business from Central State University.

Q. For me being out of town, where's Central State University?

A. In Wilberforce, Ohio. Okay. And I have a master's degree in human resource management from Central Michigan.

Q. Oh, up my way. I'm from Grand Rapids.

A. Okay.

Q. So you're a Chippewa?

A. Yeah.

Q. Kind of?

A. Kind of.

Q. You're probably a little more loyal to your undergraduate institution.



A. True.

Q. When did you get your bachelor's degree?

A. In '82.

Q. And your master's?

A. In '88, I believe.

Q. Okay. During what time period did you work for the DSCC?

A. From March 1984 until, I believe, the end of February of 2001.

Q. Had you worked for the United States Government before March of 1984?

A. No.

Q. Have you worked for the government since February of 2001?

A. No.

Q. So as an employee of the DSCC, can you walk me through the progression, what you were hired at, and when you left, what position you held?

A. Yes. I was hired -- actually, it was a program called the PAC program, which was basically for recent college graduates. And I was hired in as a -- let me see. I think it was

called a procurement agent at the time.
Q. Did you say PAC, as in P-A-C?
A. Yes. It's an acronym, but I can't remember what it stands for.
Q. Well, one thing I've learned from dealing with cases involving the government is everything is an acronym. Okay.
A. All right. So I held that position for a year -- no -- yeah, a year. Then I was promoted to a contract specialist, and I believe I was in that position for a couple years. And then I was promoted to a contract administrator and held that position for a couple of years.
Q. Okay.
A. And then I was promoted to a small business specialist, and actually held that position for 11 years, the final 11 years.
Q. Now, there's a place called the Small Business Administration; am I right?
A. Yes.
Q. As a small business specialist, you were still an employee of DSCC?
A. Yes.
Q. Okay. Now, maybe you know this, maybe



you don't. Is there a difference in terms of being a small business specialist for the DSCC and then working for the SBA?
A. Yes. Well, they're two different agencies.
Q. Okay. Is the type of work you were doing, as far as you could tell, different from what somebody would be doing for the SBA or --
A. Yes.
Q. Okay. As a small business specialist at the DSCC, what were your job duties?
A. First of all, I had to review all the contracts -- or actually, they weren't contracts, but solicitations that the buyers sent out, anything above $10,000, and made sure that they met all the Small Business requirements.
Q. Now, let me just stop you for a minute.
A. Uh-huh.
Q. When you're talking about all the solicitations above $10,000, are you talking about where the proposed or prospective contractor would be an 8(a) supplier?
A. No. This is just --
Q. Period?



A. Right.
Q. Okay. Now -- okay. If the federal government was going to procure something from a big large C corporation, Westinghouse or IBM or, you know, McDonald Douglas or something like that, would that still come through you or --
A. Yes. It would come through our office.
Q. Okay.
A. And there were -- I believe we had five specialists. And one of us, depending on which application group it came out of, would evaluate that solicitation.
Q. Okay. And so the distinction between you and your peers, the five of you, you would handle certain kinds of product and others would handle other kinds of products?
A. Yes.
Q. It wasn't divided by company or industry -- well, maybe industry, I guess, but not by the size of the company or the name of the company, but rather the product involved?
A. Pretty much. There's, what, five application groups, I believe, and I was responsible for land application and all the



solicitations that came out of the land applications, I was responsible for evaluating.
Q. And just to give me a flavor for this, to try to appreciate what you had to spend your time doing, what kinds of requirements were in place that you were looking to see were being met?
A. The first thing, of course, was to evaluate the solicitation and determine whether or not it should be placed in a small business program. There were certain requirements that had to be in line for it to fall within one of the those programs. Also, some of the solicitations were already placed in the program, and it was my responsibility to make sure that the buyer continued that process.
You know, sometimes it may have been in the small business set-aside, and they may be soliciting it unrestricted to the whole market. And, of course, it would be my responsibility to stop it and redirect it to the small business program.
Q. And for my benefit -- and I've seen references to set-aside. What that means is that this product is being set aside so that it's only

available to the small business contractors?
A. Correct.
Q. Okay. So you'd review these solicitations. Anything else that would be part of that job that you did?
A. Other than reviewing solicitations?
Q. Right.
A. Yes. Of course, I -- we were responsible for training the buyers and administrators on small business programs. Typically, we did that annually.
Q. And just to clarify, when you talk about buyers, you're talking about the contract specialists?
A. Correct.
Q. Okay.
A. Also, of course, I was responsible for the 8(a) program. Actually, it was considered the Minority Business Program, because under the Minority Business Program came the 8(a) program and, also, SDB, which actually eventually phased out, but at the time was responsible for the SDB Program, Small Disadvantaged Business, along with the SDB preferential consideration. And, also,



responsible for putting on seminars and conferences.
Q. Anything else in terms of categories of types of things that you did when you were a small business specialist?
A. I think that covers most of the things. I know we had what is called a TKO, Training, Knowledge, and Opportunity seminars that we put on every month. We did that for a good three years or so.
Q. Okay.
A. And, of course, I was responsible for that. Oh, I was also responsible for maintaining the stats.
Q. And what kinds of statistics would you maintain?
A. How many contracts were awarded to the small businesses, women-owned businesses, minority businesses, things of that nature. What percentage of contracts in each application group were awarded to those categories. Of course, at the end of the year, we made a full evaluation, compared that to the previous years, looked at how we compared to the overall goals for not only the



agency and applications, but all the other DSCCs or DSCs.
Q. Okay. So you worked at the DSCC through February of 2001. Then what did you do?
A. Actually, I worked as a consultant for about a year and a half.
Q. Okay. What kind of consulting?
A. With government contractors.
Q. Were you with a firm, or were you just on your own?
A. I was with a company called Able Manufacturing and Consortium.
Q. Able, A-B-L-E?
A. Yes.
Q. And where is that company located?
A. In Chicago.
Q. And was that -- let's see, we're about -- we're almost three years out from when you left.
A. Right.
Q. So is that what you did first, and now you're doing something else? Is that --
A. Correct.
Q. Okay. And now what are you doing?



A. Now I'm doing marketing for a company called Ohio Energy.
Q. And how long have you been working there?
A. Since about the first part of August of this year.
Q. Okay. Did you do anything between working for Able Manufacturing and Ohio Energy?
A. No.
Q. Did you remain in Columbus when you worked for Able?
A. Yes. I actually worked from the home.
Q. Okay.
A. Actually, we had an office initially -- had an office on Airport Drive for about a year. Actually -- well, I started from the home, then we -- he got the office on Airport Drive and held the office for about a year. And then I went back to working from the home.
Q. Okay. You've been convicted of something; is that right?
A. Right.
Q. Can you tell me what that -- what was the conviction for?

A. Fraud.
Q. And -- well, let me back up. Was there a trial, or was there a plea on your part?
A. A plea.
Q. Okay. And what jurisdiction are we talking about? What court?
A. Ohio Southern District.
Q. So federal court?
A. Yes.
Q. Okay. And do you remember what the actual charge was? I mean, was there anything more specific than fraud that you can recall?
A. It was basically fraud. I had a travel company, and they stated that the products we were selling were overpriced. And, also, I had it set up as a network marketing program in which they stated was a pyramid.
Q. The travel company, where does that fit into the DSCC, Able Manufacturing, Ohio Energy time-wise?
A. Oh, I had that while I was working for DSCC.
Q. Oh, okay. I get it. Now, did that conviction have anything to do with your leaving



DSCC?
A. Yes. You can't have a -- you can't work for the government if you have fraud on your record.
Q. Okay. So and I mean, I can understand that. I'm just trying to make sure I understand the timing too. Was the conviction in or around February of 2001, or did they make you leave even before your plea?
A. No. I left after the plea.
Q. Okay. And was it termed as a discharge or a resignation; do you know?
A. I resigned. What they put on my record doesn't say -- I don't think it says I resigned -- well, it says I resigned because I was going to be released or something to that effect.
Q. Okay. And, in fact, that's your understanding, that had you refused to resign, they would have let you go?
A. Correct.
Q. Okay. Let me get -- bring you back to, I think it's the 1999, 2000 time frame. Well, you know, we might want to be a little less specific than that. Are you familiar with a company by the



name of Flexfab?
A. Yes.
Q. Do you remember how long it was that -- since you first became aware of that company?
A. I've known of Flexfab for years. I mean, when I was a buyer --
Q. Okay.
A. -- I believe I dealt with Flexfab.
Q. Do you remember dealing with Flexfab because it was a subcontractor of an 8(a) supplier or because it was a direct supplier to the government or both?
A. Both.
Q. Okay. And how long -- well, were you aware at any time that Flexfab was located in Michigan?
A. Yes.
Q. Okay. As long as you've known about Flexfab, you've known that they were in Michigan?
A. I don't know if it's as long as I've known about them, but, you know --
Q. Close to it?
A. Yes.
Q. Okay. And you know that they provide



specialty hose and these other kind of pliable rubber materials, kind of high-end stuff?
A. Yes.
Q. Okay. Now -- and I take it you're probably aware that there is a point in time when Flexfab was the manufacturer of some products that were being purchased through Capital City Pipes in the 1999, 2000 time frame?
A. Yes.
Q. Okay. Maybe it's kind of a big question, but if you could just give me an idea of what your role was related to that whole transaction?
A. As far as the connection between Capital and Flexfab?
Q. Right.
A. Actually, I didn't have a role in that process.
Q. Okay. At some point in time, you got involved with that particular contract and -- you know what, just to help you out and in fairness, let me show you -- these are the exhibits that we have marked so far in this case in various depositions. And different people have -- they've

come in through different people. Okay?
A. All right.
Q. And we'll kind of share this together unless counsel has an extra that they want to show you. But Exhibit 3, do you recognize that as at least the typical kind of DSCC contract?
A. Yes.
Q. Now, are you familiar with that particular contract from June of 1999?
A. I've seen information on this.
Q. Okay.
A. I've awarded -- I mean, I was involved with several contracts with Capital City Pipes so --
Q. Okay. Now, with respect to this particular contract, I know that Anita Luich was the pre-award contract specialist and that Malinda Jeffries was the post-award contract specialist?
A. Yes.
Q. And you've held -- I should have asked you this: When you were contract specialist, did you do both pre-award and post-award?
A. Actually, I started off on pre-award, and then when I became contract administrator,



that was post-award.
Q. Okay. Gotcha. So you have a basic idea, probably more than that, of what their jobs were. What was -- can you explain to me how it is that you came to be aware that this particular contract was in place with Flexfab supplying products to the federal government through Capital City Pipes?
A. You want me to just give you an overall view of how that all comes about, because I can give you the specifics on one particular contract.
Q. Okay. That's fair enough. How does that normally come about?
A. Okay. Normally, like I said earlier, I review all the solicitation over $10,000. And I also review -- part of my job as minority business coordinator or 8(a) coordinator is also to identify items even before the buyer puts out a solicitation. And actually, that's the preferable way to go.
Once I identify an NSN, I, of course, had that item tagged as an 8(a) requirement. And during that process, evaluating that NSN, of course, I have a contractor in mind whom I would



like to see that awarded to. Of course, with the Capital City Pipe issue, all the items -- I knew they were looking to supply hoses to the government.
So if I identified the NSN, which, of course, this is probably what I did with this one, find out whether or not Capital City Pipes meets the qualifications to provide that material. At that point, I'd send the information to the buyer if the solicitation has come out. Or if there is a purchase request out there, I'll send it to the buyer letting them know that that item is being considered for 8(a) set-aside.
I'll also send a letter to the Small Business Administration asking for basically approval to set that item aside for this particular company. And they'll do whatever they do to make the evaluation and send the letter back stating whether or not they agree or disagree.
Once they agree, then that information is forwarded on to the buyer, and then the buyer proceeds with an 8(a) solicitation to whatever company was selected.
During that process, of course, I'm in



contact with the potential 8(a) company, and I also want to know from them, you know, who are they going to supply. Sometimes they give me a specific company. Other times, they say they may be working with several potential manufacturers. And it's not necessary for them to tell me exactly which company that they're going to provide because it could change. But the thing I need to know is do they have a source available to provide them with the material. And if they do, then we proceed with the 8(a) set-aside.
Q. Do you have any recollection as to these particular NSNs -- which you can see in Exhibit 3 -- whether the government was looking to purchase them and you tried to find an 8(a) supplier who could meet the need, or you found -- you did it that way or the other way around, where you had a supplier that could provide a product, and then later on, the government needed to procure? Do you understand what I'm -- I'm not sure I'm asking it very well. But an NSN is a national stock number, right?
A. Right.
Q. And there must be many, many of these

stock numbers?
A. Correct.
Q. And the government will buy a particular product, and then it might not buy it for a period of time, I assume?
A. That's correct.
Q. So there might be a time period when you're not aware of any product being needed by the government, but you would nevertheless be recruiting or developing 8(a) suppliers who could meet the need when the need arises?
A. That's correct.
Q. Okay. In effect, if I understood what you were saying before, you would like to do it that way so that you've got a ready source of small businesses or disadvantaged businesses who could meet the government needs. And I assume you could probably respond quicker if you've got that stable sitting there instead of you've got to go find them after the government identifies the need?
A. Correct.
Q. So I guess my question is: Do you remember if you had cultivated Capital City Pipes



as a source for these particular NSNs before the government indicated its need for them, or was it the other way around?
A. I believe -- and actually I'm, I'd say, about 90 percent sure that in this case, I cultivated -- well, I guess it's kind of 50/50. And let me explain, that this particular NSN, national stock number, initially was set aside for C & S Supply, which was an 8(a) company that I had worked with over the years. And then they graduated from the 8(a) program. Once a company graduates from the 8(a) program, all their items that were being set aside for them, of course, are no longer set aside for them. And it's incumbent upon me to find a new source to basically take their place. And I had heard of Capital City Pipes over the years, but I hadn't done any work with them. And C & S Supply had actually reintroduced Capital City Pipes to me and -- as a company that they were going to help, actually act as a mentor for them, and in turn, that allowed me to -- okay -- well, I can move the C & S items from them to Capital City Pipes.



So, of course, that was before a solicitation actually came out. But at the same time, these were NSNs that were already placed in the 8(a) program. Because once you put -- place an NSN in the 8(a) program, it remains there as long as there are 8(a) sources available to utilize.
Q. Okay. And you were aware back -- well, when you were dealing through C & S, was C & S, with respect to these particulars products, acting as a distributor with Flexfab as the manufacturer, or was C & S the actual manufacturer?
A. C & S was a distributor.
Q. Okay. And so what was happening -- if I'm understanding you, what was happening was C & S had graduated, and these NSNS are still in the 8(a) program, and now you needed to find a new 8(a) supplier who could basically become that new distributor?
A. Correct.
Q. Were there any other manufacturers that -- for these particular NSNs that you were aware of, other than Flexfab?
A. I can't answer that question because



there were several different hose manufacturers that C & S worked with and Capital City Pipes worked with. And actually, I had a few other 8(a) companies that were in that same category. And like I said, there were several other manufacturers of hoses that the 8(a) companies worked with. So for this particular one, I can't tell you whether or not Flexfab was the only source.
Q. Okay. If I'm hearing you right, there were other 8(a) companies, 8(a) suppliers that were also distributors, as opposed to manufacturers?
A. Correct.
Q. Okay. And then there were, in terms of the manufacturers who weren't themselves 8(a) suppliers, there were at least one or two more than Flexfab?
A. Correct.
Q. Okay. Gotcha. So -- I can appreciate your job is to cultivate, is to have sources available, and then to make sure that the contract specialists who are actually going out procuring --

next involvement with respect to these particular NSNs and this particular contract?
A. Are you saying after the purchase order comes out and the buyers working with it or --
Q. Yeah. See, you know so much more about all this stuff than I do. I don't want to leave a gap out there, but here's my point -- or I guess, let me back up and explain it. I know that from what you've told me, getting the SBA's approval had to come before any solicitation, any PO, anything like that?
A. Actually, getting their approval -- maybe I missed a couple steps -- but getting their approval actually comes once a purchase request is released.
Q. Okay.
A. And that purchase request is prior to the solicitation.
Q. Okay.
A. And my evaluation in placing the NSN in the system actually becomes -- comes before that. I do an analysis first, then I put it in the system, and then -- if this is a new, totally new item, put it in the system. And then the buyer --



once the purchase request comes out, the buyer will see that it's set aside for 8(a). They should contact me.
At that point, I send a letter to SBA for approval. Regardless of whether the company has made it before or supplied it before or not, it would still go to SBA to get approval because things change. Then SBA will send back an acceptance letter, and then I forward that acceptance letter and the offer letter to the buyer letter stating that, you know, it was asked and received. And then the buyer puts together the 8(a) solicitation, sends that out, only to the 8(a) contractor.
Now, with the systems they have now, sometimes other people find out about it, but it's only supposed to go to that 8(a) contractor. The contractor is supposed to provide a price. That goes to the buyer. The buyer is to evaluate the price and also go to our cost and price office, and they will do an analysis to determine whether or not the price meets what they consider a fair market price.
If it does, then the buyer proceeds



with an award. If it doesn't, then we got to go back and forth and try to come to a happy medium, and then again award or dissolve.
Q. Okay. And when you say "we," are you personally involved in that process because of your small business specialist position, or is -- was "we" the royal we, just meaning the DSCC?
A. Are you -- I don't know what part I said "we," so --
Q. If there's some issue over whether the quoted price is a fair market price, then you said "we" need to haggle over it?
A. Usually "we" was me.
Q. Okay.
A. Yeah.
Q. Okay. So now, what's the next role that you played as far as you can remember in connection with this particular contract, this particular solicitation, which turned into a contract?
A. Well, once it becomes a contract, typically, there's nothing else to do. I will, you know, periodically check on a company to see if they're performing. Or if the company -- I



mean, typically, they'll call me if they have any problems or anything like that. And I will try to work to resolve those problems if it's in my capacity.
Q. Did you have any direct communications with anybody at Flexfab prior to the award being issued?
A. No.
Q. Okay. Did you have any communications with anyone at Flexfab after the award was issued?
A. No. Not to my knowledge, no.
Q. Okay. And in fairness to you, my questions were in connection with this particular contract.
A. Correct.
Q. Okay. Did you have any pre-award conversations with Henry Cook about this contract or this solicitation?
A. I'm not sure if I had conversation with him. Actually, most of my conversation was with Capital City Pipes. The only real dealings I had with Mr. Cook was prior to their arrangement. And I know I did call him at one point when I had made several calls to Capital City Pipes and didn't get

response from them.
And I remember making a call to
Mr. Cook to find out if he had any conversation
with them or if he knew what was going on, because
I think I was getting frustrated at that point.
Q. Okay. When did you first become aware
of someone's desire to have an escrow account set
up for payment?
A. I don't know the exact time frame when
that happened, but --
Q. Well, help me out at least -- I know
you're about to answer, but just try to focus the
answer. We've got the June date of the contract.
We've got the September date of the mod. You
know, before both, after both, between them, you
know, if you can give me some kind of --
A. I believe it was between them.
Q. Okay.
A. And, actually, I believe I was -- it
all started -- and I know you don't want to hear
about JGB -- but all of this, these problems, I
became aware of all these problems when JGB
contacted me and the small business office. And I
believe Mr. Cook made contact with me as well.



Q. Okay. And it's okay. We can talk
about JGB. I was just at that point in time
trying to keep it focused on Flexfab. In
connection with JGB, do you remember whether the
contract -- well, back up. With respect to JGB,
the prime contractor was Capital City Pipes?
A. Correct.
Q. And so like my client's situation,
JGB's situation was a supplier to Capital City
Pipes, which was acting as a distributor through
the 8(a) program?
A. Correct.
Q. Now, do you remember the timing of the
-- I'll call it the JGB transaction and the
Flexfab transaction, because they both involve
Capital City Pipes, so we'll distinguish between
the original source. Do you remember the timing
of the JGB solicitation or award relative to the
Flexfab solicitation or award, which one came
first?
A. I have no idea because -- and the
reason why I say that, I didn't even know there
was a problem with Flexfab until way down the line
when -- I believe it was when I had the meeting



with Henry Cook. And that's when I found out that
Flexfab was involved. But, actually, I thought
Flexfab's involvement was minimal.
Q. Okay. Now, as someone who's been a
contract specialist and a contract administrator,
you're familiar with the solicitation award
post-award process?
A. Correct.
Q. Okay. And my understanding -- and
correct me if I'm wrong -- is that when the
contract is issued, is awarded, then that
information is communicated probably a number of
places, but one place is to DFAS?
A. Correct.
Q. And, similarly, if there's ever a
modification to the contract, that information is
communicated to DFAS?
A. Correct.
Q. And we even see that on the bottom of
Exhibit 4, that DFAS is on the distribution list?
A. Right.
Q. Now, is it your understanding that that
information is communicated to DFAS through the
computer system, at least that's one way that it's



done?
A. My understanding at the time, no, was
that it was -- hard copy was sent over to DFAS.
Q. Okay. Do you have any personal
knowledge of what DFAS does with that hard copy to
process awards and modifications issued by the
DSCC?
A. No.
Q. Okay. Would you agree with me that the
modification, which we've marked as Exhibit 4,
what was supposed to happen was DFAS, when it paid
money on that particular contract, would actually
remit the funds to the bank account that's listed
in section 14 of the mod?
A. Correct.
Q. Okay. And if I understand what you
were saying earlier, you didn't realize there was
a problem with Flexfab until later on down the
line, meaning you didn't realize that money hadn't
been sent to that particular bank account? You
didn't learn that until later?
A. Right.
Q. But you were aware around the time of
the modification that there was a modification?

A. Yes. Yes.
Q. And you understood the purpose of the modification?
A. Yes.
Q. Okay. And I kind of asked you this, and I'm not trying to just keep going back to things, but to the best of your ability, tell me what you knew at the time about why that modification was being made?
A. Because they were having some problems making payments and -- going back to JGB -- when JGB contacted me, they were in process of sending Capital City Pipes some more material to ship to the government. And they stated that they weren't going to ship any more material to Capital City Pipes until Capital City Pipes made good on their payments. So when I spoke with Capital City Pipes, you know, of course since I'm the 8(a) coordinator, I need to make sure that they take care of their responsibilities. And in talking with them, they sound like they were going to, you know, take care of their responsibilities. And one of their ways of doing that -- and to ensure



that they get their material was to do the modification and allow them the funds to go to another source other than Capital City Pipes, so that the suppliers could receive their money.
Q. Okay. And that problem and that solution was something you were aware of before the modification marked as Exhibit 4?
A. Correct.
Q. And Henry Cook was involved with the JGB payment problems?
A. He was -- if I remember correctly, I believe he introduced Capital City Pipes to JGB. So I guess, indirectly, he was involved with that as well.
Q. Well, let me ask it to you this way: Prior to September 27, 1999, the date of that modification marked as Exhibit 4, had you had contacts with Henry Cook concerning the JGB situation?
A. I don't think I had conversation with him at that point. I think it -- our conversation started after that, when the modifications went through and still -- I mean, we still had the same problems.



Q. Okay. Do you know -- would you have any information to confirm that Flexfab was unwilling -- like JGB -- was unwilling to supply product without having this escrow account in place first?
A. No.
Q. Do you have any reason to say that that wasn't the case?
A. No.
Q. Okay. Did you have conversations with anybody outside of the DSCC about the escrow account that is referenced on Exhibit 4?
A. When you say "outside the DSCC," are you referring to contractors or just family members?
Q. Well, I'm thinking -- fair enough. And that's why I told you you can ask me clarification. I know you already told me you didn't talk to anybody at Flexfab before or after the award, so I guess they're out of the picture. And I think you've told me you weren't sure if you had talked to Henry Cook by that point in time. What I'm wondering is did you talk to somebody at Capital City Pipes, or did you talk to



some other person in a business setting, but not a DSCC employee, about the details of this particular account or the idea of an escrow account that went into the preparation of this modification that's marked as Exhibit 4?
A. Well, I know I talked with Capital City Pipes because we were trying to determine what options they had available to them. And, of course, we wanted our -- the agency wanted the material.
Q. Right.
A. So -- yes.
Q. And when you talked to Capital City Pipes, you talked to them about the JGB situation first -- or maybe not at the time first, but at one point in time, you talked to them about JGB, correct?
A. Right.
Q. But you also talked to them about Flexfab?
A. See that, that I -- I don't believe I talked to them about Flexfab. Because I didn't -- like I said, I didn't know Flexfab -- there was a problem with Flexfab until down the road.

Q. Well, let me back up here. I've heard you say two things which I can understand, but I think there might be like a gap in between these two things. Okay? On the one hand, you're not aware of a problem, meaning you're not aware of Flexfab not being paid until after the modification?
A. Right.
Q. Okay. Before the modification you talked to the folks at Capital City Pipes about JGB not getting paid by Capital City Pipes, so they've already had a payment problem, right?
A. Right.
Q. Okay. Now, when you talked to the folks at Capital City Pipes, was that Mr. Gilliam?
A. Actually, most of my conversation was with Thelma.
Q. Thelma Williams?
A. Yes.
Q. Okay. When you talked to Ms. Williams or whoever you talked to, did you talk to them about the idea of setting up an escrow account so there would not be any further problems with payment?



A. Yes.
Q. Okay. Did you talk to them about the idea of doing the same thing for Flexfab so that you would prevent the possibility of future payment problems?
A. I don't remember. I could have, but I don't remember talking to them about Flexfab.
Q. But certainly, you talked to the folks at Capital City Pipes about the idea of using an escrow account to avoid the problem of the government paying Capital City Pipes and Capital City Pipes not paying the producer of the product?
A. Correct.
Q. Okay. And I take it that Ms. Williams was fine with that idea?
A. Yes.
Q. Now, do you know where the idea generated from? Was that your idea? Was that her idea? Was that -- come from Mr. Cook or somebody else that you're aware of?
A. It probably was my idea. Actually, I probably gave them several options.
Q. Okay.
A. And that was something that they were



agreeable to.
Q. Okay. Do you know if -- I don't know that I've seen the JGB stuff, so -- and I don't know what kind of recollection you have, but we'll see what we can do together.
A. All right.
Q. Was there -- when you're having this conversation with Thelma Williams or whoever at Capital City Pipes, they must have had their award already, right?
A. Correct.
Q. Because there's already been some payments made by the federal government for products shipped?
A. Correct.
Q. Okay. Now, was there a modification done with respect to what I'll call the JGB contract?
A. Yes.
Q. Okay. Did you ever see that modification?
A. Yes.
Q. Now, does that -- did that modification work essentially the same as the modification



we've marked as Exhibit 4?
A. Yes, I believe so.
Q. Okay. So I mean, obviously, the names are a little bit different and it's got different contract numbers, and maybe Anita Luich wasn't the contract specialist involved, or in this case, Malinda Jeffries, but the change that was made in section 14 would have been more or less the same, just the different account numbers?
A. Correct.
Q. Okay. Now, do you know if, in fact, from that point forward with JGB, the payments that were made by the government were sent to the right escrow account?
A. Do I know -- I'm sorry?
Q. That's fine. I'll say it -- it got a little bit long. I'll break it up. The modification that we were just talking about concerning JGB required the money to be paid to a an escrow account controlled by JGB? That's your understanding?
A. My understanding was that it was an escrow account controlled by both parties.
Q. Okay. It required joint action to

57

here. At that point in time when you did learn that there was a problem with Flexfab not getting paid, do you remember when that was roughly?

A. I believe that was at the point of the meeting between Henry Cook, myself, Howard Griffin and Kover from DFAS.

Q. Phil Kover?

A. Right.

Q. When that meeting happened, was the -- to the best of your knowledge, was the contract completely completed, or was it still in process?

A. I believe it was still in process.

Q. Okay. Tell me about that meeting, what you can recall.

A. To the best of my recollection, Mr. Cook was, of course, looking for our help to receive payment from the contracts that, of course, Capital City Pipes received. And there was an issue with the payments and the -- I'm trying to talk and remember at the same time. I'm trying to think if the modifications had been done at that point. I believe they had. But anyway, our meeting mainly was with Kover to determine what money -- what funds were supposed to be sent

58

to Capital City Pipes and what funds had already been sent to Capital City Pipes.

And I know that's when we discovered that Capital City had been paid twice on a particular contract. And basically, DFAS or DSCC was taking back money from other contracts to recoup the double payments.

Q. You're saying that Capital City Pipes had been double paid on one particular installment instead of just paid the once?

A. Right.

Q. And was that particular double payment relating to the product that Flexfab was supplying or maybe on just some other contract all put together?

A. Actually, I believe it was on the JGB requirement, because, again, that's when I discovered that Flexfab was involved as well. And that's when Mr. Cook stated -- he actually gave us the amounts that were owed to JGB, Flexfab, and himself.

Q. Okay. And were you able, with the help of Mr. Kover and, I guess, Mr. Griffith's involvement, to determine that payments were being

59

made directly to Capital City Pipes and not to the escrow accounts stated in the modification?

A. Yes.

Q. Okay. Now, who does -- well, at the time, who did Mr. Kover work for?

A. I don't know. He worked for DFAS, but I don't know who --

Q. Okay. But it was DFAS, not DSCC?

A. Right.

Q. And so, presumably, Mr. Kover is somebody who would have had access to the DFAS computer, and regardless, the information he provided to you is that the payments had been sent directly to Capital City Pipes and not to the escrow account?

A. Correct.

Q. Now, did you talk to him about fixing that problem or what needed to be done to make sure that didn't continue to happen?

MS. BURKE: Can I just interrupt for a second? Are we talking about JGB or Flexfab right now?

MR. RYNDERS: Well, my understanding is they were talking about both at this meeting. So

60

the question would be really on both.

A. Actually, it would -- Flexfab was actually an afterthought. I don't mean to be rude about it, but --

Q. Just say it the way it is. That's all I can ask you do.

A. The meeting mainly was regarding the payment to Capital City Pipes that should have gone to the escrow account for JGB.

Q. Okay.

A. And then that's why I said I didn't realize that there was an escrow account set up with Flexfab as well. And at that meeting is when we were talking, going back and forth. And then at that point, Mr. Cook stated that, you know, Capital City Pipes owed JGB this amount, owed Flexfab this amount, and owed him that amount. So --

Q. Okay. Now, did Mr. Kover then confirm for you the payment arrangements just involving JGB, or did this group of individuals that you were part of examine the payment status as to Flexfab as well?

A. Actually, I don't remember us

discussing during conversation -- and we knew that JGB, Flexfab, and Mr. Cook were involved, but our main conversation was on contract, contact numbers, and payments so --

Q. Okay. So you may have gone through a list of contract numbers and you wouldn't have known at that point in time whether these were JGB or Flexfab?

A. Correct.

Q. Okay. Fair enough. Now, I've been told, but I hope I'm wrong about this, that Mr. Kover is deceased?

A. Oh, I have no idea.

Q. Okay. I hope I'm wrong. It's just a bad rumor. Have you seen him since you left the DSCC?

A. No.

Q. Did you have any follow-up meetings with Mr. Kover?

A. No. That was the one and only meeting I had with him.

Q. Did you have any additional involvement with the problems that JGB and that Flexfab were having, either/or? Did you have anymore meetings



from that point on about payment?

A. Oh, yes, several.

Q. Okay. Now, do you know whether or not at the time of this meeting, Flexfab was still manufacturing and delivering product to the federal government?

A. Through Capital City Pipes?

Q. Through Capital City Pipes.

A. I can't say for sure. I believe they were, but I can't confirm that.

Q. Okay. I'm probably going to be able to find a document in a little bit, but do you have any recollection without the help of a document as to when that meeting took place?

A. No.

Q. Okay. Did you talk to Mr. Kover -- did anybody leave Mr. Kover with instructions to make sure that DFAS paid attention to these two contract modifications that called for payments to these two escrow accounts?

A. Yes -- well, Mr. Griffin was basically the lead in this meeting, and, yes, he left instructions with Mr. Kover. And, actually, it was, you know, a mutual agreement that things



would be worked out.

Q. Okay. And I'm not suggesting that Mr. Kover didn't want to. I'm just saying that he was told, and you're telling me that he also agreed, that DFAS needed to take account of these two modifications?

A. Correct.

Q. Did you walk out of that meeting with the impression that from time forward, whatever payments were made by DFAS would be made to these two escrow accounts?

A. Yes.

- - - - -

Thereupon, Exhibit 15 is marked for purposes of identification.

- - - - -

Q. Let me show you what I've marked as Exhibit 15. And as I kind of alluded to before, we're just continuing on with the sequence so we don't have -- every time we start over, there's a new Deposition No. 1, or we don't have to mark things five times.

This appears to be a printout from



Anita Luich's e-mail file or account which has some e-mails back and forth between you and her?

A. Right.

Q. Do you remember this exchange of e-mails?

A. Yes.

Q. Now, at the top, what we have here is Anita Luich asking you to consider the idea of I guess kind of surveying the capabilities of Capital City Pipes; is that right?

A. Right. Are you talking about at the very top of this page or --

Q. Yeah, the first e-mail message itself.

A. Okay. Because it starts --

Q. Oh, it starts at the bottom and works up.

A. Yeah.

Q. Okay. So the bottom entry comes first. And in that she's reporting to you that some other folks are -- have had some conversation about whether or not to do a survey of Capital City Pipes?

A. Correct.

Q. And the issue is the amount of the

contract specialist, I guess, in this situation, a post-award contract specialist should do to make sure that the modification is, in fact, implemented by DFAS?
A. As far as I know, you know, they submit the information to DFAS. And what happens from there, you know, I don't think they're giving any notification or anything of that nature.
Q. Okay. Now, turning back to JGB, the position -- as far as you know -- well, did you ever have conversations directly with JGB?
A. Yes.
Q. And their position stated to you was that we haven't been paid for products we've made and we're not going to ship anymore product unless we get paid?
A. Correct.
Q. And, in fact, they also indicated to you that they said we're not going to ship any product unless we also get this escrow arrangement, so we don't have this problem again in the future?
A. No.
Q. Okay.



A. My recollection was that basically they weren't going to deliver until they got paid. And -- so the escrow agreement came about as a means for them to receive payment and an assurance that they would get paid on future requirements.
Q. Okay. Now, what was -- I think it's kind of obvious, but I'm just going to ask the question: What was the point of the escrow agreement?
A. To make sure that JGB received payments on their requirements.
Q. And who was the intended beneficiary of that modification for JGB?
A. Actually, everyone would benefit. The government would get the supplies. JGB would get their funds. And Capital City Pipes would get their portion of the funds.
Q. Okay. Now, I know you've explained that at the time you weren't aware of Flexfab's request for an escrow account, but would you have any different answers to the purpose of the modification marked as Exhibit 4?
A. No.
Q. It was all around for everybody's



benefit?
A. Correct.
Q. Is there anything you can do to shed light on why the modification marked as Exhibit 4, being the Flexfab modification, why that wasn't followed?
A. Probably a breakdown in the system, but I can't -- you know, I'm not a hundred percent sure on that, but --
Q. Don't take this the wrong way. I'm just throwing out crazy ideas to show you how far I'm willing to go -- I mean, just any explanation that you've got other than breakdown of communication? Obviously, you've worked hard to develop suppliers. Were you, in fact, the person who developed C & S?
A. Yes.
Q. And then they graduated, and so now you've developed Capital City?
A. Uh-huh.
Q. I mean, it's not like you went in and said, ignore this contract modification, I want to make sure Capital City gets the money?
A. No. Right.



Q. Is there any reason why somebody would have intercepted the modification or that there was a policy that you're aware of that would have made the modification unenforceable or anything like that?
A. The only thing I know is that DFAS folks, when it's time for payment, they look at the information in the CCR, the Contractor -- I can't remember the name of the CCR. But, anyway, the CCR is the system where the contractors register. And when they make payment, they go by the remittance address in the CCR. But my understanding at the time was that if a modification went through, it would override what was in the CCR, but, apparently, it doesn't.
Q. And we all understand human error. Okay? But in terms of the procedures and policies that you're aware of, the people at DFAS are supposed to know that the modification overrides the CCR?
A. That, I don't know. I don't know if the modification overrides that or how that works.
Q. Okay. From the DSCC standpoint, that

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT I

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

- - -

Flexfab, LLC, a Michigan Limited Liability Company, Successor to Flexible Bellows International, Inc., d/b/a Flexfab, :

Plaintiff, :

vs. : Case No. 02-1096 C
: Lawrence J. Block

United States of America, :

Defendant. :

- - - - -

**DEPOSITION OF SHIRLEY SPRATT**

- - - - -

Taken at Defense Supply Center
3990 East Broad Street
Building 20, Room A7255
Columbus, Ohio 43213
August 28, 2003, 8:31 a.m.

- - - - -

Spectrum Reporting LLC
333 East Stewart Avenue
Columbus, Ohio 43206
614-444-1000

- - - - -



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

Mark E. Hills, Esq.
Varnum, Riddering, Schmidt, Howlett
Bridgewater Place, Post Office Box 352
Grand Rapids, Michigan 49501-0352

ON BEHALF OF DEFENDANT:

Claudia Burke, Esq.
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20530

ALSO PRESENT:

Vasso Monta



Thursday Morning Session

August 28, 2003, 8:31 a.m.

S T I P U L A T I O N S

- - -

It is stipulated by and between counsel for the respective parties that the deposition of SHIRLEY SPRATT, a witness herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice and by agreement of counsel, that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -



MR. HILLS: The record should reflect this is the deposition of Shirley Spratt, taken in the matter of Flexfab, LLC versus United States, United States Court of Federal Claims, Case No. 02-1096C.

We've set a number of depositions, and I think we're taking Ms. Spratt -- I don't remember where with respect to the time frame, but do you have any problem with the notice we got for her today?

MS. BURKE: No.

MR. HILLS: Thank you.

Just so we're clear, Ms. Monta, I understand you're the agency counsel?

MS. MONTA: Yes.

MR. HILLS: And you're here to observe today?

MS. MONTA: Yes.

MR. HILLS: You're not participating in the deposition?

MS. MONTA: No.

MR. HILLS: Okay. Thank you.

- - - - -

Q. All right. Is that something you would normally do?
A. No.
Q. Okay. Did you undertake to deal with Capital City-related issues for any other subcontractors besides Flexfab and JGB Enterprises?
A. No.
Q. Do you know if anyone did?
A. No, I don't.
Q. All right. We're going to look at the notice now. If you could look -- I think it's on the last page, there are items 16 and 17. The first one relates, I believe, to payments?
A. Yes.
Q. It lists then five different entities?
A. Yes.
Q. You've indicated that you were dealing with payment issues relating to JGB Enterprises and its contracts with Capital City?
A. Yes.
Q. You were also dealing with those similar issues with Flexfab on this particular contract?



A. Yes.
Q. Were you dealing with payment issues on any of the other entities listed there?
A. Not payment issues that I recall, but C & S Industrial Supply is familiar.
Q. Okay. Why?
A. I'm thinking Flexfab was a second-tier sub, and C & S was the first-tier sub.
Q. Okay. Do either of the other two entities --
A. The other three? There are five.
Q. Well, we've talked about JGB, Flexfab, and C & S?
A. Where is Flexfab?
Q. Oh, I'm sorry. So then we have Geoffrey Boddon & Associates, Fidelity Leasing in Tallahassee Mack. Did you deal with payment issues on either of those three entities or any of those three entities?
A. No.
Q. All right. Same question for, then, item No. 17 and the entities listed again. You dealt with the claims made by JGB Enterprises?
A. Yes. As a reviewer. Not directly.



Q. All right. Who was it that was directly dealing with JGB Enterprises?
A. Phyllis Moore.
Q. All right?
MS. BURKE: Can I just clarify something? The question says claims -- the two questions say claims and payments with respect to this contract.
MR. HILLS: I know. I noticed that when I was asking her the question. That's why I phrased my earlier question a little differently.
MS. BURKE: Okay.
MR. HILLS: Yeah, I appreciate you pointing that out.
Q. And then you also dealt, then, with claims made by Flexfab under the contract in dispute in this matter, right?
A. Yes.
Q. All right. Did you deal with claims made by any of the other entities listed there?
A. Only to say that C & S is familiar. I don't think I had any claims issues, but it seems there was some involvement regarding C & S.
Q. Okay. And then the other three?



A. The other three, no.
Q. Okay. Do you know did the other three make formal claims?
A. If they did, I'm not aware of it.
Q. Okay. What does Melinda Jeffries do now?
A. She's a post-award contract specialist.
Q. All right. And that was true at the time of this contract processing, if you know?
A. Yes.
Q. Okay. Do you know who her supervisor is now?
A. Norman Young.
Q. That takes care of the notice, the 30(b)(6) notice. So I understand correctly, from 1988 when you became a post-award contracting officer through 2001 when you switched to pre-award, were you essentially performing the same functions that Melinda Jeffries would have performed on the contract at issue here?
A. Yes.
Q. All right. During that time, did you ever have involvement with Flexfab on any other contract?

Q. Okay. Do you know when?
A. When I reviewed the contract.
Q. And that's Modification P00001?
A. Yes.
Q. And it's dated what date?
A. September 27th, 1999.
Q. And that was Melinda Jeffries who executed that?
A. Yes.
Q. All right. And what did that modification do?
A. It corrects the remittance address.
Q. Okay. You indicated earlier that you looked at some documents as part of the preparation for the deposition that showed when payments on this particular contract were made?
A. Yes.
Q. All right. When were those payments made?
A. I didn't look that close to it. I just looked at the documents to see if they were familiar.
Q. Okay. Do you have any recollection of when payment was made?



A. No.
Q. I'm going to hand to you, Ms. Spratt, what's labeled -- Bates labeled documents DF1 through DF5, which were produced by the government. Were those the entire collection of the payment records you looked at earlier in preparation for the deposition?
A. I can't answer that. I looked at documents that looked like this. I can't say that they were --
Q. Okay. Those look familiar?
A. Yes.
Q. All right. Can you tell me when are the dates of payment that are reflected on those documents, DF1 through DF5?
A. DF1 is 28 March of 2000, DF2 is 4 April of 2000, DF3 is 11 April of 2000, DF4 is 20 April of 2000, DF5 is 17 April of 2000.
Q. What would the process be here at DSCC after execution of Exhibit 4 to have that information entered into the computer system or otherwise processed to have that reflected in DSCC's records?
A. You would do a keypunch entry.



Q. All right. Who would do that?
A. Either Melinda or her clerk.
Q. All right. Do you know who on this contract her clerk was?
A. No.
Q. When would that be done?
A. Shortly after the modification is signed.
Q. All right. Do you know why it wasn't done in this case?
A. No.
Q. But that is what you determined to be the case, correct?
A. That is what should have happened, yes.
Q. All right. But you determined that did not happen, correct?
A. I did not determine that.
Q. All right.
MR. HILLS: Mark that Exhibit 5, please.

\- - - - -

Thereupon, Exhibit 5 is marked for purposes of identification.



\- - - - -

Q. Could you review that, please, and let me know if you recognize it.
A. Yes, I recognize it.
Q. It's a letter you sent to me, correct?
A. Yes.
Q. And it's dated October 2, 2000?
A. Yes.
Q. Don't you conclude in there, or don't you indicate in there that the modification was apparently never entered into your computer system at DSCC?
A. Yes.
Q. All right. So then you did conclude that at some point in time?
A. Yes.
Q. All right. How?
A. My guess is because it wasn't changed.
Q. How would you have -- I mean, what would you have done? Describe to me the process that you would have used to determine that. I mean, is it as simple as pulling up a computer screen, or what would you have had to do?
A. If it was right after this, I could

A. That is correct.
Q. But in any event, it shows that address twice?
A. Yes.
Q. The P.O. Box in Tallahassee, and it shows another address in Michigan, correct?
A. Yes.
Q. All right. Why, then, did you conclude that the Tallahassee address was the correct address?
A. Did I say I concluded that was the correct address?
Q. Well, you indicate in here that's the address the contract shows, correct, and I'm talking about Exhibit 5 now.
A. Right.
Q. I'm not trying to put words in your mouth. I want to make sure as I read it upside down, I'm interpreting the letter correctly.
A. The letter does not say that I concluded that was the correct address.
Q. All right. What does it say, because I don't mean to misconstrue it?
A. It says the remittance address in the



original contract was stated as Capital City Pipes, P.O. Box 12368, Tallahassee, Florida.
Q. All right. But it's stated as another address as well, isn't it?
A. Modification P1 was issued to change the remittance address to Old Kent Bank.
Q. The modification isn't there, is it?
A. It's right here.
Q. Okay. But that's not part of the original contract, is it?
A. Right, it is not.
Q. Right. And there's a document in the original contract that shows a different remittance address, correct?
A. Yes.
Q. All right. So you concluded that one was appropriate, and the other one was not?
A. Not based on this.
Q. Okay.
A. I didn't say one was appropriate, and one was not.
Q. Okay. I'm asking why you put in your letter to me of October 2 that that was the remittance address, the P.O. Box in Tallahassee,



Florida?
A. I see what you're saying.
Q. In the original contract it says both, correct?
A. Right.
Q. So it's ambiguous, right?
A. The contract is ambiguous, yes.
Q. That what's what I'm asking you.
A. Yes.
Q. Okay. So why did you list in your letter to me that the remittance address was Tallahassee, Florida?
A. Because it was in here twice.
Q. Well -- but you indicated earlier you weren't sure if the solicitation documents were part of the contract?
A. True.
Q. Would it be your conclusion that because one address is listed twice and the other address is listed only once, if that were the case here, that that shows one is the remittance address?
A. No.
Q. All right. Was that the easy answer to



the question in October 2 of 2000, that the remittance address just didn't get changed, but now, your position's a little different?
A. No. My position -- no.
Q. Okay. But that doesn't -- the letter doesn't explain the problem, does it?
A. Right.
Q. So what was the purpose of writing it?
A. The purpose for writing it was, I said the remittance address in the contract was this. It was changed to Old Kent Bank by modification. The computer system didn't get updated, so DFAS made payment to the original address stated in the contract.
Capital City Pipe, who the government had the contract with, did not contact us and tell us that that was incorrect. So as far as I was concerned as the contracting officer, the government's obligation was done.
Q. Okay. Let's go back and look at, I think, 12 of 24 in the contract.
A. This?
Q. Right. And that's dated June 23, right?

81

A. Yes.
Q. And that's Capital City telling the government that the remittance address for this contract should be Old Kent Bank in Michigan, right?
A. Yes.
Q. Do you have any idea -- and I'm not -- this isn't meant as a challenge to you personally -- do you have any idea why that wasn't accounted for when this contract was entered originally into the system?
A. No.
Q. Okay. Would it, again, have been the obligation of the contracting officer to make sure that that information was correctly reflected?
A. The pre-award contracting officers don't check on that -- check to see that the system is correct for things like this.
Q. Okay.
A. Like the post-award contracting officers do.
Q. Okay. You're talking about checking to make sure they're correct?
A. Right.

82

Q. All right. But it wouldn't be the pre-award contracting officer's obligation to make sure when it was originally entered, it was entered correctly, regardless of whether she's doing it as she sits there or goes back and checks again?
A. You're asking me if that's her obligation, or are you asking her if that's standard procedure? I'm confused what your question is.
Q. All right. Let's do both. Let's start with procedure. How is that the information from the contract gets entered into the DSCC computer system?
A. At this time, June of 1999, I don't know if they were using the automated system, which automatically updates, or if it would have been keypunched. It would have been one of those two ways.
Q. Okay. When you say the automatic system --
A. Automated, uh-huh.
Q. All right. How does that enter -- how does the automated -- as silly as this sounds -- how does the automated system enter information into the computer?

83

A. When you put it all in your award document, once you hit send, if you will, that sends it automatically to our computer.
Q. So someone has to input it initially, right, or it's scanned, or somehow it's inputted into the computer system?
A. Yes.
Q. All right. And then from that point forward, you can change the document as it exists in the system?
A. No. Once it's funded, which means the money has been obligated, you can't make changes.
Q. Okay. But page 12 of 24 is directed to Ms. Luich, correct?
A. Yes.
Q. And she was the pre-award contracting officer, right?
A. Yes.
Q. And you're telling me that she has no responsibility as the pre-award contracting officer to make sure that the contract information has been correctly entered into the DSCC computer system?

84

A. I didn't say she didn't have the responsibility. I think she does have the responsibility.
Q. Okay. And that's in your position as a supervising contracting officer?
A. Yes.
Q. Okay. In the normal course of processing this kind of an award, is it understood that there is a responsibility with someone to make sure that the information gets entered correctly?
A. Yes.
Q. All right. Who would that responsibility fall on?
A. The contracting officer.
Q. Okay. Is there any way you can say here today why that didn't happen?
A. No.
Q. All right. Same with why the modification information was never updated into your computer system?
A. Right. I can't say why that didn't happen.

85

Q. Okay. But that was clearly the intent, right, of the modification?
A. Yes.
Q. All right. And, again, so I'm clear -- well, let me ask you this: If the government were aware of the existence of the escrow account in this matter, would that change your conclusions?
A. No.
Q. Why not?
A. Because there's -- you can do an assignment of claims. That's the way to handle money that is assigned from one contractor to another.
Q. Is that a requirement?
A. I think it is.
Q. So is your conclusion, then, following that logic, as I understand it, that these escrow accounts shouldn't be used?
A. I won't say they shouldn't be used. I think they're not safe.
Q. Okay. And if the government was not only aware of the existence of this escrow account, but the fact that it was to ensure that C & S Industrial Supply and Flexfab received

86

payment, does that change your conclusion at all?
A. You are saying that the government was aware that that was what was supposed to be happening. I don't agree that the government was aware.
Q. All right. But I'm asking you to assume that.
A. Okay. I'm assuming that the government was aware --
Q. And I'm going to ask you to assume two things.
A. Okay.
Q. One, that the government was aware of the existence of this particular escrow account, and, two, that the escrow account was established to protect the financial interest of C & S Industrial and Flexfab on this contract. Okay?
A. Okay.
Q. All right. Assuming those two things, is it still your position that there's no claim by Flexfab or no viable claim by Flexfab or C & S for this money?
A. Against the government, yes, that is still my position.

87

Q. Okay. We're nearing the bitter end. If you'll give me a minute or two.
You don't dispute that Flexfab wasn't paid for the parts it supplied to the government, do you?
A. I have no way of knowing for sure that they were not. It appears they were not.
Q. You don't believe they would make a claim if they had been paid, do you?
A. I would hope not.
Q. That would be kind of bad business practice, right?
A. Yes.
Q. All right. How well did you know Michael Taylor?
A. Casually, very casually. You know, I would say hi to him.
Q. Okay. Do you have any idea if he's still in the Columbus area?
A. I think he still lives in Columbus.
Q. Okay. Did you ever have any conversations about Flexfab's claim on this contract with a gentleman named Phil Kover?
A. No.

88

Q. Do you know who that is?
A. I know he worked at DFAS.
Q. Okay. Do you know what he did there?
A. He had something to do with payments. I don't know if he was a supervisor over the payment area or if he did the payments himself.
Q. All right. When you say "if he did the payments himself," you mean actually processed payments?
A. Yes.
Q. Okay. If he were a supervisor, do you have any idea what his responsibilities would have been? Would he have just been overseeing the people who were making -- processing the payments or --
A. That would be my guess.
Q. Okay. Do you know one way or the other?
A. No, I do not.
Q. That's fine. Did you ever have any contact with a gentleman named Henry Cook from C & S Industrial Supply?
A. No, not that I'm aware.
Q. Okay. Did you ever have any contact

A. No.
Q. All right. Documents DF222 and DF223, what is that?
A. This is a synopsis that is issued when we're going out to solicit proposals.
Q. All right. So that would be pre-award?
A. Yes.
Q. All right. DF230 to 232, it says request for synopsis. Again, part of the pre-award process?
A. I think this is issued, and that's what creates the other synopsis to generate.
Q. Who would issue this or generate this generally?
A. The buyer, I think.
Q. All right. Any idea who the buyer on this contract was?
A. Anita Luich.
Q. Anita. Document DF234 is a large purchase acquisition plan?
A. Yes.
Q. What is that?
A. It's just like a cover sheet that documents everything you did, what you're going to



do on this acquisition.
Q. Okay. Was that used on each one?
A. On large purchases, yes.
Q. Okay. What differentiates large as opposed to I mean, are there ones that say small purchase acquisition plan?
A. No. You don't have to do them for a small purchase.
Q. All right. What's the distinction?
A. Today, large purchase is $100,000 and above.
Q. Okay. Any idea what it would have been in 1998, '99?
A. It may have been a hundred before that -- before it became a hundred, I think it was 25.
Q. Okay. Do you have 245 to 253, purchase request trailer listing? What's the purpose of that document?
A. This kicks out when the purchase request comes out, and it gives you technical information, acquisition history, almost anything you need to know about to prepare for this solicitation.
Q. As part of your review of this matter,



did you look at the material inspection and receiving reports?
A. Probably.
Q. All right. Let me hand you a copy of one of them. It's a document Bates labeled DF261. Does that look familiar to you?
A. Not necessarily.
Q. Okay. Does there seem to be, as you look at it today, anything unusual about it?
A. Yeah. The remittance address doesn't match the one in the modification.
Q. Anything else about it seem out of the ordinary or unusual?
A. No.
Q. You looked at the remittance address. Why did you look at the remittance address?
A. Just because it was typed there. I just looked to see.
Q. Okay. And that particular one was signed by a government agent, correct?
A. The quality assurance representative, yes.
Q. Accepting the product?
A. Yes.



Q. Correct? As part of your involvement with this matter, do you have any recollection of any of the other people, Mr. Crockett or Mr. Griffen or Mr. Taylor, indicating that they had ever had any conversations with Henry Cook at C & S Industrial Supply?
A. I think they did say he came to visit them.
Q. All right. Do you remember who said that?
A. No. It was in a meeting.
Q. Okay. Why don't we get off the record for a minute.
(A short recess is taken.)
Q. Have you ever looked at anything to determine whether Flexfab has used escrow accounts to ensure payment in previous contracts with the government?
A. No.
Q. All right. I don't have any more for you.
MS. BURKE: What we're going to do is have you review the document, and however much time is regular for you. And then sign it --

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT J

DE. .NSE LOGISTICS AGENCY
DEFENSE SUPPLY CENTER, COLUMBUS
POST OFFICE BOX 3990
COLUMBUS, OH 43216-5000

EXHIBIT

Deposition 5

IN REPLY REFER TO DSCC-LECC

October 02, 2000

FACSIMILE TRANSMITTAL LETTER

Mr. Mark E. Hills
Varnum, Riddering, Schmidt, & Howlett

FAX: 616-336-7000

Dear Mr. Hills:

Reference your letter dated August 25, 2000 relative to Contract SP0740-99-C-1004.

Contract SP0740-99-C-1004 was awarded to Capital City Pipes, Inc. (Capital City) on June 29, 1999. The remittance address in the original contract was stated as Capital City Pipes, Inc., PO Box 12368, Tallahassee, FL. Modification P00001 was issued on September 27, 1999 to change the remittance address to Old Kent Bank, Corp Trust. Because our computer system was not changed to reflect this revised remittance address, the Defense Finance and Accounting Service (DFAS) remitted payment to the original remittance address stated in the contract. Inasmuch as we did not hear from Capital City (our prime contractor), we assumed payment was received satisfactorily. Further, since we did not hear from Capital City that payment was not received, we believe we have discharged our legal obligations under this contract.

If you have any further questions relative to this issue, feel free to contact me at (614)692-3971.

Sincerely,

Shirley Spratt

SHIRLEY SPRATT
Contracting Officer
DSCC-LECC

APP-118

Exhibit 2

Federal Recycling Program Printed on Recycled Paper

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT K

IN THE U.S. COURT OF
FEDERAL CLAIMS

- - -

Flexfab, LLC, a Michigan :
Limited Liability Company, :
Successor to Flexible :
Horizons International :
Inc., d/b/a Flexfab, :

Plaintiff, :

vs. : Case No. 02-1096 C
: Lawrence J. Block
United States of America, :

Defendant. :

- - - - -

**DEPOSITION OF HOWARD GRIFFIN**

- - - -

Taken at Defense Supply Center
3990 East Broad Street
Building 20, Room A7255
Columbus, Ohio 43213
August 28, 2003, 10:45 a.m.

- - - -

**Spectrum Reporting LLC**
**333 East Stewart Avenue**
**Columbus, Ohio 43206**
**614-444-1000**

- - - - -



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

Mark E. Hills, Esq.
Varnum, Riddering, Schmidt, Howlett
Bridgewater Place, Post Office Box 352
Grand Rapids, Michigan 49501-0352

ON BEHALF OF DEFENDANT:

Claudia Burke, Esq.
U. S. Department of Justice
1100 L Street, NW
Washington, D.C. 20530

ALSO PRESENT:

Vasso Monta



Thursday Morning Session
August 28, 2003, 10:45 a.m.

S T I P U L A T I O N S

It is stipulated by and between counsel for the respective parties that the deposition of HOWARD GRIFFIN, a witness herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice and by agreement of counsel; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -



HOWARD GRIFFIN
being first duly sworn, as hereinafter certified, testifies and says as follows:

CROSS-EXAMINATION

- - - - -

BY MR. HILLS:
**Q.** Sir, if you could state your name, please?
**A.** First name is Howard, middle name is Anthony, and last name is Griffin. I'm referred to as Tony often times as a nickname.
**Q.** Griffin is G-R-I-F-F-I-N?
**A.** That is correct.
**Q.** Mr. Griffin, where do you reside?
**A.** I reside in the city of Pickerington, at 9425 Haaf Farm. I'm saying H-A-A-F, that's Farm Drive, and the zip is 43147.
**Q.** Did you say Pinkerton?
**A.** Pickerington.
**Q.** Pickerington?
**A.** P-I-C-K-E-R-I-N-G-T-O-N.
**Q.** Okay.
MR. HILLS: The record should reflect we're here in the matter of the deposition of

CSR, a customer support representative for the Patriot missile system, which means that all the spare parts necessary to maintain operation and mission capability fell under re -- part of my responsibility.
Q. What were your duties as the associate director of small business?
A. I was responsible for making sure that the socioeconomic programs as dictated by Public Law 95507 were carried out here at this organization.
Q. And is that a good way to describe your duties from 1990 til 2003?
A. Pretty much, unless you get into particular kinds of programs associated with the socioeconomic program, but the bottom line is that they fell under my charge here, and I was reporting directly to the commander.
Q. Okay. Did you, or were you involved with dealing with particular contractors or subcontractors under those programs, or were you overseeing other people who were doing that?
A. I oversee other people. Now, there may have been times when the issue rose to the level



that I got involved.
Q. Okay. Was your posting as the small business specialist, did that immediately proceed becoming the associate director of small business?
A. That's correct.
Q. All right. What were your duties there?
A. If I recall -- now, I'm simply recollecting -- I think I had the 8(a) program, the Section 8 -- the SBA Section 8(a) Small Business Program, the JWOD Program, which is Javits-Wagner-O'Day Program for social -- for -- it's for the severely handicapped and for the blind. I may have had a couple others, labor surplus areas, but those were programs that fell under my responsibility as a small business specialist.
Q. All right. How long were you a small business specialist?
A. From December of '86 until May of '90.
Q. What sort of things did you do to prepare for your deposition today?
A. Basically, nothing. I spoke with the attorneys yesterday in general about I will be up



for a deposition.
Q. Did you review any documents?
A. No documents. He did show me a couple of documents to see if I could identify them.
Q. Do you know what they were?
A. If I recall, they were a couple of offering letters with respect to awards that went to one of the 8(a) participants, and there was an acceptance letter from the SBA with regard to one of the awards.
Q. All right. If you recall, Mr. Griffin, did you have any direct involvement with the certification of Capital City Pipes, Inc. out of Florida as a 8(a) contract?
A. None whatsoever.
Q. All right. Who handled that?
A. You got me. The responsibility for certification is an SBA responsibility.
Q. Is that a function that the SBA office here would have performed?
A. No. Probably the district office where the firm is located.
Q. Okay. Are you familiar with a gentleman named Mike Taylor?



A. Oh, yeah.
Q. How do know you Mr. Taylor?
A. Mike -- in fact, I hired Mr. Taylor. I don't recall when, but I'm the person who hired Mr. Taylor into the small business office.
Q. What were his responsibilities?
A. He was my 8(a) and Hub Zone Program coordinator.
Q. I'm sorry. You said 8(a) and --
A. 8(a) Program, Section 8(a).
Q. Right. And then the other one?
A. Hub Zone, H-U-B, Z-O-N-E.
Q. What is that?
A. We've got -- business zones where we identify firms that have some difficulties with respect to being able to compete, and they've designated areas where we support those areas.
Q. All right. How long did he work for you?
A. I don't really remember, but I'm thinking a good half a dozen years, maybe more.
Q. Okay.
A. So I don't know.
Q. Why was there a change in your status

A. That authority is delegated to Mr. Taylor, but the reason his name is up here so that any response will come back to him because he's working this --
Q. All right. In either of those two letters, Exhibit 8 or 9, is that your signature?
A. No.
Q. All right. That's him signing your name?
A. That's him signing my name.
Q. Was Mr. Taylor the only person performing that function, or were there other people who were doing the same thing for other 8(a) companies or other programs?
A. If I'm correct, I had -- the 8(a) program is broken down in two categories. I have a construction side where we do base supply, and the gentleman involved with that, his name is Gerry Wade.
Q. Okay.
A. So Gerry Wade would be doing offering letters from the construction, signing them.
Q. Okay.
A. So you have Mr. Taylor doing



commodities and services -- well, I don't want to say service, commodities. Because services would fall into base supply, which means it would have been something that Mr. Wade was doing.
Q. Okay. Would it be fair to say that these are examples of letters that went out frequently, these two just happened to have been directed to something involving Capital City Pipes?
A. Yes. This is a standard format.
Q. Yeah.
A. So any 8(a) that receives an award, an offering letter would have went prior to that.
Q. Okay. You indicated earlier, sir, that you had a conversation with Henry Cook?
A. Yes.
Q. Regarding Capital City Pipes?
A. Yes. More than -- well, not necessarily -- I've had multiple conversations with Henry Cook.
Q. Okay. How many of those related to Capital City Pipes?
A. I have no idea.
Q. All right. When was the last time you



had a conversation with Mr. Cook?
A. I'm going to guess and say two years ago.
Q. Okay. Did you meet with Mr. Cook at any time to discuss the Capital City Pipes matter?
A. The answer to that is yes, but when you say "Capital City Pipes matter," I met with Mr. Cook to discuss some financing regarding Flexfab not being paid or --
Q. Okay.
A. So I guess we're saying the same thing.
Q. Yeah, that's what I'm referring to. So you had that meeting. Was Phil Kover there as well?
A. As I recollect, yes.
Q. All right. Was Michael Taylor part of that meeting?
A. I believe he was.
Q. All right. Were you there the whole time?
A. I'm pretty certain I was there the whole time. If not the whole time, the vast majority of the time.
Q. All right. If you could review that



for me please, sir.
A. Okay.
Q. Does that accurately summarize the meeting you had with him?
A. I don't know -- when you say accurate, there's some things I'm not certain -- I couldn't say yay or nay to. But, basically, the gist of what was being said about a meeting with Mr. Kover and asking about payment, I can recall that.
Q. All right. Do you recall as a result of that meeting that you and Mr. Taylor had any additional discussions about C & S Industrial Supply and Flexfab and their failure to receive payment for parts?
A. I don't know. I would think that probably we did, but I don't know. I don't recall anything specific.
Q. All right. Do you remember --
A. The conversation would have been more -- would have went along with Mr. Kover about getting these people paid.
Q. All right. Do you have any recollection of talking with Mr. Kover about that issue?

A. Only to the extent that there was something in the automated process associated with the address, and it's supposed to transfer over, and it didn't, or something with regard to that. I don't know how that works.
Q. All right. Do you know if there was ever a conclusion reached or a plan of action reached as a result of these discussions to rectify the nonpayment?
A. No. My -- last I heard, they had filed an action, and I assume this is part of it.
Q. Okay.
MR. HILLS: Let me go ahead and mark that as 10.
- - - - -
Thereupon, Exhibit 10 is marked for purposes of identification.
- - - - -
Q. So I understand, we've now marked as Exhibit 10 the copy of the e-mail message you received from Henry Cook, correct?
A. I don't know that. What I'm saying, I guess, this is on the top of my sheet, and I don't



recall the e-mail itself, but I do recall much of the contents in the e-mail. So I have no reason to believe it was anything other that, but I can't identify this is the e-mail that I received.
Q. All right. Given the way it's set up, you don't have any reason to argue that it's an e-mail that was --
A. I wouldn't debate it is. I just can't confirm.
Q. All right. And as I understand what your testimony is about the contents of the e-mail, you may not recall specifically some of the issues, but you think it generally is a accurate summary of the issues that were discussed?
A. Well, he spoke to some things that Mr. Kover has said and did, and I don't know about those things. Okay? But in terms of the debt -- the monies not going to where it was supposed to go, I am familiar with that situation.
Q. All right. And, again, so I'm clear, you don't have a specific recollection of the nature of any conversations you had with Mr. Taylor or Mr. Kover after this meeting that's



being referred to in Exhibit 10?
A. No. No. In the back of my mind, I would have told Mr. Taylor to press on this issue with Capital City and see what's going on to get these folks money, et cetera, but no particular conversation.
Q. All right. Did you ever do anything to follow up and see what had happened as a result of this contact with Henry Cook?
A. When you say that, what do you mean, "follow up"?
Q. Well, did you ever get back to Mr. Taylor or Mr. Kover some period of time later to say, hey, what happened with that?
A. If I can recall correctly, there was perpetual back and forthness. I think as a result of that, there was dissatisfaction in not knowing specifically and how. As a result of that, there was this action that was filed.
Q. All right. Would you have made notes of any of these conversations?
A. Certainly would. However, I looked for a file that -- since I've been gone, so many -- when files get a certain age, they discard them.



So any notes that I might have, I was unable to find.
Q. All right. Would there be any computer records or anything that would have notes or log entries or journal entries, whatever you might want to describe them as?
A. I attempted to go through some of my old e-mails just the other day, but I didn't find anything relevant to this situation. I can't say. It may or may not be. I just don't have any knowledge of where I'd find them.
Q. Okay. Did Mr. Taylor ever indicate to you that he was keeping notes or keeping --
A. We would have had a file on Capital City, C & S. They were both 8(a) firms --
Q. Right.
A. So they're -- whether we've got something stored somewhere or they've got destroyed, I don't know. But we would have maintained a file on program participants. Simple as that.
Q. All right. That would have been something you would have done in the regular course --

A. Regular course of business.
Q. Okay. And do you know what the document retention policy is for that kind of information?
A. Honestly, no. That's probably a bad thing, but no.
Q. Generally, how long are those types of records maintained? Do you know the period of time?
A. First of all, what I will say to you with clarity that as long as the firm is in the program, we would maintain the records. So if Firm A is in that program for a period -- typically, it's a 9-year process.
Q. Okay.
A. We would have their folder a minimum of nine years and probably would keep it an extra year before we sent it somewhere to be filed.
Q. All right. So C & S Industrial is still part of that program, so there would still be a file somewhere?
A. If they were still part of the program, but they're not.
Q. All right. When did C & S Industrial



drop out of the 8(a) program?
A. I don't know exactly, but I can tell you probably a couple years ago. They didn't drop out. They graduated. In other words, their period of time ended.
Q. Oh, okay. Sort of moved onto being just a regular business?
A. That's right.
Q. Okay. What happened with Capital City Pipes?
A. I don't know. I can tell you in terms of our association with them, is that when they got broke or -- the word was that they absconded with the money. Is that fact? I don't know. But as a result of that, of course, we weren't in any position to do business with them, and, of course, they did not come back requesting business.
Q. All right. Let me hand you a two-page document that's Bates labeled DF176 and DF177. Just tell me what that is.
A. This is what I made reference to earlier about an acceptance letter.
Q. Okay. That's an example of an acceptance letter?



A. This would be a -- this is, in fact, a copy of an acceptance letter from the SBA out of Jacksonville, Florida.
Q. All right. Are those issued on particular contracts, or do those relate to just -- I'm probably mixing some stuff up here, so bear with me.
Does that relate to the original certification of a business as an 8(a) program business, or does that relate to a specific contract offer letter such as we discussed in Exhibits 8 and 9?
A. Actually, this relates to a specific offer, not a contract because it's not a contract yet.
Q. Right.
A. We're offering this opportunity in a procurement package saying, hey, here's something that we're willing to set aside for the firm because we believe, based on the profile, they can do this.
It is the obligation of the SBA to accept on their behalf because it's a tripartite agreement.



Q. Okay.
A. The actual award at this time -- and I'm saying time with respect to in 1988 -- the actual award would have been with the SBA who subcontracted to the program participants.
Q. All right. And it's the SBA function to determine whether they can satisfy the various requirements?
A. Exactly. Again --
Q. And would that pertain to requirements not only from a financial perspective, but, say, their ability to actually perform the work?
A. Across the board. If SBA says that this firm is capable of -- they're accepting this on their behalf.
Q. Okay.
A. And that's what this letter -- that's why we call it an acceptance letter.
Q. All right.
A. They're accepting that procurement on behalf of the 8(a) program participant.
Q. So they're saying they're fully qualified to handle this particular offer?
A. That's our read on it. Now, SBA may

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT L

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

Flexfab, LLC, a Michigan Limited Liability Company, Successor to Flexible Horizons International, Inc., d/b/a Flexfab,

Plaintiff,

vs. : Case No. 02-1096 C
: Lawrence J. Block

United States of America,

Defendant.

- - - - -

**DEPOSITION OF HOWARD CROCKETT**

- - - - -

Taken at Defense Supply Center
3990 East Broad Street
Columbus, Ohio 43213
August 28, 2003, 11:55 a.m.

- - - - -

**Spectrum Reporting LLC**
**333 East Stewart Avenue**
**Columbus, Ohio 43206**
**614-444-1000**



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

Mark E. Hills, Esq.
Varnum, Riddering, Schmidt Howlett
Bridgewater Place, P.O. Box 352
Grand Rapids, Michigan 49501-0352

ON BEHALF OF DEFENDANT:

Claudia Burke, Esq.
U. S. Department of Justice
1100 L Street, NW
Washington, DC 20530

ALSO PRESENT:

Vasna [illegible]



Thursday Morning Session

August 28, 2003, 11:53 a.m.

S T I P U L A T I O N S

It is stipulated by and between counsel for the respective parties that the deposition of HOWARD CROCKETT, a witness herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice and by agreement of counsel; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -



MR. HILLS: We are here in the matter of Flexfab, LLC versus the United States of America, pending in the United States Court of Federal Claims, Case No. 02-1096C. This is the deposition of Howard Crockett. We've been moving times around, but I presume you have no objection on the notice here today?

MS. BURKE: Correct. No objection.

- - - - -

HOWARD CROCKETT

being first duly sworn, testifies and says as follows:

CROSS-EXAMINATION

BY MR. HILLS:

Q. Can you state and spell your name?

A. First name is Howard, H-O-W-A-R-D, Crockett, C-R-O-C-K-E-T-T.

Q. Mr. Crockett, could you tell me where you reside, please?

A. Live, my address?

Q. Yes, please.

A. 276 Arbor, A-R-B-O-R, Circle, Gahanna, Ohio 43230.

Q. Mr. Crockett, have you ever had your

deposition taken before?
A. No.
Q. I'll just give you a few quick rules which are real easy to follow. We need you to verbalize your responses because the court reporter cannot take down nods or shakes of the head.
And if from time to time, I prompt you, I just want to make sure we're getting everything down we need to. I'm just going to ask you a series of questions. If there's anything you don't understand or you want me to reword, please tell me to rephrase the question, and I'll do my best. But if you do answer a question, we're going to assume that you heard and you understood it.
A. All right.
Q. If you need a break at any point, please just let me know.
A. Okay.
Q. Are you a high-school graduate?
A. Yes, sir.
Q. Where did you graduate from high school?



A. South High School.
Q. When was that?
A. 1972.
Q. All right. And did you have any formal education after high school?
A. Yes, sir. I have a total of about three years of college.
Q. Where was that?
A. Well, I did some at the University of Toledo and then Franklin University.
Q. All right. Do you have a formal degree of any sort?
A. No, I don't.
Q. Okay. When were you first employed by the government?
A. Well, I came in after the military in 1975.
Q. All right. You were in the military from '72 until '75?
A. Yes. U.S. Navy.
Q. All right. If you could, just kind of walk me through from '75 to the present, where you've been, what your responsibilities have been?
A. From '75, October '75, I was employed



by DSCC. Okay. Worked here for less than a year and got called to the U.S. Post Office. I was at the Post Office in a training position. I didn't pass completely that training, so I was released. And then I worked four years in the private industry at Ag Rock, A-G R-O-C-K, Industries.
Q. What do they do?
A. They make the gravel and different things out there, you know. I was with them for four years, and then I finally got back with the government in 1981.
Q. Was that back at DSCC?
A. Yes, sir.
Q. What were you doing then?
A. Came back as a clerk.
Q. Okay.
A. Worked as a clerk for about a year, and then I got a promotion to inspector.
Q. All right.
A. And was inspector for about two years. Then I became inventory manager.
Q. All right.
A. And I've been inventory manager ever since until now.



Q. And that's still what you do today?
A. Yes, sir.
Q. Okay. Generally, what are your job responsibilities?
A. Well, a -- the major job is I have a group -- as inventory manager, my job is to ensure that we have proper assets in order to be available to support the military services.
Q. Okay. Are you familiar, then, also with not only the various materials, but the companies that produce them as well, or do you just stay up on the needed materials?
A. Just the material pretty much.
Q. All right. Do you know a gentleman named Bret Snyder?
A. Yes.
Q. Who is he?
A. He's -- he was manager on the team, but he's now a supervisor.
Q. I'm going to hand you, Mr. Crockett, two pages that are marked with Bates labels as DF328 and DF329. If you could tell me if you're familiar with those, and if you remember or if you know what they are?

A. Yes. DF328 is the cover sheet for some fax correspondence I received from Thelma Williams.
Q. Okay. Do you know who she is?
A. I knew her when she was at Capital City, yes.
Q. How much interaction did you have with her?
A. Just phone conversations.
Q. Okay. How many -- do you have any idea how many phone conversations you had with her?
A. Oh, no. I can't remember.
Q. Okay. Less than five, less than one?
A. I would say less than 10.
Q. Do you know what that related to?
A. We had an urgent need for some hosing --
Q. Is that the air duct hosing?
A. Yes, the hoses.
Q. When you say it was an urgent need, what was the nature --
A. Based on the KC-135, it provided air coolant so they could work on aircraft. You know, it got -- so they had air conditioning pumps in --



so I had aircraft that couldn't be worked on because they didn't have the ducts. And so that's why I was speaking with her trying to get her to expedite it as much as possible.
Q. To your knowledge, was that the only cause of --
A. The KC-135 was my aircraft, yes.
Q. Are you aware of the fact that that was material or supplies produced by Flexfab?
A. You know, I didn't know until, you know, later on I found out about it.
Q. That's where -- what we're talking about, the same thing, right?
A. Right.
Q. Okay. Do you know what the page 329 is, the DF329 is?
A. It looks like a response from Thelma that they had -- she received from Flexfab saying that they had requested if they could be expedited.
Q. If you could pull 238 up as well. I see the same Flexfab line, same date, same time. I've got a page 1 and a page 3. Any idea where page 2 is?



A. No, sir, I don't.
Q. Okay.
A. It's been such a while.
Q. Sure. Let me also hand you, then, pages 331 and 332. See if those look familiar to you.
A. Yeah. This is 331. It's a cover sheet for a fax to Ms. Jeffries and also -- she also CCed me.
Q. Okay.
A. This is the fax cover. 331 and 332 is information they sent to Melissa about what they could do about the parts being expedited.
Q. Who is Melissa?
A. Melissa was our contract administrator.
Q. Is it Melinda?
A. Melinda, I'm sorry.
Q. The third page of the fax, which is actually 332, has some handwriting. I think it says "error." Do you know what that relates to?
A. Well, mil-spec items are definite, and for some reason it was a wrong mil-spec. It was a revision.
Q. So we're just changing it to the proper



number?
A. Right. That's all it was.
Q. Okay. Did -- the 180, do you have any idea what that relates to?
A. I know it's a cancellation request on the purchase request itself. Clin 2 is to be cancelled. I'm unsure exactly the reason why I did that.
Q. Okay. Let me hand you DF220 and --
A. They were -- these were both requests that the buyer increased the quantity Clin 1 to make it a certain quantity, a new quantity.
Q. Okay. And does that relate to the same part that we're talking about?
A. Yes, sir.
Q. What did it increase it to?
A. It looks like the requested quantity would be 496.
Q. Do you know if that ever took place?
A. I believe -- I believe so.
Q. Okay. Are both of them part of the same request, both pages, or are they different requests?
A. It would have to be the same, yes.

Q. Okay.
A. I see the date is the same required date and everything so --
Q. Okay. Now, other than your involvement in the inventory management aspect of this, did you have any interaction with anybody at Flexfab?
A. I did call Flexfab in order to see if they could expedite on getting parts to Capital City.
Q. Do you know when that would have been?
A. No.
Q. Do you know if it was after the contract was issued?
A. Yes. It had to be.
Q. All right. Do you have any recollection of how far ahead of delivery it would have been?
A. No. I'm not sure.
Q. Okay. Did you have any involvement in payment issues relating to --
A. No, sir.
Q. And I presume normally you would not?
A. No. That -- that's out of my ballpark.
Q. You manage inventory and let other



people worry about it?
A. Yes.
Q. So you don't have any information who made payment -- why particular payment was made to a particular place or time or anything like that?
A. No.
Q. Did you have any discussions with anyone at DSCC about payment being made to Capital City Bank or payment being made to an escrow account? Does any of that sound familiar?
A. No, sir.
Q. Would you ever have discussed Flexfab related issues with Michael Taylor?
A. I don't believe -- no.
Q. How about a gentleman named Phil Kover?
A. No.
Q. Do you know a Henry Cook?
A. No.
Q. Did you ever talk with the contracting officers about those issues, payment issues?
A. Melinda.
Q. Okay.
A. Yes.
Q. Of payment issues?



A. No. No payment issues.
Q. Okay. Just --
A. Just inventory, just parts.
MR. HILLS: I'm sorry. You told me before what's he's got.
MS. BURKE: The two, number 4 and number 1. I think we might have already covered both of them.
Q. You indicated you made a call, you think, maybe to Flexfab?
A. Yes, once.
Q. Other than that, did you ever have any communication with them, with Flexfab?
A. No.
Q. What was the nature of the communication you had with people at Capital City Pipes? Do you remember what you discussed?
A. I think just the issue that, you know, how urgent our requirements were, and whatever they could do to get our parts there.
Q. How was it that the urgency of need for the parts as communicated to you -- I mean, I presume that happens on more than just this one part. How does that come to you?



A. Well, it's either as I -- as the manager, I review my back order listings, and once I see where I need the parts at -- and it was communication by Tinker Air Force Base. And they let me know what they needed to do and --
Q. Where is Tinker Air Force Base?
A. Omaha City.
Q. Okay. Did anybody -- is it your belief that they did communicate to you?
A. Tinker?
Q. Yes.
A. Yes.
Q. Did they explain that there was somebody, something in particular that they -- I realize you indicated to me why they needed the material, but was there some event that was going on that was leading then to make that urgent request?
A. No. I believe it was just overall maintenance dealing with the aircraft itself.
Q. Okay. Other than a general understanding of operation of KC-135, was there anything in particular that stood out as to why they needed that so fast? For instance, was it,

you know, a group going overseas?
A. No.
Q. Something like that?
A. It comes to my mind the major reason was because it was getting to be hot weather time, a 100 degrees, and they couldn't work inside the aircraft.
Q. Okay. All right. I'm sure that satisfies the 30(b)(6) notice. Bear with me for just a moment or two, Mr. Crockett, and I think we'll have you on out the door.
Do you know a Bruce Givens?
A. No, I don't.
Q. Let me ask you to look at this document.
A. Okay.
Q. Do you have any idea what that is or how it would relate to the Flexfab supply parts?
A. Okay. This is a tech document stating exactly what was required for those hoses in -- or to lock into the air conditioning unit. It required four locks.
Q. Okay.
A. Sort of clip in.



Q. Okay. There's a reference to Kelly Air Force base at the top?
A. Right.
Q. Do you know what that's about? It looks like it's in Texas.
A. Yeah.
Q. Nobody wants you to guess. I just want to know if you know.
A. And looking now, maybe it was Kelly and not Tinker. I apologize.
Q. That's all right. Do you think it was the same issue?
A. No doubt about it. I know it was hot where it was at.
Q. It's one or the other?
A. Right.
Q. Okay. Thank you. I appreciate that. I don't have any more for you, sir. Thank you for your time.

\- - - -

Thereupon, the foregoing proceedings conclude at 12:15 p.m.

\- - - - -



WITNESS SIGNATURE PAGE

I have read the entire transcript of my deposition taken on August 28, 2003. The changes and/or corrections, if any, which I desire to make to my testimony have been noted on a separate errata sheet. I request that those changes, if any, be entered into the record by attaching the errata sheet to the original transcript.

______________________________

HOWARD CROCKETT

Spectrum Job No.: 4974

State of Ohio : C E R T I F I C A T E
County of Franklin:

I, Rebecca Williams, a Notary Public in and for the State of Ohio, do hereby certify the within named HOWARD CROCKETT was by me first duly sworn to testify to the whole truth in the cause aforesaid; testimony then given was by me reduced to stenotypy in the presence of said witness, afterwards transcribed by me; the foregoing is a true and correct transcript of the testimony so given; and this deposition was taken at the time and place as specified on the title page.

I do further certify I am not a relative, employee or attorney of any of the parties hereto, and further I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Columbus, Ohio, on September 10, 2003.

______________________________
Rebecca Williams, Notary Public - State of Ohio
My commission expires April 5, 2003.