IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

**ORAL ARGUMENT REQUESTED**

# APPENDIX


| | | |
|---|---|---|
| Exhibit A | Matt DeCamp Affidavit | APP-3 |
| Tab 1 | 1996 Opinion and Order | APP-11 |
| Tab 2 | FlexFab April 11, 2000 Statement of Account | APP-18 |
| Exhibit B | Henry Cook Affidavit | APP-20 |
| Exhibit C | Sue LaJoye Affidavit | APP-28 |
| Tab 1 | Flexfab April 11, 2000 Statement of Account | APP-35 |
| Exhibit D | Anita Luich Deposition (pp 3-6, 9, 13-15, 17-19, 24, 28, 43, 50) | APP-37 |
| Exhibit E | Anita Luich Deposition, Exhibit 3 (June 29, 1999 Contract) | APP-47 |
| Exhibit F | Malinda Jeffries Deposition (pp 13, 20-22, 28, 70) | APP-86 |
| Exhibit G | Malinda Jeffries Deposition, Exhibit 4 (Sept. 27, 1999 Modification) | APP-93 |
| Exhibit H | Michael Taylor Deposition (pp 5-24, 27, 38, 41-42, 45-48, 50-51, 57-63, 82) | APP-95 |
| Exhibit I | Shirley Spratt Deposition (pp 33, 57, 59, 60, 78-81, 84, 85, 96) | APP-110 |
| Exhibit J | Shirley Spratt Deposition, Exhibit 5 (Oct 2, 2002 letter to M. Hills) | APP 118 |
| Exhibit K | Howard Griffin Deposition (pp 15, 26-31, 33) | APP-120 |
| Exhibit L | Howard Crockett Deposition (pp 8-10, 13, 15, 17) | APP-126 |

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.**, a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT A

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP
Perrin Rynders (P38221)
Mark E. Hills (P47524)
Attorneys for Plaintiff
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336 6000
(616) 336-7000 – Facsimile

Claudia Burke
Commercial Litigation Branch
Civil Division
United States Department of Justice
Washington DC 20530
Attn: Classification Unit
1100 L Street NW, 8th Floor
(202) 307-0277
(202) 514-8624 – Facsimile

## AFFIDAVIT OF MATT DECAMP

STATE OF MICHIGAN )
)ss.
COUNTY OF BARRY )

I, Matt DeCamp, being first duly sworn, depose and say as follows:

1. The statements made in this Affidavit are based on my personal knowledge and to the best of my knowledge are true. If called upon as a witness, I can testify competently as to the truth of the statements made in this Affidavit.

2. I am the president of the Flexfab, LLC., North America ("Flexfab") in Hastings, Michigan. I have been in this position since approximately 2002. I have been employed by Flexfab since 1993.

3. In my position as president, I have personal knowledge of Flexfab's contracts with the Government and Capital City.

4. Flexfab is an elastomeric engineering company that specializes in the design and production of hose, ducts, flexible connectors, boots, bellows, and special shapes made from a wide range of materials for severe applications in the automotive, heavy duty truck, aerospace, government, and broad industrial sectors.

5. Flexfab's principal place of business is located in the City of Hastings, State of Michigan.

6. Flexfab has developed a working history and business relationship with C&S Industrial Supply ("C&S"), a company owned by Mr. Henry Cook.

7. C&S and Flexfab have a long-standing relationship of dealing with each other on contracts through the 8A Program based upon C&S' status as a Small Disadvantaged Business.

8. Flexfab, over the years has frequently served as one of the contractors to C&S and would frequently manufacture products required by a contract between C&S and the Government.

9. As a result, C&S, in connection with the receipt of an award from the Government, would contract Flexfab to serve as the manufacturer of products required by a contract between C&S and the Government.

10. In each of these contracts with C&S, Flexfab agreed to supply parts to the United States only if payment for its goods were made through a Flexfab controlled escrow account, thereby insuring that there would be no significant delay in Flexfab's receipt of payment for its goods. The particular escrow account used by Flexfab and C&S is located at Old Kent Bank in Grand Rapids, Michigan.

11. Flexfab conducts all of its business with 8(A) Program and Small Disadvantaged Business contracts through this escrow account.

12. Flexfab insists on the use of the escrow account system of payment as a result of past contracts where such a payment plan was not in place and Flexfab experienced extensive delays in receiving payments directly from the contractors.

13. Flexfab was previously successful in a lawsuit against the Government in the Court of Claims on a third party beneficiary theory. In 1994, Flexfab filed an action against the Government, Case No. 94-974C, based on the Government's failure to remit payment directly to Flexfab's address as required by a modified contract. Contrary to the language of the modified contract, the Government erroneously remitted payment directly to its prime contractor and not to Flexfab. On February 8, 1996, the United States Court of Federal Claims denied the Government's summary judgment motion and

granted Flexfab's summary judgment motion on liability. The Court permitted recovery under a third-party beneficiary theory and based its decision on evidence that "clearly demonstrat[ed] that the contract modifications were intended to benefit plaintiff [Flexfab]." The Court of Claims' Opinion is attached hereto at Tab 1.

14. Upon information and belief, in 1998, Flexfab was contracted by an 8A contractor, Capital City Pipes ("Capital City"). Capital City approached Flexfab to manufacturer the product that Capital City was to provide to the Government.

15. Since Flexfab had never worked with Capital City and had previously decided to not take on any new 8A customers, Flexfab refused to enter into a direct contract with Capital City.

16. Flexfab told Capital City that C&S was its minority supplier, that it was not taking on any new 8A customers and that if Capital City wanted to deal with Flexfab it would have to order goods from Flexfab through C&S.

17. Flexfab also told Capital City that it would only agree to manufacture the air ducting hose needed by Capital City and the Government if an escrow account was established for its benefit.

18. Mr. Cook of C&S subsequently contacted Flexfab to serve as the subcontractor to Capital City and produce the air ducting hose required by the prime contract between Capital City and the United States.

19. As a condition to Flexfab's agreement to manufacturer the air ducting hose, Flexfab insisted that it receive payment directly from the Government and not from Capital City.

20. As a result of the parties' agreement, an escrow account specifically benefiting Flexfab was established. The escrow account was set up to ensure that Flexfab would receive proper payment, and subsequently that the Government would receive the goods that it desired from Flexfab.

21. Pursuant to the escrow agreement, the Government was not supposed to make payments directly to Capital City, its 8A supplier. Rather, the Government was required to make its payments directly to the escrow account controlled by Flexfab. Flexfab, upon payment by the Government, was to then authorize payment from the escrow to Capital City.

22. In accordance with Flexfab's conditions, the contract between Capital City and the Government identified the remittance address for payment by the Government to be directed to C/o ABA#C0720052, Old Kent Bank, Corp. Trust, P.O. Box 144, Grand Rapids, MI 49501-0144.

23. Moreover, Capital City and the Government entered into a modification a few months after the contract again clarifying that the remittance address was the escrow account located at Old Kent Bank in Grand Rapids, Michigan.

24. Flexfab, after receiving multiple assurances that the Defendant was required to direct payment to the Flexfab controlled escrow account in Grand Rapids, Michigan, agreed to manufacture the air ducting hose and ship it directly to the Government.

25. Flexfab would not have supplied the air ducting hose required by Capital City and the Government if the parties had not agreed to direct the Defendant's payment directly to the Flexfab controlled escrow account.

26. The document identified as Statement of Account dated March 11, 2000, attached hereto at Tab 2, identifies the invoice number, invoice date and invoice amount for the shipments made by Flexfab to the Government. Pursuant to the parties' contract, Flexfab shipped air ducting hose directly to the Government on approximately February 22, 2000, February 29, 2000, March 7, 2000 and March 14, 2000. Flexfab shipped goods in the amount of $452,031.60 to the Government.

27. Contrary to agreement, the Government did not direct any payments into the Flexfab controlled escrow account.

28. Instead, the Government erroneously and incorrectly directed payment for air ducting hose to Capital City in the amount of $452,031.60.

29. Flexfab, in an attempt to collect the amount due, contacted Capital City but to date has been unsuccessful in recovering the amount due.

30. Upon information and belief, Capital City is currently seeking protection from its creditors through bankruptcy.

31. Flexfab has not received any of the amounts due to it. This was the very result that Flexfab had sought to avoid when it required the Government to agree to make payment directly to the Flexfab controlled escrow account. The amount of $452,031.60 remains unpaid on the invoices the Government agreed but failed to pay directly to the Flexfab controlled escrow.

FURTHER AFFIANT SAYETH NOT.

Dated: 3-19-04

Matthew DeCamp

Sworn and subscribed to before me, a Notary Public, this 19 day of March 2004

, Notary Public

Barry County, Michigan

My Commission Expires: 10-27-2004

962967

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT A-1

# United States Court of Federal Claims

February 8, 1996

94-974 C

FLEXFAB, INC.,

Plaintiff,

versus

UNITED STATES OF AMERICA,

Defendant.

---

Perrin Rynders, Grand Rapids, MI, for plaintiff.

Armando O. Bonilla, with whom were Assistant Attorney General Frank W. Hunger, David M. Cohen and Kirk T. Manhardt, Washington, DC, for defendant. Susan McKee and Carol N. Matheke, Defense Logistics Agency, Columbus, OH, of counsel.

## OPINION AND ORDER

TURNER, Judge.

This government contract case stands on cross-motions for summary judgment. For reasons stated below, we conclude that the government's motion for summary judgment filed July 7, 1995 must be denied and that plaintiff's motion for summary judgment on liability issues filed August 22, 1995 should be granted.

I

The following facts, derived from plaintiff's complaint and both plaintiff's and defendant's dispositive motions, are undisputed.

Plaintiff is a manufacturing firm specializing in parts for military vehicles. During the Gulf War, plaintiff was a subcontractor to Gladen Industries Inc. During the period at issue in this case, Gladen had three contracts to supply aircraft and submarine parts to the Defense Construction Supply Center (DCSC) (an agency within the Department of Defense). Plaintiff, in turn, supplied the vehicle parts to Gladen under its subcontract. This suit arises out of business interactions among plaintiff, Gladen and DCSC.

Exhibit 7

letter asking the government to change both 'the payee and remittance address' on ... Gladen's contracts with the Government to indicate that only the remittance address was to be changed."); Weiden Aff. ¶ 8 ("Mrs. Turner confirmed that my suggestion was acceptable to the Government and that this solution would take care of my concerns about payment on these contracts.").

The second step in the process of informally turning Gladen's contract rights over to Flexfab entailed Gladen granting Flexfab authority to endorse the checks it received from DCSC. Flexfab agreed to renew deliveries as soon as it had the authority to cash checks made out to Gladen and disbursed under the contracts with DCSC. According to Tebo:

> Upon receiving the endorsement stamp, I informed Mrs. Turner at the DCSC via facsimile on December 5, 1991, that Flexfab had received the endorsement stamp and was ready to proceed on the contracts as soon as the contract modifications were enacted.

Tebo Aff. ¶ 12. A copy of the facsimile is Pl.'s Mot. Summ. J., Ex. 4 and Def.'s Mot. Summ. J., Ex. 8; A copy of the endorsement letter is Def.'s Mot. Summ. J., Ex. 9.

The final step in the arrangement was for Flexfab to make shipments directly to DCSC. Gladen agreed to this arrangement. *See* Letter from Green of 12/20/91, Pl.'s Mot. Summ. J., Ex. 6 (authorizing Flexfab to ship orders directly to the government). Flexfab proceeded according to the new arrangement. *See* Tebo Aff. ¶ 14 ("Flexfab shipped these orders in December 1991 and January 1992.").

According to plaintiff, the modifications designating Flexfab as "mailee" were simply one step in an arrangement among it, Gladen, and the government -- an arrangement that was negotiated both by and for the benefit of all three parties. Plaintiff specifically alleges that the government was an active participant in the negotiations that led up to the modifications and clearly intended the modifications to directly benefit Flexfab.

Plaintiff argues that it is entitled to judgment as a matter of law on its cross-motion for summary judgment against defendant.

**2. Defendant's Position**

The following facts are taken from the answer, from defendant's motion for summary judgment, from defendant's proposed findings of uncontroverted fact and from defendant's response to plaintiff's cross-motion for summary judgment.

The government claims that it did not intend to benefit plaintiff when it modified its contract with Gladen and further denies any participation in negotiations with Gladen and plaintiff. According to defendant:

> Had the Government intended to make Flexfab a direct beneficiary under the purchase orders in issue, such intent would have been evidenced by a novation agreement and subsequent modifications to the contract making Flexfab the prime contractor.

Def.'s Mot. Summ. J. at 9. The Contract Specialist who performed contract administration for the modifications at issue, Turner, stated in her affidavit:

> My normal practice, if a contractor requests a change of payee and/or remittance address, is to inform the contractor that they must make the request in writing. It would not be my normal practice to tell a contractor who wanted to change a payee that it could not be done because the Government would have to rebid the contract.

Turner Aff. ¶ 2 (6/15/95).

Defendant does not specifically respond to plaintiff's contention that, in this case, the government refused to follow the normal procedure of getting a novation and assignment because it would require rebidding the contract and result in delay which was unacceptable under the circumstances (the Gulf War). Thus, the testimony of defendant's affiant is not directly responsive to plaintiff's evidence. The government does not contradict the statements of fact alleged by plaintiff's affiants Tebo and Weiden explaining that under wartime conditions, the government did not follow "normal procedures."

The government does specifically deny participating in the negotiations that led to the modifications:

> [T]he modifications in issue ... were executed at the request of Gladen to implement a financial arrangement between a general contractor (Gladen) and its

> subcontractor (Flexfab); the government was not a party to the agreement, nor did the government participate in the negotiations between Gladen and Flexfab.

Def.'s Mot. Summ. J. at 9. The government's affiant, Turner, stated that she did "not recall having any discussions with Flexfab about paying Flexfab directly" (Turner Aff. ¶ 3 (6/15/95)), and denies negotiating an agreement with plaintiff:

> As a Contract Specialist, I do not negotiate agreements with subcontractors. I have discussion or negotiations with the prime contractor, which is the party with whom the government has the contract or purchase order. I did not negotiate any agreement with Flexfab in this case.

Turner Aff. ¶ 3 (9/20/95).

However, under plaintiff's third-party beneficiary theory, evidence of an agreement between the government and plaintiff is not necessary. All that plaintiff must show is that the parties to the prime contract intended to benefit plaintiff directly. This status may be established by implication. *Schuerman*, 30 Fed.Cl. at 433.

The government does not deny that it was aware of the arrangement between Gladen and Flexfab. In fact, defendant's own submissions provide conclusive proof that the government was fully informed regarding the arrangement. Included in defendant's proposed findings of uncontroverted fact is a finding that on December 5, 1991 plaintiff informed the government that Gladen had agreed to "permit [plaintiff] to endorse any checks the Government issued to Gladen relating to the purchase orders in issue [and] ... that work under the purchase orders would begin 'as soon as [Flexfab] received the mods changing the remittance address'." Def.'s Proposed Findings Uncontroverted Fact ¶ 8. Further, exhibit 8 to defendant's motion for summary judgment, a facsimile from plaintiff to Contract Specialist Turner together with an accompanying copy of the letter of agreement between Flexfab and Gladen, demonstrates beyond peradventure that DCSC contract officials were aware of the payment arrangement between plaintiff and Gladen and that plaintiff would ship parts when the contracts had been modified to designate plaintiff as the "mailee" for

payment.

Also submitted by defendant as uncontroverted fact is a finding that on December 9, 1991 DCSC issued unilateral contract modifications for each of the three purchase orders in issue changing the remittance address. Def.'s Proposed Findings Uncontroverted Fact ¶ 9. Defendant does not dispute that upon receipt of the modifications, plaintiff promptly made shipments pursuant to the purchase orders or that the shipments were sent directly from plaintiff to DCSC.

In short, defendant admits that it was informed that Gladen agreed to permit plaintiff to endorse checks representing payment by the government and that plaintiff agreed to make shipments to the government only if defendant modified the contracts, designating plaintiff as "mailee" for payment. Defendant further admits that it made the requested modification and subsequently received the shipments.

Under the circumstances outlined above, we conclude that the evidence clearly demonstrates that the contract modifications were intended to benefit plaintiff.

V

The evidence supporting plaintiff's claim consists of the allegations made in its brief, extensive supporting documents in the form of letters, facsimiles and invoices, and detailed affidavit testimony included as an appendix to the brief. We find this evidence convincing for several reasons. The affidavits are detailed in describing the government's active involvement in negotiations with plaintiff and Gladen. The documents cited by plaintiff are consistent with plaintiff's version of the facts and support the statements of plaintiff's affiants. Finally, nowhere does the government specifically contest the details of plaintiff's statements of fact.

In response to plaintiff's claims and the evidence plaintiff has provided, defendant merely reiterates the fact that plaintiff was never made "payee" under the contract, repeats its assertion that mere designation of Flexfab as "mailee" is not sufficient to show intent to benefit, and denies negotiating an agreement with

plaintiff. Because the government does not contradict the factual details of plaintiff's affidavits, we conclude that no genuine issues of material fact remain in this case.

VI

Based on the forgoing, plaintiff's cross-motion for summary judgment on liability issues filed August 22, 1995 is GRANTED and defendant's motion for summary judgment filed July 7, 1995 is DENIED. Judgment for plaintiff shall be withheld pending resolution of damages issues.[2]

The parties are requested to agree upon the precise amount of damages to which plaintiff is entitled and upon the correct date for accrual of interest pursuant to 41 U.S.C. § 611. The parties shall file a joint status report by Monday, March 11, 1996 covering these subjects.

James T. Turner
Judge

[2] Upon entry of judgment, plaintiff shall be awarded costs pursuant to RCFC 54(d) ("costs shall be allowed as a matter of course to the prevailing party").

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT A-2

FROM : PHONE NO. : 9127326587 May. 12 2000 12:50PM P4

# FLEXFAB® DIVISION

A MEMBER OF THE FHI FLEXFAB HORIZONS INTERNATIONAL INC.

COMMITTED TO EXCELLENCE IN ENGINEERED ELASTOMERIC PRODUCTS SINCE 1961

ISO 9001 & QS 9000 REGISTERED CERT. #95-031

1699 West M-43 Highway • Hastings, Michigan U.S.A. 49058 • TEL: (616) 945-2433 • FAX: (616) 945-4149

Parent Customer:
Customer: C & S INDUSTRIAL SUPPLY

## STATEMENT OF ACCOUNT
04/11/00

C & S INDUSTRIAL SUPPLY

PO BOX 5

CUTHBERT GA 31740

CUSTOMER NUMBER
10418

| INVOICE NO. | INV. DATE | PO NUMBER | INVOICE AMOUNT | AMOUNT OPEN |
|---|---|---|---|---|
| 105 218222 | 02/22/00 | 503305 | 55,464.00 | 55,464.00 |
| 105 218901 | 02/29/00 | 503305 | 157,379.10 | 157,379.10 |
| 105 219740 | 03/07/00 | 503305 | 155,992.50 | 155,992.50 |
| 105 220563 | 03/14/00 | 503305 | 83,196.00 | 83,196.00 |
| Totals in USD 452,031.60 DE | | | | 452,031.60 |

Grand Totals in USD
TOTAL BALANCE 452,031.60

AGING ANALYSIS IN DAYS USD
Aging On Document date

| 0 - 30 Days | 31 - 60 Days | 61 - 90 Days | 91 - 120 Days | > 120 Days |
|---|---|---|---|---|
| 83,196.00 | 368,835.60 | 0.00 | 0.00 | 0.00 |

Please remember your credit terms are Net 30 Days
We would appreciate payment on any past due amounts immediately! If you need more information please call Suzy Schmader at 616-945-3533 ext. 223.

F000058

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT B

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FLEXFAB, INC.,
a Michigan corporation,

Plaintiff,

Case No. ______________

v.

HON. ________________

UNITED STATES OF AMERICA,

Defendant.

VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP
Perrin Rynders (P38221)
Attorneys for Plaintiff
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000

**AFFIDAVIT OF HENRY COOK**

STATE OF GEORGIA )
)ss.
COUNTY OF RANDOLPH )

I, Henry Cook, being first duly sworn, depose and say as follows:

1. The statements made in this Affidavit are based on my personal knowledge and to the best of my knowledge are true. If called upon as a witness, I can testify competently as to the truth of the statements made in this Affidavit.

2. I am the owner and president of C&S Industrial Supply ("C&S"), an industrial supply company that I founded fifteen years ago.

3. C&S is designated as a Small Disadvantaged Business by the United States Government.

4. Until approximately August 1998, C&S was also a participant in the United States' 8A Program for minority owned suppliers.

5. As both an 8A Program participant and a Small Disadvantaged Business, C&S has been awarded many industrial supply contract by the United States.

6. Over the past ten years, C&S has developed a history of working with Flexfab, Inc. ("Flexfab"), a manufacturing firm, as one of its subcontractors. C&S, subsequent to the award of contracts from the United States (Department of Defense, Defense Logistics Agency, Defense Supply Centers) has contacted and relied upon Flexfab, as a subcontractor, to supply the required goods. As a consequence, C&S has entered into numerous subcontracts with Flexfab whereby Flexfab, as a subcontractor, would supply goods to the United States pursuant to prime contracts between C&S and the United States.

7. C&S and Flexfab have a long-standing relationship of dealing with each other on contracts through the 8A Program and C&S' status as a Small Disadvantaged Business.

8. In each of these contracts, Flexfab agreed to supply parts to the United States only if payment for its goods were made through a Flexfab-controlled escrow account, thereby insuring that there would be no significant delay in Flexfab's receipt of payment for its goods. The particular escrow account used by Flexfab and C&S is located at Old Kent Bank in Grand Rapids, Michigan. To my knowledge Flexfab conducts all of its business with 8(A) Program and Small Disadvantaged Business contracts through this escrow account.

9. It is my understanding that Flexfab insists on the use of the escrow account system of payment as a result of past contracts where such a payment plan was not in place and Flexfab experienced extensive delays in receiving payments directly from the contractors.

10. Numerous other manufacturers with whom C&S works on 8A Program and Small Disadvantaged Business contracts insist on similar escrow account payment plans to insure that they do not encounter delays in receiving payment for the goods they provide.

11. The contract at issue was specifically designated as an 8A contract and required to be awarded to an 8A contractor.

12. In 1998, I was contacted by Mike Taylor, a small business specialist at the Small Business Office of the Defense Logistics Agency, Defense Supply Construction Center, ("DSCC") in Columbus, Ohio. Mr. Taylor indicated that he was looking for the name of an 8A Program contractor to work with the Government on the prime contract at issue in this matter. I gave him the name of Capital City Pipes ("Capital City") and several other 8A contractors as possible prime contractors.

13. In 1999, Mr. Taylor, contacted me and told me that the DSCC, through its 8A Program, had awarded Capital City contract SPO704-99-C-1004. Mr. Taylor told me that Capital City had approached Flexfab directly to manufacture air ducting hose that Capital City was to provide to the DSCC.

14. From my conversation with Mr. Taylor in 1999, I understood that Flexfab was the sole source and manufacturer of the air ducting hose that Capital City had agreed to provide to the DSCC.

15. Mr. Taylor informed me that Flexfab had told Capital City that it had a long-standing relationship with C&S and that C&S was its minority supplier. Mr. Taylor told me that Flexfab informed Capital City that it was not taking any new 8A customers and if it wanted Flexfab to supply goods, it would have to work through C&S.

16. In response, Mr. Taylor contacted me to determine whether C&S would be willing to work with both Flexfab and Capital City to facilitate acquisition and shipment of the goods from Flexfab to the United States.

17. I told Mr. Taylor if Capital City wanted Flexfab to provide the goods pursuant to its primary contract with the DSCC, that C&S would have to be involved in the deal and that Capital City would have to deal with Flexfab through C&S. It is my understanding that Mr. Taylor provided this information to Capital City.

18. I also told Mr. Taylor that I could facilitate the sale, but due to my past experience and dealings with Flexfab I knew that Flexfab would agree to supply the air ducting hose only if an escrow account was established for its benefit as described in paragraph 8 above.

19. I then contacted Flexfab in Michigan to subcontract with Flexfab to produce the air ducting hose required by the prime contract between Capital City and the United States.

20. I had multiple conversations with Mr. Taylor, who told me that Flexfab was the only source for the goods that the United States required pursuant to its contract with Capital City, and that Mr. Taylor was going to contact Capital City to ensure that the contract was properly executed to remit payment to a Flexfab controlled escrow account.

21. On June 29, 1999, the United States, through the DSCC, and Capital City executed a contract which, contrary to my conversations with Mr. Taylor, did not direct the United States' payments into the Flexfab controlled escrow account.

22. Thereafter, I contacted Mr. Taylor and indicated to him that the June 29, 1999, original contract did not direct payment to the Flexfab controlled escrow account and that Flexfab would not provide any air ducting hose until the contract was modified to reflect that payments would be made by the United States to the Flexfab controlled escrow account.

23. Mr. Taylor told me that he would inform Capital City that Flexfab was a necessary party and that Capital City's contract with the DSCC would not proceed unless a modification of the original June 29, 1999, contract was executed to direct payments to the Flexfab controlled escrow account.

24. On September 27, 1999, the original contract between the DSCC and Capital City was modified to direct payment to the Flexfab controlled escrow account. Capital City faxed me a copy of the contract Modification to demonstrate that the remittance address was changed and that payments were to be directed to the Flexfab controlled escrow account.

25. The September 27, 1999, Modification occurred prior to Flexfab's manufacture or shipment of any air ducting hose to the DSCC.

26. The United States failed to remit payment to the escrow account and incorrectly directed payment for air ducting hose to Capital City, which I understand is now in bankruptcy.

27. Subsequent to the first misrouted payment, I contacted the DSCC's billing office and spoke with a representative named Phil. I informed him that the DSCC had failed to properly remit payment to the Flexfab controlled escrow account.

28. When I reminded Phil of the September 27, 1999, Modification, he informed me that the DSCC had incorrectly remitted payment directly to Capital City and that he would correct the error and properly remit payment to the Flexfab controlled escrow account.

29. Despite this conversation, the DSCC failed to correct the error and continued to remit payments for the air ducting hose directly to Capital City.

30. I contacted Phil at the DSCC on several subsequent occasions to inform him that payments were still not being made to the Flexfab controlled escrow account as required by the September 27, 1999, Modification.

31. I even faxed information to Phil demonstrating that the DSCC was incorrectly remitting payment in violation of the September 27, 1999, Modification.

32. After the final payment was incorrectly made directly to Capital City, I traveled to Columbus, Ohio, and met with Mr. Taylor and Phil to discuss the DSCC's failure to properly remit payment to the Flexfab controlled escrow account.

33. Phil assured me that the DSCC would remedy the error and that payment would be properly made to the Flexfab controlled escrow account.

34. In all of my conversations and meetings, neither Mr. Taylor nor Phil ever disputed the DSCC's obligation to remit payment for the air ducting hose to the Flexfab controlled escrow account, and Phil assured me that the payment error would be corrected.

35. Upon information and belief, the DSCC has failed to remedy its error and has not yet directed payment into the Flexfab controlled escrow account.

FURTHER AFFIANT SAITH NOT.

Dated: 3/14/01

Henry Cook

Sworn and subscribed to before me, a Notary Public, this 14th day of March, 2001.

Wesley L Thornton, Notary Public
Randolph County, Georgia
My Commission Expires: 3/15/04

#537891