IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.**, a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA**,

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT C

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

VARNUM, RIDDERING, SCHMIDT & HOWLETT LLP
Perrin Rynders (P38221)
Mark E. Hills (P47524)
Attorneys for Plaintiff
Bridgewater Place, P.O. Box 352
Grand Rapids, MI 49501-0352
(616) 336-6000
(616) 336-7000 – Facsimile

Claudia Burke
Commercial Litigation Branch
Civil Division
United States Department of Justice
Washington DC 20530
Attn: Classification Unit
1100 L Street NW, 8th Floor
(202) 307-0277
(202) 514-8624 – Facsimile

**AFFIDAVIT OF SUSAN K. LAJOYE**

STATE OF MICHIGAN )
)ss.
COUNTY OF KENT )

I, Susan K. LaJoye, being first duly sworn, depose and say as follows:

1. The statements made in this Affidavit are based on my personal knowledge and to the best of my knowledge are true. If called upon as a witness, I can testify competently as to the truth of the statements made in this Affidavit.

2. I was previously employed as the Government Contract Administrator of the Flexfab, LLC., North America ("Flexfab") in Hastings, Michigan. Although I was employed at Flexfab for approximately eleven years, I held that position for approximately two years. I am currently employed at Foremost Insurance in Grand Rapids, Michigan.

3. In my position as Government Contract Administrator at Flexfab, I have personal knowledge of Flexfab's contracts with the DSCC and Capital City.

4. Flexfab is an elastomeric engineering company that specializes in the design and production of hose, ducts, flexible connectors, boots, bellows, and special shapes made from a wide range of materials for severe applications in the automotive, heavy duty truck, aerospace, government, and broad industrial sectors.

5. Flexfab's principal place of business is located in the City of Hastings, State of Michigan.

6. Flexfab has developed a working history and business relationship with C&S Industrial Supply ("C&S"), a company owned by Mr. Henry Cook. During the time that I was employed at Flexfab, Flexfab would frequently work with C&S and Mr. Cook. As a result, C&S, in connection with the receipt of an award from the Government, would contract Flexfab to serve as the manufacturer of products required by a contract between C&S and the Government.

7. In each of these contracts with C&S, Flexfab agreed to supply parts to the United States only if payment for its goods were made through a Flexfab-controlled escrow account, thereby insuring that there would be no significant delay in Flexfab's receipt of payment for its goods. The particular escrow account used by Flexfab and C&S is located at Old Kent Bank in Grand Rapids, Michigan.

8. Flexfab conducted all of its business with C&S through this escrow account.

9. Flexfab insisted on the use of the escrow account system of payment as a result of past contracts where such a payment plan was not in place and Flexfab experienced extensive delays in receiving payments directly from the contractors.

10. Upon information and belief, in 1998, Flexfab was contracted by an 8A contractor, Capital City Pipes ("Capital City"). Capital City approached Flexfab to manufacturer air ducting hose that Capital City was to provide to the Government.

11. Flexfab agreed to manufacturer the product required by Capital City's contract with the Government. Due to Flexfab's prior and long standing relationship with C&S, C&S facilitated the relationship between Flexfab, Capital City and the Government.

12. As a condition to Flexfab's agreement to manufacturer the air ducting hose, Flexfab insisted that it receive payment directly from the Government and not from Capital City.

13. As a result of the parties' agreement, an escrow account specifically benefiting Flexfab was established. The escrow account was set up to ensure that Flexfab

would receive proper payment, and subsequently that the DSCC would receive the goods that it desired from Flexfab.

14. Pursuant to the escrow agreement, the DSCC was not supposed to make payments directly to Capital City, its 8A supplier. Rather, the DSCC was required to make its payments directly to the escrow account controlled by Flexfab. Flexfab, upon payment by the DSCC, was to then authorize payment from the escrow to Capital City.

15. Pursuant to the parties' agreement and in accordance with Flexfab's conditions, the contract between Capital City and the Government was to identify the remittance address for payment by the Government to a Flexfab controlled escrow account located in Grand Rapids, Michigan.

16. Subsequent to the execution of the original contract, Flexfab requested that a modification be issued clarifying that the remittance address was the escrow account identified at C/o ABA#C0720052, Old Kent Bank, Corp. Trust, P.O. Box 144, Grand Rapids, MI 49501-0144.

17. Prior to the Government's contract with Capital City requiring it to direct payment to the Flexfab controlled escrow account, the Government had, on numerous occasions throughout my employment at Flexfab, issued payment to Flexfab's controlled escrow account located in Grand Rapids, Michigan.

18. Flexfab would not have supplied the air ducting hose required by Capital City and the Government if the parties had not agreed to direct the Defendant's payment directly to the Flexfab controlled escrow account.

19. The September 27, 1999, Modification, like the parties' original June 29, 1999, contract occurred prior to Flexfab's manufacture or shipment of any air ducting hose to the Defendant.

20. Pursuant to the parties' contract, Flexfab was to ship the parts required by the Government through its contract with Capital City, directly to the Government.

21. Pursuant to the parties' contract, the contract was scheduled for a March 21, 2000, ship date.

22. In approximately January of 2000, Howard Crockett, in his capacity as an agent for the defendant, employed at the time as an inventory manager supporting supplies to the military services, contacted me directly to request that Flexfab expedite the delivery of the air ducting hose to the Defendant.

23. In response to the Defendant's request for expedited delivery, in approximately February of 2000, Flexfab began directing shipments of the air ducting hose directly to the Defendant.

24. Prior to shipment, an agent for the government inspected the air ducting hose manufactured by Flexfab. The inspection by the Government occurred at Flexfab.

25. As of approximately January of 2000 through the end of the contract, I dealt directly with the Government regarding the contract on issues such as shipment and deliver. Prior to this time, the Government would deal with Flexfab through C&S.

26. The document identified as Statement of Account dated March 11, 2000, attached hereto at Tab 1, identifies the invoice number, invoice date and invoice amount for the shipments made by Flexfab to the Government. Pursuant to the parties' contract, Flexfab shipped air ducting hose directly to the Government on approximately, February

22, 2000, February 29, 2000, March 7, 2000 and March 14, 2000. *See* 4/11/00, Statement of Account, Tab 1. The invoice date evidences the date that Flexfab shipped air ducting hose to the Government. Flexfab, shipped goods in the amount of $452,031.60, to the Government.

27. Contrary to agreement, the DSCC did not direct any payments into the Flexfab controlled escrow account.

28. Instead, the Government erroneously and incorrectly directed payment for air ducting hose to Capital City.

29. In an attempt to collect the amount due, I contacted Thelma Williams at Capital City. I asked Ms. Williams if it had incorrectly received payment from the Government. Ms. Williams would not provide me with an answer or a response.

30. An agent for the Government admitted that they incorrectly remitted payment to Capital City and not to Flexfab. The agent for the Government indicated that the government would correct the error.

31. I later learned that the Government had never corrected its error and had not, as promised, properly remitted payment to Flexfab.

FURTHER AFFIANT SAYETH NOT.

Dated: 3/22/04

Susan K. LaJoye
Susan K. LaJoye

Sworn and subscribed to before me, a Notary Public, this 22 day of 04, 2004.

Laurentiu Matei

, Notary Public

Kent County, Michigan

My Commission Expires: Nov 25 2007

LAURENTIU MATEI
Notary Public, Kent County, Michigan
My Commission Expires November 25, 2007

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.**, a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA**,

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT C-1

FROM : PHONE NO. : 9127326587 May. 12 2000 12:50PM P4

# FLEXFAB® DIVISION

A MEMBER OF THE FHI FLEXFAB HORIZONS INTERNATIONAL INC.

COMMITTED TO EXCELLENCE IN ENGINEERED ELASTOMERIC PRODUCTS SINCE 1961

ISO 9001 & QS 9000 REGISTERED CERT. #95-031

1699 West M-43 Highway • Hastings, Michigan U.S.A. 49058 • TEL: (616) 945-2433 • FAX: (616) 945-4149

Parent Customer:
Customer: C & S INDUSTRIAL SUPPLY

STATEMENT OF ACCOUNT
04/11/00

C & S INDUSTRIAL SUPPLY

PO BOX 5

CUTHBERT GA 31740

CUSTOMER NUMBER
10418

| INVOICE NO. | INV. DATE | PO NUMBER | INVOICE AMOUNT | AMOUNT OPEN |
|---|---|---|---|---|
| 105 218222 | 02/22/00 | 503305 | 55,464.00 | 55,464.00 |
| 105 218901 | 02/29/00 | 503305 | 157,379.10 | 157,379.10 |
| 105 219740 | 03/07/00 | 503305 | 155,992.50 | 155,992.50 |
| 105 220563 | 03/14/00 | 503305 | 83,196.00 | 83,196.00 |
| Totals in USD | | | | |
| 452,031.60 nE | | | | 452,031.60 |

Grand Totals in USD
TOTAL BALANCE 452,031.60

AGING ANALYSIS IN DAYS USD
Aging On Document date

| 0 - 30 Days | 31 - 60 Days | 61 - 90 Days | 91 - 120 Days | > 120 Days |
|---|---|---|---|---|
| 83,196.00 | 368,835.60 | 0.00 | 0.00 | 0.00 |

Please remember your credit terms are Net 30 Days
We would appreciate payment on any past due amounts immediately! If you need more information please call Suzy Schmader at 616-945-3533 ext. 223.

F000058

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT D

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

- - -

Flexfab, LLC, a Michigan Limited Liability Company, Successor to Flexible Horizons International, Inc., d/b/a Flexfab, :

Plaintiff, :

vs. : Case No. 02-1096 C
: Judge Lawrence J. Block

United States of America, :

Defendant. :

- - - - -

DEPOSITION OF ANITA LUICH

- - -

Taken at Defense Supply Center
3990 East Broad Street
Columbus, Ohio 43213
December 10, 2003, 10:45 a.m.

- - -

Spectrum Reporting LLC
333 East Stewart Avenue
Columbus, Ohio 43206
614-444-1000

- - - -

Spectrum Reporting, LLC
Specializing in Real-Time Reporting



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

Perrin Rynders, Esq.
Varnum, Riddering, Schmidt, Howlett
Bridgewater Place, Post Office Box 352
Grand Rapids, Michigan 49501

ON BEHALF OF DEFENDANT:

Claudia Burke, Esq.
U. S. Department of Justice
1100 L Street, NW
Washington, DC 20530

ALSO PRESENT:

Vasso Monta



Wednesday Morning Session
December 10, 2003, 10:45 a.m.

- - - - -

S T I P U L A T I O N S

- - - - -

It is stipulated by and between counsel for the respective parties that the deposition of ANITA LUICH, a witness herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice and by agreement of counsel; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -



ANITA LUICH

being first duly sworn, as hereinafter certified, testifies and says as follows:

CROSS-EXAMINATION

- - - - -

MR. RYNDERS: The record should reflect that this is the deposition of Anita Luich, taken pursuant to notice. Any objections?

MS. BURKE: No.

BY MR. RYNDERS:

Q. Would you please state your full name for the record?

A. Anita Lynne Luich.

Q. Is it L-Y-N-N?

A. E.

Q. Oh, L-Y-N-N-E. Okay. Ms. Luich, my name is Perrin Rynders. I represent a company by the name of Flexfab, at least that's what pretty much everybody knows it by. Have you given a deposition before?

A. No.

Q. A couple ground rules. I will do the asking. You'll do the answering. If there's something about my question that's not clear to

you or if I include something in my question that you don't agree with, just tell me that I'm -- either I'm not clear or I'm asking a loaded question or whatever. You can't do your job until I've done my job at least well enough for you to understand. Okay?
A. Okay.
Q. If you answer the question, then I can only conclude that you understood the question. Fair enough?
A. Yes.
Q. We need to talk one at a time. That's as hard for me as it is for you, and I'll try to respect that. You can remind me if I've interrupted you and -- it's not a big deal, but that's really so our court reporter can make sure she gets everything down. You're aware that what I say and what you say and what anybody else says in here is being typed?
A. Yes.
Q. Okay. So when you answer a question, it might be a long sentence or a paragraph, but if it's a yes or no, it needs to be a yes or no, not uh-huh and not a nod. Okay?



A. Okay.
Q. We're going to go through a series of questions on a variety of topics that are pretty related to each other. We're not going to go all over everywhere, but there's a possibility that you will try to answer my questions to the best of your ability, and then later on because the conversation has evolved, you might think of something new that was responsive to what I was talking about before or that we were talking about before.
If that happens, would you just interrupt me right then and there and let me know what you've just remembered?
A. Yes.
Q. Our court reporter types it all down. It's a lot easier for her to tell us where we were when we were just interrupted by your flashback than for you to somehow try to remember something until the end of the deposition and then do it. So please don't hesitate to interrupt me.
A. Okay.
Q. You recognize you're under oath?
A. Yes.



Q. I want you to treat what we're doing here this morning and maybe after lunch -- we'll see how long this lasts -- as if you were in court. It's just as important as if you were in court. Okay?
A. Okay.
Q. On the other hand, we're not in court, and it's a lot easier to take a break, or if we get to the noon hour, to take lunch. That's not a problem. You can just let me know if you need to take a break for any reason.
A. Okay.
Q. You're employed by the DSCC; is that right?
A. Yes.
Q. And currently in what position?
A. I'm a supplier operations supervisor.
Q. Okay. I've heard about contract specialists, pre-award and post-award, and I've heard about contract administrators. Is what you just said something different than that?
A. No, it's not. We are focused on the pre-award side of the contracting.
Q. Okay. But it's sounding to me that



you're in more of a supervisory or administrative --
A. Currently, I am a supervisor, yes.
Q. Okay. Now, you're aware that this deposition is in connection with litigation brought by Flexfab, and that relates to a contract from the 1999 time frame?
A. Yes.
Q. Okay. At that time frame, my understanding is you were a pre-award contract specialist?
A. Yes.
Q. Okay. And since then, you've been promoted to the supervisory position?
A. Yes.
Q. Okay. How long have you worked for DSCC?
A. 20 years.
Q. Okay. And can you run me real briefly through the progression of positions?
A. Yeah. Initially, I started as a procurement clerk in the procurement field. And then I progressed up into the procurement intern program.

Q. Okay.
A. And then following, as a GS11, a contract specialist. And currently, as a supervisor.
Q. Okay. Have you been a contract specialist both pre- and post-award?
A. No.
Q. Just pre-award?
A. Yes.
Q. Have you had any post-award roles during your time at DSCC?
A. Very minimal.
Q. Okay. So, basically, you're a pre-award person, and now you're in a supervisory status?
A. Yes.
Q. Okay. Now, to get us started here, I'm going to show you what was previously marked as Exhibit 3. Do you recognize this to be the contract pertaining to parts that were supplied by Flexfab through Capital City Pipe?
A. Yes.
Q. And down at the bottom, is that your signature?



A. Yes.
Q. Okay. My understanding is that this Exhibit 3 starts out as a form on the computer, and you would fill in blanks?
A. Yes.
Q. So where there are spaces to have information added, you're the person who keystroked that into the computer?
A. Yes.
Q. Okay. And just to clarify -- I've learned a lot of things about this case -- Exhibit 3 is, I think, 24 pages long, and it would include solicitation materials that are added to it once the contract's awarded?
A. Yes.
Q. Okay. Now, it starts out -- on this first page of Exhibit 3, you'll see where it says 1 of 11, and then the 11 is crossed out?
A. Yes.
Q. And so when you first prepared this, it hadn't been approved or awarded yet; is that correct?
A. No.
Q. I can imagine that your job would, in



part, include preparing documents like this to be in the anticipation of the award being given?
A. Yes.
Q. So at the time that you filled it out and in the anticipation of the award being given, it was 11 pages long?
A. Yes.
Q. And then once the award is given, the solicitation materials get added to it, and now, all of sudden, it's up to 24?
A. That is part of the process, yes.
Q. Okay. Now, you had direct contact with Capital City Pipes during this time period?
A. Yes.
Q. Okay. And were you the person with the primary responsibility for having contact with Capital City Pipes?
A. Yes.
Q. How did you come to know about Capital City Pipes?
A. They are an 8(a) set-aside contractor, so I was designated to solicit them through the small business office.
Q. Okay. To try to cut to the chase and



-- because we'd both like to get out of here on time. It's not just because I'm a nice guy, although I try to be -- let me see if I can summarize it, and you tell me if I've gotten off track. I can imagine that in your job, somehow it's brought to your attention that the United States Government, the Department of Defense, in particular, needs to procure certain parts, certain products; is that fair?
A. Yes.
Q. Okay. And when you're informed of that, then part of your job is to find the source for those products?
A. Yes.
Q. And in this particular case, it was certain hose products. And when you did your investigation, you found out that those particular hoses were part of an 8(a) set-aside?
A. Yes.
Q. And am I correct in understanding that, in fact, you learned that the supplier to be used was Capital City Pipe?
A. Yes.
Q. Okay. So it's not just that we have --

I have to find an 8(a) supplier for these products; I actually have to go to Capital City Pipe, barring them tripling the price on us, which might open up some other issues, but in the ordinary course, you would just go directly to them and only to them?
A. Yes.
Q. Okay. And that's how it worked in this case?
A. Yes.
Q. Now, were you aware from the beginning that Capital City Pipe would be functioning as a distributor and not the actual manufacturer of these products?
A. Initially at what point?
Q. At the point in time when you are informed that the government needs to buy them?
A. No.
Q. Okay. At what point in time -- well, did you ever come to learn that Capital City Pipe, in connection with the contract marked as Exhibit 3, was functioning as a distributor, not the actual manufacturer?
A. Yes.



Q. Where did you learn that -- or at what point in time did you learn that?
A. When they submitted their proposal.
Q. Okay. And so their proposal indicates that the source is Flexfab?
A. Yes.
Q. Okay. Now, I know at some point in time we've got some contract modifications. You're not involved in that?
A. No.
Q. Now, at the bottom of Exhibit 1 -- I'm sorry. Excuse me. At the bottom of Exhibit 3, the bottom right, it has the date June 29, 1999; is that right?
A. Yes.
Q. Is that the date that the award was actually given to Capital City?
A. Yes.
Q. Okay. You would have started preparing Exhibit 3 before June 29?
A. Yes.
Q. And they would have submitted their quote or their proposal well before June 29?
A. Yes.



Q. In fact, if I'm understanding things correctly, you had been working on this particular procurement maybe even back into late 1998? Do you remember that?
A. Possibly.
Q. Okay. If I indicated to you that it's my impression that there were a series of extensions during the solicitation process, does that trigger memory?
A. Yes.
Q. Okay. Is that unusual, or is that routine?
A. Very routine.
Q. Okay. But anyway, it would have been a number of months prior to June 29 that you would have been working on this?
A. Yes.
Q. And I'm guessing that you're working on a lot of other projects like this?
A. Yes.
Q. Okay. And at the point in time when Capital City provided a quote or a proposal, that's when you learned about Flexfab's role?
A. Yes.



Q. Now, I'll show you -- I don't know if you're aware of this, but Exhibit 4 is a contract modification. Have you seen that before?
A. Yes.
Q. Did you see it in connection with your role as being a contract specialist or in connection with preparing for a deposition?
A. Actually, I may retract my statement. I was thinking this was one of the amendments I did. This is not -- I'm not the author of this, so no, I would not have seen this.
Q. Okay. I have seen other documents that are before the award, and that's what you were thinking of?
A. Right, yes.
Q. Now, this same form is used whether you are amending the solicitation or modifying the contract?
A. Yes.
Q. And so either you're amending the offer, or you are amending the agreement that's struck at eventually?
A. Yes.
Q. Okay. And that confused me too at one

point in time before I really figured all of that out. Okay. Anyway, if you look at Exhibit 4, you will see that the remittance address has changed. Do you see that?
A. Yes.
Q. Now, was there ever a point in time when anybody brought to your attention that the remittance address that was contained in what started out as your proposed contract, the original 11 pages, or in the final award -- did anybody bring it your attention that the remittance address was not what the parties had wanted to have?
A. There is an attachment to this contract with the correct remittance address.
Q. Okay. You know what, instead of me flipping through there, I'm sure you'll be faster.
A. Right there. I'm sorry.
Q. And this is in Exhibit 3, what's been marked up at the top as page 12 of 24?
A. Yes.
Q. So that tells me it's part of the solicitation materials that were added to what you originally created once the contract was awarded?



A. Yes.
Q. Okay.
A. And it's part of the contract.
Q. Okay. And this is a June 23 letter that pre-dates the June 29 document that you typed up?
A. Yes.
Q. Okay. Now, is this -- in terms of the original award, does this June 23, 1999 letter addressed to you from Thelma Williams, page 12 of 24 -- is that what the contract is, in terms of the remittance address?
A. This is the remittance address in the contract.
Q. Okay. Now, I'm going to quickly turn over -- kind of keep this handy, but also turn over to Exhibit 4. And I'm looking at it upside down, and it's kind of small, so maybe you can do this: Is the modification calling for an -- actually in a different account?
A. No. No.
Q. Now, I know that you've only very little worked on the post-award side, but do you have an understanding of why there would be a need



for the modification marked as Exhibit 4, given the fact that this June 23 letter was part of the original contract?
A. No.
Q. Okay. Now, let's forget about Exhibit 4. Let's just think about Exhibit 3, your contract that you put together. What happens to the contract to make sure that payment is handled the way it's supposed to be handled?
A. A copy goes over to DFAS.
Q. Okay. Now, is that an electronic transmission, or was it a hard copy transmission or both and -- back at that point in time?
A. I'm unsure.
Q. Okay. My guess is that today, it's electronic?
A. Yes.
Q. Is it today both electronic and hard copy?
A. I'm unsure.
Q. Clearly, 20 years ago, it was just hard copy?
A. Yes.
Q. Today it might be both, but it's for



sure electronic?
A. Yes.
Q. And you're not sure where the transition was?
A. That's not my role.
Q. Okay. Maybe this is silly, but bear with me. I know that you're the person who types the information into the form that is at least the first 11 pages of the contract?
A. Uh-huh.
Q. What happens then? Do you hit print and it comes out the printer, or does somebody else deal with that?
A. You're correct. You hit print, and it comes out on a local printer with the first 11 pages. After that, you start to add your attachments and solicitations and renumber it with the final contract.
Q. Okay. And then do you create a file that has just those 24 pages in it?
A. Not just those 24 pages. The entire contract file encompasses all documentation from the beginning of the initiation of the solicitation to the very end.

Q. So correspondence, e-mails, faxes --
A. Yes.
Q. -- if they were printed off, would go into the file?
A. Yes.
Q. Now, physically, what happens to the file? It stays here at DSCC?
A. There is a holding file here, yes.
Q. Now, what actually gets physically sent to DFAS?
A. The contract.
Q. Okay. The 24 pages?
A. Yes.
Q. Okay. And are you the person who actually does that, or does a clerical person make a copy of that and deliver that?
A. A clerical.
Q. Okay. Is there some way that you confirmed that, in fact, it was transmitted over to DFAS?
A. No.
Q. Has it ever happened that you've discovered that somehow the contract didn't get delivered? You know, a clerical person says, oh,



gosh, I forgot. I didn't make it over there yesterday or -- have you ever encountered that kind of scenario?
A. No.
Q What would happen -- would something bog down if DFAS didn't get the contract?
A. I can't speak for DFAS. I don't know what their procedures are.
Q. Okay. Let me get at it this way: Obviously, you've got a contract, and that's all nice, but it's just paper. And so what you really want to end up with is somebody who actually makes something and gets it to the Department of Defense so that those people can use it obviously.
What I'm wondering is, is there something in the way that your whole system works so that unless that contract gets over to DFAS, the actual process of getting parts made and delivered isn't going to happen? I mean, is there like a check and balance?
A. There is a system process, yes. And if the contract has not been delivered at a certain point, it becomes delinquent, and there is action taken on that. They follow it through on



delivery.
Q. And when you talk about "they," you're talking about DFAS, or are you talking about --
A. DSCC follows through delivery. DFAS handles the payment issues.
Q. Okay. So the fact that -- well, let me -- do you know whether or not DFAS ever paid any money with respect to this contract?
A. No.
Q. My understanding is that DFAS did pay money, but paid it directly to Capital City, not to the bank account at Old Kent Bank. Do you know if that's true or not?
A. No.
Q. Okay. Just assume that that's true for right now. Does that indicate to you that, obviously, these 12 pages -- I'm sorry, these 24 pages of the contract were, in fact, physically delivered to DFAS?
A. Yes.
Q. Okay. Now, is there anything in the first 11 pages that would indicate, but for page 12, where payment is to be made?
A. There is a location on page 8 that



offers a remittance payment, an address.
Q. Okay. So if they only looked through page 8, they would see, okay, I'm supposed to remit payment to Capital City Pipes, Inc, right?
A. Yes.
Q. What they're supposed to do, though, at the very least is continue reading all 24 pages to make sure there isn't something else that supersedes that?
A. Yes.
Q. Now, is page 12 intended to supersede page 8 in terms of the remittance address?
A. Yes.
Q. Is there some protocol or procedure that you're aware of that DFAS is supposed to follow to know whether to look at page 8 for a remittance address or page 12 for the remittance address?
A. No. I have no idea.
Q. Okay. Is there anything that you know to do or can do to check to see what DFAS does in terms of remittance address or any other issue --
A. No.
Q. -- in terms of handling payment?

A. No.
Q. Can you get in through your computer here at DSCC and look to see where DFAS is sending money?
A. Yes. And I'm not a hundred percent sure of that, but I'm pretty sure in our SAMMS system it displays the remittance address.
Q. Okay. Now, on the SAMMS system -- S-A-M-M-S?
A. Yes.
Q. Is that something that was around back in 1999?
A. Yes.
Q. Do pre-award contract specialists have different access under the SAMMS system than post-award contract specialists?
A. Sometimes.
Q. Okay. Do you have any reason to believe that Malinda Jeffries back in 1999 would have had different access than you in terms of knowing where the payments were being sent?
A. She would have more knowledge of where to find that information than I would.
Q. Okay. And that's because she's



post-award and you're pre-award?
A. Yes.
Q. Now, when you finished these 24 pages, and you've put them together and renumbered them and had a clerk send a copy over to DFAS, are you done?
A. Yes.
Q. Is there anything after that that you did with respect to this particular contract?
A. Aside from faxing out the contract to Capital City Pipes.
Q. Okay. Now, if there is a complaint down the road that -- and somebody says, well, I was dealing with Anita Luich, I'm going to give her a call, what do you do?
A. I refer them to post-award.
Q. Okay. And that was Melinda Jeffries?
A. Yes.
Q. Did you ever get anything like that? Did you hear about things that you then referred to Ms. Jeffries?
A. I can't recall.
Q. Okay. But, certainly, your procedure would have been to do that?



A. Yes.
Q. Okay. Since we've got the binder open with the exhibits, let me show you what's been marked as Exhibit 5. This is a letter to one of my colleagues from Shirley Spratt. Did you have any input into the preparation of this letter?
A. No.
Q. Have you ever seen this letter before?
A. No.
Q. Did you ever have a meeting with Shirley Spratt to deal with any problems that had arisen over this contract?
A. No.
Q. Other than finding out that you were being asked to give a deposition and meeting with counsel to prepare for that, have you had any role at all with Flexfab in that particular contract since the day you faxed a copy off to Capital City Pipes?
A. No.
Q. I'm going to guess from that, then, on Exhibit 6, another letter -- this one's three pages long, also from Ms. Spratt to my colleague Mark Hills -- that you didn't have any role in



this?
A. No.
Q. And you've never seen this before?
A. No.
Q. The fact that we have in Exhibit 3, page 12 of 24, this letter dated June 23, 1999, addressed to you from Thelma Williams, establishes absolutely conclusively in your mind that you, in fact, had this letter at the time of the contract being awarded?
A. Yes.
Q. Were you involved in a procurement effort where Capital City Pipes was the primary contractor and JGB Enterprises was the manufacturer? Do you remember anything about that?
A. No.
Q. Okay. Do you know -- we've marked as Exhibit 3 materials that have been faxed, at least twice, I can tell from the headers at the top, so it's really hard to read. And so that's not your fault certainly, but there's some reference here to JGB Enterprises. And I'm wondering if you can explain why that's part of the solicitation

Q. In fact, do you even pay attention to whether the remittance address is the same as the prime contractor?
A. I do make note of that because that does need to be addressed in the formal contract.
Q. Okay. But here, the remittance address was not Tallahassee, Florida. You were aware of that?
A. Yes.
Q. Did that raise any flags with you, or did that require you to do anything? Or if that's what you're told, that's fine with you?
A. That's not uncommon, so it's fine.
Q. Okay. I'm going to show you what's been marked as Exhibit 18. And I will alert you to the fact that this is a prior procurement effort. This is different. I don't want there to be any misunderstanding about that, but do you ever in your status as a pre-award contract specialist encounter quotes like Exhibit 18 that come from subcontractors?
A. No.
Q. Now, you were aware -- and maybe I've asked you this -- but you were aware at the time



that Capital City was not the point of origin for this hose, correct?
A. At the time of their submitted proposal.
Q. Right. That's right. That's what you said. I'm sorry. And you became aware of that how? Somebody told you that, or somebody sent you something?
A. They would identify that, Capital City.
Q. Okay. And how would they identify that?
A. I'm not sure where -- if I can --
Q. Yeah. You can look at anything in the binder. They're all marked exhibits.
A. Specifically, I'm looking for a fax from Capital City identifying Flexfab as their manufacturer.
Q. It would have been before June 29, correct?
A. Yes.
Q. This is something that you remember looking at recently?
A. Yes.
Q. Well, look at page 12 of 24 in Exhibit



3. Do you see where it says that -- in the second line of the text -- that Flexfab is the manufacturer?
A. That was their final confirmation that Flexfab is the contractor -- I mean, is the manufacturer.
Q. Okay. But most likely, you were aware of that possibility before June 23 of 1999?
A. Yes.
Q. And that might have come through verbal communications, or would it have come through written communications?
A. Written.
Q. Let me show you something which we will have marked as Exhibit 20.

- - - - -

Thereupon, Exhibit 20 is marked for purposes of identification.

- - - - -

Q. And my first question for you is whether you've seen Exhibit 20 before today?
A. Yes.
Q. And is it something that you would have



seen at the time of the solicitation process?
A. No.
Q. Did you see it only in connection with preparing for your deposition?
A. No.
Q. When did you first see it, to the best of your recollection?
A. This is, I'm assuming, a part of the pre-award survey.
Q. Okay. I was going to ask you that too. It's not necessarily a stand-alone document?
A. No.
Q. It's part of something bigger. And, unfortunately, at least the way I have it is -- yeah. I may have pulled it out of something, so I apologize, or it may have been given to me this way. I don't know one way or the other.
Do you see in the beginning of the narrative where it talks about a pre-award quality survey was performed on June 15, 1999?
A. Yes.
Q. Obviously, this document was created on or after June 15, right?
A. Yes.

remember seeing this document?
A. Yes.
Q. It's got your name on the bottom of it, right?
A. Yes.
Q. And I'm understanding this to say that you've done your check and determined that the Flexfab price, or maybe the Flexfab plus Capital City mark-up price, was competitive?
A. Determining that the Capital City Pipes is competitive.
Q. Okay. And you weren't sure what percentage of that Flexfab got and what percentage of it Capital City got?
A. No.
Q. And it didn't matter?
A. No.

- - - - -

Thereupon, Exhibits 21 and 22 are marked for purposes of identification.

- - - - -

Q. Let me show you what we've marked as Exhibit 21. And do you remember getting that



letter?
A. Yes.
Q. And this would indicate that at least by March 26 of 1999, you were aware that Flexfab was the source for the product?
A. Yes.
Q. Let me turn your attention to Exhibit 17. Is that your handwriting on there by any chance?
A. No.
Q. Okay. Let me show you what has been marked as Exhibit 22. Can you explain what that document is?
A. This is the submission of a Flexfab quote.
Q. Okay. And so this date of January 19, 1999, is that corresponding with when the quote is sent in?
A. No. That is when the solicitation closes, the date and time.
Q. I see. Okay. So, presumably, this is something that you would have received on or before that date?
A. I would not have received. Our bid



room would have received this.
Q. Okay. And when you say "our bid room," meaning somebody here at the DSCC?
A. Yes.
Q. Now, what is the purpose for Flexfab submitting that quote to your bid room?
A. They're submitting their quote in anticipation of receiving an award.
Q. Okay. Now, is this in connection -- can you tell, is this in connection with the contract that's at issue in this case?
A. This is in connection with the initial solicitation that was issued.
Q. Do you know whether this is Flexfab saying, hey, we'd like to be the prime contractor for this solicitation, or is this in connection with Flexfab as the subcontractor for Capital City Pipes?
A. This, based on this document, is just a copy of the Fed Ex envelope that they sent to the bid room. Now, what's involved in that, I'm unsure.
Q. Okay. My understanding is that this particular product was part of an 8(a) set-aside,



and nobody other than an 8(a) supplier would have been permitted to actually bid on it?
A. There was no minimum established to the initial solicitation modifying them -- the solicitation to an 8(a) set-aside.
Q. I see. So perhaps at this point in time, it was prior to that?
A. Yes.
Q. But you don't know if that's the case or not?
A. I'm assuming, yes.
Q. Okay. That would make the most sense to you?
A. Yes.
Q. Okay. I'm curious: How does a place like Flexfab or any other place, Capital City Pipes for that matter, know that the federal government wants to purchase a particular piece of equipment or a particular product?
A. We have publications that come out to identify solicitations, NSNs, and items.
Q. Okay.
A. And they have their own networking capabilities as well.