IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT H

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Flexfab, LLC, a Michigan Limited Liability Company Successor to Flexible Horizons International Inc., d/b/a Flexfab, :

Plaintiff, :

vs. : Case No. 02-1096 C : Judge Lawrence J. Block

United States of America, :

Defendant. :

\- - - - -

DEPOSITION OF MICHAEL TAYLOR

\- - - - -

Taken at Defense Supply Center
3990 East Broad Street
Columbus, Ohio 43213
December 10, 2003, 8:21 a.m.

\- - - -

Spectrum Reporting LLC
333 East Stewart Avenue
Columbus, Ohio 432[illegible]
614-444-1000
\- - -



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

Perrin Rynders, Esq.
Varnum, Riddering, Schmidt, Howlett
Bridgewater Place, Post Office Box 352
Grand Rapids, Michigan 49501

ON BEHALF OF DEFENDANT:

Claudia Burke, Esq.
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20530

ALSO PRESENT:

Vasso Monte



Wednesday Morning Session
December 10, 2003, 8:21 a.m.

\- - - - -

S T I P U L A T I O N S

\- - - - -

It is stipulated by and between counsel for the respective parties that the deposition of MICHAEL TAYLOR, a witness herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice and by agreement of counsel; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

\- - - - -



MICHAEL TAYLOR
being first duly sworn, as hereinafter certified, testifies and says as follows:

CROSS-EXAMINATION

\- - - - -

BY MR. RYNDERS:

Q. Good morning, Mr. Taylor.
A. Morning.
MR. RYNDERS: The record should reflect that this is the deposition of Mr. Taylor taken pursuant to notice. Any objections?
MS. BURKE: No.
MR. RYNDERS: Thank you.
Q. Can you state your full name for the record?
A. Michael Anthony Taylor.
Q. Mr. Taylor, my name is Perrin Rynders. I represent a company we all know as Flexfab, and I've got some questions for you today. Have you given a deposition before?
A. Yes.
Q. Okay. Just to refresh you, then, if there's anything about the questions that I ask that is unclear, that you don't understand, or if

the question suggests something that you don't agree with, just let me know, and I'll try to rephrase the question. Okay?
A. Yes.
Q. My job is to ask questions. Your job is to answer them. Unless I do my job well enough for you to understand, then you can't do yours, so you just let me know that.
A. All right.
Q. You're doing a wonderful job. We need to talk one at a time for the benefit of our court reporter. And when the answer is yes or no, say yes or no instead of nodding your head or uh-huh or huh-uh because sometimes that gets unclear.
A. Right.
Q. We're going to talk about a number of topics today, and my understanding is you don't work for the DSS anymore; is that correct?
A. That's correct.
Q. Okay. And how long has it been?
A. I believe it's been close to three years.
Q. Okay. So some of these issues may not be fresh in your mind. It's possible that as we



go through the conversation, more and more memory will come back to you. And so if you think about something or you remember something that I've been asking about earlier, I just want you to tell me at that point in time. Okay?
A. Okay.
Q. In other words, if I ask you some questions and you tell me everything that you can remember and then we continue with the conversation and then more memory comes back, just let me know then what pops into your head regardless of what we are talking about at that point in time.
A. All right.
Q. You recognize that you're under oath?
A. Yes.
Q. You know that in some ways this is like being in court. I mean, your testimony might be used in court or for the purposes of legal proceedings.
A. Right.
Q. On the other hand, we're in a conference room. If you need a break, feel free to let me know, and we'll accommodate you as much



as we can.
A. All right.
Q. It's about 8:22, by the clock here in the room. I'll try not to keep you too long this morning. We have a few things to get through. Why don't we start with your educational background. Can you tell me if you went to college, and, if so, how far you got through and what kind of degrees you might have?
A. Okay. I do have a bachelor's degree in business from Central State University.
Q. For me being out of town, where's Central State University?
A. In Wilberforce, Ohio. Okay. And I have a master's degree in human resource management from Central Michigan.
Q. Oh, up my way. I'm from Grand Rapids.
A. Okay.
Q. So you're a Chippewa?
A. Yeah.
Q. Kind of?
A. Kind of.
Q. You're probably a little more loyal to your undergraduate institution.



A. True.
Q. When did you get your bachelor's degree?
A. In '82.
Q. And your master's?
A. In '88, I believe.
Q. Okay. During what time period did you work for the DSCC?
A. From March 1984 until, I believe, the end of February of 2001.
Q. Had you worked for the United States Government before March of 1984?
A. No.
Q. Have you worked for the government since February of 2001?
A. No.
Q. So as an employee of the DSCC, can you walk me through the progression, what you were hired at, and when you left, what position you held?
A. Yes. I was hired -- actually, it was a program called the PAC program, which was basically for recent college graduates. And I was hired in as a -- let me see. I think it was

called a procurement agent at the time.
Q. Did you say PAC, as in P-A-C?
A. Yes. It's an acronym, but I can't remember what it stands for.
Q. Well, one thing I've learned from dealing with cases involving the government is everything is an acronym. Okay.
A. All right. So I held that position for a year -- no -- yeah, a year. Then I was promoted to a contract specialist, and I believe I was in that position for a couple years. And then I was promoted to a contract administrator and held that position for a couple of years.
Q. Okay.
A. And then I was promoted to a small business specialist, and actually held that position for 11 years, the final 11 years.
Q. Now, there's a place called the Small Business Administration; am I right?
A. Yes.
Q. As a small business specialist, you were still an employee of DSCC?
A. Yes.
Q. Okay. Now, maybe you know this, maybe



you don't. Is there a difference in terms of being a small business specialist for the DSCC and then working for the SBA?
A. Yes. Well, they're two different agencies.
Q. Okay. Is the type of work you were doing, as far as you could tell, different from what somebody would be doing for the SBA or --
A. Yes.
Q. Okay. As a small business specialist at the DSCC, what were your job duties?
A. First of all, I had to review all the contracts -- or actually, they weren't contracts, but solicitations that the buyers sent out, anything above $10,000, and made sure that they met all the Small Business requirements.
Q. Now, let me just stop you for a minute.
A. Uh-huh.
Q. When you're talking about all the solicitations above $10,000, are you talking about where the proposed or prospective contractor would be an 8(a) supplier?
A. No. This is just --
Q. Period?



A. Right.
Q. Okay. Now -- okay. If the federal government was going to procure something from a big large C corporation, Westinghouse or IBM or, you know, McDonald Douglas or something like that, would that still come through you or --
A. Yes. It would come through our office.
Q. Okay.
A. And there were -- I believe we had five specialists. And one of us, depending on which application group it came out of, would evaluate that solicitation.
Q. Okay. And so the distinction between you and your peers, the five of you, you would handle certain kinds of product and others would handle other kinds of products?
A. Yes.
Q. It wasn't divided by company or industry -- well, maybe industry, I guess, but not by the size of the company or the name of the company, but rather the product involved?
A. Pretty much. There's, what, five application groups, I believe, and I was responsible for land application and all the



solicitations that came out of the land applications, I was responsible for evaluating.
Q. And just to give me a flavor for this, to try to appreciate what you had to spend your time doing, what kinds of requirements were in place that you were looking to see were being met?
A. The first thing, of course, was to evaluate the solicitation and determine whether or not it should be placed in a small business program. There were certain requirements that had to be in line for it to fall within one of the those programs. Also, some of the solicitations were already placed in the program, and it was my responsibility to make sure that the buyer continued that process.
You know, sometimes it may have been in the small business set-aside, and they may be soliciting it unrestricted to the whole market. And, of course, it would be my responsibility to stop it and redirect it to the small business program.
Q. And for my benefit -- and I've seen references to set-aside. What that means is that this product is being set aside so that it's only

available to the small business contractors?
A. Correct.
Q. Okay. So you'd review these solicitations. Anything else that would be part of that job that you did?
A. Other than reviewing solicitations?
Q. Right.
A. Yes. Of course, I -- we were responsible for training the buyers and administrators on small business programs. Typically, we did that annually.
Q. And just to clarify, when you talk about buyers, you're talking about the contract specialists?
A. Correct.
Q. Okay.
A. Also, of course, I was responsible for the 8(a) program. Actually, it was considered the Minority Business Program, because under the Minority Business Program came the 8(a) program and, also, SDB, which actually eventually phased out, but at the time was responsible for the SDB Program, Small Disadvantaged Business, along with the SDB preferential consideration. And, also,



responsible for putting on seminars and conferences.
Q. Anything else in terms of categories of types of things that you did when you were a small business specialist?
A. I think that covers most of the things. I know we had what is called a TKO, Training, Knowledge, and Opportunity seminars that we put on every month. We did that for a good three years or so.
Q. Okay.
A. And, of course, I was responsible for that. Oh, I was also responsible for maintaining the stats.
Q. And what kinds of statistics would you maintain?
A. How many contracts were awarded to the small businesses, women-owned businesses, minority businesses, things of that nature. What percentage of contracts in each application group were awarded to those categories. Of course, at the end of the year, we made a full evaluation, compared that to the previous years, looked at how we compared to the overall goals for not only the



agency and applications, but all the other DSCCs or DSCs.
Q. Okay. So you worked at the DSCC through February of 2001. Then what did you do?
A. Actually, I worked as a consultant for about a year and a half.
Q. Okay. What kind of consulting?
A. With government contractors.
Q. Were you with a firm, or were you just on your own?
A. I was with a company called Able Manufacturing and Consortium.
Q. Able, A-B-L-E?
A. Yes.
Q. And where is that company located?
A. In Chicago.
Q. And was that -- let's see, we're about -- we're almost three years out from when you left.
A. Right.
Q. So is that what you did first, and now you're doing something else? Is that --
A. Correct.
Q. Okay. And now what are you doing?



A. Now I'm doing marketing for a company called Ohio Energy.
Q. And how long have you been working there?
A. Since about the first part of August of this year.
Q. Okay. Did you do anything between working for Able Manufacturing and Ohio Energy?
A. No.
Q. Did you remain in Columbus when you worked for Able?
A. Yes. I actually worked from the home.
Q. Okay.
A. Actually, we had an office initially -- had an office on Airport Drive for about a year. Actually -- well, I started from the home, then we -- he got the office on Airport Drive and held the office for about a year. And then I went back to working from the home.
Q. Okay. You've been convicted of something; is that right?
A. Right.
Q. Can you tell me what that -- what was the conviction for?

A. Fraud.
Q. And -- well, let me back up. Was there a trial, or was there a plea on your part?
A. A plea.
Q. Okay. And what jurisdiction are we talking about? What court?
A. Ohio Southern District.
Q. So federal court?
A. Yes.
Q. Okay. And do you remember what the actual charge was? I mean, was there anything more specific than fraud that you can recall?
A. It was basically fraud. I had a travel company, and they stated that the products we were selling were overpriced. And, also, I had it set up as a network marketing program in which they stated was a pyramid.
Q. The travel company, where does that fit into the DSCC, Able Manufacturing, Ohio Energy time-wise?
A. Oh, I had that while I was working for DSCC.
Q. Oh, okay. I get it. Now, did that conviction have anything to do with your leaving



DSCC?
A. Yes. You can't have a -- you can't work for the government if you have fraud on your record.
Q. Okay. So and I mean, I can understand that. I'm just trying to make sure I understand the timing too. Was the conviction in or around February of 2001, or did they make you leave even before your plea?
A. No. I left after the plea.
Q. Okay. And was it termed as a discharge or a resignation; do you know?
A. I resigned. What they put on my record doesn't say -- I don't think it says I resigned -- well, it says I resigned because I was going to be released or something to that effect.
Q. Okay. And, in fact, that's your understanding, that had you refused to resign, they would have let you go?
A. Correct.
Q. Okay. Let me get -- bring you back to, I think it's the 1999, 2000 time frame. Well, you know, we might want to be a little less specific than that. Are you familiar with a company by the



name of Flexfab?
A. Yes.
Q. Do you remember how long it was that -- since you first became aware of that company?
A. I've known of Flexfab for years. I mean, when I was a buyer --
Q. Okay.
A. -- I believe I dealt with Flexfab.
Q. Do you remember dealing with Flexfab because it was a subcontractor of an 8(a) supplier or because it was a direct supplier to the government or both?
A. Both.
Q. Okay. And how long -- well, were you aware at any time that Flexfab was located in Michigan?
A. Yes.
Q. Okay. As long as you've known about Flexfab, you've known that they were in Michigan?
A. I don't know if it's as long as I've known about them, but, you know --
Q. Close to it?
A. Yes.
Q. Okay. And you know that they provide



specialty hose and these other kind of pliable rubber materials, kind of high-end stuff?
A. Yes.
Q. Okay. Now -- and I take it you're probably aware that there is a point in time when Flexfab was the manufacturer of some products that were being purchased through Capital City Pipes in the 1999, 2000 time frame?
A. Yes.
Q. Okay. Maybe it's kind of a big question, but if you could just give me an idea of what your role was related to that whole transaction?
A. As far as the connection between Capital and Flexfab?
Q. Right.
A. Actually, I didn't have a role in that process.
Q. Okay. At some point in time, you got involved with that particular contract and -- you know what, just to help you out and in fairness, let me show you -- these are the exhibits that we have marked so far in this case in various depositions. And different people have -- they've

come in through different people. Okay?
A. All right.
Q. And we'll kind of share this together unless counsel has an extra that they want to show you. But Exhibit 3, do you recognize that as at least the typical kind of DSCC contract?
A. Yes.
Q. Now, are you familiar with that particular contract from June of 1999?
A. I've seen information on this.
Q. Okay.
A. I've awarded -- I mean, I was involved with several contracts with Capital City Pipes so --
Q. Okay. Now, with respect to this particular contract, I know that Anita Luich was the pre-award contract specialist and that Malinda Jeffries was the post-award contract specialist?
A. Yes.
Q. And you've held -- I should have asked you this: When you were contract specialist, did you do both pre-award and post-award?
A. Actually, I started off on pre-award, and then when I became contract administrator,



that was post-award.
Q. Okay. Gotcha. So you have a basic idea, probably more than that, of what their jobs were. What was -- can you explain to me how it is that you came to be aware that this particular contract was in place with Flexfab supplying products to the federal government through Capital City Pipes?
A. You want me to just give you an overall view of how that all comes about, because I can give you the specifics on one particular contract.
Q. Okay. That's fair enough. How does that normally come about?
A. Okay. Normally, like I said earlier, I review all the solicitation over $10,000. And I also review -- part of my job as minority business coordinator or 8(a) coordinator is also to identify items even before the buyer puts out a solicitation. And actually, that's the preferable way to go.
Once I identify an NSN, I, of course, had that item tagged as an 8(a) requirement. And during that process, evaluating that NSN, of course, I have a contractor in mind whom I would



like to see that awarded to. Of course, with the Capital City Pipe issue, all the items -- I knew they were looking to supply hoses to the government.
So if I identified the NSN, which, of course, this is probably what I did with this one, find out whether or not Capital City Pipes meets the qualifications to provide that material. At that point, I'd send the information to the buyer if the solicitation has come out. Or if there is a purchase request out there, I'll send it to the buyer letting them know that that item is being considered for 8(a) set-aside.
I'll also send a letter to the Small Business Administration asking for basically approval to set that item aside for this particular company. And they'll do whatever they do to make the evaluation and send the letter back stating whether or not they agree or disagree.
Once they agree, then that information is forwarded on to the buyer, and then the buyer proceeds with an 8(a) solicitation to whatever company was selected.
During that process, of course, I'm in



contact with the potential 8(a) company, and I also want to know from them, you know, who are they going to supply. Sometimes they give me a specific company. Other times, they say they may be working with several potential manufacturers.
And it's not necessary for them to tell me exactly which company that they're going to provide because it could change. But the thing I need to know is do they have a source available to provide them with the material. And if they do, then we proceed with the 8(a) set-aside.
Q. Do you have any recollection as to these particular NSNs -- which you can see in Exhibit 3 -- whether the government was looking to purchase them and you tried to find an 8(a) supplier who could meet the need, or you found -- you did it that way or the other way around, where you had a supplier that could provide a product, and then later on, the government needed to procure? Do you understand what I'm -- I'm not sure I'm asking it very well. But an NSN is a national stock number, right?
A. Right.
Q. And there must be many, many of these

stock numbers?
A. Correct.
Q. And the government will buy a particular product, and then it might not buy it for a period of time, I assume?
A. That's correct.
Q. So there might be a time period when you're not aware of any product being needed by the government, but you would nevertheless be recruiting or developing 8(a) suppliers who could meet the need when the need arises?
A. That's correct.
Q. Okay. In effect, if I understood what you were saying before, you would like to do it that way so that you've got a ready source of small businesses or disadvantaged businesses who could meet the government needs. And I assume you could probably respond quicker if you've got that stable sitting there instead of you've got to go find them after the government identifies the need?
A. Correct.
Q. So I guess my question is: Do you remember if you had cultivated Capital City Pipes



as a source for these particular NSNs before the government indicated its need for them, or was it the other way around?
A. I believe -- and actually I'm, I'd say, about 90 percent sure that in this case, I cultivated -- well, I guess it's kind of 50/50. And let me explain, that this particular NSN, national stock number, initially was set aside for C & S Supply, which was an 8(a) company that I had worked with over the years. And then they graduated from the 8(a) program. Once a company graduates from the 8(a) program, all their items that were being set aside for them, of course, are no longer set aside for them. And it's incumbent upon me to find a new source to basically take their place. And I had heard of Capital City Pipes over the years, but I hadn't done any work with them. And C & S Supply had actually reintroduced Capital City Pipes to me and -- as a company that they were going to help, actually act as a mentor for them, and in turn, that allowed me to -- okay -- well, I can move the C & S items from them to Capital City Pipes.



So, of course, that was before a solicitation actually came out. But at the same time, these were NSNs that were already placed in the 8(a) program. Because once you put -- place an NSN in the 8(a) program, it remains there as long as there are 8(a) sources available to utilize.
Q. Okay. And you were aware back -- well, when you were dealing through C & S, was C & S, with respect to these particulars products, acting as a distributor with Flexfab as the manufacturer, or was C & S the actual manufacturer?
A. C & S was a distributor.
Q. Okay. And so what was happening -- if I'm understanding you, what was happening was C & S had graduated, and these NSNS are still in the 8(a) program, and now you needed to find a new 8(a) supplier who could basically become that new distributor?
A. Correct.
Q. Were there any other manufacturers that -- for these particular NSNs that you were aware of, other than Flexfab?
A. I can't answer that question because



there were several different hose manufacturers that C & S worked with and Capital City Pipes worked with. And actually, I had a few other 8(a) companies that were in that same category. And like I said, there were several other manufacturers of hoses that the 8(a) companies worked with. So for this particular one, I can't tell you whether or not Flexfab was the only source.
Q. Okay. If I'm hearing you right, there were other 8(a) companies, 8(a) suppliers that were also distributors, as opposed to manufacturers?
A. Correct.
Q. Okay. And then there were, in terms of the manufacturers who weren't themselves 8(a) suppliers, there were at least one or two more than Flexfab?
A. Correct.
Q. Okay. Gotcha. So -- I can appreciate your job is to cultivate, is to have sources available, and then to make sure that the contract specialists who are actually going out procuring --

next involvement with respect to these particular NSNs and this particular contract?
A. Are you saying after the purchase order comes out and the buyers working with it or --
Q. Yeah. See, you know so much more about all this stuff than I do. I don't want to leave a gap out there, but here's my point -- or I guess, let me back up and explain it. I know that from what you've told me, getting the SBA's approval had to come before any solicitation, any PO, anything like that?
A. Actually, getting their approval -- maybe I missed a couple steps -- but getting their approval actually comes once a purchase request is released.
Q. Okay.
A. And that purchase request is prior to the solicitation.
Q. Okay.
A. And my evaluation in placing the NSN in the system actually becomes -- comes before that. I do an analysis first, then I put it in the system, and then -- if this is a new, totally new item, put it in the system. And then the buyer --



once the purchase request comes out, the buyer will see that it's set aside for 8(a). They should contact me.
At that point, I send a letter to SBA for approval. Regardless of whether the company has made it before or supplied it before or not, it would still go to SBA to get approval because things change. Then SBA will send back an acceptance letter, and then I forward that acceptance letter and the offer letter to the buyer letter stating that, you know, it was asked and received. And then the buyer puts together the 8(a) solicitation, sends that out, only to the 8(a) contractor.
Now, with the systems they have now, sometimes other people find out about it, but it's only supposed to go to that 8(a) contractor. The contractor is supposed to provide a price. That goes to the buyer. The buyer is to evaluate the price and also go to our cost and price office, and they will do an analysis to determine whether or not the price meets what they consider a fair market price.
If it does, then the buyer proceeds



with an award. If it doesn't, then we got to go back and forth and try to come to a happy medium, and then again award or dissolve.
Q. Okay. And when you say "we," are you personally involved in that process because of your small business specialist position, or is -- was "we" the royal we, just meaning the DSCC?
A. Are you -- I don't know what part I said "we," so --
Q. If there's some issue over whether the quoted price is a fair market price, then you said "we" need to haggle over it?
A. Usually "we" was me.
Q. Okay.
A. Yeah.
Q. Okay. So now, what's the next role that you played as far as you can remember in connection with this particular contract, this particular solicitation, which turned into a contract?
A. Well, once it becomes a contract, typically, there's nothing else to do. I will, you know, periodically check on a company to see if they're performing. Or if the company -- I



mean, typically, they'll call me if they have any problems or anything like that. And I will try to work to resolve those problems if it's in my capacity.
Q. Did you have any direct communications with anybody at Flexfab prior to the award being issued?
A. No.
Q. Okay. Did you have any communications with anyone at Flexfab after the award was issued?
A. No. Not to my knowledge, no.
Q. Okay. And in fairness to you, my questions were in connection with this particular contract.
A. Correct.
Q. Okay. Did you have any pre-award conversations with Henry Cook about this contract or this solicitation?
A. I'm not sure if I had conversation with him. Actually, most of my conversation was with Capital City Pipes. The only real dealings I had with Mr. Cook was prior to their arrangement. And I know I did call him at one point when I had made several calls to Capital City Pipes and didn't get

41

response from them.
And I remember making a call to Mr. Cook to find out if he had any conversation with them or if he knew what was going on, because I think I was getting frustrated at that point.
Q. Okay. When did you first become aware of someone's desire to have an escrow account set up for payment?
A. I don't know the exact time frame when that happened, but --
Q. Well, help me out at least -- I know you're about to answer, but just try to focus the answer. We've got the June date of the contract. We've got the September date of the mod. You know, before both, after both, between them, you know, if you can give me some kind of --
A. I believe it was between them.
Q. Okay.
A. And, actually, I believe I was -- it all started -- and I know you don't want to hear about JGB -- but all of this, these problems, I became aware of all these problems when JGB contacted me and the small business office. And I believe Mr. Cook made contact with me as well.

42

Q. Okay. And it's okay. We can talk about JGB. I was just at that point in time trying to keep it focused on Flexfab. In connection with JGB, do you remember whether the contract -- well, back up. With respect to JGB, the prime contractor was Capital City Pipes?
A. Correct.
Q. And so like my client's situation, JGB's situation was a supplier to Capital City Pipes, which was acting as a distributor through the 8(a) program?
A. Correct.
Q. Now, do you remember the timing of the -- I'll call it the JGB transaction and the Flexfab transaction, because they both involve Capital City Pipes, so we'll distinguish between the original source. Do you remember the timing of the JGB solicitation or award relative to the Flexfab solicitation or award, which one came first?
A. I have no idea because -- and the reason why I say that, I didn't even know there was a problem with Flexfab until way down the line when -- I believe it was when I had the meeting

43

with Henry Cook. And that's when I found out that Flexfab was involved. But, actually, I thought Flexfab's involvement was minimal.
Q. Okay. Now, as someone who's been a contract specialist and a contract administrator, you're familiar with the solicitation award post-award process?
A. Correct.
Q. Okay. And my understanding -- and correct me if I'm wrong -- is that when the contract is issued, is awarded, then that information is communicated probably a number of places, but one place is to DFAS?
A. Correct.
Q. And, similarly, if there's ever a modification to the contract, that information is communicated to DFAS?
A. Correct.
Q. And we even see that on the bottom of Exhibit 4, that DFAS is on the distribution list?
A. Right.
Q. Now, is it your understanding that that information is communicated to DFAS through the computer system, at least that's one way that it's

44

done?
A. My understanding at the time, no, was that it was -- hard copy was sent over to DFAS.
Q. Okay. Do you have any personal knowledge of what DFAS does with that hard copy to process awards and modifications issued by the DSCC?
A. No.
Q. Okay. Would you agree with me that the modification, which we've marked as Exhibit 4, what was supposed to happen was DFAS, when it paid money on that particular contract, would actually remit the funds to the bank account that's listed in section 14 of the mod?
A. Correct.
Q. Okay. And if I understand what you were saying earlier, you didn't realize there was a problem with Flexfab until later on down the line, meaning you didn't realize that money hadn't been sent to that particular bank account? You didn't learn that until later?
A. Right.
Q. But you were aware around the time of the modification that there was a modification?

A. Yes. Yes.
Q. And you understood the purpose of the modification?
A. Yes.
Q. Okay. And I kind of asked you this, and I'm not trying to just keep going back to things, but to the best of your ability, tell me what you knew at the time about why that modification was being made?
A. Because they were having some problems making payments and -- going back to JGB -- when JGB contacted me, they were in process of sending Capital City Pipes some more material to ship to the government. And they stated that they weren't going to ship any more material to Capital City Pipes until Capital City Pipes made good on their payments.
So when I spoke with Capital City Pipes, you know, of course since I'm the 8(a) coordinator, I need to make sure that they take care of their responsibilities. And in talking with them, they sound like they were going to, you know, take care of their responsibilities. And one of their ways of doing that -- and to ensure



that they get their material was to do the modification and allow them the funds to go to another source other than Capital City Pipes, so that the suppliers could receive their money.
Q. Okay. And that problem and that solution was something you were aware of before the modification marked as Exhibit 4?
A. Correct.
Q. And Henry Cook was involved with the JGB payment problems?
A. He was -- if I remember correctly, I believe he introduced Capital City Pipes to JGB. So I guess, indirectly, he was involved with that as well.
Q. Well, let me ask it to you this way: Prior to September 27, 1999, the date of that modification marked as Exhibit 4, had you had contacts with Henry Cook concerning the JGB situation?
A. I don't think I had conversation with him at that point. I think it -- our conversation started after that, when the modifications went through and still -- I mean, we still had the same problems.



Q. Okay. Do you know -- would you have any information to confirm that Flexfab was unwilling -- like JGB -- was unwilling to supply product without having this escrow account in place first?
A. No.
Q. Do you have any reason to say that that wasn't the case?
A. No.
Q. Okay. Did you have conversations with anybody outside of the DSCC about the escrow account that is referenced on Exhibit 4?
A. When you say "outside the DSCC," are you referring to contractors or just family members?
Q. Well, I'm thinking -- fair enough. And that's why I told you you can ask me clarification. I know you already told me you didn't talk to anybody at Flexfab before or after the award, so I guess they're out of the picture. And I think you've told me you weren't sure if you had talked to Henry Cook by that point in time. What I'm wondering is did you talk to somebody at Capital City Pipes, or did you talk to



some other person in a business setting, but not a DSCC employee, about the details or this particular account or the idea of an escrow account that went into the preparation of this modification that's marked as Exhibit 4?
A. Well, I know I talked with Capital City Pipes because we were trying to determine what options they had available to them. And, of course, we wanted our -- the agency wanted the material.
Q. Right.
A. So -- yes.
Q. And when you talked to Capital City Pipes, you talked to them about the JGB situation first -- or maybe not at the time first, but at one point in time, you talked to them about JGB, correct?
A. Right.
Q. But you also talked to them about Flexfab?
A. See that, that I -- I don't believe I talked to them about Flexfab. Because I didn't -- like I said, I didn't know Flexfab -- there was a problem with Flexfab until down the road.

Q. Well, let me back up here. I've heard you say two things which I can understand, but I think there might be like a gap in between these two things. Okay? On the one hand, you're not aware of a problem, meaning you're not aware of Flexfab not being paid until after the modification?
A. Right.
Q. Okay. Before the modification you talked to the folks at Capital City Pipes about JGB not getting paid by Capital City Pipes, so they've already had a payment problem, right?
A. Right.
Q. Okay. Now, when you talked to the folks at Capital City Pipes, was that Mr. Gilliam?
A. Actually, most of my conversation was with Thelma.
Q. Thelma Williams?
A. Yes.
Q. Okay. When you talked to Ms. Williams or whoever you talked to, did you talk to them about the idea of setting up an escrow account so there would not be any further problems with payment?



A. Yes.
Q. Okay. Did you talk to them about the idea of doing the same thing for Flexfab so that you would prevent the possibility of future payment problems?
A. I don't remember. I could have, but I don't remember talking to them about Flexfab.
Q. But certainly, you talked to the folks at Capital City Pipes about the idea of using an escrow account to avoid the problem of the government paying Capital City Pipes and Capital City Pipes not paying the producer of the product?
A. Correct.
Q. Okay. And I take it that Ms. Williams was fine with that idea?
A. Yes.
Q. Now, do you know where the idea generated from? Was that your idea? Was that her idea? Was that -- come from Mr. Cook or somebody else that you're aware of?
A. It probably was my idea. Actually, I probably gave them several options.
Q. Okay.
A. And that was something that they were



agreeable to.
Q. Okay. Do you know if -- I don't know that I've seen the JGB stuff, so -- and I don't know what kind of recollection you have, but we'll see what we can do together.
A. All right.
Q. Was there -- when you're having this conversation with Thelma Williams or whoever at Capital City Pipes, they must have had their award already, right?
A. Correct.
Q. Because there's already been some payments made by the federal government for products shipped?
A. Correct.
Q. Okay. Now, was there a modification done with respect to what I'll call the JGB contract?
A. Yes.
Q. Okay. Did you ever see that modification?
A. Yes.
Q. Now, does that -- did that modification work essentially the same as the modification



we've marked as Exhibit 4?
A. Yes, I believe so.
Q. Okay. So I mean, obviously, the names are a little bit different and it's got different contract numbers, and maybe Anita Luich wasn't the contract specialist involved, or in this case, Malinda Jeffries, but the change that was made in section 14 would have been more or less the same, just the different account numbers?
A. Correct.
Q. Okay. Now, do you know if, in fact, from that point forward with JGB, the payments that were made by the government were sent to the right escrow account?
A. Do I know -- I'm sorry?
Q. That's fine. I'll say it -- it got a little bit long. I'll break it up. The modification that we were just talking about concerning JGB required the money to be paid to a an escrow account controlled by JGB? That's your understanding?
A. My understanding was that it was an escrow account controlled by both parties.
Q. Okay. It required joint action to

here. At that point in time when you did learn that there was a problem with Flexfab not getting paid, do you remember when that was roughly?

A. I believe that was at the point of the meeting between Henry Cook, myself, Howard Griffin and Kover from DFAS.

Q. Phil Kover?

A. Right.

Q. When that meeting happened, was the -- to the best of your knowledge, was the contract completely completed, or was it still in process?

A. I believe it was still in process.

Q. Okay. Tell me about that meeting, what you can recall.

A. To the best of my recollection, Mr. Cook was, of course, looking for our help to receive payment from the contracts that, of course, Capital City Pipes received. And there was an issue with the payments and the -- I'm trying to talk and remember at the same time. I'm trying to think if the modifications had been done at that point. I believe they had. But anyway, our meeting mainly was with Kover to determine what money -- what funds were supposed to be sent



to Capital City Pipes and what funds had already been sent to Capital City Pipes.

And I know that's when we discovered that Capital City had been paid twice on a particular contract. And basically, DFAS or DSCC was taking back money from other contracts to recoup the double payments.

Q. You're saying that Capital City Pipes had been double paid on one particular installment instead of just paid the once?

A. Right.

Q. And was that particular double payment relating to the product that Flexfab was supplying or maybe on just some other contract all put together?

A. Actually, I believe it was on the JGB requirement, because, again, that's when I discovered that Flexfab was involved as well. And that's when Mr. Cook stated -- he actually gave us the amounts that were owed to JGB, Flexfab, and himself.

Q. Okay. And were you able, with the help of Mr. Kover and, I guess, Mr. Griffith's involvement, to determine that payments were being



made directly to Capital City Pipes and not to the escrow accounts stated in the modification?

A. Yes.

Q. Okay. Now, who does -- well, at the time, who did Mr. Kover work for?

A. I don't know. He worked for DFAS, but I don't know who --

Q. Okay. But it was DFAS, not DSCC?

A. Right.

Q. And so, presumably, Mr. Kover is somebody who would have had access to the DFAS computer, and regardless, the information he provided to you is that the payments had been sent directly to Capital City Pipes and not to the escrow account?

A. Correct.

Q. Now, did you talk to him about fixing that problem or what needed to be done to make sure that didn't continue to happen?

MS. BURKE: Can I just interrupt for a second? Are we talking about JGB or Flexfab right now?

MR. RYNDERS: Well, my understanding is they were talking about both at this meeting. So



the question would be really on both.

A. Actually, it would -- Flexfab was actually an afterthought. I don't mean to be rude about it, but --

Q. Just say it the way it is. That's all I can ask you do.

A. The meeting mainly was regarding the payment to Capital City Pipes that should have gone to the escrow account for JGB.

Q. Okay.

A. And then that's why I said I didn't realize that there was an escrow account set up with Flexfab as well. And at that meeting is when we were talking, going back and forth. And then at that point, Mr. Cook stated that, you know, Capital City Pipes owed JGB this amount, owed Flexfab this amount, and owed him that amount. So --

Q. Okay. Now, did Mr. Kover then confirm for you the payment arrangements just involving JGB, or did this group of individuals that you were part of examine the payment status as to Flexfab as well?

A. Actually, I don't remember us

discussing during conversation -- and we knew that JGB, Flexfab, and Mr. Cook were involved, but our main conversation was on contract, contract numbers, and payments so --

Q. Okay. So you may have gone through a list of contract numbers and you wouldn't have known at that point in time whether these were JGB or Flexfab?

A. Correct.

Q. Okay. Fair enough. Now, I've been told, but I hope I'm wrong about this, that Mr. Kover is deceased?

A. Oh, I have no idea.

Q. Okay. I hope I'm wrong. It's just a bad rumor. Have you seen him since you left the DSCC?

A. No.

Q. Did you have any follow-up meetings with Mr. Kover?

A. No. That was the one and only meeting I had with him.

Q. Did you have any additional involvement with the problems that JGB and that Flexfab were having, either/or? Did you have anymore meetings



from that point on about payment?

A. Oh, yes, several.

Q. Okay. Now, do you know whether or not at the time of this meeting, Flexfab was still manufacturing and delivering product to the federal government?

A. Through Capital City Pipes?

Q. Through Capital City Pipes.

A. I can't say for sure. I believe they were, but I can't confirm that.

Q. Okay. I'm probably going to be able to find a document in a little bit, but do you have any recollection without the help of a document as to when that meeting took place?

A. No.

Q. Okay. Did you talk to Mr. Kover -- did anybody leave Mr. Kover with instructions to make sure that DFAS paid attention to these two contract modifications that called for payments to these two escrow accounts?

A. Yes -- well, Mr. Griffin was basically the lead in this meeting, and, yes, he left instructions with Mr. Kover. And, actually, it was, you know, a mutual agreement that things



would be worked out.

Q. Okay. And I'm not suggesting that Mr. Kover didn't want to. I'm just saying that he was told, and you're telling me that he also agreed, that DFAS needed to take account of these two modifications?

A. Correct.

Q. Did you walk out of that meeting with the impression that from time forward, whatever payments were made by DFAS would be made to these two escrow accounts?

A. Yes.

- - - - -

Thereupon, Exhibit 15 is marked for purposes of identification.

- - - - -

Q. Let me show you what I've marked as Exhibit 15. And as I kind of alluded to before, we're just continuing on with the sequence so we don't have -- every time we start over, there's a new Deposition No. 1, or we don't have to mark things five times. This appears to be a printout from



Anita Luich's e-mail file or account which has some e-mails back and forth between you and her?

A. Right.

Q. Do you remember this exchange of e-mails?

A. Yes.

Q. Now, at the top, what we have here is Anita Luich asking you to consider the idea of I guess kind of surveying the capabilities of Capital City Pipes; is that right?

A. Right. Are you talking about at the very top of this page or --

Q. Yeah, the first e-mail message itself.

A. Okay. Because it starts --

Q. Oh, it starts at the bottom and works up.

A. Yeah.

Q. Okay. So the bottom entry comes first. And in that she's reporting to you that some other folks are -- have had some conversation about whether or not to do a survey of Capital City Pipes?

A. Correct.

Q. And the issue is the amount of the

contract specialist, I guess, in this situation, a post-award contract specialist should do to make sure that the modification is, in fact, implemented by DFAS?
A. As far as I know, you know, they submit the information to DFAS. And what happens from there, you know, I don't think they're giving any notification or anything of that nature.
Q. Okay. Now, turning back to JGB, the position -- as far as you know -- well, did you ever have conversations directly with JGB?
A. Yes.
Q. And their position stated to you was that we haven't been paid for products we've made and we're not going to ship anymore product unless we get paid?
A. Correct.
Q. And, in fact, they also indicated to you that they said we're not going to ship any product unless we also get this escrow arrangement, so we don't have this problem again in the future?
A. No.
Q. Okay.



A. My recollection was that basically they weren't going to deliver until they got paid. And -- so the escrow agreement came about as a means for them to receive payment and an assurance that they would get paid on future requirements.
Q. Okay. Now, what was -- I think it's kind of obvious, but I'm just going to ask the question: What was the point of the escrow agreement?
A. To make sure that JGB received payments on their requirements.
Q. And who was the intended beneficiary of that modification for JGB?
A. Actually, everyone would benefit. The government would get the supplies. JGB would get their funds. And Capital City Pipes would get their portion of the funds.
Q. Okay. Now, I know you've explained that at the time you weren't aware of Flexfab's request for an escrow account, but would you have any different answers to the purpose of the modification marked as Exhibit 4?
A. No.
Q. It was all around for everybody's



benefit?
A. Correct.
Q. Is there anything you can do to shed light on why the modification marked as Exhibit 4, being the Flexfab modification, why that wasn't followed?
A. Probably a breakdown in the system, but I can't -- you know, I'm not a hundred percent sure on that, but --
Q. Don't take this the wrong way. I'm just throwing out crazy ideas to show you how far I'm willing to go -- I mean, just any explanation that you've got other than breakdown of communication? Obviously, you've worked hard to develop suppliers. Were you, in fact, the person who developed C & S?
A. Yes.
Q. And then they graduated, and so now you've developed Capital City?
A. Uh-huh.
Q. I mean, it's not like you went in and said, ignore this contract modification, I want to make sure Capital City gets the money?
A. No. Right.



Q. Is there any reason why somebody would have intercepted the modification or that there was a policy that you're aware of that would have made the modification unenforceable or anything like that?
A. The only thing I know is that DFAS folks, when it's time for payment, they look at the information in the CCR, the Contractor -- I can't remember the name of the CCR. But, anyway, the CCR is the system where the contractors register. And when they make payment, they go by the remittance address in the CCR. But my understanding at the time was that if a modification went through, it would override what was in the CCR, but, apparently, it doesn't.
Q. And we all understand human error. Okay? But in terms of the procedures and policies that you're aware of, the people at DFAS are supposed to know that the modification overrides the CCR?
A. That, I don't know. I don't know if the modification overrides that or how that works.
Q. Okay. From the DSCC standpoint, that