IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.**, a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA**,

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT I

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

- - -

Flexfab, LLC, a Michigan :
Limited Liability Company, :
Successor to Flexible :
Horizon International, :
Inc., d/b/a Flexflab, :

Plaintiff, :

vs. : Case No. 02-1096 C
. Lawrence J. Block

United States of America, :

Defendant. :

- - - - -

**DEPOSITION OF SHIRLEY SPRATT**

- - - - -

Taken at Defense Supply Center
3990 East Broad Street
Building 20, Room A7255
Columbus, Ohio 43213
August 28, 2003, 8:31 a.m.

- - - - -

Spectrum Reporting LLC
333 East Stewart Avenue
Columbus, Ohio 43206
614-444-1000

- - - - -



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

Mark E. Hills, Esq.
Varnum, Riddering, Schmidt, Howlett
Bridgewater Place, Post Office Box 352
Grand Rapids, Michigan 49501-0352

ON BEHALF OF DEFENDANT:

Claudia Burke, Esq.
U.S. Department of Justice
1100 L Street, NW
Washington, DC 20530

ALSO PRESENT:

Vasso Monta



Thursday Morning Session

August 28, 2003, 8:31 a.m.

S T I P U L A T I O N S

- - -

It is stipulated by and between counsel for the respective parties that the deposition of SHIRLEY SPRATT, a witness herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice and by agreement of counsel, that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -



MR. HILLS: The record should reflect this is the deposition of Shirley Spratt, taken in the matter of Flexfab, LLC versus United States, United States Court of Federal Claims, Case No. 02-1096C.

We've set a number of depositions, and I think we're taking Ms. Spratt -- I don't remember where with respect to the time frame, but do you have any problem with the notice we got for her today?

MS. BURKE: No.

MR. HILLS: Thank you.

Just so we're clear, Ms. Monta, I understand you're the agency counsel?

MS. MONTA: Yes.

MR. HILLS: And you're here to observe today?

MS. MONTA: Yes.

MR. HILLS: You're not participating in the deposition?

MS. MONTA: No.

MR. HILLS: Okay. Thank you.

- - - - -

Q. All right. Is that something you would normally do?
A. No.
Q. Okay. Did you undertake to deal with Capital City-related issues for any other subcontractors besides Flexfab and JGB Enterprises?
A. No.
Q. Do you know if anyone did?
A. No, I don't.
Q. All right. We're going to look at the notice now. If you could look -- I think it's on the last page, there are items 16 and 17. The first one relates, I believe, to payments?
A. Yes.
Q. It lists then five different entities?
A. Yes.
Q. You've indicated that you were dealing with payment issues relating to JGB Enterprises and its contracts with Capital City?
A. Yes.
Q. You were also dealing with those similar issues with Flexfab on this particular contract?



A. Yes.
Q. Were you dealing with payment issues on any of the other entities listed there?
A. Not payment issues that I recall, but C & S Industrial Supply is familiar.
Q. Okay. Why?
A. I'm thinking Flexfab was a second-tier sub, and C & S was the first-tier sub.
Q. Okay. Do either of the other two entities --
A. The other three? There are five.
Q. Well, we've talked about JGB, Flexfab, and C & S?
A. Where is Flexfab?
Q. Oh, I'm sorry. So then we have Geoffrey Boddon & Associates, Fidelity Leasing in Tallahassee Mack. Did you deal with payment issues on either of those three entities or any of those three entities?
A. No.
Q. All right. Same question for, then, item No. 17 and the entities listed again. You dealt with the claims made by JGB Enterprises?
A. Yes. As a reviewer. Not directly.



Q. All right. Who was it that was directly dealing with JGB Enterprises?
A. Phyllis Moore.
Q. All right?
MS. BURKE: Can I just clarify something? The question says claims -- the two questions say claims and payments with respect to this contract.
MR. HILLS: I know. I noticed that when I was asking her the question. That's why I phrased my earlier question a little differently.
MS. BURKE: Okay.
MR. HILLS: Yeah, I appreciate you pointing that out.
Q. And then you also dealt, then, with claims made by Flexfab under the contract in dispute in this matter, right?
A. Yes.
Q. All right. Did you deal with claims made by any of the other entities listed there?
A. Only to say that C & S is familiar. I don't think I had any claims issues, but it seems there was some involvement regarding C & S.
Q. Okay. And then the other three?



A. The other three, no.
Q. Okay. Do you know did the other three make formal claims?
A. If they did, I'm not aware of it.
Q. Okay. What does Melinda Jeffries do now?
A. She's a post-award contract specialist.
Q. All right. And that was true at the time of this contract processing, if you know?
A. Yes.
Q. Okay. Do you know who her supervisor is now?
A. Norman Young.
Q. That takes care of the notice, the 30(b)(6) notice. So I understand correctly, from 1988 when you became a post-award contracting officer through 2001 when you switched to pre-award, were you essentially performing the same functions that Melinda Jeffries would have performed on the contract at issue here?
A. Yes.
Q. All right. During that time, did you ever have involvement with Flexfab on any other contract?

Q. Okay. Do you know when?
A. When I reviewed the contract.
Q. And that's Modification P00001?
A. Yes.
Q. And it's dated what date?
A. September 27th, 1999.
Q. And that was Melinda Jeffries who executed that?
A. Yes.
Q. All right. And what did that modification do?
A. It corrects the remittance address.
Q. Okay. You indicated earlier that you looked at some documents as part of the preparation for the deposition that showed when payments on this particular contract were made?
A. Yes.
Q. All right. When were those payments made?
A. I didn't look that close to it. I just looked at the documents to see if they were familiar.
Q. Okay. Do you have any recollection of when payment was made?



A. No.
Q. I'm going to hand to you, Ms. Spratt, what's labeled -- Bates labeled documents DF1 through DF5, which were produced by the government. Were those the entire collection of the payment records you looked at earlier in preparation for the deposition?
A. I can't answer that. I looked at documents that looked like this. I can't say that they were --
Q. Okay. Those look familiar?
A. Yes.
Q. All right. Can you tell me when are the dates of payment that are reflected on those documents, DF1 through DF5?
A. DF1 is 28 March of 2000, DF2 is 4 April of 2000, DF3 is 11 April of 2000, DF4 is 20 April of 2000, DF5 is 17 April of 2000.
Q. What would the process be here at DSCC after execution of Exhibit 4 to have that information entered into the computer system or otherwise processed to have that reflected in DSCC's records?
A. You would do a keypunch entry.



Q. All right. Who would do that?
A. Either Melinda or her clerk.
Q. All right. Do you know who on this contract her clerk was?
A. No.
Q. When would that be done?
A. Shortly after the modification is signed.
Q. All right. Do you know why it wasn't done in this case?
A. No.
Q. But that is what you determined to be the case, correct?
A. That is what should have happened, yes.
Q. All right. But you determined that did not happen, correct?
A. I did not determine that.
Q. All right.
MR. HILLS: Mark that Exhibit 5, please.

\- - - - -

Thereupon, Exhibit 5 is marked for purposes of identification.



\- - - - -

Q. Could you review that, please, and let me know if you recognize it.
A. Yes, I recognize it.
Q. It's a letter you sent to me, correct?
A. Yes.
Q. And it's dated October 2, 2000?
A. Yes.
Q. Don't you conclude in there, or don't you indicate in there that the modification was apparently never entered into your computer system at DSCC?
A. Yes.
Q. All right. So then you did conclude that at some point in time?
A. Yes.
Q. All right. How?
A. My guess is because it wasn't changed.
Q. How would you have -- I mean, what would you have done? Describe to me the process that you would have used to determine that. I mean, is it as simple as pulling up a computer screen, or what would you have had to do?
A. If it was right after this, I could

77

A. That is correct.
Q. But in any event, it shows that address twice?
A. Yes.
Q. The P.O. Box in Tallahassee, and it shows another address in Michigan, correct?
A. Yes.
Q. All right. Why, then, did you conclude that the Tallahassee address was the correct address?
A. Did I say I concluded that was the correct address?
Q. Well, you indicate in here that's the address the contract shows, correct, and I'm talking about Exhibit 5 now.
A. Right.
Q. I'm not trying to put words in your mouth. I want to make sure as I read it upside down, I'm interpreting the letter correctly.
A. The letter does not say that I concluded that was the correct address.
Q. All right. What does it say, because I don't mean to misconstrue it?
A. It says the remittance address in the

78

original contract was stated as Capital City Pipes, P.O. Box 12368, Tallahassee, Florida.
Q. All right. But it's stated as another address as well, isn't it?
A. Modification P1 was issued to change the remittance address to Old Kent Bank.
Q. The modification isn't there, is it?
A. It's right here.
Q. Okay. But that's not part of the original contract, is it?
A. Right, it is not.
Q. Right. And there's a document in the original contract that shows a different remittance address, correct?
A. Yes.
Q. All right. So you concluded that one was appropriate, and the other one was not?
A. Not based on this.
Q. Okay.
A. I didn't say one was appropriate, and one was not.
Q. Okay. I'm asking why you put in your letter to me of October 2 that that was the remittance address, the P.O. Box in Tallahassee,

79

Florida?
A. I see what you're saying.
Q. In the original contract it says both, correct?
A. Right.
Q. So it's ambiguous, right?
A. The contract is ambiguous, yes.
Q. That what's what I'm asking you.
A. Yes.
Q. Okay. So why did you list in your letter to me that the remittance address was Tallahassee, Florida?
A. Because it was in here twice.
Q. Well -- but you indicated earlier you weren't sure if the solicitation documents were part of the contract?
A. True.
Q. Would it be your conclusion that because one address is listed twice and the other address is listed only once, if that were the case here, that that shows one is the remittance address?
A. No.
Q. All right. Was that the easy answer to

80

the question in October 2 of 2000, that the remittance address just didn't get changed, but now, your position's a little different?
A. No. My position -- no.
Q. Okay. But that doesn't -- the letter doesn't explain the problem, does it?
A. Right.
Q. So what was the purpose of writing it?
A. The purpose for writing it was, I said the remittance address in the contract was this. It was changed to Old Kent Bank by modification. The computer system didn't get updated, so DFAS made payment to the original address stated in the contract.
Capital City Pipe, who the government had the contract with, did not contact us and tell us that that was incorrect. So as far as I was concerned as the contracting officer, the government's obligation was done.
Q. Okay. Let's go back and look at, I think, 12 of 24 in the contract.
A. This?
Q. Right. And that's dated June 23, right?

A. Yes.
Q. And that's Capital City telling the government that the remittance address for this contract should be Old Kent Bank in Michigan, right?
A. Yes.
Q. Do you have any idea -- and I'm not -- this isn't meant as a challenge to you personally -- do you have any idea why that wasn't accounted for when this contract was entered originally into the system?
A. No.
Q. Okay. Would it, again, have been the obligation of the contracting officer to make sure that that information was correctly reflected?
A. The pre-award contracting officers don't check on that -- check to see that the system is correct for things like this.
Q. Okay.
A. Like the post-award contracting officers do.
Q. Okay. You're talking about checking to make sure they're correct?
A. Right.



Q. All right. But it wouldn't be the pre-award contracting officer's obligation to make sure when it was originally entered, it was entered correctly, regardless of whether she's doing it as she sits there or goes back and checks again?
A. You're asking me if that's her obligation, or are you asking her if that's standard procedure? I'm confused what your question is.
Q. All right. Let's do both. Let's start with procedure. How is that the information from the contract gets entered into the DSCC computer system?
A. At this time, June of 1999, I don't know if they were using the automated system, which automatically updates, or if it would have been keypunched. It would have been one of those two ways.
Q. Okay. When you say the automatic system --
A. Automated, uh-huh.
Q. All right. How does that enter -- how does the automated -- as silly as this sounds -- how does the automated system enter information into the computer?



A. When you put it all in your award document, once you hit send, if you will, that sends it automatically to our computer.
Q. So someone has to input it initially, right, or it's scanned, or somehow it's inputted into the computer system?
A. Yes.
Q. All right. And then from that point forward, you can change the document as it exists in the system?
A. No. Once it's funded, which means the money has been obligated, you can't make changes.
Q. Okay. But page 12 of 24 is directed to Ms. Luich, correct?
A. Yes.
Q. And she was the pre-award contracting officer, right?
A. Yes.
Q. And you're telling me that she has no responsibility as the pre-award contracting officer to make sure that the contract information has been correctly entered into the DSCC computer system?



A. I didn't say she didn't have the responsibility. I think she does have the responsibility.
Q. Okay. And that's in your position as a supervising contracting officer?
A. Yes.
Q. Okay. In the normal course of processing this kind of an award, is it understood that there is a responsibility with someone to make sure that the information gets entered correctly?
A. Yes.
Q. All right. Who would that responsibility fall on?
A. The contracting officer.
Q. Okay. Is there any way you can say here today why that didn't happen?
A. No.
Q. All right. Same with why the modification information was never updated into your computer system?
A. Right. I can't say why that didn't happen.

Q. Okay. But that was clearly the intent, right, of the modification?
A. Yes.
Q. All right. And, again, so I'm clear -- well, let me ask you this: If the government were aware of the existence of the escrow account in this matter, would that change your conclusions?
A. No.
Q. Why not?
A. Because there's -- you can do an assignment of claims. That's the way to handle money that is assigned from one contractor to another.
Q. Is that a requirement?
A. I think it is.
Q. So is your conclusion, then, following that logic, as I understand it, that these escrow accounts shouldn't be used?
A. I won't say they shouldn't be used. I think they're not safe.
Q. Okay. And if the government was not only aware of the existence of this escrow account, but the fact that it was to ensure that C & S Industrial Supply and Flexfab received



payment, does that change your conclusion at all?
A. You are saying that the government was aware that that was what was supposed to be happening. I don't agree that the government was aware.
Q. All right. But I'm asking you to assume that.
A. Okay. I'm assuming that the government was aware --
Q. And I'm going to ask you to assume two things.
A. Okay.
Q. One, that the government was aware of the existence of this particular escrow account, and, two, that the escrow account was established to protect the financial interest of C & S Industrial and Flexfab on this contract. Okay?
A. Okay.
Q. All right. Assuming those two things, is it still your position that there's no claim by Flexfab or no viable claim by Flexfab or C & S for this money?
A. Against the government, yes, that is still my position.



Q. Okay. We're nearing the bitter end. If you'll give me a minute or two.
You don't dispute that Flexfab wasn't paid for the parts it supplied to the government, do you?
A. I have no way of knowing for sure that they were not. It appears they were not.
Q. You don't believe they would make a claim if they had been paid, do you?
A. I would hope not.
Q. That would be kind of bad business practice, right?
A. Yes.
Q. All right. How well did you know Michael Taylor?
A. Casually, very casually. You know, I would say hi to him.
Q. Okay. Do you have any idea if he's still in the Columbus area?
A. I think he still lives in Columbus.
Q. Okay. Did you ever have any conversations about Flexfab's claim on this contract with a gentleman named Phil Kover?
A. No.



Q. Do you know who that is?
A. I know he worked at DFAS.
Q. Okay. Do you know what he did there?
A. He had something to do with payments. I don't know if he was a supervisor over the payment area or if he did the payments himself.
Q. All right. When you say "if he did the payments himself," you mean actually processed payments?
A. Yes.
Q. Okay. If he were a supervisor, do you have any idea what his responsibilities would have been? Would he have just been overseeing the people who were making -- processing the payments or --
A. That would be my guess.
Q. Okay. Do you know one way or the other?
A. No, I do not.
Q. That's fine. Did you ever have any contact with a gentleman named Henry Cook from C & S Industrial Supply?
A. No, not that I'm aware.
Q. Okay. Did you ever have any contact

A. No.
Q. All right. Documents DF222 and DF223, what is that?
A. This is a synopsis that is issued when we're going out to solicit proposals.
Q. All right. So that would be pre-award?
A. Yes.
Q. All right. DF230 to 232, it says request for synopsis. Again, part of the pre-award process?
A. I think this is issued, and that's what creates the other synopsis to generate.
Q. Who would issue this or generate this generally?
A. The buyer, I think.
Q. All right. Any idea who the buyer on this contract was?
A. Anita Luich.
Q. Anita. Document DF234 is a large purchase acquisition plan?
A. Yes.
Q. What is that?
A. It's just like a cover sheet that documents everything you did, what you're going to



do on this acquisition.
Q. Okay. Was that used on each one?
A. On large purchases, yes.
Q. Okay. What differentiates large as opposed to -- I mean, are there ones that say small purchase acquisition plan?
A. No. You don't have to do them for a small purchase.
Q. All right. What's the distinction?
A. Today, large purchase is $100,000 and above.
Q. Okay. Any idea what it would have been in 1998, '99?
A. It may have been a hundred before that -- before it became a hundred, I think it was 25.
Q. Okay. Do you have 245 to 253, purchase request trailer listing? What's the purpose of that document?
A. This kicks out when the purchase request comes out, and it gives you technical information, acquisition history, almost anything you need to know about to prepare for this solicitation.
Q. As part of your review of this matter,



did you look at the material inspection and receiving reports?
A. Probably.
Q. All right. Let me hand you a copy of one of them. It's a document Bates labeled DF261. Does that look familiar to you?
A. Not necessarily.
Q. Okay. Does there seem to be, as you look at it today, anything unusual about it?
A. Yeah. The remittance address doesn't match the one in the modification.
Q. Anything else about it seem out of the ordinary or unusual?
A. No.
Q. You looked at the remittance address. Why did you look at the remittance address?
A. Just because it was typed there. I just looked to see.
Q. Okay. And that particular one was signed by a government agent, correct?
A. The quality assurance representative, yes.
Q. Accepting the product?
A. Yes.



Q. Correct? As part of your involvement with this matter, do you have any recollection of any of the other people, Mr. Crockett or Mr. Griffen or Mr. Taylor, indicating that they had ever had any conversations with Henry Cook at C & S Industrial Supply?
A. I think they did say he came to visit them.
Q. All right. Do you remember who said that?
A. No. It was in a meeting.
Q. Okay. Why don't we get off the record for a minute.
(A short recess is taken.)
Q. Have you ever looked at anything to determine whether Flexfab has used escrow accounts to ensure payment in previous contracts with the government?
A. No.
Q. All right. I don't have any more for you.
MS. BURKE: What we're going to do is have you review the document, and however much time is regular for you. And then sign it --

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT J

DE. .NSE LOGISTICS AGENCY
DEFENSE SUPPLY CENTER, COLUMBUS
POST OFFICE BOX 3990
COLUMBUS, OH 43216-5000

EXHIBIT

Deposition 5

IN REPLY REFER TO DSCC-LECC

October 02, 2000

FACSIMILE TRANSMITTAL LETTER

Mr. Mark E. Hills
Varnum, Riddering, Schmidt, & Howlett

FAX: 616-336-7000

Dear Mr. Hills:

Reference your letter dated August 25, 2000 relative to Contract SP0740-99-C-1004.

Contract SP0740-99-C-1004 was awarded to Capital City Pipes, Inc. (Capital City) on June 29, 1999. The remittance address in the original contract was stated as Capital City Pipes, Inc., PO Box 12368, Tallahassee, FL. Modification P00001 was issued on September 27, 1999 to change the remittance address to Old Kent Bank, Corp Trust. Because our computer system was not changed to reflect this revised remittance address, the Defense Finance and Accounting Service (DFAS) remitted payment to the original remittance address stated in the contract. Inasmuch as we did not hear from Capital City (our prime contractor), we assumed payment was received satisfactorily. Further, since we did not hear from Capital City that payment was not received, we believe we have discharged our legal obligations under this contract.

If you have any further questions relative to this issue, feel free to contact me at (614)692-3971.

Sincerely,

Shirley Spratt

SHIRLEY SPRATT
Contracting Officer
DSCC-LECC

APP-118

Exhibit 2