IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT K

IN THE U.S. COURT OF
FEDERAL CLAIMS

- - -

Flexfab, LLC, a Michigan :
Limited Liability Company, :
Successor to Flexible :
Horizons International :
Inc., d/b/a Flexfab, :

Plaintiff, :

vs. : Case No. 02-1096 C
: Lawrence J. Block

United States of America, :

Defendant. :

- - - - -

**DEPOSITION OF HOWARD GRIFFIN**

- - - -

Taken at Defense Supply Center
3990 East Broad Street
Building 20, Room A7255
Columbus, Ohio 43213
August 28, 2003, 10:45 a.m.

- - - -

**Spectrum Reporting LLC**
**333 East Stewart Avenue**
**Columbus, Ohio 43206**
**614-444-1000**

- - - - -



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

Mark E. Hills, Esq.
Varnum, Riddering, Schmidt, Howlett
Bridgewater Place, Post Office Box 352
Grand Rapids, Michigan 49501-0352

ON BEHALF OF DEFENDANT:

Claudia Burke, Esq.
U. S. Department of Justice
1100 L Street, NW
Washington, D.C. 20530

ALSO PRESENT:

Vasso Monta



Thursday Morning Session

August 28, 2003, 10:45 a.m.

S T I P U L A T I O N S

It is stipulated by and between counsel for the respective parties that the deposition of HOWARD GRIFFIN, a witness herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice and by agreement of counsel; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -



HOWARD GRIFFIN

being first duly sworn, as hereinafter certified, testifies and says as follows:

CROSS-EXAMINATION

- - - - -

BY MR. HILLS:

Q. Sir, if you could state your name, please?

A. First name is Howard, middle name is Anthony, and last name is Griffin. I'm referred to as Tony often times as a nickname.

Q. Griffin is G-R-I-F-F-I-N?

A. That is correct.

Q. Mr. Griffin, where do you reside?

A. I reside in the city of Pickerington, at 9425 Haaf Farm. I'm saying H-A-A-F, that's Farm Drive, and the zip is 43147.

Q. Did you say Pinkerton?

A. Pickerington.

Q. Pickerington?

A. P-I-C-K-E-R-I-N-G-T-O-N.

Q. Okay.

MR. HILLS: The record should reflect we're here in the matter of the deposition of

CSR, a customer support representative for the Patriot missile system, which means that all the spare parts necessary to maintain operation and mission capability fell under re -- part of my responsibility.
Q. What were your duties as the associate director of small business?
A. I was responsible for making sure that the socioeconomic programs as dictated by Public Law 95507 were carried out here at this organization.
Q. And is that a good way to describe your duties from 1990 til 2003?
A. Pretty much, unless you get into particular kinds of programs associated with the socioeconomic program, but the bottom line is that they fell under my charge here, and I was reporting directly to the commander.
Q. Okay. Did you, or were you involved with dealing with particular contractors or subcontractors under those programs, or were you overseeing other people who were doing that?
A. I oversee other people. Now, there may have been times when the issue rose to the level



that I got involved.
Q. Okay. Was your posting as the small business specialist, did that immediately proceed becoming the associate director of small business?
A. That's correct.
Q. All right. What were your duties there?
A. If I recall -- now, I'm simply recollecting -- I think I had the 8(a) program, the Section 8 -- the SBA Section 8(a) Small Business Program, the JWOD Program, which is Javits-Wagner-O'Day Program for social -- for -- it's for the severely handicapped and for the blind. I may have had a couple others, labor surplus areas, but those were programs that fell under my responsibility as a small business specialist.
Q. All right. How long were you a small business specialist?
A. From December of '86 until May of '90.
Q. What sort of things did you do to prepare for your deposition today?
A. Basically, nothing. I spoke with the attorneys yesterday in general about I will be up



for a deposition.
Q. Did you review any documents?
A. No documents. He did show me a couple of documents to see if I could identify them.
Q. Do you know what they were?
A. If I recall, they were a couple of offering letters with respect to awards that went to one of the 8(a) participants, and there was an acceptance letter from the SBA with regard to one of the awards.
Q. All right. If you recall, Mr. Griffin, did you have any direct involvement with the certification of Capital City Pipes, Inc. out of Florida as a 8(a) contract?
A. None whatsoever.
Q. All right. Who handled that?
A. You got me. The responsibility for certification is an SBA responsibility.
Q. Is that a function that the SBA office here would have performed?
A. No. Probably the district office where the firm is located.
Q. Okay. Are you familiar with a gentleman named Mike Taylor?



A. Oh, yeah.
Q. How do know you Mr. Taylor?
A. Mike -- in fact, I hired Mr. Taylor. I don't recall when, but I'm the person who hired Mr. Taylor into the small business office.
Q. What were his responsibilities?
A. He was my 8(a) and Hub Zone Program coordinator.
Q. I'm sorry. You said 8(a) and --
A. 8(a) Program, Section 8(a).
Q. Right. And then the other one?
A. Hub Zone, H-U-B, Z-O-N-E.
Q. What is that?
A. We've got -- business zones where we identify firms that have some difficulties with respect to being able to compete, and they've designated areas where we support those areas.
Q. All right. How long did he work for you?
A. I don't really remember, but I'm thinking a good half a dozen years, maybe more.
Q. Okay.
A. So I don't know.
Q. Why was there a change in your status

A. That authority is delegated to Mr. Taylor, but the reason his name is up here so that any response will come back to him because he's working this --
Q. All right. In either of those two letters, Exhibit 8 or 9, is that your signature?
A. No.
Q. All right. That's him signing your name?
A. That's him signing my name.
Q. Was Mr. Taylor the only person performing that function, or were there other people who were doing the same thing for other 8(a) companies or other programs?
A. If I'm correct, I had -- the 8(a) program is broken down in two categories. I have a construction side where we do base supply, and the gentleman involved with that, his name is Gerry Wade.
Q. Okay.
A. So Gerry Wade would be doing offering letters from the construction, signing them.
Q. Okay.
A. So you have Mr. Taylor doing



commodities and services -- well, I don't want to say service, commodities. Because services would fall into base supply, which means it would have been something that Mr. Wade was doing.
Q. Okay. Would it be fair to say that these are examples of letters that went out frequently, these two just happened to have been directed to something involving Capital City Pipes?
A. Yes. This is a standard format.
Q. Yeah.
A. So any 8(a) that receives an award, an offering letter would have went prior to that.
Q. Okay. You indicated earlier, sir, that you had a conversation with Henry Cook?
A. Yes.
Q. Regarding Capital City Pipes?
A. Yes. More than -- well, not necessarily -- I've had multiple conversations with Henry Cook.
Q. Okay. How many of those related to Capital City Pipes?
A. I have no idea.
Q. All right. When was the last time you



had a conversation with Mr. Cook?
A. I'm going to guess and say two years ago.
Q. Okay. Did you meet with Mr. Cook at any time to discuss the Capital City Pipes matter?
A. The answer to that is yes, but when you say "Capital City Pipes matter," I met with Mr. Cook to discuss some financing regarding Flexfab not being paid or --
Q. Okay.
A. So I guess we're saying the same thing.
Q. Yeah, that's what I'm referring to. So you had that meeting. Was Phil Kover there as well?
A. As I recollect, yes.
Q. All right. Was Michael Taylor part of that meeting?
A. I believe he was.
Q. All right. Were you there the whole time?
A. I'm pretty certain I was there the whole time. If not the whole time, the vast majority of the time.
Q. All right. If you could review that



for me please, sir.
A. Okay.
Q. Does that accurately summarize the meeting you had with him?
A. I don't know -- when you say accurate, there's some things I'm not certain -- I couldn't say yay or nay to. But, basically, the gist of what was being said about a meeting with Mr. Kover and asking about payment, I can recall that.
Q. All right. Do you recall as a result of that meeting that you and Mr. Taylor had any additional discussions about C & S Industrial Supply and Flexfab and their failure to receive payment for parts?
A. I don't know. I would think that probably we did, but I don't know. I don't recall anything specific.
Q. All right. Do you remember --
A. The conversation would have been more -- would have went along with Mr. Kover about getting these people paid.
Q. All right. Do you have any recollection of talking with Mr. Kover about that issue?

A. Only to the extent that there was something in the automated process associated with the address, and it's supposed to transfer over, and it didn't, or something with regard to that. I don't know how that works.
Q. All right. Do you know if there was ever a conclusion reached or a plan of action reached as a result of these discussions to rectify the nonpayment?
A. No. My -- last I heard, they had filed an action, and I assume this is part of it.
Q. Okay.
MR. HILLS: Let me go ahead and mark that as 10.
- - - - -
Thereupon, Exhibit 10 is marked for purposes of identification.
- - - - -
Q. So I understand, we've now marked as Exhibit 10 the copy of the e-mail message you received from Henry Cook, correct?
A. I don't know that. What I'm saying, I guess, this is on the top of my sheet, and I don't



recall the e-mail itself, but I do recall much of the contents in the e-mail. So I have no reason to believe it was anything other that, but I can't identify this is the e-mail that I received.
Q. All right. Given the way it's set up, you don't have any reason to argue that it's an e-mail that was --
A. I wouldn't debate it is. I just can't confirm.
Q. All right. And as I understand what your testimony is about the contents of the e-mail, you may not recall specifically some of the issues, but you think it generally is a accurate summary of the issues that were discussed?
A. Well, he spoke to some things that Mr. Kover has said and did, and I don't know about those things. Okay? But in terms of the debt -- the monies not going to where it was supposed to go, I am familiar with that situation.
Q. All right. And, again, so I'm clear, you don't have a specific recollection of the nature of any conversations you had with Mr. Taylor or Mr. Kover after this meeting that's



being referred to in Exhibit 10?
A. No. No. In the back of my mind, I would have told Mr. Taylor to press on this issue with Capital City and see what's going on to get these folks money, et cetera, but no particular conversation.
Q. All right. Did you ever do anything to follow up and see what had happened as a result of this contact with Henry Cook?
A. When you say that, what do you mean, "follow up"?
Q. Well, did you ever get back to Mr. Taylor or Mr. Kover some period of time later to say, hey, what happened with that?
A. If I can recall correctly, there was perpetual back and forthness. I think as a result of that, there was dissatisfaction in not knowing specifically and how. As a result of that, there was this action that was filed.
Q. All right. Would you have made notes of any of these conversations?
A. Certainly would. However, I looked for a file that -- since I've been gone, so many -- when files get a certain age, they discard them.



So any notes that I might have, I was unable to find.
Q. All right. Would there be any computer records or anything that would have notes or log entries or journal entries, whatever you might want to describe them as?
A. I attempted to go through some of my old e-mails just the other day, but I didn't find anything relevant to this situation. I can't say. It may or may not be. I just don't have any knowledge of where I'd find them.
Q. Okay. Did Mr. Taylor ever indicate to you that he was keeping notes or keeping --
A. We would have had a file on Capital City, C & S. They were both 8(a) firms --
Q. Right.
A. So they're -- whether we've got something stored somewhere or they've got destroyed, I don't know. But we would have maintained a file on program participants. Simple as that.
Q. All right. That would have been something you would have done in the regular course --

A. Regular course of business.
Q. Okay. And do you know what the document retention policy is for that kind of information?
A. Honestly, no. That's probably a bad thing, but no.
Q. Generally, how long are those types of records maintained? Do you know the period of time?
A. First of all, what I will say to you with clarity that as long as the firm is in the program, we would maintain the records. So if Firm A is in that program for a period -- typically, it's a 9-year process.
Q. Okay.
A. We would have their folder a minimum of nine years and probably would keep it an extra year before we sent it somewhere to be filed.
Q. All right. So C & S Industrial is still part of that program, so there would still be a file somewhere?
A. If they were still part of the program, but they're not.
Q. All right. When did C & S Industrial drop out of the 8(a) program?



A. I don't know exactly, but I can tell you probably a couple years ago. They didn't drop out. They graduated. In other words, their period of time ended.
Q. Oh, okay. Sort of moved onto being just a regular business?
A. That's right.
Q. Okay. What happened with Capital City Pipes?
A. I don't know. I can tell you in terms of our association with them, is that when they got broke or -- the word was that they absconded with the money. Is that fact? I don't know. But as a result of that, of course, we weren't in any position to do business with them, and, of course, they did not come back requesting business.
Q. All right. Let me hand you a two-page document that's Bates labeled DF176 and DF177. Just tell me what that is.
A. This is what I made reference to earlier about an acceptance letter.
Q. Okay. That's an example of an acceptance letter?



A. This would be a -- this is, in fact, a copy of an acceptance letter from the SBA out of Jacksonville, Florida.
Q. All right. Are those issued on particular contracts, or do those relate to just -- I'm probably mixing some stuff up here, so bear with me.
Does that relate to the original certification of a business as an 8(a) program business, or does that relate to a specific contract offer letter such as we discussed in Exhibits 8 and 9?
A. Actually, this relates to a specific offer, not a contract because it's not a contract yet.
Q. Right.
A. We're offering this opportunity in a procurement package saying, hey, here's something that we're willing to set aside for the firm because we believe, based on the profile, they can do this.
It is the obligation of the SBA to accept on their behalf because it's a tripartite agreement.



Q. Okay.
A. The actual award at this time -- and I'm saying time with respect to in 1988 -- the actual award would have been with the SBA who subcontracted to the program participants.
Q. All right. And it's the SBA function to determine whether they can satisfy the various requirements?
A. Exactly. Again --
Q. And would that pertain to requirements not only from a financial perspective, but, say, their ability to actually perform the work?
A. Across the board. If SBA says that this firm is capable of -- they're accepting this on their behalf.
Q. Okay.
A. And that's what this letter -- that's why we call it an acceptance letter.
Q. All right.
A. They're accepting that procurement on behalf of the 8(a) program participant.
Q. So they're saying they're fully qualified to handle this particular offer?
A. That's our read on it. Now, SBA may

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

**FLEXFAB, L.L.C.,** a Michigan Limited Liability Company, successor to Flexible Horizons International, Inc., d/b/a Flexfab

Plaintiff,

v.

**UNITED STATES OF AMERICA,**

Defendant.

Case No. 02-1096 C

Hon. Lawrence J. Block

**PLAINTIFF'S BRIEF IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT**

# EXHIBIT L

IN THE UNITED STATES COURT
OF FEDERAL CLAIMS

Flexfab, LLC, a Michigan :
Limited Liability Company, :
Successor to Flexible :
Horizons International, :
Inc., d/b/a Flexfab, :

Plaintiff, :

vs. : Case No. 02-1096 C
: Lawrence J. Block

United States of America, :

Defendant. :

- - - - -

**DEPOSITION OF HOWARD CROCKETT**

- - - - -

Taken at Defense Supply Center
3990 East Broad Street
Columbus, Ohio 43213
August 28, 2003, 11:53 a.m.

- - - - -

**Spectrum Reporting LLC**
**333 East Stewart Avenue**
**Columbus, Ohio 43206**
**614-444-1000**



A P P E A R A N C E S

ON BEHALF OF PLAINTIFF:

Mark E. Hills, Esq.
Varnum, Riddering, Schmidt Howlett
Bridgewater Place, P.O. Box 352
Grand Rapids, Michigan 49501-0352

ON BEHALF OF DEFENDANT:

Claudia Burke, Esq.
U. S. Department of Justice
1100 L Street, NW
Washington, DC 20530

ALSO PRESENT:

Vasne M[illegible]



Thursday Morning Session

August 28, 2003, 11:53 a.m.

S T I P U L A T I O N S

It is stipulated by and between counsel for the respective parties that the deposition of HOWARD CROCKETT, a witness herein, called by the Plaintiff for cross-examination, may be taken at this time by the notary pursuant to notice and by agreement of counsel; that said deposition may be reduced to writing in stenotypy by the notary, whose notes may thereafter be transcribed out of the presence of the witness; that proof of the official character and qualification of the notary is waived.

- - - - -



MR. HILLS: We are here in the matter of Flexfab, LLC versus the United States of America, pending in the United States Court of Federal Claims, Case No. 02-1096C. This is the deposition of Howard Crockett. We've been moving times around, but I presume you have no objection on the notice here today?

MS. BURKE: Correct. No objection.

- - - - -

HOWARD CROCKETT

being first duly sworn, testifies and says as follows:

CROSS-EXAMINATION

BY MR. HILLS:

Q. Can you state and spell your name?
A. First name is Howard, H-O-W-A-R-D, Crockett, C-R-O-C-K-E-T-T.
Q. Mr. Crockett, could you tell me where you reside, please?
A. Live, my address?
Q. Yes, please.
A. 276 Arbor, A-R-B-O-R, Circle, Gahanna, Ohio 43230.
Q. Mr. Crockett, have you ever had your

deposition taken before?
A. No.
Q. I'll just give you a few quick rules which are real easy to follow. We need you to verbalize your responses because the court reporter cannot take down nods or shakes of the head.
And if from time to time, I prompt you, I just want to make sure we're getting everything down we need to. I'm just going to ask you a series of questions. If there's anything you don't understand or you want me to reword, please tell me to rephrase the question, and I'll do my best. But if you do answer a question, we're going to assume that you heard and you understood it.
A. All right.
Q. If you need a break at any point, please just let me know.
A. Okay.
Q. Are you a high-school graduate?
A. Yes, sir.
Q. Where did you graduate from high school?



A. South High School.
Q. When was that?
A. 1972.
Q. All right. And did you have any formal education after high school?
A. Yes, sir. I have a total of about three years of college.
Q. Where was that?
A. Well, I did some at the University of Toledo and then Franklin University.
Q. All right. Do you have a formal degree of any sort?
A. No, I don't.
Q. Okay. When were you first employed by the government?
A. Well, I came in after the military in 1975.
Q. All right. You were in the military from '72 until '75?
A. Yes. U.S. Navy.
Q. All right. If you could, just kind of walk me through from '75 to the present, where you've been, what your responsibilities have been?
A. From '75, October '75, I was employed



by DSCC. Okay. Worked here for less than a year and got called to the U.S. Post Office. I was at the Post Office in a training position. I didn't pass completely that training, so I was released. And then I worked four years in the private industry at Ag Rock, A-G R-O-C-K, Industries.
Q. What do they do?
A. They make the gravel and different things out there, you know. I was with them for four years, and then I finally got back with the government in 1981.
Q. Was that back at DSCC?
A. Yes, sir.
Q. What were you doing then?
A. Came back as a clerk.
Q. Okay.
A. Worked as a clerk for about a year, and then I got a promotion to inspector.
Q. All right.
A. And was inspector for about two years. Then I became inventory manager.
Q. All right.
A. And I've been inventory manager ever since until now.



Q. And that's still what you do today?
A. Yes, sir.
Q. Okay. Generally, what are your job responsibilities?
A. Well, a -- the major job is I have a group -- as inventory manager, my job is to ensure that we have proper assets in order to be available to support the military services.
Q. Okay. Are you familiar, then, also with not only the various materials, but the companies that produce them as well, or do you just stay up on the needed materials?
A. Just the material pretty much.
Q. All right. Do you know a gentleman named Bret Snyder?
A. Yes.
Q. Who is he?
A. He's -- he was manager on the team, but he's now a supervisor.
Q. I'm going to hand you, Mr. Crockett, two pages that are marked with Bates labels as DF328 and DF329. If you could tell me if you're familiar with those, and if you remember or if you know what they are?

A. Yes. DF328 is the cover sheet for some fax correspondence I received from Thelma Williams.
Q. Okay. Do you know who she is?
A. I knew her when she was at Capital City, yes.
Q. How much interaction did you have with her?
A. Just phone conversations.
Q. Okay. How many -- do you have any idea how many phone conversations you had with her?
A. Oh, no. I can't remember.
Q. Okay. Less than five, less than one?
A. I would say less than 10.
Q. Do you know what that related to?
A. We had an urgent need for some hosing --
Q. Is that the air duct hosing?
A. Yes, the hoses.
Q. When you say it was an urgent need, what was the nature --
A. Based on the KC-135, it provided air coolant so they could work on aircraft. You know, it got -- so they had air conditioning pumps in --



so I had aircraft that couldn't be worked on because they didn't have the ducts. And so that's why I was speaking with her trying to get her to expedite it as much as possible.
Q. To your knowledge, was that the only cause of --
A. The KC-135 was my aircraft, yes.
Q. Are you aware of the fact that that was material or supplies produced by Flexfab?
A. You know, I didn't know until, you know, later on I found out about it.
Q. That's where -- what we're talking about, the same thing, right?
A. Right.
Q. Okay. Do you know what the page 329 is, the DF329 is?
A. It looks like a response from Thelma that they had -- she received from Flexfab saying that they had requested if they could be expedited.
Q. If you could pull 238 up as well. I see the same Flexfab line, same date, same time. I've got a page 1 and a page 3. Any idea where page 2 is?



A. No, sir, I don't.
Q. Okay.
A. It's been such a while.
Q. Sure. Let me also hand you, then, pages 331 and 332. See if those look familiar to you.
A. Yeah. This is 331. It's a cover sheet for a fax to Ms. Jeffries and also -- she also CCed me.
Q. Okay.
A. This is the fax cover. 331 and 332 is information they sent to Melissa about what they could do about the parts being expedited.
Q. Who is Melissa?
A. Melissa was our contract administrator.
Q. Is it Melinda?
A. Melinda, I'm sorry.
Q. The third page of the fax, which is actually 332, has some handwriting. I think it says "error." Do you know what that relates to?
A. Well, mil-spec items are definite, and for some reason it was a wrong mil-spec. It was a revision.
Q. So we're just changing it to the proper



number?
A. Right. That's all it was.
Q. Okay. Did -- the 180, do you have any idea what that relates to?
A. I know it's a cancellation request on the purchase request itself. Clin 2 is to be cancelled. I'm unsure exactly the reason why I did that.
Q. Okay. Let me hand you DF220 and --
A. They were -- these were both requests that the buyer increased the quantity Clin 1 to make it a certain quantity, a new quantity.
Q. Okay. And does that relate to the same part that we're talking about?
A. Yes, sir.
Q. What did it increase it to?
A. It looks like the requested quantity would be 496.
Q. Do you know if that ever took place?
A. I believe -- I believe so.
Q. Okay. Are both of them part of the same request, both pages, or are they different requests?
A. It would have to be the same, yes.

Q. Okay.
A. I see the date is the same required date and everything so --
Q. Okay. Now, other than your involvement in the inventory management aspect of this, did you have any interaction with anybody at Flexfab?
A. I did call Flexfab in order to see if they could expedite on getting parts to Capital City.
Q. Do you know when that would have been?
A. No.
Q. Do you know if it was after the contract was issued?
A. Yes. It had to be.
Q. All right. Do you have any recollection of how far ahead of delivery it would have been?
A. No. I'm not sure.
Q. Okay. Did you have any involvement in payment issues relating to --
A. No, sir.
Q. And I presume normally you would not?
A. No. That -- that's out of my ballpark.
Q. You manage inventory and let other



people worry about it?
A. Yes.
Q. So you don't have any information who made payment -- why particular payment was made to a particular place or time or anything like that?
A. No.
Q. Did you have any discussions with anyone at DSCC about payment being made to Capital City Bank or payment being made to an escrow account? Does any of that sound familiar?
A. No, sir.
Q. Would you ever have discussed Flexfab related issues with Michael Taylor?
A. I don't believe -- no.
Q. How about a gentleman named Phil Kover?
A. No.
Q. Do you know a Henry Cook?
A. No.
Q. Did you ever talk with the contracting officers about those issues, payment issues?
A. Melinda.
Q. Okay.
A. Yes.
Q. Of payment issues?



A. No. No payment issues.
Q. Okay. Just --
A. Just inventory, just parts.
MR. HILLS: I'm sorry. You told me before what's he's got.
MS. BURKE: The two, number 4 and number 1. I think we might have already covered both of them.
Q. You indicated you made a call, you think, maybe to Flexfab?
A. Yes, once.
Q. Other than that, did you ever have any communication with them, with Flexfab?
A. No.
Q. What was the nature of the communication you had with people at Capital City Pipes? Do you remember what you discussed?
A. I think just the issue that, you know, how urgent our requirements were, and whatever they could do to get our parts there.
Q. How was it that the urgency of need for the parts as communicated to you -- I mean, I presume that happens on more than just this one part. How does that come to you?



A. Well, it's either as I -- as the manager, I review my back order listings, and once I see where I need the parts at -- and it was communication by Tinker Air Force Base. And they let me know what they needed to do and --
Q. Where is Tinker Air Force Base?
A. Omaha City.
Q. Okay. Did anybody -- is it your belief that they did communicate to you?
A. Tinker?
Q. Yes.
A. Yes.
Q. Did they explain that there was somebody, something in particular that they -- I realize you indicated to me why they needed the material, but was there some event that was going on that was leading then to make that urgent request?
A. No. I believe it was just overall maintenance dealing with the aircraft itself.
Q. Okay. Other than a general understanding of operation of KC-135, was there anything in particular that stood out as to why they needed that so fast? For instance, was it,

you know, a group going overseas?
A. No.
Q. Something like that?
A. It comes to my mind the major reason was because it was getting to be hot weather time, a 100 degrees, and they couldn't work inside the aircraft.
Q. Okay. All right. I'm sure that satisfies the 30(b)(6) notice. Bear with me for just a moment or two, Mr. Crockett, and I think we'll have you on out the door.
Do you know a Bruce Givens?
A. No, I don't.
Q. Let me ask you to look at this document.
A. Okay.
Q. Do you have any idea what that is or how it would relate to the Flexfab supply parts?
A. Okay. This is a tech document stating exactly what was required for those hoses in -- or to lock into the air conditioning unit. It required four locks.
Q. Okay.
A. Sort of clip in.



Q. Okay. There's a reference to Kelly Air Force base at the top?
A. Right.
Q. Do you know what that's about? It looks like it's in Texas.
A. Yeah.
Q. Nobody wants you to guess. I just want to know if you know.
A. And looking now, maybe it was Kelly and not Tinker. I apologize.
Q. That's all right. Do you think it was the same issue?
A. No doubt about it. I know it was hot where it was at.
Q. It's one or the other?
A. Right.
Q. Okay. Thank you. I appreciate that. I don't have any more for you, sir. Thank you for your time.

\- - - -

Thereupon, the foregoing proceedings conclude at 12:15 p.m.

\- - - - -



WITNESS SIGNATURE PAGE

I have read the entire transcript of my deposition taken on August 28, 2003. The changes and/or corrections, if any, which I desire to make to my testimony have been noted on a separate errata sheet. I request that those changes, if any, be entered into the record by attaching the errata sheet to the original transcript.

______________________________

HOWARD CROCKETT

Spectrum Job No.: 4974

State of Ohio : C E R T I F I C A T E
County of Franklin:

I, Rebecca Williams, a Notary Public in and for the State of Ohio, do hereby certify the within named HOWARD CROCKETT was by me first duly sworn to testify to the whole truth in the cause aforesaid; testimony then given was by me reduced to stenotypy in the presence of said witness, afterwards transcribed by me; the foregoing is a true and correct transcript of the testimony so given; and this deposition was taken at the time and place as specified on the title page.

I do further certify I am not a relative, employee or attorney of any of the parties hereto, and further I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my seal of office at Columbus, Ohio, on September 10, 2003.

______________________________

Rebecca Williams, Notary Public - State of Ohio
My commission expires April 5, 2003.