IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| FLEXFAB, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 02-1096C |
| v. | ) | (Judge Block) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Pursuant to Rule 56(h) of the rules of this Court ("RCFC") and this Court's order dated February 12, 2004, defendant, the United States, respectfully submits this cross-motion for summary judgment.

DEFENDANT'S BRIEF

STATEMENT OF THE ISSUES

1. Whether Flexfab is a third-party beneficiary of Contract No. SPO740-99-C-1004, a contract between the United States and Capital City Pipes, Inc.

2. Whether the United States is entitled to summary judgment upon Flexfab's claim that the United States breached Contract No. SPO740-99-C-1004, by making payment to Capital City, because the United States's payment to Capital City was properly made in accordance with the plain language of the contract, which required that the United States make payment by means of an electronic funds transfer ("EFT") to the account specified in the Central Contractor Registration ("CCR") database.

STATEMENT OF THE CASE

I. Nature Of The Case

This case arises pursuant to the Contract Disputes Act of 1978 ("CDA"), 41 U.S.C. § 601 et seq. Flexfab instituted this action on August 30, 2002. In its complaint, Flexfab alleges that a modification to contract SPO740-99-C-1004 was issued with the intent to benefit Flexfab and that the Government breached that modification. Flexfab requests that the Court enter judgment in its favor for $452,031.60 plus interest, attorneys fees, and costs.

Flexfab is not a third-party beneficiary to this contract. However, even if the Court finds that Flexfab is a third-party beneficiary of the contract, the United States is entitled to summary judgment, as a matter of law, because, in properly making payment in strict accordance with the plain language of the contracts, the United States has completely discharged any and all obligations it owed to Capital City and Flexfab. Accordingly, the complaint should be dismissed.

II. Statement Of Facts

For our statement of facts, we rely primarily upon our proposed findings of uncontroverted fact, filed simultaneously with this motion. Briefly stated, this case concerns a contract between the United States, acting through the Department of Defense, Defense Logistics Agency, Defense Supply Center Columbus ("DSCC") and Capital City Pipes, Inc. ("Capital City"). The plaintiff, Flexfab, LLC, acted as Capital City's third-tier subcontractor and supplier in this contract. Flexfab contends,

first, that a change in remittance address requested by Capital City on June 23, 1999, and again on July 1, 1999, was intended to benefit Flexfab, and second, that DSCC breached its contract with Flexfab by failing to remit payment to the proper address. However, nothing in Capital City's request or the amendment indicates that Capital City and DSCC intended directly or indirectly to benefit Flexfab.

## SUMMARY OF THE ARGUMENT

This Court does not possess jurisdiction to entertain this complaint because Flexfab, as a third-tier subcontractor, is not in privity with the Government. Flexfab cannot establish that it is a third-party beneficiary to the contract because Flexfab cannot demonstrate that the contract explicitly intended to benefit Flexfab directly. Nor can Flexfab demonstrate that the parties to the contract implicitly intended to benefit Flexfab. Nothing in the contract, the modification to the contract, or the dealings between the parties suggests any such intent.

Even if Flexfab could prove that the parties intended to benefit it, the Government's full payment of the contract price to the prime contractor, pursuant to the terms of the FAR and the contract, demonstrate that the Government has discharged its responsibilities pursuant to the contract.

## ARGUMENT

### I. Standard Of Review

Summary judgment may be granted where there are no genuine

issues of material fact in dispute and the movant is entitled to judgment as a matter of law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986); Mingus Constructors, Inc. v. United States, 812 F.2d 1387, 1390-91 (Fed. Cir. 1987); Ralph Larson & Son, Inc. v. United States, 17 Cl. Ct. 39, 42 (1989).

A court may consider a motion for summary judgment in stages. The initial inquiry should be whether the movant has presented an adequate legal basis for its motion. E.g., Ralph Larson, 17 Cl. Ct. at 43. If the legal support is insufficient, then the inquiry is at an end and the motion must be denied. E.g., Anderson, 477 U.S. at 250 ("There is no requirement that the trial judge make findings of fact."). Once a movant has established an adequate legal basis for its motion, the Court must consider whether the opposing party has identified any genuine issues of material fact. The first step is to determine whether the issues raised are truly factual issues, or are issues of law. The second step is to determine what subset of the truly factual issues are material to the decision of the case. The third step is to examine the evidence presented by the parties to determine whether there is any genuine issue concerning any material factual issue. Ralph Larson, 17 Cl. Ct. at 43 (describing three steps); accord Anderson, 477 U.S. at 248 ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or

unnecessary will not be counted.").

Contract interpretation is a question of law. Giove v. Department of Transportation, 230 F.3d 1333, 1240 (Fed. Cir. 2000). Accordingly, when there is a dispute between the parties concerning contract interpretation, it is appropriate to resolve this legal dispute first in order to determine whether the moving party has an adequate basis for its motion, and then to determine what facts are material to the proper legal standard. See Ralph Larson, 17 Cl. Ct. at 43-45. Where no facts material to the proper interpretation of the contract are disputed, the claim at issue may appropriately be decided by summary judgment. Anderson, 477 U.S. at 248; Government Systems Advisors v. United States, 847 F.2d 811, 813 (Fed. Cir. 1988) (decision concerning contract interpretation precludes need to address factual issues raised by the parties where those factual disputes were not material to the legal standard created by the proper contract interpretation).

## II. This Court Does Not Possess Jurisdiction To Entertain This Complaint Because Flexfab Lacks Privity With The Government

This Court is required to determine whether it possesses jurisdiction before it may consider the merits of any action. Wrona v. United States, 40 Fed. Cl. 784, 786 (1998). The Court of Federal Claims possesses jurisdiction to consider a matter only to the extent that the United States has waived its sovereign immunity. United States v. Testan, 424 U.S. 392, 393

(1976). "[A]ny such waiver of sovereign immunity must be narrowly construed." National Leased Housing Assoc. v. United States, 32 Fed. Cl. 454, 460 (1994).

Flexfab asserts that the Court possesses jurisdiction to consider the matters asserted in its complaint pursuant to the Tucker Act, 28 U.S.C. § 1491, and 41 U.S.C. § 601, the Contract Disputes Act ("CDA"). Compl. ¶ 5. The Tucker Act does not create any substantive right of recovery for money damages, but merely confers jurisdiction to enforce substantive law. United States v. Mitchell, 445 U.S. 535, 538 (1980); Testan, 424 U.S. at 398-99. The CDA allows only a "contractor" to appeal the decision of a contracting officer. 41 U.S.C. § 609(a)(1). "Contractors" are statutorily defined as parties "to a Government contract other than the Government." 41 U.S.C. § 601(4). A contractor for these purposes is limited to the prime contractor. Erickson Air Crane Co. v. United States, 731 F.2d 810, 813 (Fed. Cir. 1984). Because Flexfab is not a contractor within the meaning of the CDA, it may not sue the United States pursuant to either the Tucker Act or the CDA. E.g., Merritt v. United States, 267 U.S. 338, 340-41 (1925) (Tucker Act); United States v. Johnson Controls, Inc., 713 F.2d 1541, 1550-51 (Fed. Cir. 1983) (Tucker Act and CDA).

## III. Flexfab Is Not A Third-Party Beneficiary To The Contract Between DSCC And Capital City

In very limited circumstances, this Court has permitted a

third-party beneficiary of a contract to bring suit upon the contract. See Montana v. United States, 124 F.3d 1269, 1273 (Fed. Cir. 1997). Here, Flexfab claims that it is a third-party beneficiary to the Government's contracts with Capital City. As we demonstrate below, Flexfab is not a third-party beneficiary of these contracts.

To qualify as a third-party beneficiary, Flexfab must show that the contracts reflect the parties' express or implied intent to benefit Flexfab. Id.; Schuerman v. United States, 30 Fed. Cl. 420, 433 (1994). Norwest Bank Arizona, N.A. v. United States, 37 Fed. Cl. 605 (1997). This is particularly difficult for Flexfab to show because Flexfab is not only subcontractor, but a third-tier subcontractor. Ordinarily, a subcontractor is not a third-party beneficiary because it is merely an incidental beneficiary of a contract. Carlow v. United States, 40 Fed. Cl. 773, 780 (1998) (citing Restatement (Second) of Contracts § 302); Christos v. United States, 48 Fed. Cl. 469, 477 (2000). Thus, Flexfab must establish some extraordinary circumstance which renders it a third-party beneficiary. There are no extraordinary circumstances here.

A. The Parties Did Not Expressly Intend To Benefit Flexfab

The United States Court of Appeals for the Federal Circuit has found subcontractors to be third-party beneficiaries only in limited circumstances, none of which exist in this case. For example, the Federal Circuit has found a third-party beneficiary

relationship where the contract between the Government and the prime contractor has expressly provided for joint payment to the prime and the subcontractor. See, e.g., D&H Distributing Co. v. United States, 102 F.3d 542, 545 (Fed. Cir. 1996); Wallace O'Connor Int'l, Ltd. v. United States, 23 Cl. Ct. 754 (1991). Neither the contract nor the modification here provides for joint payment. A6, A45.[1] In its initial request that payment be remitted to Old Kent Bank, Capital City stated:

> Capital City Pipes, Inc. request the remittance address to be:
>
> Capital City Pipes, Inc.
> C/O ABA #07200052
> Old Kent Bank, Corp Trust
> P.O. Box 144
> Grand Rapids, MI 49501-0144

A17. Nothing in this request states or implies that the change in address was intended to be benefit Flexfab. Although the letter requests that Flexfab be approved as manufacturer (A17), this request has no grammatical or logical relationship to the request for remittance address. Even if Capital City intended to benefit Flexfab, it is necessary that both parties intend to benefit the alleged third-party. The pre-award contract office, Anita Luich, did not interpret this request as relating in any way to an escrow account. A89.

Similarly, the language in the request for a modification

---

[1] Citations to "A___" refer to pages of the appendix, filed simultaneously with this motion.

does not reference Flexfab. A44. Capital City's request for a modification, dated July 1, 1999, requested two adjustments to the contract. Id. First, Capital City requested that DSCC modify the contract to change the remittance address to:

> Capital City Pipes, Inc.
> C/O ABA# 07200052
> Old Kent Bank Corp Trust
> P.O. Box 144
> Grand Rapids, MI 49501-0144

Id. Second, Capital City requested that the place of performance, place of shipping, and inspection be:

> FlexFab, Division
> 8143 Gun Lake Road
> Hastings, MI

Id. Capital City separated its requests. Therefore, there is no reason to believe that it intended to benefit Flexfab directly when it requested these amendments. Notably, the post-award contracting officer who issued the solicitation stated in her deposition that the place of shipping and inspection is not necessarily the place of manufacturing. A82. Therefore, there can exist no implied relationship between the request for remittance address change and request for shipping/inspection change.

Most importantly, the modification states:

> [t]he remittance address where cited throughout the contract is hereby corrected to read as follows:
> Old Kent Bank, Corp Trust
> CO# ABA# 07200052
> P.O. Box 144
> Grand Rapids, MI 49501-0144

A45. The modification does not state or imply that DSCC intended to benefit Flexfab. Id. Indeed, the post-award contracting officer, Melinda Jeffries, stated that she had no knowledge of the reason for the modification. A78A.

This Court has also found a subcontractor to be a third-party beneficiary where a prime had assigned its claims to a subcontractor and the contract's payment provision was modified in accordance with the assignment. Norwest, 37 Fed. Cl. at 605. There has been no assignment to Flexfab. As demonstrated above, although Capital City requested remittance of payment to different addresses, it never suggested that it was assigning or transferring its right to payment to Flexfab. A46, A76. Additionally, the Government never agreed to make payment to Flexfab either jointly or independently.

B. The Parties Did Not Implicitly Intend To Benefit Flexfab

Third-party beneficiary status is an "exceptional privilege" in that it permits a suit against the Government pursuant to the Tucker Act despite the absence of privity of contract. Glass v. United States, 258 F.3d 1349, 1354 (Fed. Cir. 2001) As an exception to sovereign immunity, it must be narrowly construed. See, e.g., National Leased Housing Assoc. v. United States, 32 Fed. Cl. 454, 460 (1994). In assessing the intentions of the parties, the "court should examine whether the contract in

question was intended specifically to benefit the party claiming third-party beneficiary status." Schuerman, 30 Fed. Cl. at 430, 433 (1984). The lack of identity of the beneficiary at the time the agreement is executed may have a bearing on whether the person was intended by the parties to be a third-party beneficiary. State of Mont. v. U.S., 33 Fed. Cl. 82, 87 (1995) (citing Restatement (Second) of Contracts § 308 cmt. A (1979)).

Thus, to qualify as a third-party beneficiary, Flexfab must show that the contracts not only reflect the parties' express or implied intent to benefit Flexfab, but also that the contracts reflect an intent to benefit Flexfab directly and specifically. Glass, 258 F.3d at 1354 (quoting German Alliance Ins. Co. v. Home Water Supply Co., 226 U.S. 220, 230 (1912)). As we demonstrated above, Flexfab cannot establish that either party to the contract intended explicitly to benefit Flexfab.

Similarly, Flexfab cannot establish that either party implicitly intended to benefit Flexfab. Flexfab relies upon communications with the DSCC SBA Representative, Michael Taylor. Cook Aff. ¶¶ 18, 20. However, Mr. Taylor never communicated with Flexfab directly. A92. Whatever Mr. Taylor may have communicated to C&S, a second-tier subcontractor, regarding this contract, occurred at least 10 months after the modification was issued. A83-85, A95, A65. The only communications that Mr. Taylor had with Capital City did not concern Flexfab at all, but, rather, these communications concerned another subcontractor to

another contract. A94. To the extent that Flexfab may have communicated to Capital City regarding payment, any such communications are of no consequence. It is axiomatic that the prime contractor neither speaks upon the Government's behalf nor can bind the Government.

Even if Mr. Taylor had discussed with Flexfab and Capital City the possibility of an escrow account, the SBA representative does not have authority to bind the Government. Therefore, Mr. Taylor's statement that the alleged escrow account in this case benefitted Flexfab is of no import. A96. Instead, the SBA representative is tasked solely with promoting the participation of small businesses in Government contracts. See 15 U.S.C. § 644. Only the contracting officer can bind the Government. See, e.g., Trauma Service Group v. United States, 104 F.3d 1321, 1325 (Fed. Cir. 1997) (specific authority required to bind the Government). Neither the pre-award contracting officer, Anita Luich, nor the post-award contracting officer, Melinda Jeffries, reassured Flexfab that the contract was intended to benefit Flexfab directly. A89, A78A. Indeed, neither contracting officer communicated with Flexfab, C&S, or Capital City regarding an escrow account to benefit Flexfab.[2]

It is a well recognized rule that "anyone entering into an

[2] The only evidence that exists that a contracting officer to this contract discussed escrow accounts concerns separate contract and an escrow account between Capital City and C&S. This communication does not involve Flexfab A5.

arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority." Federal Crop Ins. Corp. v. Merrill, 332 U.S. 380, 384 (1947); accord McAfee v. United States, 46 Fed. Cl. 428, 435 (2000)(plaintiffs alleging they were a third-party beneficiary bore the burden of establishing the Government agent, an Assistant United States Attorney, possessed authority to bind the Government). It is equally well-settled that when an agent exceeds his authority, the Government is not bound by acts of its agents beyond the bounds of that agent's actual authority. Humlen v. United States, 49 Fed. Cl. 497, 503 (2001) (citing Essen Mall Properties v. United States, 21 Cl. Ct. 430, 445 (1990)); see also Hawkins and Powers Aviation, Inc., v. United States, 46 Fed. Cl. 238 (2000) (Government not bound by acts of Assistant Director); Melrose Associates, LP v. United States, 43 Fed. Cl. 124 (1999) (Government not bound by representations of Secretary of United States of Housing and Urban Development).

To the extent that Flexfab relied upon Mr. Taylor's representations to another company regarding another contract, it did so at its peril. As no one with authority to bind the Government intended to make Flexfab a third-party beneficiary, Flexfab is not a third-party beneficiary. US Ecology, Inc. v. United States, 245 F.3d 1352, 1356 (Fed. Cir. 2001).

In addition, nowhere does Flexfab allege that Capital City

manifested an intent to make Flexfab a third-party beneficiary. Thus, Flexfab fails to establish that either of the parties to the contracts intended Flexfab to benefit from them. Only the relationship between Flexfab and C&S is manifest from the deposition and documentary discovery. However, C&S was not a party to this contract, and had no authority to speak on behalf of Capital City.

Even if the Government had been aware that Capital City and Flexfab had entered into an escrow agreement, such knowledge is insufficient to establish privity. Fairchild Indus., Inc. v. United States, 223 Ct. Cl. 315, 317-21, 620 F.2d 807, 808-9 (1980); Centron Corporation v. United States, 218 Ct. Cl. 1, 8-9, 585 F.2d 982, 986 (1978). Likewise, accommodating Capital City's request and paying Old Kent would not create an obligation to Flexfab. Fairchild, 223 Ct. Cl. at 321-2. Centron, 218 Ct. Cl. at 9-10. Flexfab is not a third-party beneficiary, and the Court, therefore, cannot entertain its claims.

III. The Government Is Entitled To Summary Judgment Because By Properly Making Payment In Strict Accordance With The Plain Language Of The Contracts , The United States Discharged Any And All Liability To Either Capital City Or Flexfab

It is undisputed that, pursuant to the contract, Capital City was to provide duct hose and the Government was to pay for such hose. It is further undisputed that Capital City provided the duct hose and the Government paid for such assemblies. As the Government's responsibilities have been discharged, Capital

City would have no cause of action against the Government. It is basic, hornbook law that:

> a third party beneficiary's rights are subject to any contract defense that the promisor could assert against the promisee if the promisee were suing on the contract.

Lord, Richard A., Williston on Contracts § 37:55 (4th ed. 2000); see also 9 Corbins' on Contracts § 823 (Interim ed. 2002). Although we could not find binding precedent directly on point, these hornbooks cite various Federal and state cases. See, e.g., Baii Banking Corporation, v. Upg, Inc., 985 F.2d 685 (2nd Cir. 1983) (as a third-party beneficiary, BAII possessed no greater right to enforce a contract than the actual parties to the contract) (citing Wasserman v. Weisner, 36 Misc.2d 916, 917, 234 N.Y.S.2d 128, 130 (Sup. Ct. New York County 1962); Dunning v. Leavitt, 85 N.Y. 30, 35 (1881); Meyerson v. New Idea Hosiery Co., 217 Ala. 153, 115 So. 94 (1927)); Rogue Valley Stations, Inc., v. Birk Oil Company, Inc., 568 F. Supp. 337 (D. Or. 1983) (in a third-party beneficiary contract, promisor can generally assert against beneficiary any defense which promisor could assert against promisee) (citing United States v. Industrial Crane & Manufacturing Co., 492 F.2d 772, 774 (5th Cir.1974); Wolf v. National Shopmen Pension Fund, 512 F. Supp. 1182, 1183 (E.D. Pa.1981); Visor Builders, Inc. v. Devon E. Tranter, Inc., 470 F. Supp. 911, 923 (M.D.Pa.1978); and National Benefit Fund v. Presbyterian Hospital, 448 F.Supp. 136, 138 (S.D.N.Y.1978)). As

we demonstrate below, the Government is entitled to summary judgment because its payment through an electronic funds transfer does not breach its contract with Capital City.

In its complaint, Flexfab alleges it is entitled to payments due pursuant to the contract. Compl. ¶ 10. Flexfab's contention, however, ignores that payments due pursuant to the contract were to be made in accordance with FAR 52.232-33, which mandates payment through electronic funds transfers. A34.[3] The Government's electronic funds transfer to the account stated in the CCR satisfied any and all obligations of the Government regarding payment. Accordingly, because there are no material facts in dispute, the Government is entitled to summary judgment because, as a matter of law, the Government has not breached the contract.

The starting place for interpreting a contract is the text of the contract itself. Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000); McAbee Construction, Inc. v. United States, 97 F.3d 1431, 1435 (Fed. Cir. 1996); accord Hol-Gar Manufacturing Corp. v. United States, 169 Ct. Cl. 384, 395, 351 F.2d 972, 979 (1965) ("interpretation which gives a reasonable meaning to all parts of an instrument will be preferred to one

[3] Although the contract appears in our appendix in its entirety, the pre-award contracting officer stated during her deposition, that these final pages were added after award. A88. However, the numbering of these final pages contradicts her assertion.

which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless or superfluous"). In this case, the contract incorporated the master agreement, which clearly incorporated by reference FAR Clause 52.232-33. A21-2. FAR 52.232-33 is therefore an express term of the contract. Firth Constr. Co., Inc. v. United States, 36 Fed. Cl. 268, 275 (1996).

In pertinent part, FAR 52.232-33 provides that:

> all payments by the Government under this contract shall be made by electronic funds transfer (EFT). . . The Government shall make payment to the contractor using the electronic funds transfer information contained in the Central Contractor Registration (CCR) database.

FAR 52.232-33(a) and (b) (emphasis added).

Pursuant to 52.232-33(b), Capital City was responsible for providing updated information. According to the electronic payment transaction records, Flexfab was not identified in the CCR. A53-64. In accordance with FAR 52.232-33, the Government made an electronic funds transfer to the payee identified in the CCR, i.e., Capital City. Id. Indeed, because payment was made to the payee identified in the CCR, "the Government is deemed to have made payment and the Contractor is responsible for recovery of any erroneously directed funds." FAR 52.232-33(e)(2)(i). Although Flexfab may contend that the contract identified Capital City's account at Old Kent Bank as the appropriate payment location, the contract also expressly required the Government to pay to the address that Capital City identified in the CCR and,

pursuant to FAR 52.232-33, obligated Capital City to resolve any discrepancies. The contract, therefore, was not breached by the Government, and, even if Flexfab had sufficient privity of contract to maintain this action, the United States would be entitled to judgment as a matter of law. A96 (stating that DFAS looks to the contents of the CCR to determine the correct payee). Flexfab's complaint should be directed to Capital City, not the Government.

## IV. Nothing In The Course Of Dealing Between Flexfab And DSCC Indicates DSCC Intended To Benefit Flexfab

Flexfab alleges that prior dealings between Flexfab and the Government permit the Court to draw inferences regarding the relationship between the parties. Compl. ¶ 80. However, the prior relationship alleged involved Flexfab as subcontractor and C&S as prime contractor. Compl. ¶¶ 81-83. This contract is fundamentally different from the course of dealing alleged by Flexfab in its complaint. First, Capital City is the prime contractor here, not C&S. Second, in the unpublished decision cited in Flexfab's complaint, Flexfab, Inc. v. United States, (Fed. Cl. No. 94-947), the Court found that the contracting officer had received information regarding the specific payment arrangements between Flexfab and the prime contractor, Gladen Industries, Inc. Compl. App. 10. Here, there is no evidence that either contracting officer was aware of any financial arrangement between Capital City and Flexfab. Both contracting

officers as well as their supervising contracting officer stated that they had no familiarity with escrow accounts established on behalf of subcontractors. A73, A89-90, A80. Even if, pursuant to other contracts, payments were made to Old Kent Bank and reached Flexfab, there is no indication from these contracts that the remittance addresses were intended to benefit Flexfab. Indeed, it is possible that Capital City correctly identified Old Kent Bank in its CCR entry, as it should have done here.

## CONCLUSION

For these reasons, defendant respectfully requests that the Court grant its motion for summary judgment and dismiss the complaint with prejudice.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/ Harold D. Lester, Jr.

HAROLD D. LESTER, JR.
Assistant Director

s/ Claudia Burke

CLAUDIA BURKE
Attorney
Commercial Litigation Branch
Civil Division
U.S. Department of Justice
1100 L Street
Attn: Classification Unit
8th Floor
Washington, D.C. 20530
Tele: (202)353-7978

March 23, 2004

Attorneys for Defendant

CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 23d day of March, 2004, a copy of the foregoing Defendant's Cross Motion for Summary Judgment. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/ Claudia Burke

No. 02-1096C
(Judge Block)

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

FLEXFAB, LLC,

Plaintiff,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

HAROLD D. LESTER, JR.
Assistant Director

CLAUDIA BURKE
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street, N.W.,
Washington D.C. 20530
Tele: (202) 307-1011
Fax: (202) 307-0972

March 23, 2004

Attorneys for Defendant

TABLE OF CONTENTS

PAGE(S)

DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT . . . . . . . . . . 1

DEFENDANT'S BRIEF . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . 2

II. Statement Of Facts . . . . . . . . . . . . . . . . . . 2

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . 3

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

I. Standard Of Review . . . . . . . . . . . . . . . . . . 3

II. This Court Does Not Possess Jurisdiction To Entertain This Complaint Because Flexfab Lacks Privity With The Government . . . . . . . . . . . . . . . . . . . . . . 5

III. Flexfab Is Not A Third-Party Beneficiary To The Contract Between DSCC And Capital City . . . . . . . 6

A. The Parties Did Not Expressly Intend To Benefit Flexfab . . . . . . . . . . . . . . . . . . . . . 7

B. The Parties Did Not Implicitly Intend To Benefit Flexfab . . . . . . . . . . . . . . . . . . . . 10

III. The Government Is Entitled To Summary Judgment Because By Properly Making Payment In Strict Accordance With The Plain Language Of The Contracts The United States Discharged Any And All Liability To Either Capital City Or Flexfab . . . . . . . . . . . . . . . . . . . . . 14

IV. Nothing In The Course Of Dealing Between Flexfab And DSCC Indicates DSCC Intended To Benefit Flexfab . 18

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . 19

# TABLE OF AUTHORITIES

FEDERAL CASES Page(s)

Anderson v. Liberty Lobby, Inc.,
477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . 4,5

Baii Banking Corporation, v. Upg, Inc.,
985 F.2d 685 (2nd Cir. 1983) . . . . . . . . . . . . . . . . 15

Carlow v. United States,
40 Fed. Cl. 773 (1998) . . . . . . . . . . . . . . . . . . . 7

Centron Corporation v. United States,
218 Ct. C 585 F.2d 982 (1978) . . . . . . . . . . . . . . . . 14

Christos v. United States,
48 Fed. Cl. 469 (2000) . . . . . . . . . . . . . . . . . . . 7

D&H Distributing Co. v. United States,
102 F.3d 542 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . 8

Erickson Air Crane Co. v. United States,
731 F.2d 810 (Fed. Cir. 1984) . . . . . . . . . . . . . . . . 6

Fairchild Industrial, Inc. v. United States,
223 Ct. C 620 F.2d 807 (1980) . . . . . . . . . . . . . . . . 14

Federal Crop Insurance Corp. v. Merrill,
332 U.S. 380 (1947) . . . . . . . . . . . . . . . . . . . . . 13

Firth Construction Co., Inc. v. United States,
36 Fed. Cl. 268 (1996) . . . . . . . . . . . . . . . . . . . 17

Flexfab, Inc. v. United States,
(Fed. Cl. No. 94-947 ) . . . . . . . . . . . . . . . . . . . 18

Giove v. Department of Transportation,
230 F.3d 1333 (Fed. Cir. 2000) . . . . . . . . . . . . . . . 5

Glass v. United States,
258 F.3d 1349 (Fed. Cir. 2001) . . . . . . . . . . . . . 10,11

Government Systems Advisors v. United States,
847 F.2d 811 (Fed. Cir. 1988) . . . . . . . . . . . . . . . . 5

Hawkins and Powers Aviation, Inc., v. United States,
46 Fed. Cl. 238 (2000) . . . . . . . . . . . . . . . . . . . 13

Hol-Gar Manufacturing Corp. v. United States,
169 Ct. C 351 F.2d 972 (1965) . . . . . . . . . . . . . . . . 16

Humlen v. United States,
49 Fed. Cl. 497 (2001) . . . . . . . . . . . . . . . . . . . 13

Jowett, Inc. v. United States,
234 F.3d 1365 (Fed. Cir. 2000) . . . . . . . . . . . . . . . 16

McAbee Construction, Inc. v. United States,
97 F.3d 1431 (Fed. Cir. 1996) . . . . . . . . . . . . . . . . 16

McAfee v. United States,
46 Fed. Cl. 428 (2000) . . . . . . . . . . . . . . . . . . . 13

Melrose Associates, LP v. United States,
43 Fed. Cl. 124 (1999) . . . . . . . . . . . . . . . . . . . 13

Merritt v. United States,
267 U.S. 338 (1925) . . . . . . . . . . . . . . . . . . . . . 6

Mingus Constructors, Inc. v. United States,
812 F.2d 1387 (Fed. Cir. 1987) . . . . . . . . . . . . . . . 4

Montana v. United States,
124 F.3d 1269 (Fed. Cir. 1997) . . . . . . . . . . . . . . . 7

National Leased Housing Associate v. United States,
32 Fed. Cl. 454 (1994) . . . . . . . . . . . . . . . . . 6, 10

Norwest Bank Arizona, N.A. v. United States,
37 Fed. Cl. 605 (1997) . . . . . . . . . . . . . . . . . 7, 10

Ralph Larson & Son, Inc. v. United States,
17 Cl. Ct. 39, 42 (1989) . . . . . . . . . . . . . . . . . . 4

Rogue Valley Stations, Inc., v. Birk Oil Company, Inc.,
568 F. Supp. 337 (D. Or. 1983) . . . . . . . . . . . . . . . 15

Schuerman v. United States,
30 Fed. Cl. 420 (1994) . . . . . . . . . . . . . . . . . 7, 11

State of Mont. v. U.S.,
33 Fed. Cl. 82 (1995) . . . . . . . . . . . . . . . . . . . . . . 11

Trauma Service Group v. United States,
104 F.3d 1321 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . 12

US Ecology, Inc. v. United States,
245 F.3d 1352 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . 13

United States v. Johnson Controls, Inc.,
713 F.2d 1541 (Fed. Cir. 1983) . . . . . . . . . . . . . . . . . 6

United States v. Mitchell,
445 U.S. 535 (1980) . . . . . . . . . . . . . . . . . . . . . . . 6

United States v. Testan,
424 U.S. 392 (1976) . . . . . . . . . . . . . . . . . . . . . . . 5

Wrona v. United States,
40 Fed. Cl. 784 (1998) . . . . . . . . . . . . . . . . . . . . . 5

FEDERAL STATUTES

15 U.S.C. § 644 . . . . . . . . . . . . . . . . . . . . . . . . . 12

41 U.S.C. § 601 et seq . . . . . . . . . . . . . . . . . . . . . 2

28 U.S.C. § 1491 . . . . . . . . . . . . . . . . . . . . . . . . 6

# INDEX TO APPENDIX

Document | Page


DSCC SBA Letter to National SBA....................................1
(March 19, 1999)

SBA letter to Michael Taylor.......................................2
(Nov. 17, 1998)

Letter from Thelma Williams to Anita Luich.........................4
(June 23, 1999)

E-mails from Michael Taylor to Anita Luich.........................5
(April, 1999)

Contract SP0740-99-C-1004..........................................6

Letter from Thelma Williams to Anita Luich........................44
(July 1, 1999)

Modification P00010...............................................45
(September 27, 1999)

Material Inspection and Receiving Reports.........................46

EFT Transfer Payment Subvouchers..................................53

Email from Henry Cook to Howard Griffin...........................65
(Aug. 11, 2000)

Letter from Howard Griffin to SBA.................................66
(Aug. 20, 2000)

Letter from Shirley Spratt to Mark Hills..........................67
(October 2, 2000)

Letter from Flexfab to Shirley Spratt.............................68
(May 30, 2001)

Letter from Shirley Spratt to Mark Hills..........................70
(June 27, 2002)

Deposition Testimony of Shirley Spratt............................73
(August 28, 2003)

Deposition Testimony of Melinda Jeffries..........................77
(December 9, 2003)

Deposition Testimony of Howard Griffin........................82
(Aug. 28, 2003)

Deposition Testimony of Anita Luich............................85
(December 10, 2003)

Deposition Testimony of Michael Taylor.........................89
(December 10, 2003)

Bankruptcy Docket Report.......................................96

**DEFENSE LOGISTICS AGENCY**
DEFENSE SUPPLY CENTER, COLUMBUS
POST OFFICE BOX 3990
COLUMBUS, OH 43216-5000

IN REPLY REFER TO DSCC-DU (M. Taylor/614-692-3777)

March 19, 1999

Gentlemen:

The Defense Supply Center Columbus, offers the following requirements to the Small Business Administration's Section 8(a) Contracting Program:

Requirement: HOSE ASSY
NSN: 4720-01-066-6447
PR Number: YPC99022000873

Estimated Value: $94,172.50

8(a) Firm: CAPITAL CITY PIPES, INC
1872 MILLS ST., P.O. BOX 12481
TALLAHASSE, FL 32317-2481

SIC Code : 3566 & 5085 Size Standard: 500

SBA OFFICE: U.S. SMALL BUSINESS ADMINISTRATION
7825 BAYMEADOWS WAY, SUITE 100B
JACKSONVILLE, FL 32256-7504

For requirements under the simplified acquisition threshold, submit the solicitation and purchase order directly to the 8(a) contractor with a copy going to the appropriate SBA district office. No offering or acceptance letter is required for requirements processed under the simplified acquisition threshold. For requirements above the simplified acquisition threshold an offer and acceptance letter is required. The cognizant DoD contracting officer may award a contract or purchase order directly to the section 8(a) program participant; an SBA contracting officer signature is not required. Contract execution shall be on the appropriate form as specified in the FAR or DFARS. The "Issued by" block shall identify the awarding DoD office. The cognizant SBA district office for the 8(a) program participant shall be identified in the award document. The section 8(a) participant's name and address shall be listed as the contractor.

HOWARD A. GRIFFIN, SR
Associate Director of
Small Business



Federal Recycling Program Printed on Recycled Paper

DF 175

**U. S. SMALL BUSINESS ADMINISTRATION**
**7825 BAYMEADOWS WAY SUITE 100B**
**JACKSONVILLE, FL 32256-7504**

November 17, 1998

Mike Taylor
Defense Logistics Agency
Defense Supply Center, Columbus
P.O. Box 3990
Columbus, OH 43216-5000

Reference: SBA Procurement #:0491-99-900429, NSN 4720-01-066-6447 Hose Assembly ACCEPTED UNDER THE NEW MOU BETWEEN SBA & DOD WHICH DELEGATES SBA's CONTRACT SIGNATURE AUTHORITY TO YOUR PROCURING ACTIVITY.

Dear Mr. Taylor:

Pursuant to Section 8(a) of the Small Business Act (15 USC 637 (a)) and in accordance with FAR 19.8, the U.S. Small Business Administration (SBA) accepts your offering of the above referenced project and certifies its competency and responsibility to perform based on its determination that the 8(a) concern with which it intends to subcontract, is responsible to perform.

Our preliminary analysis indicates that Capital City Pipes, Inc has the requisite capabilities to satisfactorily perform the referenced work. A determination has been made that acceptance of this procurement will cause no adverse impact on another small business concern. Therefore, the U.S. Small Business Administration shall subcontract performance of the contract to the above named firm. The estimated value of this procurement is $263,297.00.

Please be advised that SBA's acceptance of referenced procurement for the above firm is only valid for a period of <u>120 days</u>. Beyond that it may be necessary for this office to reevaluate the firm's capacity and capability to perform the project cited.

Further, if the Statement of Work (SOW) is changed, SBA will have to redetermine the appropriateness of the SIC Code, and the acceptability of this offer for the named 8(a) Participant.

**<u>We request that you furnish the complete solicitation package to the above 8(a) firm and at the same time forward one (1) copy of the solicitation and an official detailed Government estimate to the U.S. Small Business Administration, 7825 Baymeadows Way, Suite 100B, Jacksonville, FL 32256-7504, Attn: Mr. Celso J. Herrera, Contracting Officer.</u>**

DF 176

Page 2
0491-99-900429
Mr. Taylor

You are hereby authorized to conduct negotiations directly with Capital City Pipes, Inc. Your point of contact is Lee Gilliam at (850) 574-3717. After contract award, please furnish a copy of the complete executed contract. FAX 850-576-2956

As with all companies doing business with the Government, the 8(a) firm may be faced with new and unfamiliar situations in the course of performing this contract. Since 8(a) is a business development program, with the 8(a) contract as its principal tool, we ask that you give personal attention to the administration of this contract so that timely assistance can be provided if and when necessary.

Thank you for your support of the 8(a) Program. If you have any questions please call me at (904) 443-1905.

Sincerely,

Celso J. Herrera
Assistant District Director
for 8(a) Business Development

**** The procurement on the front page serves as the tracking number for this requirement. Please reference this number when forwarding your solicitation package to SBA.**

Enclosure

**Lee Gilliam**
**Capital City Pipes Inc**
**1872 Mills Street, P.O. Box 12481**
**Tallahassee, FL 32317-2481**
**Phone:850/574-3717 FAX: 850/576-2956**



DF 177

# Capital City Pipes, Inc.

Office 850/574-3717
Fax 850/574-0384

June 23, 1999

Anita L. Luich
DSCC/ADAA
Defense Supply Center/Columbus
P.O. Box 16704
Columbus, Ohio

Ref: SP074099R3025
4720-01-066-6447
QTY (1304)

Dear Madam:

Capital City Pipes, Inc is submitting a proposal to you on the above reference.
Capital City Pipe, Inc is quoting FLEXFAB as the manufacturer.
**Quoting a price of $381.32 each.**
Capital City Pipes, Inc request the remittance address to be:

**Old Kent Bank, Corp Trust**
**CO# ABA# 07200052**
**P.O. Box 144**
**Grand Rapids, MI 49501-0144**

If there are any questions, you may contact me by phone, 850/574-3717; fax, 850/574-0384; or e-mail, capicity@aol.com

Thank you,

Thelma S. Williams
Director of Government Sales

1872 Mills Street Bldg. -F ** P.O. Box 12368 ** Tallahassee, Florida 32317-2368

DF 42

**Luich, Anita L**

**From:** Taylor, Michael A
**Sent:** Wednesday, April 28, 1999 3:53 PM
**To:** Luich, Anita L
**Cc:** Barger, Gregory B
**Subject:** RE: capital city pipes

-----Original Message-----
**From:** Taylor, Michael A
**Sent:** Monday, April 26, 1999 9:02 AM
**To:** Luich, Anita L
**Cc:** Barger, Gregory B
**Subject:** RE: capital city pipes

Anita,

I spoke to another buyer regarding her 8(a) requirement with Capital City. She said that her requirement was less than $100,000, that's why she did not proceed with a preaward survey. After further discussion, it was concluded that it might be a good idea to go forward with the preaward survey. The survey should conclude that Capital City is capable of performing. Once that is complete, it will remain in their file for one year eliminating the need for another preaward survey on the other 8(a) requirements that we have reserved for Capital City. My suggestion is that you request the preaward survey on your file. Get back with me if you have any questions.

Thanks
Mike

-----Original Message-----
**From:** Luich, Anita L
**Sent:** Tuesday, April 20, 1999 2:18 PM
**To:** Taylor, Michael A
**Subject:** capital city pipes

Anita,

I will talk with Greg Barger. Capital City has an escrow agreement from C & S Industrial Supply that backs them financially. Also, SBA has stated that they are capable of performing on this contract and that they are financially capable. A PAS would be a waste of time because the failure of a PAS would require a COC which is done by SBA. SBA has already certified them through the 8(a) program and they confirmed their capabilities when I contacted them. Going through with a PAS would only delay the process, but if you think you need the PAS to process this requirement, in the words of Judge Mills Lane "Let's get it on".

Mike

Mike,

per our meeting last week, you had mentioned you would speak with Katie Hines about waiving the PAS on Capital City Pipes. She is on extended leave, so I spoke with Saundra Felty about it. She in turn spoke with Bill Witzberger and Greg Barger. They are all still in agreement about requiring a PAS based on the total dollar amount of contract $497,000.00 is above the net worth of Capital City. Did you want to speak to Bill and Greg about it. Let me know.

Anita

F000046

SECTION A

[X] J AWARD/CONTRACT [ ] K

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) > RATING DOA1 | PAGE 01 OF PAGES 24

2. CONTRACT (Proc. Inst. Ident.) NO. SP0740-99-C-1004

3. EFFECTIVE DATE 99 JUN 29

4. REQUISITION/PURCHASE REQUEST/PROJECT NO. SEE ATTACHED

5. ISSUED BY CODE SC0700

DEFENSE SUPPLY CENTER COLUMBUS
ATTN: DSCC-
3990 E. BROAD STREET, P.O. BOX 16704
COLUMBUS, OHIO 43216-5010

For Post Award Inquiries - See G01

6. ADMINISTERED BY CODE S1109A

DCMC CLEARWATER
GADSEN BLDG SUITE 200
9549 KROGER BLVD
ST PETERSBURG FL 33702-2455

CD: PAS: YES

7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, state and ZIP code)

CAPITAL CITY PIPES INC
1872 MILLS ST SUITE F
TALLAHASSEE FL 32310-0205

CAGE CODE 0NSZ5 FACILITY CODE SEE SCHEDULE

8. DELIVERY
[X] FOB DESTINATION *See Section F
[ ] FOB ORIGIN [ ] OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT
NET 30

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN > Item BLOCK 12

11. SHIP TO/MARK FOR CODE

SEE SECTION B

12. PAYMENT WILL BE MADE BY: EFT: T CODE S33181

DFAS COLUMBUS CENTER
ATTN: DFAS-CO-LSCAA
P O BOX 182317
COLUMBUS OH 43218-2317

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:

[X] 10 U.S.C. 2304 (c) ( 1 )

[ ] 41 U.S.C. 253 (c) ( )

14. ACCOUNTING AND APPROPRIATION DATA:

[ ] OTHER - See Sec G, Clause G03

[ ] CG: 97 x 4930.5CC0 000-26.0 S33-150

[ ] 97 x 4930.5CC0 000-22.1 S33-150 (Trans)

[ ] FMS 9711 x 8242 L009 4D 8401 GBL S380000 (Trans)

[ ] Award issued pursuant to the Small Business Competitiveness Demonstration Program.

CAUTION: Whenever only a portion of a Clause is set forth herein, or identified only by number and title, such portion shall not be construed as varying the meaning or intent of the entire Clause as it appears or is referred to in the Federal Acquisition Regulation (FAR) or DoD FAR Supplement.
Federal Acquisition Regulation (FAR) Clauses cited throughout this Contract by Clause Title, Number, and Date are incorporated herein by reference with the same force and effect as if set forth in full text.

[ ] SPECIAL REVIEW [ ] FMS REQUIREMENT

15G. TOTAL AMOUNT OF CONTRACT > $ 497241.28

16. TABLE OF CONTENTS


| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 9 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH | |
| | C | DESCRIPTION/SPECS/WORK STATEMENT | | X | J | LIST OF ATTACHMENTS | 10 |
| | D | PACKAGING AND MARKING | | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 9 | | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | |
| X | F | DELIVERIES OR PERFORMANCE | 9 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 9 | | L | INSTRS, CONDS. AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |


CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE

17. [ ] CONTRACTORS NEGOTIATED AGREEMENT (Contractor is required to sign this document and return ______ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. [X] AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number SP0740-99-R-3025, including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

F000001

19A. NAME AND TITLE OF SIGNER (Type or print)

20A. NAME OF CONTRACTING OFFICER
ANITA L. LUICH

19B. NAME OF CONTRACTOR
BY ______
(Signature of person authorized to sign)

19C. DATE SIGNED

20B. UNITED STATES OF AMERICA
BY Anita L. Luich
(Signature of Contracting Officer)

20C. DATE SIGNED
99 JUN 29

**CONTINUATION SHEET** | REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-C-1004 | PAGE 02 OF 124 PAGES

OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|

PR YPC98169000611
NSN 4720-01-066-6447

ITEM DESCRIPTION:

HOSE ASSY, AIR DUCT. 8" SIZE, 15 FT LENGTH, YELLOW COLOR WITH STOWAGE DEVICE, 4 LOCKS. PER MILITARY SPECIFICATION TITLED "DUCT ASSEMBLIES, GROUND, CONDITIONED AIR, INSULATED, FLEXIBLE." THE FOLLOWING EXCEPTIONS TO THE CITED DRAWINGS APPLY: ON DRAWING 64C1004, PART NUMBER 64C1004, ASTM-A-569HR P AND O CQ .156 OR .180 THICK WILL BE USED AND ALLOWING ZINC PLATING PER ASTM-B-633 SC3 TYPE II AS AN OPTION TO THE CADMIUM PLATING AND; ON DWG 64C1005, PART NUMBER 64C1005, ASTM-A-569HR P AND O CQ .125 THICK WILL BE USED AND ALLOWING ZINC PLATING PER ASTM-B-633 AC3 TYPE II AS AN OPTION TO THE CADMIUM PLATING.

"CONTRACTOR/MANUFACTURER IS REQUIRED TO ESTABLISH AND MAINTAIN A CALIBRATION SYSTEM THAT MEETS THE REQUIREMENTS OF ANSI/NCSL Z540-1-1994, AMERICAN NATIONAL STANDARD FOR CALIBRATION - CALIBRATION LABORATORIES AND MEASURING AND TEST EQUIPMENT-GENERAL REQUIREMENTS, OR ISO 10012-1, QUALITY ASSURANCE REQUIREMENTS FOR MEASURING EQUIPMENT- PART 1, METROLOGICAL CONFIRMATION SYSTEM FOR MEASURING EQUIPMENT."

IF AQLS ARE LISTED IN THE SPECIFICATION(S) OR DRAWING(S) THEY MAY BE USED TO ESTABLISH THE AUTHORIZED SAMPLE SIZE, HOWEVER, THE ACCEPTANCE NUMBER FOR THIS CONTRACT IS ZERO; I.E., THIS CONTRACT REQUIRES A SAMPLING PLAN THAT ACCEPTS ON ZERO DEFECTS AND REJECTS ON ONE OR MORE DEFECT(S).

"CLASS I OZONE DEPLETING CHEMICALS ARE NOT TO BE USED NOR INCORPORATED IN ANY ITEMS TO BE DELIVERED UNDER THIS CONTRACT. THIS PROHIBITION SUPERSEDES ALL SPECIFICATION REQUIREMENTS BUT DOES NOT ALLEVIATE ANY PRODUCT REQUIREMENTS. SUBSTITUTE CHEMICALS MUST BE SUBMITTED FOR APPROVAL UNLESS THEY ARE AUTHORIZED BY THE

CONTINUED ON NEXT PAGE

F000002

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-C-1004 | PAGE 03 | OF 124 PAGES |
|---|---|---|---|

OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | SPECIFICATION REQUIREMENTS." | | | | |
| | I/A/W DRAWING NR 98750 62A1008<br>REFNO DTD 64 MAR 12<br>AMEND NR B DTD 70 JUN 05<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1004<br>REFNO DTD 64 MAR 11<br>AMEND NR C DTD 72 OCT 04<br>TYPE NUMBER: 62B1004<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1005<br>REFNO DTD 64 MAR 10<br>AMEND NR F DTD 86 APR 10<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1006<br>REFNO DTD 64 MAR 11<br>AMEND NR B DTD 70 JUN 05<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1007<br>REFNO DTD 64 MAR 11<br>AMEND NR C DTD 86 APR 10<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 64C1004<br>REFNO DTD 64 MAR 12<br>AMEND NR M DTD 83 JUN 20<br>TYPE NUMBER: 64C1004<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 64C1005<br>REFNO DTD 64 MAR 11<br>AMEND NR L DTD 83 JUN 20<br>TYPE NUMBER: 64C1005<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | CONTINUED ON NEXT PAGE | | | | |

F000003



NSN 7540-01-152-8-67 36-109 STANDARD FORM 36 (REV. 10-83)

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-C-1004 | PAGE 04 | OF ~~11~~ 24 PAGES |
|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | I/A/W DRAWING NR 98750 64C1006<br>REFNO DTD 64 MAR 11<br>AMEND NR F DTD 83 JUN 20<br>TYPE NUMBER: 64C1006<br>"DETAILED DRAWING (ONE ITEM)"<br><br>I/A/W SPEC NR MIL-D-38386D<br>BASIC DTD 89 AUG 28<br>AMEND NR DTD<br>TYPE NUMBER: M38386-C-015 | | | | |
| 0001 | PR YPC98169000611 PRLI 0001 | 416 | EA | $ 381.32 | $ 158629.12 |

PREP FOR DELIVERY

PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991
QUP = 001: PRES MTHD = 10: CLNG/DRY = 1: PRESV MAT = 00:
WRAP MAT = 00: CUSH/DUNN MAT = 00: CUSH/DUNN THKNESS = 0:
UNIT CONT = E1: LEVEL PRESV = A: OPI = O:
PACK CODE = U: PACKING LEVEL = C:
MARKING SHALL BE IN ACCORDANCE WITH MIL-STD-129M SPECIAL
MARKING CODE: 99 - NO CODES IN THIS TABLE ONLY MIL-STD-129.
PALLETIZATION SHALL BE IN ACCORDANCE WITH DC1636P001 REV A
DATED 96150

DOD LOGMARS BAR CODE MARKING REQUIRED IAW MIL-STD-129M,
DATED 15 JUN 93 AND MIL-STD-1189B, DATED 10 AUG 89.

PARCEL POST ADDRESS:

SW3100
MECHANICSBURG FACILITY
DEF DIST DEPOT SUSQUEHANNA PA
GENERAL SUPPLIES
MECHANICSBURG PA 17055-0789

FREIGHT SHIPPING ADDRESS:

CONTINUED ON NEXT PAGE

F000004



NSN 7540-01-152-8-67 36-109 STANDARD FORM 36 (REV. 10-83)
Previous edition usable * GPO : 1983 O - 381-526 (9050) Prescribed by GSA

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-C-1004 | PAGE OF 05 | 1124 PAGES |
|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | PR YPC98169000611 PRLI 0001 CONT'D | | | | |
| | SW3100<br>MECHANICSBURG FACILITY TRNS OFFICER<br>DEF DIST DEPOT SUSQUEHANNA PA<br>5450 CARLISLE PIKE<br>MECHANICSBURG PA 17055-0789 | | | | |
| | NON-MILSTRIP RDD 01/28/99 PROJ | | | | |
| | * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |
| 0002 | PR YPC98169000611 PRLI 0002 | 198 | EA | $ 381.32 | $ 75501.36 |
| | PREP FOR DELIVERY | | | | |
| | PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991<br>MIL-STD-2073 PACKAGING DATA SAME AS PRIOR LINE | | | | |
| | PARCEL POST/FREIGHT ADDRESS: | | | | |
| | SW3200<br>DEF DIST DEPOT SAN JOAQUIN<br>TRACY CA 95376-5000 | | | | |
| | NON-MILSTRIP RDD 12/17/98 PROJ | | | | |
| | * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |
| | CONTINUED ON NEXT PAGE | | | | |

F000005



NSN 7540-01-152-8-67 36-109 STANDARD FORM 36 (REV. 10-83)

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-C-1004 | PAGE OF 06 | 124 PAGES |
|---|---|---|---|

OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0003 | PR YPC98201001312 PRLI 0001 | 178 | EA | $ 381.32 | $ 67874.96 |

PREP FOR DELIVERY

PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991
QUP = 001: PRES MTHD = 10: CLNG/DRY = 1: PRESV MAT = 00:
WRAP MAT = 00: CUSH/DUNN MAT = 00: CUSH/DUNN THKNESS = 0:
UNIT CONT = E1: LEVEL PRESV = A: OPI = O:
PACK CODE = U: PACKING LEVEL = C:
MARKING SHALL BE IN ACCORDANCE WITH MIL-STD-129M SPECIAL
MARKING CODE: 99 - NO CODES IN THIS TABLE ONLY MIL-STD-129.
PALLETIZATION SHALL BE IN ACCORDANCE WITH DC1636P001 REV A
DATED 96150

DOD LOGMARS BAR CODE MARKING REQUIRED IAW MIL-STD-129M,
DATED 15 JUN 93 AND MIL-STD-1189B, DATED 10 AUG 89.

PARCEL POST ADDRESS:

SW3100
MECHANICSBURG FACILITY
DEF DIST DEPOT SUSQUEHANNA PA
GENERAL SUPPLIES
MECHANICSBURG PA 17055-0789

FREIGHT SHIPPING ADDRESS:

SW3100
MECHANICSBURG FACILITY TRNS OFFICER
DEF DIST DEPOT SUSQUEHANNA PA
5450 CARLISLE PIKE
MECHANICSBURG PA 17055-0789

NON-MILSTRIP RDD 05/15/99 PROJ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CONTINUED ON NEXT PAGE

F000006

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-C-1004 | PAGE OF 07 | ~~11~~ 24 PAGES |
|---|---|---|---|

OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0004 | PR YPC98201001312 PRLI 0002 | 343 | EA | $ 381.32 | $ 130792.76 |
| | PREP FOR DELIVERY<br>PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991<br>MIL-STD-2073 PACKAGING DATA SAME AS PRIOR LINE<br>PARCEL POST/FREIGHT ADDRESS:<br>SW3200<br>DEF DIST DEPOT SAN JOAQUIN<br>TRACY CA 95376-5000<br>NON-MILSTRIP RDD 05/15/99 PROJ<br>* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |
| 5 | PR YPC98323000624 PRLI 0001 | 169 | EA | $ 381.32 | $ 64443.08 |
| | PREP FOR DELIVERY<br>PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991<br>QUP = 001: PRES MTHD = 10: CLNG/DRY = 1: PRESV MAT = 00:<br>WRAP MAT = 00: CUSH/DUNN MAT = 00: CUSH/DUNN THKNESS = 0:<br>UNIT CONT = E1: LEVEL PRESV = A: OPI = O:<br>PACK CODE = U: PACKING LEVEL = C:<br>MARKING SHALL BE IN ACCORDANCE WITH MIL-STD-129M SPECIAL<br>MARKING CODE: 99 - NO CODES IN THIS TABLE ONLY MIL-STD-129.<br>PALLETIZATION SHALL BE IN ACCORDANCE WITH DC1636P001 REV A<br>DATED 96150<br>DOD LOGMARS BAR CODE MARKING REQUIRED IAW MIL-STD-129M,<br>DATED 15 JUN 93 AND MIL-STD-1189B, DATED 10 AUG 89.<br>PARCEL POST ADDRESS:<br>CONTINUED ON NEXT PAGE | | | | |

F000007



NSN 7540-01-152-8-67 36-109 STANDARD FORM 36 (REV. 10-83) Prescribed by GSA

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-C-1004 | 08 | 11 PAGES |

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | PR YPC98323000624 PRLI 0001 | | CONT'D | | |

SW3100
MECHANICSBURG FACILITY
DEF DIST DEPOT SUSQUEHANNA PA
GENERAL SUPPLIES
MECHANICSBURG PA 17055-0789

FREIGHT SHIPPING ADDRESS:

SW3100
MECHANICSBURG FACILITY TRNS OFFICER
DEF DIST DEPOT SUSQUEHANNA PA
5450 CARLISLE PIKE
MECHANICSBURG PA 17055-0789

NON-MILSTRIP RDD 08/25/99 PROJ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

The following stamp applies to all lines

USE REVISION D OF MIL-37386 UNTIL REVISION E IS AMENDED.

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

REMIT PAYMENT TO:
CAPITAL CITY PIPES, INC.
PO BOX 12368
TALLAHASSEE FL 32317

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

F000008

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-C-1004 | PAGE OF 09 | 124 PAGES |
|---|---|---|---|

ECTION B
02 - CONFIRMING NOTICE OF AWARD:

( ) Ltr (X) Facsimile Dated 06/28/99 .

ECTION E
01 - INSPECTION AT ORIGIN:

SUPPLIES:

LIN(s)

LL (X) Same as Block 7 on Standard Form 26
( ) Other (Cage Code, Name, Street Address, City, State & Zip Code)

Cage Code:

Cage Code:

PACKAGING

CLIN(s)

ALL (X) Same as Block 7 on Standard Form 26
( ) Same as for Supplies
( ) Other (Cage Code, Name, Street Address, City, State & Zip Code)

Cage Code:

Cage Code:

TREATING FACILITY, if applicable (Name, Street, City, State & Zip Code)

( ) See

E01/E02 - INSPECTION/ACCEPTANCE AT ORIGIN WILL BE PERFORMED BY:

CLIN(s) Supplies:

ALL (X) Office Administering Contract (See SF 26, Block 6)
( ) Other

Packaging:
(X) Office Administering Contract (See SF 26, Block 6)
( ) Same as for Supplies
( ) Other

F0000(

E02 - ACCEPTANCE AT ORIGIN.

E05 - CERTIFICATE OF CONFORMANCE (CoC) (APR 1984) FAR 52.246-15.
a. (X) Not Authorized.
b. ( ) Shipment based on CoC shall not be made unless authorized by CAO.

SECTION F
F03 - F.O.B. DESTINATION.
EXPORT SHIPMENTS - PORT

Delivery Point (Wood Products):

( ) FAS Vessel ( ) FOB Dock ( ) FOB Port

(see clause F70 and F71)

F62 - TIME OF DELIVERY:

See Clause F62 of the basic solicitation.

SECTION G
G01 - CONTRACTING OFFICE REPRESENTATIVE:

-- FOR POST AWARD INFORMATION CONTACT --

DSCC-AEAA Telephone: A/C 614-692-2961

G02 - NOTES TO CONTRACT ADMINISTRATION OFFICE:

a. Delinquency Reports - In accordance with FAR 42.1106(c), the Contract Administration Office may at any time initiate a report to advise the Administrative Contracting Officer and Inventory Control Manager (ICM) of any potential or actual delay in performance.

Address for ICM is as follows:
(X) DLA, Defense Supply Center Columbus
P.O. Box 16704
ATTN: DSCC-ADAA
Columbus, Ohio 43216-5000

( ) See Clause H01, Table 2 of this contract.

g. Part IV of the solicitation has been retained in the contract file in accordance with FAR 14.201-1(c) and FAR 15.406-1(b).

SECTION I
I20 - RATED ORDERS:

(X ) DO A1 ( ) DO B1

( ) DX

Extend the Defense Rating to your Supplier(s)

I82 - TRANSPORTATION OF SUPPLIES BY SEA

I87 - PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY

I99 - DRUG FREE WORKPLACE

I212 - SECTION 8(a) AWARD (DEC 1996) - FAR 52.219-17

(a) By execution of a contract, the Small Business Administration (SBA) agrees to the following:
(1) To furnish the supplies or services set forth in the contract according to the specifications and the terms and conditions by subcontracting with the Offeror who has been determined an eligible concern pursuant to the provisions of section 8(a) of the Small Business Act, as amended (15 U.S.C. 637(a)).
...xcept for novation agreements and advance ...elegates to the Defense Supply Center Columbus ...bility for administering the contract with

complete authority to take any action on behalf of the Government under the terms and conditions of the contract; provided, however that the contracting agency shall give advance notice to the SBA before it issues a final notice terminating the right of the subcontractor to proceed with further performance, either in whole or in part, under the contract.

(3) That payments to be made under the contract will be made directly to the subcontractor by the contracting activity.

(4) To notify the Defense Supply Center Columbus Contracting Officer immediately upon notification by the subcontractor that the owner or owners upon whom 8(a) eligibility was based plan to relinquish ownership or control of the concern.

(5) That the subcontractor awarded a subcontract hereunder shall have the right of appeal from decisions of the cognizant Contracting Officer under the "Disputes" clause of the subcontract.

(b) The offeror/subcontractor agreees and acknowledges that it will, for and on behalf of the SBA, fulfill and perform all of the requirements of the contract.

(c) The offeror/subcontractor agrees that it will not subcontract the performance of any of the requirements of this subcontract to any lower tier subcontractor without the prior written approval of the SBA and the cognizant Contracting Officer of the Defense Supply Center, Columbus.

**I213 - NOTIFICATION OF COMPETITION LIMITED TO ELIGIBLE 8(a) CONCERNS (FAR 52.219-18) (JAN 1997)**

(a) Offers are solicited only from small business concerns expressly certified by the Small Business Administration (SBA) for participation in the SBA's 8(a) Program and which meet the following criteria at the time of sub- -sion of offer --

(1) SIC code 3494 is specifically included in the r's approved business plan;

(2) The Offeror is in conformance with the 8(a) support limitation set forth in its approved business plan; and

(3) The Offeror is in conformance with the Business Activity Targets set forth in its approved business plan or any remedial action directed by the SBA.

(b) By submission of its offer, the Offeror represents that it meets all of the criteria set forth in paragraph (a) of this clause.

(c) Any award resulting from this solicitation will be made to the Small Business Administration, which will subcontract performance to the successful 8(a) offeror selected through the evaluation criteria set forth in this solicitation.

(d)(1) Agreement. A manufacturer or regular dealer submitting an offer in its own name agrees to furnish, in performing the contract, only end items manufactured or produced by small business concerns inside the United States, its territories or possessions, the Commonwealth of Puerto Rico, or the Trust Territory of the Pacific Islands. However, this requirement does not apply in connection with construction or service contracts.

(2) The will notify the Defense Supply Center Columbus Contracting Officer in writing immediately upon entering an agreement (either oral or written) to transfer all or part of its stock or other ownership interest to any other party.

## SECTION J

**J02 - LIST OF ENCLOSURES MADE A PART OF THIS CONTRACT:**

| | | | |
|---|---|---|---|
| AMENDED QUOTE | dtd | 03/04/99 | Encl #1 |
| AMENDED QUOTE | dtd | 06/28/99 | Encl #2 |
| | dtd | | Encl # |
| | dtd | | Encl # |
| | dtd | | Encl # |
| | dtd | | Encl # |
| | dtd | | Encl # |

N04 - Solicitation Amendment Number (s) 0001, 0002, 0003

**ATTACHMENT**
**PALLETIZATION NO. DC1636P001 - 96150**

1. **SCOPE.** This sheet covers the requirements for palletization of DSCC items or supply for handling, shipment, and storage.

2. **REFERENCED DOCUMENTS.** The following documents, of the issue in effect on the date of solicitation, form a part of this palletization sheet to the extent specified herein:

Specifications

FEDERAL

NN-P-71 Pallets, Material Handling, Wood Stringer Construction, 2-way and 4-way (Partial)

Standards

MILITARY

MIL-STD-147 Palletized Unit Load

(Copies of listed federal and military specifications, standards, and associated documents listed in the Department of Defense Index of Specifications and Standards (DODISS), should be obtained from the DOD Single Stock Point, Commanding Officer, Naval Publications and Forms (Center, 5801 Tabor Ave., Philadelphia, PA 19120-5099).

3. **REQUIREMENTS.**

Shipments of indentical items packed in four or more shipping containers exceeding a total of 48 cubic feet per destination shall be palletized except when the shipping containers are required to be skidded (see 3c), or a quantity of four shipping containers pallet exceeds the size of weight limitations for palletized loads (see 3a and 3b, as applicable). Shipments packed Level C shall be palletized in accordance with 3a or 3b. Shipments packed Level A or Level B shall be palletized in accordance with 3b.

a. Material may be palletized on commercial pallets provided the load meets the following requirements:

(1) The load does not exceed 52 inches in length or width, 54 inches in height, and 3,000 pounds.

(2) The load is prepared and secured in a manner that will ensure carrier acceptance and permit safe rehandling at destination.

b. Palletization shall comply with MIL-STD-147 and appendices there to modified as follows:

(1) Loads shall be stable and shall not exceed the size and overseas limitations of MIL-STD-147.

(2) Glued loads shall not be used.

(3) For Level A packing, pallets shall comply with NN-P-71, Type V, class 1, size 2, except softwood may be used and the size may be reduced to a minimum of 36 inches in length and 44 inches in width to properly fit the load.

(4) For Level B packing, pallets shall conform to NN-P-71, Type II, size 2; Type IV; or Type V, class I, size 2. Wood used to construct pallets shall be group II, III, or IV, grade A, as specified in NN-P-71.

(5) Residual quantities of less than the quantity required for one course of the load need not be palletized.

c. Palletization is not required for shipping containers that are constructed with skids. Shipping containers, except drums, exceeding 70 pounds gross weight or 40 inches in length, shall be constructed with skids, skids, shall be a minimum of 3x4 inch (nominal) lumber and shall be securely attached to permit multiple re-handling at destination. Drums shall be palletized.

F000010

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-C-1004 | PAGE 11 | OF ~~11~~ 24 PAGES |
|---|---|---|---|

'repared by: DSCC
Columbus, OH 43216-5000
December 13, 1996

F000011

SP0740-99-C-1004 12 of 24

# Capital City Pipes, Inc.

Office 850/574-3717
Fax 850/574-0384

June 23, 1999

Anita L. Luich
DSCC/ADAA
Defense Supply Center/Columbus
P.O. Box 16704
Columbus, Ohio

Ref: SP074099R3025
4720-01-066-6447
QTY (1304)

Dear Madam:

Capital City Pipes, Inc is submitting a proposal to you on the above reference. Capital City Pipe, Inc is quoting FLEXFAB as the manufacturer.
**Quoting a price of $381.32 each.**

Capital City Pipes, Inc request the remittance address to be:
**Capital City Pipes, Inc**
**C/o ABA#07200052**
**Old Kent Bank, Corp Trust**
**P.O. Box 144**
**Grand Rapids, MI 49501-0144**

If there are any questions, you may contact me by phone, 850/574-3717; fax, 850/574-0384; or e-mail, capicity@aol.com

Thank you,

Thelma S. Williams
Director of Government Sales

F000012

SP0740-99-C-1004 13 of 24

# Capital City Pipes, Inc.

Office 850/574-3717
Fax 850/576-2956

March 4, 1999

To: Anita L. Luich
DSCC, PAADAA1
Columbus, Ohio
614 692 6271-fax

Re: SP074099R3025
4720-01-066-6447

Ms. Luich:

I am resubmitting an offer of $311.50 as my best and final offer pertaining to the above Solicitation # SP074099R3025.

I will call you on tomorrow morning to verify that you have received this fax.

If you have any questions, please call me at 850-574-3717 or e-mail Capicity@aol.com

Thank you again,

Thelma S. Williams
Director of Government Sales

1872 Mills Street Bldg. - F (32310) ** PO Box 12388 ** Tallahassee, Florida 32317-2388

F000013

02/25/1999 16:51 850-57( 356 CAPITAL CITY PI PAGE 05
FILE No. 103 01-14 '00 11:16 ID:DCSC AEROSPACE COLO.OH 1 614 692 271 PAGE 4

SP0740-99-C-1004 14 of 24

**SOLICITATION AND OFFER** [X] J [ ] K

| | | | |
|---|---|---|---|
| 1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) | RATING: See L11 or I20 | PAGE OF PAGES: 01 / 23 | |
| 2. CONTRACT NO | 3. SOLICITATION NO. SP0740-99-R-3025 | 4. TYPE OF SOLICITATION [ ] SEALED BID (IFB) [X] NEGOTIATED (RFP) | 5. DATE ISSUED 22-DEC-98 / 6. REQUISITION/PURCHASE NO. SEE ATTACHED |

7. ISSUED BY CODE SC0700
DEFENSE SUPPLY CENTER COLUMBUS
ATTN: DSCC- ABAA1
P.O. BOX 16704
COLUMBUS, OHIO 43216-5010
For Post Award Inquiries - See G01

8. ADDRESS OFFER TO
DEFENSE SUPPLY CENTER COLUMBUS
ATTN: DSCC-PBAA (Bid Opening Room B130, Bldg 20)
P.O. BOX 16653
COLUMBUS, OHIO 43216-5009
FOR COURIER SERVICE AND FACSIMILE NUMBERS - SEE BLOCK 9

NOTE: In sealed bid solicitations "offer" and "offeror" mean "bid" and "bidder"

[ ] SPECIAL REVIEW [ ] FMS REQUIREMENT

## SOLICITATION

9. Sealed offers in original and NO copies for furnishing the supplies or services in the Schedule will be received at the place specified in item 8, or if handcarried, in the depository located in Bid Opening Room, Bldg 20, Room B130, 3990 East Broad Street, Columbus, OH 43213 until 1:00pm local time 19-JAN-99
(Hour) (Date)

Facsimile Numbers: A/C 614-692-4235, A/C 614-692-2279, or A/C 614-692-5703.
CAUTION - LATE Submissions, Modifications, and Withdrawals: See Section L, Provision No. 52.214-7 or 52.215-10. All offers are subject to all terms and conditions contained in this solicitation.

| 10. FOR INFORMATION CALL: | A. NAME: Anita Lulch DSCC-PAADAA1 | B. TELEPHONE NO. (include area code) (NO COLLECT CALLS): A/C (614) 692-3277 |
|---|---|---|

### 11. TABLE OF CONTENTS

| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE(S) |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 10 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH. | |
| X | C | DESCRIPTION/SPECS/WORK STATEMENT | 7 | X | J | LIST OF ATTACHMENTS | 16 |
| X | D | PACKAGING AND MARKING | 7 | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 8 | X | K | REPRESENTATIONS, CERTIFICATIONS AND OTHER STATEMENTS OF OFFERORS | 17 |
| X | F | DELIVERIES OR PERFORMANCE | 9 | | | | |
| X | G | CONTRACT ADMINISTRATION DATA | 9 | X | L | INSTRS., CONDS., AND NOTICES TO OFFERORS | 21 |
| X | H | SPECIAL CONTRACT REQUIREMENTS | 9 | X | M | EVALUATION FACTORS FOR AWARD | 22 |

## OFFER (Must be fully completed by offeror)

NOTE: Item 12 does not apply if the solicitation includes the provisions at 52.214-16, Minimum Bid Acceptance Period. See Provision K 19

12. In compliance with the above, the undersigned agrees, if this offer is accepted within (See Note Above) calendar days (60 calendar days unless a different period is inserted by the offeror) from the date for receipt of offers specified above, to furnish any or all items upon which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the schedule.

| 13. DISCOUNT FOR PROMPT PAYMENT (See Section I, Clause No. 52.232-8) | 10 CALENDAR DAYS % | 20 CALENDAR DAYS % | 30 CALENDAR DAYS % | CALENDAR DAYS % |
|---|---|---|---|---|

| 14. ACKNOWLEDGEMENT OF AMENDMENTS (The offeror acknowledges receipt of amendments to the SOLICITATION for offerors and related documents numbered and dated) | AMENDMENT NO | DATE | AMENDMENT NO | DATE |
|---|---|---|---|---|
| | | | | |

15A. NAME AND ADDRESS OF OFFEROR — CAGE CODE 0NSZ6 — FACILITY
Capital City Pipes Inc
1872 Mills St Bldg-F
Tallahassee Fl 32310
FACSIMILE NUMBER: 850 574 0384

16. NAME AND TITLE OF PERSON AUTHORIZED TO SIGN OFFER (Type or print)
THELMA S. Williams
Director of Government Sales

15B. TELEPHONE NO. (Include area code) 850 574 3717

15C. CHECK IF REMITTANCE ADDRESS IS DIFFERENT FROM ABOVE. ENTER SUCH ADDRESS IN SCHEDULE [ ]

17. SIGNATURE Thelma S Williams

18. OFFER DATE 2/25/99

IMPORTANT - Award will be made on Standard Form 26, or by other authorized official written notice. SECTION A

NSN 7540-01-152-8064
PREVIOUS EDITION UNUSABLE
OP 301-33.0-2 (R7) (FAR) (FEB 87)
33-132
DPACS SF33M (REV. 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(c)

F000014

SP0740-99-C-1004

15 of 24

**CONTINUATION SHEET**

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025

PAGE 02 OF 24 PAGES

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | PR YPC98323000624<br>NSN 4720-01-066-6447<br>ITEM DESCRIPTION: | | | | |

HOSE ASSY, AIR DUCT. 8" SIZE, 15 FT LENGTH, YELLOW COLOR WITH STOWAGE DEVICE, 4 LOCKS. PER MILITARY SPECIFICATION TITLED "DUCT ASSEMBLIES, GROUND, CONDITIONED AIR, INSULATED, FLEXIBLE."
THE FOLLOWING EXCEPTIONS TO THE CITED DRAWINGS APPLY: ON DRAWING 64C1004, PART NUMBER 64C1004, ASTM-A-569HR P AND O CQ .156 OR .180 THICK WILL BE USED AND ALLOWING ZINC PLATING PER ASTM-B-633 SC3 TYPE II AS AN OPTION TO THE CADMIUM PLATING AND; ON DWG 64C1005, PART NUMBER 64C1005, ASTM-A-569HR P AND O CQ .125 THICK WILL BE USED AND ALLOWING ZINC PLATING PER ASTM-B-633 AC3 TYPE II AS AN OPTION TO THE CADMIUM PLATING.

"CONTRACTOR/MANUFACTURER IS REQUIRED TO ESTABLISH AND MAINTAIN A CALIBRATION SYSTEM THAT MEETS THE REQUIREMENTS OF ANSI/NCSL Z540-1-1994, AMERICAN NATIONAL STANDARD FOR CALIBRATION - CALIBRATION LABORATORIES AND MEASURING AND TEST EQUIPMENT-GENERAL REQUIREMENTS, OR ISO 10012-1, QUALITY ASSURANCE REQUIREMENTS FOR MEASURING EQUIPMENT- PART 1, METROLOGICAL CONFIRMATION SYSTEM FOR MEASURING EQUIPMENT."

IF AQLS ARE LISTED IN THE SPECIFICATION(S) OR DRAWING(S) THEY MAY BE USED TO ESTABLISH THE AUTHORIZED SAMPLE SIZE, HOWEVER, THE ACCEPTANCE NUMBER FOR THIS CONTRACT IS ZERO; I.E., THIS CONTRACT REQUIRES A SAMPLING PLAN THAT ACCEPTS ON ZERO DEFECTS AND REJECTS ON ONE OR MORE DEFECT(S).

"CLASS I OZONE DEPLETING CHEMICALS ARE NOT TO BE USED NOR INCORPORATED IN ANY ITEMS TO BE DELIVERED UNDER THIS CONTRACT. THIS PROHIBITION SUPERSEDES ALL SPECIFICATION REQUIREMENTS BUT DOES NOT ALLEVIATE ANY PRODUCT REQUIREMENTS. SUBSTITUTE CHEMICALS MUST BE SUBMITTED FOR APPROVAL UNLESS THEY ARE AUTHORIZED BY THE SPECIFICATION REQUIREMENTS."

CONTINUED ON NEXT PAGE

SP0740-99-C-1004 16 of 24

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025 | PAGE 03 | OF 24 PAGES |
|---|---|---|---|

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | DLAD 52.246-9004, PRODUCT VERIFICATION TESTING, APPLIES. THIS CLAUSE IS A GOVERNMENT OPTION THAT CAN ONLY BE INVOKED UPON THE COGNIZANT CONTRACT ADMINISTRATION OFFICE NOTIFYING THE CONTRACTOR THAT PVT SAMPLES ARE TO BE SELECTED. | | | | |
| | I/A/W DRAWING NR 98750 62A1003<br>REFNO DTD 64 MAR 12<br>AMEND NR B DTD 70 JUN 05<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1004<br>REFNO DTD 64 MAR 11<br>AMEND NR C DTD 72 OCT 04<br>TYPE NUMBER: 62B1004<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1005<br>REFNO DTD 64 MAR 11<br>AMEND NR B DTD 70 JUN 05<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 62B1007<br>REFNO DTD 64 MAR 11<br>AMEND NR C DTD 86 APR 10<br>TYPE NUMBER:<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 64C1004<br>REFNO DTD 64 MAR 12<br>AMEND NR M DTD 83 JUN 20<br>TYPE NUMBER: 64C1004<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 64C1005<br>REFNO DTD 64 MAR 11<br>AMEND NR L DTD 83 JUN 20<br>TYPE NUMBER: 64C1005<br>"DETAILED DRAWING (ONE ITEM)" | | | | |
| | I/A/W DRAWING NR 98750 64C1006<br>REFNO DTD 64 MAR 11<br>AMEND NR F DTD 83 JUN 20 | | | | |

CONTINUED ON NEXT PAGE

F000016

SP0740-99-C-1004 17 of 24

**CONTINUATION SHEET**

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025 | PAGE 04 OF 23 PAGES

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | TYPE NUMBER: 64C1006<br>"DETAILED DRAWING (ONE ITEM)"<br><br>I/A/W SPEC NR MIL-D-38386E<br>BASIC DTD 89 AUG 28<br>AMEND NR DTD<br>TYPE NUMBER: M38386-C-015 | | | | |
| 0001 | PR YPC98201001312 PRLI 0001 | 178 | EA | 381.32 | 67874.96 |

PREP FOR DELIVERY:

PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991
QUP = 001: PRES MTHD = 10: CLNG/DRY = 1: PRESV MAT = 00:
WRAP MAT = 00: CUSH/DUNN MAT = 00: CUSH/DUNN THKNESS = 0:
UNIT CONT = EX: LEVEL PRESV = A: OPI = O:
PACK CODE = U: PACKING LEVEL = C:
MARKING SHALL BE IN ACCORDANCE WITH MIL-STD-129M SPECIAL
MARKING CODE: 99 - NO CODES IN THIS TABLE ONLY MIL-STD-129.
PALLETIZATION SHALL BE IN ACCORDANCE WITH DC1536P001 REV A
DATED 96150

DOD LOGMARS BAR CODE MARKING REQUIRED IAW MIL-STD-129M,
DATED 15 JUN 93 AND MIL-STD-1189B, DATED 10 AUG 89.

PARCEL POST ADDRESS:

SW3100
MECHANICSBURG FACILITY
DEF DIST DEPOT SUSQUEHANNA PA
GENERAL SUPPLIES
MECHANICSBURG PA 17055-0789

FREIGHT SHIPPING ADDRESS

SW3100
MECHANICSBURG FACILITY TRNS OFFICER
DEF DIST DEPOT SUSQUEHANNA PA
5450 CARLISLE PIKE
MECHANICSBURG PA 17055-0789

NON-MILSTRIP RDD 05/15/99 PROJ

* * * * * * * * * * * * * * * * * * * * * * * * * * * * *

CONTINUED ON NEXT PAGE

F000017

SP0740-99-C-1004 18 of 24

**CONTINUATION SHEET**

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025

PAGE 05 OF 24 PAGES

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| 0002 | PR YPC98323000624 PRLI 0002 | 100 | EA | 381.32 | 38132.00 |
| | PREP FOR DELIVERY:<br>PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991<br>MIL-STD-2073 PACKAGING DATA SAME AS PRIOR LINE<br><br>PARCEL POST/FREIGHT ADDRESS:<br>SW3200<br>DEF DIST DEPOT SAN JOAQUIN<br>TRACY CA 95376-5000<br><br>NON-MILSTRIP RDD 08/25/99 PROJ | | | | |
| | * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |
| 0003 | PR YPC98201001312 PRLI 0001 | 178 | EA | 381.32 | 67874.96 |
| | PREP FOR DELIVERY:<br>PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991<br>QUP = 001: PRES MTHD = 10: CLNG/DRY = 1: PRESV MAT = 00:<br>WRAP MAT = 00: CUSH/DUNN MAT = 00: CUSH/DUNN THKNESS = 0:<br>UNIT CONT = B1: LEVEL PRESV = A: OPI = O:<br>PACK CODE = U: PACKING LEVEL = C:<br>MARKING SHALL BE IN ACCORDANCE WITH MIL-STD-129M SPECIAL<br>MARKING CODE: 99 - NO CODES IN THIS TABLE ONLY MIL-STD-129.<br>PALLETIZATION SHALL BE IN ACCORDANCE WITH DC1636P001 REV A<br>DATED 96150<br><br>DOD LOGMARS BAR CODE MARKING REQUIRED IAW MIL-STD-129M,<br>DATED 15 JUN 93 AND MIL-STD-1189B, DATED 10 AUG 89.<br><br>PARCEL POST ADDRESS:<br>SW3100<br>MECHANICSBURG FACILITY<br>DEF DIST DEPOT SUSQUEHANNA PA<br>GENERAL SUPPLIES<br>MECHANICSBURG PA 17055-0789<br><br>CONTINUED ON NEXT PAGE | | | | |

F000018

SP0740-99-C-1004 19 of 24

CONTINUATION SHEET

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025

PAGE 06 OF 24 PAGES

NAME OF OFFEROR OR CONTRACTOR

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | FREIGHT SHIPPING ADDRESS<br><br>SW3100<br>MECHANICSBURG FACILITY TRNS OFFICER<br>DEF DIST DEPOT SUSQUEHANNA PA<br>5450 CARLISLE PIKE<br>MECHANICSBURG PA 17055-0789<br><br>NON-MILSTRIP RDD 05/15/99 PROJ<br>* * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |
| 0004 | PR YPC98201001312 PRLI 0002 | 343 | EA | 381.32 | 130792.76 |
| | PREP FOR DELIVERY:<br><br>PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991<br>MIL-STD-2073 PACKAGING DATA SAME AS PRIOR LINE<br><br>PARCEL POST/FREIGHT ADDRESS:<br><br>SW3200<br>DEF DIST DEPOT SAN JOAQUIN<br>TRACY CA 95376-5000<br><br>NON-MILSTRIP RDD 05/15/99 PROJ<br>* * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |
| 0005 | PR YPC98169000611 PRLI 0001 | 218 | EA | 381.32 | 83127.76 |
| | PREP FOR DELIVERY:<br><br>PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991<br>QUP = 001: PRES MTHD = 10: CLNG/DRY = 1: PRESV MAT = 00:<br>WRAP MAT = 00: CUSH/DUNN MAT = 00: CUSH/DUNN THKNESS = 0:<br>UNIT CONT = 81: LEVEL PRESV = A: OPI = O:<br>PACK CODE = U: PACKING LEVEL = C:<br>MARKING SHALL BE IN ACCORDANCE WITH MIL-STD-129M SPECIAL<br>MARKING CODE: 99 - NO CODES IN THIS TABLE ONLY MIL-STD-129.<br>PALLETIZATION SHALL BE IN ACCORDANCE WITH DC1636P001 REV A<br>DATED 96150<br><br>DOD LOGMARS BAR CODE MARKING REQUIRED IAW MIL-STD-129M,<br>DATED 15 JUN 93 AND MIL-STD-1189B, DATED 10 AUG 89.<br><br>CONTINUED ON NEXT PAGE | | | | |

F000019

SP0740-99-C-1004 20 of 24

**CONTINUATION SHEET**

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025

PAGE 07 OF 24 PAGES

NAME OF OFFEROR OR CONTRACTOR:

SECTION B

| ITEM NO. | SUPPLIES/SERVICES | QUANTITY | UNIT | UNIT PRICE | AMOUNT |
|---|---|---|---|---|---|
| | PARCEL POST ADDRESS:<br>SW3100<br>MECHANICSBURG FACILITY<br>DEF DIST DEPOT SUSQUEHANNA PA<br>GENERAL SUPPLIES<br>MECHANICSBURG PA 17055-0789<br>FREIGHT SHIPPING ADDRESS<br>SW3100<br>MECHANICSBURG FACILITY TRNS OFFICER<br>DEF DIST DEPOT SUSQUEHANNA PA<br>5450 CARLISLE PIKE<br>MECHANICSBURG PA 17055-0789<br>NON-MILSTRIP RDD 12/17/98 PROJ<br>* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |
| 0006 | PR YPC98169000611 PRLI 0002 | 198 | EA | 381.32 | 75,501.36 |
| | PREP FOR DELIVERY:<br>PKGING DATA - MIL-STD-2073-1B & MIL-STD-2073-2C, 21 JUN 1991<br>MIL-STD-2073 PACKAGING DATA SAME AS PRIOR LINE<br>PARCEL POST/FREIGHT ADDRESS:<br>SW3200<br>DEF DIST DEPOT SAN JOAQUIN<br>TRACY CA 95376-5000<br>NON-MILSTRIP RDD 12/17/98 PROJ<br>* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * | | | | |

F000020

SP0740-99-C-1004 21 of 24

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 08 | 24 PAGES |

ATTENTION CONTRACTORS!!

ALL CONTRACTORS ARE REQUIRED TO REGISTER IN THE CENTRAL CONTRACTOR REGISTRATION (CCR) SYSTEM BY MAY 31, 1998 (DEFENSE FEDERAL ACQUISITION REGULATION SUPPLEMENT (DFARS) 204.7302). UNREGISTERED CONTRACTORS WILL NOT BE ELIGIBLE FOR AWARDS SOLICITED AFTER THAT DATE. YOU MAY REGISTER OR CHECK YOUR CCR REGISTRATION STATUS AT THE CENTRAL CONTRACTOR REGISTRATION SITE - (HTTP://CCR.EDI.DISA.MIL/)

HELP WITH CCR REGISTRATION IS AVAILABLE AT YOUR REGIONAL ELECTRONIC COMMERCE RESOURCE CENTER (ECRC) (HTTP://WWW.ECRC.DOSS.MIL/REGIONAL.HTML)

VENDORS WILL NEED TO SUPPLY A DUNS NUMBER WITH ALL QUOTATIONS REGARDLESS OF DOLLAR VALUE IN THE NEAR FUTURE. A DUNS NUMBER IS ALSO A REQUIREMENT FOR CCR REGISTRATION. YOU MAY REQUEST A DUNS NUMBER AT THE D-U-N-S NUMBER REQUEST FROM SITE, HTTP://WWW.DNBSIA.COM/DBIS/DNBHOME.HTM

***ALTERNATE DISPUTE RESOLUTION (ADR) POLICY***

It is the goal of this Center for all parties to be satisfied at contract completion. Consequently, this Center is encouraging the use of all forms of ADR to resolve differences of view that may occur under the contract, whether the differences involve disputes of contract terms, issues of administration, or merely points of inquiry. The use of any form of ADR is voluntary for all parties. Any costs associated with the use of ADR will be agreed to by both parties and with no increase in contract price, unless agreed to otherwise.

FOR COURIER SERVICE AND/OR CONTRACTOR HANDCARRIED OFFERS

RFPs and IFBs (generally Large Purchase Offers, $100,000 and over when being hand carried (Courier service or other means) shall be placed in the White Bid Box, located at DSCC in the Lobby of Building 20, 3990 E. Broad St., Columbus, OH 43216-5000.

SECTION B

NOTICE

Any contract awarded to a contractor who, at the time of award was suspended, debarred, ineligible for receipt of contracts with Government agencies or in receipt of a notice of proposed debarment from any Government agency, is voidable at the option of the Government.

AVAILABILITY OF AWARD INFORMATION

Large Purchases - $100,000 and over (IFB/RFP) - Written notification is automatically mailed to all unsuccessful offerors at time of award. This notice provides the number of firms solicited, the number of offers received, the name of successful offeror and contract unit price and quantity awarded. In addition, unsuccessful offerors are also informed why their offer was not accepted.

NOTE: Firms not responding to an IFB/RFP, may request award information under the Freedom of Information Act (FOIA) by written request to this Center, ATTN: DSCC-VEIP. Include specific identification data and statement that you are willing to pay necessary fees for research and/or reproduction costs.

PROCUREMENT HISTORY

Procurement history is not supplied with the solicitation, and will not be furnished based on telephone calls. Procurement history is now available on microfiche as follows:

NSN History published quarterly;
Non-NSN History published semi-annually; and
Prior Month Award History published monthly.

Each updated microfiche set will be available in the Bid Opening Room at DSCC for public viewing. This information can be purchased by submitting a written request for history desired to: Defense Supply Center Columbus, ATTN: DSCC-VEIP, P.O. Box 3990, Columbus, Ohio 43216-5010. Requester will be advised of cost of history by return mail.

AVAILABILITY OF DRAWING

This requirement is in accordance with drawings listed in Section B - Item Description. See Provision L12 for instructions for obtaining aperture cards of these drawings.

NOTE: The drawings cannot be furnished by the buyer/contracting officer.

AVAILABILITY OF SPECIFICATIONS

This requirement is in accordance with specifications, standards and descriptions. Do not try to order from this Center. For order instructions see Provision L12 in the IFB/RFP. See item description for address to order standards.

SECTION C

Year 2000 (Y2K) Compliant Notice:

All deliverables under this contract containing embedded microcircuit chips with a clock mechanism, timing device, or control device required to perform date\time processing involving dates subsequent to December 31, 1999, shall be year 2000 (Y2K) compliant at the time of delivery.

"Y2K compliant" means that it accurately process date\time data (including, but not limited to, calculation, comparing, and sequencing) from, into, and between the twentieth and twenty-first century, and the years 1999 and 2000 and leap year calculations, to the extent that other (information technology) IT / non-IT items being acquired properly exchange date/time data with it.

SECTION D

D01 - PACKING AND MARKING (AUG 1991) DSCC 52.219-9C02

( ) Packaging will be in accordance with the Contractor's commerical practice, which will ensure acceptance by the carrier.

Marking will be in accordance with MIL-STD-129.

CLIN(s)

( ) Packaging and Marking shall be in accordance with the following DSCC Pkg sheet:

| CLIN(s) | ATTACHED PKG SHT NO. | QUP | PRES/PKG LEVEL | PACKING LEVEL | METHOD |
|---|---|---|---|---|---|

(X) Packaging Data MIL-STD-2073-1B and MIL-STD-2073-2C, 21 JUN 93. Marking will be in accordance with MIL-STD-129.

( ) OTHER:

CLIN(s)

D02 - USE OF OAK-CHESTNUT WOOD FOR PACKING SUPPLIES (JUN 1986) - DSCC 52.210-9C05

(a) In order to prevent the spread of oak wilt disease, oak or chestnut wood shall not be used for packaging and packing of supplies to be delivered under this contract, unless the wood either is bark free and square-edged so that none of the natural rounded surface tissues remain or is bark free and has a moisture content not exceeding twenty (20) percent.

(b) The contractor must comply with and perform inspection to insure compliance with the above restrictions on use of oak or chestnut wood. If a shipment is frustrated for noncompliance, the contractor will be responsible for the cost incurred to repack the supplies; and this right of the Government shall not be affected by other provisions concerning the conclusiveness of inspection and acceptance and is in addition to and does not limit any rights of the government under other provision of the contract.

SP0740-99-C-1004 22 of 24

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 09 | 24 |

## SECTION E

**E01 - INSPECTION AT ORIGIN (FEB 1993) - DCSC 52.246-9C01**

(a) Inspection for compliance with contract requirements will be performed at origin by an authorized Government inspector.

(b) Inspection prior to shipment will be based on the following:

(1) For CLIN(s) described by a Military or Federal specification or purchase description contractor must present evidence showing compliance with all contract and specification requirements including preparation for delivery.

(2) For CLIN(s) described by manufacturer's name/code and part number:

(i) Contractor must present evidence of performance of all quality assurance requirements specified in the contract and assure that item will serve its intended purpose by performing examinations and tests to determine (A) completeness of item, (B) absence of rust, contamination, or deterioration, (C) correct identification, (D absence of any damage, and (E) compliance with preparation for delivery. If the contractor is not the manufacturer of the supplies, evidence must be furnished to establish that the supplies were produced by the manufacturer.

(ii) The word "manufacturer" means the actual manufacturer of each CLIN. The QAR may require that evidence be furnished establishing the name and address of the plant that manufactures each CLIN to assure that a domestic product is being supplied.

(iii) In lieu of the requirement specified above, the contractor may be required by the inspecting activity to furnish a Certificate of Conformance.

**E02 - ACCEPTANCE AT ORIGIN (NOV 1985) - DCSC 52.246-9C02**

Acceptance will be performed by an authorized Government Representative at origin. The point of acceptance will be the point of last inspection before shipment unless otherwise indicated by the offeror.

NOTE: For contracts awarded on F.O.B. Destination basis, contractor must comply with Clause F03 - F.O.B. Destination, in order that payment may be made prior to receipt of the supplies at destination.

**E06 - CERTIFICATE OF CONFORMANCE (CoC) (APR 1984) - FAR 52.246-15**
(Applicable as specified in the Award/Contract)

**E07 - INSPECTION OF SUPPLIES--FIXED PRICE (AUG 1996) - FAR 52.246-2**

**E08 - RESPONSIBILITY FOR SUPPLIES (APR 1984) - FAR 52.246-16**

**E09 - RECORDS RETENTION REQUIREMENTS (JUN 1986) - DCSC 52.246-9C01**

The Contractor shall retain receiving and inspection report records, consisting of reports reflecting receipt and inspection of supplies, equipment and material, for four (4) years from the date of final payment under this contract and shall make them available upon request, to the Comptroller General of the United States, the Contracting Officer, or their authorized representatives.

**E10 - CHANGE OF INSPECTION/ACCEPTANCE POINT (AUG 1990) DCSC 52.246-9C08**

If this solicitation provides for inspection and acceptance at destination, the Government may exercise the right reserved under FAR 52.246-2 Inspection of Supplies Fixed Price and make awards requiring inspection and acceptance at origin and Clauses E01 and E02 will be applicable. Bidders must complete Provision C33, Place of Performance of the solicitation.

**E17 - PRODUCT VERIFICATION TESTING (AUG 1997) - DLAD 52.246-9004**

(a) References: The applicable documents are the issues of Federal Acquisition Regulation (FAR) Clause 52.246-2, "Inspection of Supplies-Fixed Price," and ANSI/ASQC Z1.4-1993, Sampling Plan and Tables for Inspection by Attributes, which are in effect on date of solicitation for awards resulting from invitation for bids and date of award for all other contractual actions. These documents form the basis for the Government's right to perform product verification testing (PVT) of this product. FAR 52.246-2 is hereby incorporated by reference into the contract if not otherwise called out in the purchase document.

(b) The contractor is responsible for insuring that supplies are manufactured, produced, and subjected to all tests required by applicable material specifications/drawings specified in the purchase description of the contract. Notwithstanding any other clause to the contrary, and/or in addition thereto, the Government reserves the right to conduct PVT to ascertain if any or all requirements of the purchase identification description contained elsewhere herein are met prior to final acceptance.

(c) On any given contract, the Government may require PVT through a Government-designated testing laboratory on the contract or production lot at Government expense. Testing will consist of chemical and/or mechanical/dimensional conformance tests as the Government deems necessary. When material under the contract is designated by the contracting officer/ administrative contracting officer for such test, the Government inspector will select a sample size in accordance with MIL-STD-105, Inspection Level S-2, randomly from the contract or production lot, and send the samples to a designated laboratory for testing. Where origin inspection is specified, the contractor agrees to make available, at the Government's request, at the manufacturing facility, subcontracting facility, and/or final point of inspection, the quantity selected by the DCAS QAR to verify that the entire lot tendered meets the requirements of the Contract. The Government shall be permitted to select such samples at random from the production lot tendered for acceptance

(d) [This subparagraph pertains only to contracts and bilateral purchase orders.]

(1) The PVT samples will be sent, by the Government and at Government expense, to a Government-designated testing laboratory for product verification. The Government will notify the contractor of the results of the testing within 15 working days of receipt of the samples by the Government. If the Government fails to act within the period set forth herein for notification, the contracting officer shall, upon timely written request, equitably adjust, under the Changes Clause of this contract, the delivery or performance dates and/or the contract price and any other contractual term affected by the delay. The Government is not required to accept/reject the supplies tendered until after receipt of the PVT test results.

(2) The Government shall have the option to require the contractor to screen the entire lot tendered for any defects noted by the PVT testing. Any defects so found shall be corrected before retendering the lot for acceptance by the Government. Further, the Government may subject this lot to additional PVT testing. If the Government disapproves the lot tendered for acceptance because of a failure to pass the PVT, the contractor shall be deemed to have failed to make delivery within the meaning of the Default Clause of this contract. In such case, the Government reserves all rights and remedies to which it is otherwise entitled by law, regulation, or this contract.

(e) [This subparagraph pertains only to unilateral purchase orders.]

(1) The PVT samples will be sent by the Government and at Government expense, to a Government-designated testing laboratory for for product verification. The Government will notify the contractor of the results of the testing within 15 days after receipt of the samples by the Government. If the Government fails to act within the specified time period set forth herein for notification, the contracting officer shall, upon timely written request from the contractor, incorporate FAR Clause 52.243-1, "Changes-Fixed Price," into the purchase order, and equitably

SP0740-99-C-1004 23 of 24

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-R-3025 | PAGE 10 | OF 24 PAGES |
|---|---|---|---|

adjust the delivery or performance date and/or the price and any other terms affected by the delay. The Government is not required to accept/reject the supplies tendered until after receipt of the FVT test results.

(2) The Government shall have the option to require the contractor to screen the entire lot tendered for any defects noted by the FVT. Any defects so found shall be corrected before retendering the lot for acceptance by the Government. Further, the Government may subject this lot to additional FVT. If the Government disapproves the lot tendered for acceptance because of a failure to pass the FVT, the Government has the right to reject the entire offer, thereby releasing the parties from further obligations under the purchase order.

**SECTION F**
**F64A - ADVANCE NOTICE OF DELIVERY TO CONSIGNEES (OTHER THAN AIR OR WATER TERMINALS (AUG 1988) - DCIC INFORMATION TO VENDORS**

The contractor is responsible for requiring carriers to give telephone notice of delivery to the consignee Transportation Officer (Transport Control/Preladge Desk), at least 24 hours prior to delivery of freight shipments (other than small parcels). All bills of lading must be annotated to reflect this requirement.

F05 - **LOADING, BLOCKING AND BRACING OF FREIGHT CAR SHIPMENTS (APR 1984) - FAR 52.247-58**

F07 - **FIRST ARTICLE DELIVERY** (OCT 1974) - DCSC 52.209-9C01

CLIN(S) 5501

When First Article Approval (Clause I43 or I44) is required, the applicable 'Time of Delivery' clause includes the number of days specified for submission and approval of First Article. If First Article Approval is waived in the award, the number of days required for such testing and approval will be subtracted from the delivery time as provided by the First Article Approval clause unless offeror specifies a different period of reduction in Clause I43a or I44a.

F11 - **DELIVERY OF EXCESS QUANTITIES (SEP 1989) FAR 52.211-17**

F13 - **GOVERNMENT DELAY OF WORK (APR 1984) - FAR 52.242-17**

F22 - **REQUIRED DELIVERY WITH DELIVERY EVALUATION FACTOR** (DEC 1995) DCSC 52.211-9C05

(a) This clause applies to CLINS ALL

The intent of this clause is to obtain the shortest delivery at the best possible price. Offers for other than the required delivery will be considered and evaluated in accordance with Provision M22.

The Government requires delivery to be made according to the following schedule:

**REQUIRED DELIVERY SCHEDULE**
(Contracting Officer insert specific details.)

| ITEM NO. | QUANTITY | WITHIN DAYS AFTER DATE OF CONTRACT |
|---|---|---|
| ALL | 837 | 150 |

It is intended to award without discussions regarding delivery; therefore it is in the offeror's best interest to provide the best delivery. If the offeror proposes no other delivery schedule, the required delivery schedule will apply.

**OFFEROR'S PROPOSED DELIVERY SCHEDULE**

| ITEM NO. | QUANTITY | WITHIN DAYS AFTER DATE OF CONTRACT |
|---|---|---|
| 0001 thru 0005 | 1682 | 150 days |

| | | | |
|---|---|---|---|
| ______ | ______ | ______ | ______ |

(b) Application of the delivery evaluation factor set forth in Provision M22 may result in award to other than the lowest priced acceptable offeror. In such circumstances, if delivery is made after the contract due date, the award price will be reduced using the following formula

Unit Price x Evaluation Factor x Delinquent Quantity x # of Days Delinquent

This reduction may be applied even if the awardee offered the required delivery schedule and the lowest offered price was for delivery longer than the required delivery

This reduction may be up to, but not exceeding 25% of the total award price or 150% of the price differential, whichever is greater, plus the administrative cost of modifying the award to provide for a revised delivery schedule

(c) This clause does not affect or limit the Government's right under the Default Clause of this contract

(d) Attention is directed to the Contract Award provision of the solicitation that provides that a written award or acceptance of offer mailed or otherwise furnished to the successful offeror results in a binding contract. The Government will mail or otherwise furnish to the offeror an award or notice of award not later than the day the award is dated. Therefore, the offeror shall compute the time available for performance beginning with the actual date of award, rather than the date the written notice of award is received from the Contracting Officer through the ordinary mails.

NOTE. Unless otherwise specified in the individual solicitation/contract ACCELERATED DELIVERY IS ACCEPTABLE AND DESIRED AT NO ADDITIONAL COST TO THE GOVERNMENT; however, for contracts awarded on an F.O.B. origin delivery basis, the requirements of FAR 52.247-59, F.O.B. Origin-Carload and Truckload Shipments, must be complied with.

F23 - **STOP-WORK ORDER** (AUG 1989) - FAR 52.242-15

**SECTION G**
**G - CONTRACT ADMINISTRATION DATA** to be included in Section G of the contract.

**SECTION H**
**H01 - MATERIAL INSPECTION AND RECEIVING REPORT (DEC 1991) DFARS 252.246-7000**

At the time of each delivery of supplies or services under this contract, the Contractor shall prepare and furnish to the government a material inspection and receiving report in the manner and to the extent required by Appendix F Material Inspection and Receiving Report, of the Defense FAR Supplement.

NOTE 1: DD Forms 250 may be obtained upon request and at no cost, from the Contract Administration Office.

NOTE 2: Insure that all DD Forms 250 covering MIPR shipments indicate the MIPR Number.

NOTE 3: Wood Products shipments require supplemental data per Clause H01a.

NOTE 4: The following addresses are provided to supplement the distribution prescribed in DoD FAR Sup Appendix F, Tables 1 and 2:

**Table 1 - Consignee mailing address:**

(C) - See Ship-to Address in Section F

( ) - *APO/FPO Address in Section G

( ) - *APO/FPO Address:

24 of —

**CONTINUATION SHEET** | REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025 | PAGE 11 OF 24 PAGES

*NOTE: Copies must be forwarded by airmail.

Table 2 - Inventory Control Manager (ICM) Copy:

[ ] - Navy Status Control Activity, Army, or Air Force. (ICM)

And the MIPR processing purchase office, if applicable:

[ ] - Marine Corps - Addresses as cited in Table 2.

[ ] - FMS - Address will be obtained from activity administering contract.

[ ] -

H17 - SUBSTITUTIONS FOR MILITARY OR FEDERAL SPECIFICATIONS AND STANDARDS (AUG 1997) DLAD 252.211-7005

(a) Definition. "SPI process," as used in this clause, means a management or manufacturing process that has been accepted previously by the Department of Defense under the Single Process Initiative (SPI) for use in lieu of a specific military or Federal specification or standard. Under SPI, these processes are reviewed and accepted by a Management Council, which includes representatives from the Defense Contract Management Command, the Defense Contract Audit Agency, and the military departments.

(b) Offerors are encouraged to propose SPI processes in lieu of military or Federal specifications and standards cited in the solicitation.

(c) An offeror proposing to use an SPI process shall -

(1) Identify the specific military or Federal specification or standard for which the SPI process has been accepted, and the specific paragraph or other location in the solicitation where the military or Federal specification or standard is required;

(2) Provide a copy of the Department of Defense acceptance of the SPI process;

(3) Identify each facility at which the offeror proposes to use the specific SPI process; and

(4) Unless provided in response to paragraph (d)(3) of this clause, provide the name and telephone number of the cognizant Administrative Contracting Officer for each facility where the SPI process is proposed for use.

(d) Absent a determination at the head of the contracting activity or program executive officer level that an SPI process is not acceptable for this procurement, the contractor shall use the following SPI processes in lieu of military or Federal specifications and standards:

(Offeror insert information for each SPI process)

SPI Process:

Facility:
Military or Federal

Specification or Standard:
Affected Contract Line Item and Subline Item Number and Requirement Citation

Cognizant Administrative Contracting Officer:

**SECTION I**

I02 - AUTHORIZED DEVIATIONS IN CLAUSES (APR 1984) - FAR 52.252-6

(a) The use in this solicitation or contract of any Federal Acquisition Regulation (48 CFR Chapter 1) clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the clause.

(b) The use in this solicitation or contract of any DoD FAR Supplement (48 CFR Chapter 2) or Defense Logistics Acquisition Regulation Clause with an authorized deviation is indicated by the addition of "(DEVIATION)" after the name of the regulation.

I03 - WARRANTY - ACCEPTANCE OF SUPPLIES (JUN 1988) DCSC 52.246-9C10

This clause is applicable when surplus materials are accepted (See Clause I28), when a Certificate of Conformance (see Provision K05) supports or forms the basis for acceptance of supplies at origin by the Government, or when acceptance is performed by the Government at destination.

(a) The contractor warrants for a period of one year that the supplies at time of delivery conform to all contract requirements. If this warranty is breached, the Government at its option may (1) reject the supplies and require refund of contract price, or (2) require contractor at its expense to repair or replace the supplies; or (3) repair or correct the supplies and charge the contractor for the costs incurred, or (4) retain the supplies and require an equitable adjustment in the contract price. The Government shall mail or otherwise furnish notice to the contractor of the breach of this warranty within one year after date of delivery, inform the contractor of the option exercised, and require the contractor to take action accordingly. For Wood Products, notice of breach of warranty for other than packing deficiencies must be furnished by the Government within the time limits specified in the applicable industry grading rules or standards after receipt of the supplies. Any disputes as to the breach of this warranty shall be resolved under the Disputes clause of the contract.

(b) The contractor shall mark warranty items as required by paragraph 5.2.8, MIL-STD-129(N), "Marking For Shipments And Storage."

(c) The rights hereby provided the Government shall not be affected by other clauses concerning the conclusiveness of inspection and acceptance and are in addition to and do not limit any rights of the Government under other clauses of this contract.

I05 - PREFERENCE FOR CERTAIN DOMESTIC COMMODITIES (FEB 1997) - DFARS 252.225-7012

(a) The Contractor agrees to deliver under this contract only such of the following articles that have been grown, reprocessed, reused, or produced in the United States, its possessions, or Puerto Rico:

(1) Food;
(2) Clothing;
(3) Tents, tarpaulins, covers;
(4) Cotton and other natural fiber products.
(5) Woven silk or woven silk blends;
(6) Spun silk yarn for cartridge cloth;
(7) Synthetic fabric, and coated synthetic fabric, including all textile fibers and yarns that are for use in such fabrics;
(8) Canvas products,
(9) Wool (whether in the form of fiber or yarn or contained in fabrics, materials, or manufactured articles), or;
(10) Any item of individual equipment Federal Supply Classification 8465 manufactured from or containing such fibers, yarns, fabrics or materials.

(b) This clause does not apply--

(1) To supplies listed in FAR 25.108(d)(1), or other supplies for which the Government has determined that a satisfactory quality and sufficient quantity cannot be acquired as and when needed at U.S. market prices;

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025 | PAGE OF: 12 | 24 PAGES |
|---|---|---|---|

(2) To foods which have been manufactured or processed in the United States, its possessions, or Puerto Rico; and
(3) To chemical warfare protective clothing produced in countries listed in subsection 225.872-1 of the Defense FAR Supplement; or
(4) To purchases of fibers and yarns that are for use in synthetic fabric or coated synthetic fabric, if such fabric is to be used as a component of an end item not classified in Federal Supply Group 83, Textile/leather/furs/findings/tents/flags, or Federal Supply Group 84, Clothing, individual equipment and insignia

## I12 - REMITTANCE ADDRESS (COMPLETE IF DIFFERENT FROM BLOCK 15A, SF33): (APR 1984) - DCSC INFORMATION TO VENDORS

Capital City Pipe Inc
PO Box 12368
Tallahassee FL 32317

## I13 - DEFAULT - ADMINISTRATIVE COST OF REPROCUREMENT AFTER DEFAULT (MAY 1968) - DLAD 52.249-9000

If this contract is terminated in whole or in part for default pursuant to the clause included herein entitled 'Default,' and the supplies or services covered by the contract so terminated are repurchased by the Government, the Government will incur administrative costs in such repurchases. The contractor and the Government expressly agree that, in addition to any excess costs of repurchase, as provided in paragraph (b) of the 'Default' clause of the contract, or any other damages resulting from such default, the contractor shall pay, and the Government shall accept, the sum of $619.00 as payment in full for the administrative costs of such repurchase. This assessment of damages for administrative costs shall apply for any termination for default following which the Government repurchases the terminated supplies or services, regardless of whether any other damages are incurred and/or assessed.

## I14 - BANKRUPTCY (JUL 1995) - FAR 52.242-13

In the event the Contractor enters into proceedings relating to bankruptcy, whether voluntary or involuntary, the Contractor agrees to furnish, by certified mail, written notification of the bankruptcy to the Contracting Officer responsible for administering the contract. This notification shall be furnished within five days of the initiation of the proceedings relating to bankruptcy filing. This notification shall include the date on which the bankruptcy petition was filed, the identity of the court in which the bankruptcy petition was filed, and a listing of Government contract numbers and contracting offices for all Government contracts against which final payment has not been made. This obligation remains in effect until final payment under this contract.

## I16 - CANCELLATION, RESCISSION, AND RECOVERY OF FUNDS FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) - FAR 52.203-8

(a) If the Government receives information that a contractor or a person has engaged in conduct constituting a violation of subsection (a), (b), or (f) of Section 27 of the Office of Federal Procurement Policy Act (41 U.S.C. 423) (the Act), for Fiscal Year 1996 (Pub. L. 104-106), the Government may-
(1) Cancel the solicitation, if the contract has not yet been awarded or issued; or
(2) Rescind the contract with respect to which-
(i) The Contractor or someone acting for the Contractor has been convicted for an offense where the conduct constitutes a violation of subsection 27 (a) or (b) of the Act for the purpose of either-
(A) Exchanging the information covered by such subsections for anything of value; or
(B) Obtaining or giving anyone a competitive advantage in the award of a Federal agency procurement contract; or
(ii) The head of the contracting activity has determined, based upon a preponderance of the evidence, that the Contractor or someone acting for the Contractor has engaged in conduct constituting an offense punishable under subsections 27(e)(1) of the Act.
(b) If the Government rescinds the contract under paragraph (a) of this clause, the Government is entitled to recover, in addition to any penalty prescribed by law, the amount expended under the contract.
(c) The rights and remedies of the Government specified herein are not exclusive, and are in addition to any other rights and remedies provided by law, regulation, or under this contract.

## I20 - PRIORITY RATING (FEB 1995) - DLAD 52.211-9002

This contract is assigned a priority rating under the Defense Priorities and Allocations System (DPAS) regulations (15 CFR 700) which requires contractors to utilize said rating in obtaining the products, materials and supplies needed to fill their contracts. In the event the contractor is unable to obtain the necessary products, materials and supplies to complete the contract the contractor shall immediately advise the DCMC or the appropriate DSC priorities and allocations (P&A) officer through the cognizant ACO or contracting officer. The P&A officer or the DCMC industrial specialist will provide necessary assistance or will provide the necessary instructions to complete DOC ITA Form 999, Request for Special Priorities Assistance. This form will be processed through appropriate channels to the Department of Commerce which, upon receipt, will take action to make the needed supplies available to the applicant.

## I21 - HAZARDOUS MATERIAL IDENTIFICATION AND MATERIAL SAFETY DATA (JAN 1997) - FAR 52.223-3

(a) "Hazardous material", as used in this clause, includes any material defined as hazardous under the latest version of Federal Standard No. 313 (including revisions adopted during the term of the contract).
(b) The offeror must list any hazardous material, as defined in paragraph (a) of this clause, to be delivered under this contract. The hazardous material shall be properly identified and include any applicable identification number, such as National Stock Number or Special Item Number. This information shall also be included on the Material Safety Data Sheet submitted under this contract.

| MATERIAL (If none, insert "NONE") | IDENTIFICATION NO. |
|---|---|
| - NONE - | |
| | |
| | |

(c) This list must be updated during performance of the contract whenever the Contractor determines that any other material to be delivered under this contract is hazardous.
(d) The apparently successful offeror agrees to submit, for each item as required prior to award, a Material Safety Data Sheet, meeting the requirements of 29 CFR 1910.1200(g) and the latest version of Federal Standard No. 313, for all hazardous material identified in paragraph (b) of this clause. Data shall be submitted in accordance with Federal Standard No. 313, whether or not the apparently successful offeror is the actual manufacturer of these items. Failure to submit the Material Safety Data Sheet prior to award may result in the apparently successful offeror being considered nonresponsible and ineligible for award.
(e) If, after award, there is a change in the composition of the item(s) or a revision to Federal Standard No. 313, which renders incomplete or inaccurate the data submitted under paragraph (d) of this clause, the Contractor shall promptly notify the Contracting Officer and resubmit the data.
(f) Neither the requirements of this clause nor any act or failure to act by the Government shall relieve the Contractor of any responsibility or liability for the safety of Government, Contractor, or subcontractor personnel or property.
(g) Nothing contained in this clause shall relieve the Contractor from complying with applicable Federal, State, and local laws, codes, ordinances, and regulations (including the obtaining of licenses and permits) in connection with hazardous material.
(h) The Government's rights in data furnished under this contract with respect to hazardous material are as follows:
(1) To use, duplicate and disclose any data to

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SPO740-99-R-3025 | PAGE OF 13 | 24 PAGES |
|---|---|---|---|

which this clause is applicable. The purposes of this right are to--

(i) Apprise personnel of the hazards to which they may be exposed in using, handling, packaging, transporting, or disposing of hazardous materials;

(ii) Obtain medical treatment for those affected by the material; and

(iii) Have others use, duplicate, and disclose the data for the Government for these purposes.

(2) To use, duplicate, and disclose data furnished under this clause, in accordance with subparagraph (h)(1) of this clause, in precedence over any other clause of this contract providing for rights in data.

(3) The Government is not precluded from using similar or identical data acquired from other sources.

**I31a - MATERIAL SAFETY DATA SHEET (MSDS) AND HAZARD WARNING LABELS (MAR 1992) - DLAD 52.223-9030**

(a)(1) This clause is to be used in conjunction with FAR clause 52.223-3, "Hazardous Material Identification and Material Safety Data", and DFARS clause 252.223-7001, "Hazard Warning Labels." Material Safety Data Sheets (MSDSs) and Hazard Warning Labels shall be required to be submitted by the apparently successful offeror prior to contract award. Notwithstanding paragraph 4. of Federal Standard (FED-STD) 313c (1 March 1988), the contractor shall submit MSDSs and accompanying HWLs to the contracting officer, rather than directly to the Defense General Supply Center (DGSC). This will satisfy the FED-STD requirement on the part of the contractor.

(2) The MSDS must cite the solicitation number and the applicable CAGE code of the manufacturer, the part number, and where so identified, the National Stock Number (NSN).

**I31b - HAZARD WARNING LABELS (DEC 1991) (DFARS 252.223-7001**

(a) "Hazardous material" as used in this clause, is defined in the Hazardous Material Identification and Material Safety Data clause of this contract.

(b) The contractor shall label the item package (unit container) of any hazardous material to be delivered under this contract in accordance with the Hazard Communication Standard (29 CFR 1910.1200 et seq). The Standard requires that the hazard warning label conform to the requirements of the standard unless the material is otherwise subject to the labeling requirements of one of the following statutes:

(1) Federal Insecticide, Fungicide and Rodenticide Act;
(2) Federal Food, Drug and Cosmetic Act;
(3) Consumer Product Safety Act;
(4) Federal Hazardous Substances Act; or
(5) Federal Alcohol Administration Act.

(c) The Offeror shall list which hazardous material listed in the Hazardous Material Identification and Material Safety Data clause of this contract will be labeled in accordance with one of the Acts in paragraphs (b)(1) through (5) of this clause instead of the Hazard Communication Standard. Any hazardous material not listed will be interpreted to mean that a label is required in accordance with the Hazard Communication Standard.

| MATERIAL (If None, Insert "None.") | ACT |
|---|---|
| — NONE — | |

(d) The apparently successful Offeror agrees to submit, before award, a copy of the hazard warning label for all hazardous materials not listed in paragraph (c) of this clause. The Offeror shall submit the label with the Material Safety Data Sheet being furnished under the Hazardous Material Identification and Material Safety Data clause of this contract.

(e) The Contractor shall also comply with MIL-STD-129, Marking for Shipment and Storage (including revisions adopted during the term of this contract).

**I33 - OZONE-DEPLETING SUBSTANCES (JUN 1996) - FAR 52.223-11**

(a) Definitions. "Ozone-depleting substance", as used in this clause, means any substance designated as Class I by the Environmental Protection Agency (EPA) (40 CFR Part 82), including but not limited to chlorofluorocarbons, halons, carbon tetrachloride, and methyl chloroform; or any substance designated as Class II by EPA (40 CFR Part 82), including but not limited to hydrochlorofluorocarbons.

(b) The Contractor shall label products which contain or are manufactured with ozone-depleting substances in the manner and to the extent required by 42 U.S.C. 7671j(b), (c), and (d) and 40 CFR Part 82, Subpart E, as follows:

"WARNING: Contains (or manufactured with, if applicable) * ________ a substance(s) which harm(s) public health and environment by destroying ozone in the upper atmosphere."

*The Contractor shall insert the name of the substance(s).

**I34 - CERTIFICATION OF REQUESTS FOR EQUITABLE ADJUSTMENT (MAR 1998) - DFARS 252.243-7002**

(a) The amount of any request for equitable adjustment to contract terms shall accurately reflect the contract adjustment for which the Contractor believes the Government is liable. The request shall include only costs for performing the change, and shall not include any costs that already have been reimbursed or that have been separately claimed. All indirect costs included in the request shall be properly allocable to the change in accordance with applicable acquisition regulations.

(b) In accordance with 10 U.S.C. 2410(a), any request for equitable adjustment to contract terms that exceeds the simplified acquisition threshold shall bear, at the time of submission, the following certificate executed by an individual authorized to certify the request on behalf of the Contractor:

I certify that the request is made in good faith, and that the supporting data are accurate and complete the best of my knowledge and belief.

D. Felton Williams
(Official's Name)

Director of Government Sales
(Title)

(c) The certification in paragraph (b) of this clause requires full disclosure of all relevant facts, including-

(1) Cost or pricing data if required in accordance with FAR 15.403-4 of the Federal Acquisition Regulation (FAR); and

(2) Information other than cost or pricing data, in accordance with subsection 15.403-3 of the FAR, including actual cost data and data to support any estimated costs, even if cost or pricing data are not required.

(d) The certification requirement in paragraph (b) of this clause does not apply to--

(1) Requests for routine contract payments, for example, requests for payment for accepted supplies and services, routine vouchers under a cost-reimbursement type contract, or progress payment invoices; or

(2) Final adjustments under an incentive provision of the contract.

**I35 - Required Central Contractor Registration (Mar 1998) DFARS 252.204-7004**

(a) Definitions. As used in this clause--

(1) Central Contractor Registration (CCR) database means the primary DoD repository for contractor information required for the conduct of business with DoD.

(2) Data Universal Numbering System (DUNS) number means the 9-digit number assigned by Dun and Bradstreet Information Services to identify unique business entities.

(3) Data Universal Numbering System +4 (DUNS+4) number means the DUNS number assigned by Dun and Bradstreet plus a 4-digit suffix that may be assigned by a parent (controlling) business concern. This 4-digit suffix may be assigned at the discretion of the parent business concern for

**CONTINUATION SHEET** | REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025 | PAGE 14 OF 24 PAGES

such purposes as identifying subunits or affiliates of the parent business concern.

(4) Registered in the CCR database means that all mandatory information, including the DUNS number or the DUNS+4 number, if applicable, and the corresponding Commercial and Government Entity (CAGE) code, is in the CCR database; the DUNS number and the CAGE code have been validated, and all edits have been successfully completed.

(b)(1) By submission of an offer, the offeror acknowledges the requirement that a prospective awardee must be registered in the CCR database prior to award, during performance, and through final payment of any contract resulting from this solicitation, except for awards to foreign vendors for work to be performed outside the United States.

(2) The offeror shall provide its DUNS or, if applicable, its DUNS+4 number with its offer, which will be used by the Contracting Officer to verify that the offeror is registered in the CCR database.

(3) Lack of registration in the CCR database will make an offeror ineligible for award.

(4) DoD has established a goal of registering an applicant in the CCR database within 48 hours after receipt of a complete and accurate application via the Internet. However, registration of an applicant submitting an application through a method other than the Internet may take up to 30 days. Therefore, offerors that are not registered should consider applying for registration immediately upon receipt of this solicitation.

(c) The Contractor is responsible for the accuracy and completeness of the data within the CCR, and for any liability resulting from the Government's reliance on inaccurate or incomplete data. To remain registered in the CCR database after the initial registration, the Contractor is required to confirm on an annual basis that its information in the CCR database is accurate and complete.

(d) Offerors and contractors may obtain information on registration and annual confirmation requirements by calling 1-888-227-2423, or via the Internet at http://ccr.edi.disa.mil.

I1$ - PRODUCTION FACILITY CHANGES (APR 1991) - DCSC 52.118-9C04

The performance of any of the work contracted for in any place other than that named in the contract is prohibited unless specifically approved by the DSCC Contracting Officer. Written requests for a change in production facilities must be submitted to the DSCC Contracting Officer. Changes in production facilities may be approved, provided (1) performance by small business or in labor surplus areas as required by the contract will not be changed; (2) the change will not cause a delay in delivery or necessitate a change in the purchase description; (3) the F.O.B. point is not changed; and (4) each request is supported by a price reduction of $250.00 to defray the government's administrative costs to process the change.

I51 - SPECIAL PROHIBITION ON EMPLOYMENT (JUN 1997) DFARS 252.203-7001

(a) Definitions. As used in this clause--

(1) "Arising out of a contract with the DoD" means any act in connection with--(i) Attempting to obtain, (ii) Obtaining, or (iii) Performing a contract or first-tier subcontract of any agency, department, or component of the Department of Defense (DoD).

(2) "Conviction of fraud or any other felony" means any conviction for fraud or a felony in violation of state or Federal criminal statutes, whether entered on a verdict or plea, including a plea of nolo contendere, for which sentence has been imposed.

(3) "Date of conviction" means the date judgment was entered against the individual.

(b) 10 U.S.C. 2408 provides that any individual who is convicted after September 29, 1988, of fraud or any other felony arising out of a contract with the DoD is prohibited from:

(1) Working in a management or supervisory capacity on any DoD contract or first-tier subcontract;

(2) Serving on the board of directors of any DoD contractor or first-tier subcontractor; or

(3) Serving as a consultant to any DoD contractor or first-tier subcontractor.

(c) Unless waived, the prohibition in paragraph (b) applies for five years from the date of conviction.

(d) 10 U.S.C. 2408 further provides that a defense contractor or first-tier subcontractor shall be subject to a criminal penalty of not more than $500,000 if convicted of knowingly--

(1) Employing a person under a prohibition specified in paragraph (b) of this clause; or

(2) Allowing such a person to serve on the board of directors of the contractor or first-tier subcontractor.

(e) In addition to the criminal penalties contained in 10 U.S.C. 2408, the Government may consider other available remedies, such as--

(1) Suspension or debarment;

(2) Cancellation of the contract at no cost to the Government; or

(3) Termination of the contract for default.

(f) The Contractor may submit written requests for waiver of the prohibitions in paragraph (b) of this clause to the Contracting Officer. Requests shall clearly identify--

(1) The person involved;

(2) The nature of the conviction and resultant sentence or punishment imposed;

(3) The reasons for the requested waiver; and,

(4) An explanation of why a waiver is in the interest of national security.

(g) The Contractor agrees to include the substance of this clause, appropriately modified to reflect the identity and relationship of the parties, in all first-tier subcontracts exceeding the simplified acquisition threshold in Part 2 of the Federal Acquisition Regulation, except those for commercial items or components.

(h) Pursuant to 10 U.S.C. 2408(c), defense contractors and subcontractors may obtain information as to whether a particular person has been convicted of fraud or any other felony arising out of a contract with the DoD by contacting The Office of Justice Programs, The Denial of Benefits Office, U.S. Department of Justice, telephone (202) 616-3507.

I82 - TRANSPORTATION OF SUPPLIES BY SEA (NOV 1995) - DFARS 252.247-7023

(a) Definitions. As used in this clause:

(1) "Components" means articles, materials, and supplies incorporated directly into end products at any level of manufacture, fabrication or assembly by the Contractor or any subcontractor.

(2) "Department of Defense" (DoD) means the Army, Navy, Air Force, Marine Corps, and defense agencies.

(3) "Foreign flag vessel" means any vessel that is not a U.S.-flag vessel.

(4) "Ocean transportation" means any transportation aboard a ship, vessel, boat, barge, or ferry through international waters.

(5) "Subcontractor" means a supplier, materialman, distributor or vendor at any level below the prime contractor whose contractual obligation to perform results from, or is conditioned upon, award of the prime contract and who is performing any part of the work or other requirement of the prime contract.

(6) "Supplies" means all property except land and interests in land that is clearly identifiable for eventual use by the armed services, or owned by the armed services, at the time of transportation by sea. (i) An item is clearly identifiable for eventual use by DoD if, for example, the contract documentation contains a reference to a DoD contract number or a Military destination. (ii) "Supplies" includes (but is not limited to) public works, buildings and facilities, ships, floating equipment and vessels of every character, type, and description, together with parts, subassemblies, accessories, and equipment; machine tools, material, equipment, and stores of all kinds; end items, construction materials and the components of the foregoing.

(7) "U.S.-flag vessel" means a vessel of the United States or belonging to the United States, including any vessel registered or having national status under the laws of the United States.

(b) The Contractor shall employ United States-flag vessels in the transportation by sea of any supplies to be furnished in the performance of this contract. The Contractor and its subcontractors may request that the Contracting Officer authorize shipment in foreign flag vessels, or designate available U.S flag vessels, if the Contractor or a subcontractor believes that, (1) U.S.-flag vessels are not available for timely shipment, (2) the freight charges are excessive or unreasonable; or (3) freight charges are higher than charges to private persons for transportation of like goods.

(c) The Contractor must submit any request for use of

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>SP0740-99-R-3025 | PAGE OF<br>15 | 24<br>PAGES |
|---|---|---|---|

other than U.S-flag vessels in writing to the Contracting Officer at least forty-five (45) days prior to the sailing date for the shipper to meet its delivery schedules. The Contracting Officer will process requests submitted after such date(s) as expeditiously as possible but the Contracting Officer's failure to grant approvals to meet the shipper's sailing date will not of itself constitute a compensable delay under this or any other clause of this contract.

The request shall contain at a minimum:

(1) Type, weight, and cube of cargo.
(2) Required shipping date.
(3) Special handling and discharge requirements.
(4) Loading and discharge points.
(5) Name of shipper and consignee.
(6) Prime contract number.
(7) A documented description of efforts made to secure U.S.-flag vessels, including points of contact with at least two (2) U.S.-flag carriers contacted by name and telephone number. Copies of telephone notes, telegraphic and facsimile messages or letters will be sufficient for this purpose.

(d) The Contractor shall, within thirty (30) days after each shipment covered by this clause provide the Contracting Officer and the Division of National Cargo, Office of Market Development, Maritime Administration, U.S. Department of Transportation, Washington, DC 20590, one copy of the rated on board vessel operating carrier's ocean-bill-of-lading, which shall contain the following information:

(1) Applicable Government prime contract number;
(2) Name of vessel;
(3) Vessel flag of registry,
(4) Date of loading;
(5) Port of loading;
(6) Port of final discharge;
(7) Description of commodity;
(8) Gross weight in pounds and cubic feet if applicable;
(9) Total ocean freight in U.S. dollars.
(10) Name of steamship company.

(e) The Contractor agrees to provide with its final invoice under this contract a representation that to the best of its knowledge and belief:

(1) No ocean transportation was used in the performance of this contract,
(2) Ocean transportation was used and only United States-flag vessels were used for all ocean shipments under the contract.
(3) Ocean transportation was used, and to the extent any non-U.S.-flag vessels were used, the Contractor had the written consent of the Contracting Officer for all non-U.S.-flag ocean transportation; or
(4) Ocean transportation was used and some or all of the shipments were made on non-U.S.-flag vessels without the written consent of the Contracting Officer. These shipments were as follows:

| ITEM DESCRIPTION | CONTRACT LINE ITEM | QUANTITY |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| TOTAL | | 1686 |

(f) If the invoice does not include the required representation, the Government will be reject and return it to the Contractor as an improper invoice for the purposes of the clause of the contract entitled "Prompt Payment". In the event there has been unauthorized use of non-U.S.-flag vessels in the performance of this contract, the Contracting Officer is entitled to equitably adjust the contract, based on the unauthorized use.

(g) The contractor shall include this clause, including this paragraph (g) in all subcontracts under this contract, which exceed the simplified acquisition threshold in Part 13 of the Federal Acquisition Regulation.

**I47 - PRICE OR FEE ADJUSTMENT FOR ILLEGAL OR IMPROPER ACTIVITY (JAN 1997) - FAR 52.203-10**

(a) The Government, at its election, may reduce the price of a fixed-price type contract or contract modification and the total cost and fee under a cost-type contract or contract modification by the amount of profit or fee determined as set forth in paragraph (b) of this clause if the head of the contracting activity or his or her designee determines that there was a violation of subsection 27(a) of the Office of Federal Procurement Policy Act, as amended (41 U.S.C. 423), as implemented in the FAR. In the case of a contract modification, the fee subject to reduction is the fee specified in the particular contract modification at the time of execution, except as provided in subparagraph (b)(5) of this clause.

(b) The price or fee reduction referred to in paragraph (a) of this clause shall be--

(1) For cost-plus-fixed-fee contracts, the amount of the fee specified in the contract at the time of award;

(2) For cost-plus-incentive-fee contracts, the target fee specified in the contract at the time of award notwithstanding any minimum fee or "fee floor" specified in the contract.

(3) For cost-plus-award-fee contracts--

(i) The base fee established in the contract at the time of contract award;

(ii) If no base fee is specified in the contract, 30 percent of the amount of each award fee otherwise payable to the Contractor for each award fee evaluation period or at each award fee determination point.

(4) For fixed-price-incentive contracts, the Government may--

(i) Reduce the contract target price and contract target profit both by an amount equal to the initial target profit specified in the contract at the time of contract award; or

(ii) If an immediate adjustment to the contract target price and contract target profit would have a significant adverse impact on the incentive price revision relationship under the contract, or adversely affect the contract financing provisions, the Contracting Officer may defer such adjustment until establishment of the total final price established in accordance with the incentive price revision provisions of the contract shall be reduced by an amount equal to the initial target profit specified in the contract at the time of contract award and such reduced price shall be the total final contract price.

(5) For firm-fixed price contracts, by 10 percent of the initial contract price or a profit amount determined by the Contracting Officer from records or documents in existence prior to the date of the contract award

(c) The Government may, at its election, reduce a prime contractor's price or fee in accordance with the procedures of paragraph (b) of this clause for violations of the Act by its subcontractors by an amount not to exceed the amount of profit or fee reflected in the subcontract at the time the subcontract was first definitively priced.

(d) In addition to the remedies in paragraphs (a) and (c) of this clause, the Government may terminate this contract for default. The rights and remedies of the Government specified herein are not exclusive, and are in addition to any other rights and remedies provided by law or under this contract.

**I34 - SECONDARY ARAB BOYCOTT OF ISRAEL (JUN 1992) DFARS 252.226-7031**

(a) Definitions.
As used in this clause--

"Foreign person" means any person other than a United States person as defined in Section 16(2) of the Export Administration Act of 1979 (50 U.S.C. App. Sec 2415).

"United States person" is defined in Section 16(2) of the Export Administration Act of 1979 and means any United States resident or national (other than an individual resident outside the United States and employed by other than a United States person), any domestic concern (including any permanent domestic establishment of any foreign concern), and any foreign subsidiary or affiliate (including any permanent foreign establishment) of any domestic concern which is controlled in fact by such domestic concern, as determined under regulations of the President.

(b) Certification.

By submitting this offer, the offeror, if a foreign person, company or entity, certifies that it--

(1) Does not comply with the secondary Arab boycott of

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025 | PAGE 16 OF 24 PAGES |
|---|---|---|

Israel; and

(2) Is not taking or knowingly agreeing to take any action, with respect to the secondary boycott of Israel by Arab countries, which 50 U.S.C. App. Sec 2407(a) prohibits a United States person from taking.

I36 - COMPUTER GENERATED FORMS (JAN 1991) FAR 52.253-1

(a) Any data required to be submitted on a Standard or Optional Form prescribed by the Federal Acquisition Regulation (FAR) may be submitted on a computer generated version of the form, provided there is no change to the name, content, or sequence of the data elements on the form, and provided the form carries the Standard or Optional Form number and edition date.

(b) Unless prohibited by agency regulations, any data required to be submitted on an agency unique form prescribed by an agency supplement to the FAR may be submitted on a computer generated version of the form provided there is no change to the name, content, or sequence of the data elements on the form and provided the form carries the agency form number and edition date.

(c) If the Contractor submits a computer generated version of a form that is different than the required form, then the rights and obligations of the parties will be determined based on the content of the required form.

I33 - DRUG-FREE WORKPLACE (JAN 1997) - FAR 52.223-6

I180 - CLAUSES INCORPORATED BY REFERENCE (FEB 1998) FAR 52.252-2

This contract incorporates one or more clauses by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available.

NOTE: The text of any referenced FAR or DFARS clause may be obtained by request to Defense Supply Center Columbus, Logistics Management Group, P.O. Box 16704, ATTN: DSCC-GPP, Columbus, Ohio 43216-5000. However, the complete edition of Federal Acquisition Regulation (FAR) or DoD FAR SUPPLEMENT (DFARS) may be obtained by purchase from the Superintendent of Documents, Government Printing Office, Washington, D.C. 20402.

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) CLAUSES

(a) The following clauses are applicable to sealed bid/negotiated solicitations/contracts:

| CLAUSE TITLE | DATE | FAR REFERENCE |
|---|---|---|
| Affirmative Action for Disabled Veterans and of the Vietnam Era | (APR 1998) | 52.222-35 |
| Affirmative Action for Workers with Disabilities | (JUN 1998) | 52.222-36 |
| Anti-Kickback Procedures | (JUL 1995) | 52.203-7 |
| Assignment of Claims and Alternate I | (JAN 1986) (APR 1984) | 52.232-23 52.232-23 |
| Authorization and Consent | (JUL 1995) | 52.227-1 |
| Audit and Records - Negotiation | (AUG 1996) | 52.215-2 |
| Changes - Fixed Price | (AUG 1987) | 52.243-1 |
| Clean Air and Water | (APR 1984) | 52.223-2 |
| Contract Work Hours and Safety Standards Act - Overtime Compensation | (JUL 1995) | 52.222-4 |
| Covenant Against Contingent Fees | (APR 1984) | 52.203-5 |
| Contractor Use of Mandatory Sources of Supply | (MAR 1996) | 52.208-9 |
| Convict Labor | (AUG 1996) | 52.222-3 |
| Default (Fixed Price Supply and Service) | (APR 1984) | 52.249-8 |
| Defense Priority and Allocation Requirements | (SEP 1990) | 52.211-15 |
| Definitions | (OCT 1995) | 52.202-1 |
| Discounts for Prompt Payments | (MAY 1997) | 52.232-8 |
| Disputes | (DEC 1998) | 52.233-1 |
| Duty-Free Entry | (APR 1984) | 52.225-10 |
| Employment Reports on Disabled Veterans and Veterans of the Vietnam Era | (APR 1998) | 52.222-37 |
| Equal Opportunity (DEVIATION) | (APR 1984) | 52.222-26 |
| Extras | (APR 1984) | 52.232-11 |
| Federal, State, and Local Taxes (Applicable UNLESS clause at FAR 52.229-6, Taxes-Foreign Fixed-Price Contracts (JAN 1991) applies to contracts to be performed outside the U.S.) | (JAN 1991) | 52.229-3 |
| Gratuities | (APR 1984) | 52.203-3 |
| Integrity of Unit Prices and Alternate I | (OCT 1997) (OCT 1997) | 52 215-14 |
| Interest | (JUN 1996) | 52.232-17 |
| Limitation of Liability | (FEB 1997) | 52.246-23 |
| Mandatory Information for Electronic Funds Transfer Payment | (AUG 1996) | 52.232-33 |
| Material Requirements | (OCT 1997) | 52.211-5 |
| Notice & Assistance Regarding Patent and Copyright Infringement | (AUG 1996) | 52.227-2 |
| Notice to the Government of Labor Disputes | (FEB 1997) | 52.222-1 |
| Patent Indemnity | (APR 1984) | 52.227-3 |
| Payments | (APR 1984) | 52.232-1 |
| Pollution Prevention and Right-to-Know Information | MAR 1997 | 52.223-5 |
| Preference for Privately Owned U.S. - Flag Commercial Vessels | (AUG 1996) | 52.247-64 |
| Preference for U.S. - Flag Air Carriers | (JAN 1997) | 52.247-63 |
| Printing/Copying Double-Sided on Recycled Paper | (JUN 1996) | 52.204-4 |
| Prompt Payment | (JUN 1997) | 52.232-25 |
| Protecting the Government's Interest When Subcontracting With Contractors Debarred, Suspended, or Proposed for Debarment | (AUG 1995) | 52.209-6 |
| Protest After Award | (AUG 1996) | 52.233-3 |

# CONTINUATION SHEET

REFERENCE NO. OF DOCUMENT BEING CONTINUED: SP0740-99-R-3025 | PAGE 17 OF 24 PAGES

| | | |
|---|---|---|
| Restrictions of Subcontractor Sales to the Government | (JUL 1995) | 52.203-6 |
| Subcontracts | (AUG 1996) | 52.244-2 |
| Taxes - Contracts Performed in U.S. Possessions or Puerto Rico | (APR 1984) | 52.229-6 |
| Termination for Convenience of the Government (Fixed-Price) (Short Form) (Applicable to contracts of $100,000 or less) | (AUG 1996) | 52.249-1 |
| Termination for Convenience of the Government (Fixed-Price) | (SEP 1996) | 52.249-2 |
| Toxic Chemical Release Reporting | (OCT 1996) | 52.223-14 |
| Utilization of Small, Small Disadvantaged and Women-Owned Small Business Concerns | (JAN 1999) | 52.219-8 |
| Walsh-Healey Public Contracts Act | (DEC 1996) | 52.222-20 |
| Order of Precedence - Uniform Contract Format | (OCT 1997) | 52.215-8 |
| Restrictions on Certain Foreign Purchases | (OCT 1996) | 52.225-11 |

II. DoD FAR SUPPLEMENT (48 CFR Chapter 2) Clauses

| | | |
|---|---|---|
| Assignment of Claims (Overseas) | (JUN 1997) | 252.225-7006 |
| Authorization to Perform | (JUN 1997) | 252.225-7042 |
| Buy American Act and Balance of Payments Program | (MAR 1998) | 252.225-7001 |
| Choice of Law (Overseas) | (JUN 1997) | 252.233-7001 |
| Control of Government Personnel Work Product | (APR 1992) | 252.204-7003 |
| Correspondence in English | (JUN 1997) | 252.225-7041 |
| Duty-Free Entry - Qualifying Country Supplies (End Products and Components) | (MAR 1998) | 252.225-7009 |
| Duty-Free Entry - Eligible End Products | (MAR 1998) | 252.225-7037 |
| Duty-Free Entry-Additional Provisions | (MAR 1998) | 252.225-7010 |
| Military Recruiting On Campus | (FEB 1996) | 252.209-7005 |
| Payment For Subline Items Not Separately Priced | (DEC 1991) | 252.204-7002 |
| Pricing Adjustments | (DEC 1991) | 252.215-7000 |
| Pricing of Contract Modifications | (DEC 1991) | 252.243-7001 |
| Qualifying Country Sources as Subcontractors | (DEC 1991) | 252.225-7002 |
| Postaward Conference | (DEC 1991) | 252.242-7000 |
| Subcontracting with Firms That are Owned or Controlled by the Government of a Terrorist Country | (MAR 1998) | 252.209-7004 |
| Supplies to be Accorded Duty-Free Entry | (MAR 1998) | 252.225-7008 |

I206 - DRUG-FREE WORK FORCE (SEP 1988) - DFARS 252.223-7004

I207 - INCONSISTENCY BETWEEN ENGLISH VERSION AND TRANSLATION OF CONTRACT (AUG 1989) - FAR 52.225-14

In the event of inconsistency between any terms of this contract and any translation thereof into another language, the English language meaning shall control.

I209 - LIMITATIONS ON PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (JUN 1997) - FAR 52.203-12

I216 - SUBCONTRACTS FOR COMMERCIAL ITEMS AND COMMERCIAL COMPONENTS (OCT 1998) - FAR 52.244-6

(a) Definition.
"Commercial item", as used in this clause, has the meaning contained in the clause at 52.202-1, Definitions.
"Subcontract", as used in this clause, includes a transfer of commercial items between divisions, subsidiaries, or affiliates of the Contractor or subcontractor at any tier.
(b) To the maximum extent practicable, the Contractor shall incorporate, and require its subcontractors at all tiers to incorporate, commercial items or nondevelopmental items as components of items to be supplied under this contract.
(c) Notwithstanding any other clause of this contract, the Contractor is not required to include any FAR provision or clause, other than those listed below to the extent they are applicable and as may be required to establish the reasonableness of prices under Part 15, in a subcontract at any tier for commercial items or commercial components:
(1) 52.222-26, Equal Opportunity (E.O. 11246);
(2) 52.222-35, Affirmative Action for Disabled Veterans and of the Vietnam Era (38 U.S.C. 4212(a));
(3) 52.222-36, Affirmative Action for Workers with Disabilities 29 U.S.C. 793); and
(4) 52.247-64, Preference for Privately-Owned U.S.-Flagged Commercial Vessels (46 U.S.C. 1241) (flow down not required for subcontracts awarded beginning May 1, 1996).
(d) The Contractor shall include the terms of this clause, including this paragraph (d), in subcontracts awarded under this contract.

## SECTION J

J01 - LIST OF DOCUMENTS, EXHIBITS, AND OTHER ATTACHMENTS

This solicitation consists of documents and attachments identified by an "X" in the space provided and made a part hereof.

| ATCH/FM NO. | NAME | DATE |
|---|---|---|
| (X) DD FM 1707 (Cover Sheet) | Information to Offerors or Quoters | MAR 90 |
| (X) SF 33 | Solicitation, Offer and Award | Rev 4-85 |
| (X) --- | Section B | --- |
| (X) --- | Sections C thru H | --- |
| ( ) --- | Pkg Sht(s) as cited in Sec D | --- |
| ( ) --- | Interim Amend. No. | |
| ( ) --- | Quality Assurance Provision (QAP) No. | |
| ( ) --- | Supplemental Alternate Offer Guidelines for AMO/NAVSEA/AVSCOM Critical Items | --- |
| ( ) SF 1411 | *Contract Pricing Proposal Cover Sheet | Rev 10-95 |
| ( ) SF 1448 | Proposal Cover Sheet (Cost or Pricing Data Not Required) | 10-95 |

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-R-3025 | PAGE OF 18 | 24 PAGES |
|---|---|---|---|

( ) DCSC FM 1650 Freight Shipping Information - Mode of Shipment AUG 73

( ) Form CASB-CMF Facilities Capital Cost of Money Factors Computation ---

( ) DD Form 1861 Contract Facilities Capital Cost of Money APR 96

(X) DC14369001 Palletization Rev 98151

( )

( )

( )

( ) DD FM 1423 Contract Data Rqmt List JUN 90
EXHIBIT No. ---
w/ATCH No. ---

EXHIBIT No. ---
w/ATCH No. ---

EXHIBIT No. ---
w/ATCH No. ---

EXHIBIT No. ---
w/ATCH No. ---

*Instructions included in FAR 15.404-6(b) must be followed carefully.

## SECTION K

**K01 - CERTIFICATE OF INDEPENDENT PRICE DETERMINATION (APR 1985) - FAR 52.203-2**

(a) The offeror certifies that -

(1) The prices in this offer have been arrived at independently, without, for the purpose of restricting competition, any consultation, communication, or agreement with any other offeror or competitor relating to (i) those prices, (ii) the intention to submit an offer, or (iii) the methods or factors used to calculate the prices offered;

(2) The prices in this offer have not been and will not be knowingly disclosed by the offeror, directly or indirectly, to any other offeror or competitor before bid opening (in the case of a formally advertised solicitation) or contract award (in the case of a negotiated solicitation) unless otherwise required by law; and

(3) No attempt has been made or will be made by the offeror to induce any other concern to submit or not to submit an offer for the purpose of restricting competition.

(b) Each signature on the offer is considered to be a certification by the signatory that the signatory--

(1) Is the person in the offeror's organization responsible for determining the prices being offered in this bid or proposal, and that the signatory has not participated and will not participate in any action contrary to subparagraphs (a)(1) through (a)(3) above; or

(2)(i) Has been authorized, in writing, to act as agent for the following principals in certifying that those principals have not participated, and will not participate in any action contrary to subparagraphs (a)(1) through (a)(3) above

*Capital City Pipe Inc*
*PO Box 12368*
*Tallahassee FL 32317*

(insert full name of person(s) in the offeror's organization responsible for determining the prices offered in this bid or proposal, and the title of his or her position in the offeror's organization);

(ii) As an authorized agent, does certify that the principals named in subdivision (b)(2)(i) above have not participated, and will not participate, in any action contrary to subparagraphs (a)(1) through (a)(3) above; and

(iii) As an agent, has not personally participated, and will not participate, in any action contrary to subparagraphs (a)(1) through (a)(3) above.

(c) If the offeror deletes or modifies subparagraph (a)(2) above, the offeror must furnish with its offer a signed statement setting forth in detail the circumstances of the disclosure.

**K02 - PREVIOUS CONTRACTS AND COMPLIANCE REPORTS (APR 1984) (DEVIATION) FAR 52.222-22**

The offeror represents that--

(a) It ( ) has, (✓) has not participated in a previous contract or subcontract subject to the Equal Opportunity clause of this solicitation;

(b) It (✓) has, ( ) has not, filed all required compliance reports; and

(c) Representations indicating submission of required compliance reports, signed by proposed subcontractors, will be obtained before subcontract awards.

**K03 SMALL BUSINESS PROGRAM REPRESENTATIONS (OCT 1998) FAR 52.219-1**

(a)(1) The standard industrial classification (SIC) code for this acquisition is

(2) The small business size standard is (insert size standard).

(3) The small business size standard for a concern which submits an offer in its own name, other than on a construction or service contract, but which proposes to furnish a product which it did not itself manufacture, is 500 employees.

(b) Representations. (1) The offeror represents and certifies that it (✓) is, ( ) is not a small business concern.

(2) (Complete only if offeror represented itself as a small business concern in paragraph (b)(1) of this provision.) The offeror represents, for general statistical purposes, that it ( ) is, ( ) is not, a small disadvantaged business concern as defined in 13 CFR 124.1002.

(3) (Complete only if offeror represented itself as a small business concern in block (b)(1) of this section.) The offeror represents as part of its offer that it ( ) is (✓) is not a women-owned small business concern.

(c) Definitions.

"Small business concern," as used in this provision, means a concern, including its affiliates, that is independently owned and operated, not dominant in the field of operation in which it is bidding on Government contracts, and qualified as a small business under the criteria in 13 CFR Part 121 and the size standard in paragraph (a) of this provision.

"Woman-owned small business concern," as used in this provision, means a small business concern--

(1) Which is at least 51 percent owned by one or more women or, in the case of any publicly owned business, at least 51 percent of the stock of which is owned by one or more women; and

(2) Whose management and daily business operations are controlled by one or more women.

(d) Notice. (1) If this solicitation is for supplies and has been set aside, in whole or in part, to small business concerns, then the clause in this solicitation providing notice of the set-aside contains restrictions on the source of the end items to be furnished.

(2) Under 15 U.S.C. 645(d), any person who misrepresents a firm's status as a small or small disadvantaged business concern in order to obtain a contract to be awarded under the preference programs established pursuant to sections 8(a), 8(d), 9, or 15 of the Small Business Act or any other provision of Federal law that specifically references section 8(d) for a definition of program eligibility, shall -

(i) Be punished by imposition of fine, imprisonment, or both;

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-R-3025 | PAGE OF 19 | 24 PAGES |
|---|---|---|---|

(ii) Be subject to administrative remedies, including suspension and debarment; and
(iii) Be ineligible for participation in programs conducted under the authority of the Act.

(K) ALTERNATE I (OCT 1994)
(4) [Complete if the offeror has represented itself as disadvantaged in paragraph (b)(2) of this provision. (The offeror shall check the category in which its ownership falls):

[✓] Black American.
[ ] Hispanic American.
[ ] Native American (American Indians, Eskimos, Aleuts, or Native Hawaiians).
[ ] Asian-Pacific American (persons with origins from Burma, Thailand, Malaysia, Indonesia, Singapore, Brunei, Japan, China, Taiwan, Laos, Cambodia (Kampuchea), Vietnam, Korea, The Philippines, U.S. Trust Territory of the Pacific Islands (Republic of Palau), Republic of the Marshall Islands, Federated States of Micronesia, The Commonwealth of the Northern Mariana Islands, Guam, Samoa, Macao, Hong Kong, Fiji, Tonga, Kiribati, Tuvalu, or Nauru).
[ ] Subcontinent Asian (Asian-Indian) American (persons with origins from India, Pakistan, Bangladesh, Sri Lanka, Bhutan, the Maldives Islands, or Nepal).
[ ] Individual/concern, or other than one of the preceding.

K04 - PROHIBITION OF SEGREGATED FACILITIES (APR 1984) (DEVIATION)

(a) "Segregated facilities," as used in this clause, means any waiting rooms, work areas, rest rooms and wash rooms, restaurants and other eating areas, time clocks, locker rooms and other storage or dressing areas, parking lots, drinking fountains, recreation or entertainment areas, transportation, and housing facilities provided for employees, that are segregated by explicit directive or are in fact segregated on the basis of race, color, religion, sex or national origin because of written or oral policies or employee custom. The term does not include separate or single-user rest rooms and necessary dressing or sleeping areas, which shall be provided to assure privacy between the sexes.
(b) The Contractor agrees that it does not and will not maintain or provide for its employees any segregated facilities at any of its establishments, and that it does not and will not permit its employees to perform their services at any location under its control where segregated facilities are maintained. The Contractor agrees that a breach of this clause is a violation of the Equal Opportunity clause in this contract.
(c) The Contractor shall include this clause in every subcontract that contains the clause of this contract entitled "Equal Opportunity."

K06 - RECOVERED MATERIAL CERTIFICATION (OCT 1997) - FAR 52.223-4

K07b - TYPE OF BUSINESS ORGANIZATION (OCT 1997) - FAR 52.215-6 (RFP's only)

The offeror or respondent, by checking the applicable box, represents that-
(a) It operates as [ ] an individual, [ ] a partnership, [ ] a nonprofit organization, [ ] a joint venture, or a corporation under the laws of the State of FLORIDA
(b) If the offeror or respondent is a foreign entity, it operates as [ ] an individual, [ ] a partnership, [ ] a nonprofit organization, [ ] a joint venture, or [ ] a corporation, registered for business in ______________ (Country)

K08 - CLEAN AIR AND WATER CERTIFICATION (APR 1984) - FAR 52.223-1

The Offeror certifies that-
(a) Any facility to be used in the performance of this proposed contract is [✓], is not [ ] listed on the Environmental Protection Agency List of Violating Facilities;
(b) The offeror will immediately notify the Contracting Officer, before award, of the receipt of any communication from the Administrator, or a designee, of the Environmental Protection Agency, indicating that any facility that the offeror proposes to use for the performance of the contract is under consideration to be listed on the EPA List of Violating Facilities; and
(c) The offeror will include a certification substantially the same as this certification, including this paragraph (c), in every nonexempt subcontract.

K12 - AFFIRMATIVE ACTION COMPLIANCE (APR 1984) FAR 52.222-25

The offeror represents that (a) it [✓] has developed and has on file, [ ] has not developed and does not have on file, at each establishment, affirmative action programs required by the rules and regulations of the Secretary of Labor (41 CFR 60-1 and 60-2), or (b) it [ ] has not previously had contracts subject to the written affirmative action programs requirement of the rules and regulations of the Secretary of Labor.

NOTE: Offeror represents that he [ ] has, [✓] has not, 50 or more employees.

K16 - DATA UNIVERSAL NUMBERING SYSTEM (DUNS) NUMBER (APR 1996) - FAR 52.204-6

(a) The offeror shall enter, in the block with its name and address on the cover page of its offer, the annotation "DUNS" followed by the DUNS number that identifies the offeror's name and address exactly as stated in the offer. The DUNS number is a nine-digit number assigned by Dun and Bradstreet Information Services.
(b) If the offeror does not have a DUNS number, it should contact Dun and Bradstreet directly to obtain one. A DUNS number will be provided immediately by telephone at no charge to the offeror. For information on obtaining a DUNS number, the offeror, if located within the United States, should call Dun and Bradstreet at 1-800-333-0505. The offeror should be prepared to provide the following information:
(1) Company name.
(2) Company address.
(3) Company telephone number.
(4) Line of business.
(5) Chief executive officer/key manager.
(6) Date the company was started.
(7) Number of people employed by the company.
(8) Company affiliation.
(c) Offerors located outside the United States may obtain the location and phone number of the local Dun and Bradstreet Information Services office from the Internet Home Page at http://www.[dnb.com/. If an offeror is unable to locate a local service center, it may send an e-mail to Dun and Bradstreet at globalinfo

K17 - WHEN OFFEROR DESIRES ADMINISTRATIVE MATTERS TO BE PERFORMED AT OTHER THAN ADDRESS IN BLOCK 15A, SF 33, INDICATE BELOW. (APR 1984) --DCSC INFORMATION TO VENDOR

K18 - MINIMUM ACCEPTANCE PERIODS (APR 1984) - DCSC 52.214-9C01

MINIMUM BID ACCEPTANCE PERIOD (APR 1984) - FAR 52.214-16 (IFBs only)

(a) "Acceptance period," as used in this provision, means the number of calendar days available to the Government for awarding a contract from the date specified in this solicitation for receipt of bids.

(b) This provision supersedes any language pertaining to the acceptance period that may appear elsewhere in this solicitation.

(c) The Government requires a minimum acceptance period of (See Notes 1 & 2) calendar days.

(d) In the space provided immediately below, bidders may specify a longer acceptance period than the Government's minimum requirement. The bidder allows the following

# CONTINUATION SHEET

| REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|
| SP0740-99-R-3025 | 20 | 24 PAGES |

acceptance period: calendar days.

(e) A bid allowing less than the Government's minimum acceptance period will be rejected.

(f) The bidder agrees to execute all that it has undertaken to do, in compliance with its bid, if that bid is accepted in writing within (1) the acceptance period stated in paragraph (c) above or (2) any longer acceptance period stated in paragraph (d) above.

NOTES:
(1) All Items (except Wood Products):
(i) 60 calendar days.
(ii) If a period is not stated by offeror, offer may be accepted within 60 calendar days after date of bid opening.

(2) Wood Products' Items:
(i) 10 calendar days for shipments to Ports of Loading.
(ii) 7 calendar days for all other shipments.
(iii) If a period is not stated by offeror, offer may be accepted within 10 calendar days after date of bid opening.

PERIOD FOR ACCEPTANCE OF OFFER (AFR 1984) - FAR 52.215-19 (RFPs only)

In compliance with the solicitation, the offeror agrees, if this offer is accepted within : calendar days (60 calendar days unless a different period is inserted by the offeror) from the date specified in the solicitation for receipt of offers, to furnish any or all items on which prices are offered at the price set opposite each item, delivered at the designated point(s), within the time specified in the Schedule.

NOTE:
(3) Negotiated RFP: The minimum acceptance periods stated in notes (1) and (2) above are desired. If a different period is not stated, 60 calendar days applies except for wood products which is 30 calendar days.

K20 - ROYALTY INFORMATION (APR 1984) - FAR 52.227-6 (RFPs only)

K25 - REPRESENTATION OF EXTENT OF TRANSPORTATION BY SEA (AUG 1992) - DFARS 252.247-7022

(a) The Offeror shall indicate by checking the appropriate blank in paragraph (b) of this clause whether transportation of supplies by sea is anticipated under the resultant contract. The term "supplies" is defined in the Transportation of Supplies by Sea clause of this solicitation.

(b) REPRESENTATION.
The Offeror represents that it-

( ) Does anticipate that supplies will be transported by sea in the performance of any contract or subcontract resulting from this solicitation.

(✓) Does not anticipate that supplies will be transported by sea in the performance of any contract or subcontract resulting from this solicitation.

(c) Any contract resulting from this solicitation will include the Transportation of Supplies by Sea clause. If the Offeror represents that it will not use ocean transportation, the resulting contract will also include the Defense FAR Supplement clause at 252.247-7024, Notification of Transportation of Supplies by Sea.

K30 - Place of Performance (FAR 52.215-6)(OCT 1997)

(a) The offeror or respondent, in the performance of any contract resulting from this solicitation, ( ) intends, (✓) does not intend (check applicable block) to use one or more plants or facilities located at a different address from the address of the offeror or respondent as indicated in this proposal or response to request for information.
(b) If the offeror or respondent checks "intends" in paragraph (a) of this provision, it shall insert in the following spaces the required information:

Place of Performance (Street, Address, City, County, State, Zip Code:
JGB Enterprises
115 Metropolitan Dr / Liverpool NY

Name and Address of Owner and Operator of the Plant or Facility if other Than Offeror or Respondent
JGB Enterprises
115 Metropolitan Dr / Liverpool NY

K31 - INSPECTION AND SHIPPING POINTS (APR 1984) - DCSC 52.251-9C02

Paragraphs a, b and c below must be completed ONLY if the place of inspection of supplies, packaging/packing point or shipping point are DIFFERENT than the place of manufacture/treating facility listed in Provision K30.
(a) PLACE OF INSPECTION (Supplies): Indicate below where Contractor inspection will be performed and where facilities and assistance for Government verification inspection will be furnished as required by FAR 52.246-2(b) and (d) Inspection.

| CLIN(S) | PLANT NAME | ADDRESS |
|---|---|---|
| | | |
| | | |
| | | |

(b) PLACE OF INSPECTION (Packaging and Packing Point): Indicate location at which packaging/packing will be performed if other than place of inspection for supplies.

| CLIN(S) | PLANT NAME | ADDRESS |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

(c) SHIPPING POINT: Indicate below the shipping point if DIFFERENT from (a) or (b) above (See Provision M10).

| CLIN(S) | PLANT NAME | ADDRESS |
|---|---|---|
| | | |
| | | |
| | | |
| | | |

K35 - ECONOMIC PURCHASE QUANTITY-SUPPLIES (AUG 1987) FAR 52.207-4

(a) Offerors are invited to state an opinion on whether the quantity(ies) of supplies on which bids, proposals or quotes are requested in this solicitation is (are) economically advantageous to the Government.

(b) Each offeror who believes that acquisitions in different quantities would be more advantageous is invited to recommend an economic purchase quantity. If different quantities are recommended, a total and a unit price must be quoted for applicable items. An economic purchase quantity is that quantity at which a significant price break occurs. If there are significant price breaks at different quantity points, this information is desired as well.

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-99-R-3025 | PAGE OF 21 | 24 PAGES |
|---|---|---|---|

OFFEROR RECOMMENDATIONS

| CLIN(s) | QUANTITY | PRICE QUOTATION | TOTAL |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

(c) The information requested in this provision is being solicited to avoid acquisitions in disadvantageous quantities and to assist the Government in developing a data base for future acquisitions of these items. However, the Government reserves the right to amend or cancel the solicitation and resolicit with respect to any individual item in the event quotations received and the Government's requirements indicate that different quantities should be acquired.

K40 - DISCLOSURE OF OWNERSHIP OR CONTROL BY THE GOVERNMENT OF A TERRORIST COUNTRY (MAR 1998) DFARS 252.209-7001

(a) Definitions

As used in this provision--

(1) "Government of a terrorist country" includes the state and the government of a terrorist country, as well as any political subdivision, agency, or instrumentality thereof.

(2) "Terrorist country" means a country determined by the Secretary of State, under Section 6(j)(1)(A) of the Export Administration Act of 1979 (50 U.S.C. App. 2405(j)(1)(A)), to be a country the government of which has repeatedly provided support for acts of international terrorism. As of the date of this provision, terrorist countries include: Cuba, Iran, Iraq, Libya, North Korea, Sudan, and Syria.

(3) "Significant interest" means--

(i) Ownership of or beneficial interest in five percent (5%) or more of the firm's or subsidiary's securities. Beneficial interest includes holding five percent (5%) or more of any class of the firm's securities in "nominee shares", "street names", or some other method of holding securities that does not disclose the beneficial owner;

(ii) Holding a management position in the firm such as director or officer;

(iii) Ability to control or influence the election, appointment, or tenure of directors or officers of the firm;

(iv) Ownership of ten percent (10%) or more of the assets of a firm such as equipment, buildings, real estate, or other tangible assets of the firm; or

(v) Holding fifty percent (50%) or more of the indebtedness of a firm.

(b) Prohibition on award.

In accordance with 10 U.S.C. 2327, no contract may be awarded to a firm or a subsidiary of a firm if the government of a terrorist country has a significant interest in the firm or subsidiary or, in the case of a subsidiary, the firm that owns the subsidiary, unless a waiver is granted by the Secretary of Defense.

(c) Disclosure.

If the government of a terrorist country has a significant interest in the Offeror or a subsidiary of the Offeror, the Offeror shall disclose such interest in an attachment to its offer. If the Offeror is a subsidiary, it shall also disclose any significant interest the government of a terrorist country has in any firm that owns or controls the subsidiary. The disclosure shall include--

(1) Identification of each government holding a significant interest; and

(2) A description of the significant interest held by each government.

K41 - DISCLOSURE OF OWNERSHIP OR CONTROL BY A FOREIGN GOVERNMENT (SEP 1994) - DFARS 252.209-7002

K43 - TAXPAYER IDENTIFICATION (OCT 1998) - FAR 52.204-3

(a) Definitions.

"Common parent," as used in this provision, means that corporate entity that owns or controls an affiliated group of corporations that files its Federal income tax returns on a consolidated basis, and of which the offeror is a member.

"Taxpayer Identification Number (TIN)," as used in this provision, means the number required by the Internal Revenue Service (IRS) to be used by the offeror in reporting income tax and other returns. The TIN may be either a Social Security Number or an Employer Identification Number.

(b) All offerors must submit the information required in paragraphs (d) through (f) of this provision to comply with debt collection requirements of 31 U.S.C. 7701(c) and 3325 (d), reporting requirements of 26 U.S.C. 6041, 6041A, and 6050M and implementing regulations issued by the IRS. If the resulting contract is subject to the reporting requirements described in Federal Acquisition Regulation (FAR) 4.904, the failure or refusal by the the offeror to furnish the information may result in a 31 percent reduction of payments otherwise due under the contract.

(c) The TIN may be used by the Government to collect and report on any delinquent amounts arising out of the offeror's relationship with the Government (31 U.S.C. 7701(c)(3)). If the resulting contract is subject to the payment reporting requirements described in FAR 4.904, the TIN provided hereunder may be matched with IRS records to verify the accuracy of the offeror's TIN.

(d) ✓ TIN: 59-2991957

( ) TIN has been applied for.

( ) TIN is not required because:

( ) Offeror is a nonresident alien, foreign corporation, or foreign partnership that does not have income effectively connected with the conduct of a trade or business in the United States and does not have an office or place of business or a fiscal paying agent in the United States;

( ) Offeror is an agency or instrumentality of a foreign government;

( ) Offeror is an agency or instrumentality of the Federal Government.

(e) Type of organization.

( ) Sole proprietorship;

( ) Partnership;

(✓) Corporate entity (not tax-exempt);

✓ Corporate entity (tax-exempt);

( ) Government entity (Federal, State, or local);

( ) Foreign government;

( ) International organization per 26 CFR 1.6049-4

( ) Other ____________

(f) Common parent.

✓ Offeror is not owned or controlled by a common parent as defined in paragraph (a) of this provision.

( ) Name and TIN of common parent:

Name ____________

TIN ____________

K45 - CERTIFICATION REGARDING DEBARMENT, SUSPENSION, PROPOSED PROPOSED DEBARMENT, AND OTHER RESPONSIBILITY MATTERS (MAR 1996) - FAR 52.209-5

(a)(1) The Offeror certifies, to the best of its knowledge and belief, that--

(i) The Offeror and/or any of its Principals--

(A) Are ( ) are not (✓) presently debarred, suspended, proposed for debarment, or declared ineligible for the award of contracts by any Federal agency.

(B) Have ( ) have not (✓), within a three-year period preceding this offer, been convicted of or had a civil judgement rendered against them for: commission of fraud or a criminal offense in connection with obtaining, attempting to obtain, or performing a public (Federal, state, or local) contract or subcontract; violation of Federal or state antitrust statutes relating to the submission of offers; or commission of embezzlement, theft, forgery, bribery, falsification or destruction of records, making false statements, tax evasion, or receiving stolen

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED SP0740-95-R-3025 | PAGE OF 22 | 24 PAGES |
|---|---|---|---|

property; and

(C) Are ( ) are not ( ) presently indicted for, or otherwise criminally or civilly charged by a governmental entity with, commission of any of the offenses enumerated in subdivision (a)(1)(i)(B) of this provision.

(ii) The Offeror has ( ) has not ( ) within a three-year period preceding this offer, had one or more contracts terminated for default by any Federal agency.

(2) "Principals," for the purposes of this certification, means officers; directors; owners; partners; and, persons having primary management or supervisory responsibilities within a business entity (e.g., general manager; plant manager; head of a subsidiary, division or business segment, and similar positions).

THIS CERTIFICATION CONCERNS A MATTER WITHIN THE JURISDICTION OF AN AGENCY OF THE UNITED STATES AND THE MAKING OF A FALSE, FICTITIOUS, OR FRAUDULENT CERTIFICATION MAY RENDER THE MAKER SUBJECT TO PROSECUTION UNDER SECTION 1001, TITLE 18, UNITED STATES CODE.

(b) The Offeror shall provide immediate written notice to the Contracting Officer if, at any time prior to contract award, the offeror learns that its certification was erroneous when submitted or has become erroneous by reason of changed circumstances.

(c) A certification that any of the items in paragraph (a) of this provision exists will not necessarily result in withholding of an award under this solicitation. However, the certification will be considered in connection with a determination of the Offeror's responsibility. Failure of the offeror to furnish a certification or provide such additional information as requested by the Contracting Officer may render the Offeror nonresponsible.

(d) Nothing contained in the foregoing shall be construed to require establishment of a system of records in order to render, in good faith, the certification required by paragraph (a) of this provision. The knowledge and information of an Offeror is not required to exceed that which is normally possessed by a prudent person in the ordinary course of business dealings.

(e) The certification in paragraph (a) of this provision is a material representation of fact upon which reliance was placed when making award. If it is later determined that the Offeror knowingly rendered an erroneous certification, in addition to other remedies available to the Government, the Contracting Officer may terminate the contract resulting from this solicitation for default.

**K46 - CERTIFICATION AND DISCLOSURE REGARDING PAYMENTS TO INFLUENCE CERTAIN FEDERAL TRANSACTIONS (APR 1991) - FAR 52.203-11**

**K47 - INFORMATION FOR DUTY-FREE ENTRY EVALUATION (MAR 1998) DFARS 252.225-7003**

(a) Does the offeror propose to furnish -

(1) A domestic end product with nonqualifying country components for which the offeror requests duty-free entry; or

(2) A foreign end product consisting of end items, components, or material of foreign origin other than those for which duty-free entry is to be accorded pursuant to the Duty - Free Entry-Qualifying Country Supplies (End Products and Components) clause or, if applicable, the Duty - Free Entry-Eligible End Products clause of this solicitation?

( ) Yes ( ) No

(b) If the answer in paragraph (a) is yes, answer the following questions:

(1) Are such foreign supplies now in the United States? ( ) Yes ( ) No

(2) Has the duty on such foreign supplies been paid? ( ) Yes ( ) No

(3) If the answer to paragraph (b)(2) is no, what amount is included in the offer to cover such duty?
$

**K50 - CERTIFICATION OF TOXIC CHEMICAL RELEASE REPORTING (OCT 1996) - FAR 52.223-13**

(a) Submission of this certification is a prerequisite for making or entering into this contract imposed by Executive Order 12969, August 8, 1995.

(b) By signing this offer, the offeror certifies that--

(1) As the owner or operator of facilities that will be used in the performance of this contract that are subject to the filing and reporting requirements described in section 313 of the Emergency Planning and Community Right-to-Know Act of 1986 (EPCRA) (42 U.S.C. 11023) and section 6607 of the Pollution Prevention Act of 1990 (PPA) (42 U.S.C. 13106), the offeror will file and continue to file for such facilities for the life of the contract the Toxic Chemical Release Inventory Form (Form R) as described in sections 313(a) and (g) of EPCRA and section 6607 of PPA; or

(2) None of its owned or operated facilities to be used in the performance of this contract is subject to the Form R filing and reporting requirements because each such facility is exempt for at least one of the following reasons: (Check each block that is applicable.)

[ ] (i) The facility does not manufacture, process, or otherwise use any toxic chemicals listed under section 313(c) of EPCRA, 42 U.S.C. 11023(c);

[ ] (ii) The facility does not have 10 or more full-time employees as specified in section 313(b)(1)(A) of EPCRA, 42 U.S.C. 11023(b)(1)(A);

[ ] (iii) The facility does not meet the reporting thresholds of toxic chemicals established under section 313(f) of EPCRA, 42 U.S.C. 11023(f) (including the alternate thresholds at 40 CFR 372.27, provided an appropriate certification form has been filed with EPA);

[ ] (iv) The facility does not fall within Standard Industrial Classification Code (SIC) designations 20 through 39 as set forth in section 19.102 of the Federal Acquisition Regulation; or

[ ] (v) The facility is not located within any State of the United States, the District of Columbia, the Commonwealth of Puerto Rico, Guam, American Samoa, the United States Virgin Islands, the Northern Mariana Islands, or any other territory or possession over which the United States has jurisdiction.

**SECTION L**

**L01 - AUTHORIZED DEVIATIONS IN PROVISIONS (APR 1984) - FAR 52.252-5**

(a) The use in this solicitation of any Federal Acquisition Regulation (48 CFR Chapter 1) provision with an authorized deviation is indicated by the addition of "(DEVIATION)" after the date of the provision.

(b) The use in this solicitation of any DoD FAR Supplement (48 CFR Chapter 2) or Defense Logistics Acquisition Regulation provision with an authorized deviation is indicated by the addition of "(DEVIATION)" after the name of the regulation.

**L05 - POSTPONEMENT OF OPENING OF OFFERS (OCT 1992) - DLAD 52.214-9000**

If the opening of offers is postponed because emergency or unanticipated events (such as, but not limited to, flood, fire, accident, weather condition or strikes) result in closing the designated site for opening offers, so that the conduct of openings as scheduled is impracticable, offers or modifications or withdrawal of offers received prior to the time of actual opening will be considered as timely. Offers or modifications or withdrawal of offers received after the time of actual opening of offers, when opening of offers was postponed as provided above, will not be considered except as provided in FAR 52.214-7 or FAR 52.215-10 as applicable.

**L11 - NOTICE OF PRIORITY RATING FOR NATIONAL DEFENSE USE (SEP 1990) - FAR 52.211-14**

Any contract awarded as a result of this solicitation will be ( ) DX Rated order; (X) DO Rated order certified for national defense use under the Defense Priorities and Allocations System (DPAS) (15 CFR 700), and the Contractor will be required to follow all the requirements of this regulation.

( ) DX-Rating; (X) DO-Rating

NOTE: (INFORMATION FOR OFFEROR-

(X) DO A1 ( ) DO A1 rating

( ) DX

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED | PAGE OF | |
|---|---|---|---|
| | SP0740-99-R-3025 | 23 | 24 PAGES |

L15 - SUBMISSION OF OFFERS IN THE ENGLISH LANGUAGE (APR 1991) - FAR 52.214-34

Offers submitted in response to this solicitation shall be in the English language. Offers received in other than English shall be rejected.

L16 - SUBMISSION OF OFFERS IN U.S. CURRENCY (APR 1991) - FAR 52.214-35

Offers submitted in response to this solicitation shall be in terms of U.S. dollars. Offers received in other than U.S. dollars shall be rejected.

L18 - GOVERNMENT PRODUCTION AND RESEARCH PROPERTY (APR 1985) - DCSC 52.245-9C02

This solicitation does not authorize the use of any Government production or research property, except as may be specified in the solicitation. If an offeror requires the use, in performing any resulting contract, of any items of Government property in the offeror's or its subcontractor's possession under a facilities contract or agreement independent of this solicitation, such offers, to be responsive, must identify the contract under which the property is held and list the property to be used showing acquisition cost and date of acquisition, and include written permission of the Contracting Officer having cognizance of the property to use property for the period required under the solicitation, and indicate the rent to be paid for the use, or if use is rent free, the evaluation factor to be applied computed under the facilities contract. Offers in response to sealed bid solicitations contingent on the use of Government Property not provided for in the schedule thereof that do not comply with the foregoing will be nonresponsive and not considered for award.

L19 - TYPE OF CONTRACT (APR 1984) - FAR 52.216-1 (RFPs only)

The Government contemplates award of:
(X) FIRM FIXED PRICE
( ) FIXED PRICE WITH ECONOMIC PRICE ADJUSTMENT
( )
contract resulting from this solicitation.

L27 - SERVICE OF PROTEST (AUG 1996) - FAR 52.233-2

(a) Protests, as defined in Section 33.101 of the Federal Acquisition Regulation, that are filed directly with an agency, and copies of any protests that are filed with the General Accounting Office (GAO), shall be served on the contracting officer (addressed as follows) by obtaining written and dated acknowledgment of receipt from:

Office of Counsel (DCSC-G)
Defense Supply Center Columbus
P.O. Box 16704
Columbus, OH 43216-5010

(b) The copy of any protest shall be received in the office designated above within one day of filing a protest with the GAO.

L28 - MANUFACTURING OR PRODUCTION INFORMATION (FEB 1996) - DLAD 52.217-9001 (RFPs only)

If offers are submitted which fail to provide the actual manufacturing/production source(s) for the item(s) offered, or such, if such information is provided but restricted from disclosure (by the inclusion of the FAR 52.215-12 legend or any other proprietary or confidentiality restriction) such offers may be rejected as technically unacceptable. This provision does not apply to commercial items.

L37 - AGENCY PROTESTS (SEP 1996) - DLAD 52.233-9000

Companies protesting this procurement may file a protest
1. with the contracting officer, or
2. with the General Accounting Office, or
3. pursuant to Executive Order 12979, with the activity for a decision at a level above the contracting officer.

Protests filed with the activity should be addressed to the contracting officer, but should be addressed to the contracting officer, but should clearly state that they are an "Agency Level Protest under Executive Order 12979." The contracting officer will forward the protest to the appropriate official for decision. (This process allows for a higher level decision on the initial protest; it is not a review of a contracting officer's decision on a protest filed with the contracting officer.) Absent a clear indication of the intent to file an agency level protest, protests will be presumed to be protests to the contracting officer.

LS100 - SOLICITATION PROVISIONS INCORPORATED BY REFERENCE (FEB 1998) - FAR 52.252-1

This solicitation incorporates one or more solicitation provisions by reference, with the same force and effect as if they were given in full text. Upon request, the Contracting Officer will make their full text available. The offeror is cautioned that the listed provisions may include blocks that must be completed by the offeror and submitted with its quotation or offer. In lieu of submitting the full text of those provisions, the offeror may identify the provision by paragraph identifier and provide the appropriate information with its quotation or offer. Also, the full text of a solicitation provision may be accessed electronically at this/these address(es):

NOTE: The text of any referenced FAR provisions may be obtained by request to Defense Construction Supply Center, ATTN: DCSC-BOA, P.O. Box 16704, Columbus, Ohio 43216-5000. However, the complete edition of Federal Acquisition Regulation (FAR) may be obtained by purchase from the Superintendent of Documents, Government Printing Office, Washington, D. C. 20402.

I. FEDERAL ACQUISITION REGULATION (48 CFR CHAPTER 1) SOLICITATION PROVISIONS

| PROVISION TITLE | DATE | FAR REFERENCE |
|---|---|---|
| COMPLIANCE WITH VETERANS' EMPLOYMENT REPORTING REQUIREMENTS | (MAR 1998) | 252.209-7003 |

## SECTION M

M06 - F.O.B. TERMS (MAR 1972) - DCSC 52.247-9C08

Bids/offers submitted on a basis other than the F.O.B. terms specified in Section F will render an offeror's bid (IFB) nonresponsive and may preclude consideration of an offeror's proposal (RFP).

ATTACHMENT
PALLETIZATION NO. DC1636P001 - 961&0

1. SCOPE. This sheet covers the requirements for palletization of DCSC items of supply for handling, shipment, and storage.

2. REFERENCED DOCUMENTS. The following documents, of the issue in effect on the date of solicitation, form a part of this palletization sheet to the extent specified herein.

Specifications

FEDERAL

NN-P-71 Pallets, Material Handling, Wood Stringer Construction, 2-way and 4-way (Partial

Standards

MILITARY

MIL-STD-147 Palletized Unit Load

(Copies of listed federal and military specifications, standards, and associated documents listed in the Department of Defense Index of Specifications and Standards (DODISS), should be obtained from the DOD Single Stock Point, Commanding Officer, Naval Publications and Forms (Center, 5801 Tabor Ave., Philadelphia, PA 19120-5099).

3. REQUIREMENTS.

Shipments of indentical items packed in four or more shipping

| CONTINUATION SHEET | REFERENCE NO. OF DOCUMENT BEING CONTINUED<br>SP0740-99-R-3025 | PAGE OF<br>24 | 24<br>PAGES |
|---|---|---|---|

containers exceeding a total of 48 cubic feet per destination shall be palletized except when the shipping containers are required to be skidded (see 4c), or a quantity of four shipping containers palet exceeds the size of weight limitations for palletized loads (see 3a and 3b, as applicable). Shipments packed Level C shall be palletized in accordance with 3a or 3b. Shipments packed Level A or Level B shall be palletized in accordance with 3b.

a. Material may be palletized on commercial pallets provided the load meets the following requirements:

(1) The load does not exceed 52 inches in length or width, 54 inches in height, and 3,000 pounds.

(2) The load is prepared and secured in a manner that will ensure carrier acceptance and permit safe rehandling at destination.

b. Palletization shall comply with MIL-STD-147 and appendices there to modified as follows.

(1) Loads shall be stable and shall not exceed the size and overseas limitations of MIL-STD-147.

(2) Glued loads shall not be used.

(3) For Level A packing, pallets shall comply with NN-P-71, Type V, class 1, size 2, except softwood may be used and the size may be reduced to a minimum of 36 inches in length and 44 inches in width to properly fit the load.

(4) For Level B packing, pallets shall conform to NN-P-71, Type II, size 2; Type IV; or Type V, class I, size 1. Wood used to construct pallets shall be group II, III, or IV, grade A, as specified in NN-P-71.

(5) Residual quantities of less than the quantity required for one course of the load need not be palletized.

c. Palletization is not required for shipping containers that are constructed with skids. Shipping containers, except drums, exceeding 70 pounds gross weight or 40 inches in length, shall be constructed with skids, skids, shall be a minimum of 3x4 inch (nominal) lumber and shall be securely attached to permit multiple re-handling at destination. Drums shall be palletized.

Prepared by: DSCC
Columbus, OH 43216-5000
December 13, 1996

SECTION A

[X] J AWARD/CONTRACT [ ] K

1. THIS CONTRACT IS A RATED ORDER UNDER DPAS (15 CFR 700) > RATING: DOA1 | PAGE 01 OF PAGES 24

2. CONTRACT (Proc. Inst. Ident.) NO.: SP0740-99-C-1004

3. EFFECTIVE DATE: 99 JUN 29

4. REQUISITION/PURCHASE REQUEST/PROJECT NO.: SEE ATTACHED

5. ISSUED BY CODE SC0700

DEFENSE SUPPLY CENTER COLUMBUS
ATTN: DSCC-
3990 E. BROAD STREET, P.O. BOX 16704
COLUMBUS, OHIO 43216-5010

For Post Award Inquiries - See G01

6. ADMINISTERED BY CODE S1109A

DCMC CLEARWATER
GADSEN BLDG SUITE 200
9549 KROGER BLVD
ST PETERSBURG FL 33702-2455

CD: PAS: YES

7. NAME AND ADDRESS OF CONTRACTOR (No., street, city, state and ZIP code)

CAPITAL CITY PIPES INC
1872 MILLS ST SUITE F
TALLAHASSEE FL 32310-0205

CAGE CODE 0NSZ5 FACILITY CODE SEE SCHEDULE

8. DELIVERY
[X] FOB DESTINATION *See Section F
[ ] FOB ORIGIN [ ] OTHER (See below)

9. DISCOUNT FOR PROMPT PAYMENT

NET 30

10. SUBMIT INVOICES (4 copies unless otherwise specified) TO THE ADDRESS SHOWN IN > Item BLOCK 12

11. SHIP TO/MARK FOR CODE

SEE SECTION B

12. PAYMENT WILL BE MADE BY: EFT: T CODE S33181

DFAS COLUMBUS CENTER
ATTN: DFAS-CO-LSCAA
P O BOX 182317
COLUMBUS OH 43218-2317

13. AUTHORITY FOR USING OTHER THAN FULL AND OPEN COMPETITION:

[X] 10 U.S.C. 2304 (c) ( 1)
[ ] 41 U.S.C. 253 (c) ( )

14. ACCOUNTING AND APPROPRIATION DATA:

[ ] OTHER - See Sec G, Clause G03
[ ] CG: 97 x 4930.5CC0 000-26.0 S33-150
[ ] 97 x 4930.5CC0 000-22.1 S33-150 (Trans)
[ ] FMS 9711 x 8242 L009 4D 8401 GBL S380000 (Trans)

[ ] Award issued pursuant to the Small Business Competitiveness Demonstration Program.

CAUTION: Whenever only a portion of a Clause is set forth herein, or identified only by number and title, such portion shall not be construed as varying the meaning or intent of the entire Clause as it appears or is referred to in the Federal Acquisition Regulation (FAR) or DoD FAR Supplement.
Federal Acquisition Regulation (FAR) Clauses cited throughout this Contract by Clause Title, Number, and Date are incorporated herein by reference with the same force and effect as if set forth in full text.

[ ] SPECIAL REVIEW [ ] FMS REQUIREMENT

15G. TOTAL AMOUNT OF CONTRACT > $ 497241.78

16. TABLE OF CONTENTS



| (X) | SEC. | DESCRIPTION | PAGE(S) | (X) | SEC. | DESCRIPTION | PAGE |
|---|---|---|---|---|---|---|---|
| | | PART I - THE SCHEDULE | | | | PART II - CONTRACT CLAUSES | |
| X | A | SOLICITATION/CONTRACT FORM | 1 | X | I | CONTRACT CLAUSES | 9 |
| X | B | SUPPLIES OR SERVICES AND PRICES/COSTS | 2 | | | PART III - LIST OF DOCUMENTS, EXHIBITS AND OTHER ATTACH | |
| | C | DESCRIPTION/SPECS/WORK STATEMENT | | X | J | LIST OF ATTACHMENTS | 10 |
| | D | PACKAGING AND MARKING | | | | PART IV - REPRESENTATIONS AND INSTRUCTIONS | |
| X | E | INSPECTION AND ACCEPTANCE | 9 | | K | REPRESENTATIONS, CERTIFICATIONS AND | |
| X | F | DELIVERIES OR PERFORMANCE | 9 | | | OTHER STATEMENTS OF OFFERORS | |
| X | G | CONTRACT ADMINISTRATION DATA | 9 | | L | INSTRS, CONDS. AND NOTICES TO OFFERORS | |
| | H | SPECIAL CONTRACT REQUIREMENTS | | | M | EVALUATION FACTORS FOR AWARD | |



CONTRACTING OFFICER WILL COMPLETE ITEM 17 OR 18 AS APPLICABLE

17. [ ] CONTRACTORS NEGOTIATED AGREEMENT (Contractor is required to sign this document and return ________ copies to issuing office.) Contractor agrees to furnish and deliver all items or perform all the services set forth or otherwise identified above and on any continuation sheets for the consideration stated herein. The rights and obligations of the parties to this contract shall be subject to and governed by the following documents: (a) this award/contract, (b) the solicitation, if any, and (c) such provisions, representations, certifications, and specifications, as are attached or incorporated by reference herein. (Attachments are listed herein.)

18. [X] AWARD (Contractor is not required to sign this document.) Your offer on Solicitation Number SP0740-99-R-3025 including the additions or changes made by you which additions or changes are set forth in full above, is hereby accepted as to the items listed above and on any continuation sheets. This award consummates the contract which consists of the following documents: (a) the Government's solicitation and your offer, and (b) this award/contract. No further contractual document is necessary.

F000038

19A. NAME AND TITLE OF SIGNER (Type or print)

20A. NAME OF CONTRACTING OFFICER: ANITA L. LUICH

19B. NAME OF CONTRACTOR

BY ______________________
(Signature of person authorized of sign)

19C. DATE SIGNED

20B. UNITED STATES OF AMERICA
Anita L. Luich
(Signature of Contracting Officer)

20C. DATE SIGNED: 99 JUN 29



NSN 7540-01-152-8069
PREVIOUS EDITION UNUSABLE
OP 301-26.9-3 (R4) (FAR) (OCT 87)

DPACS SF26M (REV 4-85)
Prescribed by GSA
FAR (48 CFR) 53.214(a)

# Capital City Pipes, Inc.

Office 850/574-3717 Fax 850/574-0384

July 1, 1999

To Anita Luich
DSCC/Columbus

Ref: P.O # SP074099C1004

Dear Ms Luich:

Capital City Pipes, Inc is requesting an amendment on the above Purchase Order

**The adjustments are 1st the remittance address**
Capital City Pipes, Inc
C/O ABA# 07200052
Old Kent Bank Corp Trust
P.O. Box 144
Grand Rapids, MI 49501-0144

**2Nd Adjustment**
Place of Performance , Place of Shipping & Inspection should read:

FlexFab, Division
8143 Gun Lake Road
Hastings, MI
If there are any questions please call 850-574-3717, fax 850-475-0384

Thank you,

Thelma S. Williams

**AMENDMENT OF SOLICITATION/MODIFICATION OF CONTRACT**

1. CONTRACT ID CODE: [X] J [ ] K — PAGE 01 OF PAGES 01

| | |
|---|---|
| 2. AMENDMENT/MODIFICATION NO. | P00001 |
| 3. EFFECTIVE DATE | SEP 27 1999 |
| 4. REQUISITION/PURCHASE REQ. NO. | YPC98169000611 + |
| 5. PROJECT NO. (if applicable) | |
| 6. ISSUED BY — CODE SC0700 | DEFENSE SUPPLY CENTER, COLUMBUS<br>Post Office Box 16704<br>Columbus, Ohio 43216-5010<br>INITIATOR: M.A. Jeffries<br>DSCC-PAAEAAL (614) 692-2961, fax (614) 692-1238 |
| 7. ADMINISTERED BY (If other than Item 6) — CODE S1109A | DCMC CLEARWATER<br>GADSEN BLDG SUITE 200<br>9549 KROGER BLVD<br>ST PETERSBURG FL 33702-2455 |
| 8. NAME AND ADDRESS OF CONTRACTOR (No., street, county, State and Zip Code) | CAPITAL CITY PIPES INC<br>1872 MILLS ST SUITE F<br>TALLAHASSEE FL 32310-0205 |
| CODE | 0NSZ5 |
| FACILITY CODE | |
| 9A. AMENDMENT OF SOLICITATION NO. | |
| 9B. DATED (SEE ITEM 11) | |
| 10A. MODIFICATION OF CONTRACT/ORDER NO. | X SP0740-99-C-1004 |
| 10B. DATED (SEE ITEM 13) | 1999 JUN 29 |

**11. THIS ITEM ONLY APPLIES TO AMENDMENTS OF SOLICITATIONS**

[ ] The above numbered solicitation is amended as set forth in Item 14. The hour and date specified for receipt of Offers [ ] is extended, [ ] is not extended. Offers must acknowledge receipt of this amendment prior to the hour and date specified in the solicitation or as amended, by one of the following methods: (a) By completing Items 8 and 15, and returning _______ copies of the amendment; (b) By acknowledging receipt of this amendment on each copy of the offer submitted; or (c) By separate letter or telegram which includes a reference to the solicitation and amendment numbers. FAILURE OF YOUR ACKNOWLEDGEMENT TO BE RECEIVED AT THE PLACE DESIGNATED FOR THE RECEIPT OF OFFERS PRIOR TO THE HOUR AND DATE SPECIFIED MAY RESULT IN REJECTION OF YOUR OFFER. If by virtue of this amendment you desire to change an offer already submitted, such change may be made by telegram or letter, provided each telegram or letter makes reference to the solicitation and this amendment, and is received prior to the opening hour and date specified.

12. ACCOUNTING AND APPROPRIATION DATA (if required)

SAME AS BASIC

13. THIS ITEM APPLIES ONLY TO MODIFICATIONS OF CONTRACTS/ORDERS, IT MODIFIES THE CONTRACT/ORDER NO. AS DESCRIBED IN ITEM 14

| | |
|---|---|
| X | A. THIS CHANGE ORDER IS ISSUED PURSUANT TO: THE CHANGES SET FORTH IN ITEM 14 ARE MADE IN CONTRACT ORDER NO. IN ITEM 10A. |
| X | B. THE ABOVE NUMBERED CONTRACT/ORDER IS MODIFIED TO REFLECT THE ADMINISTRATIVE CHANGES (such as changes in paying office, appropriation data, etc.) SET FORTH IN ITEM 14, PURSUANT TO THE AUTHORITY OF FAR 43.103(b). |
| | C. THIS SUPPLEMENTAL AGREEMENT IS ENTERED INTO PURSUANT TO AUTHORITY OF: |
| | D. OTHER (Specify type of modification and authority) |

**E. IMPORTANT:** Contractor [X] is not, [ ] is required to sign this document and return _____ copies to the issuing office.

14. DESCRIPTION OF AMENDMENT/MODIFICATION
(Organized by section headings, including solicitation/contract subject matter where feasible.)

NSN: 4720-01-066-6447

The remittance address where cited throughout the contract is hereby corrected to read as follows:

Old Kent Bank, Corp Trust
CO# ABA# 07200052
P.O. Box 144
Grand Rapids, MI 49501-0144

DF 32

Distribution: S1109A DCMC CLEARWATER, S33181 DFAS COLUMBUS CENTER

Except as provided herein, all terms and conditions of the document referenced in Item 9A or 10A, as heretofore changed, remains unchanged and in full force and effect.

| | |
|---|---|
| 15A. NAME AND TITLE OF SIGNER (Type or print) | 16A. NAME AND TITLE OF CONTRACTING OFFICER (Type or print)<br>MALINDA A. JEFFRIES<br>Contracting Officer |
| 15B. CONTRACTOR/OFFEROR<br>(Signature of person authorized to sign) | 16B. UNITED STATES OF AMERICA<br>BY [signature] Malinda A. Jeffries<br>(Signature of Contracting Officer) |
| 15C. DATE SIGNED | 16C. DATE SIGNED SEP 27 1999 |

NSN 7540-01-152-8070
PREVIOUS EDITION UNUSABLE

DPACS SF30
Prescribed by GSA
FAR (48 CFR) 53.243

4-11-00

# MATERIAL INSPECTION AND RECEIVING REPORT

Form Approved OMB No. 0704-0248

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0248), Washington, DC 20503.

PLEASE DO NOT RETURN YOUR COMPLETED FORM TO EITHER OF THESE ADDRESSES.
SEND THIS FORM IN ACCORDANCE WITH THE INSTRUCTIONS CONTAINED IN THE DFARS, APPENDIX F-401.

1. PROC. INSTRUMENT IDEN. (CONTRACT) SP0740-99-C-1004 (ORDER) NO.

6. INVOICE NO./DATE 503305-4

7. PAGE 1 OF 1

8. ACCEPTANCE POINT S

2. SHIPMENT NO. FLE0004

3. DATE SHIPPED 00MAR07

4. B/L CONSOL FRT #52467 TCN B

5. DISCOUNT TERMS NET 30 DAYS

9. PRIME CONTRACTOR CODE ONSZ5
CAPITAL CITY PIPES INC.
1872 MILLS ST. SUITE F
TALLAHASSEE FL 32310-0205

10. ADMINISTERED BY CODE S1109A
DCMC CLEARWATER
GADSEN BLDG SUITE 200
9549 KROGER BLVD
ST. PETERSBURG, FL 33702-2455

11. SHIPPED FROM (if other than 9) CODE 16632 FOB: D
FLEXFAB DIVN.
1699 WEST M-43 HIGHWAY
HASTINGS, MICHIGAN 49058

12. PAYMENT WILL BE MADE BY CODE S33181
DFAS-CO-SEC
ATTN: STOCK FUND ENTITLEMENTS DIV
P.O. BOX 182317
COLUMBUS OH 43218-2317

13. SHIPPED TO CODE SW3100
MECHANICSBURG FACILITY TRNS OFFICER
DEF DIST DEPOT SUSQUEHANNA PA
5450 CARLISLE PIKE
MECHANICSBURG PA 17055-0789

14. MARKED FOR CODE
NON-MILSTRIP RDD 05/15/99 PROJ

| 15. ITEM NO. | 16. STOCK/PART NO. DESCRIPTION (Indicate number of shipping containers - type of container - container number.) | 17. QUANTITY SHIP/REC'D * | 18. UNIT | 19. UNIT PRICE | 20. AMOUNT |
|---|---|---|---|---|---|
| 0003 | 4720-01-066-6447<br>HOSE ASSY, AIR DUCT<br>M38386-C-015 | 178 | EA | 381.32 | $67,874.96 |
| | | | | | $67,874.96 |
| | ORIGINAL INVOICE | | | | |
| | GROSS SHIPMENT WEIGHT: 5,102# 1 BOX & 11 SKIDS | | | | |

21. CONTRACT QUALITY ASSURANCE

A. ORIGIN
[X] CQA [X] ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.

00MAR07 [signature]
DATE SIGNATURE OF AUTH GOVT REP

TYPED NAME AND OFFICE MICHAEL A. WILSON S2303A 616-961-5327

B. DESTINATION
[ ] CQA [ ] ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.

DATE SIGNATURE OF AUTH GOVT REP

TYPED NAME AND TITLE

22. RECEIVER'S USE
Quantities shown in column 17 were received in apparent good condition except as noted.

DATE RECEIVED SIGNATURE OF AUTH GOVT REP

TYPED NAME AND OFFICE

* If quantity received by the Government is the same as quantity shipped, indicate by a checkmark, if different, enter actual quantity received below quantity shipped and encircle.

23. CONTRACTOR USE ONLY

0003 SW3100 178 PCS

CHERYL L. MCWHINNEY, ORDER ENTRY
616-945-2433 EXT 232
FLEXFAB DIVN.
REMIT TO:
OLD KENT BANK
4420 - 44TH ST. S.E.
SUITE A
GRAND RAPIDS, MI 49512
ATTN: CURTISS D. BALLAST

DD Form 250, NOV 92 ...ised. ...401

DF 261



Mil-Pac Form: MP15C001.015-930309 http://milpac.com (619) 435-1420

4-11-00

# MATERIAL INSPECTION AND RECEIVING REPORT

Form Approved OMB No. 0704-0248

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0248), Washington, DC 20503.

PLEASE DO NOT RETURN YOUR COMPLETED FORM TO EITHER OF THESE ADDRESSES.
SEND THIS FORM IN ACCORDANCE WITH THE INSTRUCTIONS CONTAINED IN THE DFARS, APPENDIX F-401.

1. PROC. INSTRUMENT IDEN. (CONTRACT) SP0740-99-C-1004 | (ORDER) NO.

6. INVOICE NO./DATE 503305-5 | 7. PAGE 1 | OF 1 | 8. ACCEPTANCE POINT S

2. SHIPMENT NO. FLE0005 | 3. DATE SHIPPED 00MAR07 | 4. B/L CONSOL FRT #52468 TCN | B

5. DISCOUNT TERMS NET 30 DAYS

9. PRIME CONTRACTOR CODE ONSZ5
CAPITAL CITY PIPES INC.
1872 MILLS ST. SUITE F
TALLAHASSEE FL 32310-0205

10. ADMINISTERED BY CODE S1109A
DCMC CLEARWATER
GADSEN BLDG SUITE 200
9549 KROGER BLVD
ST. PETERSBURG, FL 33702-2455

11. SHIPPED FROM (if other than 9) CODE 16632 FOB: D
FLEXFAB DIVN.
1699 WEST M-43 HIGHWAY
HASTINGS, MICHIGAN 49058

12. PAYMENT WILL BE MADE BY CODE S33181
DFAS-CO-SEC
ATTN: STOCK FUND ENTITLEMENTS DIV
P.O. BOX 182317
COLUMBUS OH 43218-2317

13. SHIPPED TO CODE SW3200
DEF DIST DEPOT SAN JOAQUIN
TRACY CA 95376-5000

14. MARKED FOR CODE

NON-MILSTRIP RDD 05/15/99 PROJ

| 15. ITEM NO. | 16. STOCK/PART NO. DESCRIPTION (Indicate number of shipping containers - type of container - container number.) | 17. QUANTITY SHIP/REC'D * | 18. UNIT | 19. UNIT PRICE | 20. AMOUNT |
|---|---|---|---|---|---|
| 0004 | 4720-01-066-6447<br>HOSE ASSY, AIR DUCT<br>M38386-C-015 | 272 | EA | 381.32 | $103,719.04 |
| | | | | | $103,719.04 |

ORIGINAL INVOICE

GROSS SHIPMENT WEIGHT: 7,786# 17 SKIDS

21. CONTRACT QUALITY ASSURANCE

A. ORIGIN
☒ CQA ☒ ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.

00MAR07 DATE | [signature] SIGNATURE OF AUTH GOVT REP

TYPED NAME AND OFFICE MICHAEL A. WILSON S2303A 616-961-5377

B. DESTINATION
☐ CQA ☐ ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.

DATE | SIGNATURE OF AUTH GOVT REP

TYPED NAME AND TITLE

22. RECEIVER'S USE
Quantities shown in column 17 were received in apparent good condition except as noted.

DATE RECEIVED | SIGNATURE OF AUTH GOVT REP

TYPED NAME AND OFFICE

*If quantity received by the Government is the same as quantity shipped, indicate by a checkmark; if different, enter actual quantity received below quantity shipped and encircle.

23. CONTRACTOR USE ONLY

0004 SW3200 343 PCS
-272 PCS SHIPPED 3/7/00
-----
71 PCS BALANCE

CHERYL L. MCWHINNEY, ORDER ENTRY
616-945-2433 EXT 232
FLEXFAB DIVN.
REMIT TO:
OKD KENT BANK
4420 - 44TH ST. S.E.
SUITE A
GRAND RAPIDS, MI 49512
ATTN: CURTISS D. BALLAST

DD Form 250, NOV 92

DF 269



ed. 41

Mil-Pac Form: MPLF0001.015-990209 http://milpac.com (613)495-1400

47

# MATERIAL INSPECTION AND RECEIVING REPORT

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0248), Washington, DC 20503.

Form Approved OMB No. 0704-0248

PLEASE DO NOT RETURN YOUR COMPLETED FORM TO EITHER OF THESE ADDRESSES.
SEND THIS FORM IN ACCORDANCE WITH THE INSTRUCTIONS CONTAINED IN THE DFARS, APPENDIX F-401.

4/20

1. PROC. INSTRUMENT IDEN. (CONTRACT) SP0740-99-C-1004 (ORDER) NO.

6. INVOICE NO./DATE 503305-6

7. PAGE 1 OF 1

8. ACCEPTANCE POINT S

2. SHIPMENT NO. FLE0006

3. DATE SHIPPED 00MAR14

4. B/L CONSOL FRT #52471 TCN B

5. DISCOUNT TERMS NET 30 DAYS

9. PRIME CONTRACTOR CODE ONSZ5
CAPITAL CITY PIPES INC.
1872 MILLS ST. SUITE F
TALLAHASSEE FL 32310-0205

10. ADMINISTERED BY CODE S1109A
DCMC CLEARWATER
GADSEN BLDG SUITE 200
9549 KROGER BLVD
ST. PETERSBURG, FL 33702-2455

11. SHIPPED FROM (If other than 9) CODE 16632 FOB: D
FLEXFAB DIVN.
1699 WEST M-43 HIGHWAY
HASTINGS, MICHIGAN 49058

12. PAYMENT WILL BE MADE BY CODE S33181
DFAS-CO-SEC
ATTN: STOCK FUND ENTITLEMENTS DIV
P.O. BOX 182317
COLUMBUS OH 43218-2317

13. SHIPPED TO CODE SW3200
DEF DIST DEPOT SAN JOAQUIN
TRACY CA 95376-5000

14. MARKED FOR CODE

NON-MILSTRIP RDD 05/15/99 PROJ

| 15. ITEM NO. | 16. STOCK/PART NO. DESCRIPTION (Indicate number of shipping containers - type of container - container number.) | 17. QUANTITY SHIP/REC'D * | 18. UNIT | 19. UNIT PRICE | 20. AMOUNT |
|---|---|---|---|---|---|
| 0004 | 4720-01-066-6447<br>HOSE ASSY, AIR DUCT<br>M38386-C-015 | 71 | EA | 381.32 | $27,073.72 |
| | | | | | $27,073.72 |

ORIGINAL INVOICE

GROSS SHIPMENT WEIGHT: 2,150#, 5 SKIDS

21. CONTRACT QUALITY ASSURANCE

A. ORIGIN
[ ] CQA [X] ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.

00MAR14 DATE — [signature] SIGNATURE OF AUTH GOVT REP

TYPED NAME AND OFFICE: MICHAEL A. WILSON S2303A 616-461-5327

B. DESTINATION
[ ] CQA [ ] ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.

DATE SIGNATURE OF AUTH GOVT REP

TYPED NAME AND TITLE

22. RECEIVER'S USE
Quantities shown in column 17 were received in apparent good condition except as noted.

DATE RECEIVED SIGNATURE OF AUTH GOVT REP

TYPED NAME AND OFFICE

* If quantity received by the Government is the same as quantity shipped, indicate by a checkmark if different, enter actual quantity received below quantity shipped and encircle.

23. CONTRACTOR USE ONLY

0004 SW3200 343 PCS
-272 PCS SHIPPED 3/7/00
-----
71 PCS BALANCE
-71 PCS SHIPPED 3/14/00
-----
-0-

CHERYL L. MCWHINNEY, ORDER ENTRY
616-945-2433 EXT 232
FLEXFAB DIVN.
REMIT TO:
OKD KENT BANK
4420 - 44TH ST. SE.
SUITE A
GRAND RAPIDS, MI 49512
ATTN: CURTISS D. BALLAST

DD Form 250, NOV 92 Previous edition may be used. 01 DF 277

Mil-Pac Form: MPLF0991..13-493079 http://milpac.com

4-17-00

# MATERIAL INSPECTION AND RECEIVING REPORT

Form Approved
OMB No. 0704-0248

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0248), Washington, DC 20503.

PLEASE DO NOT RETURN YOUR COMPLETED FORM TO EITHER OF THESE ADDRESSES.
SEND THIS FORM IN ACCORDANCE WITH THE INSTRUCTIONS CONTAINED IN THE DFARS, APPENDIX F-401.

1. PROC. INSTRUMENT IDEN. (CONTRACT): SP0740-99-C-1004
(ORDER) NO.:
6. INVOICE NO./DATE: 503305-7
7. PAGE: 1 OF 1
8. ACCEPTANCE POINT: S

2. SHIPMENT NO.: FLE0007Z
3. DATE SHIPPED: 00MAR14
4. B/L: CONSOL FRT #52472
TCN:
B
5. DISCOUNT TERMS: NET 30 DAYS

9. PRIME CONTRACTOR CODE: ONSZ5
CAPITAL CITY PIPES INC.
1872 MILLS ST. SUITE F
TALLAHASSEE FL 32310-0205

10. ADMINISTERED BY CODE: S1109A
DCMC CLEARWATER
GADSEN BLDG SUITE 200
9549 KROGER BLVD
ST. PETERSBURG, FL 33702-2455

11. SHIPPED FROM (if other than 9) CODE: 16632 FOB: D
FLEXFAB DIVN.
1699 WEST M-43 HIGHWAY
HASTINGS, MICHIGAN 49058

12. PAYMENT WILL BE MADE BY CODE: S33181
DFAS-CO-SEC
ATTN: STOCK FUND ENTITLEMENTS DIV
P.O. BOX 182317
COLUMBUS OH 43218-2317

13. SHIPPED TO CODE: SW3100
MECHANICSBURG FACILITY TRNS OFFICER
DEF DIST DEPOT SUSQUEHANNA PA
5450 CARLISLE PIKE
MECHANICSBURG PA 17055-0789

14. MARKED FOR CODE:
NON-MILSTRIP RDD 08/25/99 PROJ

| 15. ITEM NO. | 16. STOCK/PART NO. DESCRIPTION (Indicate number of shipping containers - type of container - container number.) | 17. QUANTITY SHIP/REC'D * | 18. UNIT | 19. UNIT PRICE | 20. AMOUNT |
|---|---|---|---|---|---|
| 0005 | 4720-01-066-6447<br>HOSE ASSY, AIR DUCT<br>M38386-C-015 | 169 | EA | 381.32 | $64,443.08 |
| | | | | | $64,443.08 |
| | GROSS SHIPMENT WEIGHT: 4,840# 11 SKIDS | | | | |

ORIGINAL INVOICE

21. CONTRACT QUALITY ASSURANCE

A. ORIGIN
☒ CQA ☒ ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.

00MAR14 — DATE
[signature] — SIGNATURE OF AUTH GOVT REP
TYPED NAME AND OFFICE: MICHAEL A. WILSON S2303A 616-461-5327

B. DESTINATION
☐ CQA ☐ ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.

DATE
SIGNATURE OF AUTH GOVT REP
TYPED NAME AND TITLE

22. RECEIVER'S USE
Quantities shown in column 17 were received in apparent good condition except as noted.

DATE RECEIVED
SIGNATURE OF AUTH GOVT REP
TYPED NAME AND OFFICE

* If quantity received by the Government is the same as quantity shipped, indicate by a checkmark, if different, enter actual quantity received below quantity shipped and encircle.

23. CONTRACTOR USE ONLY

0005 SW3100 169 PCS

CHERYL L. MCWHINNEY, ORDER ENTRY
616-945-2433 EXT 232
FLEXFAB DIVN.
REMIT TO:
OLD KENT BANK
4420 - 44TH ST. SE.
SUITE A
GRAND RAPIDS, MI 49512
ATTN: CURTISS D. BALLAST

DD Form 250, NOV 92



ed.
11

DF 286

3-28-00

# MATERIAL INSPECTION AND RECEIVING REPORT

Form Approved OMB No. 0704-0248

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0248), Washington, DC 20503.

PLEASE DO NOT RETURN YOUR COMPLETED FORM TO EITHER OF THESE ADDRESSES.
SEND THIS FORM IN ACCORDANCE WITH THE INSTRUCTIONS CONTAINED IN THE DFARS, APPENDIX F-401.

| 1. PROC. INSTRUMENT IDEN. (CONTRACT) | (ORDER) NO. | 6. INVOICE NO./DATE | 7. PAGE | OF | 8. ACCEPTANCE POINT |
|---|---|---|---|---|---|
| SP0740-99-C-1004 | | 503305-1 | 1 | 1 | S |

| 2. SHIPMENT NO | 3. DATE SHIPPED | 4. B/L | 5. DISCOUNT TERMS |
|---|---|---|---|
| FLE0001 | 00FEB22 | CONSOL FRT #52460<br>TCN B | NET 30 DAYS |

**9. PRIME CONTRACTOR** CODE ONSZ5
CAPITAL CITY PIPES INC.
1872 MILLS ST. SUITE F
TALLAHASSEE FL 32310-0205

**10. ADMINISTERED BY** CODE S2303A
DCMC GRAND RAPIDS
RIVERVIEW CTR BLDG
678 FRONT ST NW
GRAND RAPIDS, MI 49504-5352

**11. SHIPPED FROM (if other than 9)** CODE 16632 FOB: D
FLEXFAB DIVN.
1699 WEST M-43 HIGHWAY
HASTINGS, MICHIGAN 49058

**12. PAYMENT WILL BE MADE BY** CODE S33181
DFAS-CO-SEC
ATTN: STOCK FUND ENTITLEMENTS DIV
P.O. BOX 182317
COLUMBUS OH 43218-2317

**13. SHIPPED TO** CODE SW3100
MECHANICSBURG FACILITY TRNS OFFICER
DEF DIST DEPOT SUSQUEHANNA PA
5450 CARLISLE PIKE
MECHANICSBURG PA 17055-0789

**14. MARKED FOR** CODE
NON-MILSTRIP RDD 01/28/99 PROJ

| 15. ITEM NO. | 16. STOCK/PART NO. DESCRIPTION (Indicate number of shipping containers - type of container - container number.) | 17. QUANTITY SHIP/REC'D * | 18. UNIT | 19. UNIT PRICE | 20. AMOUNT |
|---|---|---|---|---|---|
| 0001 | 4720-01-066-6447<br>HOSE ASSY, AIR DUCT<br>M38386-C-015 | 160 | EA | 381.32 | $61,011.20 |
| | | | | | $61,011.20 |

ORIGINAL INVOICE

GROSS SHIPMENT WEIGHT: 4,580# 10 SKIDS

**21. CONTRACT QUALITY ASSURANCE**

A. ORIGIN
[X] CQA [X] ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.

DATE: 000223 SIGNATURE OF AUTH GOVT REP: [signature]
TYPED NAME AND OFFICE: MICHAEL A. WILSON 616-761-5327
S2303A

B. DESTINATION
[ ] CQA [ ] ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.

DATE SIGNATURE OF AUTH GOVT REP
TYPED NAME AND TITLE

**22. RECEIVER'S USE**
Quantities shown in column 17 were received in apparent good condition except as noted.

DATE RECEIVED SIGNATURE OF AUTH GOVT REP
TYPED NAME AND OFFICE

*If quantity received by the Government is the same as quantity shipped, indicate by a checkmark, if different, enter actual quantity received below quantity shipped and encircle.

**23. CONTRACTOR USE ONLY**

0001 SW3100 416 PCS
-160 PCS SHIPPED 2/22/00.
-----
-256 PCS BALANCE

CHERYL L. MCWHINNEY, ORDER ENTRY
616-945-2433 EXT 232
FLEXFAB DIVN

REMIT TO:
OLD KENT BANK
4420 - 44TH ST. S.E.
SUITE A
GRAND RAPIDS, MI 49512
ATTN: CURTISS D. BALLAST

440

# MATERIAL INSPECTION AND RECEIVING REPORT

Form Approved OMB No. 0704-0248

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0248), Washington, DC 20503.

PLEASE DO NOT RETURN YOUR COMPLETED FORM TO EITHER OF THESE ADDRESSES. SEND THIS FORM IN ACCORDANCE WITH THE INSTRUCTIONS CONTAINED IN THE DFARS, APPENDIX F-401.

1. PROC. INSTRUMENT IDEN. (CONTRACT): SP0740-99-C-1004 (ORDER) NO.:

6. INVOICE NO./DATE: 503305-2

7. PAGE: 1 OF: 1

8. ACCEPTANCE POINT: S

2. SHIPMENT NO.: FLE0002

3. DATE SHIPPED: 00FEB29

4. B/L: CONSOL FRT #52465 TCN: B

5. DISCOUNT TERMS: NET 30 DAYS

9. PRIME CONTRACTOR CODE: ONSZ5
CAPITAL CITY PIPES INC.
1872 MILLS ST. SUITE F
TALLAHASSEE FL 32310-0205

10. ADMINISTERED BY CODE: S2303A
DCMC GRAND RAPIDS
RIVERVIEW CTR BLDG
678 FRONT ST NW
GRAND RAPIDS, MI 49504-5352
SEE BLOCK #23

11. SHIPPED FROM (if other than 9) CODE: 16632 FOB: D
FLEXFAB DIVN.
1699 WEST M-43 HIGHWAY
HASTINGS, MICHIGAN 49058

12. PAYMENT WILL BE MADE BY CODE: S33181
DFAS-CO-SEC
ATTN: STOCK FUND ENTITLEMENTS DIV
P.O. BOX 182317
COLUMBUS OH 43218-2317

13. SHIPPED TO CODE: SW3100
MECHANICSBURG FACILITY TRNS OFFICER
DEF DIST DEPOT SUSQUEHANNA PA
5450 CARLISLE PIKE
MECHANICSBURG PA 17055-0789

14. MARKED FOR CODE:
NON-MILSTRIP RDD 01/28/99 PROJ

| 15. ITEM NO. | 16. STOCK/PART NO. DESCRIPTION (Indicate number of shipping containers - type of container - container number.) | 17. QUANTITY SHIP/REC'D * | 18. UNIT | 19. UNIT PRICE | 20. AMOUNT |
|---|---|---|---|---|---|
| 0001 | 4720-01-066-6447<br>HOSE ASSY, AIR DUCT<br>M38386-C-015 | 256 | EA | 381.32 | $97,617.92 |
| | | | | | $97,617.92 |
| | "CORRECTED COPY"<br>SEE BLOCK #10<br>ORIGINAL INVOICE<br>GROSS SHIPMENT WEIGHT: 7,328#, 16 SKIDS | | | | |

21. CONTRACT QUALITY ASSURANCE

A. ORIGIN
[X] CQA [X] ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.
DATE: 00FEB29
SIGNATURE OF AUTH GOVT REP: [signature]
TYPED NAME AND OFFICE: MICHAEL A. WILSON S2303A 616-961-5327

B. DESTINATION
[ ] CQA [ ] ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.
DATE
SIGNATURE OF AUTH GOVT REP
TYPED NAME AND TITLE

22. RECEIVER'S USE
Quantities shown in column 17 were received in apparent good condition except as noted.
DATE RECEIVED
SIGNATURE OF AUTH GOVT REP
TYPED NAME AND OFFICE

*If quantity received by the Government is the same as quantity shipped, indicate by a checkmark; if different, enter actual quantity received below quantity shipped and encircle.

23. CONTRACTOR USE ONLY

0001 SW3100 416 PCS
-160 PCS SHIPPED 2/22/00.
-----
256 PCS BALANCE
-256 PCS SHIPPED 2/29/00
----
-0- BALANCE

CORRECTION FOR BLK #10
DCMC CLEARWATER
GADSEN BLDG SUITE 200
9549 KROGER BLVD
ST. PETERSBURG, FL 33702-2455

CHERYL L. MCWHINNEY, ORDER ENTRY
616-945-2433 EXT 232
FLEXFAB DIVN.

REMIT TO:
OLD KENT BANK
4420 - 44TH ST. S.E.
SUITE A
GRAND RAPIDS, MI 49512
ATTN: CURTISS D. BALLAST

51

1/00. CLM

DF 299

DD Form 250, NOV 92 Previous edition may be used.

1-400

# MATERIAL INSPECTION AND RECEIVING REPORT

Form Approved OMB No. 0704-0248

Public reporting burden for this collection of information is estimated to average 30 minutes per response, including the time for reviewing instructions, searching existing data sources, gathering and maintaining the data needed, and completing and reviewing the collection of information. Send comments regarding this burden estimate or any other aspect of this collection of information, including suggestions for reducing this burden, to Department of Defense, Washington Headquarters Services, Directorate for Information Operations and Reports, 1215 Jefferson Davis Highway, Suite 1204, Arlington, VA 22202-4302, and to the Office of Management and Budget, Paperwork Reduction Project (0704-0248), Washington, DC 20503.

PLEASE DO NOT RETURN YOUR COMPLETED FORM TO EITHER OF THESE ADDRESSES. SEND THIS FORM IN ACCORDANCE WITH THE INSTRUCTIONS CONTAINED IN THE DFARS, APPENDIX F-401.

1. PROC. INSTRUMENT IDEN. (CONTRACT) SP0740-99-C-1004 | (ORDER) NO.

6. INVOICE NO./DATE 503305-3

7. PAGE 1 OF 1

8. ACCEPTANCE POINT S

2. SHIPMENT NO. FLE0003

3. DATE SHIPPED 00FEB29

4. B/L CONSOL FRT #52464 — TCN — B

5. DISCOUNT TERMS NET 30 DAYS

9. PRIME CONTRACTOR CODE ONSZ5
CAPITAL CITY PIPES INC.
1872 MILLS ST. SUITE F
TALLAHASSEE FL 32310-0205

10. ADMINISTERED BY CODE S2303A
DCMC GRAND RAPIDS
RIVERVIEW CTR BLDG
678 FRONT ST NW
GRAND RAPIDS, MI 49504-5352

11. SHIPPED FROM (if other than 9) CODE 16632 FOB: D
FLEXFAB DIVN.
1699 WEST M-43 HIGHWAY
HASTINGS, MICHIGAN 49058

12. PAYMENT WILL BE MADE BY CODE S33181
DFAS-CO-SEC
ATTN: STOCK FUND ENTITLEMENTS DIV
P.O. BOX 182317
COLUMBUS OH 43218-2317

13. SHIPPED TO CODE SW3200
DEF DIST DEPOT SAN JOAQUIN
SAN JOAQUIN TRACY
TRACY CA 95376-5000

14. MARKED FOR CODE
NON-MILSTRIP RDD 12/17/98 PROJ

| 15. ITEM NO. | 16. STOCK/PART NO. DESCRIPTION (Indicate number of shipping containers - type of container - container number.) | 17. QUANTITY SHIP/REC'D * | 18. UNIT | 19. UNIT PRICE | 20. AMOUNT |
|---|---|---|---|---|---|
| 0002 | 4720-01-066-6447 HOSE ASSY, AIR DUCT M38386-C-015 | 198 | EA | 381.32 | $75,501.36 |
| | | | | | $75,501.36 |
| | GROSS SHIPMENT WEIGHT: 5,686# 13 SKIDS | | | | |

ORIGINAL INVOICE

21. CONTRACT QUALITY ASSURANCE

A. ORIGIN
[X] CQA [X] ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.

00FEB29 — DATE | [signature] — SIGNATURE OF AUTH GOVT REP

TYPED NAME AND OFFICE: MICHAEL A. WILSON S2303A 616-961-5357

B. DESTINATION
[ ] CQA [ ] ACCEPTANCE of listed items has been made by me or under my supervision and they conform to contract, except as noted herein or on supporting documents.

DATE | SIGNATURE OF AUTH GOVT REP

TYPED NAME AND TITLE

22. RECEIVER'S USE
Quantities shown in column 17 were received in apparent good condition except as noted.

DATE RECEIVED | SIGNATURE OF AUTH GOVT REP

TYPED NAME AND OFFICE

* If quantity received by the Government is the same as quantity shipped, indicate by a checkmark; if different, enter actual quantity received below quantity shipped and encircle.

23. CONTRACTOR USE ONLY

0002 SW3200 198 PCS

CHERYL L. MCWHINNEY, ORDER ENTRY
616-945-2433 EXT 232
FLEXFAB DIVN.
REMIT TO:
OLD KENT BANK
4420 - 44TH ST. S.E.
SUITE A
GRAND RAPIDS, MI 49512
ATTN: CURTISS D. BALLAST

DD Form 250, NOV 92



DF 307

ELECTRONIC TRANSFER PAYMENT SUBVOUCHER PAGE 48

2000088

DFAS - COLUMBUS CENTER (DFAS-CO)
COLUMBUS, OHIO 43218-6204

PAID TO: CAPITAL CITY PIPES, I
CAGE: 0NSZ5
FIN. ORG: CAPITAL CITY BANK
FIN. RTN: 063100688

SUBVOUCHER NUMBER: CE22933-01
DSSN: 6355
TRANSACTION DATE: 28 MAR 2000

CONTRACT: SP074099C1004

| CALL/ ORDER | LINE ITEM | INVOICE NUMBER | MAN PAY | TYPE PAYMENT | GROSS AMOUNT | DISC/PEN AMOUNT | NET AMOUNT |
|---|---|---|---|---|---|---|---|
| | 0001 | 5033051 | | PARTIAL | 61,011.20 | 0.00 | 61,011.20 |

CONTRACT TOTAL: 61,011.20

SUBVOUCHER TOTAL: 61,011.20

ACNTNG CLSFCTN: 97X4930.5CC0 26 S33-150 61,011.20





FIN001.FRM

FACSIMILE INVOICE 03/28/2000 (2000088)

DEFENSE FINANCE AND ACCOUNTING SERVICE COLUMBUS CENTER (DFAS-CO)
COLUMBUS, OH 43218-2317

PIIN: SP0740-99-C-1004 ORDER:

INVOICE: 5033051
SUB-VOUCHER: E22933-01
DISCOUNT TERMS: 0.000% 00
INVOICE DATE: 02/29/2000
DATE RECEIVED: 02/29/2000

SHIPMENT NO.:

SHIPMENT DATE
FEB 22 2000

SHIP MODE: 5

REMIT TO: CAGE: ONSZ5
CAPITAL CITY PIPES, I
CAPITAL CITY BANK

| ITEM NO. | STOCK/PART NUMBER DESCRIPTION | QUANTITY SHIP/RECD | UNIT | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|
| 0001 | NSN 4720-01-066-6447 | 160 | EA | $381.32 | $61,011.20 |

TOTAL INVOICED AMOUNT $61,011.20

ELECTRONIC TRANSFER PAYMENT SUBVOUCHER PAGE 138

2000095

DFAS - COLUMBUS CENTER (DFAS-CO)
COLUMBUS, OHIO 43218-6204

PAID TO: CAPITAL CITY PIPES, I
CAGE: 0NSZ5
FIN. ORG: CAPITAL CITY BANK
FIN. RTN: 063100688

SUBVOUCHER NUMBER: CE23877-01
DSSN: 6355
TRANSACTION DATE: 04 APR 2000

CONTRACT: SP074099C1004

| CALL/ ORDER | LINE ITEM | INVOICE NUMBER | MAN PAY | TYPE PAYMENT | GROSS AMOUNT | DISC/PEN AMOUNT | NET AMOUNT |
|---|---|---|---|---|---|---|---|
| | 0001 | 5033052 | | PARTIAL | 97,617.92 | 0.00 | 97,617.92 |
| | 0002 | 5033053 | | FINAL | 75,501.36 | 0.00 | 75,501.36 |

CONTRACT TOTAL: 173,119.28

SUBVOUCHER TOTAL: 173,119.28

ACNTNG CLSFCTN: 97X4930.5CC0 26 S33-150 173,119.28



DF 317

FIN001 FRM

FACSIMILE INVOICE 04/04/2000 (2000095)

DEFENSE FINANCE AND ACCOUNTING SERVICE COLUMBUS CENTER (DFAS-CO)
COLUMBUS, OH 43218-2317

PIIN: SP0740-99-C-1004 ORDER: INVOICE: 5033052

SHIPMENT NO.: SHIPMENT DATE FEB 29 2000

SUB-VOUCHER: E23877-01
DISCOUNT TERMS: 0.000% 00
INVOICE DATE: 03/07/2000
DATE RECEIVED: 03/07/2000

SHIP MODE: 5

---

REMIT TO: CAGE: 0NSZ5
CAPITAL CITY PIPES, I
CAPITAL CITY BANK

| ITEM NO. | STOCK/PART NUMBER DESCRIPTION | QUANTITY SHIP/RECD | UNIT | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|
| 0001 | NSN 4720-01-066-6447 | 256 | EA | $381.32 | $97,617.92 |

TOTAL INVOICED AMOUNT $97,617.92



FIN001.FRM

DF 318

FACSIMILE INVOICE 04/04/2000 (2000095)

DEFENSE FINANCE AND ACCOUNTING SERVICE COLUMBUS CENTER (DFAS-CO)
COLUMBUS, OH 43218-2317

PIIN: SP0740-99-C-1004 ORDER:

INVOICE: 5033053
SUB-VOUCHER: E23877-01
DISCOUNT TERMS: 0.000% 00
INVOICE DATE: 03/07/2000
DATE RECEIVED: 03/07/2000

SHIPMENT NO.:

SHIPMENT DATE
FEB 29 2000

SHIP MODE: 5

---

REMIT TO: CAGE: ONSZ5
CAPITAL CITY PIPES, I
CAPITAL CITY BANK

| ITEM NO. | STOCK/PART NUMBER DESCRIPTION | QUANTITY SHIP/RECD | UNIT | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|
| 0002 | NSN 4720-01-066-6447 | 198 | EA | $381.32 | $75,501.36 |

TOTAL INVOICED AMOUNT $75,501.36

ELECTRONIC TRANSFER PAYMENT SUBVOUCHER PAGE 78

2000102

DFAS - COLUMBUS CENTER (DFAS-CO)
COLUMBUS, OHIO 43218-6204

PAID TO: CAPITAL CITY PIPES, I
CAGE: 0NSZ5
FIN. ORG: CAPITAL CITY BANK
FIN. RTN: 063100688

SUBVOUCHER NUMBER: CE25013-01
DSSN: 6355
TRANSACTION DATE: 11 APR 2000

CONTRACT: SP074099C1004

| CALL/ ORDER | LINE ITEM | INVOICE NUMBER | MAN PAY | TYPE PAYMENT | GROSS AMOUNT | DISC/PEN AMOUNT | NET AMOUNT |
|---|---|---|---|---|---|---|---|
| | 0003 | 5033054 | | FINAL | 67,874.96 | 0.00 | 67,874.96 |
| | 0004 | 5033055 | | PARTIAL | 103,719.04 | 0.00 | 103,719.04 |

CONTRACT TOTAL: 171,594.00

SUBVOUCHER TOTAL: 171,594.00

ACNTNG CLSFCTN: 97X4930.5CC0 26 S33-150 171,594.00

FACSIMILE INVOICE 04/11/2000 (2000102)

DEFENSE FINANCE AND ACCOUNTING SERVICE COLUMBUS CENTER (DFAS-CO)
COLUMBUS, OH 43218-2317

PIIN: SP0740-99-C-1004 ORDER:

INVOICE: 5033054
SUB-VOUCHER: E25013-01
DISCOUNT TERMS: 0.000% 00
INVOICE DATE: 03/14/2000
DATE RECEIVED: 03/14/2000

SHIPMENT NO.: SHIPMENT DATE MAR 07 2000

SHIP MODE: 5

---

REMIT TO: CAGE: 0NSZ5
CAPITAL CITY PIPES, I
CAPITAL CITY BANK

| ITEM NO. | STOCK/PART NUMBER DESCRIPTION | QUANTITY SHIP/RECD | UNIT | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|
| 0003 | NSN 4720-01-066-6447 | 178 | EA | $381.32 | $67,874.96 |

TOTAL INVOICED AMOUNT $67,874.96

FACSIMILE INVOICE 04/11/2000 (2000102)

DEFENSE FINANCE AND ACCOUNTING SERVICE COLUMBUS CENTER (DFAS-CO)
COLUMBUS, OH 43218-2317

PIIN: SP0740-99-C-1004
ORDER:
INVOICE: 5033055
SHIPMENT NO.:
SUB-VOUCHER: E25013-01
SHIPMENT DATE
MAR 07 2000
DISCOUNT TERMS: 0.000% 00
SHIP MODE: 5
INVOICE DATE: 03/14/2000
DATE RECEIVED: 03/14/2000

REMIT TO: CAGE: 0NSZ5
CAPITAL CITY PIPES, I
CAPITAL CITY BANK

| ITEM NO. | STOCK/PART NUMBER DESCRIPTION | QUANTITY SHIP/RECD | UNIT | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|
| 0004 | NSN 4720-01-066-6447 | 272 | EA | $381.32 | $103,719.04 |

TOTAL INVOICED AMOUNT $103,719.04

FACSIMILE INVOICE 04/17/2000 (2000108)

DEFENSE FINANCE AND ACCOUNTING SERVICE COLUMBUS CENTER (DFAS-CO)
COLUMBUS, OH 43218-2317

PIIN: SP0740-99-C-1004 ORDER: INVOICE: 5033057
SUB-VOUCHER: E25850-01
SHIPMENT NO.: SHIPMENT DATE DISCOUNT TERMS: 0.000% 00
MAR 14 2000 INVOICE DATE: 03/20/2000
SHIP MODE: 5 DATE RECEIVED: 03/20/2000

REMIT TO: CAGE: ONSZ5
CAPITAL CITY PIPES, I
CAPITAL CITY BANK

| ITEM NO. | STOCK/PART NUMBER DESCRIPTION | QUANTITY SHIP/RECD | UNIT | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|
| 0005 | NSN 4720-01-066-6447 | 169 | EA | $381.32 | $64,443.08 |

TOTAL INVOICED AMOUNT $64,443.08

ELECTRONIC TRANSFER PAYMENT SUBVOUCHER PAGE 63

2000108

DFAS - COLUMBUS CENTER (DFAS-CO)
COLUMBUS, OHIO 43218-6204

PAID TO: CAPITAL CITY PIPES, I
CAGE: 0NSZ5
FIN. ORG: CAPITAL CITY BANK
FIN. RTN: 063100688

SUBVOUCHER NUMBER: CE25850-01
DSSN: 6355
TRANSACTION DATE: 17 APR 2000

CONTRACT: SP074099C1004

| CALL/ ORDER | LINE ITEM | INVOICE NUMBER | MAN PAY | TYPE PAYMENT | GROSS AMOUNT | DISC/PEN AMOUNT | NET AMOUNT |
|---|---|---|---|---|---|---|---|
| | 0005 | 5033057 | | FINAL | 64,443.08 | 0.00 | 64,443.08 |

CONTRACT TOTAL: 64,443.08

SUBVOUCHER TOTAL: 64,443.08

ACNTNG CLSFCTN: 97X4930.5CC0 26 S33-150 64,443.08

ELECTRONIC TRANSFER PAYMENT SUBVOUCHER PAGE 71

2000111

DFAS - COLUMBUS CENTER (DFAS-CO)
COLUMBUS, OHIO 43218-6204

PAID TO: CAPITAL CITY PIPES, I
CAGE: 0NSZ5
FIN. ORG: CAPITAL CITY BANK
FIN. RTN: 063100688

SUBVOUCHER NUMBER: CE26462-01
DSSN: 6355
TRANSACTION DATE: 20 APR 2000

CONTRACT: SP074099C1004

| CALL/ ORDER | LINE ITEM | INVOICE NUMBER | MAN PAY | TYPE PAYMENT | GROSS AMOUNT | DISC/PEN AMOUNT | NET AMOUNT |
|---|---|---|---|---|---|---|---|
| | 0004 | 5033056 | | FINAL | 27,073.72 | 0.00 | 27,073.72 |

CONTRACT TOTAL: 27,073.72

SUBVOUCHER TOTAL: 27,073.72

ACNTNG CLSFCTN: 97X4930.5CC0 26 S33-150 27,073.72



DF 325

FIN001.FRM

FACSIMILE INVOICE 04/20/2000 (2000111)

DEFENSE FINANCE AND ACCOUNTING SERVICE COLUMBUS CENTER (DFAS-CO)
COLUMBUS, OH 43218-2317

PIIN: SP0740-99-C-1004 ORDER:

SHIPMENT NO.:

SHIPMENT DATE
MAR 14 2000

SHIP MODE: 5

INVOICE: 5033056
SUB-VOUCHER: E26462-01
DISCOUNT TERMS: 0.000% 00
INVOICE DATE: 03/20/2000
DATE RECEIVED: 03/20/2000

REMIT TO: CAGE: 0NSZ5
CAPITAL CITY PIPES, I
CAPITAL CITY BANK

| ITEM NO. | STOCK/PART NUMBER DESCRIPTION | QUANTITY SHIP/RECD | UNIT | UNIT PRICE | EXTENDED AMOUNT |
|---|---|---|---|---|---|
| 0004 | NSN 4720-01-066-6447 | 71 | EA | $381.32 | $27,073.72 |

TOTAL INVOICED AMOUNT $27,073.72



FIN001.FRM

DF 326

**Griffin, Howard (Tony) A**

| | |
|---|---|
| **From:** | henryc [henryc@alltel.net] |
| **Sent:** | Friday, August 11, 2000 12:41 PM |
| **To:** | Howard_Griffin@dscc.dla.mil |
| **Subject:** | conversation with Phil Cover concening contract#SP0740-99-c-1004 |

Dear Mr. Griffin:

In reference to our telephone conversation on friday August 11,2000 concerning the modification for contract # spo740-99-c-1004,for change of remittance address was submitted on july,1999 to Ms.Luich,letter verifying info is being faxed. Mr. Griffin in the month of september a modification was receivedsigned by miss,or mrs Jeffries, Mr. Griffin C&S Industrial started talking to a gentlemen by the name Phil Covers In reference to payment after the first payment was made to Capital City Pipes and C&S indicated that payment should have gone to Old Kent Bank in Michigan, so he asked for information concerning the remit to address and faxed a copy of the modificationfor him to review and reviewing the modification he indicated that it had not been changed in the system and he would input the modification in the system and not to worry, a couple of weeks later we called again to check on payment status and determined that payment had gone out to capital city pipes again,so we calledmr Phil cover again and he stated again that this would happen again and he would retrieve our funds from capital city pipes, a few weeks went by again and wecalled to check on status of payment with cover and indicated that he could not help and that the money was sent to Capital City Pipes and asked about what was indicated to our company about the modification and solving the problem he only restated that the money was sent capital and it was nothing else he could do. so I met with Mr. Michal Taylor in the mont of July and met with Phil Cover and restated everything to him in the presence of Mr. Taylor and nothing was refuted what I had said. Mr. Griffin if there is any more information that I can proved please let me know.

Respectfully

Henry Cook(C&S Industrial Supply

F000065

**DEFENSE LOGISTICS AGENCY**
DEFENSE SUPPLY CENTER, COLUMBUS
POST OFFICE BOX 3990
COLUMBUS, OH 43216-5000

IN REPLY
REFER TO **DSCC-DU**

**29 AUG 2000**

Small Business Administration (SBA)
North Florida District Office
Attn: Mr. Wilfredo J. Gonzalez, District Director
7825 Baymeadows Way, Suite 100-B
Jacksonville, FL 32256-7504

Mr. Gonzalez:

I wish to express my concern about the unethical practices of Capital City Pipes, Inc., an 8(a) Program participant in your portfolio that has several contracts with the Defense Supply Center, Columbus (DSCC). For whatever reason, Mr. Lee Gilliam, Capital City Pipes' CEO has failed to pay his suppliers some $ 500,000, resulting in a Congressional Inquiry and a Claim being filed against the Government. About six weeks ago I spoke with Ms. Francine Parks on this matter and advised her that we would no longer set-aside 8(a) opportunities for Mr. Gilliam's firm if the firm persisted with its failure to pay its suppliers. Ms. Parks indicated that she would follow-up with the firm, however, the matter has gone from bad to worst.

I have attached several documents, detailing the various circumstances and issues surrounding this matter. On behalf of DSCC, I am requesting the assistance of your office in holding Capital City Pipes accountable for its responsibility to honor and pay its lawful debts as an 8(a) Program participant, receiving Federal funds and support. I'm looking for your support in bringing this matter to a speedy resolution.

Sincerely,

HOWARD A. (Tony) GRIFFIN, SR.
Director of Small and Disadvantaged Utilization



Federal Recycling Program Printed on Recycled Paper

DE. .NSE LOGISTICS AGENCY
DEFENSE SUPPLY CENTER, COLUMBUS
POST OFFICE BOX 3990
COLUMBUS, OH 43216-5000

IN REPLY REFER TO DSCC-LECC

October 02, 2000

FACSIMILE TRANSMITTAL LETTER

Mr. Mark E. Hills
Varnum, Riddering, Schmidt, & Howlett

FAX: 616-336-7000

Dear Mr. Hills:

Reference your letter dated August 25, 2000 relative to Contract SP0740-99-C-1004.

Contract SP0740-99-C-1004 was awarded to Capital City Pipes, Inc. (Capital City) on June 29, 1999. The remittance address in the original contract was stated as Capital City Pipes, Inc., PO Box 12368, Tallahassee, FL. Modification P00001 was issued on September 27, 1999 to change the remittance address to Old Kent Bank, Corp Trust. Because our computer system was not changed to reflect this revised remittance address, the Defense Finance and Accounting Service (DFAS) remitted payment to the original remittance address stated in the contract. Inasmuch as we did not hear from Capital City (our prime contractor), we assumed payment was received satisfactorily. Further, since we did not hear from Capital City that payment was not received, we believe we have discharged our legal obligations under this contract.

If you have any further questions relative to this issue, feel free to contact me at (614)692-3971.

Sincerely,

Shirley Spratt

SHIRLEY SPRATT
Contracting Officer
DSCC-LECC

F000123



Federal Recycling Program Printed on Recycled Paper

FLEXFAB® DIVISION
A MEMBER OF THE FHI FAMILY
FLEXFAB HORIZONS INTERNATIONAL, INC.
'MITTED TO EXCELLENCE IN ENGINEERED ELASTOMERIC PRODUCTS SINCE 1961
ISO 9001 & QS 9000 REGISTERED CERT. #95-031

May 30, 2001

Ms. Shirley Spratt
Contracting Officer
Defense Supply Center, Columbus
P.O. Box 3990
Columbus, OH 43216-5000

RE: Contract SP0740-99-C-1004
Claim for Decision by Contracting Officer pursuant to 41 U.S.C. § 605

Dear Ms. Spratt:

Pursuant to the terms of the Contract Disputes Act, 41 U.S.C. §601, *et. seq.*, Flexfab, L.L.C. hereby claims the sum of $452,031.60 as a result of the United States' failure to make proper payments in the processing of the above referenced contract. In this regard, I am attaching the following items:

a. A copy of Contract SP0740-99-C-1004
b. A copy of Contract Modification P00001
c. Copies of the pertinent Flexfab invoices and documentation
d. Affidavit of Henry Cook relating to the administration of the above contract
e. Your letter of October 2, 2000 to Flexfab's counsel, Mark E. Hills, in this matter

As you will recall from your previous review of this matter, the Contract Modification, P00001, was issued to insure that payments on the above contract were made to an escrow account at Old Kent Bank in Grand Rapids, Michigan. For some reason, that modification was never entered in the DSCC's computer system. As a result, DSCC has previously indicated that it had no knowledge that the modification was intended to benefit Flexfab.

The Affidavit of Henry Cook, however, demonstrates his repeated telephone conversations with DSCC employees regarding both Flexfab's requirement that payments be made to the escrow account and the repeated complaints lodged with DSCC when the payments were not being properly processed by DSCC. On each occasion, Mr. Cook was promised by the DSCC employees that the payment errors would be corrected and that payments would be made pursuant to the Contract Modification. There appears to be,



1843 Gun Lake Road • Hastings, Michigan U.S.A. 49058 • TEL: (616) 945-2433 • FAX: (616) 945-4802

therefore, no basis for DSCC to assert that it was unaware of the Modification being instituted for Flexfab's benefit.

Instead of those commitments being fulfilled by DSCC, the payment modification was never implemented and payments were made to the prime contractor, Capital City Pipes, Inc. Based on the foregoing, Flexfab respectfully requests that you review your file and the enclosed information and render a timely final decision on the instant claim for payment under the Contract, pursuant to 41 U.S.C. § 605(a).

Finally, as Vice President/General Manager of Flexfab, L.L.C., I am duly authorized to certify that this claim is made in good faith, the supporting data is accurate and complete to the best of Flexfab's knowledge and belief through the date of this claim, and the amount requested ($452,031.60) accurately reflects the contract adjustment for which Flexfab believes the United States is liable.

I would be most appreciative if you would direct any inquiries regarding this claim to Mark E. Hills, counsel for Flexfab, L.L.C.

Very truly yours,

FLEXFAB, L.L.C.

Paul Timmons, Vice President/General Manager

F000083

DEFENSE LOGISTICS AGENCY
DEFENSE SUPPLY CENTER, COLUMBUS
POST OFFICE BOX 3990
COLUMBUS, OH 43216-5000

IN REPLY REFER TO DSCC-LDAC

JUN 27 2002

Mr. Mark E. Hills
Varnum, Riddering, Schmidt, & Howlett
Bridgewater Place
P.O. Box 352
Grand Rapids, MI 49501-0352

Re: Your client, Flexfab LLC and Contract SP0740-99-C-1004

Dear Mr. Hills:

This is in response to your request for payment under Contract SP0740-99-C-1004 ("the contract"). At the outset, it should be noted that your proposed indemnification agreement raised an issue as to the relationship between and identities of:

- Your client (apparently Flexfab LLC),
- Flexfab, Inc.,
- The second-tier subcontractor under the subject contract,
- Flexfab Horizons, International, Inc., Flexfab Division, and
- Flexfab Moxness, LLC (Division of Flexfab Horizons).

These various entities have overlapping addresses and CAGE codes. As a result, we are unable to determine who was the actual second-tier subcontractor under the subject contract, and who, if anyone, has the right to bring suit on that entity's behalf.

Despite the uncertainty as to the identity of the second tier subcontractor, I will address the other issues associated with your request for payment. My references to "Flexfab," below, are to the second tier subcontractor, whoever that may be.

Flexfab has requested payment in the amount of $452,031.60 as a third party beneficiary under contract SP0740-99-C-1004 ("the contract"), entered into by Capital City Pipes, Inc. (Capital) and the Defense Supply Center, Columbus, a primary level field activity of the Defense Logistics Agency, an agency of the United States Government.

The primary issue is whether Flexfab is a third party beneficiary to the contract. A person is a third party beneficiary to a contract when the intention of the contracting parties is to confer a benefit under the contract to that third party. Schuerman v. U.S., 30 Fed. Cl. 420 (1994). In this case, I have determined that Flexfab is not a third party beneficiary to the contract for the reasons set forth below.

F000124

It is clear that the Government did not intend to make Flexfab a third party beneficiary to the contract because the contract does not evidence any intention to benefit Flexfab. There is only evidence of an intention to allow Capital to change the payment address for payments by check. The contract does not evidence any intention to direct payments to C&S Industrial Supply, (C&S), the first tier subcontractor, or to Flexfab.

There is also insufficient evidence to conclude that Capital intended Flexfab to receive payments as a third party beneficiary. (1) Capital never expressed any intention to benefit Flexfab or C&S to the Contracting Officer. (2) Neither the modification nor the requests by Capital for the modification make any reference to Flexfab or C&S. (3) After Capital began to receive payments under the contract, they still made no effort to redirect them. While C&S contacted DFAS and the DSCC small business office to allege that Capital wanted payments directed to Flexfab and C&S, Capital never expressed that intention. C&S, despite its repeated contacts, could not put the Government on notice of an intention on the part of Capital. (4) Capital knew or should have known that the Government had the option to pay by either electronic fund transfer (EFT) or check. FAR 52.232-33 (Aug 1996). Capital was required to register in the Central Contractor Registration (CCR) in order to be eligible for award. DFARS 252.204-7004 (Mar 1998). Capital did register in the CCR. Capital did not change its payment information in the CCR. And, Capital knew or should have known that the Government had the right to rely on the information in the CCR to make payments. DFARS 252.204-7004 (Mar 1998). (5) But, even if Capital believed that the modification would change the CCR information, Capital submitted an incorrect routing number, omitting one number in the modification request. There is no way for me to know whether Capital did so intentionally or by mistake. And, it clearly is not sufficient evidence of an intention to make Flexfab or C&S a third party beneficiary to the contract.

You have submitted a copy of an escrow agreement as evidence that Capital intended to benefit Flexfab and C&S. However, Capital is not a party to the escrow agreement. It is an agreement between C&S and Flexfab. Again, this does not support a conclusion that Flexfab or C&S was a third party beneficiary to the contract.

The Government did not intend to benefit Flexfab or C&S. And, for all of the foregoing reasons, I cannot conclude that Capital intended to benefit Flexfab or C&S. Therefore, I am, hereby, denying your request for $452,031.60

Flexfab was not a party to the contract. And, since it is my conclusion that Flexfab is not a third party beneficiary to the contract, I conclude that Flexfab neither has rights under the Tucker Act to appeal this decision to the U.S. Court of Federal Claims nor rights under the Contract Disputes Act, 41 U.S.C. § 601 et. seq. (CDA) because pursuant to 41 U.S.C. § 601(4) third party beneficiaries do not fall under the definition of contractor. Therefore, they cannot avail themselves of the provision of

the CDA which states, "A contractor may bring an action directly on the claim in the . . . [COFC]." Sallee v. U.S., 41 Fed. Cl. 509 (1998). However, I am including the standard final decision language, should you try to appeal this decision arguing that either the ASBCA or the U. S. Court of Federal Claims should take jurisdiction.

The standard final decision language reads: This is the final decision of the Contracting Officer. You may appeal this decision to the agency board of contract appeals. If you decide to appeal, you must, within 90 days from the date you receive this decision, mail or otherwise furnish written notice to the agency board of contract appeals and provide a copy to the Contracting Officer from whose decision this appeal is taken. The notice shall indicate that an appeal is intended, reference this decision, and identify the contract by number. With regard to appeals to the agency board of contract appeals, you may, solely at your election, proceed under the board's small claim procedure for claims of $50,000 or less or its accelerated procedure for claims of $100,000 or less. Instead of appealing to the agency board of contract appeals, you may bring an action directly in the United States Court of Federal Claims within 12 months of the date you receive this decision.

Shirley Spratt

SHIRLEY SPRATT
Contracting Officer

53

contractor?
A. No.
Q. What was your understanding of the 8 (a) program?
A. It's for contractors who are disadvantaged in some way. The government gives them sort of a preferential treatment. And the government sets aside certain NSNs for 8 (a) contractors.
Q. What is an NSN?
A. National stock number.
Q. Does that mean they're allowed to provide certain types of parts?
A. Yes.
Q. Okay. How is it decided, if you know, what parts they can provide?
A. If they can do it, we set aside the NSN. It doesn't necessarily matter --
Q. Oh, so it doesn't say --
A. These NSNs -- no. It is if you can make this paper clip and you are an 8(a) disadvantaged contractor, I will give you business to make this paper clip.
Q. Okay. So any part the government could

54

ever need, it could acquire from an 8(a) contractor?
A. There's potential for that, yes.
Q. Okay. They have to prove that they're capable of doing it, right?
A. Yes.
Q. And there's a whole series of requirements for that, right?
A. Yes.
Q. And is that part of the certification process, establishing whether the contractor can meet those various requirements?
A. I really don't know.
Q. Okay. That's fine. The contract at issue in this matter relates only to that particular product that Flexfab ultimately provided, correct?
A. Yes.
Q. Have you as a either pre- or post-award contracting officer dealt with 8(a) contractors before?
A. Yes.
Q. All right. Any idea how many times?
A. I would say many. That doesn't tell

55

you anything.
Q. More than 50?
A. No. I've probably dealt with 15 to 20 8(a) contractors.
Q. Okay. And in dealing with those 15 to 20 -- and I understand that that's an estimate -- have you had an opportunity to deal with escrow accounts in favor of subcontractors?
A. No.
Q. Are you aware that subcontractors use escrow accounts on government contracts?
A. Now I'm aware, yes.
Q. All right. At the time this matter arose, you were not aware of that?
A. I was not.
Q. All right. That had never come up in any of your training sessions or classes?
A. Correct.
Q. What's your understanding of the use of an escrow account for a subcontractor?
A. That as an escrow account is established by the prime, and the subcontractor has access to it.
Q. Okay. And then payment would be made

56

to the escrow account rather than to the prime?
A. No. Payment is made to the prime.
Q. Well, payment's made to the escrow account, right?
A. Payment is made wherever the prime contractor directs in the contract for payment to be made.
Q. Okay. Do you have an understanding of why a subcontractor would want to do that?
A. Yes.
Q. What is that?
A. This contract -- I mean, the --
Q. To ensure they get paid, right?
A. Yes.
MR. HILLS: Let me mark this.

- - - - -

Thereupon, Exhibit 4 is marked for purposes of identification.

- - - - -

Q. Let me hand you what's been marked as Deposition Exhibit 4. If you could look at that, and let me know if you've seen that before.
A. I have seen it.

A. That is correct.
Q. But in any event, it shows that address twice?
A. Yes.
Q. The P.O. Box in Tallahassee, and it shows another address in Michigan, correct?
A. Yes.
Q. All right. Why, then, did you conclude that the Tallahassee address was the correct address?
A. Did I say I concluded that was the correct address?
Q. Well, you indicate in here that's the address the contract shows, correct, and I'm talking about Exhibit 5 now.
A. Right.
Q. I'm not trying to put words in your mouth. I want to make sure as I read it upside down, I'm interpreting the letter correctly.
A. The letter does not say that I concluded that was the correct address.
Q. All right. What does it say, because I don't mean to misconstrue it?
A. It says the remittance address in the



original contract was stated as Capital City Pipes, P.O. Box 12368, Tallahassee, Florida.
Q. All right. But it's stated as another address as well, isn't it?
A. Modification P1 was issued to change the remittance address to Old Kent Bank.
Q. The modification isn't there, is it?
A. It's right here.
Q. Okay. But that's not part of the original contract, is it?
A. Right, it is not.
Q. Right. And there's a document in the original contract that shows a different remittance address, correct?
A. Yes.
Q. All right. So you concluded that one was appropriate, and the other one was not?
A. Not based on this.
Q. Okay.
A. I didn't say one was appropriate, and one was not.
Q. Okay. I'm asking why you put in your letter to me of October 2 that that was remittance address, the P.O. Box in Tall—



Florida?
A. I see what you're saying.
Q. In the original contract it says both, correct?
A. Right.
Q. So it's ambiguous, right?
A. The contract is ambiguous, yes.
Q. That what's what I'm asking you.
A. Yes.
Q. Okay. So why did you list in your letter to me that the remittance address was Tallahassee, Florida?
A. Because it was in here twice.
Q. Well -- but you indicated earlier you weren't sure if the solicitation documents were part of the contract?
A. True.
Q. Would it be your conclusion that because one address is listed twice and the other address is listed only once, if that were the case here, that that shows one is the remittance address?
A. No.
Q. All right. Was that the easy answer to



the question in October 2 of 2000, that the remittance address just didn't get changed, but now, your position's a little different?
A. No. My position -- no.
Q. Okay. But that doesn't -- the letter doesn't explain the problem, does it?
A. Right.
Q. So what was the purpose of writing it?
A. The purpose for writing it was, I said the remittance address in the contract was this. It was changed to Old Kent Bank by modification. The computer system didn't get updated, so DFAS made payment to the original address stated in the contract.

Capital City Pipe, who the government had the contract with, did not contact us and tell us that that was incorrect. So as far as I was concerned as the contracting officer, the government's obligation was done.
Q. Okay. Let's go back and look at, I think, 12 of 24 in the contract.
A This?
Right. And that's dated June 23,

74

81

A. Yes.
Q. And that's Capital City telling the government that the remittance address for this contract should be Old Kent Bank in Michigan, right?
A. Yes.
Q. Do you have any idea -- and I'm not -- this isn't meant as a challenge to you personally -- do you have any idea why that wasn't accounted for when this contract was entered originally into the system?
A. No.
Q. Okay. Would it, again, have been the obligation of the contracting officer to make sure that that information was correctly reflected?
A. The pre-award contracting officers don't check on that -- check to see that the system is correct for things like this.
Q. Okay.
A. Like the post-award contracting officers do.
Q. Okay. You're talking about checking to make sure they're correct?
A. Right.

82

Q. All right. But it wouldn't be the pre-award contracting officer's obligation to make sure when it was originally entered, it was entered correctly, regardless of whether she's doing it as she sits there or goes back and checks again?
A. You're asking me if that's her obligation, or are you asking her if that's standard procedure? I'm confused what your question is.
Q. All right. Let's do both. Let's start with procedure. How is that the information from the contract gets entered into the DSCC computer system?
A. At this time, June of 1999, I don't know if they were using the automated system, which automatically updates, or if it would have been keypunched. It would have been one of those two ways.
Q. Okay. When you say the automatic system --
A. Automated, uh-huh.
Q. All right. How does that enter -- does the automated -- as silly as this s

83

how does the automated system enter information into the computer?
A. When you put it all in your award document, once you hit send, if you will, that sends it automatically to our computer.
Q. So someone has to input it initially, right, or it's scanned, or somehow it's inputted into the computer system?
A. Yes.
Q. All right. And then from that point forward, you can change the document as it exists in the system?
A. No. Once it's funded, which means the money has been obligated, you can't make changes.
Q. Okay. But page 12 of 24 is directed to Ms. Luich, correct?
A. Yes.
Q. And she was the pre-award contracting officer, right?
A. Yes.
Q. And you're telling me that she has no responsibility as the pre-award contracting officer to make sure that the contract information has been correctly entered into the DSCC computer

84

system?
A. I didn't say she didn't have the responsibility. I think she does have the responsibility.
Q. Okay. And that's in your position as a supervising contracting officer?
A. Yes.
Q. Okay. In the normal course of processing this kind of an award, is it understood that there is a responsibility with someone to make sure that the information gets entered correctly?
A. Yes.
Q. All right. Who would that responsibility fall on?
A. The contracting officer.
Q. Okay. Is there any way you can say here today why that didn't happen?
A. No.
Q. All right. Same with why the modification information was never updated into your computer system?
A. Right. I can't say why that didn't
1.

Q. Okay. But that was clearly the intent, right, of the modification?
A. Yes.
Q. All right. And, again, so I'm clear -- well, let me ask you this: If the government were aware of the existence of the escrow account in this matter, would that change your conclusions?
A. No.
Q. Why not?
A. Because there's -- you can do an assignment of claims. That's the way to handle money that is assigned from one contractor to another.
Q. Is that a requirement?
A. I think it is.
Q. So is your conclusion, then, following that logic, as I understand it, that these escrow accounts shouldn't be used?
A. I won't say they shouldn't be used. I think they're not safe.
Q. Okay. And if the government was not only aware of the existence of this escrow account, but the fact that it was to ensure that C & S Industrial Supply and Flexfab received



payment, does that change your conclusion at all?
A. You are saying that the government was aware that that was what was supposed to be happening. I don't agree that the government was aware.
Q. All right. But I'm asking you to assume that.
A. Okay. I'm assuming that the government was aware --
Q. And I'm going to ask you to assume two things.
A. Okay.
Q. One, that the government was aware of the existence of this particular escrow account, and, two, that the escrow account was established to protect the financial interest of C & S Industrial and Flexfab on this contract. Okay?
A. Okay.
Q. All right. Assuming those two things, is it still your position that there's no claim by Flexfab or no viable claim by Flexfab or C & S for this money?
A. Against the government, yes, that still my position.

Q. Okay. We're nearing the bitter end. If you'll give me a minute or two.
You don't dispute that Flexfab wasn't paid for the parts it supplied to the government, do you?
A. I have no way of knowing for sure that they were not. It appears they were not.
Q. You don't believe they would make a claim if they had been paid, do you?
A. I would hope not.
Q. That would be kind of bad business practice, right?
A. Yes.
Q. All right. How well did you know Michael Taylor?
A. Casually, very casually. You know, I would say hi to him.
Q. Okay. Do you have any idea if he's still in the Columbus area?
A. I think he still lives in Columbus.
Q. Okay. Did you ever have any conversations about Flexfab's claim on this contract with a gentleman named Phil Kover?
A. No.



Q. Do you know who that is?
A. I know he worked at DFAS.
Q. Okay. Do you know what he did there?
A. He had something to do with payments. I don't know if he was a supervisor over the payment area or if he did the payments himself.
Q. All right. When you say "if he did the payments himself," you mean actually processed payments?
A. Yes.
Q. Okay. If he were a supervisor, do you have any idea what his responsibilities would have been? Would he have just been overseeing the people who were making -- processing the payments or --
A. That would be my guess.
Q. Okay. Do you know one way or the other?
A. No, I do not.
Q. That's fine. Did you ever have any contact with a gentleman named Henry Cook from C & S Industrial Supply?
A. No, not that I'm aware.
Q. Okay. Did you ever have any contact

76

A. In that scenario, I would possibly, yes.
Q. Okay. Now, what -- physically, what do you do? What steps do you go through at that point?
A. I would go into our -- at that point, in 1999, I do believe that we had a system which is now -- it's called DPACS. I would have went into the system and processed the modification and distributed it to the parties who would need a copy.
Now, the system would automatically tell me which party needs a copy. But other than the system actually doing the distribution, I would have sent everyone a copy of the mod up-front.
Q. Okay. Now, that document, we'll probably look at it in a moment. I believe it was given the document number P1. Do you remember that?
A. I don't recall. I don't recall.
Q. That's fine. The best you can do is what you recall today. Is whatever that document's called or whatever number its given,



are you the one who types it up?
A. Yes.
Q. And you do that in the computer?
A. Yes.
Q. There is probably some kind of form that you fill in the blanks, and then you can print that completed form? Is that how it works?
A. Sort of, yes.
Q. Okay. I mean, if we see something that's been printed out, are you the one who prints it for the first time?
A. Yes.
Q. Okay. And the information in there that's not part of the blank form but that's filled in, you would have typed that information into the computer?
A. That's correct.
Q. Okay. Now, when the change has to do with where the money gets sent, is there anything else that needs to be done to make sure that the modification is, in fact, followed?
A. As far as I know, any additional function that I would have to make, I do not believe so.



Q. Okay. Now, are you the person that handles the payments?
A. No, I am not.
Q. Who handles the payments?
A. DFAS.
Q. And -- D-F-A-S?
A. Yes.
Q. And what does that stand for?
A. Defense Finance and Accounting Service.
Q. Okay. Are they located here in Columbus?
A. Yes, they are.
Q. And how does DFAS know, if you know, that a modification has been made to the contract regarding the payment process?
A. A copy is forwarded to them.
Q. Okay. Now, is that copy forwarded to them -- is a physical copy forwarded to them, or do they receive an electronic notice of that change?
A. A physical copy is forwarded to them, and I do believe that DPACS -- somehow they have the distribution at the bottom of the mod -- sends it off electronically also.



Q. Okay. And DPACS is the computer program?
A. Right.
Q. Okay. Do you know, from your own knowledge, whether or not DFAS has to key in any additional information into its system to accomplish the modification that you've entered into?
A. I have no idea.
MR. RYNDERS: Okay. Just for the record -- and we'll work through this, but this is really for counsel to confirm. My understanding is that this witness has been produced to respond to the Rule 30(b)(6) deposition notice, items 3, 4, 5, 7, 10, and 13; is that correct?
MS. BURKE: That's correct.
MR. RYNDERS: Okay. Let's go off the record a minute.
(A discussion is held off the record.)
Q. Ms. Jeffries, let me show you what was marked previously during an earlier deposition as Exhibit 4. And I'll hand that to you, and I might have to look at it with you a little bit upside
But is this the modification?

21

A. This would be the modification -- or yes, this is the modification.
Q. Okay. As I understand, and as far as you know, am I correct that the original contract remains in place, but it's changed to whatever extent this modification says it's changed?
A. Exactly.
Q. Okay. And can you tell me what it was that this particular modification changed about the original contract?
A. The remittance address.
Q. And what was the new remittance address?
A. According to this modification, it's Old Kent Bank Corp. Trust, C/O No., ABA No. 07200052, Post Office Box 144, Grand Rapids, Michigan 49501-0144.
Q. Do you know why the remittance address is being changed from the original address to this address?
A. No, I do not.
Q. Okay. Did it matter to you at the time when you executed the contract modification why it was being changed?

22

A. No, it does not.
Q. Would you have done something different depending on what the reasoning was?
A. No.
Q. Okay. All that mattered to you was that the prime contractor requested it, and, therefore, you did it?
A. That's correct.
Q. And what was the date of this modification?
A. September 27, 1999 is the date signed.
Q. Okay. And that's your signature --
A. Yes, it is.
Q. -- down at the bottom right?
A. Yes, it is.
Q. Okay. To whom was this modification distributed?
A. The distribution at the bottom tells me it was distributed to DCMC. That's Defense Contract Management Command in Clearwater and DFAS, Columbus Center. Defense Finance and Accounting Center.
Q. Okay. And whether it did or not, at least this modification should have been provided

23

to DFAS?
A. According to this, it should have been.
Q. Okay. Now, are you the one who generated the distribution list at the very bottom of this exhibit?
A. The system does that automatically.
Q. Okay. Can you override that?
A. No, but I can add to it.
Q. Okay. So do you remember if you needed to add DFAS, or was DFAS an automatic recipient?
A. This was automatic.
Q. And was DFAS an automatic recipient simply because it was a contract modification or because the modification involved the remittance address?
A. DFAS is a recipient simply because it's a contract modification.
Q. Okay. So even a non-monetary or non-economic change still goes to DFAS?
A. It should.
Q. Okay. Fair enough. It would automatically be on the distribution list?
A. It would automatically be on the distribution list through the DPACS system.

24

Q. Okay. Let me take that back from you a moment. Thank you. If at any time you want to see this again, just let me know. I'll pull it out.
A. Okay.
Q. It's Exhibit 4. Instead of taking it out of my book, I'm going to give you my whole book.
A. Okay.
Q. Let me show you what's been marked as Deposition Exhibit 3. That's from an earlier deposition as well. Do you recognize that to be the original contract?
A. I recognize this to be a copy of the contract, yes.
Q. Okay. Fair enough. It's definitely a photocopy.
A. Okay.
Q. Sorry. Everything in there is a photocopy.
A. Okay.
Q. So can you tell me the date of that original contract?
A. The date on this contract says June

57

A. It -- right. It says that it should be done at Flexfab for supplies and packaging.
Q. Okay. Now, are these -- is the person that would do that a DSCC employee, to your knowledge?
A. No.
Q. For whom would that person work?
A. The person would work at -- for DCMC Clearwater.
Q. Okay. Which is another division of the Defense Logistics Agency? Is it part of the Department of Defense?
A. It's part of the Department of Defense.
Q. Okay. Good enough for me.
MR. RYNDERS: Just off the record.
(A discussion is held off the record.)
Q. Do you have any recollection sitting here today of preparing modification P2?
A. No, I do not.
Q. Do you have any recollection from having reviewed any portion of the contract file whether there are any other modifications?
A. No. I would like to clarify something if I could.

58

Q. You may.
A. You asked about who would the person -- the quality assurance representative work for that would go out to the contractor plant and do the actual inspection, well, I see now that this modification states that he would have actually worked for DCMC, Grand Rapids, instead of Clearwater.
Q. Okay. Do you know actually what the product was that was being purchased?
A. No, I do not.
Q. Do you know what its application was?
A. No, I do not.
Q. We've talked about Capital City Pipes. Do you know who C & S is?
A. No, I do not.
Q. Have you ever heard of Henry Cook?
A. No, I do not recall.
Q. You don't have any reason to believe that the contract modification, P1, initiated anywhere other than the request that you received? In other words, it's not something that you or somebody from the DSCC had you do, independent of a request from the prime contractor?

59

A. No.
Q. Are you aware of any reason why the modification P1 made any difference to the DSCC?
A. Am I aware of any reason why processing the modification would have made any difference at all to DSCC?
Q. Right. Whether the remittance address is here or there, does that affect DSCC?
A. No. I'm not aware of any reason why that would affect DSCC.
Q. My understanding is that there were several attempts along the way to get this contract issued, and the issuance was delayed. Whether that's true or not, my understanding is you would not have been part of that process at all; is that correct?
A. In issuing the contract, no.
Q. Okay. Because you were at that point in time handling matters post-award?
A. Yes.
Q. Okay. Do you have any idea who at DFAS would have any knowledge of that modification being received by them, the process of physically changing the remittance from one address to

60

another address or anything like that?
A. A person?
Q. Yes.
A. A person's name?
Q. That's my question.
A. No.
Q. Do you have any idea what position a person would be in that would know the answers to those questions?
A. No.
Q. Do you know the name of a single person that works at DFAS?
A. Yes.
Q. Okay. Do you know that person just as a friend, or is there some reason why you have business dealings with people at DFAS?
A. Yes.
Q. Can you just briefly explain that to me?
A. I would have dealings with persons at DFAS in the post-award positions, primarily -- mostly, the reasons why I've dealt with DFAS is because the contractor has, for some reason, been unable to get paid, and they are requesting

assistance to get payment.
Q. Okay. So these are scenarios where no money has gone out from DFAS?
A. That's correct.
Q. Have you ever been --
A. Well -- I'm sorry. Not, no money. It could be partial payment and not complete and so --
Q. But what I meant was that there was a missing payment or a missing partial payment, as opposed to a payment that was sent the wrong place?
A. Yes.
Q. Okay. Have you ever been confronted with a situation, other than this one, where payment was not made as required by the contract as modified?
A. I'm sorry. Could you repeat that?
Q. Yes. I'm wondering if you've ever been involved dealing -- other than this particular situation, have you ever dealt with any other situation where the problem wasn't that no money was paid, but that it wasn't paid to the right party or to the right address or the right bank



account?
A. I do not recall a situation like that.
Q. Okay. Did you have any role -- or did you have any dealings with anybody who was complaining that modification P1 was not being honored?
A. I do not have any recollection of any complaints regarding that modification.
Q. Okay.
A. I don't recall the modification.
Q. Fair enough. Okay. What happens when everything's done when you're the post-award contract specialist, the parts have been made, the parts have been accepted, they've been delivered, payment's been made, and the project -- the contract is completed? What happens at that point?
A. Payment's been made and the contract's complete, DFAS, I believe, goes to close out the contract.
Q. And are you the person who -- well, you wouldn't do that, because it's DFAS?
A. No. Right.
Q. So the computers are hooked together,



and now DFAS says, we've made the final payment, and they close the file, in effect, you're saying?
A. In effect, I should say, they eventually close the file. I believe it still stays open in our system so that we can still go back and look at whatever it is we may need to look at for a period of, I believe, 30 days.
Q. Okay. Do you know what happens after 30 days, after DFAS has said, this contract is completed, and then the 30 days -- what happens to that data?
A. I do not know.
Q. Is it true, though, that you -- to the best of your understanding, you no longer can access that data on the computer?
A. I can look -- you mean after the 30 days?
Q. After the 30 days.
A. After the 30 days, there's several different places where you can access different information from our material management system, which we call SAMMS. It's closed out. It's gone. No, you cannot access it.
Q. Okay. I'm going to use a hypothetical



because I don't want anybody to worry about this particular case. I want you to assume that XYZ Company has delivered goods to the government and is saying that they did not get paid. Okay?
A. Uh-huh.
Q. Now, is that an issue that DFAS has to resolve and handle?
A. That is an issue that the contract administrator and DFAS would have to probably work together to resolve. The contractor would -- the proper channel is for the contractor to contact his contract administrator.
Q. And the contract administrator works for DSCC?
A. That's correct.
Q. Is the contract administrator your boss?
A. I would be -- I would have been the contractor administrator.
Q. Okay. Okay. So in this particular case -- now I'm moving out of the hypothetical somewhat more into reality -- in this particular case with the contract that's underlying this litigation --

A. Okay.
Q. -- if a person didn't know who to call, whoever received the call, eventually, it should have been routed to you, in terms of a complaint about not getting paid or the payment not going to the right place, that sort of thing?
A. If -- let me clarify something.
Q. Sure.
A. Okay. If a contractor is having payment problems, he's not getting paid on a particular contract, his first course of action probably would be to contact DFAS. Usually what happens if the contractors sends in his invoice for payment and DFAS thinks that they should not be paid, they would send them back something which explains why they're not being paid. It would give them the reason why. Then the contractor would contact us.
If they have not gotten paid -- they got no reason for not getting paid, and they have contacted DFAS and can't get any kind of reasoning why, and they say they have sent their invoices in, then that's when they would come to the contract administrator for assistance.



Q. Okay. And if somebody who had that kind of complaint and they didn't know that they should call the contract administrator, somebody who takes the call at DSCC would know to get that person to the appropriate contract administrator?
A. Yes, they would.
Q. Okay. And you've had those kind of calls?
A. Yes, uh-huh.
Q. Let me show you what was marked earlier as Exhibit 5, and it's a letter from a woman named Shirley Spratt. Do you know Shirley?
A. Yes, I do.
Q. Is she your supervisor?
A. No, she's not.
Q. Okay. Are you her supervisor?
A. No, I'm not.
Q. Okay. Do you guys work together?
A. No, we do not.
Q. Okay. Is she a contract specialist?
A. She is.
Q. Okay. Did you have any input into the creation of Exhibit 5?
A. May I see it, please?



Q. Please.
A. I do not recall having any input into the writing of that letter.
Q. Okay. Do you remember seeing this letter before just now?
A. No.
Q. Basically, the same question as to Exhibit 6, which is, for the record, three pages also offered by Shirley Spratt.
A. I forgot the question.
Q. That's okay. You've taken your time, a few minutes to read it. Really two questions I'll ask at one time: First, do you remember ever seeing it before today? And then, secondly, did you have -- if you did, did you have any input into its creation?
A. I do not remember ever seeing it before today.
Q. Okay. So, obviously, you didn't have any input?
A. Obviously, not.
Q. Now, I guess it occurred to me that it's possible that Ms. Spratt may have come to you and consulted with you and gotten information and



never shared her letter with you. Do you remember anything like that happening?
A. I remember having discussions with Ms. Spratt, Ms. Spratt and another attorney.
Q. Okay. You were the post-award contract specialist, I recognize, but you were aware from the time that you got involved that Flexfab was the origin of the product being purchased by the DSCC?
A. No.
Q. Okay. When did you --
A. I would not say I was aware of that.
Q. Okay. When did you become aware of that?
A. I cannot say that I was ever aware of it until this issue was brought about.
Q. Okay. Am I correct in understanding that ordinarily -- well, strike that. Were you aware at the time, meaning the time that you became involved as the post-award contract specialist, that the prime contractor, Capital City Pipes, was an 8(a) contractor?
A. I can't say that I was aware of that. I don't recall.

Q. Okay. Would it be fair to say that at least by the time of mod P2 that you were aware that Flexfab was the origin of the product?
A. No, I cannot say that because I do not recall.
Q. Okay. Certainly, P2 makes that clear? You would agree?
A. Makes what clear?
Q. That the origin of the product is Flexfab.
A. P2 does state that the place of inspection would be at Flexfab.
Q. Okay. And by definition, that means that Flexfab is the manufacturer of the product?
A. No.
Q. How could it be an inspection at the point of origin if Flexfab isn't the manufacturer? How would that work?
A. There's instances where the contractors will have the supplies at their plant or what have you and have the inspection done there.
Q. So you're familiar with scenarios where -- the analogy would be Flexfab would deliver its product to Capital City Pipes?



A. Right.
Q. That would be counted as the point of origin?
A. Right.
Q. But given the fact that this particular contract, the prime contractor is Capital City Pipes and the inspection is happening at Flexfab, that would pretty clearly tell you that Flexfab is manufacturing this particular product, wouldn't it?
A. I suppose you could come to that conclusion.
Q. Another area that you've been produced as being the person best able to testify has to do with communications between the United States and Capital City Pipes regarding the modification. I think we've gone through this too many times, but are you aware of anything that we have not marked as an exhibit that would be a communication between the United States and Capital City Pipes as to that particular modification?
A. No, I'm not aware of anything.
Q. Now, would you agree with you being the person identified as best able to testify about



payments from the United States to escrow accounts --
A. Would I agree that --
Q. -- escrow accounts controlled by subcontractors?
A. Would I agree that I would be the best person to talk to -- I'm sorry -- to testify --
Q. Yeah.
A. -- about payments to escrow accounts -- I'm sorry. What was the last part?
Q. Okay. Let me back up.
A. Okay.
Q. You're aware that in this particular case, the first contract modification had to do with changing the remittance address to a particular bank account?
A. I'm aware of that.
Q. At Old Kent Bank in Grand Rapids, Michigan?
A. Yes.
Q. Okay. Now, had you prior to that time -- I believe it was September of 1999 -- been involved either as a pre-award or post-award contract specialist regarding a contract that



required payment to an escrow account?
A. Any contract?
Q. Just anywhere along the line in your 13 years or whatever.
A. I don't recall. I do not recall.
Q. Okay. Do you recall at any point during your career here, either as a post or a pre-award contract specialist, the idea of payment being made to a subcontractor instead of to the prime contractor?
A. There are situations where contracts and payments and everything that the contractor may have opened is assigned to a different contractor, and those are what we call novation agreements.
Q. Okay.
A. Which are done between the contractor and the DCMC office.
Q. And remind me, what is DCMC?
A. Defense Contract Management Command.
Q. Okay.
A. And they are the administration office that would be better located to oversee contractor's actions or --

17

from associate director of small business over to this DLA Contingency Support Team, and then on to the division chief for -- is it EMAAL?
A. EMAAL.
Q. EMAAL.
A. Well, I'm on this team called the DCST, and it stands for, again, DLA Contingency Support Team. The team requires me to go into foreign areas from time to time, which meant that it pulled me off my current function as the associate director of small business.
Each time I left, someone would have to take my function over. The last time I left, the deputy commander asked me would I consider doing something other than the small business.
Q. It sounds to me -- and correct me if I'm summarizing this wrong -- it sounds like you were doing both, and they started to interfere?
A. Actually, the DCST is a special assignment. It's something separate that comes out of headquarters.
Q. Okay.
A. And if you are selected to go to a forward position, then, of course, you only can do

18

one at a time.
Q. Okay. You're familiar with the Capital City Pipes Company?
A. In general, yes.
Q. All right. What do you know about Capital City Pipes?
A. I don't know. You need to be more specific.
Q. Did you have any involvement with Capital City Pipes in a contract it had, SP0740-99-C-1004?
A. The numbering in and of itself makes no -- has no reference to me. But I've had dialogue concerning issues associated with Capital Pipe failing to pay a subcontractor.
Q. Okay. What does that entail? What have your communications or involvement with that issue been?
A. I really don't know. There have been multiple -- I recall having a discussion with a Mr. Henry Cook about them not being paid from Capital City, as well as JGB. And something that at some point led me to write a letter : their failure to act responsibly.

19

Q. When is it you had a conversation with Mr. Cook?
A. You got me. Probably somewhere in 2000. I want to say June or July, but I'm guessing here.
MR. HILLS: Mark that as 7, please.
\- - - - -
Thereupon, Exhibit 7
is marked for purposes of
identification.
\- - - - -
Q. If I could ask you to review that, Sir. Does that look familiar to you at all? If I'm getting ahead of you, let me know. I want to make sure you have a chance to review it thoroughly.
A. Yeah. This is familiar. I'm the author of this.
Q. All right. What's the background of that letter and the purpose of the letter?
A. Well, again, as you note in the contents here, it simply says very clearly that resulting from a Congressional inquiry and claim filed against the government on -- regarding the failure of this 8(a) to pay its debts to the

20

supplier.
Q. Okay. Well, what information can you tell me about that?
A. Different than what I've already told you?
Q. Yeah.
A. I can't tell you anything, other than as a result of that Congressional and complaint from a couple of firms -- and I'm thinking it's JGB and Mr. Cook, who was at that time C & S --
Q. Okay.
A. -- prompted us to look into what was going on in terms of whether this guy was making payments or not.
Q. Did anything, to your knowledge, happen as a result of your letter?
A. In the back part of my mind, I'm thinking that Mr. Gonzalez or someone gave me a phone call and indicated that they had gotten complaints themselves. However, they couldn't decertify the company based on the complaints at the time.
And, again, that's -- I'm paraphrasing -- but what I was requesting was, in fact,

A. That authority is delegated to Mr. Taylor, but the reason his name is up here so that any response will come back to him because he's working this --
Q. All right. In either of those two letters, Exhibit 8 or 9, is that your signature?
A. No.
Q. All right. That's him signing your name?
A. That's him signing my name.
Q. Was Mr. Taylor the only person performing that function, or were there other people who were doing the same thing for other 8(a) companies or other programs?
A. If I'm correct, I had -- the 8(a) program is broken down in two categories. I have a construction side where we do base supply, and the gentleman involved with that, his name is Gerry Wade.
Q. Okay.
A. So Gerry Wade would be doing offering letters from the construction, signing them.
Q. Okay.
A. So you have Mr. Taylor doing



commodities and services -- well, I don't want to say service, commodities. Because services would fall into base supply, which means it would have been something that Mr. Wade was doing.
Q. Okay. Would it be fair to say that these are examples of letters that went out frequently, these two just happened to have been directed to something involving Capital City Pipes?
A. Yes. This is a standard format.
Q. Yeah.
A. So any 8(a) that receives an award, an offering letter would have went prior to that.
Q. Okay. You indicated earlier, sir, that you had a conversation with Henry Cook?
A. Yes.
Q. Regarding Capital City Pipes?
A. Yes. More than -- well, not necessarily -- I've had multiple conversations with Henry Cook.
Q. Okay. How many of those related to Capital City Pipes?
A. I have no idea.
Q. All right. When was the last



had a conversation with Mr. Cook?
A. I'm going to guess and say two years ago.
Q. Okay. Did you meet with Mr. Cook at any time to discuss the Capital City Pipes matter?
A. The answer to that is yes, but when you say "Capital City Pipes matter," I met with Mr. Cook to discuss some financing regarding Flexfab not being paid or --
Q. Okay.
A. So I guess we're saying the same thing.
Q. Yeah, that's what I'm referring to. So you had that meeting. Was Phil Kover there as well?
A. As I recollect, yes.
Q. All right. Was Michael Taylor part of that meeting?
A. I believe he was.
Q. All right. Were you there the whole time?
A. I'm pretty certain I was there the whole time. If not the whole time, the vast majority of the time.
Q. All right. If you could review that



for me please, sir.
A. Okay.
Q. Does that accurately summarize the meeting you had with him?
A. I don't know -- when you say accurate, there's some things I'm not certain -- I couldn't say yay or nay to. But, basically, the gist of what was being said about a meeting with Mr. Kover and asking about payment, I can recall that.
Q. All right. Do you recall as a result of that meeting that you and Mr. Taylor had any additional discussions about C & S Industrial Supply and Flexfab and their failure to receive payment for parts?
A. I don't know. I would think that probably we did, but I don't know. I don't recall anything specific.
Q. All right. Do you remember --
A. The conversation would have been more -- would have went along with Mr. Kover about getting these people paid.
Q. All right. Do you have any ollection of talking with Mr. Kover about that ne?

29

A. Only to the extent that there was something in the automated process associated with the address, and it's supposed to transfer over, and it didn't, or something with regard to that. I don't know how that works.
Q. All right. Do you know if there was ever a conclusion reached or a plan of action reached as a result of these discussions to rectify the nonpayment?
A. No. My -- last I heard, they had filed an action, and I assume this is part of it.
Q. Okay.
MR. HILLS: Let me go ahead and mark that as 10.

- - - - -

Thereupon, Exhibit 10
is marked for purposes of
identification.

- - - - -

Q. So I understand, we've now marked as Exhibit 10 the copy of the e-mail message you received from Henry Cook, correct?
A. I don't know that. What I'm saying, I guess, this is on the top of my sheet, and I don't

30

recall the e-mail itself, but I do recall much of the contents in the e-mail. So I have no reason to believe it was anything other that, but I can't identify this is the e-mail that I received.
Q. All right. Given the way it's set up, you don't have any reason to argue that it's an e-mail that was --
A. I wouldn't debate it is. I just can't confirm.
Q. All right. And as I understand what your testimony is about the contents of the e-mail, you may not recall specifically some of the issues, but you think it generally is a accurate summary of the issues that were discussed?
A. Well, he spoke to some things that Mr. Kover has said and did, and I don't know about those things. Okay? But in terms of the debt -- the monies not going to where it was supposed to go, I am familiar with that situation.
Q. All right. And, again, so I'm clear, you don't have a specific recollection of the nature of any conversations you had with Mr. Taylor or Mr. Kover after this meeting

31

being referred to in Exhibit 10?
A. No. No. In the back of my mind, I would have told Mr. Taylor to press on this issue with Capital City and see what's going on to get these folks money, et cetera, but no particular conversation.
Q. All right. Did you ever do anything to follow up and see what had happened as a result of this contact with Henry Cook?
A. When you say that, what do you mean, "follow up"?
Q. Well, did you ever get back to Mr. Taylor or Mr. Kover some period of time later to say, hey, what happened with that?
A. If I can recall correctly, there was perpetual back and forthness. I think as a result of that, there was dissatisfaction in not knowing specifically and how. As a result of that, there was this action that was filed.
Q. All right. Would you have made notes of any of these conversations?
A. Certainly would. However, I looked for a file that -- since I've been gone, so many -- when files get a certain age, they discard them.

32

So any notes that I might have, I was unable to find.
Q. All right. Would there be any computer records or anything that would have notes or log entries or journal entries, whatever you might want to describe them as?
A. I attempted to go through some of my old e-mails just the other day, but I didn't find anything relevant to this situation. I can't say. It may or may not be. I just don't have any knowledge of where I'd find them.
Q. Okay. Did Mr. Taylor ever indicate to you that he was keeping notes or keeping --
A. We would have had a file on Capital City, C & S. They were both 8(a) firms --
Q. Right.
A. So they're -- whether we've got something stored somewhere or they've got destroyed, I don't know. But we would have maintained a file on program participants. Since as that.
Q. All right. That would have been ...ng you would have done in the regular --

84

17

point in time before I really figured all of that out. Okay. Anyway, if you look at Exhibit 4, you will see that the remittance address has changed. Do you see that?
A. Yes.
Q. Now, was there ever a point in time when anybody brought to your attention that the remittance address that was contained in what started out as your proposed contract, the original 11 pages, or in the final award -- did anybody bring it your attention that the remittance address was not what the parties had wanted to have?
A. There is an attachment to this contract with the correct remittance address.
Q. Okay. You know what, instead of me flipping through there, I'm sure you'll be faster.
A. Right there. I'm sorry.
Q. And this is in Exhibit 3, what's been marked up at the top as page 12 of 24?
A. Yes.
Q. So that tells me it's part of the solicitation materials that were added to what you originally created once the contract was awarded?

18

A. Yes.
Q. Okay.
A. And it's part of the contract.
Q. Okay. And this is a June 23 letter that pre-dates the June 29 document that you typed up?
A. Yes.
Q. Okay. Now, is this -- in terms of the original award, does this June 23, 1999 letter addressed to you from Thelma Williams, page 12 of 24 -- is that what the contract is, in terms of the remittance address?
A. This is the remittance address in the contract.
Q. Okay. Now, I'm going to quickly turn over -- kind of keep this handy, but also turn over to Exhibit 4. And I'm looking at it upside down, and it's kind of small, so maybe you can do this: Is the modification calling for an -- actually in a different account?
A. No. No.
Q. Now, I know that you've only very little worked on the post-award side, but do you have an understanding of why there woul

19

for the modification marked as Exhibit 4, given the fact that this June 23 letter was part of the original contract?
A. No.
Q. Okay. Now, let's forget about Exhibit 4. Let's just think about Exhibit 3, your contract that you put together. What happens to the contract to make sure that payment is handled the way it's supposed to be handled?
A. A copy goes over to DFAS.
Q. Okay. Now, is that an electronic transmission, or was it a hard copy transmission or both and -- back at that point in time?
A. I'm unsure.
Q. Okay. My guess is that today, it's electronic?
A. Yes.
Q. Is it today both electronic and hard copy?
A. I'm unsure.
Q. Clearly, 20 years ago, it was just hard copy?
A. Yes.
Q. Today it might be both, but it's for

20

sure electronic?
A. Yes.
Q. And you're not sure where the transition was?
A. That's not my role.
Q. Okay. Maybe this is silly, but bear with me. I know that you're the person who types the information into the form that is at least the first 11 pages of the contract?
A. Uh-huh.
Q. What happens then? Do you hit print and it comes out the printer, or does somebody else deal with that?
A. You're correct. You hit print, and it comes out on a local printer with the first 11 pages. After that, you start to add your attachments and solicitations and renumber it with the final contract.
Q. Okay. And then do you create a file that has just those 24 pages in it?
A. Not just those 24 pages. The entire contract file encompasses all documentation from the beginning of the initiation of the
tion to the very end.

85

21

Q. So correspondence, e-mails, faxes --
A. Yes.
Q. -- if they were printed off, would go into the file?
A. Yes.
Q. Now, physically, what happens to the file? It stays here at DSCC?
A. There is a holding file here, yes.
Q. Now, what actually gets physically sent to DFAS?
A. The contract.
Q. Okay. The 24 pages?
A. Yes.
Q. Okay. And are you the person who actually does that, or does a clerical person make a copy of that and deliver that?
A. A clerical.
Q. Okay. Is there some way that you confirmed that, in fact, it was transmitted over to DFAS?
A. No.
Q. Has it ever happened that you've discovered that somehow the contract didn't get delivered? You know, a clerical person says, oh,

22

gosh, I forgot. I didn't make it over there yesterday or -- have you ever encountered that kind of scenario?
A. No.
Q. What would happen -- would something bog down if DFAS didn't get the contract?
A. I can't speak for DFAS. I don't know what their procedures are.
Q. Okay. Let me get at it this way: Obviously, you've got a contract, and that's all nice, but it's just paper. And so what you really want to end up with is somebody who actually makes something and gets it to the Department of Defense so that those people can use it obviously.
What I'm wondering is, is there something in the way that your whole system works so that unless that contract gets over to DFAS, the actual process of getting parts made and delivered isn't going to happen? I mean, is there like a check and balance?
A. There is a system process, yes. And if the contract has not been delivered at a certain point, it becomes delinquent, and there is action taken on that. They follow it through on

23

delivery.
Q. And when you talk about "they," you're talking about DFAS, or are you talking about --
A. DSCC follows through delivery. DFAS handles the payment issues.
Q. Okay. So the fact that -- well, let me -- do you know whether or not DFAS ever paid any money with respect to this contract?
A. No.
Q. My understanding is that DFAS did pay money, but paid it directly to Capital City, not to the bank account at Old Kent Bank. Do you know if that's true or not?
A. No.
Q. Okay. Just assume that that's true for right now. Does that indicate to you that, obviously, these 12 pages -- I'm sorry, these 24 pages of the contract were, in fact, physically delivered to DFAS?
A. Yes.
Q. Okay. Now, is there anything in the first 11 pages that would indicate, but for page 12, where payment is to be made?
A. There is a location on page 8 that

24

offers a remittance payment, an address.
Q. Okay. So if they only looked through page 8, they would see, okay, I'm supposed to remit payment to Capital City Pipes, Inc, right?
A. Yes.
Q. What they're supposed to do, though, at the very least is continue reading all 24 pages to make sure there isn't something else that supersedes that?
A. Yes.
Q. Now, is page 12 intended to supersede page 8 in terms of the remittance address?
A. Yes.
Q. Is there some protocol or procedure that you're aware of that DFAS is supposed to follow to know whether to look at page 8 for a remittance address or page 12 for the remittance address?
A. No. I have no idea.
Q. Okay. Is there anything that you know to do or can do to check to see what DFAS does in terms of remittance address or any other issue --
A. No.
Q. -- in terms of handling payment?

materials that get incorporated into, what I'm going to call the Flexfab related contract?
A. This is part of the solicitation.
Q. Do we have more than the -- do we have more as Exhibit 3 than what was part of this contract?
A. That's what I'm looking at.
Q. Yeah. It just dawned on me we have things that are duplicative.
A. Yeah.
Q. Off the record.
(A discussion is held off the record.)
Q. Ms. Luich, we've just lost Ms. Vasso, but she's off to see if she can find the file to clear this up. But where there's handwriting that says 12 of 24, 13 of 24, 14 of 24, through 24 of 24, that's your handwriting?
A. Yes.
Q. And so in Exhibit 3, the first 24 pages, from the best that you can determine, are, in fact, the contract as it was finally put together?
A. Yes.
Q. Now, we've got as part of Exhibit 3



additional pages which we're struggling with what they are. Is that a fair statement?
A. Yes.
Q. Now I just want to make sure that there's no misunderstanding. Before when we were having this conversation about page 12 of 24, that was this letter that was on Capital City Pipes' letterhead?
A. Yes.
Q. Okay. Because there's a second page 12 of 24 which is a continuation sheet that's part of the normal DSCC form?
A. Yes.
Q. Okay. And that -- the contract number, which is different, is different at least partly because it's in the solicitation stage, not the contract stage?
A. Yes.
Q. Okay. I'm just going to see if I can play sleuth a little bit with your help. All of these pages with your handwriting on them also have at the top of them a couple of fax headers. Do you see that?
A. Yes.



Q. And that continues on even beyond page 24 of 24. Do you know if what you were writing on was a faxed document? In other words, that the fax headers came first, or that you wrote on it, and then after you wrote on it, it got faxed a couple times before I got a copy of it?
A. Could you repeat that?
Q. Yeah. I'm trying to figure out if these fax headers were on there when you wrote on it or if your writing predates the fax headers?
A. The faxes predate my final writing.
Q. Okay. So what you were paginating were faxed pages?
A. Yes.
Q. Okay. Now, maybe this will help me understand this too: We know from page 1 of Exhibit 3 that you entered data before or through June 29, 1999?
A. Yes.
Q. And that's the date that the contract was finalized?
A. Yes.
Q. Now, is June 29 of 1999 the date that, then, you pulled together the solicitation



materials and date them?
A. Yes.
Q. So the fact that we see fax headers showing February 25 or January, clearly, they would come before you wrote on this?
A. Yes.
Q. And these additional pages beyond the ones that you marked through page 24, we can tie them together in the sense that they must have been all faxed at the same time. But do you know whether -- they apparently would not have been part of what you considered the actual contract?
A. Yes.
Q. Okay. I'm not sure what any of that means, but I appreciate your help.
MS. MONTA: No. The contract says -- it says 24 of 24, and then it has all sorts of additional --
MR. RYNDERS: Off the record.
(A discussion is held off the record.)
MR. RYNDERS: Okay. So just for the record here, we have on these additional pages -- they are numbered down at the bottom right-hand corner. Something I hadn't noticed before. And

saying that if they're satisfactory in enough areas, that could overcome an unsatisfactory grade in one area?
A. Normally, your final determination is a block marked to recommend an award or no award.
Q. Okay. So the fact that they were unsatisfactory financially isn't a precluding event? I mean, they're not automatically disqualified, if that's the case?
A. I go on the basis of the pre-award conclusion.
Q. Okay. And that's the SBA that does that?
A. Yes.
Q. Or -- and I know there's some, and I may be getting all this wrong -- but the SBA does that, or does the Small Business specialist that's part of the DSCC, someone like Mr. Taylor, do that?
A. We actually -- with the pre-award survey, it's monitored by the industrial specialist.
Q. Here as part of the DSCC?
A. Yes.



Q. Okay. Now, is that survey -- the results of that survey communicated to someone like Flexfab?
A. I have no idea.
Q. Okay. Now, were you aware that because of Capital City's financial situation that Flexfab wanted to have an escrow agreement and an escrow account set up so that payment would be made to an escrow account, not directly to Capital City?
A. I'm sorry. Repeat that.
Q. Yes. Were you aware at the time that you were putting together the contract that because of Capital City's financial situation, that Flexfab wanted to use an escrow account to guarantee that it would get paid?
A. No.
Q. Now, did you make note of what we were looking at earlier, page 12 of 24, where it talked about this account in Grand Rapids, Michigan?
A. I just included it in the contract.
Q. Okay. Now, did it occur to you that the reason for that was to have an escrow arrangement? I mean, you've had a communication with Mr. Taylor about some kind of escrow



agreement. You're aware of the pre-award survey which showed that they were unsatisfactory, they being Capital City was unsatisfactory financially. And then as part of the contract, you see that payment is to be remitted to Grand Rapids Bank.
Did you come to any understanding that the payment arrangement was to guarantee payment to Flexfab because of Capital City's financial situation?
A. No.
Q. Just -- nothing like that popped into your head?
A. No.
Q. Okay. Let's -- just accept for the purposes of discussion that, in fact, Flexfab was concerned about Capital City's financial wherewithal, and accept for the purposes of this discussion right now that Flexfab insisted that there be an escrow account that it had control over or, at least, partial control over so that the money would go into the escrow account and not go to Capital City and then never end up going to Flexfab. Okay. Just assume all that's true.
Have you ever, as someone dealing with



pre-award contract handling, dealt with that process of setting up an escrow account or hearing that there's going to be the use of an escrow account?
A. No. We strictly deal with the contractor that we're awarding to.
Q. Okay.
A. Subcontractors, there's no connection --
Q. Okay.
A. -- with the dollar amount.
Q. When you say "there's no connection," you're just saying you don't have conversation with them?
A. No.
Q. Or you're not looking at that?
A. No.
Q. Okay. Now, if the prime contractor desires to use an escrow account, that's fine with you?
A. It's irrelevant to me.
Q. Okay. You don't pay any attention one way or the other?
A. No.

called a procurement agent at the time.
Q. Did you say PAC, as in P-A-C?
A. Yes. It's an acronym, but I can't remember what it stands for.
Q. Well, one thing I've learned from dealing with cases involving the government is everything is an acronym. Okay.
A. All right. So I held that position for a year -- no -- yeah, a year. Then I was promoted to a contract specialist, and I believe I was in that position for a couple years. And then I was promoted to a contract administrator and held that position for a couple of years.
Q. Okay.
A. And then I was promoted to a small business specialist, and actually held that position for 11 years, the final 11 years.
Q. Now, there's a place called the Small Business Administration; am I right?
A. Yes.
Q. As a small business specialist, you were still an employee of DSCC?
A. Yes.
Q. Okay. Now, maybe you know this, maybe



you don't. Is there a difference in terms of being a small business specialist for the DSCC and then working for the SBA?
A. Yes. Well, they're two different agencies.
Q. Okay. Is the type of work you were doing, as far as you could tell, different from what somebody would be doing for the SBA or --
A. Yes.
Q. Okay. As a small business specialist at the DSCC, what were your job duties?
A. First of all, I had to review all the contracts -- or actually, they weren't contracts, but solicitations that the buyers sent out, anything above $10,000, and made sure that they met all the Small Business requirements.
Q. Now, let me just stop you for a minute.
A. Uh-huh.
Q. When you're talking about all the solicitations above $10,000, are you talking about where the proposed or prospective contractor would be an 8(a) supplier?
A. No. This is just --
Q. Period?



A. Right.
Q. Okay. Now -- okay. If the federal government was going to procure something from a big large C corporation, Westinghouse or IBM or, you know, McDonald Douglas or something like that, would that still come through you or --
A. Yes. It would come through our office.
Q. Okay.
A. And there were -- I believe we had five specialists. And one of us, depending on which application group it came out of, would evaluate that solicitation.
Q. Okay. And so the distinction between you and your peers, the five of you, you would handle certain kinds of product and others would handle other kinds of products?
A. Yes.
Q. It wasn't divided by company or industry -- well, maybe industry, I guess, but not by the size of the company or the name of the company, but rather the product involved?
A. Pretty much. There's, what, five application groups, I believe, and I was responsible for land application and all the



solicitations that came out of the land applications, I was responsible for evaluating.
Q. And just to give me a flavor for this, to try to appreciate what you had to spend your time doing, what kinds of requirements were in place that you were looking to see were being met?
A. The first thing, of course, was to evaluate the solicitation and determine whether or not it should be placed in a small business program. There were certain requirements that had to be in line for it to fall within one of the those programs. Also, some of the solicitations were already placed in the program, and it was my responsibility to make sure that the buyer continued that process.
You know, sometimes it may have been in the small business set-aside, and they may be soliciting it unrestricted to the whole market.
And, of course, it would be my responsibility to stop it and redirect it to the small business program.
Q. And for my benefit -- and I've seen references to set-aside. What that means is that [illegible]oduct is being set aside so that it's only

29

MR. RYNDERS: Off the record.
(A discussion is held off the record.)
Q. We're back on the record. Let me see if I can kind of summarize here -- and this is so I can make sure I can understand it. You can fix me if I don't have it right.
A. Okay.
Q. Your job is to cultivate sources for products through the 8(a) program and then -- so that these contract specialists have places to go to buy particular products from disadvantaged or small businesses. And then you also monitor the contract specialists to make sure that they're actually using those sources. And you do other things too, like training and things, but those two components are a big part of what you did?
A. Yeah, pretty close.
Q. Okay. And fix me where I'm wrong, but I'm just trying to kind of capture the essence of it. With respect to this particular contract, the one that we've marked here as Exhibit 3 -- and it's 24 pages long, and you're welcome to leaf through it, and it includes, in fact, the solicitation materials I'm lead to believe.

30

Do you recall now sitting here having had this conversation whether you had any awareness of the solicitation before the contract, or did you come to have any involvement with this particular transaction after the award?
A. Oh, I was involved before the solicitation.
Q. Okay. Okay. And to the best of your ability, explain what your involvement was before the solicitation and then before the award.
A. Okay. Now, I did get a chance to evaluate this information yesterday, so I know that when this particular requirement -- I, of course, sent the information to SBA prior to solicitation coming out, of course, and got approval from them. That information was sent to the buyer. The buyer did send out the initial solicitation as an 8(a) set-aside. However, the buyer receives several quotes from non-8(a) companies which, quote, unquote, is basically illegal.
Q. Okay. Certainly those quotes would not have been considered?
A. Exactly.

31

Q. Because of the set-aside?
A. Right. Right.
Q. And don't lose your train of thought here. I want you to keep going. But when you talked about getting the SBA's approval, were you specifically -- were you just saying I want these NSNs to be set aside or I want approval for Capital City Pipes with respect to these particular NSNs?
A. It's actually both. In the offer letter to SBA, it has the NSN, the PR number, purchase request number, the contractor, Capital City Pipes, had the dollar amount and prior -- or history of the NSN who was the previous supplier.
Q. Now, I've seen -- I think I've seen letters like that. I don't know if I've seen that letter in particular, but I've seen letters like that where it says previous supplier, and it had Flexfab's name on it?
A. Yes.
Q. Okay. Now, in this particular letter that you're talking about, would Flexfab have been listed as the actual supplier or --
A. No. And I believe this one was

32

previously set aside for C & S. So if that were the case, the previous supplier, of course, would be C & S. Even though Flexfab may have manufactured the material, the government's contract was with C & S.
Q. Okay. Now, on this letter to the SBA, do you indicate that Capital City Pipes is functioning as a distributor, or is that not specified one way or another?
A. It's not specified. And SBA will know that they're a distributor because they manage that company basically.
Q. Okay. I have been given materials that Capital City Pipes apparently sent into the DSCC or certainly got into files here which showed all of the pipe fittings and various products that they manufactured or had available for sale, but none of which were these specialty hoses. Have you seen that kind of material?
A. I know they sent information to me regarding their capabilities, and that's -- and usually if they don't send it to me, I request that information anyway.

**next involvement with respect to these particular NSNs and this particular contract?**

A. Are you saying after the purchase order comes out and the buyers working with it or --

**Q. Yeah. See, you know so much more about all this stuff than I do. I don't want to leave a gap out there, but here's my point -- or I guess, let me back up and explain it. I know that from what you've told me, getting the SBA's approval had to come before any solicitation, any PO, anything like that?**

A. Actually, getting their approval -- maybe I missed a couple steps -- but getting their approval actually comes once a purchase request is released.

**Q. Okay.**

A. And that purchase request is prior to the solicitation.

**Q. Okay.**

A. And my evaluation in placing the NSN in the system actually becomes -- comes before that. I do an analysis first, then I put it in the system, and then -- if this is a new, totally new item, put it in the system. And then the buyer --



once the purchase request comes out, the buyer will see that it's set aside for 8(a). They should contact me.

At that point, I send a letter to SBA for approval. Regardless of whether the company has made it before or supplied it before or not, it would still go to SBA to get approval because things change. Then SBA will send back an acceptance letter, and then I forward that acceptance letter and the offer letter to the buyer letter stating that, you know, it was asked and received. And then the buyer puts together the 8(a) solicitation, sends that out, only to the 8(a) contractor.

Now, with the systems they have now, sometimes other people find out about it, but it's only supposed to go to that 8(a) contractor. The contractor is supposed to provide a price. That goes to the buyer. The buyer is to evaluate the price and also go to our cost and price office, and they will do an analysis to determine whether or not the price meets what they consider a fair market price.

If it does, then the buyer proceeds



with an award. If it doesn't, then we got to go back and forth and try to come to a happy medium, and then again award or dissolve.

**Q. Okay. And when you say "we," are you personally involved in that process because of your small business specialist position, or is -- was "we" the royal we, just meaning the DSCC?**

A. Are you -- I don't know what part I said "we," so --

**Q. If there's some issue over whether the quoted price is a fair market price, then you said "we" need to haggle over it?**

A. Usually "we" was me.

**Q. Okay.**

A. Yeah.

**Q. Okay. So now, what's the next role that you played as far as you can remember in connection with this particular contract, this particular solicitation, which turned into a contract?**

A. Well, once it becomes a contract, typically, there's nothing else to do. I will, you know, periodically check on a company to see if they're performing. Or if the company -- I



mean, typically, they'll call me if they have any problems or anything like that. And I will try to work to resolve those problems if it's in my capacity.

**Q. Did you have any direct communications with anybody at Flexfab prior to the award being issued?**

A. No.

**Q. Okay. Did you have any communications with anyone at Flexfab after the award was issued?**

A. No. Not to my knowledge, no.

**Q. Okay. And in fairness to you, my questions were in connection with this particular contract.**

A. Correct.

**Q. Okay. Did you have any pre-award conversations with Henry Cook about this contract or this solicitation?**

A. I'm not sure if I had conversation with him. Actually, most of my conversation was with Capital City Pipes. The only real dealings I had with Mr. Cook was prior to their arrangement. And I know I did call him at one point when I had made calls to Capital City Pipes and didn't get

awarded





response from them. And I remember making a call to Mr. Cook to find out if he had any conversation with them or if he knew what was going on, because I think I was getting frustrated at that point.

Q. Okay. When did you first become aware of someone's desire to have an escrow account set up for payment?

A. I don't know the exact time frame when that happened, but --

Q. Well, help me out at least -- I know you're about to answer, but just try to focus the answer. We've got the June date of the contract. We've got the September date of the mod. You know, before both, after both, between them, you know, if you can give me some kind of --

A. I believe it was between them.

Q. Okay.

A. And, actually, I believe I was -- it all started -- and I know you don't want to hear about JGB -- but all of this, these problems, I became aware of all these problems when JGB contacted me and the small business office. And I believe Mr. Cook made contact with me as well.



Q. Okay. And it's okay. We can talk about JGB. I was just at that point in time trying to keep it focused on Flexfab. In connection with JGB, do you remember whether the contract -- well, back up. With respect to JGB, the prime contractor was Capital City Pipes?

A. Correct.

Q. And so like my client's situation, JGB's situation was a supplier to Capital City Pipes, which was acting as a distributor through the 8(a) program?

A. Correct.

Q. Now, do you remember the timing of the -- I'll call it the JGB transaction and the Flexfab transaction, because they both involve Capital City Pipes, so we'll distinguish between the original source. Do you remember the timing of the JGB solicitation or award relative to the Flexfab solicitation or award, which one came first?

A. I have no idea because -- and the reason why I say that, I didn't even know there was a problem with Flexfab until way down the line when -- I believe it was when I had the meeting



with Henry Cook. And that's when I found out that Flexfab was involved. But, actually, I thought Flexfab's involvement was minimal.

Q. Okay. Now, as someone who's been a contract specialist and a contract administrator, you're familiar with the solicitation award post-award process?

A. Correct.

Q. Okay. And my understanding -- and correct me if I'm wrong -- is that when the contract is issued, is awarded, then that information is communicated probably a number of places, but one place is to DFAS?

A. Correct.

Q. And, similarly, if there's ever a modification to the contract, that information is communicated to DFAS?

A. Correct.

Q. And we even see that on the bottom of Exhibit 4, that DFAS is on the distribution list?

A. Right.

Q. Now, is it your understanding that that information is communicated to DFAS through the computer system, at least that's one way that it's



done?

A. My understanding at the time, no, was that it was -- hard copy was sent over to DFAS.

Q. Okay. Do you have any personal knowledge of what DFAS does with that hard copy to process awards and modifications issued by the DSCC?

A. No.

Q. Okay. Would you agree with me that the modification, which we've marked as Exhibit 4, what was supposed to happen was DFAS, when it paid money on that particular contract, would actually remit the funds to the bank account that's listed in section 14 of the mod?

A. Correct.

Q. Okay. And if I understand what you were saying earlier, you didn't realize there was a problem with Flexfab until later on down the line, meaning you didn't realize that money hadn't been sent to that particular bank account? You didn't learn that until later?

A. Right.

Q. But you were aware around the time of the modification that there was a modification?

A. Yes. Yes.
Q. And you understood the purpose of the modification?
A. Yes.
Q. Okay. And I kind of asked you this, and I'm not trying to just keep going back to things, but to the best of your ability, tell me what you knew at the time about why that modification was being made?
A. Because they were having some problems making payments and -- going back to JGB -- when JGB contacted me, they were in process of sending Capital City Pipes some more material to ship to the government. And they stated that they weren't going to ship any more material to Capital City Pipes until Capital City Pipes made good on their payments.
So when I spoke with Capital City Pipes, you know, of course since I'm the 8(a) coordinator, I need to make sure that they take care of their responsibilities. And in talking with them, they sound like they were going to, you know, take care of their responsibilities. And one of their ways of doing that -- and to ensure



that they get their material was to do the modification and allow them the funds to go to another source other than Capital City Pipes, so that the suppliers could receive their money.
Q. Okay. And that problem and that solution was something you were aware of before the modification marked as Exhibit 4?
A. Correct.
Q. And Henry Cook was involved with the JGB payment problems?
A. He was -- if I remember correctly, I believe he introduced Capital City Pipes to JGB. So I guess, indirectly, he was involved with that as well.
Q. Well, let me ask it to you this way: Prior to September 27, 1999, the date of that modification marked as Exhibit 4, had you had contacts with Henry Cook concerning the JGB situation?
A. I don't think I had conversation with him at that point. I think it -- our conversation started after that, when the modifications went through and still -- I mean, we still had the same problems.



Q. Okay. Do you know -- would you have any information to confirm that Flexfab was unwilling -- like JGB -- was unwilling to supply product without having this escrow account in place first?
A. No.
Q. Do you have any reason to say that that wasn't the case?
A. No.
Q. Okay. Did you have conversations with anybody outside of the DSCC about the escrow account that is referenced on Exhibit 4?
A. When you say "outside the DSCC," are you referring to contractors or just family members?
Q. Well, I'm thinking -- fair enough. And that's why I told you you can ask me clarification. I know you already told me you didn't talk to anybody at Flexfab before or after the award, so I guess they're out of the picture. And I think you've told me you weren't sure if you had talked to Henry Cook by that point in time. What I'm wondering is did you talk to somebody at Capital City Pipes, or did you talk to



some other person in a business setting, but not a DSCC employee, about the details or this particular account or the idea of an escrow account that went into the preparation of this modification that's marked as Exhibit 4?
A. Well, I know I talked with Capital City Pipes because we were trying to determine what options they had available to them. And, of course, we wanted our -- the agency wanted the material.
Q. Right.
A. So -- yes.
Q. And when you talked to Capital City Pipes, you talked to them about the JGB situation first -- or maybe not at the time first, but at one point in time, you talked to them about JGB, correct?
A. Right.
Q. But you also talked to them about Flexfab?
A. See that, that I -- I don't believe I talked to them about Flexfab. Because I didn't -- like I said, I didn't know Flexfab -- there was a problem with Flexfab until down the road.

here. At that point in time when you did learn that there was a problem with Flexfab not getting paid, do you remember when that was roughly?
A. I believe that was at the point of the meeting between Henry Cook, myself, Howard Griffin and Kover from DFAS.
Q. Phil Kover?
A. Right.
Q. When that meeting happened, was the -- to the best of your knowledge, was the contract completely completed, or was it still in process?
A. I believe it was still in process.
Q. Okay. Tell me about that meeting, what you can recall.
A. To the best of my recollection, Mr. Cook was, of course, looking for our help to receive payment from the contracts that, of course, Capital City Pipes received. And there was an issue with the payments and the -- I'm trying to talk and remember at the same time. I'm trying to think if the modifications had been done at that point. I believe they had. But anyway, our meeting mainly was with Kover to determine what money -- what funds were supposed to be sent



to Capital City Pipes and what funds had already been sent to Capital City Pipes.
And I know that's when we discovered that Capital City had been paid twice on a particular contract. And basically, DFAS or DSCC was taking back money from other contracts to recoup the double payments.
Q. You're saying that Capital City Pipes had been double paid on one particular installment instead of just paid the once?
A. Right.
Q. And was that particular double payment relating to the product that Flexfab was supplying or maybe on just some other contract all put together?
A. Actually, I believe it was on the JGB requirement, because, again, that's when I discovered that Flexfab was involved as well. And that's when Mr. Cook stated -- he actually gave us the amounts that were owed to JGB, Flexfab, and himself.
Q. Okay. And were you able, with the help of Mr. Kover and, I guess, Mr. Griffith's involvement, to determine that payments were being



made directly to Capital City Pipes and not to the escrow accounts stated in the modification?
A. Yes.
Q. Okay. Now, who does -- well, at the time, who did Mr. Kover work for?
A. I don't know. He worked for DFAS, but I don't know who --
Q. Okay. But it was DFAS, not DSCC?
A. Right.
Q. And so, presumably, Mr. Kover is somebody who would have had access to the DFAS computer, and regardless, the information he provided to you is that the payments had been sent directly to Capital City Pipes and not to the escrow account?
A. Correct.
Q. Now, did you talk to him about fixing that problem or what needed to be done to make sure that didn't continue to happen?
MS. BURKE: Can I just interrupt for a second? Are we talking about JGB or Flexfab right now?
MR. RYNDERS: Well, my understanding is they were talking about both at this meeting. So



the question would be really on both.
A. Actually, it would -- Flexfab was actually an afterthought. I don't mean to be rude about it, but --
Q. Just say it the way it is. That's all I can ask you do.
A. The meeting mainly was regarding the payment to Capital City Pipes that should have gone to the escrow account for JGB.
Q. Okay.
A. And then that's why I said I didn't realize that there was an escrow account set up with Flexfab as well. And at that meeting is when we were talking, going back and forth. And then at that point, Mr. Cook stated that, you know, Capital City Pipes owed JGB this amount, owed Flexfab this amount, and owed him that amount. So --
Q. Okay. Now, did Mr. Kover then confirm for you the payment arrangements just involving JGB, or did this group of individuals that you were part of examine the payment status as to Flexfab as well?
A. Actually, I don't remember us

81

contract specialist, I guess, in this situation, a post-award contract specialist should do to make sure that the modification is, in fact, implemented by DFAS?

A. As far as I know, you know, they submit the information to DFAS. And what happens from there, you know, I don't think they're giving any notification or anything of that nature.

Q. Okay. Now, turning back to JGB, the position -- as far as you know -- well, did you ever have conversations directly with JGB?

A. Yes.

Q. And their position stated to you was that we haven't been paid for products we've made and we're not going to ship anymore product unless we get paid?

A. Correct.

Q. And, in fact, they also indicated to you that they said we're not going to ship any product unless we also get this escrow arrangement, so we don't have this problem again in the future?

A. No.

Q. Okay.

82

A. My recollection was that basically they weren't going to deliver until they got paid. And -- so the escrow agreement came about as a means for them to receive payment and an assurance that they would get paid on future requirements.

Q. Okay. Now, what was -- I think it's kind of obvious, but I'm just going to ask the question: What was the point of the escrow agreement?

A. To make sure that JGB received payments on their requirements.

Q. And who was the intended beneficiary of that modification for JGB?

A. Actually, everyone would benefit. The government would get the supplies. JGB would get their funds. And Capital City Pipes would get their portion of the funds.

Q. Okay. Now, I know you've explained that at the time you weren't aware of Flexfab's request for an escrow account, but would you have any different answers to the purpose of the modification marked as Exhibit 4?

A. No.

Q. It was all around for everybody's

83

benefit?

A. Correct.

Q. Is there anything you can do to shed light on why the modification marked as Exhibit 4, being the Flexfab modification, why that wasn't followed?

A. Probably a breakdown in the system, but I can't -- you know, I'm not a hundred percent sure on that, but --

Q. Don't take this the wrong way. I'm just throwing out crazy ideas to show you how far I'm willing to go -- I mean, just any explanation that you've got other than breakdown of communication? Obviously, you've worked hard to develop suppliers. Were you, in fact, the person who developed C & S?

A. Yes.

Q. And then they graduated, and so now you've developed Capital City?

A. Uh-huh.

Q. I mean, it's not like you went in and said, ignore this contract modification, I want to make sure Capital City gets the money?

A. No. Right.

84

Q. Is there any reason why somebody would have intercepted the modification or that there was a policy that you're aware of that would have made the modification unenforceable or anything like that?

A. The only thing I know is that DFAS folks, when it's time for payment, they look at the information in the CCR, the Contractor -- I can't remember the name of the CCR. But, anyway, the CCR is the system where the contractors register. And when they make payment, they go by the remittance address in the CCR. But my understanding at the time was that if a modification went through, it would override what was in the CCR, but, apparently, it doesn't.

Q. And we all understand human error. Okay? But in terms of the procedures and policies that you're aware of, the people at DFAS are supposed to know that the modification overrides the CCR?

A. That, I don't know. I don't know if the modification overrides that or how that works.

Q. Okay. From the DSCC standpoint, that

# Bankruptcy Docket Report
## 4 00-70953 (Tallahassee)

## CAPITAL CITY PIPES, INC.

## Docket items entered between 01/01/1931 and 02/13/2003

| Filing Date | No. | Docket Entry |
|---|---|---|
| 12/21/00 | 1 | Voluntary petition under chapter 7 [EOD 12/22/00] [LMI] Receipt No. #33445 [EOD 12/22/00] [LMI] |
| 12/27/00 | 2 | Notice of 341 meeting on 01/23/01 at 12:00 A.M. at 1st Floor, U.S. Trustee Hrg. Rm., Rm. 1046, 227 N. Bronough St, Tallahassee, FL [EOD 12/27/00] [LMI] |
| 12/27/00 | 3 | Certificate of Service [EOD 12/27/00] [LMI] |
| 01/24/01 | 4 | NTC of Appearance by Upchurch for City of Tallahassee [EOD 01/25/01] [LMI] |
| 02/05/01 | 5 | Application by Tee to Employ & Appoint Counsel under General Retainer together W/Verified Stmt by Counsel [Disposed] [EOD 02/06/01] [LMI] |
| 02/05/01 | 6 | Application to Employ an Auctioneer and Appraiser,for Authorization to appraise & sell property by auction & for approval of sale. [EOD 02/06/01] [LMI] |
| 02/05/01 | 7 | PROC MEMO 341 mtg hld dbtr present [EOD 02/06/01] [LMI] |
| 02/06/01 | 8 | ORDER AUTHORIZING Employment of Attorney for Tee Re: Item # 5. (5 copies) [EOD 02/06/01] [LMI] |
| 02/07/01 | 9 | ORDER AUTHORIZING Employment of Auctioneer and Appraiser Re: Item # 6. (5 copies) [EOD 02/07/01] [LMI] |
| 02/09/01 | 10A | Motion for Relief from Stay for General Motors Acceptance Corp by Bailey Jr. [Disposed] [EOD 02/12/01] [LMI] |
| 02/12/01 | 11A | ORDER/NOTICE Of Preliminary Hearing TC 03/12/01 Re: Item # 10A. (5 copies) [EOD 02/12/01] [LMI] |
| 02/15/01 | 12 | Application to Employ an Accountant By Tee to Employ & Appoint Accoutant under General Retaineer together W/Verified Stmt by Accountant [Disposed] [EOD 02/15/01] [LMI] |
| 02/15/01 | 13 | RPT/NTC of Intent/Sell Prop re: (at Auction) re:Office Inventory, Inventory:03/03/01 10:00am:Obj (15)days [EOD 02/15/01] [LMI] |
| 02/15/01 | 14 | Application Tee's Application for entry of bar date for filing claims [EOD 02/15/01] [LMI] |
| 02/15/01 | 15 | MOTION by Tee to shorten Ntc & Obj Period for Tee to Sell Property of the Estate [Disposed] [EOD 02/16/01] [LMI] |
| 02/16/01 | 16 | Order Approving Employment of Accountant Re: Item # 12. (5 copies) [EOD 02/16/01] [LMI] |
| 02/20/01 | 17 | GRANTED Re: Item # 15. (10 copies) [EOD 02/20/01] [LMI] |
| 02/20/01 | 18 | NTC to File Claims due by 05/16/01 [EOD 02/21/01] [LMI] |
| 02/20/01 | 19 | MOTION by Tee to Shorten Ntc & Obj Period to Tee's Ntc of Proposed Settlement of Claims of Landlord & Cred,Council Rental Properties & Luther "Sonny" Council [Disposed] [EOD 02/21/01] [LMI] |