contractor?
A. No.
Q. What was your understanding of the 8 (a) program?
A. It's for contractors who are disadvantaged in some way. The government gives them sort of a preferential treatment. And the government sets aside certain NSNs for 8 (a) contractors.
Q. What is an NSN?
A. National stock number.
Q. Does that mean they're allowed to provide certain types of parts?
A. Yes.
Q. Okay. How is it decided, if you know, what parts they can provide?
A. If they can do it, we set aside the NSN. It doesn't necessarily matter --
Q. Oh, so it doesn't say --
A. These NSNs -- no. It is if you can make this paper clip and you are an 8(a) disadvantaged contractor, I will give you business to make this paper clip.
Q. Okay. So any part the government could



ever need, it could acquire from an 8(a) contractor?
A. There's potential for that, yes.
Q. Okay. They have to prove that they're capable of doing it, right?
A. Yes.
Q. And there's a whole series of requirements for that, right?
A. Yes.
Q. And is that part of the certification process, establishing whether the contractor can meet those various requirements?
A. I really don't know.
Q. Okay. That's fine. The contract at issue in this matter relates only to that particular product that Flexfab ultimately provided, correct?
A. Yes.
Q. Have you as a either pre- or post-award contracting officer dealt with 8(a) contractors before?
A. Yes.
Q. All right. Any idea how many times?
A. I would say many. That doesn't tell



you anything.
Q. More than 50?
A. No. I've probably dealt with 15 to 20 8(a) contractors.
Q. Okay. And in dealing with those 15 to 20 -- and I understand that that's an estimate -- have you had an opportunity to deal with escrow accounts in favor of subcontractors?
A. No.
Q. Are you aware that subcontractors use escrow accounts on government contracts?
A. Now I'm aware, yes.
Q. All right. At the time this matter arose, you were not aware of that?
A. I was not.
Q. All right. That had never come up in any of your training sessions or classes?
A. Correct.
Q. What's your understanding of the use of an escrow account for a subcontractor?
A. That as an escrow account is established by the prime, and the subcontractor has access to it.
Q. Okay. And then payment would be made



to the escrow account rather than to the prime?
A. No. Payment is made to the prime.
Q. Well, payment's made to the escrow account, right?
A. Payment is made wherever the prime contractor directs in the contract for payment to be made.
Q. Okay. Do you have an understanding of why a subcontractor would want to do that?
A. Yes.
Q. What is that?
A. This contract -- I mean, the --
Q. To ensure they get paid, right?
A. Yes.
MR. HILLS: Let me mark this.

- - - - -

Thereupon, Exhibit 4 is marked for purposes of identification.

- - - - -

Q. Let me hand you what's been marked as Deposition Exhibit 4. If you could look at that, [illegible] let me know if you've seen that before.
I have seen it.

A. That is correct.
Q. But in any event, it shows that address twice?
A. Yes.
Q. The P.O. Box in Tallahassee, and it shows another address in Michigan, correct?
A. Yes.
Q. All right. Why, then, did you conclude that the Tallahassee address was the correct address?
A. Did I say I concluded that was the correct address?
Q. Well, you indicate in here that's the address the contract shows, correct, and I'm talking about Exhibit 5 now.
A. Right.
Q. I'm not trying to put words in your mouth. I want to make sure as I read it upside down, I'm interpreting the letter correctly.
A. The letter does not say that I concluded that was the correct address.
Q. All right. What does it say, because I don't mean to misconstrue it?
A. It says the remittance address in the



original contract was stated as Capital City Pipes, P.O. Box 12368, Tallahassee, Florida.
Q. All right. But it's stated as another address as well, isn't it?
A. Modification P1 was issued to change the remittance address to Old Kent Bank.
Q. The modification isn't there, is it?
A. It's right here.
Q. Okay. But that's not part of the original contract, is it?
A. Right, it is not.
Q. Right. And there's a document in the original contract that shows a different remittance address, correct?
A. Yes.
Q. All right. So you concluded that one was appropriate, and the other one was not?
A. Not based on this.
Q. Okay.
A. I didn't say one was appropriate, and one was not.
Q. Okay. I'm asking why you put in your letter to me of October 2 that that was remittance address, the P.O. Box in Tall—



Florida?
A. I see what you're saying.
Q. In the original contract it says both, correct?
A. Right.
Q. So it's ambiguous, right?
A. The contract is ambiguous, yes.
Q. That what's what I'm asking you.
A. Yes.
Q. Okay. So why did you list in your letter to me that the remittance address was Tallahassee, Florida?
A. Because it was in here twice.
Q. Well -- but you indicated earlier you weren't sure if the solicitation documents were part of the contract?
A. True.
Q. Would it be your conclusion that because one address is listed twice and the other address is listed only once, if that were the case here, that that shows one is the remittance address?
A. No.
Q. All right. Was that the easy answer to



the question in October 2 of 2000, that the remittance address just didn't get changed, but now, your position's a little different?
A. No. My position -- no.
Q. Okay. But that doesn't -- the letter doesn't explain the problem, does it?
A. Right.
Q. So what was the purpose of writing it?
A. The purpose for writing it was, I said the remittance address in the contract was this. It was changed to Old Kent Bank by modification. The computer system didn't get updated, so DFAS made payment to the original address stated in the contract.

Capital City Pipe, who the government had the contract with, did not contact us and tell us that that was incorrect. So as far as I was concerned as the contracting officer, the government's obligation was done.
Q. Okay. Let's go back and look at, I think, 12 of 24 in the contract.
A This?
Right. And that's dated June 23,

74

A. Yes.
Q. And that's Capital City telling the government that the remittance address for this contract should be Old Kent Bank in Michigan, right?
A. Yes.
Q. Do you have any idea -- and I'm not -- this isn't meant as a challenge to you personally -- do you have any idea why that wasn't accounted for when this contract was entered originally into the system?
A. No.
Q. Okay. Would it, again, have been the obligation of the contracting officer to make sure that that information was correctly reflected?
A. The pre-award contracting officers don't check on that -- check to see that the system is correct for things like this.
Q. Okay.
A. Like the post-award contracting officers do.
Q. Okay. You're talking about checking to make sure they're correct?
A. Right.



Q. All right. But it wouldn't be the pre-award contracting officer's obligation to make sure when it was originally entered, it was entered correctly, regardless of whether she's doing it as she sits there or goes back and checks again?
A. You're asking me if that's her obligation, or are you asking her if that's standard procedure? I'm confused what your question is.
Q. All right. Let's do both. Let's start with procedure. How is that the information from the contract gets entered into the DSCC computer system?
A. At this time, June of 1999, I don't know if they were using the automated system, which automatically updates, or if it would have been keypunched. It would have been one of those two ways.
Q. Okay. When you say the automatic system --
A. Automated, uh-huh.
Q. All right. How does that enter -- does the automated -- as silly as this s



how does the automated system enter information into the computer?
A. When you put it all in your award document, once you hit send, if you will, that sends it automatically to our computer.
Q. So someone has to input it initially, right, or it's scanned, or somehow it's inputted into the computer system?
A. Yes.
Q. All right. And then from that point forward, you can change the document as it exists in the system?
A. No. Once it's funded, which means the money has been obligated, you can't make changes.
Q. Okay. But page 12 of 24 is directed to Ms. Luich, correct?
A. Yes.
Q. And she was the pre-award contracting officer, right?
A. Yes.
Q. And you're telling me that she has no responsibility as the pre-award contracting officer to make sure that the contract information has been correctly entered into the DSCC computer



system?
A. I didn't say she didn't have the responsibility. I think she does have the responsibility.
Q. Okay. And that's in your position as a supervising contracting officer?
A. Yes.
Q. Okay. In the normal course of processing this kind of an award, is it understood that there is a responsibility with someone to make sure that the information gets entered correctly?
A. Yes.
Q. All right. Who would that responsibility fall on?
A. The contracting officer.
Q. Okay. Is there any way you can say here today why that didn't happen?
A. No.
Q. All right. Same with why the modification information was never updated into your computer system?
Right. I can't say why that didn't
1.

85

Q. Okay. But that was clearly the intent, right, of the modification?
A. Yes.
Q. All right. And, again, so I'm clear -- well, let me ask you this: If the government were aware of the existence of the escrow account in this matter, would that change your conclusions?
A. No.
Q. Why not?
A. Because there's -- you can do an assignment of claims. That's the way to handle money that is assigned from one contractor to another.
Q. Is that a requirement?
A. I think it is.
Q. So is your conclusion, then, following that logic, as I understand it, that these escrow accounts shouldn't be used?
A. I won't say they shouldn't be used. I think they're not safe.
Q. Okay. And if the government was not only aware of the existence of this escrow account, but the fact that it was to ensure that C & S Industrial Supply and Flexfab received

86

payment, does that change your conclusion at all?
A. You are saying that the government was aware that that was what was supposed to be happening. I don't agree that the government was aware.
Q. All right. But I'm asking you to assume that.
A. Okay. I'm assuming that the government was aware --
Q. And I'm going to ask you to assume two things.
A. Okay.
Q. One, that the government was aware of the existence of this particular escrow account, and, two, that the escrow account was established to protect the financial interest of C & S Industrial and Flexfab on this contract. Okay?
A. Okay.
Q. All right. Assuming those two things, is it still your position that there's no claim by Flexfab or no viable claim by Flexfab or C & S for this money?
A. Against the government, yes, that still my position.

87

Q. Okay. We're nearing the bitter end. If you'll give me a minute or two.
You don't dispute that Flexfab wasn't paid for the parts it supplied to the government, do you?
A. I have no way of knowing for sure that they were not. It appears they were not.
Q. You don't believe they would make a claim if they had been paid, do you?
A. I would hope not.
Q. That would be kind of bad business practice, right?
A. Yes.
Q. All right. How well did you know Michael Taylor?
A. Casually, very casually. You know, I would say hi to him.
Q. Okay. Do you have any idea if he's still in the Columbus area?
A. I think he still lives in Columbus.
Q. Okay. Did you ever have any conversations about Flexfab's claim on this contract with a gentleman named Phil Kover?
A. No.

88

Q. Do you know who that is?
A. I know he worked at DFAS.
Q. Okay. Do you know what he did there?
A. He had something to do with payments. I don't know if he was a supervisor over the payment area or if he did the payments himself.
Q. All right. When you say "if he did the payments himself," you mean actually processed payments?
A. Yes.
Q. Okay. If he were a supervisor, do you have any idea what his responsibilities would have been? Would he have just been overseeing the people who were making -- processing the payments or --
A. That would be my guess.
Q. Okay. Do you know one way or the other?
A. No, I do not.
Q. That's fine. Did you ever have any contact with a gentleman named Henry Cook from C & S Industrial Supply?
A. No, not that I'm aware.
Q. Okay. Did you ever have any contact

76

A. In that scenario, I would possibly, yes.
Q. Okay. Now, what -- physically, what do you do? What steps do you go through at that point?
A. I would go into our -- at that point, in 1999, I do believe that we had a system which is now -- it's called DPACS. I would have went into the system and processed the modification and distributed it to the parties who would need a copy.
Now, the system would automatically tell me which party needs a copy. But other than the system actually doing the distribution, I would have sent everyone a copy of the mod up-front.
Q. Okay. Now, that document, we'll probably look at it in a moment. I believe it was given the document number P1. Do you remember that?
A. I don't recall. I don't recall.
Q. That's fine. The best you can do is what you recall today. Is whatever that document's called or whatever number its given,



are you the one who types it up?
A. Yes.
Q. And you do that in the computer?
A. Yes.
Q. There is probably some kind of form that you fill in the blanks, and then you can print that completed form? Is that how it works?
A. Sort of, yes.
Q. Okay. I mean, if we see something that's been printed out, are you the one who prints it for the first time?
A. Yes.
Q. Okay. And the information in there that's not part of the blank form but that's filled in, you would have typed that information into the computer?
A. That's correct.
Q. Okay. Now, when the change has to do with where the money gets sent, is there anything else that needs to be done to make sure that the modification is, in fact, followed?
A. As far as I know, any additional function that I would have to make, I do not believe so.



Q. Okay. Now, are you the person that handles the payments?
A. No, I am not.
Q. Who handles the payments?
A. DFAS.
Q. And -- D-F-A-S?
A. Yes.
Q. And what does that stand for?
A. Defense Finance and Accounting Service.
Q. Okay. Are they located here in Columbus?
A. Yes, they are.
Q. And how does DFAS know, if you know, that a modification has been made to the contract regarding the payment process?
A. A copy is forwarded to them.
Q. Okay. Now, is that copy forwarded to them -- is a physical copy forwarded to them, or do they receive an electronic notice of that change?
A. A physical copy is forwarded to them, and I do believe that DPACS -- somehow they have the distribution at the bottom of the mod -- sends it off electronically also.



Q. Okay. And DPACS is the computer program?
A. Right.
Q. Okay. Do you know, from your own knowledge, whether or not DFAS has to key in any additional information into its system to accomplish the modification that you've entered into?
A. I have no idea.
MR. RYNDERS: Okay. Just for the record -- and we'll work through this, but this is really for counsel to confirm. My understanding is that this witness has been produced to respond to the Rule 30(b)(6) deposition notice, items 3, 4, 5, 7, 10, and 13; is that correct?
MS. BURKE: That's correct.
MR. RYNDERS: Okay. Let's go off the record a minute.
(A discussion is held off the record.)
Q. Ms. Jeffries, let me show you what was marked previously during an earlier deposition as Exhibit 4. And I'll hand that to you, and I might have to look at it with you a little bit upside But is this the modification?

A. This would be the modification -- or yes, this is the modification.
Q. Okay. As I understand, and as far as you know, am I correct that the original contract remains in place, but it's changed to whatever extent this modification says it's changed?
A. Exactly.
Q. Okay. And can you tell me what it was that this particular modification changed about the original contract?
A. The remittance address.
Q. And what was the new remittance address?
A. According to this modification, it's Old Kent Bank Corp. Trust, C/O No., ABA No. 07200052, Post Office Box 144, Grand Rapids, Michigan 49501-0144.
Q. Do you know why the remittance address is being changed from the original address to this address?
A. No, I do not.
Q. Okay. Did it matter to you at the time when you executed the contract modification why it was being changed?



A. No, it does not.
Q. Would you have done something different depending on what the reasoning was?
A. No.
Q. Okay. All that mattered to you was that the prime contractor requested it, and, therefore, you did it?
A. That's correct.
Q. And what was the date of this modification?
A. September 27, 1999 is the date signed.
Q. Okay. And that's your signature --
A. Yes, it is.
Q. -- down at the bottom right?
A. Yes, it is.
Q. Okay. To whom was this modification distributed?
A. The distribution at the bottom tells me it was distributed to DCMC. That's Defense Contract Management Command in Clearwater and DFAS, Columbus Center. Defense Finance and Accounting Center.
Q. Okay. And whether it did or not, at least this modification should have been provided



to DFAS?
A. According to this, it should have been.
Q. Okay. Now, are you the one who generated the distribution list at the very bottom of this exhibit?
A. The system does that automatically.
Q. Okay. Can you override that?
A. No, but I can add to it.
Q. Okay. So do you remember if you needed to add DFAS, or was DFAS an automatic recipient?
A. This was automatic.
Q. And was DFAS an automatic recipient simply because it was a contract modification or because the modification involved the remittance address?
A. DFAS is a recipient simply because it's a contract modification.
Q. Okay. So even a non-monetary or non-economic change still goes to DFAS?
A. It should.
Q. Okay. Fair enough. It would automatically be on the distribution list?
A. It would automatically be on the distribution list through the DPACS system.



Q. Okay. Let me take that back from you a moment. Thank you. If at any time you want to see this again, just let me know. I'll pull it out.
A. Okay.
Q. It's Exhibit 4. Instead of taking it out of my book, I'm going to give you my whole book.
A. Okay.
Q. Let me show you what's been marked as Deposition Exhibit 3. That's from an earlier deposition as well. Do you recognize that to be the original contract?
A. I recognize this to be a copy of the contract, yes.
Q. Okay. Fair enough. It's definitely a photocopy.
A. Okay.
Q. Sorry. Everything in there is a photocopy.
A. Okay.
Q. So can you tell me the date of that original contract?
A. The date on this contract says June

57

A. It -- right. It says that it should be done at Flexfab for supplies and packaging.
Q. Okay. Now, are these -- is the person that would do that a DSCC employee, to your knowledge?
A. No.
Q. For whom would that person work?
A. The person would work at -- for DCMC Clearwater.
Q. Okay. Which is another division of the Defense Logistics Agency? Is it part of the Department of Defense?
A. It's part of the Department of Defense.
Q. Okay. Good enough for me.
MR. RYNDERS: Just off the record.
(A discussion is held off the record.)
Q. Do you have any recollection sitting here today of preparing modification P2?
A. No, I do not.
Q. Do you have any recollection from having reviewed any portion of the contract file whether there are any other modifications?
A. No. I would like to clarify something if I could.

58

Q. You may.
A. You asked about who would the person -- the quality assurance representative work for that would go out to the contractor plant and do the actual inspection, well, I see now that this modification states that he would have actually worked for DCMC, Grand Rapids, instead of Clearwater.
Q. Okay. Do you know actually what the product was that was being purchased?
A. No, I do not.
Q. Do you know what its application was?
A. No, I do not.
Q. We've talked about Capital City Pipes. Do you know who C & S is?
A. No, I do not.
Q. Have you ever heard of Henry Cook?
A. No, I do not recall.
Q. You don't have any reason to believe that the contract modification, P1, initiated anywhere other than the request that you received? In other words, it's not something that you or somebody from the DSCC had you do, independent of a request from the prime contractor?

59

A. No.
Q. Are you aware of any reason why the modification P1 made any difference to the DSCC?
A. Am I aware of any reason why processing the modification would have made any difference at all to DSCC?
Q. Right. Whether the remittance address is here or there, does that affect DSCC?
A. No. I'm not aware of any reason why that would affect DSCC.
Q. My understanding is that there were several attempts along the way to get this contract issued, and the issuance was delayed. Whether that's true or not, my understanding is you would not have been part of that process at all; is that correct?
A. In issuing the contract, no.
Q. Okay. Because you were at that point in time handling matters post-award?
A. Yes.
Q. Okay. Do you have any idea who at DFAS would have any knowledge of that modification being received by them, the process of physically changing the remittance from one address to

60

another address or anything like that?
A. A person?
Q. Yes.
A. A person's name?
Q. That's my question.
A. No.
Q. Do you have any idea what position a person would be in that would know the answers to those questions?
A. No.
Q. Do you know the name of a single person that works at DFAS?
A. Yes.
Q. Okay. Do you know that person just as a friend, or is there some reason why you have business dealings with people at DFAS?
A. Yes.
Q. Can you just briefly explain that to me?
A. I would have dealings with persons at DFAS in the post-award positions, primarily -- mostly, the reasons why I've dealt with DFAS is because the contractor has, for some reason, been unable to get paid, and they are requesting

assistance to get payment.
Q. Okay. So these are scenarios where no money has gone out from DFAS?
A. That's correct.
Q. Have you ever been --
A. Well -- I'm sorry. Not, no money. It could be partial payment and not complete and so --
Q. But what I meant was that there was a missing payment or a missing partial payment, as opposed to a payment that was sent the wrong place?
A. Yes.
Q. Okay. Have you ever been confronted with a situation, other than this one, where payment was not made as required by the contract as modified?
A. I'm sorry. Could you repeat that?
Q. Yes. I'm wondering if you've ever been involved dealing -- other than this particular situation, have you ever dealt with any other situation where the problem wasn't that no money was paid, but that it wasn't paid to the right party or to the right address or to the right bank



account?
A. I do not recall a situation like that.
Q. Okay. Did you have any role -- or did you have any dealings with anybody who was complaining that modification P1 was not being honored?
A. I do not have any recollection of any complaints regarding that modification.
Q. Okay.
A. I don't recall the modification.
Q. Fair enough. Okay. What happens when everything's done when you're the post-award contract specialist, the parts have been made, the parts have been accepted, they've been delivered, payment's been made, and the project -- the contract is completed? What happens at that point?
A. Payment's been made and the contract's complete, DFAS, I believe, goes to close out the contract.
Q. And are you the person who -- well, you wouldn't do that, because it's DFAS?
A. No. Right.
Q. So the computers are hooked together,



and now DFAS says, we've made the final payment, and they close the file, in effect, you're saying?
A. In effect, I should say, they eventually close the file. I believe it still stays open in our system so that we can still go back and look at whatever it is we may need to look at for a period of, I believe, 30 days.
Q. Okay. Do you know what happens after 30 days, after DFAS has said, this contract is completed, and then the 30 days -- what happens to that data?
A. I do not know.
Q. Is it true, though, that you -- to the best of your understanding, you no longer can access that data on the computer?
A. I can look -- you mean after the 30 days?
Q. After the 30 days.
A. After the 30 days, there's several different places where you can access different information from our material management system, which we call SAMMS. It's closed out. It's gone. No, you cannot access it.
Q. Okay. I'm going to use a hypothetical



because I don't want anybody to worry about this particular case. I want you to assume that XYZ Company has delivered goods to the government and is saying that they did not get paid. Okay?
A. Uh-huh.
Q. Now, is that an issue that DFAS has to resolve and handle?
A. That is an issue that the contract administrator and DFAS would have to probably work together to resolve. The contractor would -- the proper channel is for the contractor to contact his contract administrator.
Q. And the contract administrator works for DSCC?
A. That's correct.
Q. Is the contract administrator your boss?
A. I would be -- I would have been the contractor administrator.
Q. Okay. Okay. So in this particular case -- now I'm moving out of the hypothetical somewhat more into reality -- in this particular case with the contract that's underlying this litigation --

A. Okay.
Q. -- if a person didn't know who to call, whoever received the call, eventually, it should have been routed to you, in terms of a complaint about not getting paid or the payment not going to the right place, that sort of thing?
A. If -- let me clarify something.
Q. Sure.
A. Okay. If a contractor is having payment problems, he's not getting paid on a particular contract, his first course of action probably would be to contact DFAS. Usually what happens if the contractors sends in his invoice for payment and DFAS thinks that they should not be paid, they would send them back something which explains why they're not being paid. It would give them the reason why. Then the contractor would contact us.
If they have not gotten paid -- they got no reason for not getting paid, and they have contacted DFAS and can't get any kind of reasoning why, and they say they have sent their invoices in, then that's when they would come to the contract administrator for assistance.



Q. Okay. And if somebody who had that kind of complaint and they didn't know that they should call the contract administrator, somebody who takes the call at DSCC would know to get that person to the appropriate contract administrator?
A. Yes, they would.
Q. Okay. And you've had those kind of calls?
A. Yes, uh-huh.
Q. Let me show you what was marked earlier as Exhibit 5, and it's a letter from a woman named Shirley Spratt. Do you know Shirley?
A. Yes, I do.
Q. Is she your supervisor?
A. No, she's not.
Q. Okay. Are you her supervisor?
A. No, I'm not.
Q. Okay. Do you guys work together?
A. No, we do not.
Q. Okay. Is she a contract specialist?
A. She is.
Q. Okay. Did you have any input into the creation of Exhibit 5?
A. May I see it, please?



Q. Please.
A. I do not recall having any input into the writing of that letter.
Q. Okay. Do you remember seeing this letter before just now?
A. No.
Q. Basically, the same question as to Exhibit 6, which is, for the record, three pages also offered by Shirley Spratt.
A. I forgot the question.
Q. That's okay. You've taken your time, a few minutes to read it. Really two questions I'll ask at one time: First, do you remember ever seeing it before today? And then, secondly, did you have -- if you did, did you have any input into its creation?
A. I do not remember ever seeing it before today.
Q. Okay. So, obviously, you didn't have any input?
A. Obviously, not.
Q. Now, I guess it occurred to me that it's possible that Ms. Spratt may have come to you and consulted with you and gotten information and



never shared her letter with you. Do you remember anything like that happening?
A. I remember having discussions with Ms. Spratt, Ms. Spratt and another attorney.
Q. Okay. You were the post-award contract specialist, I recognize, but you were aware from the time that you got involved that Flexfab was the origin of the product being purchased by the DSCC?
A. No.
Q. Okay. When did you --
A. I would not say I was aware of that.
Q. Okay. When did you become aware of that?
A. I cannot say that I was ever aware of it until this issue was brought about.
Q. Okay. Am I correct in understanding that ordinarily -- well, strike that. Were you aware at the time, meaning the time that you became involved as the post-award contract specialist, that the prime contractor, Capital City Pipes, was an 8(a) contractor?
A. I can't say that I was aware of that. I don't recall.

Q. Okay. Would it be fair to say that at least by the time of mod P2 that you were aware that Flexfab was the origin of the product?
A. No, I cannot say that because I do not recall.
Q. Okay. Certainly, P2 makes that clear? You would agree?
A. Makes what clear?
Q. That the origin of the product is Flexfab.
A. P2 does state that the place of inspection would be at Flexfab.
Q. Okay. And by definition, that means that Flexfab is the manufacturer of the product?
A. No.
Q. How could it be an inspection at the point of origin if Flexfab isn't the manufacturer? How would that work?
A. There's instances where the contractors will have the supplies at their plant or what have you and have the inspection done there.
Q. So you're familiar with scenarios where -- the analogy would be Flexfab would deliver its product to Capital City Pipes?



A. Right.
Q. That would be counted as the point of origin?
A. Right.
Q. But given the fact that this particular contract, the prime contractor is Capital City Pipes and the inspection is happening at Flexfab, that would pretty clearly tell you that Flexfab is manufacturing this particular product, wouldn't it?
A. I suppose you could come to that conclusion.
Q. Another area that you've been produced as being the person best able to testify has to do with communications between the United States and Capital City Pipes regarding the modification. I think we've gone through this too many times, but are you aware of anything that we have not marked as an exhibit that would be a communication between the United States and Capital City Pipes as to that particular modification?
A. No, I'm not aware of anything.
Q. Now, would you agree with you being the person identified as best able to testify about



payments from the United States to escrow accounts --
A. Would I agree that --
Q. -- escrow accounts controlled by subcontractors?
A. Would I agree that I would be the best person to talk to -- I'm sorry -- to testify --
Q. Yeah.
A. -- about payments to escrow accounts -- I'm sorry. What was the last part?
Q. Okay. Let me back up.
A. Okay.
Q. You're aware that in this particular case, the first contract modification had to do with changing the remittance address to a particular bank account?
A. I'm aware of that.
Q. At Old Kent Bank in Grand Rapids, Michigan?
A. Yes.
Q. Okay. Now, had you prior to that time -- I believe it was September of 1999 -- been involved either as a pre-award or post-award contract specialist regarding a contract that



required payment to an escrow account?
A. Any contract?
Q. Just anywhere along the line in your 13 years or whatever.
A. I don't recall. I do not recall.
Q. Okay. Do you recall at any point during your career here, either as a post or a pre-award contract specialist, the idea of payment being made to a subcontractor instead of to the prime contractor?
A. There are situations where contracts and payments and everything that the contractor may have opened is assigned to a different contractor, and those are what we call novation agreements.
Q. Okay.
A. Which are done between the contractor and the DCMC office.
Q. And remind me, what is DCMC?
A. Defense Contract Management Command.
Q. Okay.
A. And they are the administration office that would be better located to oversee contractor's actions or --

from associate director of small business over to this DLA Contingency Support Team, and then on to the division chief for -- is it EMAAL?
A. EMAAL.
Q. EMAAL.
A. Well, I'm on this team called the DCST, and it stands for, again, DLA Contingency Support Team. The team requires me to go into foreign areas from time to time, which meant that it pulled me off my current function as the associate director of small business.
Each time I left, someone would have to take my function over. The last time I left, the deputy commander asked me would I consider doing something other than the small business.
Q. It sounds to me -- and correct me if I'm summarizing this wrong -- it sounds like you were doing both, and they started to interfere?
A. Actually, the DCST is a special assignment. It's something separate that comes out of headquarters.
Q. Okay.
A. And if you are selected to go to a forward position, then, of course, you only can do



one at a time.
Q. Okay. You're familiar with the Capital City Pipes Company?
A. In general, yes.
Q. All right. What do you know about Capital City Pipes?
A. I don't know. You need to be more specific.
Q. Did you have any involvement with Capital City Pipes in a contract it had, SP0740-99-C-1004?
A. The numbering in and of itself makes no -- has no reference to me. But I've had dialogue concerning issues associated with Capital Pipe failing to pay a subcontractor.
Q. Okay. What does that entail? What have your communications or involvement with that issue been?
A. I really don't know. There have been multiple -- I recall having a discussion with a Mr. Henry Cook about them not being paid from Capital City, as well as JGB. And something that at some point led me to write a letter their failure to act responsibly.



Q. When is it you had a conversation with Mr. Cook?
A. You got me. Probably somewhere in 2000. I want to say June or July, but I'm guessing here.
MR. HILLS: Mark that as 7, please.

- - - - -

Thereupon, Exhibit 7 is marked for purposes of identification.

- - - - -

Q. If I could ask you to review that, Sir. Does that look familiar to you at all? If I'm getting ahead of you, let me know. I want to make sure you have a chance to review it thoroughly.
A. Yeah. This is familiar. I'm the author of this.
Q. All right. What's the background of that letter and the purpose of the letter?
A. Well, again, as you note in the contents here, it simply says very clearly that resulting from a Congressional inquiry and claim filed against the government on -- regarding the failure of this 8(a) to pay its debts to the



supplier.
Q. Okay. Well, what information can you tell me about that?
A. Different than what I've already told you?
Q. Yeah.
A. I can't tell you anything, other than as a result of that Congressional and complaint from a couple of firms -- and I'm thinking it's JGB and Mr. Cook, who was at that time C & S --
Q. Okay.
A. -- prompted us to look into what was going on in terms of whether this guy was making payments or not.
Q. Did anything, to your knowledge, happen as a result of your letter?
A. In the back part of my mind, I'm thinking that Mr. Gonzalez or someone gave me a phone call and indicated that they had gotten complaints themselves. However, they couldn't decertify the company based on the complaints at the time.
And, again, that's -- I'm paraphrasing -- but what I was requesting was, in fact,

A. That authority is delegated to Mr. Taylor, but the reason his name is up here so that any response will come back to him because he's working this --
Q. All right. In either of those two letters, Exhibit 8 or 9, is that your signature?
A. No.
Q. All right. That's him signing your name?
A. That's him signing my name.
Q. Was Mr. Taylor the only person performing that function, or were there other people who were doing the same thing for other 8(a) companies or other programs?
A. If I'm correct, I had -- the 8(a) program is broken down in two categories. I have a construction side where we do base supply, and the gentleman involved with that, his name is Gerry Wade.
Q. Okay.
A. So Gerry Wade would be doing offering letters from the construction, signing them.
Q. Okay.
A. So you have Mr. Taylor doing



commodities and services -- well, I don't want to say service, commodities. Because services would fall into base supply, which means it would have been something that Mr. Wade was doing.
Q. Okay. Would it be fair to say that these are examples of letters that went out frequently, these two just happened to have been directed to something involving Capital City Pipes?
A. Yes. This is a standard format.
Q. Yeah.
A. So any 8(a) that receives an award, an offering letter would have went prior to that.
Q. Okay. You indicated earlier, sir, that you had a conversation with Henry Cook?
A. Yes.
Q. Regarding Capital City Pipes?
A. Yes. More than -- well, not necessarily -- I've had multiple conversations with Henry Cook.
Q. Okay. How many of those related to Capital City Pipes?
A. I have no idea.
Q. All right. When was the last



had a conversation with Mr. Cook?
A. I'm going to guess and say two years ago.
Q. Okay. Did you meet with Mr. Cook at any time to discuss the Capital City Pipes matter?
A. The answer to that is yes, but when you say "Capital City Pipes matter," I met with Mr. Cook to discuss some financing regarding Flexfab not being paid or --
Q. Okay.
A. So I guess we're saying the same thing.
Q. Yeah, that's what I'm referring to. So you had that meeting. Was Phil Kover there as well?
A. As I recollect, yes.
Q. All right. Was Michael Taylor part of that meeting?
A. I believe he was.
Q. All right. Were you there the whole time?
A. I'm pretty certain I was there the whole time. If not the whole time, the vast majority of the time.
Q. All right. If you could review that



for me please, sir.
A. Okay.
Q. Does that accurately summarize the meeting you had with him?
A. I don't know -- when you say accurate, there's some things I'm not certain -- I couldn't say yay or nay to. But, basically, the gist of what was being said about a meeting with Mr. Kover and asking about payment, I can recall that.
Q. All right. Do you recall as a result of that meeting that you and Mr. Taylor had any additional discussions about C & S Industrial Supply and Flexfab and their failure to receive payment for parts?
A. I don't know. I would think that probably we did, but I don't know. I don't recall anything specific.
Q. All right. Do you remember --
A. The conversation would have been more -- would have went along with Mr. Kover about getting these people paid.
Q. All right. Do you have any ollection of talking with Mr. Kover about that e?

83

29

A. Only to the extent that there was something in the automated process associated with the address, and it's supposed to transfer over, and it didn't, or something with regard to that. I don't know how that works.
Q. All right. Do you know if there was ever a conclusion reached or a plan of action reached as a result of these discussions to rectify the nonpayment?
A. No. My -- last I heard, they had filed an action, and I assume this is part of it.
Q. Okay.
MR. HILLS: Let me go ahead and mark that as 10.

- - - - -

Thereupon, Exhibit 10 is marked for purposes of identification.

- - - - -

Q. So I understand, we've now marked as Exhibit 10 the copy of the e-mail message you received from Henry Cook, correct?
A. I don't know that. What I'm saying, I guess, this is on the top of my sheet, and I don't

30

recall the e-mail itself, but I do recall much of the contents in the e-mail. So I have no reason to believe it was anything other that, but I can't identify this is the e-mail that I received.
Q. All right. Given the way it's set up, you don't have any reason to argue that it's an e-mail that was --
A. I wouldn't debate it is. I just can't confirm.
Q. All right. And as I understand what your testimony is about the contents of the e-mail, you may not recall specifically some of the issues, but you think it generally is a accurate summary of the issues that were discussed?
A. Well, he spoke to some things that Mr. Kover has said and did, and I don't know about those things. Okay? But in terms of the debt -- the monies not going to where it was supposed to go, I am familiar with that situation.
Q. All right. And, again, so I'm clear, you don't have a specific recollection of the nature of any conversations you had with Mr. Taylor or Mr. Kover after this meeting

31

being referred to in Exhibit 10?
A. No. No. In the back of my mind, I would have told Mr. Taylor to press on this issue with Capital City and see what's going on to get these folks money, et cetera, but no particular conversation.
Q. All right. Did you ever do anything to follow up and see what had happened as a result of this contact with Henry Cook?
A. When you say that, what do you mean, "follow up"?
Q. Well, did you ever get back to Mr. Taylor or Mr. Kover some period of time later to say, hey, what happened with that?
A. If I can recall correctly, there was perpetual back and forthness. I think as a result of that, there was dissatisfaction in not knowing specifically and how. As a result of that, there was this action that was filed.
Q. All right. Would you have made notes of any of these conversations?
A. Certainly would. However, I looked for a file that -- since I've been gone, so many -- when files get a certain age, they discard them.

32

So any notes that I might have, I was unable to find.
Q. All right. Would there be any computer records or anything that would have notes or log entries or journal entries, whatever you might want to describe them as?
A. I attempted to go through some of my old e-mails just the other day, but I didn't find anything relevant to this situation. I can't say. It may or may not be. I just don't have any knowledge of where I'd find them.
Q. Okay. Did Mr. Taylor ever indicate to you that he was keeping notes or keeping --
A. We would have had a file on Capital City, C & S. They were both 8(a) firms --
Q. Right.
A. So they're -- whether we've got something stored somewhere or they've got destroyed, I don't know. But we would have maintained a file on program participants. Since as that.
Q. All right. That would have been [illegible]ng you would have done in the regular --

84