point in time before I really figured all of that out. Okay. Anyway, if you look at Exhibit 4, you will see that the remittance address has changed. Do you see that?
A. Yes.
Q. Now, was there ever a point in time when anybody brought to your attention that the remittance address that was contained in what started out as your proposed contract, the original 11 pages, or in the final award -- did anybody bring it your attention that the remittance address was not what the parties had wanted to have?
A. There is an attachment to this contract with the correct remittance address.
Q. Okay. You know what, instead of me flipping through there, I'm sure you'll be faster.
A. Right there. I'm sorry.
Q. And this is in Exhibit 3, what's been marked up at the top as page 12 of 24?
A. Yes.
Q. So that tells me it's part of the solicitation materials that were added to what you originally created once the contract was awarded?



A. Yes.
Q. Okay.
A. And it's part of the contract.
Q. Okay. And this is a June 23 letter that pre-dates the June 29 document that you typed up?
A. Yes.
Q. Okay. Now, is this -- in terms of the original award, does this June 23, 1999 letter addressed to you from Thelma Williams, page 12 of 24 -- is that what the contract is, in terms of the remittance address?
A. This is the remittance address in the contract.
Q. Okay. Now, I'm going to quickly turn over -- kind of keep this handy, but also turn over to Exhibit 4. And I'm looking at it upside down, and it's kind of small, so maybe you can do this: Is the modification calling for an -- actually in a different account?
A. No. No.
Q. Now, I know that you've only very little worked on the post-award side, but do you have an understanding of why there woul‹



for the modification marked as Exhibit 4, given the fact that this June 23 letter was part of the original contract?
A. No.
Q. Okay. Now, let's forget about Exhibit 4. Let's just think about Exhibit 3, your contract that you put together. What happens to the contract to make sure that payment is handled the way it's supposed to be handled?
A. A copy goes over to DFAS.
Q. Okay. Now, is that an electronic transmission, or was it a hard copy transmission or both and -- back at that point in time?
A. I'm unsure.
Q. Okay. My guess is that today, it's electronic?
A. Yes.
Q. Is it today both electronic and hard copy?
A. I'm unsure.
Q. Clearly, 20 years ago, it was just hard copy?
A. Yes.
Q. Today it might be both, but it's for



sure electronic?
A. Yes.
Q. And you're not sure where the transition was?
A. That's not my role.
Q. Okay. Maybe this is silly, but bear with me. I know that you're the person who types the information into the form that is at least the first 11 pages of the contract?
A. Uh-huh.
Q. What happens then? Do you hit print and it comes out the printer, or does somebody else deal with that?
A. You're correct. You hit print, and it comes out on a local printer with the first 11 pages. After that, you start to add your attachments and solicitations and renumber it with the final contract.
Q. Okay. And then do you create a file that has just those 24 pages in it?
A. Not just those 24 pages. The entire contract file encompasses all documentation from the beginning of the initiation of the
tion to the very end.

85

Q. So correspondence, e-mails, faxes --
A. Yes.
Q. -- if they were printed off, would go into the file?
A. Yes.
Q. Now, physically, what happens to the file? It stays here at DSCC?
A. There is a holding file here, yes.
Q. Now, what actually gets physically sent to DFAS?
A. The contract.
Q. Okay. The 24 pages?
A. Yes.
Q. Okay. And are you the person who actually does that, or does a clerical person make a copy of that and deliver that?
A. A clerical.
Q. Okay. Is there some way that you confirmed that, in fact, it was transmitted over to DFAS?
A. No.
Q. Has it ever happened that you've discovered that somehow the contract didn't get delivered? You know, a clerical person says, oh,



gosh, I forgot. I didn't make it over there yesterday or -- have you ever encountered that kind of scenario?
A. No.
Q. What would happen -- would something bog down if DFAS didn't get the contract?
A. I can't speak for DFAS. I don't know what their procedures are.
Q. Okay. Let me get at it this way: Obviously, you've got a contract, and that's all nice, but it's just paper. And so what you really want to end up with is somebody who actually makes something and gets it to the Department of Defense so that those people can use it obviously.
What I'm wondering is, is there something in the way that your whole system works so that unless that contract gets over to DFAS, the actual process of getting parts made and delivered isn't going to happen? I mean, is there like a check and balance?
A. There is a system process, yes. And if the contract has not been delivered at a certain point, it becomes delinquent, and there is action taken on that. They follow it through on



delivery.
Q. And when you talk about "they," you're talking about DFAS, or are you talking about --
A. DSCC follows through delivery. DFAS handles the payment issues.
Q. Okay. So the fact that -- well, let me -- do you know whether or not DFAS ever paid any money with respect to this contract?
A. No.
Q. My understanding is that DFAS did pay money, but paid it directly to Capital City, not to the bank account at Old Kent Bank. Do you know if that's true or not?
A. No.
Q. Okay. Just assume that that's true for right now. Does that indicate to you that, obviously, these 12 pages -- I'm sorry, these 24 pages of the contract were, in fact, physically delivered to DFAS?
A. Yes.
Q. Okay. Now, is there anything in the first 11 pages that would indicate, but for page 12, where payment is to be made?
A. There is a location on page 8 that



offers a remittance payment, an address.
Q. Okay. So if they only looked through page 8, they would see, okay, I'm supposed to remit payment to Capital City Pipes, Inc, right?
A. Yes.
Q. What they're supposed to do, though, at the very least is continue reading all 24 pages to make sure there isn't something else that supersedes that?
A. Yes.
Q. Now, is page 12 intended to supersede page 8 in terms of the remittance address?
A. Yes.
Q. Is there some protocol or procedure that you're aware of that DFAS is supposed to follow to know whether to look at page 8 for a remittance address or page 12 for the remittance address?
A. No. I have no idea.
Q. Okay. Is there anything that you know to do or can do to check to see what DFAS does in terms of remittance address or any other issue --
A. No.
Q. -- in terms of handling payment?

materials that get incorporated into, what I'm going to call the Flexfab related contract?
A. This is part of the solicitation.
Q. Do we have more than the -- do we have more as Exhibit 3 than what was part of this contract?
A. That's what I'm looking at.
Q. Yeah. It just dawned on me we have things that are duplicative.
A. Yeah.
Q. Off the record.
(A discussion is held off the record.)
Q. Ms. Luich, we've just lost Ms. Vasso, but she's off to see if she can find the file to clear this up. But where there's handwriting that says 12 of 24, 13 of 24, 14 of 24, through 24 of 24, that's your handwriting?
A. Yes.
Q. And so in Exhibit 3, the first 24 pages, from the best that you can determine, are, in fact, the contract as it was finally put together?
A. Yes.
Q. Now, we've got as part of Exhibit 3



additional pages which we're struggling with what they are. Is that a fair statement?
A. Yes.
Q. Now I just want to make sure that there's no misunderstanding. Before when we were having this conversation about page 12 of 24, that was this letter that was on Capital City Pipes' letterhead?
A. Yes.
Q. Okay. Because there's a second page 12 of 24 which is a continuation sheet that's part of the normal DSCC form?
A. Yes.
Q. Okay. And that -- the contract number, which is different, is different at least partly because it's in the solicitation stage, not the contract stage?
A. Yes.
Q. Okay. I'm just going to see if I can play sleuth a little bit with your help. All of these pages with your handwriting on them also have at the top of them a couple of fax headers. Do you see that?
A. Yes.



Q. And that continues on even beyond page 24 of 24. Do you know if what you were writing on was a faxed document? In other words, that the fax headers came first, or that you wrote on it, and then after you wrote on it, it got faxed a couple times before I got a copy of it?
A. Could you repeat that?
Q. Yeah. I'm trying to figure out if these fax headers were on there when you wrote on it or if your writing predates the fax headers?
A. The faxes predate my final writing.
Q. Okay. So what you were paginating were faxed pages?
A. Yes.
Q. Okay. Now, maybe this will help me understand this too: We know from page 1 of Exhibit 3 that you entered data before or through June 29, 1999?
A. Yes.
Q. And that's the date that the contract was finalized?
A. Yes.
Q. Now, is June 29 of 1999 the date that, then, you pulled together the solicitation



materials and date them?
A. Yes.
Q. So the fact that we see fax headers showing February 25 or January, clearly, they would come before you wrote on this?
A. Yes.
Q. And these additional pages beyond the ones that you marked through page 24, we can tie them together in the sense that they must have been all faxed at the same time. But do you know whether -- they apparently would not have been part of what you considered the actual contract?
A. Yes.
Q. Okay. I'm not sure what any of that means, but I appreciate your help.
MS. MONTA: No. The contract says -- it says 24 of 24, and then it has all sorts of additional --
MR. RYNDERS: Off the record.
(A discussion is held off the record.)
MR. RYNDERS: Okay. So just for the record here, we have on these additional pages -- they are numbered down at the bottom right-hand corner. Something I hadn't noticed before. And

saying that if they're satisfactory in enough areas, that could overcome an unsatisfactory grade in one area?
A. Normally, your final determination is a block marked to recommend an award or no award.
Q. Okay. So the fact that they were unsatisfactory financially isn't a precluding event? I mean, they're not automatically disqualified, if that's the case?
A. I go on the basis of the pre-award conclusion.
Q. Okay. And that's the SBA that does that?
A. Yes.
Q. Or -- and I know there's some, and I may be getting all this wrong -- but the SBA does that, or does the Small Business specialist that's part of the DSCC, someone like Mr. Taylor, do that?
A. We actually -- with the pre-award survey, it's monitored by the industrial specialist.
Q. Here as part of the DSCC?
A. Yes.



Q. Okay. Now, is that survey -- the results of that survey communicated to someone like Flexfab?
A. I have no idea.
Q. Okay. Now, were you aware that because of Capital City's financial situation that Flexfab wanted to have an escrow agreement and an escrow account set up so that payment would be made to an escrow account, not directly to Capital City?
A. I'm sorry. Repeat that.
Q. Yes. Were you aware at the time that you were putting together the contract that because of Capital City's financial situation, that Flexfab wanted to use an escrow account to guarantee that it would get paid?
A. No.
Q. Now, did you make note of what we were looking at earlier, page 12 of 24, where it talked about this account in Grand Rapids, Michigan?
A. I just included it in the contract.
Q. Okay. Now, did it occur to you that the reason for that was to have an escrow arrangement? I mean, you've had a communication with Mr. Taylor about some kind of escrow



agreement. You're aware of the pre-award survey which showed that they were unsatisfactory, they being Capital City was unsatisfactory financially. And then as part of the contract, you see that payment is to be remitted to Grand Rapids Bank.
Did you come to any understanding that the payment arrangement was to guarantee payment to Flexfab because of Capital City's financial situation?
A. No.
Q. Just -- nothing like that popped into your head?
A. No.
Q. Okay. Let's -- just accept for the purposes of discussion that, in fact, Flexfab was concerned about Capital City's financial wherewithal, and accept for the purposes of this discussion right now that Flexfab insisted that there be an escrow account that it had control over or, at least, partial control over so that the money would go into the escrow account and not go to Capital City and then never end up going to Flexfab. Okay. Just assume all that's true.
Have you ever, as someone dealing with



pre-award contract handling, dealt with that process of setting up an escrow account or hearing that there's going to be the use of an escrow account?
A. No. We strictly deal with the contractor that we're awarding to.
Q. Okay.
A. Subcontractors, there's no connection --
Q. Okay.
A. -- with the dollar amount.
Q. When you say "there's no connection," you're just saying you don't have conversation with them?
A. No.
Q. Or you're not looking at that?
A. No.
Q. Okay. Now, if the prime contractor desires to use an escrow account, that's fine with you?
A. It's irrelevant to me.
Q. Okay. You don't pay any attention one way or the other?
A. No.

9

called a procurement agent at the time.
Q. Did you say PAC, as in P-A-C?
A. Yes. It's an acronym, but I can't remember what it stands for.
Q. Well, one thing I've learned from dealing with cases involving the government is everything is an acronym. Okay.
A. All right. So I held that position for a year -- no -- yeah, a year. Then I was promoted to a contract specialist, and I believe I was in that position for a couple years. And then I was promoted to a contract administrator and held that position for a couple of years.
Q. Okay.
A. And then I was promoted to a small business specialist, and actually held that position for 11 years, the final 11 years.
Q. Now, there's a place called the Small Business Administration; am I right?
A. Yes.
Q. As a small business specialist, you were still an employee of DSCC?
A. Yes.
Q. Okay. Now, maybe you know this, maybe

10

you don't. Is there a difference in terms of being a small business specialist for the DSCC and then working for the SBA?
A. Yes. Well, they're two different agencies.
Q. Okay. Is the type of work you were doing, as far as you could tell, different from what somebody would be doing for the SBA or --
A. Yes.
Q. Okay. As a small business specialist at the DSCC, what were your job duties?
A. First of all, I had to review all the contracts -- or actually, they weren't contracts, but solicitations that the buyers sent out, anything above $10,000, and made sure that they met all the Small Business requirements.
Q. Now, let me just stop you for a minute.
A. Uh-huh.
Q. When you're talking about all the solicitations above $10,000, are you talking about where the proposed or prospective contractor would be an 8(a) supplier?
A. No. This is just --
Q. Period?

11

A. Right.
Q. Okay. Now -- okay. If the federal government was going to procure something from a big large C corporation, Westinghouse or IBM or, you know, McDonald Douglas or something like that, would that still come through you or --
A. Yes. It would come through our office.
Q. Okay.
A. And there were -- I believe we had five specialists. And one of us, depending on which application group it came out of, would evaluate that solicitation.
Q. Okay. And so the distinction between you and your peers, the five of you, you would handle certain kinds of product and others would handle other kinds of products?
A. Yes.
Q. It wasn't divided by company or industry -- well, maybe industry, I guess, but not by the size of the company or the name of the company, but rather the product involved?
A. Pretty much. There's, what, five application groups, I believe, and I was responsible for land application and all the

12

solicitations that came out of the land applications, I was responsible for evaluating.
Q. And just to give me a flavor for this, to try to appreciate what you had to spend your time doing, what kinds of requirements were in place that you were looking to see were being met?
A. The first thing, of course, was to evaluate the solicitation and determine whether or not it should be placed in a small business program. There were certain requirements that had to be in line for it to fall within one of the those programs. Also, some of the solicitations were already placed in the program, and it was my responsibility to make sure that the buyer continued that process.
You know, sometimes it may have been in the small business set-aside, and they may be soliciting it unrestricted to the whole market. And, of course, it would be my responsibility to stop it and redirect it to the small business program.
Q. And for my benefit -- and I've seen references to set-aside. What that means is that this product is being set aside so that it's only

MR. RYNDERS: Off the record.
(A discussion is held off the record.)
Q. We're back on the record. Let me see if I can kind of summarize here -- and this is so I can make sure I can understand it. You can fix me if I don't have it right.
A. Okay.
Q. Your job is to cultivate sources for products through the 8(a) program and then -- so that these contract specialists have places to go to buy particular products from disadvantaged or small businesses. And then you also monitor the contract specialists to make sure that they're actually using those sources. And you do other things too, like training and things, but those two components are a big part of what you did?
A. Yeah, pretty close.
Q. Okay. And fix me where I'm wrong, but I'm just trying to kind of capture the essence of it. With respect to this particular contract, the one that we've marked here as Exhibit 3 -- and it's 24 pages long, and you're welcome to leaf through it, and it includes, in fact, the solicitation materials I'm lead to believe.



Do you recall now sitting here having had this conversation whether you had any awareness of the solicitation before the contract, or did you come to have any involvement with this particular transaction after the award?
A. Oh, I was involved before the solicitation.
Q. Okay. Okay. And to the best of your ability, explain what your involvement was before the solicitation and then before the award.
A. Okay. Now, I did get a chance to evaluate this information yesterday, so I know that when this particular requirement -- I, of course, sent the information to SBA prior to solicitation coming out, of course, and got approval from them. That information was sent to the buyer. The buyer did send out the initial solicitation as an 8(a) set-aside. However, the buyer receives several quotes from non-8(a) companies which, quote, unquote, is basically illegal.
Q. Okay. Certainly those quotes would not have been considered?
A. Exactly.



Q. Because of the set-aside?
A. Right. Right.
Q. And don't lose your train of thought here. I want you to keep going. But when you talked about getting the SBA's approval, were you specifically -- were you just saying I want these NSNs to be set aside or I want approval for Capital City Pipes with respect to these particular NSNs?
A. It's actually both. In the offer letter to SBA, it has the NSN, the PR number, purchase request number, the contractor, Capital City Pipes, had the dollar amount and prior -- or history of the NSN who was the previous supplier.
Q. Now, I've seen -- I think I've seen letters like that. I don't know if I've seen that letter in particular, but I've seen letters like that where it says previous supplier, and it had Flexfab's name on it?
A. Yes.
Q. Okay. Now, in this particular letter that you're talking about, would Flexfab have been listed as the actual supplier or --
A. No. And I believe this one was



previously set aside for C & S. So if that were the case, the previous supplier, of course, would be C & S. Even though Flexfab may have manufactured the material, the government's contract was with C & S.
Q. Okay. Now, on this letter to the SBA, do you indicate that Capital City Pipes is functioning as a distributor, or is that not specified one way or another?
A. It's not specified. And SBA will know that they're a distributor because they manage that company basically.
Q. Okay. I have been given materials that Capital City Pipes apparently sent into the DSCC or certainly got into files here which showed all of the pipe fittings and various products that they manufactured or had available for sale, but none of which were these specialty hoses. Have you seen that kind of material?
A. I know they sent information to me regarding their capabilities, and that's -- and usually if they don't send it to me, I request that information anyway.

**next involvement with respect to these particular NSNs and this particular contract?**

A. Are you saying after the purchase order comes out and the buyers working with it or --

**Q. Yeah. See, you know so much more about all this stuff than I do. I don't want to leave a gap out there, but here's my point -- or I guess, let me back up and explain it. I know that from what you've told me, getting the SBA's approval had to come before any solicitation, any PO, anything like that?**

A. Actually, getting their approval -- maybe I missed a couple steps -- but getting their approval actually comes once a purchase request is released.

**Q. Okay.**

A. And that purchase request is prior to the solicitation.

**Q. Okay.**

A. And my evaluation in placing the NSN in the system actually becomes -- comes before that. I do an analysis first, then I put it in the system, and then -- if this is a new, totally new item, put it in the system. And then the buyer --



once the purchase request comes out, the buyer will see that it's set aside for 8(a). They should contact me.

At that point, I send a letter to SBA for approval. Regardless of whether the company has made it before or supplied it before or not, it would still go to SBA to get approval because things change. Then SBA will send back an acceptance letter, and then I forward that acceptance letter and the offer letter to the buyer letter stating that, you know, it was asked and received. And then the buyer puts together the 8(a) solicitation, sends that out, only to the 8(a) contractor.

Now, with the systems they have now, sometimes other people find out about it, but it's only supposed to go to that 8(a) contractor. The contractor is supposed to provide a price. That goes to the buyer. The buyer is to evaluate the price and also go to our cost and price office, and they will do an analysis to determine whether or not the price meets what they consider a fair market price.

If it does, then the buyer proceeds



with an award. If it doesn't, then we got to go back and forth and try to come to a happy medium, and then again award or dissolve.

**Q. Okay. And when you say "we," are you personally involved in that process because of your small business specialist position, or is -- was "we" the royal we, just meaning the DSCC?**

A. Are you -- I don't know what part I said "we," so --

**Q. If there's some issue over whether the quoted price is a fair market price, then you said "we" need to haggle over it?**

A. Usually "we" was me.

**Q. Okay.**

A. Yeah.

**Q. Okay. So now, what's the next role that you played as far as you can remember in connection with this particular contract, this particular solicitation, which turned into a contract?**

A. Well, once it becomes a contract, typically, there's nothing else to do. I will, you know, periodically check on a company to see if they're performing. Or if the company -- I



mean, typically, they'll call me if they have any problems or anything like that. And I will try to work to resolve those problems if it's in my capacity.

**Q. Did you have any direct communications with anybody at Flexfab prior to the award being issued?**

A. No.

**Q. Okay. Did you have any communications with anyone at Flexfab after the award was issued?**

A. No. Not to my knowledge, no.

**Q. Okay. And in fairness to you, my questions were in connection with this particular contract.**

A. Correct.

**Q. Okay. Did you have any pre-award conversations with Henry Cook about this contract or this solicitation?**

A. I'm not sure if I had conversation with him. Actually, most of my conversation was with Capital City Pipes. The only real dealings I had with Mr. Cook was prior to their arrangement. And I know I did call him at one point when I had made calls to Capital City Pipes and didn't get

91

awarded





response from them.
And I remember making a call to Mr. Cook to find out if he had any conversation with them or if he knew what was going on, because I think I was getting frustrated at that point.
Q. Okay. When did you first become aware of someone's desire to have an escrow account set up for payment?
A. I don't know the exact time frame when that happened, but --
Q. Well, help me out at least -- I know you're about to answer, but just try to focus the answer. We've got the June date of the contract. We've got the September date of the mod. You know, before both, after both, between them, you know, if you can give me some kind of --
A. I believe it was between them.
Q. Okay.
A. And, actually, I believe I was -- it all started -- and I know you don't want to hear about JGB -- but all of this, these problems, I became aware of all these problems when JGB contacted me and the small business office. And I believe Mr. Cook made contact with me as well.



Q. Okay. And it's okay. We can talk about JGB. I was just at that point in time trying to keep it focused on Flexfab. In connection with JGB, do you remember whether the contract -- well, back up. With respect to JGB, the prime contractor was Capital City Pipes?
A. Correct.
Q. And so like my client's situation, JGB's situation was a supplier to Capital City Pipes, which was acting as a distributor through the 8(a) program?
A. Correct.
Q. Now, do you remember the timing of the -- I'll call it the JGB transaction and the Flexfab transaction, because they both involve Capital City Pipes, so we'll distinguish between the original source. Do you remember the timing of the JGB solicitation or award relative to the Flexfab solicitation or award, which one came first?
A. I have no idea because -- and the reason why I say that, I didn't even know there was a problem with Flexfab until way down the line when -- I believe it was when I had the meeting



with Henry Cook. And that's when I found out that Flexfab was involved. But, actually, I thought Flexfab's involvement was minimal.
Q. Okay. Now, as someone who's been a contract specialist and a contract administrator, you're familiar with the solicitation award post-award process?
A. Correct.
Q. Okay. And my understanding -- and correct me if I'm wrong -- is that when the contract is issued, is awarded, then that information is communicated probably a number of places, but one place is to DFAS?
A. Correct.
Q. And, similarly, if there's ever a modification to the contract, that information is communicated to DFAS?
A. Correct.
Q. And we even see that on the bottom of Exhibit 4, that DFAS is on the distribution list?
A. Right.
Q. Now, is it your understanding that that information is communicated to DFAS through the computer system, at least that's one way that it's



done?
A. My understanding at the time, no, was that it was -- hard copy was sent over to DFAS.
Q. Okay. Do you have any personal knowledge of what DFAS does with that hard copy to process awards and modifications issued by the DSCC?
A. No.
Q. Okay. Would you agree with me that the modification, which we've marked as Exhibit 4, what was supposed to happen was DFAS, when it paid money on that particular contract, would actually remit the funds to the bank account that's listed in section 14 of the mod?
A. Correct.
Q. Okay. And if I understand what you were saying earlier, you didn't realize there was a problem with Flexfab until later on down the line, meaning you didn't realize that money hadn't been sent to that particular bank account? You didn't learn that until later?
A. Right.
Q. But you were aware around the time of the modification that there was a modification?

A. Yes. Yes.
Q. And you understood the purpose of the modification?
A. Yes.
Q. Okay. And I kind of asked you this, and I'm not trying to just keep going back to things, but to the best of your ability, tell me what you knew at the time about why that modification was being made?
A. Because they were having some problems making payments and -- going back to JGB -- when JGB contacted me, they were in process of sending Capital City Pipes some more material to ship to the government. And they stated that they weren't going to ship any more material to Capital City Pipes until Capital City Pipes made good on their payments.
So when I spoke with Capital City Pipes, you know, of course since I'm the 8(a) coordinator, I need to make sure that they take care of their responsibilities. And in talking with them, they sound like they were going to, you know, take care of their responsibilities. And one of their ways of doing that -- and to ensure



that they get their material was to do the modification and allow them the funds to go to another source other than Capital City Pipes, so that the suppliers could receive their money.
Q. Okay. And that problem and that solution was something you were aware of before the modification marked as Exhibit 4?
A. Correct.
Q. And Henry Cook was involved with the JGB payment problems?
A. He was -- if I remember correctly, I believe he introduced Capital City Pipes to JGB. So I guess, indirectly, he was involved with that as well.
Q. Well, let me ask it to you this way: Prior to September 27, 1999, the date of that modification marked as Exhibit 4, had you had contacts with Henry Cook concerning the JGB situation?
A. I don't think I had conversation with him at that point. I think it -- our conversation started after that, when the modifications went through and still -- I mean, we still had the same problems.



Q. Okay. Do you know -- would you have any information to confirm that Flexfab was unwilling -- like JGB -- was unwilling to supply product without having this escrow account in place first?
A. No.
Q. Do you have any reason to say that that wasn't the case?
A. No.
Q. Okay. Did you have conversations with anybody outside of the DSCC about the escrow account that is referenced on Exhibit 4?
A. When you say "outside the DSCC," are you referring to contractors or just family members?
Q. Well, I'm thinking -- fair enough. And that's why I told you you can ask me clarification. I know you already told me you didn't talk to anybody at Flexfab before or after the award, so I guess they're out of the picture. And I think you've told me you weren't sure if you had talked to Henry Cook by that point in time. What I'm wondering is did you talk to somebody at Capital City Pipes, or did you talk to



some other person in a business setting, but not a DSCC employee, about the details or this particular account or the idea of an escrow account that went into the preparation of this modification that's marked as Exhibit 4?
A. Well, I know I talked with Capital City Pipes because we were trying to determine what options they had available to them. And, of course, we wanted our -- the agency wanted the material.
Q. Right.
A. So -- yes.
Q. And when you talked to Capital City Pipes, you talked to them about the JGB situation first -- or maybe not at the time first, but at one point in time, you talked to them about JGB, correct?
A. Right.
Q. But you also talked to them about Flexfab?
A. See that, that I -- I don't believe I talked to them about Flexfab. Because I didn't -- like I said, I didn't know Flexfab -- there was a problem with Flexfab until down the road.

here. At that point in time when you did learn that there was a problem with Flexfab not getting paid, do you remember when that was roughly?
A. I believe that was at the point of the meeting between Henry Cook, myself, Howard Griffin and Kover from DFAS.
Q. Phil Kover?
A. Right.
Q. When that meeting happened, was the -- to the best of your knowledge, was the contract completely completed, or was it still in process?
A. I believe it was still in process.
Q. Okay. Tell me about that meeting, what you can recall.
A. To the best of my recollection, Mr. Cook was, of course, looking for our help to receive payment from the contracts that, of course, Capital City Pipes received. And there was an issue with the payments and the -- I'm trying to talk and remember at the same time. I'm trying to think if the modifications had been done at that point. I believe they had. But anyway, our meeting mainly was with Kover to determine what money -- what funds were supposed to be sent



to Capital City Pipes and what funds had already been sent to Capital City Pipes.
And I know that's when we discovered that Capital City had been paid twice on a particular contract. And basically, DFAS or DSCC was taking back money from other contracts to recoup the double payments.
Q. You're saying that Capital City Pipes had been double paid on one particular installment instead of just paid the once?
A. Right.
Q. And was that particular double payment relating to the product that Flexfab was supplying or maybe on just some other contract all put together?
A. Actually, I believe it was on the JGB requirement, because, again, that's when I discovered that Flexfab was involved as well. And that's when Mr. Cook stated -- he actually gave us the amounts that were owed to JGB, Flexfab, and himself.
Q. Okay. And were you able, with the help of Mr..Kover and, I guess, Mr. Griffith's involvement, to determine that payments were being



made directly to Capital City Pipes and not to the escrow accounts stated in the modification?
A. Yes.
Q. Okay. Now, who does -- well, at the time, who did Mr. Kover work for?
A. I don't know. He worked for DFAS, but I don't know who --
Q. Okay. But it was DFAS, not DSCC?
A. Right.
Q. And so, presumably, Mr. Kover is somebody who would have had access to the DFAS computer, and regardless, the information he provided to you is that the payments had been sent directly to Capital City Pipes and not to the escrow account?
A. Correct.
Q. Now, did you talk to him about fixing that problem or what needed to be done to make sure that didn't continue to happen?
MS. BURKE: Can I just interrupt for a second? Are we talking about JGB or Flexfab right now?
MR. RYNDERS: Well, my understanding is they were talking about both at this meeting. So



the question would be really on both.
A. Actually, it would -- Flexfab was actually an afterthought. I don't mean to be rude about it, but --
Q. Just say it the way it is. That's all I can ask you do.
A. The meeting mainly was regarding the payment to Capital City Pipes that should have gone to the escrow account for JGB.
Q. Okay.
A. And then that's why I said I didn't realize that there was an escrow account set up with Flexfab as well. And at that meeting is when we were talking, going back and forth. And then at that point, Mr. Cook stated that, you know, Capital City Pipes owed JGB this amount, owed Flexfab this amount, and owed him that amount. So --
Q. Okay. Now, did Mr. Kover then confirm for you the payment arrangements just involving JGB, or did this group of individuals that you were part of examine the payment status as to Flexfab as well?
A. Actually, I don't remember us

contract specialist, I guess, in this situation, a post-award contract specialist should do to make sure that the modification is, in fact, implemented by DFAS?
A. As far as I know, you know, they submit the information to DFAS. And what happens from there, you know, I don't think they're giving any notification or anything of that nature.
Q. Okay. Now, turning back to JGB, the position -- as far as you know -- well, did you ever have conversations directly with JGB?
A. Yes.
Q. And their position stated to you was that we haven't been paid for products we've made and we're not going to ship anymore product unless we get paid?
A. Correct.
Q. And, in fact, they also indicated to you that they said we're not going to ship any product unless we also get this escrow arrangement, so we don't have this problem again in the future?
A. No.
Q. Okay.



A. My recollection was that basically they weren't going to deliver until they got paid. And -- so the escrow agreement came about as a means for them to receive payment and an assurance that they would get paid on future requirements.
Q. Okay. Now, what was -- I think it's kind of obvious, but I'm just going to ask the question: What was the point of the escrow agreement?
A. To make sure that JGB received payments on their requirements.
Q. And who was the intended beneficiary of that modification for JGB?
A. Actually, everyone would benefit. The government would get the supplies. JGB would get their funds. And Capital City Pipes would get their portion of the funds.
Q. Okay. Now, I know you've explained that at the time you weren't aware of Flexfab's request for an escrow account, but would you have any different answers to the purpose of the modification marked as Exhibit 4?
A. No.
Q. It was all around for everybody's



benefit?
A. Correct.
Q. Is there anything you can do to shed light on why the modification marked as Exhibit 4, being the Flexfab modification, why that wasn't followed?
A. Probably a breakdown in the system, but I can't -- you know, I'm not a hundred percent sure on that, but --
Q. Don't take this the wrong way. I'm just throwing out crazy ideas to show you how far I'm willing to go -- I mean, just any explanation that you've got other than breakdown of communication? Obviously, you've worked hard to develop suppliers. Were you, in fact, the person who developed C & S?
A. Yes.
Q. And then they graduated, and so now you've developed Capital City?
A. Uh-huh.
Q. I mean, it's not like you went in and said, ignore this contract modification, I want to make sure Capital City gets the money?
A. No. Right.



Q. Is there any reason why somebody would have intercepted the modification or that there was a policy that you're aware of that would have made the modification unenforceable or anything like that?
A. The only thing I know is that DFAS folks, when it's time for payment, they look at the information in the CCR, the Contractor -- I can't remember the name of the CCR. But, anyway, the CCR is the system where the contractors register. And when they make payment, they go by the remittance address in the CCR. But my understanding at the time was that if a modification went through, it would override what was in the CCR, but, apparently, it doesn't.
Q. And we all understand human error. Okay? But in terms of the procedures and policies that you're aware of, the people at DFAS are supposed to know that the modification overrides the CCR?
A. That, I don't know. I don't know if the modification overrides that or how that works.
Q. Okay. From the DSCC standpoint, that

# Bankruptcy Docket Report
## 4 00-70953 (Tallahassee)

## CAPITAL CITY PIPES, INC.

## Docket items entered between 01/01/1931 and 02/13/2003

| Filing Date | No. | Docket Entry |
|---|---|---|
| 12/21/00 | 1 | Voluntary petition under chapter 7 [EOD 12/22/00] [LMI]<br>Receipt No. #33445 [EOD 12/22/00] [LMI] |
| 12/27/00 | 2 | Notice of 341 meeting on 01/23/01 at 12:00 A.M. at 1st Floor, U.S. Trustee Hrg. Rm., Rm. 1046, 227 N. Bronough St, Tallahassee, FL [EOD 12/27/00] [LMI] |
| 12/27/00 | 3 | Certificate of Service [EOD 12/27/00] [LMI] |
| 01/24/01 | 4 | NTC of Appearance by Upchurch for City of Tallahassee [EOD 01/25/01] [LMI] |
| 02/05/01 | 5 | Application by Tee to Employ & Appoint Counsel under General Retainer together W/Verified Stmt by Counsel [Disposed] [EOD 02/06/01] [LMI] |
| 02/05/01 | 6 | Application to Employ an Auctioneer and Appraiser,for Authorization to appraise & sell property by auction & for approval of sale. [EOD 02/06/01] [LMI] |
| 02/05/01 | 7 | PROC MEMO 341 mtg hld dbtr present [EOD 02/06/01] [LMI] |
| 02/06/01 | 8 | ORDER AUTHORIZING Employment of Attorney for Tee Re: Item # 5. (5 copies) [EOD 02/06/01] [LMI] |
| 02/07/01 | 9 | ORDER AUTHORIZING Employment of Auctioneer and Appraiser Re: Item # 6. (5 copies) [EOD 02/07/01] [LMI] |
| 02/09/01 | 10A | Motion for Relief from Stay for General Motors Acceptance Corp by Bailey Jr. [Disposed] [EOD 02/12/01] [LMI] |
| 02/12/01 | 11A | ORDER/NOTICE Of Preliminary Hearing TC 03/12/01 Re: Item # 10A. (5 copies) [EOD 02/12/01] [LMI] |
| 02/15/01 | 12 | Application to Employ an Accountant By Tee to Employ & Appoint Accoutant under General Retaineer together W/Verified Stmt by Accountant [Disposed] [EOD 02/15/01] [LMI] |
| 02/15/01 | 13 | RPT/NTC of Intent/Sell Prop re: (at Auction) re:Office Inventory, Inventory:03/03/01 10:00am:Obj (15)days [EOD 02/15/01] [LMI] |
| 02/15/01 | 14 | Application Tee's Application for entry of bar date for filing claims [EOD 02/15/01] [LMI] |
| 02/15/01 | 15 | MOTION by Tee to shorten Ntc & Obj Period for Tee to Sell Property of the Estate [Disposed] [EOD 02/16/01] [LMI] |
| 02/16/01 | 16 | Order Approving Employment of Accountant Re: Item # 12. (5 copies) [EOD 02/16/01] [LMI] |
| 02/20/01 | 17 | GRANTED Re: Item # 15. (10 copies) [EOD 02/20/01] [LMI] |
| 02/20/01 | 18 | NTC to File Claims due by 05/16/01 [EOD 02/21/01] [LMI] |
| 02/20/01 | 19 | MOTION by Tee to Shorten Ntc & Obj Period to Tee's Ntc of Proposed Settlement of Claims of Landlord & Cred,Council Rental Properties & Luther "Sonny" Council [Disposed] [EOD 02/21/01] [LMI] |