# In The United States Court of Federal Claims

**No: 02-1096C**
September 28, 2004

---

**FLEXFAB, LLC,**

***Plaintiff*,**

**v.**

**THE UNITED STATES OF AMERICA,**

***Defendant*.**

---

Summary Judgment;; Breach of Contract; Third-Party Beneficiary; Implied in Fact Contract; Government Agent Authority to Bind United States

*Perrin Rynders*, Varnum, Riddering, Schmidt, and Howlett, LLP, Grand Rapids, Michigan, for the plaintiff.

*Claudia Burke*, Commercial Litigation Branch, Civil Division, United States Department of Justice, for the defendant.

## OPINION AND ORDER

**Block, *Judge.***

Flexfab LLC ("Flexfab") initiated this action for damages, demanding payment for goods delivered to the government. A manufacturer of specialized hose, ducts, connectors, and related products, Flexfab claims that it is a third party beneficiary to a contract between The Defense Logistics Agency, Defense Supply Center Columbus ("DSCC"), and an insolvent contractor, Capital City Pipes, Inc. ("Capital City"). Alternatively, Flexfab claims that it had an implied-in-fact contract with DSCC. The parties have filed cross motions for summary judgment pursuant to Rule 56 of the Rules of the United States Court of Federal Claims ("RCFC").

Underlying this case is a tangled factual pattern worthy of a law school exam. The original contract required DSCC to remit payment to Capital City at its address in Tallahassee, Florida. However, a letter incorporated into the contract prior to its execution directed DSCC to remit payment to Capital City at an address in Grand Rapids, Michigan. A later modification to the contract directed DSCC to remit payment to the same Michigan address. Nevertheless, the modification did not indicate that the address was associated with Capital City, Flexfab, or any other entity. Adding to the confusion, the contract also permitted DSCC to pay Capital City by electronic funds transfer into the account that Capital City had listed in a central registry.

To a degree, the contract went as planned. The DSCC received the hose that it needed, and it paid Capital City, by electronic transfer, at the agreed-upon price. However, Capital City, the prime contractor, failed to pay Flexfab, a subcontractor on the contract. In apparent anticipation of this turn of events, Flexfab had attempted to ensure that it would be paid directly by the government. The Michigan address listed in both the aforementioned letter incorporated into the contract and the modification was associated with Flexfab's escrow account. According to Flexfab, DSCC or other Defense Department employees knew that the Michigan address was associated with Flexfab's escrow account—and that Flexfab would perform as a subcontractor on the condition that the government would send payments directly to its escrow account. Flexfab bases its third-party beneficiary and implied contract claims primarily on these facts.

It is black letter law that because it is sovereign, the United States may not be sued unless it so permits. *United States v. Lee,* 106 U.S. 196, 207 (1882). And because of this sovereign immunity, the actions of its agents cannot bind the United States unless such agents acted with explicit lawful authority. *Federal Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384 (1947); *Starflight Boats v. United States*, 48 Fed. Cl. 592, 598 (2001). Therefore, as will be explained in greater detail below, to survive summary judgment on its third-party beneficiary claim, Flexfab must produce some evidence that a DSCC agent with contracting authority intended the contract with Capital City to benefit Flexfab. Likewise, to survive summary judgment on its implied-in-fact contract claim, Flexfab must produce evidence of the same contracting authority.

Oliver Wendell Holmes observed that: "Men must turn square corners when they deal with the government." *Rock Island, Arkansas & Louisiana R.R. Co. v. United States*, 254 U.S. 141, 143 (1920). Justice Felix Frankfurter explained that this observation does "not reflect a callous outlook," but acknowledges the duty of courts to carefully observe the law when "charging the public treasury." *Merrill*, 332 U.S. at 385. This court is not unsympathetic to the hardship suffered by the plaintiff. However, because Flexfab has failed to produce evidence that a DSCC agent with contracting authority either intended the contract with Capital City to benefit Flexfab, or intended to contract directly with Flexfab, this court is compelled to rule in favor of the government.

Consequently, the court denies the plaintiff's motion and grants the defendant's cross-motion for summary judgment.

## I. Factual Background[1]

What might have been a routine government contract with a small cast of parties and payment options became something of a complex affair due to a set-aside program for disadvantaged and minority contractors. As the following summary of facts demonstrates, individuals and companies became involved and contractual terms regarding payment multiplied to cope with a situation in which Flexfab performed as a subcontractor (permitting Capital City to benefit from the set-aside program as prime contractor) even though it wanted to be treated as much more.

[1] The Court derives its summary of relevant facts from the parties' Proposed Findings of Uncontroverted Facts ("Pl.'s or Def.'s PFUF") and their Appendices to their Cross-Motion for Summary Judgment ("Pl.'s or Def.'s App.").

The DSCC awarded Contract No. SPO740-99-C-1004 ("Contract") to Capital City on June 29, 1999. Capital City obtained the Contract under the Small Business Administration ("SBA") program for disadvantaged and minority contractors ("8(a) program"). *See* 15 U.S.C. § 637(a) (2000). The Small Business Act requires all federal agencies to identify procurement contracts to be completed by disadvantaged and minority businesses. *See id.* The DSCC employed five small business specialists to review each DSCC contract solicitation above $10,000 to determine whether it could be completed by an SBA-approved 8(a) contractor. Pl.'s App. at 97. Once a solicitation is placed in the DSCC's small business program, it must be filled by an 8(a) contractor unless none can be found. *Id.* at 101. Each DSCC small business specialist handled all solicitations from a defined product group. *Id.* at 97. Michael Taylor was the DSCC small business specialist who handled solicitations of air-duct hose, among other things. *Id.* at 101.

Taylor arranged for Capital City's participation in the 8(a) program through C&S Industrial Supply Company ("C&S"), which was DSCC's established 8(a) air-duct hose supplier until 1998, when C&S's eligibility to participate in the program expired. *Id.* at 101. After C&S "graduated" from the program, Taylor asked Henry Cook, Chief Executive Officer of C&S, to help him identify a new 8(a) contractor to serve as DSCC's air-duct hose supplier. *Id.* at 22. Cook gave Taylor the name of Capital City as well as several other potential suppliers. *Id.* Eventually, the SBA qualified Capital City as an 8(a) contractor at the request of Taylor, and Taylor updated DSCC's records to indicate that Capital City was DSCC's new air-duct hose supplier. *Id.* at 102.

When the DSCC next needed to procure air-duct hose, in the first months of 1999, Anita Luich, the DSCC contracting officer that handled the Contract in the pre-award period, contacted Capital City. *Id.* at 38-40. Capital City approached Flexfab to manufacture the air-duct hose, but Flexfab refused to sell directly to Capital City. Pl.'s PFUF at ¶¶ 16-18. Instead, Flexfab insisted that Capital City purchase Flexfab products through C&S. *Id.* at ¶ 18. Flexfab had previously sold to the government through C&S and other 8(a) contractors. *Id.* at ¶¶ 9, 10. In its prior dealings with the government, Flexfab conditioned its performance on receiving direct payments from the government in an escrow account (established in a Michigan bank) that it controlled. *Id.* at ¶ 11.

According to Cook, Taylor contacted him and informed him that Flexfab had insisted on selling through C&S rather than directly to Capital City. Pl. App. at 22. Apparently in the same conversation, Cook agreed that C&S would serve as a subcontractor between Capital City and Flexfab. *Id.* at 23. Speaking on the basis of prior experience with Flexfab, Cook also informed Taylor that Flexfab would not enter into this arrangement unless Flexfab would be paid directly through an escrow account under its control. *Id.* Cook claims that he had multiple conversations with Taylor, and that Taylor assured him that he would contact Capital City to ensure that the contract provided for direct payment into Flexfab's escrow account. *Id.*

The record does not reveal why Taylor became involved at this phase of the solicitation process. The court notes that the record is completely void of evidence that Taylor had authority (express or implied) to execute contracts on behalf of DSCC. It is significant that there is no evidence in the record that Taylor communicated directly with the DSCC contracting officers, who were so authorized, or that Taylor's knowledge of Flexfab's expectations (limited as it may have been) can be imputed to the contracting officers.

As discussed, Luich executed the Contract on June 29, 1999. Under the Contract, Capital City, a supplier without manufacturing capabilities, agreed to provide air-duct hose to DSCC. As had apparently been worked out before hand, Capital City entered into a sub-contract with C&S, which then sub-contracted with Flexfab.

The initial contract that Luich prepared listed the following payment remittance address, Capital City's actual business address:

CAPITAL CITY PIPES, INC.
PO BOX 12368
TALLAHASSEE FL 32317

*Id.* at 54. On June 23, 1999, Capital City requested by letter that the remittance address in the Contract be changed to:

Capital City Pipes, Inc
C/O ABA #07200052
Old Kent Bank Corp Trust
P.O. Box 144
Grand Rapids, MI 49501-0144

*Id.* at 58. This letter was incorporated into the Contract *Id.* at 41. Luich contends that when she executed the Contract, she understood that Capital City wanted to be paid at the Michigan address. *Id.* In accordance with DSCC procedure, Luich forwarded the Contract to the Defense Finance and Accounting Services ("DFAS"), the Department of Defense's accounting office. *Id.*

Concerned that the Contract, as executed, did not direct payments to Flexfab as Taylor had assured him it would, Cook alleges he told Taylor that Flexfab would not perform until the Contract was modified to require direct payment to Flexfab. *Id.* at 24. Cook alleges Taylor said he would inform Capital City that Flexfab would not perform until the aforementioned modification was executed. *Id.* Taylor does not remember if he talked to Capital City about establishing an escrow account to benefit Flexfab. *Id.* at 105. He acknowledges that he could have had such a conversation and that he remembers discussing Capital City's payment problems in association with an entirely different contract. *Id.* at 105. The record is unclear as to how Capital City came to understand that Flexfab wanted to modify the remittence term. However, Capital City requested that DSCC make two adjustments to the June 29 contract in a letter to Luich of July 1, 1999:

> Capital City Pipes, Inc is requesting an amendment on the above Purchase Order
>
> The adjustments are 1st the remittance address
> Capital City Pipes, Inc
> C/O ABA #07200052
> Old Kent Bank Corp Trust
> P.O. Box 144
> Grand Rapids, MI 49501-0144

> 2nd Adjustment
> Place of Performance, Place of Shipping & Inspection should read:
>
> Flexfab, Division
> 8143 Gun Lake Road
> Hastings, MI

Def.'s App. at 44.

At this point, responsibility for the contract had passed to Malinda Jeffries, a DSCC post-award contracting officer. Jeffries issued a modification to the contract on September 27, 1999 ("Modification"), which provided:

> The remittance address where cited throughout the contract is hereby corrected to read as follows:
>
> Old Kent Bank, Corp Trust
> CO# ABA# 07200052
> P.O. Box 144
> Grand Rapids, MI 49501-0144

*Id.* at 45. It is undisputed that this address (the same that was in the letter of June 23, 1999 that was incorporated into the initial contract) is the address for Flexfab's escrow account. The Modification was electronically transferred to DFAS. Pl.'s App. at 89. Jeffries stated that she did not know why Capital City requested the Modification. *Id.* Jeffries also stated that the Modification was issued as a routine matter because Capital City, the prime contractor, requested it. *Id.* The court notes that there is no indication in the record that Jeffries knew that the remittance address in the Modification was associated in any way with Flexfab's escrow account.

The court also notes that Luich, the pre-award contracting officer, stated that she did not know that the Michigan address in Capital City's letter of June 23, 1999, which was incorporated into the Contract, was associated with Flexfab's escrow account. Def.'s App. at 88. This is supported by the fact that the portion of that letter related to the remittance address did not refer to Flexfab. Pl. App. at 58. However, in a separate part of the same letter, Capital City did mention Flexfab, but only as the manufacturer. *Id.* Similarly, the portion of the letter of July 1, 1999 (requesting the modification) related to the remittance address did not refer to Flexfab. Def.'s App. at 44. All the same, in a separate request in the same letter, Capital City did ask that Flexfab's address be listed in the Contract as the place of performance, shipping, and inspection. *Id.* Taylor acknowledged that he had some understanding of the purpose for the modification. Pl.'s App. at 103-04. However, the court finds it significant that Taylor apparently never spoke with Jeffries, and Jeffries did not speak with any other DSCC employee regarding the Modification. Def.'s App. at 78.

According to Flexfab, DSCC inventory manager Howard Crockett called Flexfab directly to expedite delivery under the contract. Pl.'s App. at 32. However, Crockett says that he contacted Capital City only to expedite delivery. *Id.* at 128. The first order was shipped from Flexfab's

Hastings, Michigan plant on February 22, 2000. Def.'s App. at 50. DFAS paid Capital City for this shipment through its electronic payment system. *Id*. at 54. The original contract incorporated FAR 52.232-33[2] which allowed the government to pay by check or electronic funds transfer. Pl.'s App. at 75. As discussed, Capital City had previously registered its own account (not Flexfab's escrow account) as the account designated to receive electronic funds transfer payments. Def.'s App. at 71. The court notes that neither DSCC nor Capital City updated this registration to indicate that electronic transfers should be sent to Flexfab's escrow account. Thus, DFAS automated payments went to Capital City's registered account, not Flexfab's escrow account. *Id*. at 84.

After the first payment to Capital City, Cook contacted DFAS employee Phil Kover. Pl.'s App. at 25. The court notes that the record does not reveal whether Cook determined what position or authority Kover held at DFAS. *Id.* at 24-25. According to Cook, Kover acknowledged that payment should have been sent to Flexfab's escrow account and that the error would be remedied. *Id.* at 25. However, DFAS did not direct payment to Flexfab's escrow account for the first or any of the subsequent shipments. *Id.* Cook complained to Kover on several occasions that payments had been issued in violation of the Modification. *Id.* At some point prior to the final shipment, Kover told Cook that there was nothing he (Kover) could do, and that Flexfab would have to collect from Capital City. Def.'s App. at 65. After the final payment to Capital City, Cook met with Kover, Taylor, and Taylor's Supervisor, Howard Griffin, to discuss the situation. Pl.'s App. at 25, 106. According to Cook, Kover again assured him in this meeting that the payment error would be remedied. *Id.* at 25. According to Taylor, an agreement was reached that "things would be worked out." *Id*. at 107. Griffin denies that any agreement regarding payment was reached. *Id*. at 123.

Flexfab ultimately delivered $452,031.60 of air-duct hose to DSCC. *Id.* at 46-52. On behalf of DSCC, DFAS paid the full amount due under the Contract to Capital City by electronic transfer. Def.'s App. at 53-64. It appears that Capital City, which never paid Flexfab, did very little other than "take the money and run." Pl.'s App. at 8. Flexfab claims that it attempted to collect from Capital City, which is apparently now insolvent. *Id.*

Flexfab demanded $452.031.60 from DSCC under the Contract on August 25, 2000. The DSCC denied that request, and Flexfab filed a claim under the Contract Disputes Act ("CDA"), 41 U.S.C. § 601. When DSCC denied that claim, Flexfab initiated the litigation now before this Court.

## II. Jurisdiction and Standard of Review

### A. Jurisdiction

The United States Court of Federal Claims has jurisdiction under the Tucker Act for claims against the United States founded on the Constitution, an Act of Congress, a regulation of an executive department, or an express or implied contract. 28 U.S.C. § 1491(a)(1); *United States v. Testan*, 424 U.S. 392, 397 (1976). This Court's jurisdiction is predicated on the United States'

---

[2] "(a) *Method of Payment*. Payments by the Government under this contract, including invoice and contract financing payments, may be made by check or electronic funds transfer (EFT) at the option of the Government." 48 C.F.R § 52.232-33 (Aug. 1996).

waiver of sovereign immunity and, therefore, it is limited to the extent of an express government waiver. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980). Furthermore, the Tucker Act does not bestow any substantive right of recovery against the United States. *Testan*, 424 U.S. at 398; *see also White Mountain Apache Tribe v. United States*, 249 F.3d 1364, 1372 (Fed. Cir. 2001). Plaintiffs must identify a separate money-mandating source of federal law which supports a claim for damages against the United States. *Tippett v. United States*, 185 F.3d 1250, 1254 (Fed.Cir. 1999).

Breach of contract claims, including those predicated upon an implied-in-fact contract theory, such as Flexfab's, are cognizable under the Tucker Act. *See Trauma Service Group v. United States*, 104 F.3d 1321, 1325 (Fed. Cir. 1997). And while subcontractors like Flexfab generally have no cause of action under the CDA,[3] this court has jurisdiction over Flexfab's third-party beneficiary claim. *See D & H Distrib. Co. v. United States*, 102 F.3d 542 (Fed. Cir. 1997).

B. Standard of Review

As stated, both parties seek summary judgment pursuant to RCFC 56. Because resolution of this case turns chiefly on the application of the summary judgment standard, it is necessary to briefly explain the burdens this motion places on the parties and the court. First, this court may grant summary judgment only when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). A moving party, however, is not required to produce evidence showing an absence of genuine material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1985). A moving party need only point to an absence of evidence for a required element of the nonmoving party's case. *Id.* Moving parties may succeed, therefore, whether or not they rely "on the pleadings, depositions, answers to interrogatories and admissions on file." *Id.* at 324.

However, when a moving party properly identifies an absence of evidence in the nonmoving party's case, the burden then shifts to the nonmoving party to make a showing sufficient to establish that element. *Celotex*, 477 U.S. at 322. It is critical to note that the nonmoving party may not rely on conclusory statements or assertions. *Id.* at 324. Once the burden shifts, the nonmoving party must go beyond its own pleadings and identify specific facts in the record that show that there is a genuine issue as to material fact for trial. *Id.* If it does not, summary judgment must be rendered in favor of the moving party. *Id.*

On a motion for summary judgment, the court does not determine the truth of the facts alleged. *Anderson*, 477 U.S. at 249. Instead, the court determines if there are any factual disputes that could make a difference in the result of the case under the governing law. *Id.* at 248. If there are factual disputes that could make a difference under governing law, courts must resolve them in favor of the nonmoving party. *Id.* at 249. On cross motions for summary judgment, as is the case here, the court may not assume there are no genuine issues as to material fact. *Air Pegasus of D.C., Inc. v. United States*, 60 Fed. Cl. 448, 450 (2004). The court must still evaluate each party's motion on its own, remembering to make all reasonable inferences against the party whose motion is being considered. *DeMarini Sports, Inc. v. Worth, Inc.*, 239 F.3d 1314, 1322 (Fed. Cir. 2001).

---

[3] Section 601(4) states in pertinent part that "the term 'contractor' means a party to a Government contract other than the Government." 41 U.S.C.§ 601 (4).

## III. Discussion

Ultimately, as alluded to above, the burden of proof associated with summary judgment acts as the sword that cuts the complex Gordian Knot of facts in this case. Flexfab's failure here is not due to its justifiable yet miscarried attempt to assure that payments were directly made to it rather than Capital City. To the contrary, Flexfab's failure is the result of an apparent neglect to ascertain who in the government had the authority to grant what it wanted from the government. Flexfab falls short here because it has failed to meet the burden required to defeat summary judgment by producing evidence that a government agent with contracting authority either intended a contract to benefit Flexfab or intended to contract with Flexfab.

### A. Third-Party Beneficiary

Generally, subcontractors cannot sue the government directly due to a lack of privity with the United States. *United States v. Johnson Controls, Inc.,* 713 F.2d 1541, 1551 (Fed.Cir. 1983). However, subcontractors may overcome this stringent privity requirement by casting themselves as third-party beneficiaries. *Maniere v. United States*, 31 Fed. Cl. 410, 416 (1994). Here, Flexfab attempted to obtain third-party beneficiary status when it sought to have the Contract modified.

Whether a third-party payee automatically rises to the level of a third-party beneficiary in the law of contracts has not always been clear. Third-party beneficiary law has been characterized as a "morass" of difficult analysis and uncertain policy. *See generally* Corbin, *Corbin on Contracts* § 772 (1952). At common law only those parties in privity could assert contractual rights against each other. *Id*. It was not until 1859 that a United States court enforced a contract under a modern third-party beneficiary theory.[4] As courts developed rules for third-party beneficiary cases they began distinguishing between two common fact patterns: those where promisees sought to indirectly discharge an obligation and those where promisees wanted to make a gift.[5]

This distinction was adopted in the Restatement (First) of Contracts, where Section 133 divided eligible third-party beneficiaries into "donee" and "creditor" beneficiaries.[6] The Restatement

---

[4] Gary L. Monserud, *Blending the Law of Sale with the Common Law of Third-party Beneficiaries*, 39 Duq. L. Rev. 111, 117 (2000).

[5] *Id.* at 119.

[6] RESTATEMENT (FIRST) OF CONTRACTS § 133 provided that:

(1) Where performance of a promise in a contract will benefit a person other than the promisee, that person is...

> (a) a donee beneficiary if it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee in obtaining the promise of all or part of the performance thereof is to make a gift to the beneficiary or to confer upon him a right against the promisor to some performance neither due nor supposed or asserted to be due from the promisee to the beneficiary;

(Second) of Contracts jettisoned the donee and creditor beneficiary names but kept this distinction by dividing them into separate subsections: (1)(a) (creditor) and (1)(b) (donee), beneficiaries. *See* Restatement (Second) of Contracts § 302.[7] Instead, the Restatement (Second) of Contracts created two new beneficiary categories: "intended" and "incidental," beneficiaries. *Id.* Only the intended beneficiaries, incorporating both subsection (a) (creditor) and subsection (b) (donee), may enforce a promise against the promisor.[8] *Id.*

---

> (b) a creditor beneficiary if no purpose to make a gift appears from the terms of the promise in view of the accompanying circumstances and performance of the promise will satisfy an actual or supposed or asserted duty of the promisee to the beneficiary, or a right of the beneficiary against the promisee which has been barred by the statute of limitations or by a discharge in bankruptcy, or which is unenforceable because of the Statute of Frauds;
>
> (c) an incidental beneficiary if neither the facts stated in Clause (a) nor those stated in Clause (b) exist.

(2) Such a promise as is described in Subsection (1a) is a gift promise. Such a promise as is described in Subsection (1b) is a promise to discharge the promisee's duty.

(3) Where it appears from the terms of the promise in view of the accompanying circumstances that the purpose of the promisee is to benefit a beneficiary under a trust and the promise is to render performance to the trustee, the trustee, and not the beneficiary under the trust, is a beneficiary within the meaning of this Section.

RESTATEMENT (FIRST) OF CONTRACTS § 133.

[7] RESTATEMENT (SECOND) OF CONTRACTS § 302 provides:

(1) Unless otherwise agreed between promisor and promisee, a beneficiary of a promise is an intended beneficiary if recognition of a right to performance in the beneficiary is appropriate to effectuate the intention of the parties and either

> (a) the performance of the promise will satisfy an obligation of the promisee to pay money to the beneficiary; or
>
> (b) the circumstances indicate that the promisee intends to give the beneficiary the benefit of the promised performance.

(2) An incidental beneficiary is a beneficiary who is not an intended beneficiary.

RESTATEMENT (SECOND) OF CONTRACTS § 302.

[8] Section 302, Comment a provides: *"a. Promisee and beneficiary.* This Section distinguishes an 'intended' beneficiary, who acquires a right by virtue of a promise, from an 'incidental' beneficiary, who does not. *See* §§ 304, 315." RESTATEMENT (SECOND) OF CONTRACTS § 302 cmt. a.

Until 1994, the lead case in this court dealing with third-party beneficiary liability was *Baudier Marine Electronics, Sales and Service, Inc. v. United States,* 6 Cl. Ct. 246 (1984). *Baudier* established a two pronged test that required a would be third-party beneficiary to establish that: (1) the contracting parties intended to benefit the third-party; and (2) the contract conferred on the third-party a "direct right to compensation or to enforce that right against the promisor." *Baudier*, 6 Cl. Ct. at 249. The court in *Baudier* did not specifically cite the Restatement's third-party beneficiary rule in developing its own test. *Id.* at 249-50.

In *Schuerman v. United States*, 30 Fed. Cl. 420 (1994), the court broke from *Baudier*'s third-party beneficiary test. The *Schuerman* court revisited each of the authorities underlying *Baudier*'s two prong test. *Id.* at 428-33. In a well-reasoned opinion, the court jettisoned the second of *Baudier*'s two-pronged test reasoning that *Baudier*, through its reliance on *Orchards v. United States*, 4 Cl. Ct. 601 (1984), had unnecessarily and without any support grafted Section 313 of the Restatement (Second) of Contracts'[9] direct contractual evidence requirement to the court's third-party beneficiary rule. *Id.* at 429. *Schuerman* correctly noted that Section 313 was limited to suits for consequential damages against promisors who had contracted with the government to render services to the general public and, therefore, was not relevant to third-party beneficiary analysis. *Id.* In its place, *Schuerman* relied upon Section 302 of the Restatement (Second) of Contracts, and limited the court's third-party beneficiary test to *Baudier*'s first prong, the so-called "intention-to-benefit" test. *Id.* at 433.

In 1997, the Federal Circuit adopted *Schuerman*'s Restatement approach in *Montana v. United States*, 124 F.3d 1269, 1273 (Fed. Cir. 1997). *Montana* further refined the intention-to-benefit test by adopting the reasoning contained in comment d to Section 302 of the Restatement.[10]

---

[9] RESTATEMENT (SECOND) OF CONTRACTS § 313 provides:

(1) The rules stated in this Chapter apply to contracts with a government or governmental agency except to the extent that application would contravene the policy of the law authorizing the contract or prescribing remedies for its breach.

(2) In particular, a promisor who contracts with a government or governmental agency to do an act for or render a service to the public is not subject to contractual liability to a member of the public for consequential damages resulting from performance or failure to perform unless

> (a) the terms of the promise provide for such liability; or
>
> (b) the promisee is subject to liability to the member of the public for the damages and a direct action against the promisor is consistent with the terms of the contract and with the policy of the law authorizing the contract and prescribing remedies for its breach.

RESTATEMENT (SECOND) OF CONTRACTS § 313.

[10] Comment d to Section 302 states that "[e]ither a promise to pay the promisee's debt to a beneficiary or a gift promise involves a manifestation of intention by the promisee and promisor sufficient, in a contractual setting, to make reliance by the beneficiary both reasonable and probable." RESTATEMENT (SECOND) OF CONTRACTS § 302 cmt. d.

The court wrote: "One way to ascertain such intent is to ask whether the beneficiary would be reasonable in relying on the promise as manifesting an intention to confer a right on him." *Id.* The Restatement (Second) of Contracts "reasonable reliance" beneficiary test is the current prevailing third-party beneficiary test in this Circuit. *See Dewakuku v. Martinez*, 271 F.3d 1031, 1041 (Fed. Cir. 2001); *Glass v. United States*, 258 F.3d 1349, 1354 (Fed. Cir. 2001); *Roedler v. Dep't of Energy*, 255 F.3d 1347, 1352-53 (Fed. Cir. 2001) (citing *Montana* approvingly for its application of general third-party beneficiary principals to claims against the United States).

The Federal Circuit, in *D&H Distributing Company v. United States*, 102 F.3d 542 (Fed. Cir. 1997), applied Section 302 to a factual situation similar to the one before this court. In that case, D&H Distributing Company ("D&H") was a potential subcontractor that was reluctant to extend credit to Computer Integrated Management Corporation ("CIM"), a prime contractor on a government contract. *Id.* at 544. D&H agreed to perform as a subcontractor to CIM on the condition that all checks issued in payment by the government would be jointly payable to both companies. *Id.* The contracting officer approved the arrangement, and issued a modification making D&H a joint payee on the contract. *Id.* Eventually, however, the government issued payment exclusively to CIM, and D&H sued in this court. *Id.*

Reviewing D&H's claim that it was a third-party beneficiary to the contract, the Federal Circuit concluded that D&H's third-party beneficiary claim fit well within the long-established meaning of the doctrine. *Id.* at 546-47. "[I]t has long been settled that a clause providing for the promisor to pay the proceeds of the contract to a third-party is enforceable by the third-party where the payment is intended to satisfy a present or future liability of the promisee to the third-party." *Id.* In support of this conclusion, the court cited Section 302 of the Restatement, noting specifically that Section 302's "intended beneficiary" standard was even broader than the well-established third-party payee principle relied upon by *D&H*. *Id.* at 547.

The circumstances underlying the present litigation are similar to the facts in *D&H* – but only up to a point. It is true that the record shows that Flexfab expected direct payment from the government to satisfy Capital City's future liability to Flexfab. It is also true that Flexfab has presented evidence that it intended to obtain the type of third-party-beneficiary status described in *D&H* by attempting to arrange direct payment from DSCC. It is also undisputed that the address in both the letter incorporated into the initial contract and the Modification was the address associated with Flexfab's escrow account. And the record reveals that it is through Cook that Flexfab expressed its intention to obtain third-party-beneficiary status to both Taylor and Kover.

The present case diverges from *D&H*, however, because the contracting officer in *D&H* clearly understood and intended that the modification in that case made D&H a joint payee under the contract. And it was not questioned (and indeed it was implicit in the court's holding) that the contracting officer in *D&H* had the authority to bind the government by contract. All this is not at all clear in this case.

It is beyond dispute that parties seeking to enforce contracts against the Untied States – as opposed to individuals – face an additional requirement: they have the added burden of establishing that the government representative whose conduct they relied upon had the actual authority to bind the government. *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990). Actual

authority may be express or implied. *H. Landau & Co. v. United States*, 886 F.2d 322, 324 (Fed. Cir. 1989). A government employee possesses express authority to bind the government when the Constitution, a statute, or a regulation unambiguously grants him such authority. *Starflight Boats v. United States*, 48 Fed. Cl. 592, 598 (2001). A government employee possesses implied authority to bind the government when such authority is an integral part of the duties assigned to him. *Roy v. United States*, 38 Fed. Cl. 184, 189 (1997). Contracting authority is integral to a government employee's duties when the government employee could not perform his or her assigned tasks without such authority and the relevant agency regulation does not grant such authority to other agency employees. *Id*. at 189-90.

Flexfab claims that the initial Contract, the Modification, and the surrounding circumstances all establish that Flexfab was an intended third-party beneficiary of the contract between DSCC and Capital City. In response, the government points out that Flexfab has failed to establish that DSCC intended to benefit Flexfab. Specifically, the government points out that the pre-award and post-award contracting officers, the only individuals involved with authority to contract on behalf of the government, could not have intended to benefit Flexfab because they had no knowledge of the purpose of the remittance address in both the Contract and the Modification. The government also points out that because Taylor had no contracting authority, his knowledge and intent are of no consequence.

Thus, under *Celotex*, the government has satisfied its burden to "point[] out ... that there is an absence of evidence to support the nonmoving party's case." 477 U.S. at 325. As discussed, entry of summary judgment is appropriate against a party who "after adequate time for discovery and upon motion ... fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of truth at trial." *Id.* at 322. Therefore, unless Flexfab can "make a sufficient showing" that DSCC intended to benefit Flexfab, in other words, that some government agent possessing authority to bind the government agreed to make Flexfab a payee under the Contract, the government is entitled to judgment as a matter of law. *Id.* at 323.

Attempting to satisfy the *Celotex* standard, Flexfab relies on the following facts: (1) Taylor contacted Cook to find a new subcontractor to purchase the air-duct hose; (2) Cook told Taylor that Flexfab would only supply hose to the government if it received direct payment; (3) Flexfab told Capital City they would not deliver hose to the DSCC without direct payment; (4) Taylor told Cook he would tell Capital City to seek a modification requiring direct payment; (5) Luich knew Flexfab was the manufacturer; (6) the plain language of contract identifies Flexfab as the manufacturer and directs payment to a Michigan bank; (7) the plain language of the modification directs payment to a Michigan bank; (8) Crockett contacted Flexfab directly to expedite delivery of the hoses; (9) Flexfab delivered the hoses; (10) Kover told Cook that the payment error would be corrected. Plaintiff's Response to Defendant's Cross Motion for Summary Judgment at 8-10.

Flexfab has failed to present evidence that Luich and Jeffries, the pre-award and post-award contracting officers, government agents who clearly had contracting authority, intended to benefit Flexfab through the Contract. Luich incorporated the Letter of June 23, 1999 with the address related to Flexfab's escrow account into the Contract. Similarly, Jeffries issued the Modification,

which again inserted the address related to Flexfab's escrow account into the Contract. However, it is significant that Flexfab has presented no evidence that either Luich or Jeffries knew that this address was related to Flexfab in any way. Likewise, there is no evidence in the record that either Luich or Jeffries otherwise intended to benefit Flexfab through the Contract.

Viewing the facts in the light most favorable to Flexfab, Taylor and Kover understood that Capital City intended the Contract to benefit Flexfab. But this only goes so far. The court finds that Flexfab has failed to present sufficient evidence that either Taylor or Kover had authority (express or implied) to commit the government to a contractual relationship. It is clear that Taylor was a DSCC small business specialist who worked to ensure that DSCC complied with the SBA. However, Flexfab has presented no evidence that Taylor had express contracting authority or that such authority was integral to the completion of his duties. The court notes that the record is even more scant regarding Kover, a DFAS employee whose particular job title or job description are unknown to this court.

In *Merrill*, the Supreme Court concluded that "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *Merrill*, 332 U.S. at 384. This rule is premised on significant policy considerations. To hold the government of the United States responsible for the unauthorized acts of its agents would empower such agents (the vast majority of whom are unelected bureaucrats) to deplete public funds at will. *See Office of Personnel Management v. Richmond,* 496 U.S. 414, 428 (1990); *City of El Centro,* 922 F.2d at 820 ("The United States Government employs over 3 million civilian employees. Clearly, federal expenditures would be wholly uncontrollable if Government employees could, of their own volition, enter into contracts obligating the United States.") (Citation omitted). Based on the record, it appears that Flexfab relied on the conduct of Taylor and Kover without first determining whether they had authority to achieve Flexfab's objectives (direct payment and status as a third-party beneficiary). Whether or not this actually happened, this court is compelled to conclude that Flexfab has failed to present sufficient evidence that Taylor and Kover possessed by law the requisite contracting authority to bind the government.

In support of its third-party beneficiary claim, Flexfab also relies on a judgement rendered in its favor by this court on somewhat similar facts. *Flexfab, Inc. v. United States*, No. 94-974, (Fed. Cl. Feb. 8, 1996). The circumstances underlying this prior case, however, are readily distinguishable from the present litigation. During the Gulf War, Flexfab served as a subcontractor to Gladen Industries, Inc. ("Gladen"), who supplied parts to the Defense Construction Supply Center ("DCSC"). Performance had already commenced when Flexfab decided to halt shipments out of concern for Gladen's ability to make payments. When Gladen failed to deliver under the contract, the DCSC issued a modification that made Flexfab a "mailee" for all payments. The DCSC failed to mail the payments to Flexfab, Gladen eventually filed for bankruptcy, and Flexfab brought suit in this court.

As in this case, the government argued that the modification was not intended to benefit Flexfab. However, the government's argument in the earlier case seems to have failed for good reason: Flexfab had produced evidence that the contracting officer had full knowledge—Flexfab had

sent the contracting officer a copy of the agreement—that Gladen and Flexfab had executed an agreement making Flexfab a "mailee" for all payments. Furthermore, the contracting officer knew that Flexfab would not resume shipments until the contract was modified to designate Flexfab as the "mailee" for payment. And, clearly, the contracting officer had the authority to bind the government. Relying on these facts, this court drew the inference that the contracting officer intended to benefit Flexfab through the modification that followed. In contrast, in the present case, Flexfab has failed to present any evidence from which a similar inference could be drawn.

In conclusion, Flexfab's third-party beneficiary claim here falls short because Flexfab has failed to present any evidence that a government employee with actual authority intended to benefit Flexfab through the Capital City contract. As a result, this court denies Flexfab's motion and grants the government's cross-motion for summary judgment as far as Flexfab's third-party beneficiary claim is concerned.

D. Implied Contract

Finally, Flexfab argues that its efforts to obtain direct payment under the Contract and the other circumstances surrounding the parties' performance under the Contract created an implied contract between it and DSCC. Specifically, Flexfab argues that: (1) Taylor's knowledge that Flexfab was the manufacturer, and that it would not make shipments until it was paid directly, (2) Crockett's direct request for delivery, and (3) the government's continued acceptance of shipments when it knew that Flexfab expected to be paid directly created an implied contract.

"The general requirements for a binding contract with the United States are identical for both express and implied contracts." *Trauma Service Group*, 104 F.3d at 1325. Thus, "[t]he party alleging a contract must show a mutual intent to contract including an offer, an acceptance, and consideration." *Id.* Furthermore, "[a] contract with the United States also requires that the Government representative who entered or ratified the agreement had actual authority to bind the United States." *Id.*

Again, the government is entitled to summary judgment under the *Celotex* standard unless Flexfab presents sufficient evidence demonstrating the legal elements essential to its implied contract claim. As the moving party, the government pointed out that Flexfab has failed to identify a government agent with contracting authority who intended to contract with Flexfab. As discussed, Flexfab presented no evidence that Luich and Jeffries intended to contract with Flexfab—or even knowledge upon which such intent could have been based. Likewise, Flexfab presented no evidence that Taylor and Kover, who (viewing the facts in the light most favorable to Flexfab) knew that Flexfab expected to be paid directly, had authority to contract on behalf of the United States. Thus, Flexfab has failed to present evidence related to two essential elements of its implied contract claim: (1) mutual intent to contract; and (2) actual authority to contract on the part of the relevant government agents.

Accordingly, this court denies Flexfab's motion and grants the government's cross-motion for summary judgment as to Flexfab's implied-in-fact contract claim.

## IV. Conclusion

For the reasons discussed above, the Court **DENIES** plaintiff's motion for summary judgment, and conversely, **GRANTS** defendant's cross-motion. The court **ORDERS** the Clerk of the Court to enter judgment in favor of the United States.

**NO COSTS.**

s/Lawrence J. Block
**Lawrence J. Block**
**Judge**